Sealed

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 19 25046 CV-Williams



---

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

ON POINT GLOBAL LLC, *et al.*,

      Defendants.

---

**Filed Under Seal**

FILED BY _____ D.C.

DEC 0 9 2019

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

**PLAINTIFF'S *EX PARTE* MOTION FOR A TEMPORARY RESTRAINING ORDER**
**AND MEMORANDUM IN SUPPORT THEREOF**

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ................................................................................................... 1

I.   DEFENDANTS' BUSINESS PRACTICES ................................................................ 1

   A.   Defendants' State Licensing and Motor Vehicle Websites Do Not Provide the Services
        They Promise ............................................................................................................ 2

      1.   Study Confirms Motor Vehicle Sites Mislead Consumers ....................................... 7

      2.   Defendants Seek to Evade Scrutiny Prompted by Chargebacks ............................... 8

   B.   Defendants' Public Benefits Websites Do Not Provide the Assistance They Promise .. 9

      1.   Defendants Sell Consumers' Data ........................................................................... 11

      2.   Study Confirms Defendants' Public Benefits Sites Mislead Consumers ............... 13

II.  THE DEFENDANTS .................................................................................................. 14

   A.   The Corporate Defendants ...................................................................................... 14

      1.   The Corporate Defendants Act as a Single Operation ............................................ 16

   B.   The Individual Defendants Behind the Operation ................................................... 19

      1.   Burton Katz ............................................................................................................. 19

      2.   Robert Zangrillo ...................................................................................................... 21

      3.   Brent Levison .......................................................................................................... 22

      4.   Elisha Rothman ....................................................................................................... 23

      5.   Christopher Sherman .............................................................................................. 24

      6.   Arlene Mahon .......................................................................................................... 24

ARGUMENT ...................................................................................................................... 25

I.   THIS COURT HAS THE AUTHORITY TO GRANT THE REQUESTED RELIEF. ... 25

II.  THE EVIDENCE JUSTIFIES ENTRY OF A TEMPORARY RESTRAINING ORDER
     AND PRELIMINARY INJUNCTION. ....................................................................... 25

   A.   The FTC Is Likely to Prevail on the Merits ............................................................ 26

      1.   Defendants Violated the FTC Act Through Their Deceptive Marketing of Online
           "Guides" ................................................................................................................. 26

         a.   Deceptive Motor Vehicle and Other State Licensing Websites ........................... 27

         b.   Deceptive Public Benefits Websites .................................................................... 28

      2.   The Corporate Defendants Have Operated as a Common Enterprise and Are Jointly
           and Severally Liable. .............................................................................................. 29

      3.   The Individual Defendants Are Liable for Monetary and Injunctive Relief. ......... 29

   B.   The Balance of Equities Favors Entering the TRO. ................................................. 31

III. THE REQUESTED EX PARTE RELIEF IS NECESSARY TO PREVENT
     DEFENDANTS FROM DISSIPATING ASSETS AND DESTROYING EVIDENCE .......... 31

A.   *Ex Parte* Relief Is Necessary to Ensure That the Court Will Be Able to Grant Effective Relief. ..................................................................................................................... 32

B.   An Asset Freeze is Necessary to Preserve the Possibility of Providing Restitution to Defendants' Victims. ........................................................................................................ 33

C.   A Temporary Receiver, Immediate Access, and Expedited Discovery Are Necessary to Preserve the Status Quo. ................................................................................................ 33

**CONCLUSION** ............................................................................................................ 34

## INTRODUCTION

Burton Katz and his associates run a sprawling online scheme that deceives consumers into providing money and their personal information.  Their websites lure consumers by promising a quick and easy government service (*e.g.*, renewing a driver's license or obtaining a fishing license) or eligibility determinations for public benefits (*e.g.*, Section 8 housing vouchers or food stamps).  Consumers provide their information because they believe the websites will actually provide these services.  Instead, consumers receive only a PDF containing publicly available, general information about the service they sought.

More than a thousand consumers have complained about the Defendants' websites, and many more asked their banks to reverse Defendants' fraudulent charges.  Scores lost money; all disclosed their personal information, which Katz's operation sells to a long list of shady marketers and lead brokers.  Predictably, as soon as consumers finish a transaction, these marketers bombard them with unwanted marketing text messages and emails, including some from other scammers.

The Defendants' deceptive websites violate Section 5 of the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45.  Furthermore, Katz's actions violate a permanent injunction entered in a prior case the FTC brought against him.  Absent a temporary restraining order and preliminary injunction, the Defendants will continue to harm consumers during this litigation.  To prevent this, and to prevent the Defendants from destroying evidence or dissipating their ill-gotten gains, the FTC seeks preliminary relief, including an asset freeze, appointment of a receiver, and immediate access to Defendants' business premises.

## STATEMENT OF FACTS

### I.  DEFENDANTS' BUSINESS PRACTICES

Defendants operate hundreds of sites employing similar branding, language, and functionality to induce consumers to relinquish their credit-card information, personal data, or both.  PX1 Atts. B, C, H, AZ, D p.1 (Defendants state they have "developed, managed and operated over 200 websites"), BH.  Defendants' sites fall into at least two categories:  those offering state licensing or motor-vehicle services, and those offering assistance with public benefits.  PX1 ¶¶18-25, Att. BH.

A.    **Defendants' State Licensing and Motor Vehicle Websites Do Not Provide the Services They Promise**

Defendants use search-engine advertising and search-engine optimization to target consumers who search for state motor-vehicle or licensing services online. PX1 ¶¶42-43, 79-80; PX14 ¶2; PX15 ¶¶2-3; PX16 ¶¶2-3; PX17 ¶¶2-3; PX11 Att. C p.19 (DMV.com document stating, "Our web traffic is predominantly generated through search and email marketing campaigns, meaning users typically find our website via search engines (e.g. Bing)."). For example, an FTC investigator searched "renew Florida drivers license online" in March 2019, and Defendants' websites appeared as the second result. PX1 ¶42, Att. M. Defendants' sites appear in search results with URLs like californiadrivers.org, floridadriverslicenses.org, and indianadriverslicense.org. They generally include a state name and some variant of "driver" or "drivers license," and many end in ".org." PX1 ¶20, Att. BH p.9. These sites have an image of the state's border and the text, "Your source for [state] driver's information," and do not conduct the transaction sought; they only receive clicks from search ads and search-engine optimization and redirect traffic to sites that accept payment. PX1 Atts. C, M, BH.

Defendants also operate DMV.com, which offers links for driver's services in all 50 states and presents itself as a clearinghouse for many types of DMV-related services, from licensing to driving records, under the heading "Online DMV Services." PX1 Att. A. Its prominent home-page banner promises "The DMV Made Easier" and features links to "Renew your License," "Renew Car Registration," and more. PX1 Att. A p.1. DMV.com's Facebook page is even more explicit, claiming "you can renew you driver [sic] licenses online here!! Skip the lines doing it from you [sic] home" and linking to "dmv.com/drivers-license-renewal," and using the hashtag "#SkipTheLine" while linking to DMV.com. PX1 Att. AW pp.1-2. When an FTC investigator clicked "Renew your License," she reached a page with a large "Get Started Online with Drivers [sic] License Renewal Assistance" hyperlink and a block of text stating, "In most states, you can renew your drivers [sic] license online, by mail or in person … During an online license renewal, you will be asked to identify yourself and pay the applicable service fees." PX1 ¶28, Att. I; *see also* PX1 Att. A p.13.

Whether from a state-specific site or DMV.com, clicking a link, like the "Get Started Online" link described above, leads consumers to a site where Defendants gather consumers' information. PX1 ¶¶28-29, 42-43, 54, Atts. J pp.1-4, N pp.1-4, Q pp.1-3. These include, for

example, license-driver.com, licenseguides.org, and registrationtags.com.[1]  *Id*.  The sites have a bold-font headline reading, for example, "Renew Drivers [sic] License In Your State," and orange text touting, "GET ALL THE INFORMATION TO COMPLETE THE PROCESS NOW."  PX1 Atts. B, J p.1, N p.1, Q p.3.  Clicking through leads to a page listing services next to check-boxes, including "New Driver's License," "Replace Driver's License," and more; one box is pre-checked depending on which service was selected on prior pages.  PX1 ¶¶31, 44, Atts. J p.2, N p.2.  The sites include forms for consumers to fill in their contact information and credit-card number.  PX 1 Atts. J pp.1-2, 4, N pp.1-2, 4, Q pp.3, 7, 10.

Once consumers pay, they either receive a PDF entitled "[State] Drivers License Guide," which includes general information about state vehicle services and safe-driving tips, or nothing at all.  PX1 ¶¶36-38, 48, 60-61, Att. O.  Either way, the sites charge consumers' credit cards a small amount (normally $3.99 or $4.99) on the day of the purchase and a larger amount (normally $19.99 or $21.99) within a few days.  PX1 ¶¶39, 49, 62, Atts. L, P, S; PX14 ¶¶5, 9; PX15 ¶9; *see also* PX17 ¶7.  The sites do not provide the promised license or other motor-vehicle transactions.[2]  PX1 ¶¶40, 50, 63; PX14 ¶¶13-14; PX15 ¶¶7-8; PX16 ¶6.

Unsurprisingly, hundreds of consumers have complained to law enforcement and consumer-protection organizations about Defendants' motor-vehicle and licensing websites.  PX5 ¶ 24, Att. E p.1.  As of June 25, 2019, the FTC has received 953 complaints that referenced one of the Defendants or their licensing and motor-vehicle websites.  *Id*.  Most such complaints concerned Defendants' motor-vehicle sites, though some addressed hunting and fishing license sites.  *Id*.  Complainants report that they believed the websites offered actual state services, and that they expected to obtain the selected service – not a guide – when they provided their information.  *Id.*, Att. E p.3; PX14 ¶13 ("I would not have paid $26 for a road guide.  This

---

[1] It appears Defendants use only one template for these "transaction" sites; in three investigative purchases on motor-vehicle sites, the transaction sites used identical wording and branding, and captures of the home pages of additional transaction sites show the same format.  *Compare* PX1 Atts. J, N, Q; *see also* PX1 ¶19, Att. B.

[2] Defendants' other state licensing sites function similarly to their motor vehicle sites.  See PX1 ¶¶78-86, PX17.  Consumers reach the sites after searching for a way to obtain state hunting or fishing licenses and clicking one of Defendants' links.  PX1 ¶79, Att. Z; PX17 ¶¶2-3.  The sites then promise help obtaining a license (for example, headlines reading "New [state] Fishing License Assistance" and "Skip the Hassle & Start Fishing" on fishinglicense.org).  PX1 ¶80, Att. Z p.2.  The sites do not deliver the promised licenses, instead providing only a PDF with information about fishing skills and fishing licenses.  PX1 ¶86; PX17 ¶11.

company is scamming people trying to renew their license."); PX16 Att. A p.2 (consumer's email to company reading, "I was misled to believe your website was a drivers license address change service. The product I received as [sic] a short few lines of text describing already publicly available knowledge, not the full-service address change as expected.") To make matters worse, consumers who called Defendants to seek a refund under Defendants' promised "Money-Back Guarantee" often did not receive a full refund. PX5 Att. E p.3. Consistent with these complaints, when the FTC's investigator sought a refund for one of her investigative purchases, Defendants offered to refund the $19.99 charge but not the $4.99 "processing fee" – and then failed to provide even the promised partial refund. PX1 ¶¶127-133, Atts. AM, AN. The number of complaints received about Defendants' motor-vehicle and licensing sites has risen steadily since 2015. PX5 Att. E p.1.

These complaints underscore the central problem with Defendants' sites: they lead consumers to believe they will actually provide a motor-vehicle or licensing service, not just a "guide." See PX5 Att. E p.3; PX14 ¶6; PX15 ¶5; PX16 ¶4; PX17 ¶4. Defendants' sites are designed to create this impression; their fine-print "disclaimers" merely serve as a fig leaf to hide, rather than correct, Defendants' misrepresentations. Indeed, in a letter to a payment processor, Defendants themselves admitted their "disclaimers" were ineffective, explaining they "place multiple notices explaining to the user that we are [sic] third party site and not affiliated with the government,"[3] but they "still encounter confusion from customers." PX11 Att. C p.19. For example, the landing pages on the transaction sites appear as follows:

---

[3] Defendants' sites include lines of small-font text outside the main section of the site reading, for instance, "DMV.com is a privately owned website that is not affiliated with any government agencies" or "[URL] is in no way or fashion affiliated with any federal or local governmental agency or offices." PX1 Atts. J, N. Even if consumers saw these inconspicuous "disclaimers," they have no bearing on Defendants' central promise: that consumers will receive a government service, regardless of whether it is delivered by the government or a third party.



*Licenseguides.org landing page, accessed March 8, 2019*

The block of text above the central highlighted area on the transaction site landing pages begins, "Welcome to licenseguides.org, your comprehensive resource for all you [sic] driver license-related services." Both that text and the text below the central area continue, "The services we provide are available for free in the official sites or local offices. You can purchase for $23.98 and download our comprehensive guide and resources, which contains [sic] vital information in order to perform any DMV service … ." PX1 Atts. J p.1, N p.1. This text buries the only reference to the "guide" in the middle of the block and presents it as if it is an optional upsell ("You can purchase …"), not the sole product the consumer will receive. *Id.*

Similarly, a popup window that appears over the transaction sites' landing pages appears as follows:

5



*Driverslicenseinfo.org, accessed July 30, 2019*

The text in the pop-up reads, "**Driving a motor vehicle without a valid driver's license, car registration or car title may be illegal, as is driving with expired credentials.** Motor vehicle services and applications must be processed by an official DMV location/website. The assistance and services on this site simplify the process by providing personalized guides, documents, and live support for a fee.  This site store [sic] cookies, by clicking "Accept" you acknowledge the statements above and that this site is privately owned and is not affiliated with nor endorsed by an official agency.  **To aid in the task, our detailed website has compiled and lists the most important information surrounding your motor vehicle services, so you can ensure the process is handled in a compliant and timely manner.  Driving a motor vehicle without a valid driver's license, car registration or car title may be illegal, as is driving with expired credentials.**" [4]  PX1 ¶58, Att. Q p.14.  Again, the text sandwiches the only vague

---

[4] As of March and April 2019, a similar pop-up appeared only when the FTC investigator typed in a transaction site URL directly; no pop-up appeared when she clicked a link from a feeder site.  PX1 ¶¶29, 43.  In July 2019, the investigator visited the car-related transaction sites again and discovered Defendants had added the pop-up quoted above over the first page regardless of how a consumer reached the site.  PX1 ¶58.

reference to "guides" between bold-font, threatening language, and never states that consumers will receive only a guide, not a motor-vehicle transaction.[5]  *Id.*

### 1.      Study Confirms Motor Vehicle Sites Mislead Consumers

Expert consumer-perception testing confirms that Defendants' motor-vehicle sites deceive a large portion of the consumers who encounter them, and nearly all of the consumers who complete transactions. PX3 ¶¶88-89, 102-103.  Dr. Michelle Mazurek, a professor of computer science who specializes in an interdisciplinary field combining human-computer interaction and computer security at the University of Maryland, tested one of Defendants' motor vehicle transaction paths.  PX3 ¶¶2, 15-18.  She conducted both preliminary in-person studies and larger online studies to determine how consumers understand the sites.  *Id.*  The online study recruited 107 participants, who were directed to role-play as a person who wants to renew a driver's license and asked to interact with Defendants' websites.  PX3 ¶¶53, 69-70, 85.  The study demonstrates that consumers who encounter Defendants' motor vehicle sites – particularly those who completed payment – overwhelmingly believed the site would renew their license, not simply send them a PDF "guide."  PX3 ¶¶88-89, 102-103.  Dr. Mazurek used two sample groups, and 50% of one group and 40% of the other completed the transaction and "paid" Defendants.  PX3 ¶¶85-86.  Of those who paid, 87.8% of one sample group and 90% of the other believed Defendants' sites had actually renewed their driver's licenses.  PX3 ¶88.  Very few participants (6.1% of one sample group and 24% of the other) mentioned the site could not be used for license renewal, was not government-owned, or was generally suspicious.  PX3 ¶92.

Dr. Mazurek's tests also confirmed the fine print on Defendants' sites is ineffective.  PX3 ¶¶93-99.  Many of Dr. Mazurek's test subjects never noticed or read Defendants' purported "disclaimers," or read only the first few sentences, which did not alert them to the true nature of the site.  PX3 ¶¶95-99; *see also* PX15 ¶5 ("When I reached the page, a pop-up window appeared, which I clicked out of right away without reading because it looked like standard information about the site.")  At the end of the study, Dr. Mazurek specifically directed participants to read the disclaimers and explain what they said; even after doing so, only 13.4% of one sample and 40% of the other noted that the site would not renew their driver's license.  PX3 ¶¶99.

---

[5] The mobile versions of Defendants' sites bury all of the "fine print" at the bottom of each screen, so consumers would have to scroll through the entire page to see it.  PX1 Att. Q pp.4-6.

### 2.     Defendants Seek to Evade Scrutiny Prompted by Chargebacks

Unsurprisingly, Defendants have perpetual problems with chargebacks, *see* PX5 ¶¶15-18, Atts. A, B, which are refunds credit-card companies issue when consumers successfully dispute transactions, PX7 ¶9.  Credit-card networks monitor chargebacks in part because they may be a sign the merchant is making unauthorized charges or using deceptive marketing.  PX7 ¶¶10-13.  When a merchant exceeds set ratios and limits (*e.g.*, Visa's current chargeback-to-sales threshold of 0.9%), credit-card processors flag their accounts for monitoring, suspension, or termination.  PX7 ¶¶10-12.

Defendants apparently attempt to avoid chargeback scrutiny by selling an identical product (*i.e.*, their "guides") on dozens of websites.  PX1 ¶¶18-20, Atts. B, BH.  This allows them to obtain more processing accounts for an identical product, a practice known as "load balancing."  *See* PX11 (Defendants' merchant accounts); PX7 ¶¶14-15 (load balancing described).  Indeed, several payment processors flagged or shut down Defendants' accounts for suspected load balancing.  *See* PX11, Att. C p.8 (business "has several accounts on our portfolio and a likely candidate for load balancing"), Att. C p.30, Att. B p.119 (prior accounts "declined … for load balancing" and noting of new application, "It's clear that since I declined the other account, they just found another signer to board a new one"), Att. B pp.120-123.  Furthermore, by breaking charges into two installments and refunding only the larger charge when challenged, PX1 ¶¶128-130, PX5 Att. E p.3, Defendants inflate their sales counts (the chargeback-ratio denominator), which depresses their chargeback ratio.  PX7 ¶¶16-19.  Indeed, Defendants pay an entity called "Chargeback Help," which advertises services to help merchants "reduc[e] chargeback rates by up to 40% and recover revenue lost due to disputed transactions."  PX1 ¶203; PX4 ¶13.

Despite Defendants' intensive efforts to evade chargeback thresholds, their chargeback rates still hover around 1 to 2%, above the threshold for increased fraud scrutiny.  PX5 Atts. A, B; PX7 ¶¶8-12.  Their merchant accounts triggered one of Visa's chargeback monitoring thresholds 64 times in just three years.  PX5 ¶18, Atts. C, D.  Payment processors have closed many of their merchant accounts, often citing chargeback problems.  PX11 and Atts. A p.38 (noting applicant "was previously declined for chargebacks"), B p.124, 125-127, C pp.8, 30, 31 (processor email seeking chargeback reduction plan).

**B.      Defendants' Public Benefits Websites Do Not Provide the Assistance They Promise**

Defendants also operate dozens of websites that promise to verify consumers' eligibility for public benefits.  PX1 ¶¶25, 134, Atts. H, BH pp.7-8.  These sites appear high in search results or sponsored links when consumers search for ways to obtain public benefits; for example, an FTC investigator's search for "section 8 housing apply" on May 6, 2019 returned Defendants' site "section-8-housing.org" as the top link.  PX1 ¶65, Att. U p.1; *see also* PX1 ¶88, Att. AD p.1.

Defendants' public benefits sites offer to help consumers seeking government programs, such as housing assistance, food stamps, Medicaid, or unemployment benefits.  *See, e.g.*, PX1 Atts. H, U, AD, AF, AH.  Some are specific to a particular service (*e.g.*, PX1 Att. H p.9); others offer a menu of government programs with a prominent headline asking consumers to "SELECT THE SERVICE YOU ARE LOOKING FOR."[6]  *E.g.*, PX1 Att. H pp.1, 3.  All of Defendants' public benefits sites solicit consumers' personal information.  PX1 Atts. H, U, AD, AF, AH.

Clicking through to the data-entry portions of Defendants' sites, consumers encounter a prominent headline inviting them to "Find Out If You Are Eligible for [Public Benefit]" or "Find out if you Qualify …"  *E.g.*, PX1 Atts. H p.5 ("Find Out If You Are Eligible for the Medicaid Program"), U p.2, AH p.1 ("Find Out If You Are Eligible For The Food Stamps Program With Our Guide By Completing Your Information Below").  The form below contains fields for consumers' name, email, and zip code, and appears above a large orange "Continue >>" button. *Id.*

Entering information and clicking "Continue >>" on the initial form leads to a series of screens soliciting additional personal information.  PX1 ¶¶ 71-72, 116-117, Atts. U, AH.  The sites seek the consumer's demographic information, medical and health conditions, employment status, household income, injuries, health insurance, and credit card debt.  *Id.*[7]  Each data-

---

[6] Some of Defendants' sites tout that the site has helped a specific, large number of consumers, which does not appear to change from site to site.  *E.g.*, PX1 Att. H p.1 ("We have helped 234,932 with Veterans Benefits"); 3("We have helped 234,932 Texas Residents").

[7] Defendants' sites contain lines of small-print text at the top and bottom of the page disclaiming government affiliation (for example, "This site is privately owned and is neither affiliated with, nor endorsed by, nor operated by any government agency.  We provide time saving information.").  *E.g.*, PX1 Atts. H, U pp.2-3, AH p.1.  Similar to Defendants' motor vehicle sites, such "disclaimers" are irrelevant to the sites' promise to provide an eligibility determination, regardless of whether they are privately owned, and are inconspicuously placed in small font,

gathering screen contains a bold headline above the form, including, for example, "Confirm Your Date of Birth and Gender to Verify Eligibility," "Confirm Your Eligibility," and "Confirm your information to get your Eligibility Guide." *Id.*[8]

After collecting consumers' data, the sites do not "confirm," "verify," or "check" consumers' eligibility for public benefits. PX1 ¶¶76, 121. Nor do they provide consumers with any personalized information based on the solicited data. Instead, the sites redirect consumers to a page informing them, for example, "Your guide has been sent to your Email." PX1 ¶¶72-74, 118, Atts. U p.29, AH p.24. Consumers sometimes receive an email from Defendants with a link to download a PDF guide containing publicly available, general information about the selected public benefit.[9] PX1 ¶¶75, 120, Att. W.

Like Defendants' motor-vehicle and licensing sites, their public benefits sites cause consumer complaints. From September 30, 2014 to October 30, 2019, the FTC's consumer response database received 66 complaints referencing one of Defendants' public benefits websites. PX1 ¶217. Most (25) concerned the website "section-8-housing.org;" the next-largest groups of complaints related to "food-stamps.com" (19) or "Obamacare-guide.org" (9). PX1 ¶¶218-220. Some complainants found the websites when they sought information about a benefit through an online search engine. *Id.* Some reported they provided their information to determine whether they were eligible for a benefit, and some of those reported fearing identity theft. *Id.* In addition, many complaints described receiving unsolicited text messages, emails, and phone calls. *Id.*

---

where consumers are unlikely to read them. *Id.* As described below, expert testing of the sites confirmed that many consumers do not notice or understand these disclaimers.

[8] Clicking on some screens launches a new window with a third-party website, while the original window navigates consumers to the next question. PX1 ¶71, Att. U pp.13-14, 16-17. For example, on May 6, 2019, when the FTC investigator answered "Yes" to "Are you struggling with over $10k in debt?" a new window launched with Accredited Debt Relief's landing page. The page promised to "Reduce Your Debt & See How Much You Can Save." PX1 ¶71, Att. U pp.13-14.

[9] For example, after the FTC investigator provided information on Defendants' site section-8-housing.com in May 2019, she received a PDF titled "Section 8 Housing" that includes general information about housing vouchers. PX1 ¶75, Att. W. Notably, after completing the questionnaire on Defendants' food stamps website in September 2019, the FTC investigator received the same Section 8 guide in her email. PX1 ¶120, Att. AJ. She never received any guide about food stamps, nor did her fictitious identity receive any eligibility verification. PX1 ¶¶120-121.

### 1.   Defendants Sell Consumers' Data

Instead of providing the promised public benefits eligibility determination, immediately after consumers leave one of Defendants' public benefits sites, Defendants and their marketing partners send them unsolicited text messages and emails. PX1 ¶¶77, 122-123, 218-220, 224. For example, right after completing transactions on Defendants' Section 8 and food stamps sites, the FTC investigator began receiving texts and emails. PX1 ¶¶77, 117, 122-123, Atts. X, AK, AL. These included offers for psychic counseling, job-search assistance, government grants, and more.[10] *Id.* Consumers have also reported receiving spam texts and emails after providing information on Defendants' websites. PX1 ¶¶218-220, 224. This spam is largely the result of Defendants selling consumers' information to third parties; Defendants have received large deposits and wires from lead buyers, including brokers like Precise Leads and Admediary, and marketers like ZipRecruiter. PX1 ¶¶203-204; PX4 ¶10.

Defendants' sites do not clearly disclose that consumers are entering their information for sale, rather than to obtain help with a benefit. *See* PX1 Atts. H, U, AH. Their only reference to data sales is a mention of "Marketing Partners" in two places: a context-free menu of links at the bottom of the page, and in a small block of text on the screen that solicits consumers' phone numbers.[11] PX1 Atts. U p.5, AH p.3. For example, on May 6, 2019, the "contact phone number" question on Defendants' Section 8 site appeared as follows:

---

[10] For example, the FTC investigator's undercover email accounts received emails claiming she had won prizes or was owed unclaimed funds (*e.g.*, "[Name], We Found a Check in Your Name … Collect Your Missing Check;" "CITIBANK Card Cleared ($1,000!) Congrats, [Name]!! … After careful consideration, the total of $1,000 has been loaded onto this cleared CITIBANK Card. Get a move on to the link below to verify this card with the highlighted requests.") and others offering psychic services ("Let me introduce myself, I am the grand Medium Diana, the famous sensitive psychic … Important events are about to happen in your life, NOME [sic], and the only way to find out what they are is by accepting my help!"). PX1 Atts. X p.2, AK p.1. The investigator's undercover phone numbers received texts offering grant money ("$6,195 in school grant $$ could be available if you qualify!"), gift cards ("CLAIM: $500 Grocery Gift Card [Name]! Click Here -> [URL];" "[Name], Your Walmart Gift Card Is Ready! Start Here:[URL]"), and more. PX1 Att. AL pp.1-2.

[11] One site (food-stamps.com) mentions third-party offers adjacent to the central form area of the page, saying, "We request your email so we can email you our Comprehensive Guide, we also ask a few personal questions so we can customize the third party offers and advertisements, we believe we can assist you, to your specific situation." PX1 Att. AH p.1. The mention is buried in the middle of a lengthy small-print block of text. *Id.* Moreover, even consumers who read the text are unlikely to understand that Defendants will sell their information, not help them obtain

11



*Section-8-housing.org, accessed May 6, 2019*

The text begins, "Please check the box to continue. By clicking 'Continue,' I am providing express written consent for section-8-housing.org and our Marketing Partners to contact me at the number provided above via telephone, email or text . . . about various products, services and related marketing/telemarketing offers." The last line in this block of text reads, "If you choose not to continue, you will still receive your free guide by email shortly." *See* PX1 Att. U p.5. Importantly, this small-print block of text never states that the detailed information collected on other screens will be sold, or that consumers will not receive the promised eligibility determination. *Id.*

Defendants sold consumers' information to dozens of shady marketers. For example, in at least one instance, Defendants sold consumers' information to a marketer the FTC has sued for selling sham health insurance plans. *See* PX1 ¶¶221-223, Att. BF (Defendants sold leads to Simple Health Plans LLC); *FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346 (S.D. Fla. 2019) (granting preliminary injunction against Simple Health defendants based on the FTC's Section 5(a) and Telemarketing Sales Rule claims). The FTC brought suit because Simple Health lured consumers to its bogus plans through deceptive lead generation websites, including Defendants' website obamacare-guide.org, that purport to provide information about

---

food stamps, as the text states that the site asks questions "so we can customize" the offers consumers receive. *Id.*

comprehensive health insurance.[12] *Id.* In another instance, the FTC has alleged that Defendants'
client AdMediary bought leads it used to enroll financially vulnerable consumers in purported
"discount clubs" that charged consumers' bank accounts without their consent. *See* PX1 ¶204;
PX4¶10 (lead buyer AdMediary paid Katz's companies more than $3 million); Second Amended
Complaint, ¶¶43-45, 193, *FTC v. Hornbeam Special Situations LLC*, Case No. 1:17-cv-03094-
WMR (N.D. Ga. Nov. 5, 2018).

      **2.**      **Study Confirms Defendants' Public Benefits Sites Mislead Consumers**

     Dr. Mazurek's consumer-perception testing confirmed consumers believe Defendants'
public benefits sites will use their information to check their eligibility for benefits, or to apply
for those benefits directly. PX3 ¶106-107, 120-121. Dr. Mazurek conducted a preliminary in-
person study and an online survey of one of Defendants' Section 8 websites. PX3 ¶¶15-18. The
study demonstrates that most consumers who reach Defendant's benefits site, and particularly
those who provide their personal information, believe the site will provide an eligibility
determination. PX3 ¶¶106-107. Indeed, about half of participants – whether they entered
information or not – believed the site was government-operated. PX3 ¶¶109-110.

     The study also demonstrates that consumers do not realize that Defendants will sell their
sensitive information to marketers. When Dr. Mazurek asked participants to explain what the
site would do, most mentioned checking eligibility, but less than 10% mentioned marketing or
advertisements. PX3 ¶106. Her testing shows that most consumers do not read the text block
regarding Defendants' "Marketing Partners," as fewer than 10% of those who reached the
disclaimer page claimed to have read it fully. PX3 ¶117. Moreover, Dr. Mazurek found that
even when she specifically directed participants to read and explain the disclaimer text, many
still did not mention marketing or advertising, and more than 10% still believed they would
receive an eligibility determination. PX3 ¶118-119.

---

[12] In August 2019, the FTC investigator conducted an undercover transaction on obamacare-
guide.org, which promised to provide affordable health insurance quotes and asked whether the
consumer was an expectant parent or suffered from a list of preexisting health conditions,
including mental illness, cancer, diabetes, arthritis, and urinary and digestive issues. PX1 ¶¶104-
110, Atts. AF p.5, AE.

## II.   THE DEFENDANTS

### A.   The Corporate Defendants

The 54 Corporate Defendants include three types of companies: operating companies, transaction entities, and holding companies.

The operating companies perform the scheme's functions. On Point Global LLC, On Point Employment LLC, and On Point Guides LLC (collectively, "On Point") hire the writers and developers who create the guides and websites, and the telemarketers who take consumers' complaints. PX1 Atts. E, F, AP. On Point subsidiaries Bella Vista Media Ltd. d/b/a BV Media and Carganet S.A. d/b/a G8 Labs run the operation's call center and web development offices in Costa Rica and Uruguay, respectively. PX1 Atts. AQ, AS, AT pp.13-14; *see also* PX1 Att. AP pp.1-3, 7-9 (seeking phone representatives in Costa Rica and developers in Uruguay), AU pp.53-58. Waltham Technologies LLC, DG DMV LLC, On Point Domains LLC, Final Draft Media LLC, Cambridge Media Series LLC f/k/a License America Series LLC, and Issue Based Media LLC handle the operation's administrative tasks, including payroll, registering domain names, holding central bank accounts, and leasing office space and private mailboxes. PX1 ¶180 (domain names); PX4 ¶¶12-13 (payroll/central accounts); PX9 and attachments (mailboxes); PX12 Att. C pp.17-22, 35-40 (leases); *see also* PX13 p.2. Dragon Global LLC, Dragon Global Management LLC, and Dragon Global Holdings LLC (collectively, "Dragon Global") are the scheme's capital-raising arm. PX1 Att. G. Direct Market LLC is involved in selling the leads the operation's websites generate. PX1 Atts. AR, BF p.3.

The transaction entities[13] hold the scheme's merchant processing accounts and revenues in a nested labyrinth of LLCs and bank accounts. PX4 ¶¶9-11; PX11 and attachments; PX12 and attachments; *see also* PX12 Att. C p.72. The operating companies' employees' names are on

---

[13] The "transaction entities" are: Bluebird Media LLC; Borat Media LLC; Bring Back the Magic Media LLC; Chametz Media LLC; Chelsea Media LLC; Coinstar Media LLC; Domain Development Studios LLC; Domain Dividends Media LLC; Eagle Media LLC; Falcon Media LLC; GNR Media LLC; Island Media LLC; Leatherback Media Group LLC; Macau Media LLC; CEG Media LLC f/k/a Matzoh Media LLC; MBL Media; Orange and Blue Media LLC; Orange Grove Media LLC; Panther Media LLC; Pirate Media LLC; Pivot Media Group LLC; PJ Groove Media LLC; Sandman Media Group LLC; Shadow Media LLC; Skylar Media LLC; Slayer Billing LLC; Spartacus Media LLC; Very Busy Media LLC; Wasabi Media LLC; and Yamazaki Media LLC.

corporate papers for many of the transaction entities,[14] and they applied for merchant processing accounts on behalf of the transaction companies.[15] *Compare* PX1 Atts. E p.5 (On Point leadership), AR (Direct Market leadership), AU (employee LinkedIn pages) *with* PX1 Att. BB (corporate chart), PX11 (merchant accounts).

The remaining Corporate Defendants have no apparent activities, but exist only to hold and move assets, often offshore. Burton Katz's holding company Bronco Family Holdings LP (a/k/a Bronco Holdings Family LP) is organized in the Bahamas and holds bank accounts in Switzerland and Nevis, along with holding Katz's interest in On Point Global LLC and other operating companies. PX1 ¶191 (money transfers), Atts. BA p.16 (On Point membership); PX8 pp.99-184; PX12 Att. C pp.24, 48, 70-71, 115; PX13 pp. 1-2. Brent Levison's holding companies, Delaware partnership BAL Family LP and Nevis-organized Cardozo Holdings LLC, receive asset transfers and hold Levison's interests in Direct Market and On Point. PX1 ¶193 (money transfers), Att. BA p.16 (On Point membership); PX12 Atts. C pp.24, 48, 70-74, 115, 143 (Cardozo), D pp.36-41 (BAL). 714 Media Ltd. and Mac Media Ltd., both Belizean entities (PX1 ¶1, PX12 Att. C p.143), hold Elisha Rothman's and Christopher Sherman's interests in Direct Market and Rothman's interest in On Point. PX12 Att. C pp.24, 48, 70-74, 115; *see also* PX1 Att. BA p.16 (On Point membership). Robert Zangrillo's holding company, Delaware-

---

[14] For example, Charles Ohana, an OnPoint software engineer, is on Borat Media's organization papers (PX1 Atts. AU pp.31-34, BB p.1); Tehilla Drori, office manager, is on Island Media's papers (PX10 Att. B p.1; PX12 Att. C pp.86-88); Candice Nestel, OnPoint's "site manager" and "director of vertical markets," is on papers for Very Busy Media (PX1 Atts. AU pp.1-2, 5, 11, BB p.3); Gabriel Penaloza, OnPoint's director of finance, is on Shadow Media's papers (PX1 Atts. AU pp.35-36, BB p.3); Brent Levison, OnPoint's general counsel and CAO, is on corporate documents for Chametz Media, Chelsea Media, Eagle Media, MBL Media, and Bring Back the Magic Media (PX1 Atts. AU pp.13-14, BB pp.1-2; PX12 Att. C pp.27-29, 76-78); Arlene Mahon, OnPoint's and Waltham's senior vice president of finance, is on PJ Groove Media's papers (PX1 Atts. AU p.15, BB; PX12 Att. C pp.135-137); Christopher Sherman, OnPoint's director of data processing and Direct Market team member, is on papers for Pirate Media and GNR Media (PX1 Atts. AR, AU p.44, BB p.2; PX11 Att. B p.83; PX12 Att. C pp.81-83); and Elisha Rothman, also a director of data processing and Direct Market team member, is on papers for Yamazaki Media (PX1 Atts. AR, AU p.39; PX11 Att. E p.6).

[15] For example, Christopher Sherman sought accounts for GNR Media and Pirate Media; Charles Ohana for Borat Media; Candice Nestel for Very Busy Media; Brent Levison for Chelsea Media, Eagle Media, MBL Media, and Bring Back the Magic Media; Gabriel Penaloza for Shadow Media; Arlene Mahon for PJ Groove Media and Cambridge Media Series; Elisha Rothman for Orange Grove Media and Yamazaki Media; and Burton Katz for Falcon Media. PX11 and attachments.

organized On Point Capital Partners LLC, holds Zangrillo's interest in On Point.  PX1 Att. BA p.16 (On Point membership); PX12 Att. C p.115 (On Point ownership).  Finally, Delaware-organized License America Management LLC, and Nevis-organized Blackbird Media LLC and License America Holdings LLC, hold corporate assets and interests, frequently offshore.  PX1 ¶¶189, 201-201, Att. BG pp.16-20 (License America Holdings' Nevis organization documents); PX8 pp.48, 108; PX12 Att. C p.13.

### 1.    The Corporate Defendants Act as a Single Operation

The Corporate Defendants form a web of integrated entities that carry out a unified scheme as described below.

**The Corporate Defendants operate under the common control of the Individual Defendants**, who are officers and owners of multiple corporate defendants.  Burton Katz, the operation's principal, is the CEO of On Point and one of three venture partners in Dragon Global, and his LinkedIn profile describes him as an "Internet Entrepreneur" who leads Waltham Technologies.  PX1 Atts. E p.5, G p.2, AU pp.16-17.  The second Dragon Global partner, Robert Zangrillo, is both Dragon Global's chairman/CEO and On Point's chairman.[16]  PX1 Atts. G p.2, AU p.46.  Arlene Mahon, On Point and Waltham's longtime CFO, is now On Point's senior VP of finance and accounting.  PX1 Att. AU p.28.  Elisha Rothman and Chris Sherman are On Point's directors of data processing and also principals at Direct Market.  PX1 Atts. AR, AU pp.39, 44.  Brent Levison is On Point's chief administrative officer and general counsel.  PX1 Atts. E p.5, AU pp.13-14.  Katz, Levison, Rothman, and Zangrillo co-own On Point Global.  PX12 Att. C p.115.  Katz, Levison, Rothman, and Sherman co-own License America Holdings, Cambridge Media Series, and Direct Market, along with (sometimes excluding Sherman) many transaction entities.  *Id.* pp. 7, 23-24, 42, 46, 48, 70-71, 73, 102, 107-08, 125, 147-48, 151-53.  Katz and Levison managed On Point's acquisition of BV Media and G8 Labs, On Point's Latin American subsidiaries.  PX1 Atts. AT p.13-14 ("Costa Rican Tech Company Celebrates Grand Opening of New Office"), AU p.20 ("G8Labs has been acquired and is now part of OnPoint Global.")

**The Corporate Defendants share employees**.  Many On Point employees identify On Point as their employer on LinkedIn, but identify Waltham, which handles payroll, as their employer on bank records.  *Compare* PX1 Att. AU pp.11, 13-14, 24, 28, 31, 39, 44 *with* PX12 Att. F pp.17, 27,

---

[16] Bob Bellack, Dragon Global's third partner, is On Point's current CFO.  PX1 Atts. E, G, AU p.61.

32-33, 37, 46, 65, 74, 79, 88, 93, 102, 111, 125; *see also* PX4 ¶13 (Waltham handles payroll).  The overlapping nature of the Corporate Defendants and their employees continues throughout the scheme; On Point employee Karla Jinesta manages BV Media, and On Point CAO Brent Levison is its acting operations manager.  PX1 Atts. E p.5, AU pp.13-14.  Likewise, Ramiro Baluga is On Point's senior VP of publishing, CEO of G8 Labs, and a team member of Direct Market.  PX1 Atts. E p.5, AR, AU pp.19-20.  On Point advertises on its LinkedIn and website for new employees at BV Media and G8 Labs.  PX Atts. AP pp.1-3, 7-9, AU pp.53-58.  On Point and Dragon Global share the same roster of "advisors" (who, indeed, use the same photographs on their Dragon Global and On Point website profiles).  PX1 Atts. E p.5, G p.2.  On Point's employees, including the individual defendants, organized the transaction companies that obtained merchant and bank accounts.  *See* notes 14 and 15 *supra*; *see also* PX1 Att. BB; PX11 and attachments; PX12 and attachments.  Individual Defendant Arlene Mahon oversees almost all of the operation's bank accounts and uses her "@issuebasedmedia.com" address as the contact for many of them.  *See* PX12 (Arlene Mahon is a signatory on 87 of the operation's documented bank accounts), Att. D pp.1-28.  When Katz registered DG DMV LLC to do business in Florida, Dragon Global employee Dede Loftus signed its corporate papers.  PX1 Atts. G p.2, AU p.26, BA pp.2-3.

**The Corporate Defendants share office space and addresses.**  On consumer-facing websites and website registrations, the Corporate Defendants display addresses for private mailbox rentals and post-office boxes.  PX1 Att. BH pp.1-6, PX9 and attachments.  Documents provided to obtain these mailboxes normally list the operation's physical address as either its former headquarters at 425 NW 26th St. in Miami or its current headquarters at 350 NE 60th St. in Miami (or in a few instances, the personal residence of an employee).  PX9 and attachments, PX10 and attachments; *see also* PX11 Att. F p.25 (April 2017 email to a payment processor stating that the merchant companies "all work out of 425 NW 26th Street in Miami").  Operating company Issue Based Media leased both headquarters, including from a company organized by individual defendant Robert Zangrillo for the property located at 350 NE 60th.  PX1 Att. BD pp.1, 3-4; PX12 Att. C pp.17-22, 35-40; *see also* PX1 Att. AV p.1 (Zangrillo social media post showing 350 NE 60th with caption describing it as "OnPoint's headquarters in Magic City").  The companies also use a recently opened satellite office at 900 N. Federal Highway in Boca Raton, which Issue Based Media also administers and "subleases" to transaction entities.  PX11 Att. A pp.30-37 (Issue Based Media leased 900 N. Federal

space to Very Busy Media, Yamazaki Media beginning on January 1, 2018). The enterprise's capital-raising division, Dragon Global, lists 350 NE 60th as its headquarters.[17] P1 Att. AU p.59.

**The Corporate Defendants commingle their funds.** The transaction entities charge consumers via credit-card processing accounts. PX4 ¶¶9, 11; PX11 and attachments. They transfer the funds to central operating accounts, like Cambridge Media's. PX4 ¶12. Often, these funds move through several accounts, and some Corporate Defendants hold multiple accounts at different banks. [18] *See, e.g.*, PX12 (lists of accounts and account holders). The defendants move significant sums into their personal and holding company accounts, including offshore accounts. PX1 ¶¶191-196, PX8 pp.3-42 (Mahon); 42-98 (Levison); 99-184 (Katz); 186-195 (Rothman). The operating entities sometimes pay and receive funds interchangeably; for example, both On Point Global and Issue Based Media have paid rent for an office space in California, occasionally referencing Dragon Global in the payment subject lines. PX1 ¶¶199-200. Dragon Global apparently sublet the space to a startup company. PX1 ¶¶197-199. That company, in turn, paid rent interchangeably to On Point Global and Dragon Global. PX1 ¶¶197, 199.

**The Corporate Defendants share operations and coordinate their marketing.** The web-content operation presents itself as "On Point" or "On Point Global;" even the subsidiaries that maintain separate names, like BV Media, brand themselves as "an On Point company." PX1 ¶165, Atts. AV p.4, AQ; *see also id.*, Att. AU pp.19-20. Some of the operating companies' websites use the same templates. *Compare* PX1 Att. AR (Direct Market) *with* PX1 Att. AS (G8 Labs). Employees use On Point's name on their LinkedIn profiles, even when they perform functions for other subsidiaries. PX1 Att. AU; *see also* PX1 Atts. AR, AS (team listings for Direct Market and G8 Labs). In contrast, the consumer-facing websites uniformly list only the shell transaction companies' names. PX1 Att. BH pp.1-6. These consumer-facing websites use common templates to sell a single

---

[17] On other documents, Dragon Global lists a private mailbox rental *(e.g.*, PX1 ¶¶197, 212, Att. BA pp.7-8) that sends mail to the California home of Zangrillo's longtime employee. PX1 ¶¶213-214, Atts. BE (forwarding address is a residence owned by William and Diana Loftus), G p.2, AU p.26 (Diana "Dede" Loftus is Dragon Global employee).

[18] For example, on January 4, 2019, On Point Global LLC transferred $8 million from its account at Wells Fargo to a newly opened account in its name at SunTrust. The On Point Sun Trust account purchased a $7.2 million CD from the bank, then received a $7.2 million "commercial loan advance" two weeks later. In February and March, On Point Global Sun Trust account wired over $1.5 million each to Katz and Zangrillo, over $1 million to Rothman, over $300,000 to Levison, and over $100,000 to Sherman, and transferred millions of dollars into On Point Global accounts at both International Finance Bank and Wells Fargo. PX4 ¶¶14-15.

product – the PDF "guides."  PX1 ¶¶19-20, 25, Atts. B, C, H.  Indeed, for a time, the "guides" were hosted on a single website under On Point branding, "onpointguides.com."  PX1 ¶¶24, 138, Att. F.

### B.      The Individual Defendants Behind the Operation

#### 1.      Burton Katz

Burton Katz is the architect and leader of Defendants' scheme.  As described above, he is CEO, owner, partner, or manager of many of the Corporate Defendants, including operating companies On Point Global, Dragon Global, Issue Based Media, DG DMV, Waltham Technologies, Direct Market, BV Media, Cambridge Media Series, and a number of the transaction entities.  PX1 ¶143, Atts. E p.5, G p.2, AT p.13, AU p.16-17, BA p.3, BB; PX12 Att. C pp.7, 23, 42, 46, 48, 69, 70-74, 102, 107-08, 115, 125, 132, 144, 147-48, 151-53; PX13 p.2. Bank documents list him as "Key Executive" or "Owner" with "Control of the Entity" for DG DMV, Cambridge Media, and Issue Based Media.  PX12 Att. F pp.32, 55, 79.  He has obtained at least one private mailbox rental and three merchant accounts and is a signatory on 27 bank accounts.  PX9 and attachments; PX11 and attachments; PX12 and attachments.  Katz, or his holding company Bronco Family, has received over $2.5 million from the other Corporate Defendants' accounts.  PX1 ¶191.

Katz has known about and controlled his operation's deceptive marketing since its inception; indeed, in 2011, he exchanged emails with associates about the design of the "driver's license form" and "DriversLicenses.org."  PX1 Att. BG pp.2, 5-7.  On one email chain, an associate told Katz, "I eliminated the questions about child support.  Why?  I believe if someone is filling out this info under the auspices or belief of getting his or her license, the child support could cause them to abandon the registration process.  Who wants to admit to being in trouble when all they want is a license?"  PX1 Att. BG p.2.  The exchange demonstrates that Katz and his partners not only knew their sites misled consumers, but intentionally designed them to do so.

Katz's social media postings also demonstrate his central involvement in and knowledge of the scheme's activities.  For instance, his LinkedIn page describes On Point Global's "core product sets" as "100s of reference guides, instructional books, and digital services" and its business model as "leveraging premium and contextual domain names" to build a "highly monetizable 'Signal Graph'" with  consumer data.  PX1 Att. AU p.16.  Katz also claims his companies "currently acquire[] 30,000 new consumer records each day" through websites they own and operate, and that he "created a network of web properties" and "achieved success by

building a scalable Customer Acquisition and Data Monetization Platform."[19]  PX1 Atts. D, AU
p.17.  Katz's website says he "partnered with Dragon Global to acquire and operate OnPoint, a
portfolio of consumer websites, to develop digital products and services in the fast-growing
online motor vehicle sector."  PX1 Att. D; *see also id.*, Att. G p.4.[20]  In January 2019, On Point
Global's Facebook account posted a picture of Katz with the caption "Happy birthday to our
fearless leader @burtonkatzmiami."  PX1 Att. AW p.3.  In addition, BV Media's website posted
a picture of Katz and Levison at a ribbon-cutting ceremony.  PX1 Att. AQ p.3.

 This case is not Katz's first encounter with the FTC.  In 2014, he entered a stipulated
permanent injunction to settle the FTC's allegations that he crammed unauthorized charges on
consumers' mobile phone bills.  Amended Compl. (Dkt. 88, June 16, 2014) and Stip. Final Judg.
and Order for Permanent Inj. and Other Equitable Relief as to Defs. Burton Katz and Jonathan
Smyth ("Order") (Dkt. 132, Oct. 16, 2014), *FTC v. Acquinity Interactive, LLC, et al.*, No. 0:14-
cv-60166-SCOLA/OTAZO-REYES (S.D. Fla.).  The Order prohibits Katz from making
misrepresentations to consumers, and subjects him to ongoing compliance monitoring.  Order pp.
3, 7-12.[21]  Pursuant to the Order, in October 2015, Katz submitted a sworn compliance report to
the FTC, in which he was required to "identify all business activities, including any business for
which such Defendant performs services whether as an employee or otherwise and any entity in
which such Defendant has any ownership interest."  PX13; Order pp. 8-9.

 Katz failed to fully disclose his ownership interests and business activities, mentioning
only Issue Based Media, DG DMV, and Bronco Holdings Family and stating that Bronco only
held a "passive, minority interest in other companies as a seed/angel investor."  PX13 p.2.  Katz
also falsely claimed that he did not hold any operational, executive officer, manager, or
employee positions with such companies, and that he was not involved in the marketing of any
products other than practice driving tests through DMV.com.  *Id.* pp.2-3.  In fact, Katz and On

---

[19] A third-party website containing Katz's biography states that Katz "started OnPoint in 2011 at
a table in Starbucks."  PX1 Att. AX p.2.

[20] Katz's profile on Dragon Global's website also states that Katz "is an experienced
entrepreneur in consumer software and digital marketing including lead generation, e-commerce,
and mobile service."  PX1 Att. G p.4.

[21] The evidence described in this Memorandum also demonstrates that Katz is violating the 2014
Order.  Therefore, the FTC intends to file a contempt motion in the original action once the
Defendants in this matter have been served and the docket is unsealed.

Point began operating the driver's license websites as early as 2011 (PX1 Atts. AU p.67, AX p.2, BG pp.1-7), and Katz owned and/or managed several other entities at the time, including Blackbird Media, Cambridge Media Series (f/k/a License America Series), CEG Media (f/k/a Matzoh Media), Falcon Media, and License America Holdings.[22]   PX1 Atts. BA p.18 (Cambridge Media 2013), BB (Cambridge Media/License America Series 2011); PX8 pp.104, 106-107 (License America Holdings 2014), 107-108 (Blackbird Media 2014); PX11 Atts. B pp.24-25, 84-85, 97-98 (Falcon Media 2014), E pp.7-10 (Falcon Media and Matzoh Media 2015).  Indeed, as recently as eight months before signing the compliance report, Katz obtained merchant accounts for Falcon Media and Matzoh Media under the DBAs "registermyvehicle.org," "cartitles.org," and "addresschangeservice.org" – none of which relate to his purported product, practice driving tests.  PX11 Atts. B pp. 24-25, 97-98 (applications signed Mar. 17, 2014), E pp.7-10 (applications signed Jan. 28, 2015 and Feb. 13, 2015).

### 2.   Robert Zangrillo

Robert Zangrillo, a Miami-based investor and real estate developer, has facilitated the On Point scheme's funding and operation since at least 2015.  PX1 Atts. BB, BA pp.7-8, 16, AU pp.46; *see also* PX1 Atts. BA pp.2-3 (Dede Loftus listed on papers for DG DMV in 2015 using @dragonglobal email), G pp.2-3 (Zangrillo founded Dragon Global and Dede Loftus works there). He co-owns On Point Global through his holding company, OnPoint Capital Partners.  PX1 Atts. BA pp. 16, 7-9; PX12 Att. C p.115.  Zangrillo also co-owns DG DMV with Katz, and the signature card for its bank account lists him as "Mgr/Owner with Control of the Entity."  PX12 Att. F p.55.  Additionally, he founded and co-owns the Dragon Global entities, in which he, Katz, and On Point CFO Bob Bellack form the "Venture Team."  PX1 Att. G p.2.  Zangrillo has been On Point Global's Chairman since January 2018 and the Founder, Chairman, and CEO of Dragon Global since February 2012.  PX1 Att. AU p.46.

---

[22] Katz's Order also required him to distribute the Order to other principals or officers of businesses he owned or managed, and submit proof of the distribution to the FTC.  Order pp.7-9. Katz submitted only a single Order acknowledgment from his wife, Marjan Katz, even though other Individual Defendants were officers of his businesses at the time (*e.g.*, Arlene Mahon was CFO of Waltham Technologies and On Point Global).  PX13 p.6; PX1 Att. AU p.28.

Zangrillo acquired office space for On Point Global's current headquarters through an LLC he organized.[23]  PX1 Att. BD pp.1, 3-4.  That LLC leases the space to Issue Based Media. PX12 Att. C pp.35-40.  Zangrillo also arranged for the property's exterior mural.  PX1 Att. AV p.1.  He is a signatory or contact person on two bank accounts, including DG DMV's, and has personally received over $2 million from the Corporate Defendants.  PX1 ¶192; PX12 and attachments.  Zangrillo is directly involved in the scheme's online operations:  he obtained privacy services for onpointguides.com, which hosted Defendants' PDF reference guides prior to September 2019.  PX1 ¶¶24, 138, 180, Atts. F, AZ p.13.  Indeed, his social media posts demonstrate his knowledge of his companies' activities, using the same language as Katz to describe On Point's offering of "reference guides" and monetization of consumer data.  PX1 Att. AU pp.46-47.  In addition, in January 2018, Zangrillo posted a picture on his Instagram profile featuring him and Katz in Uruguay, where On Point subsidiary G8 Labs operates.  PX1 Atts. AS, AV p.2.

Notably, Zangrillo was recently indicted for bribery and fraud as part of a college admissions scheme.  *See* Dep't of Justice, Investigations of College Admissions and Testing Bribery Scheme, *available at* https://www.justice.gov/usao-ma/investigations-college-admissions-and-testing-bribery-scheme; *United States v. Sidoo, et al.*, Case No. 1-19-cr-10080, Indictment ¶ 217 (D. Mass.), *available at* https://www.justice.gov/usao-ma/press-release/file/1212206/download.  He is accused of paying a co-conspirator to falsify his daughter's credentials and bribing a university to obtain his daughter's admission.  *Id.* ¶ 217. The Department of Justice alleges that Zangrillo asked his co-conspirator what lie he should tell the IRS about his payments to the co-conspirator's sham charity "just so I know we have the story straight," and agreed to claim that his bribes were actually donations to help "underserved kids."  *Id.* ¶ 240.

### 3.      Brent Levison

Brent Levison, an attorney, has been deeply involved the Corporate Defendants' scam since at least 2013.  *See, e.g.*, PX11 and Att. A p.12 (Levison sought processing accounts as early as 2013).  Levison has been On Point's Chief Administrative Officer and General Counsel since 2017, and is the "acting operations manager for [its] Costa Rica office."  PX1 Atts. E p.5, AU

---

[23] Zangrillo uses the "Magic City" brand name for Dragon Global's real estate investments and projects.  See PX1 Att. AU p.46.

pp.13-14.  He co-owns and manages operating companies On Point Global, Cambridge Media Series, On Point Guides, and Direct Market and its subsidiaries, along with several transaction entities.  PX1 Atts. BA p.16, BB; PX12 Att. C pp.2, 7, 23, 24, 26, 42, 46, 48, 69, 70-74, 102, 107-08, 110, 115, 125, 132, 144, 147-48, 151-53; PX12 Att. F pp.17, 32, 37, 52, 60, 129-131. Levison frequently appears as the signer or authorized person on Corporate Defendants' corporate filings and has obtained at least four of the operation's private mailbox rentals.  PX1 Att. BB; PX9 and attachments.  Levison signed the lease agreements for On Point Global's former and present headquarters in Miami.  PX12 Att. C pp.35-40, 17-22.  He also obtained 18 merchant accounts for the Corporate Defendants and is a signatory on 30 corporate bank accounts.  PX11 and attachments; PX12 and attachments.  Moreover, he and his personal holding company received over $1 million in distributions from the Corporate Defendants.  PX1 ¶193.

Levison is also closely involved in the scheme's online activities and in the call center that receives consumers' complaints.  He has registered 177 of the operation's domain names for privacy protection through Domains By Proxy.  PX1 ¶180, Att. AZ pp.4-6.  On LinkedIn, he claims to "oversee[] the e-commerce and product fulfillment teams" and "manage[] the legal, compliance and regulatory matters … [and] administrative functions" for On Point Global.  PX1 Att. AU p.14.  Levison also operates a personal website where he has touted On Point Global's acquisition of BV Media, the Costa Rican call center.  PX1 Att. AT p.13.[24]  Levison's LinkedIn profile highlights his role there as responsibility for "development of office facilities, resources, call center organization and billing and payment processing."  PX1 Att. AU p.14.

### 4.    Elisha Rothman

Elisha Rothman is an owner of Corporate Defendants and oversees their lead generation activity.  Rothman has been On Point Global's Director of Data Processing since 2017 and one of Direct Market's principals since 2016.  PX1 Atts. AR, AU p.39.  He co-owns and manages operating companies On Point Global, Cambridge Media Series, Direct Market and its subsidiaries, and some transaction entities.  PX1 Atts. BA p.16, BB; PX12 Att. C pp.7, 23, 24, 42, 46, 48, 69, 70-74, 102, 107-08, 115, 120, 125, 144, 147-48, 151-53, 162; PX12 Att. F pp.32-33, 83-85, 106-109.  Rothman's LinkedIn profile states that "Direct Market is a rapidly growing, innovative, and scalable Customer Acquisition and Data Monetization Platform efficiently

---

[24] Levison's website also states that he is an "owner, operator, investor and executive in the e-commerce, mobile, content media and direct marketing industries."  PX1 Att. AT p.6.

turning high volume transactional clicks into life-time value customers." PX1 Att. AU p.39. He secured four private mailbox rentals and seven merchant accounts, and he is a signatory on 19 bank accounts for the Corporate Defendants. PX9 and attachments; PX11 and attachments; PX12 and attachments. Rothman has received over $1.5 million in distributions from the Corporate Defendants' accounts. PX1 ¶195.

### 5.     Christopher Sherman

Christopher Sherman, like Rothman, has been a Director of Data Processing at On Point Global since 2012 and one of Direct Market's principals. PX1 Atts. AR, AU p.44. He co-owns Direct Market and its subsidiaries, along with some transaction entities. PX1 Att. BB; PX12 Att. C pp.7, 42, 46, 48, 69, 70, 72-73, 80, 102, 107-08, 147-48. Sherman obtained three private mailbox rentals and eight merchant accounts for the Corporate Defendants, and he is a signatory on five corporate bank accounts. PX9 and attachments; PX11 and attachments; PX12 and attachments. He registered 85 of the operation's domain names for privacy protection. PX1 ¶180, Att. AZ pp.9-10. Sherman has received more than a hundred thousand dollars in transfers from Corporate Defendants' accounts. PX1 ¶196. Sherman's LinkedIn lists "CPM" (*i.e.*, cost per thousand, a marketing term used to denote the price of advertising impressions on a webpage) and "Email Marketing" as his specialties and shows that he is a member of several lead generation groups. PX1 Att. AU p.44.

### 6.     Arlene Mahon

Arlene Mahon is a certified public accountant who has been one of Katz's top lieutenants since at least 2011. PX1 Att. AU p.28. Mahon has been the Senior Vice President and CFO of Waltham Technologies since 2010, and the Senior Vice President Finance and Accounting of On Point Global since 2011. *Id.* Additionally, Mahon signed bank documents for Corporate Defendants that identify her as a "key executive with control of the entity" for operating companies Issue Based Media, DG DMV, Cambridge Media, and many transaction entities: PX12 Att. F pp.17, 32-33, 37, 55-56, 60, 74, 79, 88, 93, 120, 125. She co-owns Waltham Technologies[25] with her husband, Robert Mahon, and is the member and manager of transaction entity PJ Groove Media. PX1 Att. BA pp.11-12; PX12 Atts. C pp.133-137, F pp.102, 110-111,

---

[25] While bank and corporate records reflect that Arlene Mahon and Robert Mahon co-own Waltham Technologies, Katz has also represented that he owns Waltham Technologies. PX1 Att. AU pp.16-17.

133-134.  Mahon has obtained a post-office box and four merchant accounts for the Corporate
Defendants, and she is a signatory for 87 – almost all – of Corporate Defendants' known bank
accounts.  PX9 and attachments; PX11 and attachments; PX12 and attachments.  She has
registered 200 of the operation's domain names for privacy services through Domains By Proxy.
PX1 ¶180, Att. AZ pp.1-3.

Mahon's LinkedIn profile states that she has "been working together with the leadership
team for the past 8 years to grow" On Point Global, and partners with the leadership "as a trusted
advisor to formulate, ensure and implement relevant business strategies, financial reporting,
strategic planning support, treasury management and global financial processes and controls that
drive positive top and bottom-line outcomes while minimizing risk.  In interface with all internal
and external stakeholder, and asset, payroll and tax partners, to foster consensus –based [sic]
organizational alignment toward a common vision."  PX1 Att. AU p.28.

**ARGUMENT**

The FTC seeks *ex parte* preliminary injunctive relief, including an asset freeze,
appointment of a temporary receiver, and immediate access to Defendants' business premises, to
prevent the Defendants from dissipating assets and destroying evidence.  As set forth below, the
evidence overwhelmingly supports entry of the proposed TRO.

**I.      THIS COURT HAS THE AUTHORITY TO GRANT THE REQUESTED RELIEF.**

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the FTC to seek, and this
Court to grant, preliminary and permanent relief enjoining violations of the FTC Act.  *See FTC
v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996) ("[A] district court may order
preliminary relief, including an asset freeze, that may be needed to make permanent relief
possible.").  With that authority comes the power to grant "ancillary relief, including freezing
assets and appointing a Receiver."  *FTC v. USA Fin., LLC*, 415 F. App'x 970, 976 (11th Cir.
2011) (quoting *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984)).

**II.     THE EVIDENCE JUSTIFIES ENTRY OF A TEMPORARY RESTRAINING
         ORDER AND PRELIMINARY INJUNCTION.**

"[I]n determining whether to grant a preliminary injunction under section 13(b), a district
court must (1) determine the likelihood that the FTC will ultimately succeed on the merits and

25

(2) balance the equities."[26] *FTC v. IAB Mktg. Assoc., LP*, 746 F.3d 1228, 1232 (11th Cir. 2014); *FTC v. World Patent Mktg., Inc.*, No. 17-CV-20848, 2017 WL 3508639, at *11 (S.D. Fla. Aug. 16, 2017).  The FTC satisfies both prongs.

### A.    The FTC Is Likely to Prevail on the Merits

The FTC need only prove a likelihood of success, not a "substantial likelihood," as private litigants must.  *FTC v. Sterling Precious Metals, LLC,* 894 F. Supp. 2d 1378, 1383 (S.D. Fla. 2012).  The FTC satisfies this standard by establishing "some chance of probable success on the merits." *FTC v. World Wide Factors, Ltd.*, 882 F.2d 344, 347 (9th Cir. 1989).  The evidence used to support such a showing can include "affidavits and hearsay materials." *FTC v. Primary Group Inc.*, 2015 WL 12976115, at *4 (N.D. Ga. June 8, 2015) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading*, 51 F.3d 982, 985 (11th Cir. 1995)).

Here, the evidence unequivocally establishes that the Defendants violated the FTC Act both through their deceptive online marketing and their unfair sale of consumers' personal data. Additionally, the Corporate Defendants are jointly and severally liable because they operated as a common enterprise, and the Individual Defendants are liable for both injunctive and monetary relief because they had authority to control the enterprise and knowledge of its unlawful acts.

### 1.    Defendants Violated the FTC Act Through Their Deceptive Marketing of Online "Guides"

Defendants' deceptive conduct violates the FTC Act, which prohibits "deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).  Deception occurs when: (1) defendants make a representation or omission; (2) that is likely to mislead consumers acting reasonably; and (3) that representation or omission is material to consumers' decisions. *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266-67 (S.D. Fla. 2007).  Consumers are "acting reasonably" in interpreting an advertisement to convey a particular claim if at least a "significant minority" of consumers took away the claim. *Matter of Cliffdale Associates, Inc.*, 103 F.T.C. 110, 177 n.20 (1984) (explaining that a reasonable interpretation is one shared by more than an insignificant and unrepresentative segment of consumers); *see also, e.g., Firestone Tire & Rubber Co. v. FTC*, 481 F.2d 246, 249 (6th Cir. 1973) (10-15% is substantial); *Benrus Watch Co. v. FTC*, 64 F.T.C. 1018,

---

[26] The FTC, unlike private plaintiffs, need not establish irreparable harm to obtain injunctive relief. *IAB Mktg. Assoc.*, 746 F.3d at 1232.

1032, 1045 (1964), *aff'd*, 352 F.2d 313, 319-20 (8th Cir. 1965) (14% is substantial).  "A representation is material if it is of a kind usually relied upon by a reasonably prudent person." *Transnet Wireless Corp.*, 506 F. Supp. at 1266 (citing *FTC v. Jordan Ashley, Inc.,* No. 93-2257-CIV, 1994 WL 200775 (S.D. Fla. Apr. 5, 1994)).  The evidence establishes all three elements for both Defendants' licensing and motor-vehicle sites, and their public benefits sites.

### a.    Deceptive Motor Vehicle and Other State Licensing Websites

As described in Section I.A above, Defendants' licensing and motor-vehicle sites represent they will provide state services – *e.g.*, renewing a driver's license or providing a fishing license.  They purchase search-engine advertising to place their sites high in the results when consumers search for ways to conduct these transactions, and those search results link to official-looking, often ".org" feeder websites, leading consumers to trust the sites.  The sites prominently claim consumers can "Renew your License," "Renew Car Registration," and "Skip the Line" to conduct DMV transactions or get other state licenses online.  Throughout the transaction, Defendants' websites solicit information consumers would expect to provide to a state licensing or motor vehicle website.  However, Defendants never provide the promised services, instead sending only a PDF of general, publicly available information.  Indeed, the very nature and cost of Defendants' "service" demonstrates their deception; consumers are unlikely to knowingly pay nearly $30 for information they can obtain for free from a public source.

The evidence shows that Defendants' licensing and motor vehicle sites overwhelmingly mislead consumers, at percentages far above those courts and the FTC have found "significant." *See, e.g.*, *Telebrands Corp.*, 140 F.T.C. 278, 325 (2005) (10.5% is substantial); *Firestone Tire*, 481 F.2d at 249 (10-15%).  As described in Section I.A.1 above, an expert's study demonstrated that nearly half of test subjects paid for Defendants' services, and of them, more than 80% expected to receive a renewed license, not a PDF "guide."  None of the purported disclaimers remedied this misrepresentation because consumers did not notice them, and many failed to understand them even when they were pointed out.  PX3 ¶¶93-99, 116-119.  Defendants' sites thus exemplify longstanding law that disclosures are ineffective if the net impression of the marketing is nevertheless misleading.  *FTC v. World Patent Mktg., Inc.*, Case No. 17-CV-20848, 2017 WL 3508639, at *13 (S.D. Fla. Aug. 16, 2017) (quoting *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)).  Indeed, as described in Section I.A.2 above, the FTC received more than 900 complaints from consumers that Defendants did not provide the services

27

consumers expected.  Even more consumers complained to their banks and credit-card companies, causing Defendants to face high chargebacks and, in many instances, lose merchant accounts altogether.  *See* Section I.A.2 *supra.*

A claim is material if it "address[es] the central characteristics of the product or service offered."  *World Patent Mktg.,* 2017 WL 3508639, at *11.  Here, Defendants' misrepresentations concerned the essential nature of the services consumers sought.  Because such a claim is of a kind normally relied upon by a prudent person, Defendants' misrepresentations on their licensing and motor vehicle sites are material.  *See Transnet Wireless Corp.,* 506 F. Supp. 2d at 1266.

**b.**      **Deceptive Public Benefits Websites**

As described in Section I.B. above, Defendants' public benefits websites claim they will verify or confirm consumers' eligibility for public benefits.  They appear high in search results and often use ".org" domain names that appear trustworthy to consumers.  The sites contain a brightly-colored "Eligibility" button under a headline "SELECT THE SERVICE YOU ARE LOOKING FOR" or a bold headline stating, for example, "Find Out If You Are Eligible for [Public Benefit]."  Importantly, consumers who click through Defendants' form see a representation on nearly every screen that instructs consumer to provide information to, for example, "verify eligibility."  However, Defendants do not verify consumers' eligibility, and instead merely email consumers a PDF of general, publicly available information.

Study evidence and consumer complaints show that Defendants' public benefits websites mislead consumers.  As described above in Section I.A.B.2, despite Defendants' small-print "disclosures," many consumers believe the sites will check their eligibility for public benefits and do not understand that their information will instead be sold to marketers.  PX3 ¶¶120-121.  These findings are confirmed by consumer complaints stating that consumers thought Defendants' sites would check their eligibility for public benefits.  After visiting Defendants' public benefits websites, many consumers reported fearing identity theft.

Defendants' misrepresentations are material because they concern the core characteristics of the services Defendants purport to offer – a central element of consumers' decision to provide their information.  *In re Southwest Sunsites, Inc.,* 105 F.T.C. 7, 149 (FTC 1985) ("A material representation or practice is one that is likely to affect a consumer's choice of or conduct regarding a product or service."); *see also World Patent Mktg.,* 2017 WL 3508639, at *11.

28

### 2. The Corporate Defendants Have Operated as a Common Enterprise and Are Jointly and Severally Liable.

Under the FTC Act, entity defendants are liable for the conduct of other entities "where the structure, organization, and pattern of a business venture reveal a common enterprise or maze of integrated business entities." *FTC v. Lanier Law, LLC*, 715 F. App'x 970, 979 (11th Cir. 2017). To determine if a common enterprise exists, courts consider whether the businesses "share office spaces and employees, commingle funds, coordinate advertising efforts, and operate under common control." *Id.* This list of factors is not rigidly applied, and the FTC need not prove a specific number of factors; instead, the court considers whether the entities "maintained an unholy alliance." *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1270 (S.D. Fla. 2019) (quoting *FTC v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008)). As another court in the 11th Circuit said, "in situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with a clear mechanism for avoiding the terms of the order, courts have been willing to find the existence of a common enterprise." *FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008) (citing *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746–47 (2d Cir. 1964)).

The Corporate Defendants meet all of the common enterprise factors. As described in Section III.A.4 above, they operate under the common control of the six Individual Defendants; share officers, employees, office space, and addresses; commingle their funds; and coordinate their marketing. *See Lanier Law*, 715 F. App'x at 979. Each of the entities described in Section II.A.1-3 plays a role in the "unholy alliance," whether it be obtaining merchant accounts and mailbox rentals, leasing office space, raising funds from investors, or designing the websites that lure in consumers. They work together in an integrated scheme to deceive consumers. Thus, they are jointly and severally liable for the acts of the enterprise as a whole.

### 3. The Individual Defendants Are Liable for Monetary and Injunctive Relief.

As ringleaders of the operation, Individual Defendants are personally liable for Corporate Defendants' illegal practices. An individual defendant is personally subject to injunctive and equitable monetary relief if he (1) "participated directly in the practices or acts or had the authority to control them" and (2) "had some knowledge of the practices." *Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996).

"An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1284 (S.D. Fla. 2019) (quoting *Transnet*, 506 F. Supp. 2d at 1270); *see also Nat'l Urological Group*, 645 F. Supp. 2d at 1207 (same).  Bank signatory authority or acquiring services on behalf of a corporation also demonstrate authority to control. *See, e.g., FTC v. USA Fin. LLC*, 415 F. App'x 970, 974-75 (11th Cir. 2011).  In addition, direct participation requires only some degree of involvement, not day-to-day immersion in all of the corporate defendant's activities. *See Pointbreak Media*, 376 F. Supp. 3d at 1271 (finding defendant who obtains merchant accounts for an entity directly participates in its wrongdoing)

Because each Individual Defendants served as both an officer and owner of at least one key Corporate Defendant, and because each served an officer's role (*e.g.*, CEO, chairman, general counsel, vice president, or CFO) within the common enterprise as a whole, *see supra* Section II.B, they had the authority to control the common enterprise.  Furthermore, each Individual Defendant actively manages and operates the common enterprise.  Among other things, they are all signatories on corporate bank accounts, and all entered contracts with mailbox and/or domain services providers.  Katz, Zangrillo, and Levison leased or purchased the operation's office spaces. *See supra* Section II.B.  In addition, Katz, Levison, Rothman, Sherman, and Mahon directly participated in the operations' illegal practices by obtaining merchant accounts for the deceptive websites. *See Pointbreak Media*, 376 F. Supp. 3d at 1271 (individual who obtains merchant accounts for deceptive marketing is personally liable).

Second, knowledge is established if an individual (1) "had actual knowledge of the deceptive conduct," (2) "was recklessly indifferent to its deceptiveness," or (3) "had an awareness of a high probability of deceptiveness and intentionally avoided learning of the truth." *FTC v. Primary Group, Inc.*, 713 F. App'x 805, 807 (11th Cir. 2017) (quoting *FTC v. Ross*, 743 F.3d 886, 892 (4th Cir. 2014); citing *FTC v. World Media Brokers*, 415 F.3d 758, 764 (7th Cir. 2005)).  The FTC is not required to prove subjective intent to defraud. *See IAB Mktg. Assocs.*, 746 F.3d at 1233.  Moreover, participation in business affairs is probative of knowledge. *FTC v. Partners in Health Care Ass'n*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016).

The evidence here, as described in Section II.B, overwhelmingly demonstrates that Individual Defendants knew of or – at minimum – intentionally avoided knowing about the unlawful practices.  All are highly placed officers who participate in many different facets of the

business' affairs.[27]  Katz, Levison, and Zangrillo have touted the operation's web publishing and lead generation and publishing activities on social media, revealing direct knowledge of those activities.  *See, e.g.,* PX 1 Att. AU at pp.13, 16, 46 (On Point is "leveraging premium and contextual domain names" to build "a robust, highly monetizable 'Signal Graph.'").  In addition, Levison's LinkedIn profile states he is responsible for "call center organization and billing and payment processing;" Rothman's LinkedIn profile describes his involvement in monetizing consumers' data ("turning high volume transactional clicks into life-time value customers."); and Mahon's profile says her management of all of the operation's finances require her to "interface with all internal and external stakeholders." *Id.* pp.14, 28, 39.

Each Individual Defendant controls and knows of the common enterprise's unlawful acts, and is therefore personally liable for any monetary judgment.

**B.     The Balance of Equities Favors Entering the TRO.**

"[W]hen a district court balances the hardships of the public interest against a private interest, the public interest should receive greater weight." *World Wide Factors, Ltd.*, 882 F.2d at 347; *see also FTC v. USA Beverages, Inc.*, 2005 WL 5654219, at *5 (S.D. Fla. Dec. 6, 2005) ("In balancing the equities, private concerns may be considered, but public equities must receive far greater weight.").  Here, the balance of equities mandates entry of a TRO because the public interest in preventing more consumers from falling victim to Defendants' deceptive practices far outweighs any possible interest Defendants may have in continuing these practices. Indeed, it is likely that only the entry of the requested injunctive relief will prevent the Defendants from continuing to deceive the public during the pendency of the litigation.

**III.    THE REQUESTED *EX PARTE* RELIEF IS NECESSARY TO PREVENT DEFENDANTS FROM DISSIPATING ASSETS AND DESTROYING EVIDENCE**

The FTC asks the Court to issue a TRO *ex parte* because, as discussed below, Defendants have shown themselves unwilling to comply with court orders or the law, and the defendants are likely to conceal assets or destroy evidence if they receive advance notice of this filing. In addition to injunctive relief to halt the deceptive conduct, the proposed TRO includes an asset

---

[27] Indeed, the fact that Katz, Levison, Mahon, Rothman, and Sherman each obtained merchant accounts for the operation is sufficient to show their knowledge of its deceptive activities, as they must have known about the operation's high chargeback and refund ratios.  *See Pointbreak Media*, 376 F. Supp. 3d at 1271 (individuals who obtained a scam's merchant accounts could not have been ignorant of its deceptive activities).

31

freeze, receivership, immediate access to Defendants' business premises, and expedited discovery. This relief also is necessary to prevent Defendants' likely dissipation of assets and destruction of evidence. Courts in this District regularly grant FTC requests for such relief in Section 13(b) cases.[28]

### A.    *Ex Parte* Relief Is Necessary to Ensure That the Court Will Be Able to Grant Effective Relief.

Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte* orders upon a clear showing that "immediate and irreparable injury, loss, or damage will result" if notice is given. *Ex parte* orders are proper in cases where "notice to the defendant would render fruitless the further prosecution of the action." *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 322 (7th Cir. 1984); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 439 (1974); *In re Vuitton et Fils, S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979).

If Defendants receive notice of this action, they will likely destroy, conceal, or dissipate evidence and assets. Indeed, destruction of evidence is a particular danger here; the misrepresentations occur on websites, which the Defendants change frequently and could destroy forever with a few clicks. The Defendants' enterprise is predicated on fraud and concealment;

---

[28] *See, e.g.*, *FTC v. Simple Health Plans LLC*, No. 18-cv-62593-DPG, Dkt. No. 13, S.D. Fla. Oct. 31, 2018) (entering *ex parte* TRO granting asset freeze, immediate access, expedited discovery, and appointment of receiver); *FTC v. Pointbreak Media LLC*, No. 18-cv-61017-CMA, Dkt. No. 12 (S.D. Fla. May 8, 2018) (same); *FTC v. Student Debt Doctor, LLC*, No. 17-cv-61937-WPD, Dkt. No. 9 (S.D. Fla. Oct. 3, 2017) (same); *FTC v. Strategic Student Solutions LLC*, No. 17-cv-80619-WPD, Dkt. No. 10 (S.D. Fla. May 15, 2017) (same); *FTC v. DOTAuthority.com, Inc.*, No. 16-cv-62186-WJZ, Dkt. No. 29 (S.D. Fla. Sept. 19, 2016) (same); *FTC v. World Patent Marketing*, No. 17-cv-20848-DPG, Dkt. No. 11 (S.D. Fla. Mar. 8, 2017) (same); *FTC v. Mail Tree Inc.*, No. 15-cv-61034-JIC, Dkt. No. 16 (S.D. Fla. May 19, 2015) (same); *FTC v. Centro Natural Corp.*, No. 14-cv-23879-CMA, Dkt. No. 10 (S.D. Fla. Oct. 21, 2014) (same); *FTC v. Partners in Health Care Ass'n, Inc.*, No. 14-cv-23109-RNS, Dkt. No. 9 (S.D. Fla. Aug. 25, 2014) (same); *FTC v. FMC Counseling Serv., Inc.*, No. 14-cv-61545-WJZ, Dkt. No. 15 (S.D. Fla. July 7, 2014) (same); *FTC v. Marcus*, No. 17-cv-60907-FAM, Dkt. No. 13 (S.D. Fla. May 9, 2017) (entering *ex parte* TRO granting asset freeze, immediate access, and appointment of receiver); *FTC v. Consumer Collection Advocates Corp.*, No. 14-cv-62491-BB, Dkt. No. 10 (S.D. Fla. Nov. 4, 2014) (same); *FTC v. Diversified Educational Resources, LLC*, No. 14-cv-62116-JIC, Dkt. No. 14 (S.D. Fla. Sept. 16, 2014) (entering *ex parte* TRO granting asset freeze, immediate access, and expedited discovery); *FTC v. Regency Fin. Serv., LLC*, No. 15-cv-20270-DPG, Dkt. No. 9 (S.D. Fla. Jan. 28, 2015) (same); *FTC v. 7051620 Canada, Inc.*, No. 14-cv-22132-FAM, Dkt. No. 8 (S.D. Fla. June 12, 2014) (same); *FTC v. Dluca*, No. 18-cv-60379-KMM, Dkt. Nos. 17, 23 (S.D. Fla. Feb. 28, 2018 & Mar. 12, 2018) (same).

the Individual Defendants use their employees as fronts to set up companies and obtain bank accounts and mailboxes to conceal their true location and identities.  Defendant Katz demonstrated his lack of respect for court orders by violating the 2014 Permanent Injunction, and Defendant Zangrillo is under indictment for bribery and fraud.  The FTC's experience with similar defendants underscores that they will take any opportunity to sabotage discovery and put their ill-gotten gains out of reach.  *See* Rule 65(b)(1) Certification and Declaration (filed concurrently).  Giving the Defendants notice could thus "render fruitless" further prosecution of this action.  *See Am. Can Co.*, 742 F.2d 322

**B.     An Asset Freeze is Necessary to Preserve the Possibility of Providing Restitution to Defendants' Victims.**

Courts have authority under Section 13(b) to impose an asset freeze to preserve the possibility of restitution to victimized consumers.  *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996).  Here, the Defendants present an especially high risk of concealment or dissipation of assets, making a freeze necessary to preserve the possibility of relief.  As described above, Defendants hold dozens of bank accounts, including multiple accounts for the same entities across several banks.  They launder money rapidly through these accounts in transfers that often have no apparent business purpose.  They have moved millions of dollars in ill-gotten gains into offshore accounts in the Caribbean, Switzerland, and elsewhere, with no other apparent purpose than to place assets beyond the reach of creditors or law enforcement.  The Individual Defendants take large payments from corporate accounts and own lavish homes, including – in Zangrillo's case – a mansion that made the cover of the Italian edition of Marie Claire.  PX1 ¶164, Att. AV p.3.  Absent an asset freeze and an order to repatriate funds already held overseas, the Defendants are likely to transfer their assets offshore and frustrate any possibility of recovery for consumers.

**C.     A Temporary Receiver, Immediate Access, and Expedited Discovery Are Necessary to Preserve the Status Quo.**

The Court may appoint a temporary receiver and take other steps to preserve the status quo pursuant to its equitable powers under Section 13(b) of the FTC Act.  *See FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1432 (11th Cir. 1984) (the court has inherent power "to grant ancillary relief, including freezing assets and appointing a Receiver, as an incident to its express statutory authority" under Section 13) (per curiam).  Where defendants have defrauded the public, "it is likely that in the absence of the appointment of a receiver to maintain the status quo,

the corporate assets will be subject to diversion and waste" to the detriment of the fraud's victims. *See SEC v. First Fin. Group*, 645 F.2d 429, 438 (5th Cir. 1981).

Appointment of a receiver is particularly appropriate here because the common enterprise is permeated with fraud. *See FTC v. USA Beverages, Inc.*, 2005 WL 5654219, at * 8 (S.D. Fla. Dec. 6, 2005) (equity receiver appropriate where entire business model is permeated with fraud). A receiver can monitor the use of defendants' assets (including assets held in foreign banks), marshal and preserve records, determine the extent of the fraud, and identify injured consumers. Moreover, defendants have constructed a complicated, multinational fraud machine involving a tangle of companies and bank accounts that only a receiver can efficiently unwind.

The Proposed TRO grants the FTC and the receiver immediate access to Defendants' business premises and records, and allow the FTC to engage in expedited discovery. Immediate access is critical to locate and preserve Defendants' documents and assets. In an effort to obscure their identities and locations, defendants have formed a web of over fifty legal entities and use over 15 mail drops across at least 8 different states. They own over two thousand domains and hide ownership of a majority (if not all) of their consumer-facing sites,[29] indicating that they are unlikely to be forthcoming in regular discovery. Further, as discussed above in Section II.B, Defendant Katz misled the Commission in a sworn compliance report and is violating a court order, and Defendant Zangrillo has been indicted on accusations of bribery and fraud. Defendants are thus unlikely to fulfill their obligation to preserve and produce records during regular discovery.

## CONCLUSION

For the reasons set forth above, the FTC moves his Court to enter the attached proposed *ex parte* temporary restraining order.

---

[29] PX1 Att. E p.1 (touting "2k+" "Owned Domains in [On Point Global's] Portfolio").

Respectfully submitted,

Dated: _12 / 9/ 2019_

_Sarah Waldrop_

Sarah Waldrop, Special Bar No. A5502583
(202) 326-3444; swaldrop@ftc.gov
Sana Chaudhry, Special Bar No. A5502350
(202) 326-2679; schaudhry@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave NW, CC 9528
Washington, DC 20580
Facsimile: (202) 326-3197


Attorneys for Plaintiff
FEDERAL TRADE COMMISSION