**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case Number 19-25046**

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

ON POINT GLOBAL LLC, *et al*.,

     Defendants.

**ROBERT ZANGRILLO, DRAGON GLOBAL LLC, DRAGON GLOBAL MANAGEMENT LLC, DRAGON GLOBAL HOLDINGS LLC, AND ON POINT CAPITAL PARTNER LLC'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISSOLVE THE *EX PARTE* TEMPORARY RESTRAINING ORDER AS IT PERTAINS TO THEM AND FOR RECIPROCAL DISCOVERY**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................... 1

RELEVANT FACTS ............................................................................................................... 4

    I.    The Moving Defendants ................................................................................................ 5

    II.   The Moving Defendants' Relationship to On Point Global .............................................. 7

    III.  On Point Websites ....................................................................................................... 9

ARGUMENT ........................................................................................................................... 11

    I.    The FTC Will Not Prevail on the Merits of its Claims. .................................................. 11

          A.   There is No Evidence that Mr. Zangrillo Participated in the Alleged Scheme. ...... 11

          B.   There is No Evidence that the Dragon Entities Participated in the Alleged Scheme. .................................................................................................................. 13

          C.   The Dragon Entities Did Not Participate in a Common Enterprise. ...................... 14

    II.   The Equities Weigh Against Applying the TRO to the Moving Defendants................. 19

          A.   The Moving Defendants—as well as Undisputedly Innocent Third Parties—Will Be Seriously and Unjustifiably Harmed by a Continuation of the TRO................. 19

          B.   An Asset Freeze Is Unnecessary to Preserve the Possibility of Future Relief. ....... 21

    III.  The Court Should Order Reciprocal Discovery. ........................................................... 23

    IV.  The Dragon Entities Did Not Violate the TRO............................................................. 23

CONCLUSION ........................................................................................................................ 24

REQUEST FOR HEARING .................................................................................................. 25

i

Defendants Robert Zangrillo, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC (collectively, the "Moving Defendants") submit this memorandum of law in support of their motion pursuant to Federal Rule of Civil Procedure 65(b)(4) to dissolve or modify the *ex parte* temporary restraining order entered by the Court on December 13, 2019 [ECF No. 17] and extended by the Court on December 26, 2019 [ECF No. 32] as it pertains to them, and for reciprocal discovery in advance of the January 10, 2019 preliminary injunction hearing.[1]

## **INTRODUCTION**

Robert Zangrillo, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC were wrongly named in this action. Far from being part of the scheme alleged in the FTC's complaint, the Moving Defendants are part of an entirely separate venture capital, private equity, and real estate investment firm that owns or manages a large portfolio of investments in the technology, hospitality, automotive, real estate, and other sectors. On Point Global LLC ("On Point") was just one of those investments.

A careful examination of the FTC's papers reveals that they actually say very little about the Moving Defendants, and certainly not enough to justify the "extraordinary and drastic remedy" of an *ex parte* TRO, asset freeze, and receivership as it pertains to the Moving Defendants. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted). Yet based on incorrect factual assertions, tangential associations, and a disregard for the Moving Defendants' true role as a minority investor in On Point, the FTC obtained an order freezing all of the Moving Defendants' assets (both personal and corporate) and placing legitimate businesses wholly unrelated to On Point into receivership. Effectively shutting the Moving Defendants down because one of their many investments was in On Point, which allegedly ran deceptive websites, is akin to shutting down an entire hedge fund because it holds stock in a healthcare company that submitted questionable reimbursement claims. The Court should correct the FTC's mistake and dissolve the TRO as to the Moving Defendants immediately, prior to the January 10, 2020, preliminary injunction hearing.

---

[1]     The Moving Defendants have not been properly served with the complaint in this action. However, because the existing TRO is causing ongoing harm to the Moving Defendants, they respectfully submit this motion to dissolve without waiving any service defense that may be available to them.

1

As to Mr. Zangrillo personally, the FTC does not allege that he took *any* action to formulate, direct, or participate in the so-called scheme, or that he had any involvement in the day-to-day operation of the websites that he invested in.  All of the evidence is in fact to the contrary.  But to support its claim of individual liability, the FTC relies on the claim that Mr. Zangrillo is the chairman, an executive, and a co-owner of On Point.  This is provably false.  Mr. Zangrillo is not the chairman of the company, and he has never been an executive.  Nor is he a "co-owner" in any meaningful sense.  Mr. Zangrillo is a minority (approximately 20%) outside investor in On Point, through his venture firm.  He is as much a co-owner of On Point as he is of Uber, Facebook, Magic City Innovation District, or some of his and his firm's other investments.  Every interaction that Mr. Zangrillo has allegedly had with On Point is absolutely typical of a venture capitalist overseeing his investment, and none of it demonstrates involvement in the allegedly deceptive websites.

The FTC's papers include other demonstrably false statements about Mr. Zangrillo, as well.  The FTC alleges that Mr. Zangrillo "co-owns" the entity DG DMV, which holds the website domain DMV.com.  He does not, and he has had no interest in that entity for almost two years.  The FTC insinuates that Mr. Zangrillo lives a "lavish" lifestyle thanks to money taken from the On Point websites, pointing to a "mansion that made the cover of the Italian edition of Marie Claire."  But Mr. Zangrillo bought that house in 2012, years before the alleged deceptive practices began.

Once the FTC's false claims about Mr. Zangrillo are set aside, all that is left are two paragraphs describing the activities of a typical outside investor.  Basing a sweeping *ex parte* TRO, asset freeze, and receivership on Mr. Zangrillo's minority stake in On Point is unprecedented and unjust.

The FTC attempts to make up for its lack of evidence against Mr. Zangrillo by devoting substantial space to unrelated pending criminal charges against him in the college admissions case.  *See* Ex Parte Motion for a Temporary Restraining Order and Memorandum in Support Thereof ("TRO Mem.") at 22.  These unproven, pre-trial allegations in a wholly unrelated criminal case (which has nothing to do with Mr. Zangrillo's businesses) have absolutely no weight as evidence in the FTC's case.  And the pendency of those charges proves exactly the opposite of the FTC's argument: far from showing his lack of respect for court orders, Mr. Zangrillo's scrupulous compliance with the terms of his release in Massachusetts demonstrates his respect for the law.

2

Recognizing that Mr. Zangrillo poses no threat of avoiding the legal process, the District Court in Massachusetts has repeatedly permitted Mr. Zangrillo to travel internationally on business, which he has done without incident.

The allegations against the other Moving Defendants are equally wanting and in many cases inaccurate.  As part of its vastly overbroad, generalized allegations, the FTC conflates Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC (collectively, the "Dragon Entities")—which are part of Mr. Zangrillo's venture capital business, and aside from their minority investment, are totally unrelated to On Point—with the other corporate defendants sued in the case.  The FTC inaccurately claims that the Dragon Entities' "sole" investment is On Point, when their portfolio in fact includes investments in various other major companies.  Moreover, the FTC attempts to tie the Dragon Entities to the alleged scheme by exaggerating and mischaracterizing common relationships between an investor and early stage investments.  For example, the FTC portrays Dragon Global Management LLC's sublease of office space to On Point as proof of a complex money-laundering scheme, when in fact it is an arm's-length commercial arrangement common to venture funds.

The FTC's papers also contain outright inaccurate statements about the Dragon Entities. For example, contrary to the FTC's unsupported and unexplained assertion, the Dragon Entities are undisputedly part of a stand-alone investment firm, and are not the "finance division" or "capital-raising arm" of On Point.  And the FTC's suggestion that the Dragon Entities paid $1.4 million of On Point's salary expenses is totally misguided—that money went to pay the payroll of the Dragon Entities' own employees, demonstrating again the separateness between the two companies. The FTC also tries to mischaracterize On Point's legitimate loan repayments to the Moving Defendants as evidence of comingling of funds.  But these are entirely ordinary interactions between a venture investor and one of its portfolio companies, none of which demonstrate involvement in the conduct alleged in the complaint and certainly are not grounds for injunctive relief.

Finally, although there is no valid reason or compelling need to freeze the Moving Defendants' assets and appoint a receiver over the Dragon Entities, the Moving Defendants are willing to consent to interim relief that will protect the FTC's articulated interests pending full consideration of the preliminary injunction motion.  Specifically, the Moving Defendants will consent to (a) a total freeze of their economic interest in On Point, and (b) posting security in an

amount equal to the distributions that the Moving Defendants allegedly received from On Point. Anything more than that is unsupported, unnecessary, and overbroad—and will have catastrophic consequences to Mr. Zangrillo's professional and personal life during the holiday season (for an investigation that the FTC began months ago).  Under the current TRO, the Moving Defendants cannot make capital calls to protect existing venture investments, pay employees, manage investments, or operate their business.  This will have serious effects on undisputedly innocent third parties, including the Dragon Entities' investors and employees.  Nor can Mr. Zangrillo continue to be the sole financial support for his three daughters and his elderly parents under the TRO: Mr. Zangrillo pays for his very ill father's nursing home expenses and health care aid, as well as his mother's and daughters' living expenses.

At base, the FTC has provided no legitimate reason to believe that the Moving Defendants present a risk of asset flight or concealment.  Nor does the TRO, as it pertains to the Moving Defendants, do anything to mitigate the alleged consumer deception.  Therefore, given that the FTC has not met its burden, the Court should dissolve the TRO as it pertains to the Moving Defendants pending the January 10, 2020, preliminary injunction hearing or, alternatively, modify the TRO solely to freeze their interest in On Point and require security for the amounts allegedly received by the Moving Defendants, as offered above.

Finally, and separately, the Court should order reciprocal discovery in the interim so Mr. Zangrillo and the Dragon Entities can depose the FTC's expert and forensic accountant, see the documents that they relied upon in preparing their declarations (which rely on multiple layers of hearsay), and prepare to oppose the preliminary injunction motion.

## **RELEVANT FACTS**

The FTC's Complaint and its TRO applications contain scant facts concerning the Moving Defendants, and much of what is alleged about them is incorrect.  The FTC's core allegations against the Moving Defendants appear to be (incorrect) claims that Mr. Zangrillo is the Chairman of On Point, that the Dragon Entities served as On Point's "finance division," and that the Dragon Entities and On Point share employees and office space.  None of these allegations are accurate.

The reality is that the Dragon Entities are part of a long-standing, successful, diversified venture capital, private equity, and real estate investment firm that has investments across the seed, early-stage, and late-stage phases of corporate development in the technology, automotive, hospitality, and real estate sectors.  One of those investments is a minority, non-controlling interest

in On Point.  Like any material investor in an early-stage technology company, the Dragon Entities have contributed capital to On Point, extended working capital loans to On Point to protect their equity investment, and leveraged their strategic relationships to help On Point succeed.  But none of the Moving Defendants have ever been involved in the day-to-day management of On Point or the conduct that the FTC complains about.

## I.    The Moving Defendants

Far from being the "capital-raising arm" of On Point, Mr. Zangrillo and the Dragon Entities are major players in the venture capital, private equity, and real estate investing worlds:

**Robert Zangrillo** is a private equity, venture capital, and real estate investor.  Mr. Zangrillo identifies and manages investments for both his family office and on behalf of third-party investors, all under the "Dragon Global" brand.  Declaration of Diana Loftus ("Loftus Decl.") ¶ 5.

**Dragon Global Management LLC** is the management entity for all of the entities under the Dragon Global brand.  *Id.* ¶ 6.  It employs four full time staff members who support Dragon Global's investments (through separate, investment-specific management companies) and run its day to day operations.  *Id.* ¶ 7.  While the Dragon Global investments are typically held in separate special purpose vehicles (for accounting, management, tax, and liability reasons, as is customary in the industry), all of those investments are managed by Dragon Global Management LLC's personnel.  *Id.* ¶ 8.  Dragon Global's portfolio includes investments across various industry sectors, including investments in companies like Facebook, Uber Technologies, Zynga, and Fair, amongst others.  *Id.* ¶ 9.  Dragon Global also does seed round investing in companies such as H2o, amongst others.  *Id.*

Dragon Global Management LLC also manages (again, through separate management entities) Dragon Global's real estate investments, including more than $100 million in real estate in the Magic City Innovation District, Wynwood, and a mixed-use project on the Miami River.  *Id.* ¶ 10.  Dragon Global Management LLC manages an entity that holds an investment in Selina, an owner and operator of hotel and co-working spaces in dozens of locations throughout the world.  *Id.* ¶ 11.  And Dragon Global Management LLC manages Dragon Global's early-stage investment

in On Point.  *Id.* ¶ 9.[2]

      **On Point Capital Partners LLC** ("OPCP") is Dragon Global's special purpose vehicle for investing in On Point.  *Id.* ¶ 16.  OPCP has a minority, non-controlling interest in On Point of approximately 28.4%.  *Id.* ¶ 17.  Currently, OPCP is one of seven minority investors in On Point, as illustrated on the chart below:



*Id.* ¶ 18 & Ex. A.  OPCP, in turn, is owned approximately 97% by Dragon Global Holdings LLC, with third-party investors making up the other approximately 3%.  *Id.* ¶ 19.

      **Dragon Global Holdings LLC** is the principle investment vehicle for Mr. Zangrillo's family office.  *Id.* ¶ 12.  Its members are Mr. Zangrillo personally (74%), the AAA 2012 trust (25%), and DMG GP LP (1%).  *Id.* ¶ 13.  The AAA 2012 trust is a trust established for the sole benefit of Mr. Zangrillo's three daughters, which is administered by a third-party trustee.  *Id.*  And as its name suggests, DMG GP LP is a general partner entity, owned by Mr. Zangrillo.  *Id.*  Thus, as it relates to On Point, Mr. Zangrillo has an indirect 20.661% interest in the company through

---

[2]      The FTC's complaint misleadingly suggests that the Dragon Entities are not a legitimate venture firm, and that they exist only to finance On Point.  Specifically, the complaint alleges that "The Dragon Global Defendants website *presents* these companies' business as venture capital funding.  According to that website, the Dragon Global Defendants' *sole* 'early stage control' investment is the On Point Defendants."  Compl. ¶ 91 (emphasis added).  The reality is that the Dragon Entities *are* venture capital businesses, and while it is true that at this moment On Point is their only investment in the "early stage" category, the FTC's complaint omits the fact that Dragon Global manages many other investments in other categories, as set forth above.

OPCP (*i.e.*, 75% of Dragon Global Holding's 97% of OPCP's 28.4% of On Point) as set forth in the chart below:



*Id.* ¶¶ 20–21 & Ex. B.

**Dragon Global LLC**, the last of the named Dragon Entities, is a largely defunct entity that was formed years ago for a corporate purpose that was never pursued.  *Id.* ¶ 14.  Dragon Global LLC holds no assets and has no operations, employees, or physical presence.  *Id.* ¶ 15. Dragon Global LLC has no connection to On Point Global LLC whatsoever.  *Id.*

## II.    <u>The Moving Defendants' Relationship to On Point Global</u>

As the above makes clear, the relationship between the Moving Defendants and On Point is the relationship between a venture capital investor and one of its portfolio companies.  In that capacity, the Moving Defendants have invested money into and extended working capital loans to On Point, exercised general oversight pursuant to its investor rights, and leveraged strategic relationships to help On Point succeed, including sub-leasing office space (at commercially reasonable rates).  Declaration of Bob Bellack ("Bellack Decl.") ¶¶ 4–5; Loftus Decl. ¶ 30.  The Moving Defendants have not, however, been involved in the day-to-day operations of On Point, let alone the design and maintenance of the websites that are the subject of the FTC's lawsuit. Bellack Decl. ¶ 6; Loftus Decl. ¶ 32.

**Equity Investments and Loans:**  In January 2018, Burton Katz (On Point's CEO) led a "roll up" of several entities to create On Point Global LLC.  Loftus Decl. ¶ 22.  Up to that point, OPCP had invested a total of approximately $4,378,786.46 into the venture, in a mix of capital

contributions and loans.  *Id.* ¶ 23.[3]  From January to August 2018, OPCP loaned On Point an additional approximately $761,671.70.  *Id.* ¶ 25.

To date, On Point has made three payments in partial repayment of OPCP's loans.  On August 28, 2018, On Point repaid $342,986.51 and $761,610, and on February 4, 2019, On Point repaid $1,469,942.17.  *Id.* ¶ 26.[4]  The current outstanding principle balance of OPCP's loans to On Point is approximately $740,849, which is due on or before December 31, 2019.  *Id.* ¶ 27.

**Expense Reimbursement:**  Periodically, On Point has reimbursed Mr. Zangrillo and the Moving Defendants for reasonable expenses they incurred in connection with their work as venture investors in On Point.  *Id.* ¶ 28; Declaration of Megan Black ("Black Decl.") ¶ 5.  For example, Mr. Zangrillo, has submitted invoices for, and On Point has reimbursed the cost of, airline tickets, airplane WiFi, and hotels related to his work as a venture investor in On Point.  Loftus Decl. ¶ 28.  On Point has also reimbursed the Moving Defendants for the significant time that Mr. Zangrillo's executive assistant spent assisting with the On Point venture.  *Id.*; Black Decl. ¶ 5.

**Office Space**:  Beginning in or about February 2018, Dragon Global Management LLC has subleased office space in Los Angeles to On Point.  Schwartz Decl., Exs. 8, 9.  In return, On Point pays market-rate rent, and makes regular rent payments to Dragon Global Management LLC.  *Id.*; Loftus Decl. ¶ 30.  On Point is not the only portfolio company that subleases space from

---

[3]     As is the case with many early-stage roll-up companies, the details are more complicated. But in short, OPCP originally invested in and loaned money to an entity called DG DMV, LLC. Loftus Decl. ¶ 24.  As part of the roll-up, OPCP contributed its ownership interest in DG DMV and other assets, and ended up with a 35% interest in On Point, as well as an outstanding loan balance in its favor.  *Id.*; Declaration of Matthew L. Schwartz ("Schwartz Decl."), Ex. 11 at 21. Later, like most technology companies, On Point issued additional equity to its key employees, which diluted OPCP to its current 28.4% interest.  Loftus Decl. ¶ 24.  When it was originally formed, Mr. Zangrillo also agreed to serve as On Point's non-executive (*i.e.*, outside) Chairman, for which he received no compensation apart from expense reimbursement.  Contrary to the FTC's allegations, however, Mr. Zangrillo has not served in that position for nearly a year, having resigned last March, and he has never been an officer of On Point.  Schwartz Decl., Ex. 2; Bellack Decl. ¶ 6.  Moreover, and also contrary to the FTC's allegations, the Moving Defendants have not had any ownership interest in DG DMV for almost two years.  Loftus Decl. ¶ 22–24; Schwartz Decl., Ex. 11.

[4]     The FTC alleges that Mr. Zangrillo has received approximately $2 million from the "Corporate Defendants."  TRO Mem. at 22.  Presumably, the FTC is referring to these loan repayments.

Dragon Global Management; multiple other portfolio companies currently or historically have subleased office space from Dragon Global Management. *Id.* ¶ 31.

**Payroll**: The Dragon Entities have *not* paid On Point's payroll. In its papers in support of the TRO, the FTC's forensic accountant states that, based upon an automated review of various bank records (including the bank account of Dragon Global Management LLC), "I identified $15,573,640 of ADP payroll and related expenses. Two accounts held by Waltham Technologies LLC were used to pay $14,239,012 (90.85 percent) of these expenses. An account held by Dragon Global Management LLC was used to pay the other $1,434,628 of payroll and related expenses." PX4 at ¶¶ 3, 13; *see also id.* ¶ 4 (defining the relevant time period as April 1, 2016, through August 31, 2019). To the extent that this statement is meant to imply that Dragon Global Management paid $1,434,628 of *On Point's* payroll, it is false. While it may be true that Dragon Global Management paid $1.4 million to ADP in payroll expenses over a three year period,[5] those payments were exclusively for Dragon Global Management's own employees. Schwartz Decl., Ex. 13. At no point did the Moving Defendants ever pay On Point's payroll, as even On Point's CFO confirms. Bellack Decl. ¶ 7; Loftus Decl. ¶ 29.

### III.    On Point Websites

The FTC's lawsuit has nothing to do with the Moving Defendants; it is about certain allegedly deceptive websites owned and operated by On Point. On Point develops internet content and operates a series of websites that offer users reference guides on, for example, how to renew driver's licenses. As the FTC notes, each of these websites includes various disclaimers that notify customers that the websites are not government-run and explain precisely that the site offers reference guides—not government services.

For example, when users visit www.license-driver.com, they receive at least three different disclosures that the website is not affiliated with any government agency and only offers guides on how to obtain DMV services.

First, the landing page specifically includes text at the top of the page explaining that the website "**is in no way or fashion affiliated with any federal or local government agency or**

---

[5]    The FTC's papers do not attach the bank records its forensic accountant relied upon or even a schedule of the identified payments. As part of the reciprocal discovery requested in this motion, the Moving Defendants will demonstrate that the payments to ADP identified by the FTC's forensic accountant— which are the only payments to or from the Moving Defendants discussed in the forensic accountant's declaration—have nothing to do with On Point.

**offices.**" Compl. ¶ 127.  In fact, all of On Point's websites contain a similar disclaimer at the very top of the landing page.  *See, e.g.*, PX1 Att. H at 1; PX1 Att. AD at 2; PX1 Att. AH at 1.



Compl. ¶ 126.

Second, in all capital letters and blue text, the heading of the landing page reads:  "OBTAIN YOUR ROAD GUIDE" and informs the user that "You can purchase for $23.98 and download our comprehensive guide and resources."  Compl. ¶ 127.



Compl. ¶ 126.

Third, before  a user is allowed to input credit card information, a window appears that (1) requires users to "**agree that the Site is privately owned and is neither operated by, nor affiliated with, any government agency**," (2) reminds users that the site "provides helpful, time-saving information and downloads as a **private value-add** to services offered by the Department of Motor Vehicles," and (3) clarifies that the site "provides an online portal to give visitors a general understanding of the driver license registration process."   PX1 Att. J at 3.

*        *        *

The Moving Defendants, as minority, non-controlling investors in On Point, have no role in the design or operation of On Point's websites that are the subject of the FTC's complaint. Loftus Decl. ¶ 32; Bellack Decl. ¶ 6.  The Moving Defendants do not manage the websites or On Point's employees, and have no oversight over or involvement in the websites' content.  Loftus Decl. ¶ 32; Bellack Decl. ¶ 6.  Nothing in the FTC's papers is credibly to the contrary.  Moreover, at the time of their investment in On Point (or more specifically, its predecessors), the Moving Defendants conducted due diligence, including receiving assurances from On Point's outside counsel that its operations complied with all legal and regulatory requirements.

## ARGUMENT

The Court should dissolve the *ex parte* TRO as it pertains to the Moving Entities because it was obtained without any evidence that Mr. Zangrillo or the Dragon Entities were engaged in the so-called scheme and there is no evidence of a risk of asset dissipation.

"On [a] motion to dissolve a temporary restraining order . . . the party that obtained the order[] bears the burden of justifying continued injunctive relief." *S.G. Cowen Sec. Corp. v. Messih*, No. 00 CIV. 3228 (HB), 2000 WL 633434, at *1 (S.D.N.Y. May 17, 2000). "Rule 65(b) does not place upon the party against whom a temporary restraining order has issued the burden of coming forward and presenting its case against a preliminary injunction." *Granny Goose Foods, Inc. v. Teamsters*, 415 U.S. 423, 442 (1974). The FTC has failed to make any showing as to the Moving Defendants, and the TRO should be dissolved as it pertains to them.

### I.     The FTC Will Not Prevail on the Merits of its Claims.

"[I]n determining whether to grant a preliminary injunction under Section 13(b), a district court must (1) determine the likelihood that the FTC will ultimately succeed on the merits and (2) balance the equities." *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217 (11th Cir. 1991). To show a likelihood of ultimate success, the FTC must raise "questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination by the FTC in the first instance and ultimately by the Court of Appeals." *Id.* at 1218 (internal quotation marks omitted). The FTC has failed to meet that burden at this time and will fail to do so at a preliminary injunction hearing as well.

### A.     There is No Evidence that Mr. Zangrillo Participated in the Alleged Scheme.

The FTC's filings are bereft of any specific allegation—let alone evidence—that Mr. Zangrillo knew about or engaged in the alleged deceptive marketing practices. Rather, the FTC resorts to broad-brush assertions that Mr. Zangrillo "formulated," "directed," and "participated in the acts and practices set forth in [the] Complaint," which are in no way supported by specific factual allegations or evidence. Compl. ¶ 68. These wholly conclusory allegations are not "entitled to the assumption of truth" in assessing the FTC's burden in connection with the instant TRO. *See McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018) (stating that "[c]onclusory allegations are not entitled to the assumption of truth" and should be disregarded).

Notably, the FTC **does not provide a single example** of any action Mr. Zangrillo took to further the alleged scheme. Nowhere in the FTC's papers does it allege, let alone provide evidence

that proves, that Mr. Zangrillo was involved in the design, maintenance, or operation of the allegedly misleading websites.  That is because he has never been involved with the allegedly deceptive websites *at all*.  Bellack Decl. ¶ 6; Loftus Decl. ¶ 32.  The paucity of allegations relating to Mr. Zangrillo stands in stark contrast to the more detailed factual assertions relating to other defendants who, the FTC alleges, hired writers, developers, and telemarketers to create the guides, run the websites, and handle administrative tasks.  *See* TRO Mem. at 14.

The handful of allegations relating to Mr. Zangrillo in the FTC's papers serve only to demonstrate the lack of evidence against him.  For example, the FTC claims that Mr. Zangrillo was "directly involved in the scheme's online operations" because, in May 2017, "he obtained privacy services for onpointguides.com, which hosted On Point's PDF reference guides prior to September 2019."  *Id.* at 22.  But, as the FTC admits, Mr. Zangrillo transferred the domain to Brent Levinson in January 2018.  PX1 ¶ 180; Loftus Decl. ¶ 33.  Prior to January 2018, the domain name was not in use and therefore could not possibly have hosted any allegedly misleading reference guides.  *Id.*

Similarly, the FTC takes entirely mundane facts about Mr. Zangrillo and tries to cast them as evidence of Mr. Zangrillo's participation in the scheme alleged in the complaint.  For example, the FTC claims that Mr. Zangrillo had specific knowledge of the misleading websites because he described On Point in an Instagram post as a company that sells reference guides and monetizes consumer data.  *See* FTC's Memorandum of Law in Support of its Motion to Extent the TRO ("Mot. to Extend") at 4.  But nothing in the Instagram post shows that Mr. Zangrillo participated in the alleged scheme or had knowledge of its allegedly deceptive aspects.  To the contrary, the FTC's entire case is about the claim that On Point misleadingly **failed** to disclose that it was only selling reference guides, rather than providing (for example) license renewal services or government-authorized section 8 benefit eligibility checks.  TRO Mem. at 1.  The post shows knowledge of a legitimate business model that one would expect of any venture investor.

And while the FTC asserts that Mr. Zangrillo is On Point's chairman and an officer of the company, Compl. ¶ 67, the reality is that he is neither. Bellack Decl. ¶¶ 5–6; Schwartz Decl., Ex. 2.  Nor is Mr. Zangrillo a "co-owner" of On Point, Compl. ¶ 67, except in the most technical sense.  Mr. Zangrillo is a *minority* investor through OPCP.  Therefore, far from being a controlling shareholding, as the FTC incorrectly claims, Compl. ¶ 106, Mr. Zangrillo owns approximately 20% of On Point through OPCP and has no ability to control or direct the company, Loftus Decl.

¶ 21; Bellack Decl. ¶ 4.  Mr. Zangrillo is no more a "co-owner" of On Point than any shareholder in any company—a status that certainly does not make him liable for the company's actions, assuming for the sake of argument that they were improper.

Moreover, the FTC's insinuation that Mr. Zangrillo received proceeds from the alleged scheme, which he used to purchase a "lavish" "mansion that made the cover of the Italian edition of Marie Claire" is completely false.  TRO Mem. at 33.  Mr. Zangrillo purchased that house in June 2012, Schwartz Decl. ¶ 2 & Ex. 1, years before On Point's "scheme" allegedly began. Moreover, as set forth above, the only payments that the Moving Defendants have ever received from On Point are partial loan repayments (with a balance still outstanding) and small expense reimbursements.  Loftus Decl. ¶¶ 26–28.  The FTC's suggestion that Mr. Zangrillo is living the high life on the back of On Point's websites has no bearing to reality.

 The FTC's numerous errors, misstatements, and overgeneralizations are important for at least three reasons.  First, in the absence of any specific allegations about Mr. Zangrillo's conduct in connection with the allegedly misleading websites, the FTC relies on its incorrect and misleading allegations about his relationship to On Point to support a "presumption of ability to control a small, closely-held corporation."[6]  TRO Mem. at 30.  Since Mr. Zangrillo is *not* the chairman, an officer, or a co-owner of On Point, the FTC is not entitled to a presumption of an ability to "control," and its entire theory of individual liability as to Mr. Zangrillo falls apart. Second, for the same reasons, Mr. Zangrillo is not individually liable for monetary and injunctive relief, which attach only if a defendant "*participated directly* in the practices or acts or had the authority to control them" *and* (2) "had some knowledge of the practices."  *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (internal quotation marks omitted) (emphasis added). And third, and perhaps most significantly, these errors and overstatements—which were presented to the Court *ex parte* as being accurate—undermine the FTC's basis for a TRO.

**B.** **There is No Evidence that the Dragon Entities Participated in the Alleged Scheme.**

The FTC's papers also lack evidence tying the Dragon Entities to the alleged scheme.  The FTC does not allege that the Dragon Entities built, ran, or managed any of the allegedly misleading

---

[6]      The presumption is rebuttable in any case, *see Fed. Trade Comm'n v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1282–84 (S.D. Fla. 2019), and has clearly been rebutted here.

websites.  Nor does the FTC allege that the Dragon Entities participate in the day-to-day operation of On Point—a reality that has now been confirmed by the Court-appointed receiver.

Instead, the FTC attempts to conflate the Dragon Entities with On Point by repeatedly asserting—without any basis in fact—that the Dragon Entities were On Point's "capital-raising arm," TRO Mem. at 14, 18, and "finance division," Compl. ¶ 91.  This characterization is especially puzzling since the Dragon Entities' sole cash investment in On Point was back in 2015, followed by working capital loans, the most recent of which was extended in August 2018.  Loftus Decl. ¶ 25.  Since then, the Dragon Entities have not made any additional investments in the company or contributed, lent, or transferred any cash to them in any way.

Moreover, it is unclear what the FTC means when it tries to describe the Dragon Entities as On Point's "finance division," a description for which the FTC offers no explanation.  To the extent the FTC is referring to the loans from OPCP to On Point, its case is vastly overstated.  These types of loans are a common practice for venture capital investors to protect their investment, and are often preferred by portfolio companies because they provide liquidity without diluting management or other existing shareholders.[7]  Loans certainly do not serve as evidence of control or complicity.

At bottom, the FTC mistakenly conflates the Dragon Entities with the dozens of other entities named in its lawsuit that have no operations separate from On Point—including by misleadingly suggesting that the Dragon Entities have no other investments.  *See supra* pp. 3, 6; Loftus Decl. ¶ 9.  The Dragon Entities are venture capital investors in On Point, and therefore invested in and loaned money to it, just like many other Dragon Global portfolio companies.  The Dragon Entities are in no sense On Point's "finance division" or "capital-raising arm."

### C.    The Dragon Entities Did Not Participate in a Common Enterprise.

Consistent with its overbroad, generalized allegations, the FTC spins together an artificially complex corporate web to argue that the Dragon Entities formed an "unholy alliance" with the other defendant entities and should therefore be held liable for their conduct.  TRO Mem. at 29. To determine whether entities engaged in a common enterprise, "courts consider a variety of

---

[7]    George W. Dent, Jr., <u>Venture Capital and the Future of Corporate Finance</u>, 70 Wash. U. L.Q. 1029, 1032 (1992) (explaining that, in the venture capital space, "[d]ebt financing is generally preferred over equity because equity investors demand a higher return on their investment than lenders").

factors, including whether the businesses: share office spaces and employees, commingle funds, coordinate advertising efforts, and operate under common control." *Fed. Trade Comm'n v. Lanier Law, LLC*, 715 F. App'x 970, 979–80 (11th Cir. 2017). *None* of these factors indicate that the Dragon Entities were part of a common enterprise. Once the Court discards the FTC's inaccurate information, what remains is a typical, arm's-length relationship between a venture firm and one of its portfolio companies.

      1.   <u>The Dragon Entities Do Not Share Office Space and Employees with Other Defendants.</u>

As to the first *Lanier* factor—shared office space and employees—the FTC offers no credible evidence whatsoever that the Dragon Entities share an office with any of the other defendants. While the FTC cites post office records and mailbox indexes to argue that the defendants have overlapping addresses, the exhibits actually establish that the two addresses associated with the Dragon Entities (1521 Alton Road, Miami Beach, Florida and Redwood City, California) do not overlap with any other defendants' addresses. TRO Mem. at 17; PX1 ¶¶ 213–14; PX9. Similarly, the FTC's spreadsheet of physical addresses associated with domain names does not list either Mr. Zangrillo or the Dragon Entities' addresses. *Id.* (citing PX1 Att. BH).[8]

The FTC's other efforts to connect the Dragon Entities' physical location with the other defendants fall short. For example, the FTC lists the fact that Mr. Zangrillo leased office space to On Point, "arranged for the property's exterior mural," and visited "OnPoint's headquarters in Magic City" as evidence of a common enterprise. TRO Mem. at 22 (citing PX1 Att. AV). But these simply are examples of an arms-length transaction and the types of aid that venture capital investors routinely provide companies in their portfolios.[9] Indeed, as any viewer of *Shark Tank* can attest, one of the primary reasons early-stage companies seek investments from experienced

---

[8]      The FTC points to a LinkedIn page for Dragon Global, which lists the address 350 NE 60th Street in Miami, Florida. This was an error. The Dragon Company Group has never had offices at that location, nor have they ever shared office space with On Point. Black Decl. ¶ 6.

[9]      *See, e.g.*, Bellack Decl. ¶¶ 4–5; Alejandro Cremades, <u>How Venture Capital Works</u>, Forbes (Aug. 2, 2018) ("VCs like Andreesen Horowitz or First Round Capital have a dedicated team of marketers, recruiters and other resources to bring into a company they invest in. Ultimately this helps in fueling the growth of the business.").

funds is for just this type of strategic assistance and access to the investors' network.[10]  The FTC also points to the court-appointed receiver's discovery of papers related to LivingHealth.com (a domain that On Point recently purchased) in a Los Angeles office space owned by Dragon Global. *See* Mot. to Extend at 3.  In the same breath, however, the FTC acknowledges that Dragon Global sublets that office space to On Point.  *Id.*  It is not at all surprising (or any evidence of shared office space) that papers related to a domain owned by On Point were found in On Point's office.

Nor has the FTC established that the Dragon Entities shared employees with any of the other defendants.  The FTC's claim that LinkedIn pages show that the defendants have overlapping employees is plainly false as to Mr. Zangrillo and the Dragon entities.  *See* TRO Mem. at 16 (citing PX1 Att. AU).  Just one of the many LinkedIn pages included in the FTC's exhibits reference the Dragon Entities, and unlike the other LinkedIn pages in the exhibit, that employee's page does not mention any of the other corporate defendants.  PX1 Att. AU at 26.

The FTC also is wrong that a Dragon Global employee, Diana "Dede" Loftus, "signed documents" on behalf of On Point.  Mot. to Extend at 3 (citing PX1 Att. BA).  As support, the FTC cites to DG DMV LLC's 2015 Application to do Business in Florida.  *Id.*  But, as explained in detail below, while Mr. Zangrillo invested in DG DMV LLC in 2015, he contributed his equity stake in DG DMV to On Point in January 2018.  *See* Schwartz Decl., Ex. 11; Loftus Decl. ¶¶ 22–24.  Accordingly, a 2015 signature does not establish that the Dragon Entities shared employees with the other defendants.

Moreover, On Point's reimbursement to the Moving Defendants for the significant time Mr. Zangrillo's executive assistant, Megan Blank, spent helping On Point's management at the time of its roll-up, Black Decl. ¶¶ 4–5, is another example of aid that venture capital investors typically provide early stage companies in their portfolios.  Ms. Black assisted On Point's management with organizing closing documents and managing the corporate data room.  *Id.*  The reimbursement for that assistance actually establishes the independence of the two companies, since no reimbursement would be necessary if the On Point and the Dragon Entities were one in the same.  Similarly, that an On Point officer asked Ms. Black to load a document onto On Point's

---

[10]      *See, e.g.*, Bellack Decl. ¶¶ 4–5; William A. Sahlman, The Structure and Governance of Venture-Capital Organizations, 27 J. Fin. Econ. 473, 506 (1990) (explaining that, to manage investment risks, venture capitalists offer their strategic relationships and knowledge to portfolio companies, "in effect functioning as consultants").

corporate data room is another insignificant example of the typical help investors offer early stage investments in their portfolios.  *See* Mot. to Extend at 3 (citing PX18 Att. A).

The FTC also calls out the overlap between the On Point advisory board and Dragon Global's advisory board.  Again, this is a common characteristic of venture capital investments.  Venture capital investors often "request board involvement in return for the investment," taking an active role in the high-level, strategic decision making of their portfolio companies.[11]  It is not surprising that Dragon Global's investors are involved in the companies in which they invest.  Moreover, the FTC's argument that the advisors use the same photographs on their Dragon Global website profiles and On Point's website demonstrates the lengths it will go to drag the Dragon Entities into the alleged scheme without any evidence.  *See* TRO Mem. at 17.  These are professional headshots.  A public image search of the advisors shows that each one of the headshots appears on various websites, including on LinkedIn, Crunchbase, news articles, and Wikipedia.  Schwartz Decl., Exs. 3–7.  The fact that two websites share the same headshots means nothing.

        2.   <u>The Dragon Entities Do Not Commingle Funds with Other Defendants.</u>

Likewise, the FTC cannot establish the second *Lanier* factor, which asks whether the Dragon Entities commingled funds with any of the other defendants.  The payments that the FTC claims are evidence of "commingling" are legitimate business activities.  For example, as evidence of "commingling funds," the FTC cites to On Point's February 2019 payment of $1.5 million to Mr. Zangrillo.  TRO Mem. at 18 n.18.   But this transfer was simply the partial repayment of On Point's outstanding debt—a common business practice—and not evidence of any impropriety.[12]  Loftus Decl. ¶¶ 23-27.

The FTC also speculates that because Dragon Global Management received rent payments from both On Point and a startup called LiveXLive, the entities must have been paid and received funds "interchangeably."  TRO Mem. at 18.  The FTC's speculation is wrong.  Dragon Global subleased California office space to On Point, and for most months On Point paid rent to Dragon Global.  *See* Schwartz Decl., Exs. 8, 9.  During certain months, however, On Point did not need the space and subleased it again to a company called LiveXLive.  Loftus Decl. ¶ 30.  Instead of

---

[11]      Cremades, *supra* note 9; *see also* Bellack Decl. ¶ 5.

[12]      George Deeb, <u>What Exactly Is Venture Capital?</u>, Forbes (July 18, 2016) ("Most investors think money is money.  But, it really comes in all shapes and sizes.  Within the venture capital space, the two most typically used structures are equity and convertible debt.").

LiveXLive paying rent to On Point and On Point then paying Dragon Global, LiveXLive simply paid Dragon Global directly in these transactions. *Id.*

Finally, as set forth above, the FTC's insinuation that Dragon Global Management ever paid any portion of On Point's payroll is false and misleading. Dragon Global Management's payments to ADP were for its own payroll, for its own employees, having nothing to do with On Point's employees or operations. *See supra* pp. 8–9. The Dragon Entities have never paid On Point's payroll. Loftus Decl. ¶ 29; Bellack Decl. ¶ 7.

> 3. <u>The Dragon Entities Do Not Coordinate Advertising Efforts with Other Defendants.</u>

The FTC's allegations relating to the third *Lanier* factor—coordinated advertising efforts—are also entirely lacking. While other defendants may share advertising and marketing efforts, a simple Google search confirms that Dragon Global is a well-established brand in the venture capital world. Dragon Global has its own completely independent website (www.dragonglobal.com), marketing plan, public relations professionals, and business structure that long predates the existence of On Point. The FTC offers no evidence to the contrary.

> 4. <u>The Dragon Entities and the Other Defendants Are Not Under Common Control.</u>

As to the fourth *Lanier* factor—common control—the FTC's false allegation that Mr. Zangrillo is On Point's chairman, officer, and controlling shareholder is addressed above: Mr. Zangrillo is a minority investor with no operating authority or duties. He has never been an officer or employee of On Point, nor has he ever been involved in the day-to-day management of On Point. Bellack Decl. ¶ 6. Nonetheless, the FTC tries to concoct a common enterprise by alleging, without any record evidence, that Mr. Zangrillo is "a member and manager of DG DMV." Compl. ¶ 67. But Mr. Zangrillo contributed his equity stake in DG DMV in January 2018 as part of On Point's roll-up, and therefore has not been a member of DG DMV for nearly two years. And he has never been its manager, contrary to the FTC's unsupported claim. *See* Schwartz Decl., Exs. 10–12. At the time Mr. Zangrillo had a stake in DG DMV LLC, Mr. Katz was the manager. *Id.*, Exs. 10, 12.

*     *     *

When the FTC's allegations and evidence are isolated to focus on the Moving Defendants, it is clear that there is very little there—and what *is* there is often demonstrably false, misleading, or irrelevant. The FTC's papers fail to show that any of the *Lanier* factors support the conclusion that Mr. Zangrillo and the Dragon Entities were engaged in a common enterprise with the other

18

defendants.  Accordingly, even assuming for the sake of argument that On Point's websites were misleading (they were not), the FTC cannot prevail on the merits of is claims against the Moving Defendants, and the TRO should be lifted as against them.

## II.  The Equities Weigh Against Applying the TRO to the Moving Defendants.

The FTC has also failed to offer a single reason why freezing the Moving Defendants' assets and appointing a receiver over the Dragon Entities—as opposed to, for example, temporarily taking down the allegedly deceptive websites or even appointing a receiver over On Point's operations—furthers the FTC's goal of preventing alleged consumer deception, let alone that doing so is absolutely necessary.  When considering a preliminary injunction, courts assess whether a balancing of the equities favors the entry of injunctive relief.  *Univ. Health*, 938 F.2d at 1217. "[I]njunctive relief should be no more burdensome to the defendants than necessary," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979), and courts should keep in mind that "appointment of a receiver and the freeze of assets effectively puts the defendants out of business," *Fed. Trade Comm'n v. Accent Mktg., Inc.*, No. CIV.A. 02-405-CB-M, 2002 WL 31257708, at *4 (S.D. Ala. July 1, 2002).  Here, the prospect of putting the Moving Defendants out of business has no relationship to the conduct that the FTC complains about.

### A.  The Moving Defendants—as well as Undisputedly Innocent Third Parties—Will Be Seriously and Unjustifiably Harmed by a Continuation of the TRO.

Here, freezing Mr. Zangrillo's assets and appointing a receiver over the Dragon Entities has seriously affected Mr. Zangrillo's personal and professional life, the lives of his employees and investors, and his ongoing business interests.  These interests clearly weigh against continuing the TRO.

First, Dragon Global Management has over $75,000 of operating expenses, including the salaries of its employees, due on or around January 10, 2020 (the date of the preliminary injunction hearing), all of which it cannot pay because of the asset freeze:

| Cost | Amount | Payment Due |
|---|---|---|
| Employee Health Benefits | $4,579 | December 29, 2019 |
| D&O Insurance Costs | $10,299 | December 30, 2019 |
| Payroll/Salaries | $21,000 | December 30, 2019 |
| Tax & Accounting Fees | $18,000 | January 10, 2020 |
| Phone Bill | $450 | January 12, 2020 |
| Payroll/Salaries | $21,000 | January 12, 2020 |

Loftus Decl. ¶ 38.

Moreover, the Moving Defendants have at least three capital calls within the next month. If they cannot make the capital calls, the Moving Defendants and their third-party investors—who are not defendants in this action—will lose a significant amount of value on their investments through draconian dilution and penalty provisions in the relevant operating agreements:

| Capital Call | Amount | Payment Due |
|---|---|---|
| 555 SRD LLC | $23,000 | December 27, 2019 |
| Wynwood | $988,400 | December 31, 2019 |
| Magic City Innovation District | $653,004 | January 21, 2020 |

*Id*. ¶ 39.[13]

Mr. Zangrillo and his family also are deeply impacted by the asset freeze.  In addition to the typical costs of living that Mr. Zangrillo is unable to pay because of the asset freeze—*e.g.*, his mortgage payments, insurance fees, home utilities, and car payments—Mr. Zangrillo is the sole financial support for his three daughters, his elderly father who is in full-time nursing care, and his mother.  *Id.* ¶ 36.  As the chart below demonstrates, Mr. Zangrillo has substantial financial obligations all due on or around January 10, 2020.  If Mr. Zangrillo is unable to access his funds to pay these amounts, the lives of his family will be dramatically affected:

| Cost | Amount | Payment Due |
|---|---|---|
| Elderly Father's Health Aid | $1,380 | December 23, 2019 |
| Elderly Father's Senior Living | $7,300 | December 29, 2019 |
| Payroll/Salaries | $7,500 | December 30, 2019 |
| Elderly Mother's Support | $5,000 | January 1, 2020 |
| Daughters' Rent | $14,830 | January 1, 2020 |
| Daughters' College Tuition | $90,000 | January 10, 2020 |
| Payroll/Salaries | $7,500 | January 15, 2020 |

*Id.* ¶ 37.

---

[13]     Besides having capital commitments, certain of the investments managed by Dragon Global Management LLC contain covenants that require some of the Moving Defendants to maintain a certain amount of cash reserves or their equivalents.  As a result of the asset freeze, the Moving Defendants are arguably in breach of these covenants, which may trigger dilution, loss of investment, or other consequences to the Moving Defendants and third-party investors.  Loftus Decl. ¶ 40.

Lastly, Mr. Zangrillo has ongoing legal bills arising from the unrelated criminal case against him pending in the District of Massachusetts.  *Id.* ¶ 42.  If the asset freeze stays in place, Mr. Zangrillo will not be able to pay his attorneys.  Not only is this unjust, but as the Supreme Court has made clear, "[t]he pretrial restraint of legitimate, untainted assets needed to retain counsel of choice violates the Sixth Amendment."  *Luis v. United States*, 136 S. Ct. 1083, 1088 (2016).  At least as it pertains to this aspect of Mr. Zangrillo's finances, the asset freeze is unconstitutional.

**B.      An Asset Freeze Is Unnecessary to Preserve the Possibility of Future Relief.**

The evidence of harm to the Moving Defendants and others from the ongoing TRO is clear. On the other side of the ledger, a freeze of Mr. Zangrillo's assets and placing the Dragon Entities into receivership is unnecessary to secure the possibility of disgorgement and restitution because the FTC has presented no evidence of asset dissipation and therefore failed to meet its burden.[14] To the contrary, the asset freeze is value-destroying, insofar as it will cause existing investments to be diluted or otherwise impaired.  In any event, far less draconian means exist to preserve the Moving Defendants' assets: if the Court believes that the FTC is entitled to any preliminary relief (which it is not), Mr. Zangrillo is willing to post substantial security.

"A party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if relief is not granted."  *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009) (holding that a *likelihood* of dissipation is necessary to support an asset freeze instead of only a *possibility* of dissipation).  To the extent an asset freeze is not necessary to ensure the availability of permanent relief, it is improper.  *F.T.C. v. Home Assure, LLC*, No. 8;09-CV-547-T-23TBM, 2009 WL 1043956, at *2 (M.D. Fla. Apr. 16, 2009); *F.T.C. v. John Beck Amazing Profits, LLC*, No. 2:09-CV-4719-FMC-FFM, 2009 WL 7844076, at *15 (C.D. Cal. Nov. 17, 2009) (dissolving asset freeze when there was no evidence defendants "have ever previously attempted to intentionally dissipate, hide or otherwise shelter corporate or personal assets from an effort to collect a debt or judgment").

Here, the FTC fails to demonstrate that Mr. Zangrillo presents a risk of asset flight or concealment.  Instead, the FTC lumps the defendants together, alleging that they would collectively use offshore accounts to frustrate recovery.  In contrast to the allegations against the

---

[14]     Additionally, in light of a recent Seventh Circuit opinion, it is unclear whether the FTC will be able to obtain restitution at all, rendering the asset freeze useless.  *See Fed. Trade Comm'n v. Credit Bureau Ctr., LLC*, 937 F.3d 764, 786 (11th Cir. 2019) (holding that Section 13(b) does not authorize restitution and vacating restitution award).

other defendants, however, Mr. Zangrillo does not control any foreign corporations, has not been accused of moving funds overseas (and in fact does not have any foreign assets or accounts), and has demonstrated no risk of capital flight. Mr. Zangrillo is conspicuously absent from the litany of allegations relating to other defendants' offshore financial activity. For example:

- The FTC's allegations that the corporate defendants move assets offshore only name offshore accounts held by Katz, Levison, Rothman, and Sherman; for Mr. Zangrillo, the FTC only names his Delaware-organized holding company, OPCP. TRO Mem. at 15–16.

- The FTC's allegation that the other defendants move funds into their personal and offshore accounts name only Mahon, Levison, Katz, and Rothman, not Mr. Zangrillo. *Id.* at 18.

- The corporate entities for which Mr. Zangrillo allegedly acts as an officer are all Delaware-organized limited liability companies. Compl. ¶¶ 6, 9, 17–19, 56.

In fact, the FTC goes as far as arguing that Mr. Zangrillo is likely to move assets offshore because his home was featured in an Italian magazine. TRO Mem. at 33. But this is a red herring: the house is located in Florida. Schwartz Decl. ¶ 2 & Ex. 1.

And although the FTC tries to argue that the pending criminal charges against Mr. Zangrillo mean he is willing to disobey court orders, TRO Mem. at 33, the opposite is true. This Court should note that the United States District Court for the District of Massachusetts has already rejected the notion that Mr. Zangrillo presents a risk of disregarding court orders. That Court has already granted Mr. Zangrillo permission to travel internationally at least *five times* since he was indicted approximately eight months ago, in recognition of the fact that he is not a flight risk. *See United States v. Sidoo, et al.*, 19-cr-100080 (D. Mass Mar. 3, 2019), ECF Nos. 324, 379, 494, 553, 585; Schwartz Decl. ¶ 16. And, Mr. Zangrillo has never violated a court order or pre-trial release obligation. *Id*. Accordingly, because there is no evidence that Mr. Zangrillo presents a risk of asset flight, the freeze as to him and the Dragon Entities is improper.

Moreover, the FTC cannot show that an asset freeze is necessary to ensure the availability of permanent relief. Even if the Court finds that there is some likelihood of asset flight, there are others means available to mitigate that risk without also destroying Mr. Zangrillo's personal life and career and harming innocent third parties. If the Court deems it absolutely necessary despite the FTC's failure to meet its burden with respect to either likelihood of success or asset flight, Mr. Zangrillo is willing to provide a security in the amount of money he allegedly received from the corporate defendants, approximately $2 million. *See* TRO Mem. at 22. If the Court does not

dissolve the freeze entirely, the Court should restrict its scope to the amount at stake. *See, e.g.*, *Home Assure*, 2009 WL 1043956, at *3 (limiting freeze of certain defendants' assets to $3,721,807.84 each and inviting them to "move to substitute a surety bond").

### III.    The Court Should Order Reciprocal Discovery.

Finally, presuming that the FTC intends to pursue relief from the Moving Defendants at the January 10 preliminary injunction hearing regardless of whether the Court dissolves the TRO, the Moving Defendants should be entitled to reciprocal discovery. The TRO provides for unequal discovery. Per the TRO, the FTC and the receiver can conduct discovery with only 48 hours' notice. TRO Order at 20–21. The TRO, however, has no mechanism whatsoever for the Moving Defendants to conduct reciprocal discovery in preparation for the preliminary injunction hearing. Nor does the FTC offer any justification for the lopsided discovery.

This disparity is particularly unjust in light of the facts that the FTC has been pursuing its case for months and has submitted an expert report, as well as ten other factual declarations, many of which rely on based on embedded hearsay – such as the forensic accountant's declaration, which fails to provide the actual records that he relied upon yet reaches sweeping and incorrect conclusions. Due process and simple fairness require that the Moving Defendants have an opportunity to conduct discovery, including deposing the FTC's expert and forensic accountant and reviewing the materials that they relied upon, before the preliminary injunction hearing. *See, e.g.*, *Fed. Trade Comm'n v. MDK Media, Inc.*, No. CV14-5099-JFW (C.D. Cal.) (defendants permitted to depose FTC investigator/expert prior to preliminary injunction hearing; TRO dissolved and preliminary injunction and asset freeze subsequently denied).

### IV.    The Dragon Entities Did Not Violate the TRO.

Finally, in its motion to extend the TRO, the FTC accuses the Moving Defendants of being in contempt of the TRO. That is not so.

As a threshold matter, the FTC correctly observes that the propriety of the underlying TRO and any purported contempt are totally separate matters. *See* Mot. to Extend at 5–6 (citing *Maggio v. Zeitz*, 333 U.S. 56, 69 (1948)). Thus, whether the Moving Defendants have complied with the TRO is not relevant to whether the TRO should be dissolved or maintained.

In any event, the Moving Defendants did not violate the TRO. Mr. Zangrillo and the Dragon Entities take the TRO seriously and have complied with its requirements. In fact, within days of receiving the TRO, counsel for the Moving Defendants distributed notice of the Order to

48 individuals pursuant to Section 22 of the Order.  Schwartz Decl. ¶ 19.  And on December 27, 2019—after receiving the Court's denial of their motion for extension of time—the Moving Defendants submitted extensive financial disclosures and supporting documents to the FTC and the Receiver, pursuant to Sections 5 and 6 of the TRO.  *Id.*[15]

According to the FTC, the Moving Defendants violated the TRO by altering the Dragon Global website.  Mot. to Extend at 2 n.2.  The truth is that one of Dragon Global Management's employees was contacted by a person who asked to be removed from On Point's website.  Black Decl. ¶ 7.  She responded that Dragon Global had no control over On Point's website, but that she would change Dragon Global's website.  *Id.*  At the same time, she removed some other people associated with On Point from the website, although she did not remove all references to On Point.  *Id.*  She made these additional changes having been sensitized to the effect on investors and investments from negative publicity, in light of the Massachusetts college admissions case.  *Id.*  But, most importantly, the employee was not aware that altering the website in this fashion was prohibited by the TRO.  *Id.*  Once it was clear that the TRO spanned well beyond On Point and extended to the Dragon Entities themselves, the Dragon Entities' employees were instructed not to make additional changes to the website (including changing the website back to its original form), and they did not.  *Id.*

## CONCLUSION

For the reasons stated above, the Court should grant the Moving Defendants' Motion to Dissolve the *Ex Parte* TRO and order reciprocal discovery.  A proposed order is attached.

---

[15]    In its most recent filing, the FTC also implies that Mr. Zangrillo has resisted the Receiver's efforts to collect information about the Dragon Entities.  That is absolutely not true.  The Dragon Entities have been clear with the Receiver that they will provide whatever information is asked of them.  The Receiver, in turn, stated that she would send a list of questions to be answered in writing about the Dragon Entities.  Schwartz Decl. ¶ 22.  On December 26, counsel for the Moving Defendants contacted the Receiver to reiterate again their cooperation and to solicit those questions, so that the receiver would have the information necessary to provide her report to the Court in advance of the January 10 hearing.  *Id.*  The Receiver responded today (December 27) with her list of questions.  Counsel for the Moving Defendants responded that they would begin working to respond "right away."  *Id.*

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), the Moving Defendants respectfully request that the Court set the instant motion for hearing on December 31, 2019.  A hearing would benefit the Court in better assessing the facts and rendering a decision.  Given the sweeping nature of the TRO entered against Mr. Zangrillo and the Dragon Entities, an immediate hearing is necessary in order to allow Mr. Zangrillo and the Dragon Entities to challenge the extreme remedy of an asset freeze and receivership.  Justice therefore requires a hearing on this matter by **Tuesday, December 31, 2019**.  Mr. Zangrillo and the Dragon Entities estimate approximately sixty (60) minutes would be an appropriate amount of time for a hearing on the instant motion.

Dated: December 27, 2019  
       Miami, Florida

                       Respectfully,

                       /s/ Marshall Dore Louis  
                       Marshall Dore Louis  
                       Fla. Bar No. 512680  
                       BOIES SCHILLER FLEXNER LLP  
                       100 SE Second Street, Suite 2800  
                       Miami, Florida 33131  
                       Tel.: (305) 357-8438  
                       E-mail:  mlouis@bsfllp.com

                       Matthew L. Schwartz (*pro hac vice*)  
                       John T. Zach (*pro hac vice*)  
                       Sara K. Winik (*pro hac vice*)  
                       BOIES SCHILLER FLEXNER LLP  
                       55 Hudson Yards  
                       New York, New York  
                       Tel.: (212) 446-2300  
                       E-mail:  mlschwartz@bsfllp.com  
                                  jzach@bsfllp.com  
                                  swinik@bsfllp.com

                       *Counsel for Defendants Robert Zangrillo, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC*

25