UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA


CASE NO. 1:19-CV-25046-SCOLA

FEDERAL TRADE COMMISSION,

          Plaintiff,

vs.

ON POINT GLOBAL, ET AL.,

          Defendants.

_____

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ..................................................................................................................1

FACTS ....................................................................................................................................1

    I.     Defendants and Their Corporate Structure .............................................................3

           A.     Free Guide Business ...................................................................................5

           B.     Data Business .............................................................................................6

           C.     Media Business ..........................................................................................6

           D.     E-Commerce Business ...............................................................................7

    II.     Defendants' Legitimate Business Operations ........................................................8

           A.     Defendants' Website Structure ..................................................................9

           B.     State Licensing And Motor Vehicle Services Websites ...........................10

           C.     Public Benefits Websites ..........................................................................21

    III.    The Temporary Restraining Order.........................................................................23

ARGUMENT ..........................................................................................................................24

    I.     The FTC Has Failed To Meet Its Heavy Burden Of Establishing Entitlement
          To Preliminary Injunctive Relief ..........................................................................24

    II.     The Harm To Defendants Outweighs The Lack Of Any Potential For Harm
          To Consumers .......................................................................................................26

    III.    The FTC Improperly Relies On The Common Enterprise Theory.........................28

    IV.    The FTC Cannot Establish That It Will Ultimately Succeed On The Merits........30

           A.     The FTC Cannot Prevail On Its Section 5(a) Deceptive Practices
                Claims .......................................................................................................30

                  1.     OnPoint's State Licensing and Motor Vehicle Services
                       Websites Are Not Deceptive.........................................................31

                       a.     The Products And Services Offered Are Clearly
                            Described with Material Information Disclosed...............31

b.      The Consumer Perception Survey is Fatally Flawed and Cannot Be Used to Demonstrate Defendants Have Deceived Consumers ........................................................33

      i.      Survey Population...................................................35

      ii.     Marketplace Conditions and Bias .........................36

      iii.    Lack of a Control ...................................................37

c.      Customer Complaints Do Not Establish Deception..........38

2.      OnPoint's Public Benefits Websites Are Not Deceptive...............39

B.      The FTC Cannot Establish Individual Liability.........................................40

V.      The FTC Has Failed to Show that an Asset Freeze is Warranted.........................41

CONCLUSION....................................................................................................................47

Individual Defendants Burton Katz, Brent Levison, Elisha Rothman, and Christopher Sherman ("Individual Defendants") and 49 corporate defendants[1]  ("Corporate Defendants" and, together with the Individual Defendants, "Defendants"), by and through their undersigned counsel, hereby file this Memorandum in Opposition to the Federal Trade Commission's ("FTC") motion for a preliminary injunction.  ECF No. 4 (the "TRO Motion").  For the reasons stated below, the TRO motion should be denied in its entirety.

## INTRODUCTION

Defendants in this action have been operating global, reputable and diversified businesses that include four separate and distinct lines of business.  These businesses include: (1) an e-commerce business comprised of various websites that sell e-books and guides or provide concierge style services for a fee; (2) a brand publishing business that includes websites that provide original, well researched and valuable free content; (3) a data business comprised of permission-based marketing and advertising; and (4) a network and exchange business. The FTC selectively presented to the Court facts about a small portion of the Defendants' businesses in order to obtain a sweeping TRO that appointed a Temporary Receiver and froze all of the assets of Defendants' entire business and of the Individual Defendants.  Based on this same misleading picture of the Defendants' business structure and operations, the FTC now seeks an identical overly broad preliminary injunction that will cripple profitable businesses (for which they have failed to

---

[1] The referenced 49 corporate defendants are On Point Global LLC, On Point Global Employment LLC, On Point Guides LLC, DG DMV LLC, On Point Domains LLC, Final Draft Media LLC, Cambridge Media Series LLC, Issue Based Media LLC, Bella Vista Media Ltd., Carganet S.A., Direct Market LLC, Bluebird Media LLC, Borat Media LLC, Bring Back the Magic Media LLC, Chametz Media LLC, Chelsea Media LLC, Coinstar Media LLC, Domain Development Studios LLC, Domain Dividends Media LLC, Eagle Media LLC, Falcon Media LLC, GNR Media LLC, Island Media LLC, Leatherback Media Group LLC, Macau Media LLC, CEG Media LLC, MBL Media Ltd. Inc., Orange and Blue Media LLC, Orange Grove Media LLC, Panther Media LLC, Pirate Media LLC, Pivot Media Group LLC, PJ Groove Media LLC, Sandman Media Group LLC, Shadow Media LLC, Skylar Media LLC, Slayer Billing LLC, Spartacus Media LLC, Very Busy Media LLC, Wasabi Media LLC, Yamazaki Media LLC, Bronco Family Holdings LP, BAL Family LP, Cardozo Holdings LLC, 714 Media Ltd., Mac Media Ltd., License America Management LLC, License America Holdings LLC, and Blackbird Media LLC.

even allege any wrongdoing) and unfairly restrain all of the assets of the Individual Defendants. In the interest of equity and as a matter of discretion the Defendants' respectfully request Court reject the FTC's draconian request.

Despite the highly diversified nature of the Defendants' businesses, the FTC has filed a Complaint containing allegations related only to certain websites operated by some of the Corporate Defendants' that either sell (1) digital resource guides to assist individuals with state motor vehicle, hunting and fishing licensing procedures, or (2) provide free guides to assist individuals in interfacing with the government to obtain government benefits. The sales of these digital resource guides represent only a small portion of the Defendants' overall e-commerce and brand publishing businesses and currently account for less than 20% of the group's overall profit. There is not a single allegation in the Complaint related to the Defendants' sale of concierge services on its e-commerce sites, a single allegation related to any "free guides" other than a few of the public benefits guides, or a single allegation relating to Defendants' media and data businesses. This reason alone provides the Court a basis to deny the FTC's request for the broad preliminary injunctive relief that it seeks.

Moreover, with respect to the digital guide websites identified in the Complaint, the FTC has not, and cannot, point to a single place on the Defendants' websites, or in the advertising for these websites, that expressly makes any false promises. The FTC alleges that the motor vehicle and hunting and fishing websites promise that consumers will receive a valid government license or registration, yet these statements cannot be found in any of the materials provided by the FTC. Instead, the FTC alleges that information on the e-commerce websites implies that visitors will obtain services that are not actually available on those websites, despite the existence of myriad disclosures found on those websites. The FTC's purported evidence of deception consists solely

of consumer complaints and a survey by a professor.  However, as discussed below, the driver's license, hunting, and fishing websites and certain of the websites containing guides to public benefits criticized by the FTC clearly and conspicuously disclose multiple times to reasonable consumers the products provided by those websites, and the FTC's consumer survey is fatally flawed. In short, the FTC has provided no credible evidence to support its allegations, nor could it because the Defendants have not engaged in any of the practices that the FTC has alleged.

Notwithstanding the fact that the FTC is unlikely to succeed on the merits of its claims, the Temporary Receiver has already shut down the motor vehicle and hunting and fishing websites and their related billing companies.  On the other hand, the Temporary Receiver has allowed the other business lines operated by the On Point Global group, including the free public benefits websites to continue to operate.  Those other businesses and entities, which provide the substantial majority of On Point's revenue, are not engaged in any of the practices that the FTC alleges to be misleading or deceptive.  Accordingly, in the interest of preserving those remaining businesses and avoiding unnecessary litigation, the Defendants are willing to enter a stipulated preliminary injunction that is limited to the e-commerce websites that sold guides.  Such an injunction would prevent any possibility of ongoing or imminent violations of the FTC Act as alleged by the FTC while this case proceeds.

## FACTS

### I.        Defendants and Their Corporate Structure

What the FTC speciously calls "a sprawling online scheme that deceives consumers" is, in reality, a network of companies with a wide variety of business lines, most of which are not part of the FTC's allegations at all.  In or around 2013, companies were established to serve as incubators to test new and innovative ideas, including selling digital guides or providing them for free in order to assist visitors interfacing with the government for licenses, benefits, and services.

Ex. B, Declaration of Brent Levison ("Levison Decl.") ¶ 3.  More recently, the services offered included "concierge" services to consumers, such as for car registration and passport renewal, brand publishing, and data monetization.  *Id.* ¶ 2.  While these companies shared a common payroll company, Corporate Defendant Waltham Technologies LLC, they each were operated separately and had their own corporate and capital structure, business models, and staff.  *Id.* ¶ 3.  As the businesses grew, new businesses had to be established to support them.  Defendant Bella Vista Media Ltd. operated a technology and customer support center in Costa Rica.  *Id.*  Transactions processing companies were established to manage the companies' increasing credit needs in order to process their rising credit card revenues.[2]  *Id.*  Other companies were established to buy media for websites operated by the companies that offered free information.[3]  *Id.*

In early 2018, all of these separate businesses except for the transaction processing companies, which were owned by individuals, were rolled up into one holding company, On Point LLC, which now uses a different payroll company, Corporate Defendant On Point Employment LLC, and another company to manage office leases and utilities, Corporate Defendant Issue Based Media LLC.  *Id.* ¶ 5.  On Point and its companies have operations in Miami and Boca Raton Florida, Redondo Beach, California, Costa Rica, and Uruguay.  *Id.*  Far from a corporate structure established for a nefarious purpose, all entities were and are fully reported for federal tax purposes.  *Id.*  International accounts were established to accommodate the Corporate Defendants' overseas operations.  *Id.*  All required tax reporting including Reports of Foreign Bank and Financial

---

[2] These transactions processing entities are Defendants Eagle Media LLC, Falcon Media LLC, GNR Media LLC, Island Media LLC, MBL Media Ltd. Inc., Orange Grove Media LLC, Pirate Media LLC, Shadow Media LLC, PJ Groove Media LLC, Skylar Media LLC, Slayer Billing LLC, Borat Media LLC, Very Busy Media LLC, Wasabi Media LLC, Yamazaki Media LLC, Bring Back the Magic Media LLC, Chametz Media LLC and Chelsea Media LLC.  *Id.* ¶ 4.

[3] These media buying companies are Defendants Bluebird Media LLC, Leatherback Media Group LLC, Sandman Media Group LLC, Coinstar Media LLC, Spartacus Media LLC, and Macau Media LLC.  *Id.* ¶ 4.

Accounts (FBAR) were filed with the appropriate authorities including the Internal Revenue Service. *Id*.

Rather than do any reasonable diligence on the Corporate Defendants' different business lines and the purpose for its corporate structure, the FTC asked the Court to enjoin them all. In its overreach, the FTC asked the Court to enjoin businesses that have nothing to do with the FTC's deceptive practices allegations and, indeed, are now operating again under the control of the Temporary Receiver. On Point's four divisions consist of (1) the Brand Publishing; (2) the Data Business; (3) Network and Exchange Business; and (4) the E-Commerce Business, which includes digital guides sold by the company and concierge services offered by the company. *Id.* ¶ 6.

A.    Brand Publishing Business

Corporate Defendant Direct Market LLC ("Direct Market") operates On Point's brand publishing and "freemium" data sale operations. *Id.* ¶ 7. In this business line, users visit websites where they can obtain free digital guides on how to obtain public benefits and, if they choose to do so, provide certain data to On Point. *Id.* These websites contain highly original content providing valuable information to consumers. The On Point employees tasked with creating the content follow a structured process to ensure the content is correct, informative, and of the highest quality. Ex. D, Declaration of Christopher Jalil ("Jalil Declaration"). The Defendants do not charge consumers for access to the content on these websites. *Id.*

The Defendants do obtain information about the consumers' interest through voluntary surveys. With the consumers' permission, customer data from these surveys is sent to Direct Market, the company's Data Business (as discussed below), or shared with a third-party marketing partner who engages with the customer for products or services that a customer might be interested in based on the data he or she provided. No participation in the surveys are required to receive the free content. Ex. C, Declaration of Paola Zuluaga ¶ 7 ("Zuluaga Decl."). Approximately 22% of

the consumers using these websites receive free e-books without participating in any survey and only provide an email. *Id*. The Temporary Receiver has allowed this business to resume operations.

Additional operations under the Brand Publishing Business includes entities which own valuable domain portfolios. In perhaps the most glaring example of the FTC's overreach, it asks the Court to enjoin Corporate Defendant On Point Domains LLC, which includes websites such as www.fishing.com, www.atlanta.com, and www.honolulu.com. *Id*. ¶ 12. Corporate Defendant Pivot Media Group, which is 68% owned by OnPoint, owns the website www.political.com. *Id*. None of these websites have anything to do with the allegations of the Complaint.

B.     Data Business

Direct Market also operates On Point's Data Business out of On Point's Boca Raton office. *Id*. ¶ 8. This division takes data obtained from various other sources, such as the Brand Publishing Business and markets to consumers who affirmatively consent to receive such messages via email, text, and/or push marketing. For example, an employee would send a text message to a consumer that provided their information through one of the "freemium" websites with a message such as "are you interested in home improvement." If the consumer clicks the link, they will be taken to a website where there is a monetization component. The company also shares data with third-party marketing partners. The Temporary Receiver has permitted this business to resume operations. *Id*. ¶ 8.

C.     Network and Exchange Business

This was an ad technology business that was recently acquired by On Point. *Id*. ¶ 9. The FTC does not claim in its Complaint that these websites are deceptive in any way and the Temporary Receiver has allowed this business to continue operating. *Id*. ¶ 9.

D.      E-Commerce Business

The E-Commerce Business consists of websites offering assistance with various state services.   The Defendants operate desirable, easy to remember web domains to encourage interested visitors to its sites.  These websites offer for sale guides providing information on how to obtain state licenses such as drivers licenses and fishing licenses.  DG DMV LLC owns the domain name DMV.com.  *Id*. ¶ 13.

Similar to the brand publishing and "freemium" business, the creation of On Point content in its E-Commerce Business is structured to create the highest quality content.  The guides are created through research, writing, fact checking, and editing by On Point editors and the content leadership team. Jalil Decl.  The guides are regularly updated pursuant to an established schedule to ensure that outdated information is removed.  *See* Jalil Decl. ¶ 11.  The Exhibits A, B and C of the Jalil Declaration offer examples of the guides.

In November 2019, only approximately 16% of OnPoint's gross profit was from the sale of its digital resource guides that the FTC alleges are deceptive.  Ex. E, Declaration of Alicia Nuche.  The FTC's action is so overbroad that it led the Court to shut down an entire profitable business with 284 employees in the U.S. and two other countries over the holidays.

Defendant Cambridge Media Series LLC[4] operates websites that offer the E-Commerce Services Business, such as concierge style assistance with car registrations.  Defendant Panther Media LLC holds licenses from the U.S. Department of State that On Point requires to offer passport renewal services to its customers.  *Id*. ¶ 11.  The FTC's Complaint contains absolutely no allegations that this business line engaged in deceptive practices or that the company did not offer

---

[4] Defendant License America Holdings LLC is the holding company for Cambridge.

the services provided.  The Temporary Receiver has allowed the company to resume operations. *Id*.

The FTC also asked this Court to enjoin several dormant companies, further illustrating its lack of diligence and overreach.[5]  *Id.* ¶ 13.  This action includes an entity – Defendant Carganet S.A. – that was never owned by On Point.  *Id*.  The FTC's net was cast so wide that the Receivership Entities under the TRO include several personal entities owned by and/or for the benefit of the Individual Defendants, even though the FTC does not claim that these entities deceived consumers.[6]

The only On Point entities involved in any way in the allegations of the Complaint are Defendants DG DMV LLC, which owns the domain name dmv.com, the part of Cambridge Media that operated the websites that sold digital resource guides, the part of Direct Market that operated the public benefit sites alleged to be deceptive in the Complaint, and the part of Bella Vista Media that provided customer support for the digital for-sale guides and public benefit sites in Costa Rica.

## II.    Defendants' Legitimate Business Operations

The FTC's allegations relate to one segment of the Defendants' its E-Commerce Guides and to a lesser extent the Brand Publishing Business related to certain free guide websites.  The FTC's main allegation is that the Defendants' motor vehicles and hunting/fishing websites and some of the public benefits websites deceive consumers into believing they are paying to receive licenses or benefits determinations when all they receive are information guides.  Compl. ¶¶ 109, 111.  As demonstrated below, the Defendants' websites clearly disclose that they are selling or

---

[5] The following defendants are dormant: Domain Development Studios LLC, Domain Dividends Media LLC, License America Management LLC, Blackbird Media LLC, CEG Media LLC, Final Draft Media LLC, and Orange and Blue Media LLC.

[6] The personal entities are: Bronco Family Holdings LP (Defendant Burton Katz), BAL Family LP and Cardozo Holdings LLC (Defendant Brent Levison), 714 Media Ltd. (Defendant Christopher Sherman), and MAC Media Ltd. (Defendant Elisha Rothman).

providing guides and not providing government licenses and benefits determinations.  Where the FTC acknowledges certain disclosures in the websites, the FTC alleges that consumers "are unlikely to see" those disclosures.  Compl. ¶ 127.   The FTC also alleges that the guides only provide "general, publicly available information about the service the consumer sought."  Compl. ¶ 111.  As navigating state websites and state offices can be frustrating and complicated, the guides are similar to a "How to For Dummies" series to help break down and simplify the process and provide valuable information to consumers.

Defendants recognize the importance of being clear and upfront with consumers who visit their sites about the information and services the sites provide and whether there is a cost for those services.  The disclosures and information provided to consumers in the motor vehicles websites are clearly demonstrated below.  Full pathways for exemplars of each of the Motor Vehicle Services, Hunting, and Fishing websites can be found at Exhibits 1-5 of the Zuluaga Declaration and demonstrate the extensive and clear disclosures provided by the Defendants.  Contrary to the FTC's assertions that Defendants offer to conduct government transactions, Compl. ¶¶ 109, 171, 174, visitors to the websites are presented with multiple disclosures on every page that the websites provide information and assistance.

A.   Defendants' Website Structure

The FTC has presented as nefarious conduct the fact that Defendants own multiple similarly named websites and that they engage in search optimization efforts.  Compl. ¶¶ 112, 116.  Defendants, just like all companies doing business on the Internet, rely on attracting visitors to its websites based on appearing in online search results, both sponsored search results and native search results.  The Defendants would not be successful without these efforts, which are routine and perfectly lawful.  The FTC asserts the Defendants operate more than 200 consumer facing sites, referring to them as "feeder" sites that appear in search results leading to "transaction" sites

that visitors navigate to and provide personal data and payment information.  Compl. ¶¶ 112, 114-15.  What the FTC refers to as "feeder" sites are more general content portals, such as dmv.com.  Once at the content portal, when visitors navigate through the material, they can choose paths that are more relevant to the information they are seeking.  The multiple sites are important to create different experiences particularly relevant to specific visitors, often with state-specific information.  The multiple sites also help with search engine maximization or better placement for native search results, which is entirely in the discretion of the search engines based on the quality of the websites and how well they match the search criteria and present locally relevant information.

       B.    <u>Motor Vehicle and Hunting/Fishing Websites</u>

The FTC's Complaint focuses extensively on the services offered related to motor vehicle licenses and registrations, alleging DMV.com is "Defendants' most heavily used motor vehicle-related feeder site."  Compl. ¶ 119.  Inexplicably, despite providing many of the web pages seen by visitors when visiting the Defendant's motor vehicle sites, none of which promise to provide motor vehicle registration services and all of which clearly and repeatedly promise to sell a time-saving Road Guide, the FTC alleges that "Defendants Motor vehicle-related sites represent that completing a transaction through Defendants' sites will result in receipt of a valid license or car title, or other motor-vehicle-related service."  Compl. ¶ 133.  Contrary to these allegations, the DMV.com website never promoted a service it did not provide, such as renewing a license.  Zuluaga Decl. ¶ 3.  Instead, throughout the process of purchasing a guide, a visitor is clearly and explicitly informed multiple times that they are purchasing a guide and the website is not affiliated with any state agency or providing any state service.

While the FTC alleges this site is heavily trafficked, the Defendants do not advertise DMV.com by paying to be a sponsored search term in feeder sites.  Contrary to the FTC's allegations, DMV.com does not sell a significant number of vehicle guides through this website; only 2% of visitors purchase a guide on DMV.com.  Zuluaga at ¶ 5.

From the moment consumers arrive at the DMV.com website, there are clear disclosures presented to visitors.  For example, when visitors arrive at the website, they can click on a link relating to driver's licenses renewals.  When navigating to the "renew drivers license" page, the FTC's grainy small screenshot in the Complaint glosses over important and clear information presented to visitors:



The information provided about the option to renew online, clearly refers to "how to renew your driver's license in the U.S." and "drivers license assistance renewal" and explains "to make

sure you are fully prepared to complete the process, you can download our informative online guide."  The paragraph goes on to explain what the guide covers.  This is not presented in "mouse type" or only after one scrolls to the bottom of the page; it is all presented directly above the "Get started" call to action.[7]

When visitors click on state specific sites, they are again confronted with numerous disclosures.  The FTC provided a small grainy screen shot of one of the state-specific pages for Florida.  This page includes significant prominent detail about what the website does and does not provide:

---

[7] The FTC also only presents the top portion of the webpage.  As seen in Exhibit A of the Zuluaga Declaration, there is more content provided about renewing a license by mail and in person.



At the top of the page in red font the text proclaims the site is the tagline that the website is "your source for Florida driver's information."  Directly next to this is clear information that to process licenses one needs to go to the DMV and notes this website provides information and charges fees.  In the middle of the page under the header to "get started with online application assistance" there is significant detail about what is provided, including the "Easy Guide."  The website also provides a direct link to the Florida DMV website.  On a single page, there are multiple disclosures that the website is only offering informative guides and the only place to obtain a license is at the DMV.  The website clearly states it is not associated with the DMV.

13

As part of an enhancement to add additional disclosures on the websites, in March of 2019 the Defendants added a large pop up notice when any visitor selected a particular area for "online assistance" (shown above with the pictures and orange bars):



The pop up is large and unavoidable and sections of the text appear in bold face. This pop up appears on any website where Defendants sell a guide well before a visitor is asked for any billing information. The Notice must be accepted before a visitor moves on to view the content. The entire middle block of text reads "Motor vehicle services and applications must be processed by an official DMV location/website. The assistance and services on this site simplify the process by providing personalized guides, documents and live support for a fee." The FTC includes this notice in its complaint without comment. Compl. ¶ 125.

After accepting the pop-up notice, the visitor moves to the beginning of the billing process:

14



The majority of the text on this page relates to informing consumers the website is selling a "Road Guide."   At the top of the page in large type it invites visitors to "Obtain Your Road Guide" followed by making clear "[t]he services we provide are available for free in the official sites of local offices.   You can purchase for $27.98 and download our comprehensive guide and resources."   It is difficult to see how any reasonable consumer could read "Obtain Your Road Guide," and somehow believe, as the FTC alleges, that they are renewing their driver's license.

In orange font in the middle of the page visitors are invited to:

> "get all the information to complete the process now."  In the middle of the page is the simple explanation that "[t]he procedure to replace a lost, stolen, or damaged driver's license requires you to provide certain documentation and to pay the necessary license issuance fees.  Furthermore, there are various different application methods from which you can choose.  To save you time and stress, our comprehensive guide provides you with all the details on the requirements you must meet and the most efficient way to complete the transaction."

The FTC includes this page in its Complaint at paragraph 126.  With little fanfare, the FTC simply rejects all of this and summarily concludes that "consumers are unlikely to see" any of the text outside of the box on the right-hand side asking for a visitor's contact information.  Compl. ¶ 127.

At the next page, there is more information for a visitor to provide, all below the same clear invitation to "Obtain Your Road Guide" with the same language from the prior page:



On the next page, there are terms and conditions reiterating that the website provides a guide and information to facilitate motor vehicle services.  The FTC omits this language from its papers, which must be affirmatively accepted before a user can arrive at the billing page.



On the final page where the visitor who wishes to purchase the guide provides payment information, directly to the left of the "submit" button, once again information about the *guide* being purchased is provided:



The payment page reiterates:

> Welcome to license-driver.org.  Discover all you need to know
> about driver license services on our convenient and comprehensive
> website. . . . The comprehensive Road Gide and detailed checklists
> have all of the above information and even more, to ensure that you
> are prepared for any driver license procedure.  We provide helpful,
> time-saving information and downloads as a private value-add to
> motor vehicle services.  This includes numerous resources, helpful
> checklists and important information for a fee of **$27.98** to assist you
> completing the process today.[8]

The plain language of the ubiquitous repetitive disclosures belies the FTC's allegation that the

website represents that a consumer will receive a driver's license or car registration.  Further

undercutting the FTC's allegations is the fact that only 2-5% of visitors have seen what is offered

---

[8] The payment page also invites contributions to Mothers Against Drunk Driving (MADD), for which the Defendants
have raised $500,000 over a two-year period.

and are making an informed decision about whether to make the purchase or not.  Zuluaga Decl. ¶ 5.  And perhaps the most important thing: nowhere in the order flow are visitors asked to provide their driver's license number.  *See* Zuluaga Decl. Exs. 2-3.  It is inconceivable that any reasonable consumer would believe he or she has actually renewed their driver's license without such a critical piece of information.

The FTC also complains that in some cases visitors who made a purchase did not receive their Road Guide.  Compl. ¶ 131.  This is not accurate, as the guide is available on the confirmation page directly online.  In addition, customers receive an email with a link to the Guide.  Technical support is provided for any customers experiencing difficulties.   Zuluaga Decl. ¶ 5.

The FTC also alleges that Defendants charge its customers twice, dividing the $27.98 into two installments.  Complaint ¶ 132.  This is accurate but not for the nefarious reason of attempting to evade chargebacks.  Consumers are first charged a processing fee and 50 hours later are charged the balance.  This is done in the event a customer cannot download the guide, and allows time for the customer to contact customer service and have the transaction voided, which the Defendants guarantee.  The customer service number is also included on the credit card statement to facilitate refund requests.  The FTC also alleges that Defendants' chargeback rates, which are consumer refunds, hover around 1 to 2% above the threshold for increased fraud scrutiny.  TRO Mot. at 8.  However, the FTC fails to inform the Court that, under the applicable Visa and Mastercard rules, Defendants' merchant accounts were placed into Visa's credit card chargeback monitoring programs a mere 11% of the months such merchant accounts had sales activity, and were placed in Mastercard's monitoring programs only 1.2% of the months in which such merchant accounts had sales activity.  Ex. F, Declaration of Steven Alonso Hussey ¶ 4.

The Complaint goes on to allege that disclosure information on mobile sites is more difficult to read.  Compl. ¶ 133.  The websites are all optimized for mobile viewing, in line with FTC best practices.  Even if the FTC were correct with respect to some of the smaller type, it is hard for a consumer to miss or not understand what is meant by the large heading "OBTAIN YOUR ROAD GUIDE" that appears on the top of multiple pages.

The FTC also alleges similar issues with sites devoted to fishing and hunting licenses. Compl. ¶¶ 135-144.  Exhibits 1, 4-5 to the Zuluaga Declaration demonstrates the consumer journey on some of these sites, disproving the FTC's allegations that the websites represent they can provide a consumer with a fishing or hunting license.  Before a visitor even finds one of the Defendants' fishing websites, the advertising used to attract visitors explains exactly what is offered.  For example, ad copy promoting fishinglicense.org for a particular state touts: "[State] Fishing.  Need to get a fishing license?  Download Our Guide.  Own the right license for your fishing trip adventure in [State].  Get your Guide now.  Learn more about requirements & regulations with Our Guide."  *Id.*  Once a visitor navigates to one of the hunting or fishing sites, just like the motor vehicle websites, every page of these hunting and fishing websites has disclosure information.  Importantly, the FTC's recitation of what visitors see excludes pop up notices that visitors must affirmatively accept:



Visitors must accept that "fishing license applications must be processed by an official State location/website.   However, independent third-party application assistance is available through this site as a value-add to official governmental services.   Our assistance services simplify the process by providing a personalized experience, recreational related benefits, and live support. By clicking 'accept' you acknowledge that this site is privately owned and is not endorsed by or affiliated with any government agency."   Just like with the motor vehicle sites, the buy rate for these hunting and fishing sites is limited, well below 5% indicating that consumers have little difficulty determining what is offered.   Defendants also have a liberal refund policy.

      C.    Public Benefits Websites

The public benefits websites are operated under On Point's "freemium" business and offer free guides on various public benefits.   The FTC alleges that consumers are led to believe they will receive eligibility determinations regarding certain public benefits after inputting personal

information in the websites.  Compl. ¶ 162-63.  As shown below, the FTC conveniently glosses over the numerous disclosures contained in the websites as consumers input information to the site.  The disclosures are clear that visitors will be receiving guides, not eligibility determinations.

The public benefits websites offer various guides assisting consumers with determining whether they are eligible for benefits.  Similar to the websites related to state registration information, the Defendants devote considerable resources to researching and writing these guides.  The Defendants partner with advertisers to provide relevant offers integrated with the content they receive.

Defendants never promise that visiting these websites will result in a determination of benefits.  The FTC alleges the websites invite visitors to "Find Out If You are Eligible for [Public Benefit]."  Compl. ¶ 149.  However, none of the websites operating at the time the TRO was entered contain this language.

Importantly, for visitors who only consent to receive email marketing, none of the survey information, other than a consumer's email address, is provided to third-party marketing partners.  Approximately 22% of the customers who input their emails to receive the free guides do not complete any questions in the surveys or provide any additional information.  *See* Zuluaga Decl. ¶ 7.  The FTC asserts that these are questions people would expect to be asked when verifying benefit eligibility.  Compl. ¶ 156.  This is beside the point.  If a company tells consumers it provides advice on exercise programs and asks their height and weight, this does not also prove that they are deceiving people into believing they are selling them a pair of pants.

Exhibit 6 of the Zuluaga Declaration contains the full mobile consumer experience for the Section 8 site.  None of the sites promise or even imply that a benefits determination is being made.  The sites are very clear that a free guide will be provided.  Further, the visitors clearly consent to

additional marketing when providing their contact information.   And these visitors overwhelmingly continue to engage with Defendants' website and content after signing up and providing consent.  In fact, in the previous month over 50% of the people who visit the public benefits sites return.  Zuluaga Decl. ¶ 8.

## III.    The Temporary Restraining Order

On December 13, 2019, this Court issued the TRO temporarily restraining the Corporate Defendants from operating their entire business, freezing the assets of all of the Defendants and appointing a Temporary Receiver to assume full control of the Corporate Defendants.  ECF No. 17.  The Temporary Receiver executed the Court's directive immediately and began shuttering the businesses including terminating employees.  The Defendants' extensive other businesses such as media buying and white glove concierge assistance with services like expedited passports were also shuttered despite any allegations by the FTC that they were engaged in any of the alleged misconduct.

As far as the Individual Defendants, there was significant concern as to whether credit cards could be used, whether holiday plans needed to be cancelled, and even if funds would be available to pay for living expenses to support their families.  Defendants did not have access to funds to prepare for a defense of this matter, and were told to borrow money from friends or family.

Nevertheless, the Individual Defendants worked around the clock to help the Temporary Receiver understand the Corporate Defendants' different businesses. On January 2, 2019 approximately three weeks after the entry of the TRO, the Temporary Receiver determined that the majority of On Point businesses could continue to operate including the Free Guide Business. Levison Decl.  The Receiver has only terminated portions of the E-Commerce Business related to the paid guides.  *Id*.  As evidenced by the actions of the Temporary Receiver in reopening significant portions of the business, the FTC sought and received a TRO much broader than

necessary and inflicting unnecessary stress and actual harm to numerous innocent individuals over the holidays.

## ARGUMENT

### I.   The FTC Has Failed To Meet Its Heavy Burden Of Establishing Entitlement To Preliminary Injunctive Relief

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the . . . prerequisites." *FTC v. Sterling Precious Metals, LLC*, 894 F. Supp. 2d 1378, 1382 (S.D. Fla. 2012) (citing *Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003)). A district court has great discretion in determining whether to grant or to deny a preliminary injunction.  "Injunctive relief must be tailored to remedy the specific harm alleged," and "should be no more burdensome to the defendants than necessary to provide complete relief to the plaintiffs." *FTC v. John Beck Amazing Profits, LLC*, No. 2:09-CV-4719-FMC-FFM, 2009 WL 7844076, at *3 (C.D. Cal. Nov. 17, 2009) (internal quotation marks and citations omitted); *see also Davis v. Romney*, 490 F.2d 1360, 1370 (3d Cir. 1974); *Keener v. Convergys, Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003) (explaining that an injunction "should be tailored to restrain no more than what is reasonably required to accomplish its ends"); *Aviation Consumer Action Project v. Washburn*, 535 F.2d 101, 108 (D.C. Cir. 1976).  "An overbroad injunction is an abuse of discretion." *John Beck Amazing Profits*, 2009 WL 7844076, at *3; *Nat. Res. Def. Council, Inc. v. Winter*, 508 F.3d 885, 886 (9th Cir. 2007).  Underscoring the exceptional nature of a preliminary injunction, district courts in this Circuit routinely refuse to enjoin defendants.  *See, e.g.*, *FTC v. Sterling Precious Metals, LLC*, 894 F. Supp. 2d at 1382-83; *FTC v. Home Assure, LLC*, No. 8:09-CV-547-T-23TBM, 2009 WL 1043956, at *20 (M.D. Fla. Apr. 16, 2009); *FTC v. Netran Dev.*

*Corp.*, No. 05-CV-22223, 2005 WL 8155969, at *8 (S.D. Fla. Dec. 22, 2006); *FTC v. Mktg. Response Grp., Inc.*, No. 96-111-CV-T-17A, 1996 WL 420865, at *2 (M.D. Fla. June 24, 1996).

Here, the FTC failed to establish that the E-Commerce offerings were deceptive.  Even under the lower standard in Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), which authorizes the FTC to seek, and the district court to grant, preliminary and permanent injunctions, the FTC's requested injunction fails.[9]  To obtain a preliminary injunction, the FTC must establish a likelihood of ultimate success on the merits and that the balance of equities weighs in its favor.  *Sterling Precious Metals*, 894 F. Supp. 2d at 1383 (citing *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1217–18 (11th Cir. 1991)).  Although this standard differs from what is required of private plaintiffs seeking preliminary injunctive relief, the FTC still bears a "*heavy* burden for the granting of *extraordinary* injunctive relief."  *Id.* (emphasis added).

As discussed above and below, the FTC's evidence falls short because it:

- Omitted pertinent disclosures
- Omitted pertinent terms and conditions that outlined the product being offered
- Omitted that the consumer must affirmatively accept these terms

Even if certain websites of the Defendant's E-Commerce Business had confused some small number of consumers, those products are only a part of one of the four distinct lines of businesses.  The potential injunction, however, would effectively require Defendants to cease operating their three other business lines which are separate from the E-Commerce Business.  For example, an injunction against On Point's Network and Exchange Business is clearly unnecessary,

---

[9] At least some courts have concluded that a relaxed standard for the FTC to seek a preliminary injunction should only apply in administrative proceedings and that Section 13(b) requires the FTC meet the traditional higher burden in federal court cases in which it ultimately seeks permanent injunctive relief. *See FTC v. NASFO VLM, Inc.*, No. CIV S-12-0781 KJM-EFB, 2012 WL 1131573, at *1 (2012); *FTC v. Evans Prods. Co.*, 775 F.2d 1084 (9th Cir. 1985). Based on the plain language of 13(b), Defendants assert the FTC should be required to show irreparable harm and demonstrate a substantial likelihood of success on the merits.  However, Defendants should prevail under the lesser standard as the FTC has not shown even a likelihood of success on the merits or that the balance of the harms tips in its favor.

where this business segment was acquired in 2019 and has no nexus with the complained of conduct.   Further underscoring the FTC's overreach, the FTC requests the Court to enjoin numerous defunct companies and companies that have never been involved with the guides and service-websites.

Courts have denied preliminary injunctions where there is no nexus between the alleged harm and requested injunctive relief as is the case here.  *See, e.g.*, *FTC v. Boost Software, Inc.*, No. 14-81397-CV-MARRA, 2004 WL 12461371, at *7 (denying preliminary injunction, where the allegedly fraudulent segments of the business represent a very small percentage of the business as a whole); *FTC v. Idea Research & Dev., Inc.*, No. CA 3-75-0710, 1975 WL 824, at *1 (N.D. Tex. June 23, 1975) (denied injunction, where the FTC's evidence was largely irrelevant to whether the injunction was necessary to protect the public from future harm).

Therefore, at this preliminary injunction stage, the need for a narrowly tailored injunction is to maintain the status quo, "rather than to enjoin all possible breaches of the law."  *John Beck Amazing Profits*, 2009 WL 7844076, at *4 (quoting *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004)).  Nothing about the relief that the FTC seeks is "narrowly tailored."

## II.   The Harm To Defendants Outweighs The Lack Of Any Potential For Harm To Consumers

Courts in this district recognize that "[b]alancing the equities between the parties requires a determination whether the public interest in preventing additional harm to consumers outweighs the harm done to the defendants should the injunction issue."  *FTC v. Netran Dev. Corp.*, No. 05-CV-22223, 2005 WL 8155969, at *3 (S.D. Fla. Dec. 22, 2006).   Accordingly, "it would be inequitable to enter a preliminary injunction which would effectively close the Defendants' business," where three out of four of the business operations are not subject to the FTC's complaint.  *Boost Software, Inc.*, 2014 WL 12461371, at *6.

26

The FTC's two conclusory sentences, that an injunction is necessary to prevent consumers from "falling victim to Defendants' deceptive practices" and to "prevent Defendants from continuing to deceive the public during the pendency of the litigation," TRO Mot. at 31, do not reflect the current reality.  There is no dispute that the Temporary Receiver took down certain websites that the FTC alleged were deceptive.  The business segment whose practices the FTC primarily complains of – Defendants' E-Commerce Business – has ceased certain operations.  In fact, since 2016 this E-Commerce Business segment has been declining.  In the interest of resolving the current dispute, Defendants are willing to stipulate to a preliminary injunction on the motor vehicle, hunting and fishing websites that sell guides.  Accordingly, without the websites at issue in operations, there is very little risk, if any, of harm to consumers.

On the other hand, the private harm of the FTC's requested injunction is severe.  The TRO itself caused a devastating shutdown of On Point's business.  Given that On Point has been diversifying and departing from the E-Commerce operations, an injunction until the merits are decided would enjoin an overwhelming portion of OnPoint's business that is not the subject of the Complaint.  As in *FTC v. Inbound Call Experts, LLC*, No. 14-81395-CIV, 2014 WL 8105107, at *4-5 (S.D. Fla. Dec. 23, 2014), the complained of business practice at issue has ceased, yet other businesses which are not a part of the FTC's complaint should continue to operate and weigh in favor of denying a preliminary injunction.

As discussed below, an overbroad preliminary injunction will financially straight-jacket Messrs. Katz, Levinson, Rothman and Sherman.  Courts have readily denied preliminary injunctions, where the debilitating financial consequences to Defendants outweighs the lack of harm to consumers.  *See FTC v. Simeon Mgmt. Corp.*, 532 F.2d 708, 717 (9th Cir. 1976) ("The court also found that a ban on advertising would cause serious financial harm to the respondents,

although it recognized that the public interest was the paramount consideration in this sort of case."); *see also Home Assure, LLC*, 2009 WL 1043956, at *20 (denying preliminary injunction where it "would have immediate and extended personal and professional consequences" on the defendants).

## III.     The FTC Improperly Relies On The Common Enterprise Theory

The Defendants operate a legitimate global Internet business, and they have carefully grown their business in line with industry standards and practices.  The FTC unfairly portrays Defendants as participants in an allegedly nefarious scheme in an improper attempt to establish a Section 5 violation.  A simple review of the FTC's conclusory and generalized allegations and incomplete evidence shows that the FTC cannot meet its burden of showing the Defendants operate as a "device to be used to circumvent the policy of the [FTC Act]." *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009) (quoting *P.F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 266 (6th Cir. 1970)).  The policy of imposing joint and several liability in connection with a violation of the FTC Act is to prevent defendants from circumventing the FTC Act.  *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1182. Defendants are transparent and have always been.  Their diversified business model is actually quite common and akin to BuzzFeed, Vox, and other similar Internet media companies.  "When determining whether a common enterprise exists, 'the pattern and frame-work of the whole enterprise must be taken into consideration.'" *Nat'l Urological Grp.*, 645 F. Supp. 2d  at 1182 (quoting *Del. Watch Co. v. FTC*, 332 F.2d 745, 746–47 (2d Cir. 1964)).  Some factors a court may consider in evaluating if a common enterprise exists include: common control; the sharing of office space and officers; whether business is transacted through a maze of interrelated companies; the commingling of corporate funds and failure to maintain separation of companies; unified advertising; and evidence that reveals that no real distinction exists between the corporate

defendants. *Id.* This multi-factor analysis, however, is not dispositive or mandatory. *Del. Watch Co.*, 332 F.2d at 746-47. Courts find that corporations act as a common enterprise in "situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with 'a clear mechanism for avoiding the terms of the order.'" *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1182 (quoting *Del. Watch Co.*, 332 F.2d at 746–47).

The FTC's proof relies on form over substance to portray On Point as a sprawling scheme of over 50 corporate entities that essentially share one Florida address, the same handful of employees, and operate websites that pose as government websites. To the contrary, On Point operates four distinct business: E-Commerce, Brand Publishing, Data, and Network and Exchange.

Today, the Company works across four distinctly managed businesses with "agile organizational constructs," popularized by online technology companies (e.g. Spotify, Netflix, etc). Each business is operated by an executive with dedicated "squads" (cross functional teams that are dedicated to two-week development sprints, common goals and objectives, etc.). Levison Decl. Divisions are structured with its own dedicated executive, and OnPoint limits any intermingling of employees. In addition, the holding companies that the FTC relies on, are in fact trusts, owned by and for the benefit of the Individual Defendants. Similarly, many of the transfer records the FTC cites reflect the repayment of loans. Tellingly, the FTC's allegations and proof do not undermine these legitimate, arm's-length transactions. *See FTC v. Vantage Point Servs., LLC*, 266 F. Supp. 3d 648, 657 (W.D.N.Y. 2017) (explaining that defendants' "funds appeared to be held separately and, although Defendants transferred money to each other, they argue that these transfers were made pursuant to contract and for services rendered"). None of the foregoing is secreted information or designed to evade detection by regulators or law enforcement.

More importantly, there are no allegations or evidence that the Brand Publishing, Data, and Network and Exchange Businesses are in anyway related to the alleged deceptive guides and service-websites.  Therefore, even though there may be a perceived overlap of resources, the FTC has failed to establish that the entirety of On Point's operations function as a "common enterprise." *Cf. FTC v. PayDay Fin. LLC*, 989 F. Supp. 2d 799, 810 (D.S.D. 2013); *FTC v. Kuykendall*, 371 F.3d 745, 758-59 (10th Cir. 2004) (finding the evidence merely showed that their "only apparent relationship with DMS included receiving payment for ancillary services, such as equipment leasing, billing, and collecting provided to DMS, and sharing some common ownership interests with DMS").

Ultimately, the proffered evidence does not establish that "the corporate structure is not a legitimate liability-limiting arrangement." *Kuykendall*, 371 F.3d at 758. Therefore, the Court should uphold "[t]he general rule . . . that, absent highly unusual circumstances, the corporate entity will not be disregarded." *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1182 (quoting *P.F. Collier & Son Corp*, 427 F.2d at 266)).

## IV.     The FTC Cannot Establish That It Will Ultimately Succeed On The Merits

To meets it burden of establishing a likelihood of ultimate success on the merits, "[t]he FTC must raise questions going to the merits so serious, substantial, difficult and doubtful as to make them fair ground for thorough investigation, study, deliberation and determination." *Mktg. Response Grp., Inc.*, 1996 WL 420865, at *2) (denying FTC's motion for a preliminary injunction) (citing *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1218 (11th Cir. 1991)).

### A.     The FTC Cannot Prevail On Its Section 5(a) Deceptive Practices Claims

Section 5(a) of the Federal Trade Commission Act prohibits unfair or deceptive acts or practices in or affecting commerce.  15 U.S.C. § 45(a)(1).  "To establish that an act or practice is deceptive under that section, the FTC must establish that (1) there was a representation, (2) the

representation was likely to mislead consumers acting reasonably under the circumstances, and (3) the representation was material." *Home Assure, LLC*, 2009 WL 1043956, at *18 (citing *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir.2003)).

In assessing whether a representation or practice is likely to mislead consumers, a court must consider the overall net impression conveyed by the activity in question. *Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d at 1189. "A representation is material if it is of a kind usually relied upon by a reasonably prudent person." *FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1360 (S.D. Fla. 2019) (quoting *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 3d 1247, 1266 (S.D. Fla. 2007)). "If a significant number of prospective purchasers are likely to attach importance to the representation in determining whether to engage in a proposed transaction, the representation is material." *Id.* (quoting *FTC v. Washington Data Resource*, 856 F. Supp. 2d 1247, 1272-73 (M.D. Fla. 2012)).

1. *OnPoint's State Licensing and Motor Vehicle Services Websites Are Not Deceptive*

a. The Products And Services Offered Are Clearly Described with Material Information Disclosed

As noted above, when visiting one of Defendant's state licensing/services websites, on every single page they see, visitors prominently learn and are reminded that the website provides information and sells Guides to facilitate the process of obtaining a state license. Contrary to the FTC's allegations, not once do Defendants promise visitors that they can register for a license on the website. With each click to a new page, visitors are reminded again and again that the website offers information and sells a Guide. The FTC takes issue with the fact that if people search Google to apply for a fishing license or renew their driver's license that they may find one of Defendants' websites at or near the top of the search results. The FTC's theory seems to be that visitors only come to the Defendant's sites to complete said registration and so regardless of what

31

information is included to the contrary, consumers will not read or process it.  But the FTC has not and cannot point to a single representation on the websites the Temporary Receiver recently disabled that promise registration services.  The cases cited by the FTC, including from this district, all involve schemes where Defendants made express misstatements, and then attempted to rely on occasional, small print, ambiguous disclaimers to clean up the mess.  *See, e.g., FTC v. World Parent Mktg.*, No. 17-cv-20848-GAYLES, 2017 WL 3508639, at *13 (A.D. Fla. Aug. 16, 2017) ("disclaimers . . . are not adequate to avoid liability unless they are sufficiently prominent and unambiguous to change the apparent meaning of the claims and to leave an accurate impression."). This is not the case at hand.

In the instant case, Defendants' website design comports with all of the FTC's guidance on disclosure best practices online.  The FTC's *dot.com Disclosures: How to Make Effective Disclosures in Digital Advertising* detail the various factors that make an online disclosure clear and conspicuous:

> In evaluating whether a disclosure is likely to be clear and conspicuous, advertisers should consider its placement in the ad and its proximity to the relevant claim.  The closer the disclosure is to the claim to which it relates, the better. Additional considerations include: the prominence of the disclosure, whether it is unavoidable, whether other parts of the ad distract from the disclosure; whether the disclosure needs to be repeated at different places on the website . . . whether the visual disclosures appear for a sufficient duration; and whether the language of the disclosure is understandable to the intended audience.[10]

Defendants website all include disclosures that the websites sell Guides or provide information next to any discussion of government services.  These disclosures are simply worded and repeated page after page.  There are not flashing visual elements that distract from the

---

[10] This guidance document is available at https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-staff-revises-online-advertising-disclosure-guidelines/130312dotcomdisclosures.pdf.

disclosures.  And several times on each website, the viewer must click to accept a disclosure before moving on in the web path.  Courts have found that where disclosures are clearly presented including in close proximity to where a consumer indicates consent to the terms of an agreement that a consumer may not decline to read the disclosure and then claim a web page is deceptive. *See, e.g., Hager v. Vertrue, Inc.*, No. 09–11245–GAO, 2011 WL 4501046, at *5 (D. Mass. Sept. 28, 2011) citing *Bott v. Vistaprint USA, Inc.*, 392 F' App'x 327 (5th Cir., 2010).  We are aware of no other case in the 11th Circuit or elsewhere where disclosures this ubiquitous have nonetheless been found to be deceptive.

> b.  The Consumer Perception Survey is Fatally Flawed and Cannot Be Used to Demonstrate Defendants Have Deceived Consumers

Perhaps recognizing this was a case where any implied claims would be tenuous at best, the FTC commissioned a consumer survey.  This is the primary evidence the FTC relies upon to assert that consumers were misled by the Defendants' websites.  The FTC hired Dr. Michelle Mazurek from the University of Maryland to conduct the survey.  Dr. Mazurek has various degrees in computer and electrical engineering.  While highly credentialed, by her own admission Dr. Mazurek has never testified at trial or at a deposition which we presume also means that she has never conducted a survey or served as a survey expert in a litigated proceeding.  The survey tested both the DMV and Section 8 sites and purported to find that a significant number of consumers were misled into believing that the sites offered more than guides, and that many consumers either did not notice the disclaimers or declined to read them.  Like any other form of evidence, the Court must assess whether this survey is reliable:

> In determining whether the survey was conducted in accordance with generally accepted principles, the court should consider whether (1) a proper universe was examined and a representative sample chosen; (2) the persons conducting the survey were experts; (3) the design, questioning, and manner of interviewing met the standard of objective surveying; (4) the survey was conducted

> independently of the attorneys involved; and (5) the surveyors and respondents were unaware of the purposes of the survey or the litigation."

*FTC v. Publishers Bus. Servs.*, *Inc.*, No. 2:08-CV-00620-PMP-PAL, 2009 WL 10692838, at *5 (D. Nev. Oct. 30, 2009).

To assist the Court, Defendants hired Dr. Justin Anderson from MMR Strategy Group. Dr. Anderson is an expert in consumer perception surveys who has been credited as an expert in federal court and has provided reports or testimony in multiple other matters that settled before trial, including one in which he served as an expert witness on behalf of the FTC.[11]  Over the years federal courts have had ample opportunities to assess the reliability of preferred surveys and a considerable body of evidence has developed in terms of the "standards of objective surveying." As Dr. Anderson points out, the FTC's survey falls short with respect to a number of these standards, any one of which would render the surveys unreliable.  *See* Expert Report of Dr. Justin R. Anderson, Ex. A (Anderson Report").  In particular the surveys (1) are over-inclusive and includes respondents who do not have a present interest either in DMV services or section 8 housing; (2) do not represent marketplace conditions and introduced bias because the respondents were asked to pretend they were someone else, were told why they were visiting the website (e.g. to renew a license) and were told they were to review the site for usability; and (3) unlike a typical experiment, had a test but not a control to determine how much net confusion was caused by the websites.

---

[11] Dr. Anderson stands in sharp contrast to Dr. Mazurek who has never provided expert testimony before.  She purports to be an expert in "human-centered computer security and privacy" and her research centers around "how and why people . . . make security- and privacy-relevant decisions.  Expert Report of Michelle Mazurek ¶ 2.  She makes no claim to be an expert in the design and execution of consumer perception research.

i.      Survey Population

Courts and commentators have consistently held that surveys must examine "the proper universe."  Further, the "proper universe" is typically consumers who have a specific interest in the product or service whose advertising or marketing is being surveyed.  *See Publishers Bus. Servs. Inc.*, 2009 WL 10692838, at *5 ("the court should consider whether a proper universe was examined"); *Kwan Software Eng'g, Inc. v. Foray Techs, LLC*, No C 12-03762 SI, 2014 WL 572290, at *5 (N.D. Cal Feb. 11, 2014) ("to succeed on its false advertising claims, VeriPac must show that the alleged misrepresentations deceived or had the tendency to deceive a substantial segment of its audience . . . VeriPac has not shown that any members of the survey were people who would see the alleged misrepresentations . . . or people who were potential purchasers of the products.") *See also* Anderson Report ¶¶ 19-21.

Insuring that a survey includes the proper universe of respondents is important for a number of reasons, including the fact that people uninterested in a particular product or service are less likely to pay close attention to the advertising or marketing they are being shown.  "A universe may be improperly over-inclusive by encompassing such a large group of persons that it includes those whose perceptions are not relevant, thus skewing the results by introducing irrelevant data." McCarthy, J. Thomas, *McCarthy on Trademarks and Unfair Competition*, Fourth Edition, database updated September 2014.  § 32:159 Relevant "universe" surveyed - Defining the universe, p. 1.

As Dr. Anderson notes, Dr. Mazurek acknowledges the need for a proper survey universe but then fails to execute on that principle.  Anderson Report ¶¶ 20-23.  The survey failed to ask a single screening question designed to elicit whether the potential respondent had any immediate interest in either online motor vehicle services or Section 8 housing.  *Id*. ¶ 27,32.  Instead,

respondents were randomly drawn from large population pools to the point that some of the respondents in the DMV Survey indicated they do not even have a driver's license and some of the respondents in the Section 8 Survey reported an annual income that would almost certainly disqualify them from receiving Section 8 housing benefits, while 42.2% of respondents indicated that they were "Not at all familiar" with Section 8 before they began the survey.  *Id.* ¶¶ 27–34.

ii.     Marketplace Conditions and Bias

The Surveys do not replicate marketplace conditions because respondents were not asked simply to view the websites and then to provide their thoughts on the information they believed the websites communicated.  Using this approach would have most closely approximated real world conditions.  Additionally, as Dr. Anderson notes, the Surveys presented the websites on the left side of the screen and instructions on the right, which made the website's text smaller and more difficult for respondents to notice and read.  Anderson Report at ¶¶58–59.  In a survey that seeks to test the effectiveness of disclosures, this clearly fails to accurately represent marketplace conditions.  *See FTC v. Nat'l Urological Grp., Inc.*, No. 1:04-CV-3294-CAP, 2017 WL 6759868, at *43 (N.D. Ga. Oct. 10, 2017) (finding survey unreliable because it did not replicate marketplace conditions); *Church & Dwight Co. v. S.C. Johnson & Son, Inc*., 873 F. Supp. 893, 910 (D.N.J. 1994) ("it is crucial that the survey evidence presented to the trier of fact most closely replicates consumers' 'real world' perceptions of the contested advertisement); *see also* Anderson Report ¶¶ 39–45.

Instead consumers were given a series of hypotheticals which could not help but shape how they perceived and reacted to the websites they were about to view.  Specifically, consumers were told that they were to pretend to be someone else (Terry Spencer), to assume that Terry Spencer wanted to renew her driver's license or determine her eligibility for Section 8 housing and finally that they were to determine the usability of the site that Terry had found.  *Id.* ¶¶ 45–46.  Providing

respondents any one piece of this information would have, by itself, been problematic, but in combination they clearly bias respondents into believing that they are being asked to assess the usability of a site that "Terry" wants to use to renew her driver's license or determine her Section 8 housing eligibility. *Id.* ¶¶ 47–54. It is hardly surprising, therefore, that many survey respondents concluded that they had done just that in the course of their review of the sites. *Id.* ¶¶ 54–60.

iii.    Lack of a Control

Finally, as Dr. Mazurek notes, consumer surveys are essentially an experiment designed to test the messages being communicated by particular advertising or marketing and, in particular, whether the advertising or marketing is communicating a "deceptive" message to consumers. *Id.* ¶¶ 51–52. Like any good experiment, along with the test there must also be a control to make sure that the measured effect (in this case, deception) arises from the condition you are testing and not some other variable. *Id.* ¶¶ 61–64. For example, suppose a company advertises its apples as "organic" and a survey seeks to determine whether the advertising also implies that organic apples are healthier. A reliable survey would use a control to "net out" those consumers who believe that organic apples are healthier for reasons unrelated to the advertising at issue (for example, because they came to the advertising with a pre-existing belief in that regard.) In other words, the control would narrow the final result to only those consumers who were "deceived" as a result of the company's advertising or marketing and not as a result of pre-existing belief, other bias, or simply an unwillingness to focus on the task at hand. As Dr. Anderson's report explains, there are typically two ways in which controls can be added to a survey test. In the first instance, the survey consists of two cells. In the first, respondents are asked to view and answer questions about the actual advertising or marketing being "tested." In the second, a separate set of respondents are shown the same advertising or marketing except that it has been modified so that the alleged deception is no longer present. Once the survey is completed, any alleged "deception" from the

37

advertising or marketing being tested is found by subtracting the percentage of respondents who were "deceived" in the control group from the percentage who were "deceived" in the test group. *See id.* ¶¶ 65–69.

Another less common approach is to add a control question to the survey. Respondents who get the control question "wrong" are then eliminated from the results. Unfortunately, Dr. Mazurek failed to use either type of control. *Id.* ¶¶ 68–69. Without the use of a control, even if her results were valid, there is simply no way of verifying what if any of the alleged "deception" resulted from the defendants' websites rather than from some other factor or pre-existing bias. As such the FTC's survey cannot be used to support its argument for the presence of deceptive implied claims. *Am. Home Prods. Corp. v. Procter & Gamble Co.,* 871 F. Supp. 739, 761–62 (D.N.J.1994) ("It is clear that in a false advertising action survey results must be filtered via an adequate control mechanism...."); McCarthy, J. Thomas. *McCarthy on Trademarks and Unfair Competition*, Fourth Edition, database updated September 2014, § 32:187, p. 1 (explaining the need for a survey control).

In summary, any one of the flaws described above would be sufficient to find the survey unreliable. Taken together, the evidence in support of this conclusion is overwhelming. The Court should not credit the Surveys or the findings. Absent such survey evidence, and in light of the overwhelming number of disclosures provided, as noted above, the FTC has provided no evidence upon which the Court can conclude that consumers were misled by the Defendant's websites.

c.      Customer Complaints Do Not Establish Deception

After concluding the Survey is not credible, the only remaining evidence is an FTC representation that it has received a number of complaints about Defendants' websites and declarations by four disappointed visitors to the various websites. Such allegations are anecdotal at best and do not form the basis for granting a preliminary injunction in this Circuit. *See Sterling*

*Precious Metals*, 894 F. Supp. 2d (highlighting "the danger of relying upon hearsay affidavits, not subject to cross-examination, in granting injunctive relief"); *see* Ex. G, Jinesta Decl.

### 2. *OnPoint's Public Benefits Websites Are Not Deceptive*

For all of the reasons discussed above, the Defendants' public benefit websites are not deceptive or misleading.  There are additional factors that make the FTC's allegations regarding these sites particularly egregious.  While all of the websites offer Guides, the public benefits websites do not charge any money for obtaining the Guides.  The FTC still alleges deception because based on the web pages and content, the visitors purportedly believe they are obtaining a benefits determination and not merely obtaining information in exchange for the "cost" of providing personal contact information for future marketing.  The FTC has given the Court screen shots from the websites that are dated.  These same dated web pages were used in conducting the survey.  Defendants made material changes to the public benefits websites prior to the filing of the Complaint.  Just one example is that the FTC alleges the websites invite visitors to "Find Out If You are Eligible for [Public Benefit]."  Compl. ¶ 149.  None of the current websites in place when the TRO was ordered have this language.  The pages currently invite visitors to "Determine if You Are Eligible for Section 8 Benefits *With Our Guide*" or offer "Eligibility *Guidance Assistance.*"  The FTC has not alleged that the current iterations of the websites are deceptive nor offered any evidence to support any such allegation.  As such, the Court based its TRO as it relates to the public benefits websites on incorrect information provided *ex parte* by the FTC.  Now in possession of accurate information, the Court should not base a preliminary injunction on outdated, incorrect allegations.

In addition, while the FTC's complaint alleges the public benefit websites are deceptive, there are passing references to the collection and sale of personal contact information being "unfair."  If the FTC asserts that the changes in the websites do not matter because the conduct is

unfair under Section 5, the FTC cannot meet this burden.  Section 5 of the FTC Act prohibits both "deceptive and unfair acts or practices."  Unfairness is not specifically defined in the Act, but the 11th Circuit recently reviewed how the unfairness doctrine has been used.  "The FTC was to consider whether an act or practice (1) caused consumers, competitors, or other businesses substantial injury; (2) offended public policy as established by statute, the common law, or otherwise; and (3) was immoral, unethical, or unscrupulous.  As to the first factor "the FTC stated that to warrant a finding of unfairness, an injury "[1] must be substantial; [2] it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and [3] it must be an injury that consumers themselves could not reasonably have avoided." *LabMD Inc v. F.T.C.*, 894 F.3d 1221, 1229 (11th Cir. 2018).  The FTC cannot demonstrate that there are no countervailing benefits to the Defendants' public benefits websites as visitors receive informational Guides.  The behavior of visitors shows how valuable the websites are because 60% of the viewers of the websites are repeat visitors.  Further, there can be no showing that any "injury" from the sharing of information could not be reasonably avoided as visitors simply to do need to provide their consent to receive marketing.

B.     <u>The FTC Cannot Establish Individual Liability</u>

To establish individual liability, the FTC must show (1) a corporate violation; (2) the individual defendant has authority to control the corporate defendant or participates directly in the wrongful acts or practices; and (3) the individual defendant has some knowledge of the wrongful acts or practices.  *FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (citing *FTC v. Amy Travel Service, Inc.*, 875 F.2d 564, 573 (7th Cir. 1989)).  As previously discussed, the FTC cannot establish a corporate violation.  *See supra*, Section IV.  In addition, the Individual Defendants may be officers and owners of certain entities, but the FTC has failed to even identify which specific Corporate Defendant is liable.  Instead, the FTC, again, improperly relies on the

common enterprise theory to impose individual liability, and baselessly contends "they had the authority to control the common enterprise."

Furthermore, the FTC cannot establish the Individual Defendants' requisite knowledge. To show the individual defendant had some knowledge, the FTC must establish that the individual defendant either: (1) had actual knowledge of the wrongful acts or practices; (2) was recklessly indifferent to whether or not the corporate acts or practices were fraudulent; or (3) had an awareness of a high probability that the corporation was engaged in fraudulent practices along with an intentional avoidance of the truth. *PayDay Fin. LLC*, 989 F. Supp. 2d at 810 (D.S.D. 2013). The Individual Defendants have knowledge of the products offered by the E-Commerce business. However, the FTC must establish that the Individual Defendants knew, were recklessly indifferent to, or were aware of the high probability that the guides and websites were deceptive.

The FTC's contention that the Individual Defendants knew of the deceptive practices, because they each obtained merchant accounts, and therefore, must have known about the chargebacks and allegedly high refund ratios is pure speculation. First, the merchant accounts were opened to meet the businesses' growing credit needs, and therefore not "scam" accounts. TRO Mot. at 31 n.27. Moreover, the FTC has failed to point to any evidence that each Individual Defendant was aware of allegedly problematic chargebacks and refunds. The FTC has failed to demonstrate the Individual Defendants had any knowledge that any of the guides and websites were deceptive. The conclusory allegations in the Complaint are not sufficient to meet the burden for injunctive relief. Accordingly, the Individual Defendants cannot be held liable.

## V.   The FTC Has Failed to Show that an Asset Freeze is Warranted

The FTC relies on conclusory statements and irrelevant and unsupported allegations in the TRO Motion to support their request for an asset freeze. The FTC does not support any of its allegations that the Defendants have exhibited any behavior indicating they are likely to dissipate

or conceal assets. Meanwhile, the Individual Defendants have spent hours completing their financial disclosures to ensure that all of their assets were properly disclosed and submitted those disclosures to the FTC on January 3, 2020.

In an action brought under Section 13(b), a district court may grant preliminary relief, including an asset freeze, if necessary to ensure the possibility of effective final relief." *Home Assure, LLC*, 2009 WL 1043956, at \*2. While a court has authority to grant an asset freeze under 13(b), "[a] party seeking an asset freeze must show a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if not granted." *FTC v. Millennium Telecard Inc*., 2011 WL 2745963, at \* (D.N.J. July 12, 2011) (quoting *Johnson v. Couturier*, 527 F.3d 1967, 1085 (9th Cir. 2009)).[12] The FTC must provide a "reasonable estimation of defendant's ill-gotten gains." *SEC v. ETS Payphones, Inc.*, 208 F.3d 727, 735 (11th Cir. 2014); *see also Simple Plan*, 379 F. Supp. 3d at 1364. The FTC argues in support of their motion that courts in this district regularly grant FTC requests for an asset freeze. (TRO Mot. at 32). However, just because courts have granted asset freezes to the FTC in the past, does not mean that the FTC does not have to meet their burden for each individual case.

The FTC's unsupported allegations do not support its request for an asset freeze. The FTC alleges there is a high risk the Defendants will destroy, conceal, or dissipate assets because "the Defendants hold dozens of bank accounts, including multiple accounts for the same entities across

---

[12] *FTC v. Millennium Telecard* is particularly instructive. In Millennium, the FTC argued an asset freeze was appropriate because (1) the underlying conduct was deceptive; (2) three checks totaling $390,000 were deposited in the corporate accounts by the defendant but bounced; (3) the defendant had a history of commingling assets and using corporate assets for personal use; (4) the defendant received corporate assets; (5) the defendant wrote large checks to cash; (6) money was wired to foreign accounts; and (7) the FTC's declaration stating there was ample evidence that assets would be dissipated because in the context of similar enforcement actions defendants often attempt to conceal or dissipate assets. *Millennium*, 2011 WL 2745963, at \*12. The court agreed with the FTC that the totality of the circumstances were relevant despite most of the factors not being improper nor illegal, but held that none of the specific acts demonstrated a likelihood there would be a dissipation of assets and thus the FTC's concerns could be addressed with less drastic measures. Id. at \*13-14.

several banks." (TRO Motion 33).  The FTC offers nothing to support this allegation.  There is nothing improper about holding foreign bank accounts and the Individual Defendants have properly disclosed their foreign assets.  The FTC goes on to allege without any support that the Defendants have laundered millions of dollars rapidly through accounts in the Caribbean, Switzerland and elsewhere with no apparent business purpose and have taken large payments from corporate accounts.  (TRO at 33).  The only support for the FTC's conclusory allegations is a citation to one paragraph of FTC investigator Lashanda L. Freeman's declaration in which defendant Robert Zangrillo's house is featured on the cover of a magazine. (PX1 164 Att. AV p.3). There is simply no credible evidence, much less plausible allegations, that the Defendants have been or will secret or dissipate assets simply because these facts do not exist.

In an effort to support the request for an asset freeze and other *ex parte* relief, the FTC makes several irrelevant statements. First, the FTC references two unrelated actions against Mr. Katz and Mr. Zangrillo (who is not one of the defendants submitting this brief) to argue that *all* of the Defendants will likely dissipate their assets because they are "unwilling to comply with court orders or follow the law." TRO Mot. at 31. It is improper for the FTC to argue an asset freeze over 61 defendants is appropriate based on two unrelated actions against Mr. Katz and Mr. Zangrillo. Second, and more alarming is the FTC's statement that "[t]he FTC's experience with similar defendants underscores that they will take any opportunity to sabotage discovery and put their ill-gotten gains out of reach." (TRO Motion 33).  The FTC cannot meet its burden for an asset freeze by arguing that the Defendants fall into an arbitrary group of "similar defendants" that the FTC unilaterally decided is more likely to hide assets.  Despite the FTC's arguments, they must show that these specific defendants are likely to dissipate assets, which cannot be maintained.

In an equitable FTC enforcement action, defendants are liable to the extent of their ill-gotten gains. *FTC v. IAB Marketing Associates, LP*, 972 F. Supp. 2d 1307 (S.D. Fl. 2013). The FTC must provide a "reasonable estimation of defendant's ill-gotten gains." *SEC v. ETS Payphones, Inc.*, 208 F.3d 727, 735 (11th Cir. 2014). "[T]he court should also consider the fact that wrongdoing has not yet been proven." *FTC v. Ideal Financial Solutions, Inc.*, 2014 WL 4541191, at *2 (D. Nev. Sept. 9, 2014) (Citing *CFTC v. Noble Metals Intnt'l, Inc.*, 67 F.3d 766, 775 (9th Cir. 1995)). A court must balance the deleterious effect of an asset freeze on a defendant and the ability to of a defendant to defend oneself with the need to protect victims. *SEC v. Quiros*, 2016 WL 3032925, at *1 (S.D. Fl. May 27, 2016). In determining whether an asset freeze is appropriate, a court must make sufficient factual findings that Defendants gained something from allegedly unlawful practices. *FTC v. Vylah Tec LLC*, 727 F. App'x 998, 1002 (11th Cir. 2018).

The FTC makes no effort to identify any allegedly ill-gotten gains received by the Individual Defendants. The only numbers offered throughout the Complaint and TRO Motion are payments made to the Individual Defendants supported by Lashanda L. Freeman's Declaration containing tables showing the specific payments to the Individual Defendants from the Corporate Defendants. (Compl. ¶¶ 62, 65, 73, 77; TRO Mot. 17-24; PX1 ¶¶190 – 196).[13] The payments are not tied to any allegation that these were ill-gotten gains. Simply stating that Defendants received payments from a company, without more, cannot constitute an allegation of ill-gotten gains in support of any asset freeze. Again, the FTC implies without any credible evidence that these payments are ill-gotten. This is not sufficient to support the total and complete restraint of Defendants' assets.

---

[13] Defendants do not concede either the accuracy or the characterization of the payments allegedly made to the Individual Defendants.

In its response to Defendant Zangrillo's motion to dissolve the TRO, the FTC argues that the Defendants are jointly liable for $85,242,225.41 and therefore the asset freeze is appropriate. (ECF No. 38 at 11). Despite this number not appearing in the Complaint or the TRO Motion, it is likely the FTC believes all Defendants are liable for this amount. The FTC supports this number by citing to a declaration from its forensic accountant in which he lists the total amount Defendants received from payment processors. (PX4 8-10). Again, the FTC does not attempt to tie any payments to allegations that these funds consisted of ill-gotten gains, or were from the lines of business alleged to be deceptive and cannot meet the standard for imposing a complete asset freeze. Additionally, as stated above, the Corporate Defendants cannot be held liable under a common enterprise theory of liability and the FTC cannot establish individual liability.

Additionally, many of the Individual Defendants' frozen assets, including assets in entities solely owned by them, are completely unrelated to any On Point Business and should not be included in the asset freeze. *See Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1521 (11th Cir. 1994) ("the general federal rule of equity is that a court may not reach a defendant's assets unrelated to the underlying litigation and freeze them so that they may be preserved to satisfy a potential money judgment.").

The deleterious effect on the Defendants far outweighs the need to protect victims. The Temporary Receiver remains in control of the Corporate Defendants assets and can protect those assets. The Individual Defendants have been greatly harmed by the asset freeze and have been unable to pay their monthly expenses such as mortgages, taxes, children's tuition and car payments. Additionally, the Defendants have been working around the clock to assist the Temporary Receiver and have been key to getting the On Point businesses operational again. The Individual Defendants have done this with no indication from the Temporary Receiver that they

will be paid for their efforts.  The Individual Defendants have essentially been working for free the last three weeks and as a result have been unable to seek work elsewhere to support their families.

## VI.    At A Minimum, The Court Should Not Impose a Preliminary Injunction, Permanent Receiver Or Asset Freeze On The Businesses That Are Not Involved in Providing the Guides At Issue

The FTC has not met its burden for the drastic relief it has sought and has no basis for a preliminary injunction, the appointment of the Temporary Receiver or the freeze on assets.  The Court should not permit the destruction of the Defendants law abiding businesses and the loss of jobs that will result due to the FTC's overzealous and haphazard investigation.

In the event the Court is inclined to grant some sort of injunctive relief, that relief should be limited, at most, to the business entities that serviced the already terminated E-Commerce business line.  This would be consistent with the approach taken by the Receiver who has been in control of the Defendant's business operations for three weeks. As the Court is aware, the Receiver has been directed to determine "whether any portion of the business of any of the Receivership Entities can continue to operate *legally* and profitably." (TRO at 15)(emphasis added). Although the Defendants were required to file this opposition prior to the release of the Receiver's report, the FTC is well aware that the Receiver has already reached the conclusion that the vast majority of Defendants' business is in fact legal and profitable. Pursuant to the terms of the TRO and the fiduciary obligations the Receiver has to the Court and the Receivership Estate no other conclusion can be drawn, as the Receiver could not otherwise allow the business to operate unless it is lawful and not engaged in the deceptive conduct. This conclusion is further supported by the facts set forth above which makes clear that the FTC obtained an overbroad and punitive TRO based on a mischaracterization of Defendants' overall operations.

Although the Defendants do not concede in any way that any portion of its business was deceptive and intend to continue to vigorously defend against these claims, they are willing to stipulate to the entry of a preliminary injunction (and the continuation of the Receiver and asset freeze) limited solely to the entities that operate the e-commerce Motor Vehicle Services, Hunting and Fishing Websites. This compromise appropriately limits the injunctive relief to the only business units the FTC alleges in its Complaint and the Receiver has determined were deceptive and could not be lawfully conducted.

The Defendants are willing to immediately confer with the FTC and the Receiver[14] to negotiate the entities that would be subject to the injunctive and equitable relief. In the event the parties are unable to agree on the scope or terms of this limited preliminary injunction, the parties could move the Court for appropriate relief. The Court should set a short deadline for the parties to meet and confer in an effort to reach a compromise consistent with the limited injunctive relief proposed herein.

"Injunctive relief must be tailored to remedy the specific harm alleged," and "should be no more burdensome to the defendants than necessary to provide complete relief to the plaintiffs." *F.T.C. v. John Beck Amazing Profits, LLC*, No. 2:09-CV-4719-FMC-FFM, 2009 WL 7844076, at *3 (C.D. Cal. Nov. 17, 2009) (internal quotation marks and citations omitted).  "An overbroad injunction is an abuse of discretion." *Id.*

## CONCLUSION

For the foregoing reasons, the Court should deny the FTC's motion for a preliminary injunction.

---

[14] Counsel for the Defendants conferred with the FTC and offered to start a dialogue regarding a proposed stipulated Preliminary Injunction. Counsel for the FTC indicated that they would not agree to a stipulated injunction that was narrower in scope to the TRO.

Dated: January 6, 2020

Respectfully submitted,

**BAKER & HOSTETLER LLP**

By:_/s/ Robert W. Thielhelm, Jr._
Robert W. Thielhelm, Jr.
Florida Bar No. 889679
SunTrust Center, Suite 2300
200 South Orange Avenue
Orlando, FL 32801-3432
Telephone: 407.649.4000
Facsimile: 407.841.0168
Email: rthielhelm@bakerlaw.com

-and-

Jonathan B. New*
Jimmy Fokas*
Patrick T. Campbell*
Jeffrey D. Martino*
Lauren P. Lyster*
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.589.4200
Facsimile: 212.589.4201
*ADMITTED PRO HAC VICE

*Attorneys for Burton Katz, Brent Levison, Elisha Rothman, Christopher Sherman, On Point Global LLC, On Point Global Employment LLC, On Point Guides LLC, DG DMV LLC, On Point Domains LLC, Final Draft Media LLC, Cambridge Media Series LLC, Issue Based Media LLC, Bella Vista Media Ltd., Carganet S.A., Direct Market LLC, Bluebird Media LLC, Borat Media LLC, Bring Back the Magic Media LLC, Chametz Media LLC, Chelsea Media LLC, Coinstar Media LLC, Domain Development Studios LLC, Domain Dividends Media LLC, Eagle Media LLC, Falcon Media LLC, GNR Media LLC, Island Media LLC, Leatherback Media Group LLC, Macau Media LLC, CEG Media LLC, MBL Media Ltd. Inc., Orange and Blue Media LLC, Orange Grove Media LLC, Panther Media LLC,*

48

*Pirate Media LLC, Pivot Media Group LLC, PJ Groove Media LLC, Sandman Media Group LLC, Shadow Media LLC, Skylar Media LLC, Slayer Billing LLC, Spartacus Media LLC, Very Busy Media LLC, Wasabi Media LLC, Yamazaki Media LLC, Bronco Family Holdings LP, BAL Family LP, Cardozo Holdings LLC, 714 Media Ltd., Mac Media Ltd., License America Management LLC, License America Holdings LLC and Blackbird Media LLC.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 6, 2020, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*s/ Robert W. Thielhelm, Jr.*
Robert W. Thielhelm, Jr.