IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-25046-Civ-Scola

FEDERAL TRADE COMMISSION,

        Plaintiff,

   v.

ON POINT GLOBAL LLC and others,

        Defendants.

_____/

## RECEIVER'S INITIAL REPORT

Melanie E. Damian, the court-appointed temporary Receiver (the "Receiver") in the above-captioned enforcement action, submits her first status report setting forth her activities and efforts to fulfill her duties under the Order pursuant to which she was appointed for the period from the date of appointment through January 9, 2020.

## **TABLE OF CONTENTS**

I.   ENTRY OF TEMPORARY RESTRAINING ORDER AND APPOINTMENT
     OF TEMPORARY RECEIVER AND OVERVIEW OF RECEIVER'S
     ACTIVITIES TO DATE...................................................................................4

     A.  Appointment and Duties of Receiver ..........................................................5

     B.  Executive Summary .....................................................................................5

         1.  Steps Taken to Implement TRO .............................................................5
         2.  The Known Assets of the Defendants.....................................................5
         3.  Steps the Receiver Intends to Take in the Future to Protect
             and Recover Assets ...............................................................................6
         4.  The Receiver Opines that Certain Businesses Can Continue to
             Operate Legally and Profitably..............................................................6
         5.  Other Matters for the Court to Consider ...............................................6

     C.  Overview of Receiver's Activities to Date ................................................. 6

II.  THE RECEIVER'S ACTIVITIES AND EFFORTS TO DATE TO IMPLEMENT
     THE TERMS OF THE TRO.........................................................................9

     A.  Receiver's Initial Efforts to Marshal and Preserve Assets
         And Records and Employment of Professionals ...........................................9

     B.  Obtaining Information and Records from Defendants...................................11

     C.  Recovery of Defendants' Records and Assets from Third Parties ................13

         1. Freezing and Recovering Funds in Various Financial Institutions ...........14
         2. Credit Cards ...........................................................................................16
         3. Merchant Processors ...............................................................................17

     D.  Securing Personal Property and Other Assets of the Defendants.................17

     E.  Preliminary Analysis of Accounts and Business Cash Flow.........................18

         1.  Accounts at Financial Institutions.........................................................18
         2.  Digital Devices.......................................................................................19
         3.  Email, Cloud Computing and Third-Party Accounts,
             And Websites.........................................................................................19

     F.  Investigation of the Defendants' Business Operations and Opinion on Legal
         and Profitable Operation...........................................................................20

      1.       E-Commerce …………………………………………....20

      2.       Lead Generation/Freemium Sites/Data Business……………...22

      3.       Domain Ownership/Sale………………………………………24

      4.       Avenue I Media………………………………………………25

      5.       Defendants' Operations Abroad………………………………27

      6.       Dragon Global Defendants and Robert Zangrillo………………28

G.  The Estate's Potential Claims Against Third Parties......................................32

H.  Transfers to Individual Defendants.................................................................32

III.   MONIES RECOVERED AND ASSETS OF DEFENDANTS AND EXPENSES
      OF ESTATE..............................................................................................................33

IV.  FUTURE ACTIVITIES AND RECOMMENDATIONS .........................................35

A.  "Freemium" Sites.........................................................................................36

B.  "Pay-for-Services" Sites...............................................................................37

C.  Expanding Receivership to Include Entities Affiliated with Defendants......38

V. CONCLUSION .........................................................................................................39

I.      **ENTRY OF TEMPORARY RESTRAINING ORDER AND APPOINTMENT OF TEMPORARY RECEIVER, OVERVIEW AND SUMMARY OF RECEIVER'S ACTIVITIES TO DATE**

A.  **Appointment and Duties of Receiver**

On December 13, 2019, the Court entered an Order Granting Ex Parte Temporary Restraining Order and Order to Show Cause [ECF No. 17] (the "TRO") in this FTC enforcement action.  Pursuant to the TRO, the Defendants' assets were frozen, all records of Defendants' activities and assets were ordered to be preserved, and Melanie E. Damian was appointed Temporary Receiver of the entity Defendants.

The Receiver's mandate was to take steps necessary to implement the terms of the TRO by, among other things, taking possession, custody and control of all entity Defendants' assets, establishing control of the entity Defendants' businesses (to the extent they exist and continue to operate), ensuring that all individual Defendants' assets were frozen and preventing their withdrawal or misapplication, obtaining and preserving documents and records pertaining to all Defendants' assets, transactions and business operations, and performing all acts necessary to protect and preserve the Receivership Estate.  *See* TRO at pp. 12-15.

Further, the TRO requires the Receiver to provide the Court with this Report, which not only summarizes the performance of her duties and responsibilities described in the TRO as well as the actions taken to implement the terms of the TRO, but also details the Receiver's efforts to marshal and secure assets, steps the Receiver intends to take in the future to protect Receivership assets, and opinions on whether any portion of the entity Defendants' business can continue to operate legally and profitably.

### B.  Executive Summary

### 1. Steps Taken to Implement TRO

- The Receiver took control of the business operations of the core entity Defendants.

- The Receiver imaged, preserved and secured exclusive access to the Defendants physical and electronic financial records, data, websites, domain names and accounts, computers, digital devices, and email, messaging and cloud-based accounts.

- The Receiver took control of or froze 191 accounts of the Defendants at 13 financial institutions and had most of the balances in the entity Defendants' account transferred to the Estate.

- The Receiver took offline 57 websites that were prohibited by the TRO because the sites deceptively charged consumers to obtain guides or "assistance" for government services.

- The Receiver analyzed the remaining business of Defendants subject to the prohibitions in the TRO and makes recommendations below.

### 2. The Known Assets of the Defendants

- $2,908,866.76 cash on hand in the Receiver's fiduciary account.

- $51,779.52 in checks received but not yet deposited.

- $6,205.44 in accounts of entity Defendants frozen but not yet turned over to Receiver.

- Operating Businesses (value unknown at this time), including office equipment, computers, data and Intellectual Property.

- Thousands of domain names appraised at approximately $30 million.

- Assets of Dragon Global Management LLC and Dragon Global Holdings, LLC, including automobiles, artwork, office furnishings and improvements to leased office space, and investments in other entities (valued at approximately $1.5 million)

**3. Steps the Receiver Intends to Take in the Future to Protect and Recover Assets**

- Investigate transfers from Defendants to insiders, affiliates, and third parties and explore bringing claims against them to recover funds for the benefit of the Estate.

- Continue to investigate, freeze and/or take control of Defendants' bank accounts in the United States and abroad not already frozen and/or turned over to the Receiver.

- Continue to operate legal and profitable businesses of Defendants until final determination of the FTC's claims, other Court order, or sale with Court approval.

- Depending on the Court's ruling on the Motion for Preliminary Injunction, liquidate, with Court approval, real and personal property of the Estate.

**4. The Receiver Opines that Certain Businesses Can Continue to Operate Legally and Profitably**

- The Receiver preliminarily opines that the Avenue I business that is not the subject of the allegations contained the FTC complaint can continue legally and profitably.

- The Receiver preliminarily opines that if modified (and approved by the Court) the Freemium data business and certain service sector businesses could potentially continue operating legally and profitably and should continue to be operated to preserve the assets of the Estate even if only in the short term.

**5. Other Matters for the Court to Consider**

- If the Receivership continues, the Receiver recommends that the Entities DG On Point LLC and the additional entities be added to the Receivership corpus because they are intertwined with the business of the Receivership Defendants. *See infra* Section IV.C.

### C. Overview of Receiver's Activities to Date

Since her appointment, the Receiver with the assistance of her legal counsel, forensic accountants and computer forensic professionals, has worked diligently with counsel for the Federal Trade Commission (the "FTC"), with the cooperation and assistance of the Defendants and their counsel, to identify, freeze, and marshal and/or freeze all known assets and preserve all books and records of the Defendants pursuant to the TRO. In particular, the Receiver and her

professionals obtained, imaged or otherwise preserved the Defendants' financial records, account records and electronic data comprising files stored on Defendants' (and Defendants' employees') computer hard drives, storage devices, tablet devices, and mobile phones, files stored with cloud storage providers, messaging and file sharing platforms, and other vendors, and emails sent and received through email service providers. Further, the Receiver has identified, marshalled and/or frozen substantial funds held in bank accounts and investment accounts and funds held in reserve accounts at the Defendants' merchant processors. To date, the Receiver has secured the transfer of $7,131,982,[1] with additional transfers still pending, of those funds to the fiduciary account she opened for the Receivership Estate.

Moreover, the Receiver has gained online access to multiple accounts of the Defendants at various financial institutions and is monitoring the activity of those accounts, with particular attention to the accounts containing frozen funds that have not yet been transferred to the Receiver's fiduciary account. And, the Receiver is working with the financial institutions (at which the entity Defendants hold assets) to have the Receiver designated as the sole signatory on all accounts and/or to effectuate the transfer of all account assets to the Receiver's account. With the assistance of her forensic accountants, the Receiver has performed a preliminary analysis of the financial information provided by the Defendants and reflected in the Defendants' financial records. The Receiver is working with her forensic accountants to identify the Defendants' additional accounts at financial institutions and merchant processors, determine whether the accounts were used in connection with the Defendants' businesses, and determine whether a more extensive forensic analysis is necessary to fulfill the Receiver's duties under the TRO. Based on her analysis to date, the Receiver recommends that if the Receivership continues, additional

---

[1] *See* Exhibit A attached hereto.

entities that are part of the operation of the Defendants' business enterprise be brought into the Receivership Estate. *See infra* Section IV.C.

Further, the Receiver has sought and obtained records and information from the Defendants, the FTC, banks at which Defendants hold and. held accounts, and merchant processors through which the Defendants conducted their businesses for purposes of investigating their operations and identifying assets to be marshaled for the benefit of the Receivership Estate. And recently, the Receiver received from the Defendants at least partial financial disclosures required by the TRO, which should, among other things, facilitate the Receiver's fulfillment of her duties thereunder.

Because of the vast number of accounts associated with the Defendants' businesses that are the subject of the FTC's Complaint, the Receiver provided all of the account records received to date to her forensic accountants, who are in the process of reviewing and performing an analysis of these records and making substantial progress analyzing the account activity and transactions. This will enable the Receiver to (i) identify and locate potential assets of the Defendants, (ii) investigate Defendants' business operations and dealings with customers, insiders, and affiliated persons and entities, (iii) determine the sources of funds transferred into the accounts for purposes of paying operational costs as well as identifying customers of the Defendants, among other things, (iv) identify transfers from those accounts to affiliates, insiders, and third parties and the accounts of such transferees for purposes of bringing actions to recover for the benefit of the Receivership Estate any improperly transferred funds, and (v) identify potential claimants and formulate an appropriate claims process and distribution plan for administering their claims and making distributions to claimants with allowed claims, if warranted.

II.    **THE RECEIVER'S ACTIVITIES AND EFFORTS TO DATE TO IMPLEMENT THE TERMS OF THE TRO**

    A.  **Receiver's Initial Efforts to Marshal and Preserve Assets and Records and Employment of Professionals**

Pursuant to the TRO, the Receiver was directed to "[a]ssume full control of Receivership Entities, . . . [t]ake exclusive custody, control, and possession of all assets and documents[,] . . . [c]onserve, hold, manage, and prevent the loss of all assets of the Receivership Entities and perform all acts necessary or advisable to preserve the value of those assets,  . . . [t]ake all steps necessary to secure and take exclusive custody of each location from which the Receivership Entities operate their businesses, . . . [m]ake an accounting, as soon as practicable, of the assets and financial condition of the receivership and file the accounting with the Court[,] . . . [s]uspend business operations of the Receivership Entities if in the judgment of the Receiver such operations cannot be continued legally and profitably . . . ." *See* ECF No. 19, at pp. 12-15.  Further, the TRO authorized the Receiver to "employ attorneys, accountants, appraisers, and other independent contractors and technical specialists, as the Receiver deemed advisable or necessary in the performance of duties and responsibilities under the authority granted by [the TRO]."  *See id.*

Accordingly, the Receiver engaged Damian & Valori LLP ("Receiver's Counsel") as her legal counsel in Florida, Diamond McCarthy, LLP as her legal counsel in California, Thomas Seaman, CFA as her business consultant in California, Andrew Cove as her compliance consultant, and Kapila Mukamal LLP (the "forensic accountants") as her forensic accountants, tax consultants and computer forensic professionals.  Then, on the morning of December 16, 2019, the Receiver, with the assistance of her legal counsel, forensic accountants, computer forensic professionals and business consultant, orchestrated a simultaneous execution of this Court's TRO at the offices of the Defendants in Florida (Miami and Boca Raton) and California during which time the Receiver

presented the TRO to certain of the individual Defendants located at the Defendants' offices and explained all Defendants' obligations thereunder with respect to their assets, records and cooperation with the Receiver.  Those individual Defendants notified their legal counsel and other individual Defendants of the entry of the TRO and the Receiver's execution thereof.  And, the Receiver sent copies of the TRO to the other individual Defendants not located at the Defendants' offices, including Defendant Robert Zangrillo, who controls Defendants Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC (collectively, the "Dragon Global Defendants").

Upon entry to the office locations, Receiver's Counsel and the Receiver ordered all employees away from their desks and computers and other digital devices to ensure that all physical and digital evidence maintained on or near the desks and stored on or accessible through computers and other digital devices would be preserved without modification or deletion.  The Receiver, Receiver's Counsel, and the Receivers' forensic accountants interviewed all employees to obtain information regarding the Defendants' business operations as well as the position and duties of each employee while the forensics experts worked to catalogue, document, and image all critically important digital evidence on computers, online third-party instant messaging platforms, cloud-based servers, phones, tablets, mobile storage devices, and other digital and online medium of storage.  Similar efforts by the Receiver's professionals simultaneously occurred at the Defendants' office locations in Boca Raton, Florida and Redondo Beach, California.[2]  Receiver's Counsel arranged for the preservation of all personal property located at the desks of all employees

---

[2] Another office in California was entered (9200 Sunset Drive).  It is leased from a Dragon Global entity to an On Point entity and sublet to an unrelated entity and was used occasionally by Defendant Zangrillo.  For the short term, the Receiver permitted the subtenant to remain in possession unaltered.

and throughout the offices (including personal and Defendant-owned property) in order for the Receiver and counsel for the FTC to take an account of such property and make a determination as to what was needed to be preserved to comply with the TRO and what could be returned to the individual employees. The Receiver's professionals had the locks at each office location changed to restrict access to the premises during the initial term of the TRO, while arranging for a representative from the Receiver's office to be present at the office locations for purposes of the Receiver's assessment, maintenance, preservation and/or wind down of various business operations of the Defendants, collection of mail and delivered packages and parcels, among other activities, and granting supervised access to the individual Defendants and certain of their employees to the office and the Defendants' records (after they were imaged or otherwise preserved by the Receiver), while the Receiver worked to fulfill her duties under the TRO.

As detailed below, the Receiver also sent copies of the TRO to financial institutions and to merchant processors at which Defendants hold accounts based upon information provided by the FTC. The letters directed the financial institutions and merchant processors to freeze all access to and activity in the accounts pursuant to the TRO, to wire account balances to the Receiver's account, to arrange for the Receiver to be the sole signatory of all bank accounts of the entity Defendants, and to produce various account records.

### B.  Obtaining Information and Records from Defendants

The TRO required the Defendants, within five (5) business days following the service of same upon the Defendants, to provide the Receiver with completed financial statements and a completed IRS Form 4506, Request for Copy of a Tax Return, as well as a full accounting, verified under oath, of all assets, documents, and accounts, including those located outside of the United States.  *See* ECF No. 17 at pages 9-10,      5(5)-(6).  However, this deadline has been extended

more than once by stipulation of the parties and additional extensions have been sought by motion of the Defendants.[3]

The Defendants have worked closely with the Receiver and Receiver's Counsel since the implementation of the TRO to assist in providing details regarding the business operations and the finances of the Defendants.  They have (i) provided to the Receiver information and records regarding many of their assets and accounts, (ii) facilitated the Receiver's online access to bank, credit card, email, cloud computing, online cloud-based instant messaging platform, and vendor accounts by, among other things, providing usernames and passwords so the Receiver could access and capture forensic images of accounts and all data stored therein, and (iii) granted access to company laptop computers, tablet devices, storage devices, filing cabinets, servers, data capture software, and mobile phones and provided passwords so the Receiver could have the FTC's forensic experts capture forensic images of those items.

With respect to the Defendants' bank and credit card accounts, the Receiver has been able to gain online access to those accounts using the usernames and passwords provided by the Defendants to confirm the balances and freezing of the accounts and download recent account statements.

For email, cloud-based accounts, online third-party instant messaging platforms, online data storage software, and vendor accounts, the Receiver has been able to access and take control of, and her IT professionals have successfully imaged and changed passwords to, all such known accounts.  And the Receiver continues to work with Defendants to gain access to other accounts as they are identified in the course of the Receiver's investigation and to otherwise fulfill her duties

---

[3] As of the filing of this Report, the Defendants have provided to the Receiver at least partial financial disclosures pursuant to the TRO.

under the TRO.

The extensive interviews conducted by the Receiver and Receiver's Counsel provided the information necessary to identify and image a number of personal computers, mobile phones, mass storage devices (including external hard drives), and online accounts for preservation. The acquisition and aggregation of the employee credentials has been instrumental in gaining access to the Defendants' digital devices as well as all online/cloud-based accounts in order for the forensic experts to image same and preserve all evidence. Further, through the interviews with the Defendants' employees and individual Defendants, the Receiver also has made progress in gaining a thorough and detailed understanding of the Defendants' assets, liabilities, business operations and relationships, and dealings with customers. Due to the complex nature of the Defendants' business, vast number of employees in at least 2 states (and at least 2 other countries) and some of the individual Defendants' position with respect to the applicability and enforceability of the TRO, the employee and Defendant interviews are still ongoing. By way of example, most recently, on January 7, 2020, the Receiver and Receiver's Counsel was able to speak with individual Defendant Robert Zangrillo for the first time, in the presence of his counsel, to discuss the Dragon Global Defendants, their operations, assets and liabilities, and their involvement with the other Defendants. The Receiver has not yet had the opportunity to speak with the individual Defendant Arlene Mahon or the Defendants' CFO Bob Bellack.

### C. Recovery of Defendants' Records and Assets from Third Parties

Following her appointment, the Receiver and her professionals swiftly took action to review all available documents associated with the Defendants for the purpose of identifying and investigating their assets and business operations. Immediately thereafter, the Receiver issued demand letters to numerous financial institutions, vendors, and other service providers with which

the Defendants have had dealings during the time period relevant to the FTC's Complaint, requesting the freezing and turnover of accounts and the production of records.  To date, the Receiver has sent letters to more than 25 different institutions providing each recipient with a copy of the TRO and demanding (i) the freezing of all accounts and assets of all Defendants, (ii) the turnover of the control and ownership to the Receiver of all accounts of the entity Defendants, (iii) exclusive access to the accounts and account records including online access, (iv) detailed information concerning the history, nature and value (where applicable) of each account as required by the TRO, (v) direction of future correspondence regarding the accounts to the Receiver, and (vi) records concerning each account including, without limitation, account statements, communications between the Defendants and the recipient of the letters, asset transfer records, and account opening documents.

In some instances, the Receiver received reasonably prompt responses from the recipients of the demand letters and the production of some or all of the requested information and records.  In many cases, the Receiver sent subsequent letters, made telephone calls, and exchanged a number of emails with representatives and counsel for the financial institutions and vendors.  The Receiver and her professionals are working to obtain full responses, documents, data and/or funds from those third parties, many of which have requested additional information to identify accounts held by the Defendants, which information the Receiver provided to the extent possible, or additional time to compile and produce the requested records, which requests the Receiver granted.

### 1. Freezing and Recovering Funds in Accounts at Various Financial Institutions

Soon after her appointment, the Receiver and her professionals analyzed the information and records provided by the FTC and the Defendants and created a database that details the Defendants' known and suspected accounts at financial institutions.  The Receiver has identified

a preliminary list of all active accounts at financial institutions that belong to or may involve the Defendants, which list includes approximately 191 different accounts held by the various Defendants[4] spread across 13 different financial institutions, including banks in Costa Rica, Uruguay, St. Lucia and Nevis.  *See* List of Accounts at Financial Institutions attached hereto as **Exhibit B**.

After sending demand letters and the TRO to the financial institutions,[5] the Receiver received confirmation that accounts and funds therein were frozen in accordance with the terms of the TRO.[6]  Initially, the Receiver was able to freeze $1,687,000.66 in the accounts of Defendants at Optimum Bank, and $914,813.53 in accounts of Defendants at International Finance Bank.  The Receiver has effected the transfer of these funds to the Receivership account.  Because certain operations were maintained during the period between the entry of the TRO and the date of this Report, there has been substantial activity in the Receivership account.  *See* Activity Report at Exhibit A.  Further, the Receiver has received confirmation from JP Morgan Chase and Wells Fargo at which Defendants hold accounts that the account balances are frozen and will be transferred to the Receiver's fiduciary account.   The Receiver is awaiting final confirmation from Wells Fargo as to the total amounts frozen in the accounts and to be transferred to the Estate.

---

[4] The list includes accounts on which individual Defendants are signatories.  Not all of these accounts may be associated with the Defendants' business operations and the Receiver's analysis of all of these accounts is ongoing.

[5] Receiver's Counsel sent freeze, preserve and/or turnover letters to the following financial institutions:  Banco Promerica, Bank of America, Bank of Nevis, Boslil Bank, Chase Bank, CIBC Credit Card Services, International Finance Bank, Optimum Bank, Regions Bank, Wells Fargo, Suntrust Bank, JP Morgan Chase Bank, Iberia Bank, Bank of America, and Goldman Sachs.

[6] Due to the large number of accounts held by the Defendants, the Receiver is still analyzing each account to determine if it is associated with the Defendants' business operations.

Additionally, the TRO requires the Defendants to identify and repatriate all documents and assets located in foreign countries which are: (1) titled in the name, individually or jointly, of any Defendant; (2) held by any person or entity for the benefit of any Defendant or for the benefit of any corporation, partnership, asset protection trust, or other entity that is directly or indirectly owned, managed, or controlled by any Defendant; or (3) under the direct or indirect control, whether jointly or singly, of any Defendant. *See* ECF No. 17 at pp. 9-10,      6(A)-(D).  While the Receiver has sent letters to all presently known institutions outside of the United States that hold such documents and assets demanding that they be frozen and turned over to the Estate, as of the date of this Report, the Receiver has not received any documents or assets from these institutions or from the Defendants pursuant to their repatriation obligation.

### *2. Credit Card Accounts*[7]

The Receiver has frozen or taken control of all known credit cards of the entity Defendants that were or are used for operating the business and has obtained records for some of those accounts.  With the assistance of her professionals, the Receiver is analyzing the account records received to date for purposes of identifying assets purchased and operational costs paid with such credit cards and making a determination as to which accounts are necessary to maintain the Defendants' business operations to the extent this Court determines such operations can be done legally and profitably.

---

[7] A number of credit cards in the names of Defendants' employees were used to finance the business.  The stated reason was because certain media purchases are required to be by credit card and the company leveraged employee credit to finance the business.  The Receiver discontinued this practice and for nondefendant employees is addressing whether she can pay off the credit card balances with Receivership assets.

### 3. Merchant Processor Accounts

Based upon the nature of the Defendants' business, the Receiver and her professionals quickly ascertained that the Defendants' merchant credit card processor partners held substantial amounts of money in reserve accounts for the purpose of "charge backs".[8]  After analyzing the information and records provided by the FTC and the Defendants, the Receiver and Receiver's Counsel, with the assistance of forensic experts, created a database that details the list of merchant processors and the amounts, if any, held in reserve for charge backs.  The Receiver has identified a preliminary list of all such merchant processor entity Defendant accounts.  There were 20 such accounts.  *See* List of Merchant Processors attached hereto as **Exhibit C**.

After sending demand letters and the TRO to these merchant processors,[9] the Receiver received confirmation that assets contained in reserve accounts were frozen in accordance with the TRO.  To date, the Receiver has been able to identify and freeze approximately $3.5 million held in reserve accounts at various merchant processors.  At this time, the Receiver has secured the transfer of approximately $2 million of these funds to the Receivership account.  *See* Exhibit A. Based upon ongoing discussions with other merchant processors, the Receiver expects to receive additional transfers of reserve funds.

### D.  Securing Real and Personal Property and Other Assets of the Defendants

As it relates the entity Defendants, the Receiver has taken possession of the offices, office

---

[8] A charge back is a reversal of a credit card payment that comes directly from the bank that issued the credit card when such payment is disputed by the credit card account holder.

[9] Receiver's Counsel sent freeze, preserve and turnover letters to the following merchant processors:  Choice Payment Services, Cynergy Data Group, Electronic Merchant Services, First Data Fiserv, Glacier Payments, Humboldt Merchant Services, Nuvei Technologies, Payarc, Payrix, Paysafe, Priority Payment, Processing.com, Qualpay, Redwood Merchant Services, Signapay Slack, TRX, Virtual Payment Systems, and Westamerica.

equipment, known accounts and all other known assets, except the Defendants' international accounts.[10]   The Receiver has also virtually taken control of the international offices with the assistance of Defendants.  The Receiver continues to search for assets of the entity Defendants and upon further review of their financial disclosures and further forensic investigation will take possession of any additionally discovered assets.  As it relates to the individual Defendants, the Receiver has worked to ensure that such assets are frozen as set forth above but, at this stage, has not taken any personal assets into her possession or control in accordance with the TRO.

### E.  Preliminary Analysis of Accounts and Business Cash Flow

#### 1. Accounts at Financial Institutions

While the Receiver has control of and access to most of the 191 bank accounts spread across 13 different financial institutions at which the Defendants and their affiliates held or hold accounts,[11] and the Receiver can obtain recent account statements for many of those accounts, she is still waiting to receive a comprehensive production of account records for the relevant time period under the FTC's Complaint for most of those accounts so she and her forensic accountants can confirm the financial records of the entity Defendants and investigate various transactions from those accounts for the purposes of marshaling and preserving assets of the Estate and investigating and evaluating the Defendants' business operations.  Nevertheless, based on a preliminary assessment of the Defendants' accounting system and financial records since the

---

[10] While the Receiver has sent demand letters to all foreign financial institutions at which Defendants are known to hold accounts, neither those institutions nor the Defendants have transferred the account balances to the Estate, pursuant to the requirements of the TRO.

[11] This list also includes billing companies that are not yet part of the Receivership Estate.  The Receiver, with the assistance of her forensic accountants, is working to identify which of the accounts is associated with the business endeavors of the Defendants.  This process will be aided by the financial disclosures provided by the Defendants.

Receiver's appointment, the Receiver's forensic accountants together with Defendants' employees have been able to prepare an accounting of various financials of the company during 2019 that were helpful in evaluating the business and are referenced below. *See* Exhibit Consolidated Income Statement January 2019 to October 2019 prior to the Receivership at **Exhibit D**. In addition, the activity by the Receiver from the December 16 to date is attached as Exhibit A.

The Receiver's forensic accountants will continue to update this accounting as the Receiver obtains additional records from the various financial institutions. Further, the Receiver will continue to seek the transfer of all funds in the entity Defendants' accounts that have not yet been transferred to the Receivership account. The Receiver will provide updates to the Court as appropriate and consistent with her duties set forth in the TRO and any subsequent orders.

### 2. *Digital Devices*

As explained above, as part of the initial execution of the TRO, the FTC's and the Receiver's computer forensic professionals successfully imaged a large number of the Defendants' company and personal computers, external hard drives, mobile phones, and other digital devices. The Receiver will obtain from the FTC's computer forensic professionals copies of the images they preserved to review for purposes of investigating the Defendants' business operations and dealings with customers related to the subject of the FTC's Complaint, identifying and locating assets of the Defendants, and otherwise fulfilling her obligations under the TRO.

### 3. *Email, Cloud Computing, and Third-Party Accounts, and Websites*

Additionally, with the assistance of the Defendants, the Receiver and her professionals were able to access and secure images of or otherwise preserve the Defendants' employee email and online/cloud-based accounts, third-party online instant messaging platforms, data capture software, vendor accounts, domain name accounts, and websites. As necessary, the Receiver and

her professionals will review the images to identify and locate assets of the Defendants, investigate the Defendants' business operations and dealings with customers related to the subject of the FTC's Complaint, and otherwise fulfill the Receiver's obligations under the TRO.

### F. Investigation of the Defendants' Business Operations and Opinion on Legal and Profitable Operation

The vast majority of the entity Defendants are related, interwoven and inter-dependent corporate entities that operate under the banner of On Point Global LLC ("On Point").[12]   The Defendants operate several complex lines of business grouped into four distinct categories[13]:

### 1. E-Commerce

The first category is the "e-commerce" branch of the Defendants' business operations.[14] The e-commerce branch contains various models of revenue-generating online content known as the "paid guides" as well as an offer of online services to consumers.  From January 2018 through

---

[12] Based upon current information, the Receiver understands that the following entity Defendants are dormant and no longer have business operations: Domain Development Studios LLC, Domain Dividends Media LLC, License America Management LLC, Blackbird Media LLC, CEG Media LLC, Final Draft Media LLC, and Orange and Blue Media LLC.

[13] The following information on the function and structure of the business operations of the Defendants comes from initial impressions based upon the allegations in the FTC Complaint [ECF No. 1], numerous interviews of Defendants' employees and the individual Defendants, and analysis of documents and summary reports prepared and provided by the Defendants, the FTC, and the Receiver's forensic accountants and computer forensic professionals.

[14] This branch is operated by entity Defendant, Cambridge Media Services LLC.  Additionally, entity Defendant, Panther Media LLC has been represented to hold licenses from the U.S. Department of State required to offer passport renewal services.  The Receiver has not yet verified this.

November 2019, paid guide revenues totaled approximately $63.2 million and services revenues totaled approximately $17.1 million.  *See* **Exhibit E** attached hereto.[15]

The Defendants' websites that market paid digital guides to consumers all operate on the same platform.  A number of the Defendants' sites provide guides to consumers under the appearance of offering a service such as renewing driver's licenses and car registration or determining eligibility for government services like affordable housing.  Consumers would pay a fee to receive the guides to such service.  Based on the Court's finding at      5(1)-(2) of the TRO,[16] and her own review and assessment of the paid guides sites, the Receiver, while preserving the data, took all of the paid guide sites offline as squarely prohibited by the TRO.  The consumer-facing page on these sites now indicate that they are "temporarily unavailable."[17]

The other branch of the e-commerce portion of the Defendants' business model is the services that they provide.  Through a number of web domains, the Defendants market services to consumers that provide, among other things, driver's license assistance, passport renewal, car registration renewal, and change of address assistance.[18]  The Receiver analyzed each segment of

---

[15] To assist the Court in understanding this business aspect, the Receiver also provides a Summary of Guide and Services Revenue by Domain for the period from May through November 2019.  This summary provides the following domain level net revenues for this stub period:

- ▪ $14.7 million in guide revenues.
- ▪ $8.9 million in services revenues.

[16] *See* ECF No. 17.

[17] The list of sites in this category are attached hereto as **Exhibit F**.

[18] The following entity Defendants were established by On Point to process credit card transactions for the e-commerce business:  Eagle Media LLC, Falcon Media LLC, GNR Media LLC, Island Media LLC, MBL Media Ltd. Inc., Orange Grove Media LLC, Pirate Medial LLC, Shadow Media LLC, PJ Groove Media LLC, Skylar Media LLC, Slayer Billing LLC, Borat Media LLC, Very Busy Media LLC, Wasabi Media LLC, Yamazaki Media LLC, Bring Back the Magic Media LLC, Chametz Media LLC, and Chelsea Media LLC.

the services business and determined that, pursuant to       5(1)-(2) of the TRO,[19] the driver's license assistance sites were squarely prohibited by the TRO.  Therefore, the Receiver took them offline by indicating on the consumer-facing page that the site is "temporarily unavailable", while preserving the data.   Based upon the information currently known to the Receiver, certain other sites relating specifically to passport services and car registrations remain live pending this Courts' determination regarding their legality or potential legality at the Preliminary Injunction hearing. *See* discussion *infra* at IV.B.

### 2. Lead Generation/Freemium Sites/Data Business

This arm of the Defendants' business activities is commonly referred to as "Freemiums" and is split into two parts: "Path", which gathers data; and "Channel", which markets to consumers. The "Freemium" business[20] involves websites that offer "free" guides.[21]  As part of these guides websites, consumers are asked to provide the Defendants with personal information and complete lengthy questionnaires.   The Defendants built their websites on a platform that allows the consumers' data to be captured, aggregated, and sold or shared with marketing partners.   The consumer data is stored in the Direct Market Console, access to which is shared with marketing partners in exchange for a fee paid to the Defendants based on clicks or advertising revenue.   The revenue generated by the Freemium Path or data business for the year 2019 totaled $9,083,655.87.

The second branch of the Freemium business is referred to as the data, or "Channel" model.

---

[19] [ECF No. 17].

[20] This line of business is operated in part by entity Defendant, Direct Market LLC.

[21] The following entity Defendants were established solely to buy media for the websites that offered "free" information:  Bluebird Media LLC, Leatherback Media Group, LLC, Sandman Media Group, LLC, Coinstar Media LLC, Spartacus Media LLC, and Macau Media LLC.

This branch operates very similarly to the "Path" model in that its value is derived from the data harvested from users that visit the Defendants' websites and provide their personal data. "Channel" marketing uses email, text, and push notifications to direct customer traffic back to additional websites owned by the Defendants or its marketing partners which, in turn, generate additional advertising revenue by way of advertisement placement on Defendants' websites and the resulting views and clicks. To help drive traffic, the Defendants purchase ad words and search engine ad space so their domains appear at or near the top of search engine results. The Channel model revenue is tracked and categorized by domain and how the Defendants' use consumer data obtained by each domain (*i.e.*, SMS, Push, email, trading). The accounting records provided by the Defendants and analyzed by the Receiver's forensic accountants reflect the total revenue generated by the Channel business model for the year 2019, broken down by domain, as $8,214,099.[22]

While the Defendants have provided some accounting records that evidence the revenues generated from the lead generation/Freemium business, as explained above, the Receiver has not been able to independently confirm the accuracy of those records. As detailed in her analysis and recommendations in Section IV, *infra*, the Receiver has determined, in consultation with her independent compliance expert, that the current format, content and layout of certain Freemium sites are likely to be within the prohibitions of the TRO in that they can be found to be misleading to consumers relating to obtaining public benefits eligibility determinations in its collection of consumer date that is used for the benefit of the Receivership Entities. However, the Receiver opines that the Freemium business may potentially be modified to be compliant with applicable law and keeping them live will preserve the value of the sites and the associated domain names,

---

[22] *See* 2019 Data Channel Business attached as **Exhibit G**.

many of which have significant market value.  Therefore, in balancing her duties under the Court's TRO Order to preserve the assets of the Defendants while protecting consumers from misleading business practices, the Receiver has maintained the Freemium sites live pending the Court's determination at or after the Preliminary Injunction hearing of their legality and the Receiver's recommendation.[23]

### 3. Domain Ownership/Sale

The third segment of the Defendants' business is the ownership and sale of web domains.[24] Several of the Defendants are corporate entities formed for the sole purpose of purchasing and holding web domains.[25]  The Defendants buy and sell domains based upon the valuations assigned by third-party companies such as GoDaddy or Right of the Dot, LLC, the third party that performed the domain valuation for the Defendants in November 2019.[26]  As domain values are constantly in flux based upon user traffic, among other things, the Defendants are active in purchasing and selling web domains.  Amongst the domains owned by the Defendants, several are valued at well over $1 million individually.

---

[23] In addition, the Receiver is in the process of preserving the websites in a forensically sound manner so that the parties have access to the websites as they existed at the time the TRO was entered before she engages in any modification.  The preservation process has been slightly cumbersome because of the other duties required of the Receiver's forensic professionals.

[24] As identified *supra*, the Defendants, through various entity Defendants, own in excess of 12,000 domains collectively valued at approximately $30 million.  *See* Summary of Domain Valuation attached hereto as **Exhibit H**.

[25] On Point Domains LLC owns an internet domain portfolio that includes www.fishing.com, www.atlanta.com, among others.  Pivot Media Group owns the website www.political.com. DG DMV LLC owns www.dmv.com.

[26] *See* Summary of Domain Valuation attached hereto as Exhibit H.

As part of the domain ownership branch of the Defendants' business, within the last 2 years, Defendants executed an asset purchase of a portfolio of web domains by acquiring CCH Domain Holdings, LLLP ("CCH").  On March 6, 2018, On Point Domains LLC purchased 502 domain names from CCH for $15,000,000, pursuant to an Asset Purchase Agreement.  Under the Agreement, On Point Domains LLC received a two-year option, followed by a five-year right of first refusal, to purchase an additional 80 domain names.   The records indicate that, of the $15,000,000 purchase price, $13,752,456,51 remains due for this asset, pursuant to a Promissory Note issued to CCH, with compound interest accruing on the obligation at a rate of 3% until maturity (December 1, 2032).  This amount is reflected on a loan payment schedule maintained by On Point.  CCH asserts a security interest in the domain names as security for On Points' payment obligation.

### 4. Avenue I Media

The fourth and final branch is the recently acquired company, Avenue I Media ("Avenue I"), which operates in Redondo Beach, California.  According to interviews with Avenue I employees during the simultaneous coordinated execution of the TRO, Avenue I operates a "pay for clicks" model whose monthly revenue is in excess of $2 million.  On Point acquired Avenue I on July 5, 2019 in a transaction wherein entity Defendant Direct Market, LLC purchased all of the membership interests of Adam Rioux, LLC, d/b/a Avenue I Media, a California limited liability company, pursuant to a Membership Interest Purchase Agreement dated July 5, 2019, in exchange for the purchase price of $13,250,000.  The documents reflect that Direct Market, LLC agreed to pay the remaining $4,000,000, plus interest, prior to July 5, 2020.[27]

---

[27] The Receiver negotiated a forbearance of any payment through February 10, 2020 with all parties reserving all rights to preserve this asset pending ruling by this Court.

Prior to the acquisition, Avenue I was using its ad-supported business to drive traffic to the Defendants' various websites.  Avenue I's core business is an ad-supported business.  The core of Avenue I's business has two parts.

The first part is referred to as "Exchange" in which Avenue I purchases media and places those advertisements on websites that it has created.  Marketing partners, including various search engines (Google, Yahoo, and Bing, etc.) among others, pay Avenue I when those advertisements are clicked by users.  Avenue I optimizes the profits from this part of its business by monitoring how much it pays for the media and how much revenue is generated.  Avenue I owns hundreds of website domains and pages as well as vertical sites on WordPress.  Avenue I builds sites on topics that consumers are interested in, buys traffic on the topics, places advertisements on those webpages, and then gets paid from their marketing partners when users click on the advertisements.  These websites are content pages only – they do not perform any transactions and do not sell anything to customers through the websites.  The revenue from the "Exchange" part of Avenue I's business comes from its various marketing partners from the advertisement placement.

The second part of Avenue I's business is referred to as "Network".  Avenue I has relationships with partners/publishers/third parties[28] in which those third parties own their own media and place advertisements on Avenue I's websites.  The third parties get back their cost for the media and then split the profits with Avenue I.  Avenue I does not purchase these advertisements because the third parties already own the media.

All data collected from both business models is run through Avenue I's proprietary software, Crossroads, which collects all data and runs reports on the analytics in order for Avenue

---

[28] In the Receiver's Counsel's investigation and interviewing of Avenue I employees, all of these three terms were used interchangeably without differentiation to describe Avenue I's relationships with third parties.

I and their partners to gauge how profitable the models are.  The analytics on Crossroads are closely monitored and Avenue I makes adjustments as necessary to optimize the performance of the advertisements.

The media that Avenue I purchases for the Exchange part of the business is bought on credit.  Since the acquisition by On Point, Avenue I relies on On Point to pay the credit cards used to purchase the media, and On Point has been paying the costs of the business.

According to the Defendants' records, since its acquisition by the On Point in July 2019, Avenue I's net revenue from July 2019 – November 2019 was $6,223,446.33.[29]  Further, the Defendants' records reflect that the total gross profit generated by Avenue I in 2017 was $7,209,322.20[30] and in 2018 was $2,067,771.43[31].  Based on the Receiver's review, the business of Avenue I appears to be outside the allegations of the FTC's Complaint, and the Receiver's initial determination based on her review of the business model and financials of Avenue I is that it can be operated lawfully and profitably.[32]

### 5. Defendants' Operations Abroad

In addition to the offices in Miami, Florida, Boca Raton, Florida and Redondo Beach, California, the Defendants maintain additional offices in Uruguay and Costa Rica.[33]  The location

---

[29] *See* Summary of Avenue I Media LLC Gross and Net Revenues attached hereto as **Exhibit I**.

[30] *See* 2017 Adam Rioux LLC P & L attached hereto as **Exhibit J**.

[31] *See* 2018 Adam Rioux LLC P & L attached hereto as **Exhibit K**.

[32] The Receiver has not done a deep dive into the content on the websites or other aspects of the business model as of the date of this Report and will update this Court if anything comes to her attention that is troubling as to the legality of the business model.

[33] Lease payments and utilities for the Defendants' office locations are handled by Issue Based Media LLC.

in Costa Rica is operated by entity Defendant, Bella Vista Media d/b/a BV Media. BV Media operates On Point's call center out of the Costa Rica office location supporting generally the e-commerce business. Because a large portion of the e-commerce business was taken offline, the Receiver terminated a number of employees in the Costa Rica call center. The Uruguay office is run by Carganet S.A. d/b/a G8 Labs which focuses on various web development and maintenance projects associated with the entity Defendants and the Freemium business specifically.[34]

*6. Dragon Global Defendants and Robert Zangrillo*

The FTC's Complaint names as Defendants Robert Zangrillo and the Dragon Global Defendants, including Dragon Global Management LLC, Dragon Global Holdings LLC, On Point Capital Partners and Dragon Global LLC.

The Receiver personally interviewed Robert Zangrillo and certain employees of Dragon Global Management LLC. Mr. Zangrillo reported that he is an investor in technology and other business ventures. According to Mr. Zangrillo and his employees, Dragon Global Management LLC manages and overseas the different investments of Mr. Zangrillo, which investments are usually owned by a separate entity. Dragon Global Management LLC employs five employees, including Megan Black, Diana Loftus, Yvette Lacrette, Sagar Desai, and Mr. Zangrillo. Ms. Black is Mr. Zangrillo's chief of staff and organizes his travel and business meetings and manages his relationships with his investors. Ms. Loftus runs the day-to-day operations of Dragon Global Management LLC, including payroll and human resources. Ms. Lacrette is a chef and house manager for Mr. Zangrillo. Mr. Desai manages Mr. Zangrillo's real estate investments.[35] Mr.

---

[34] Funds are transferred from On Point's accounts for the payroll of the Costa Rica and Uruguay employees. On Point Employment LLC handles the United States payroll for On Point.

[35] Mr. Desai is a recent hire and is not yet on the payroll of Dragon Global Management LLC.

Zangrillo receives a salary from Dragon Global Management LLC. Dragon Global Management LLC also owns certain assets, including tenant improvements for a leased office space located in Los Angeles, various artwork, a 2010 Ferrari, a 2018 Range Rover, and a 2016 Range Rover. Dragon Global Management LLC has two bank accounts at JP Morgan Chase.  But the accounts are funded either by Mr. Zangrillo personally or by management fees charged to other entities.  As part of their duties, Dragon Global Management LLC employees provided services for and interacted with entity Defendant On Point Global LLC and assisted Mr. Zangrillo in soliciting equity investments in On Point Global LLC through an investment vehicle in 2018 and 2019 (DG On Point LLC).

Dragon Global Holdings LLC is an entity used by Mr. Zangrillo to hold his interest in certain investments.  Dragon Global Holdings LLC is owned by Mr. Zangrillo and AAA 2012 Trust.  Dragon Global Holdings LLC owns an interest in DG On Point LLC, On Point Capital Partners LLC (which has an ownership interest in On Point Global LLC, as described below) as well as other minor investments.  Dragon Global Holdings LLC did not report having any employees or bank accounts and is funded personally by Mr. Zangrillo.

On Point Capital Partners LLC is an entity used by Mr. Zangrillo to invest in On Point Global LLC.  On Point Capital Partners LLC is owned 97.143% by Dragon Global Holdings LLC. On Point Capital Partners LLC owns an interest in On Point Global LLC (described below), On Point Capital Partners, LLC, and Bronco, LLC.  On Point Capital Partners LLC did not report any employees or bank accounts and is funded personally by Mr. Zangrillo.

Dragon Global LLC was reported to be a defunct entity that has not operated in several years.  Dragon Global LLC does not have employees, and no bank accounts were reported.

In approximately 2015, Mr. Zangrillo became involved with the entity Defendants through On Point Capital Partners, LLC, by investing $4.378 million into DG DMV LLC.     In 2018, DG DMV LLC was reportedly "rolled up" with some other businesses to create On Point Global LLC. Mr. Zangrillo had one of his employees from Dragon Global Management LLC, Megan Black, assist with the roll up by among other things assisting in investor relations. After the rollup, Mr. Zangrillo assisted On Point Global LLC to recruit Bob Belleck to be the CFO of the company.  In addition, on January 1, 2018, Mr. Zangrillo entered into a consulting agreement with On Point Global LLC, whereby Mr. Zangrillo agreed to serve as a consultant to On Point Global LLC and to serve as Chairman of the Board.  Pursuant to the consulting agreement, Mr. Zangrillo agreed to provide consulting services for the period beginning January 1, 2018 and ending December 31, 2019, with a renewal for one additional year.  On March 3, 2019, an amendment to the consulting agreement was entered into, whereby Mr. Zangrillo resigned from his position as Chairman of the Board and it was agreed to that Mr. Zangrillo.

Mr. Zangrillo's assistance with the raising capital for On Point Global LLC resulted in 18 investors investing a total of $19,125,000.[36]  More specifically, the investors formed a separate entity called DG On Point LLC (organized by Mr. Zangrillo), paid a subscription amount to DG On Point LLC, and in return received an interest in DG On Point LLC.  DG On Point LLC then sent to On Point Global LLC the subscription amounts, which totaled $19,125,000, and in return DG On Point LLC received an ownership interest in On Point Global LLC.  Mr. Zangrillo also collected from the investors an operational fee totaling $401,250.

---

[36] This amount includes Mr. Zangrillo's investment through Dragon Global Holdings LLC of $350,000.

During this time, Ms. Black performed work for On Point Global LLC, which included preparing a slide deck for the investors, setting up and organizing the data room for investors, assisting with due diligence of the investors, organizing meetings with the investors, and sitting in on meetings with investors.  Mr. Zangrillo also reviewed and approved the slide deck for the investors, coordinated investor meetings, sat in on investor meetings, and updated the investors after the investments had been made.

During the time of February 2018 through July 2018, On Point Global LLC paid the salary of Ms. Black.  In addition, during the month of January 2019, both Ms. Black and Mr. Zangrillo were put on the payroll of On Point Global LLC and their health insurance was paid for by On Point Global LLC.  Mr. Zangrillo and Ms. Black also submitted reimbursement requests to On Point Global LLC for expenses related to investor meetings, including airfare and travel expenses.

In addition, Mr. Zangrillo made several loans to both DG DMV, LLC and On Point Global, LLC from 2014 through 2019 in the total amount of $3,376,638.68.  Pursuant to the Contribution and Exchange Agreement entered into on January 1, 2018, On Point Global LLC agreed to assume the obligation of Mr. Zangrillo's loans to DG DMV, LLC.  On Point Global LLC has repaid $2,574,539.38 of the loan amounts, and according to internal accounting records still owes a remaining balance of $740,849.30.

Dragon Global Management LLC also leases office space in Los Angeles, California to On Point Global LLC.  On Point Global LLC then subleased the office space to Live X Live.  The status of that lease is unclear because it is not in writing and Live X Live has refused to pay full rent owed.

Finally, given its significant connection to and involvement with On Point Global, LLC, the Receiver recommends that the Court expand the Receivership Estate to include DG On Point

LLC and appoint Ms. Damian as Receiver of that company (*see* Section IV, *infra*).

### G.  The Estate's Potential Claims Against Third Parties

During the first three weeks of the Receivership, much of the Receiver's and her professionals' efforts were spent identifying, securing and marshalling the Defendants' funds and other assets that were readily identifiable and recoverable, preserving, accessing and analyzing the Defendants' records, and investigating and operating the Defendants businesses.[37]  Throughout this brief reporting period, the Receiver's professionals, including her forensic accountant, paid particular attention to all potential sources from which the Receivership Estate could recover funds belonging to the Defendants, including affiliates, insiders, relatives and third parties who received funds or other assets traceable to the Defendants' businesses or customers.  The Receiver has already identified a number of persons and entities who received hundreds of thousands of dollars in transfers from the Defendants and will continue to gather evidence of additional transfers for purposes of developing and bringing claims to recover fraudulent and other voidable transfers as is appropriate and authorized by the Court.  In the event the Court extends the Receivership at or after the Preliminary Injunction hearing and authorizes the Receiver to bring recovery clams, the Receiver will complete her investigation of those claims, and after consultation with the FTC, pursue those claims she believes are meritorious and likely to result in a significant recovery for the Receivership Estate.

### H.  Transfers to Individual Defendants

Based on the Receiver's preliminary investigation, it is apparent that the entity Defendants

---

[37] The Receiver was required. to spend a significant amount of time to balance the business cash flow and meet expenses as they came due as insufficient funds were available to pay the operating expenses at the time of the entry of the TRO.  It was reported to the Receiver that the company was hopeful it would receive additional financing to meet its cash needs to continue operations.

transferred large sums of money to the individual Defendants, by way of the individual Defendants' respective entities, *inter alia,* for repayment of loans.[38]   The Receiver and her professionals will further investigate the nature and source of those payments and continue to analyze the records of all Defendants, including their bank account records, and obtain any additional records necessary to determine the amount, source, nature, and details of the payments, pending further order of this Court as to the Receivership responsibilities and any disgorgement ordered from the individual Defendants and their respective entities.

### III.   MONIES RECOVERED, ASSETS OF DEFENDANTS AND EXPENSES OF ESTATE

The Receiver presently holds a total of $2,908,866.76 in cash on hand, which she recovered from the entity Defendants and deposited in her fiduciary account for the Receivership Estate at City National Bank in Miami, Florida, earning interest at 1.25% (APR).  In addition to this cash on hand, the Receiver received $51,779.52 in checks on the date this Report was filed but has not yet deposited them.  Further, the entity Defendants own the following assets:

Liquid Assets at Financial Institutions not yet turned over in the amount of $6,205.44.

Liquid Assets at Merchant Processors not yet turned over in the amount of approximately $1.5 million.

Domain Names valued at approximately $30 million

Avenue I – Exchange Business (value unknown)

---

[38] Several of the individual Defendants provided loans to On Point, through their respective entities, as an alternative workout for sums owed to their entities in repayment of seed investment. These entities include the following entity Defendants: Bronco Family Holdings LP, BAL Family LP, 714 Media Ltd., Mac Media Ltd., On Point Capital Partners LLC, License America Management LLC, and License America Holdings LLC.  *See* Shareholder Loan Payout and Investment in DG On Point, attached hereto as **Exhibit L**.

Avenue I Domain Names (value unknown)

Remaining business operations including intellectual property (value unknown)

Office furnishings and equipment including computers and other electronics in 5 offices (value unknown)

Dragon Global Management LLC's assets:  tenant improvements for a leased office space located in Los Angeles, various artwork, a 2010 Ferrari, a 2018 Range Rover, and a 2016 Range Rover (the total value of these assets was disclosed to be approximately $1.2 million)

Since the inception of the Receivership, the Receiver has made substantial disbursements (totaling $ 4,674,200.83) from the entity Defendants' accounts and the Receivership account for necessary expenses to preserve and administer the Estate as well as to keep the Defendants' business operational until such time that the Court makes a determination as to the continued operation of the business.  Such expenses included payroll for all offices as they continue to operate in a limited capacity (Miami, Boca Raton, Redondo Beach, Uruguay, and Costa Rica), utilities for each office location, publishing and data expense, google Adsense, e-commerce expense, domain hosting, maintenance fees, fees for certified copies of certain Court Orders, and fees for bank account services and maintenance.  Attached hereto as Exhibit A is a detailed statement of the Estate's Receipts and Disbursements during this initial reporting period.

The fees and expenses incurred by the Receiver and her professionals during the time period covered by this Report are also expenses of the Estate.  Pursuant to the TRO, the Receiver will file an application seeking approval and payment of those fees and expenses from the funds the Receiver has marshalled and deposited into her fiduciary account in connection with fulfilling her duties under the Court's TRO.

## IV.     FUTURE ACTIONS AND RECOMMENDATIONS

The Receiver and her professionals have spent considerable time and effort in unpackaging the complex and intertwined web of businesses and finances of the Defendants in order to fully satisfy her duties set forth in the TRO.  However, there remain outstanding items that the Receiver must continue to address in order to fully comply with the TRO.  In particular, the Receiver has retained her own independent compliance counsel to assist in her analysis required by the TRO of whether any portion of the Defendants' business could be run legally and profitably.  As set forth above, the Receiver determined that the Avenue I business operated out of the Redondo Beach, California office (recently acquired by Defendants) is not the subject of the FTC's Complaint and does not involve any of the business lines that are alleged to be deceptive by the FTC.  It is the Receiver's preliminary opinion that it can be run legally and profitably.  *See* Short Term Cash Flow Business Plan attached hereto as **Exhibit M**.

In addition, the Receiver also analyzed the Freemium business and certain of the e-commerce sites, and in her opinion with modifications the Freemium business and certain services sites have the potential to be operated legally and profitably. *See* 2019 Cash Flow Business Plan attached hereto as Exhibit M.

Despite representations to the contrary in Defendants' briefing, it is the Receiver's opinion that the Freemium sites as currently structured are likely to be deceptive to consumers and may be prohibited by the Court's TRO to the extent they represent that consumers may obtain public benefit eligibility determinations in exchange for providing personal data.  However, in an abundance of caution, weighing the competing objectives of the TRO, to preserve the value of the Receivership assets and to fully consider the Court's request for a recommendation regarding prospective business operations, and to forensically preserve the sites prior to alteration, the

Receiver exercised her judgment to keep the Freemium sites live until at least the Preliminary Injunction hearing at which, depending on the Court's rulings, the Receiver will seek guidance from the Court regarding the disposition of those sites.

### A.   "Freemium" Sites

In making her recommendation, the Receiver in consultation with her compliance counsel, considered whether the statements on the Freemium sites were *likely to mislead* a *significant minority* of consumers based on the "net impression" standard.  There are almost 100 Freemium sites offering ostensibly free information, but their true purpose appears to be "lead generation." Lead generation is the practice of gathering data on consumers, preferably with demographic details or consumer-interests identified, and either using it directly to market goods and services in a focused way, to package and sell these leads to other marketers.  It is the Receiver's understanding that there is nothing inherently illegal about lead generation itself.  But in this context and considering the URLs and the "net impression" given by the language used, the Receiver has concerns about deception.  Particularly, as noted in the TRO, with the impression that eligibility for government services would be determined by the consumer providing personal information.  *See, e.g.,* Section8assitance.org path pages, attached as **Exhibit N**.  While the Freemium sites contain disclosures at the top of the Home page: "This site is privately owned and is neither affiliated with or endorsed by any government agency. We provide time-saving information," the disclosures are not prominent and are "passive", *i.e.*, in that they do not require an acknowledgement to proceed.  It also appears that more than one site repeats a consistent representation: that they are "determining eligibility" or have "helped" (precisely) 234,932 "Medicaid Recipients", "Missouri Residents", "Veterans", "Unemployment Beneficiaries", etc. The number is always 234,932, which is, at best, questionable and implies assistance, not merely

information, is provided.  And, the disclosure regarding data collection and use by marketing partners is also likely insufficient.  That said, the content contained on the websites appears to the Receiver to have value and could potentially provide a benefit to consumers if provided in a nondeceptive way.  In addition, the Receiver analyzed the financial model together with her forensic accountants, the Defendants' historic financial data, and based on interviews of Defendants and independent consultants, determined that, if the websites were converted to a nondeceptive format, they could likely be run profitably.  *See* Cash flow projections attached as Exhibit M.

If the Court agrees with the Receiver's analysis, then the Receiver recommends that revised templates for these sites (although there are approximately 100 sites, there are less than 5 templates used throughout the sites) be vetted with the FTC and the Defendants and presented to the Court for approval within 10 business days following any Order the Court may enter granting a Preliminary Injunction in favor of the FTC or otherwise continuing the Receivership, providing the parties the opportunity to brief any objection they may have to the Receiver's proposal.

> **B.**      *"Pay-for-Services" Sites*

As stated above, the Receiver took offline the driver's license assistance sites because those sites, in her view, were prohibited by the Court's TRO.  However, like the Freemium sites, the passport, car registration and change of address services sites were kept live in an abundance of caution pending this Court's ruling on the FTC's Motion for Preliminary Injunction to preserve the value of the Receivership assets and to fully consider the Court's request for a recommendation regarding prospective business operations and to forensically preserve the sites prior to any alteration.   The sites that are still live provide actual services, albeit for a fee.  While the value of the services rendered exceed that which could be obtained by directly procuring the services from

the government, the Receiver is not aware of anything inherently illegal about providing these services at a fee.  It was also reported to the Receiver through various interviews, though not yet verified forensically, that the data collected is not sold or otherwise used on the data side of Defendants' business.  The disclaimers on the home page all contained the same, small-font, one-line disclosure and a second, separate pop-up disclosure that requires acknowledgement (among other things) that the site was **not** run by the state.   The Receiver was unable in the time since the entry of the TRO to verify certain of the representations made on the sites, and the Receiver is of the opinion that certain of the disclosures could be made more clear regarding the premium being paid above the government fees.  However, the services appear to have value and, in the Receiver's opinion with appropriate changes could be operated nondeceptively and profitably and are included in the cashflow above.  If the Court agrees with the Receiver's analysis, then the Receiver recommends that a revised template for these sites be vetted with the FTC and the Defendants and presented to the Court within 10 days following any Order the Court may enter granting a Preliminary Injunction in favor of the FTC or otherwise continuing the Receivership, providing the parties the opportunity to brief any objection they may have to the Receiver's proposal.

### C.  *Expanding Receivership Estate to Include Entities Affiliated with Defendants*

During the course of the Receiver's investigation, several additional corporate entities used for billing and others that have bank accounts related to the entity Defendants' business have been identified as potentially being involved with and related to the Defendants' business activities.  *See* **Exhibit O**.  The Receiver has shared this information with counsel for the FTC, and the Receiver would request that this Court enter an Order appointing Ms. Damian as Receiver for these additional corporate entities so that the assets may be recovered for the Receivership Estate.  These

entities, which were not named as defendants in the FTC's Complaint, include DG On Point, LLC[39] and those listed on Exhibit O.[40]

## V. CONCLUSION

The Receiver and her professionals appreciate the opportunity to assist the Court in this matter.  Significant progress has been made, if so ordered the Receiver and her professionals will continue their efforts, as discussed herein, to fulfill the Receiver's duties under the TRO or Preliminary Injunction, with the focus on affording the most cost-effective approach to preserving the assets, maximizing the ultimate recovery to the Receivership Estate and fulfilling the directives set forth by the Court.

Respectfully submitted this 9th day of January 2020.

<div style="margin-left:40%">

Respectfully submitted,

/s/Kenneth Dante Murena
Kenneth Dante Murena, Esq.
Florida Bar No.: 147486
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: kmurena@dvllp.com
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*

</div>

---

[39] DG On Point, LLC is the corporate entity through which Robert Zangrillo raised $19 million in investor funds for On Point Global LLC.  *See* Section III.G.6., *supra*.

[40] Pursuant to information and documentation provided to the Receiver's forensic accountant, the majority of these corporate entities, with the exception of the Adam Rioux entities (which are related to the Avenue I business) and DG On Point LLC, are billing companies for the Defendants that moved funds in and out of Defendant-owned bank accounts at financial institutions.  These billing companies received funds from On Point customers and subsequently transferred said funds to an On Point operating company or to other subsidiaries of On Point.

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on January 9, 2020 on all counsel or parties who have appeared in the above-styled action.

/s/Kenneth Dante Murena
Kenneth Dante Murena,
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*