## DECLARATION OF LASHANDA L. FREEMAN

(Pursuant to 28 U.S.C. § 1746)

I, Lashanda Freeman, hereby state that I have personal knowledge of the facts set forth below and am competent to testify as follows:

1.      I am a United States citizen and am over 18 years of age.  I am employed by the Federal Trade Commission ("FTC" or "the Commission") as an Investigator in the Division of Enforcement, Bureau of Consumer Protection.  My office address is 600 Pennsylvania Ave., NW, CC-9528, Washington, D.C. 20580.

2.      Prior to my employment with the FTC, I was a Paralegal Specialist from June 2012 to August 2016, and a Program Analyst from August 2016 to February 2019, for the Department of Justice, Consumer Protection Branch in Washington, DC. I earned a Bachelor and Master of Science degree in Criminal Justice from Drury University in 2008 and 2010, respectively.

3.      My duties as an investigator include investigating possible violations of the laws and regulations the FTC enforces and possible violations of orders obtained by the Commission.

4.      I was assigned to work on the matter *FTC v. On Point Global LLC, et al.,* in February 2019.

5.      A number of documents are attached to this declaration. In accordance with FTC procedures and this Court's rules, information from these documents has been redacted in order to protect sensitive information, such as financial account numbers and personally identifiable information.

**350 NE 60<u>th</u> Street, Miami, Florida**

6.  As described in my previous declaration (*see* ECF No. 24-1, PX18- Declaration of Lashanda Freeman, ¶¶ 6-10,) with assistance from other FTC employees present, I reviewed and collected certain paper documents from the Defendants' premises located at 350 NE 60th Street, Miami, Florida. Selected documents obtained during the immediate access of the Defendants' business premises are attached hereto as **Attachment A.**

7.  As described in my previous declaration (*see* ECF No. 24-1, PX18 (Declaration of Lashanda Freeman) ¶ 7) during the immediate access of the Defendants' business premises located at 350 NE 60th Street, Miami, Florida, I assigned each office, workstation, or room a unique number and took photographs. Upon my entry of the premises on December 16, 2019, at approximately 11:45am, I identified a large, executive corner office that belonged to Burton Katz and Bob Bellack based on business cards and documents I located on or inside the desks. The office had a small conference room table, flat screen TV, large white marker board, two large executive desks next to each other with a large credenza behind them, a couch, a small table, and two chairs.

8.  I took photographs of Burton Katz and Bob Bellack's desks before I began my review of documents. I observed that the top of Bob Bellack's desk contained the following items: 10 notebooks filled with handwritten notes, a stack of PowerPoint presentation printouts, paperwork related to Allstate Benefits, travel authorization for OnPoint Global employee Mario Garcia, several post-it notes, a wireless computer mouse, and a pair of eyeglasses. I selected six documents from Bob Bellack's desk and credenza area behind his desk notably leaving the large stack of PowerPoint presentation printouts, eyeglasses, and nine remaining notepads in the same manner they were originally found before I began my

review. At approximately 4:30pm the same day, I re-entered the office and observed the six documents I selected were still on the desk with slip-sheets and the other materials were in the same manner they were originally found before I began my review. I placed a post-it note in the office to indicate that FTC staff had finished the review of the office. The photographs I took of Bob Bellack's desk are attached hereto as **Attachment B**. On December 17, 2019, at approximately 9:45am, I entered the office of Burton Katz and Bob Bellack and immediately noticed the large stack of PowerPoint presentation printouts, seven notepads, and the eyeglasses were missing from the top of Bob Bellack's desk. I notified FTC staff attorney Sarah Waldrop and counsel for the receiver, Kenneth Murena, about my observation that documents and eyeglasses were missing from the top of Bob Bellack's desk. On December 18, 2019, before leaving the Defendants' business premises, I took a photograph documenting the missing items from Bob Bellack's desk (*see* **Attachment B p. 4**).

9. After entering the Defendants' premises located at 350 NE 60th Street, Miami, Florida, FTC Digital Investigative Analyst Dan Gillenwater coordinated with members of the receiver's team to access information contained in email servers and cloud hosting services utilized by the Defendants. On December 23, 2019, FTC Digital Investigative Analyst Gillenwater forwarded FTC staff a list of all custodians associated with the email address domain "onpointglobal.com." The list of custodians is attached hereto as **Attachment C.**

## Florida Corporate Records

10. On December 28, 2019, I visited the Florida Department of State website and utilized the Division of Corporations Entity Search at

http://search.sunbiz.org/Inquiry/CorporationSearch/ByName. I conducted searches for Florida entities or foreign entities that had registered in Florida, associated with Robert Zangrillo. I also searched for entities associated with the address 1521 Alton Road, Suite 352, Miami Beach, Florida. The information I found is summarized below:

| Full Name | Date of Incorporation | Place of Incorporation | Owners, Members, Managers, and/or Agents |
| --- | --- | --- | --- |
| Cho Dragon Employee LLC | 2/9/2015 | DE | Robert Zangrillo |
| Cho Dragon Management LLC | 3/5/2014 | DE | Robert Zangrillo |
| DG Dreamland LLC | 12/18/2013 | DE | Robert Zangrillo |
| DG Ghost LLC | 6/2/2015 | DE | Robert Zangrillo |
| Dragon Global LR Management LLC | 6/19/2014 | DE | Robert Zangrillo |
| Dragon Global Management | 3/14/2013 | DE | Dragon Global LLC, Dragon Global Holdings LLC, Dede Loftus |
| Dragon Global Management II LP, LLC | 12/16/2015 | DE | Robert Zangrillo |
| Dragon Global Miami Real Estate Development LLC | 4/8/2014 | DE | Robert Zangrillo (Dede Loftus listed as an authorized person) |
| Dragon Miami Urban Management Group LLC | 7/29/2014 | DE | Robert Zangrillo |
| Dragonfly Marine LLC | 6/7/2018 | DE | Dede Loftus (manager) |
| Magic City Fund LLC | 7/29/2014 | DE | Robert Zangrillo |
| Magic City Management LLC (cross reference name Magic City Project LLC) | 3/17/2017 | DE | Robert Zangrillo |
| Magic City Project LLC | 3/17/2017 | DE | Robert Zangrillo |
| Magic City | 12/24/2014 | DE | Robert Zangrillo |

| Properties XII, LLC | | | |
|---|---|---|---|
| Magic City Properties XIII LLC | 12/24/2014 | DE | Robert Zangrillo |
| Magic City Studios LLC | 8/3/3016 | DE | Robert Zangrillo |
| OnPoint Capital Partners LLC | 6/4/2015 | DE | Dragon Global Management (Robert Zangrillo listed as Manager of Dragon Global Management) |
| Quasart Partners, LLC | 5/19/2011 | FL | Robert Zangrillo |
| Robert L. Zangrillo Family Foundation, Inc. | 9/14/2011 | FL | Robert Zangrillo |
| Wynwood Property Holdings LLC | 7/31/2014 | DE | Robert Zangrillo |

Executed in Fair Grove, Missouri this _28_ day of _December_ 2019.

Lashanda L. Freeman

Attachment A



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Division of Enforcement
Bureau of Consumer Protection

### *FTC v. OnPoint Global, et. al*

# DOCUMENTS OBTAINED FROM DEFENDANTS' BUSINESS PREMISES

### 350 NE 60th Street, Miami, Florida 33137

**DATE:** December ____17____ 2019

**FTC STAFF INITIALS:** ____SC____

**LOCATION OF ORIGINAL DOCUMENTS:**

O22 Mario Garcia
bottom desk drawer

**CUSTODIAN (if known):**

Mario Garcia

**ADDITIONAL DESCRIPTION:**

On Point Global LLC First Amended
and Restated LLC Agmt w/Zangrillo
Signatures

# FIRST AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

## OF

## ON POINT GLOBAL, LLC

Effective as of July 5, 2019

THE UNITS REPRESENTED BY THIS FIRST AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS.  SUCH UNITS MAY NOT BE OFFERED, SOLD, ASSIGNED, PLEDGED OR OTHERWISE DISPOSED OF AT ANY TIME WITHOUT EFFECTIVE REGISTRATION UNDER SUCH ACT AND LAWS OR EXEMPTION THEREFROM, AND COMPLIANCE WITH THE OTHER RESTRICTIONS ON TRANSFERABILITY SET FORTH HEREIN.

# TABLE OF CONTENTS

Page

1. DEFINITIONS ................................................................................................ 1

2. FORMATION AND PURPOSE ...................................................................... 9

    2.1   Formation ................................................................................................ 9
    2.2   Name ..................................................................................................... 10
    2.3   Registered Office/Agent ...................................................................... 10
    2.4   Term ..................................................................................................... 10
    2.5   Purpose ................................................................................................ 10
    2.6   Specific Powers .................................................................................. 10
    2.7   Principal Office ................................................................................... 11
    2.8   Filings .................................................................................................. 11

3. MEMBERSHIP, CAPITAL CONTRIBUTIONS AND UNITS ...................... 11

    3.1   Members .............................................................................................. 11
    3.2   Member Interests and Units ............................................................... 12
    3.3   Additional Members and Units ........................................................... 13
    3.4   Unit Splits and Dividends ................................................................... 13
    3.5   Capital Contributions .......................................................................... 13
    3.6   Unit Certificates .................................................................................. 13
    3.7   Loss of Certificates ............................................................................. 14
    3.8   Special Approval Rights ...................................................................... 14
    3.9   Member Indebtedness .......................................................................... 16
    3.10  Tax Treatment ..................................................................................... 17

4. CAPITAL ACCOUNTS .................................................................................. 17

    4.1   Capital Accounts ................................................................................. 17
    4.2   Additional Capital Account Provisions .............................................. 17
    4.3   Negative Capital Account ................................................................... 18

5. DISTRIBUTIONS AND ALLOCATIONS OF PROFIT AND LOSS ............ 18

    5.1   Distributions ........................................................................................ 18
    5.2   No Violation ........................................................................................ 19
    5.3   Withholdings ........................................................................................ 19
    5.4   Net Profit or Net Loss ......................................................................... 19
    5.5   Regulatory Allocations ....................................................................... 20
    5.6   Tax Allocations ................................................................................... 21

6. STATUS, RIGHTS AND POWERS OF MEMBERS; AND AGREEMENTS .... 22

    6.1   Limited Liability ................................................................................. 22
    6.2   Return of Distributions of Capital ...................................................... 22
    6.3   No Management or Control ................................................................. 23
    6.4   Specific Limitations ............................................................................ 23

-i-

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 3

## TABLE OF CONTENTS
### (continued)

Page

| | | | |
|---|---|---|---|
| | 6.5 | Meetings of Members | 23 |
| | 6.6 | Key Man (Other) Insurance | 23 |
| 7. | | DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES AND DUTIES OF THE BOARD OF MANAGERS | 23 |
| | 7.1 | Management of the Company by the Board of Managers | 23 |
| | 7.2 | Members of the Board of Managers | 24 |
| | 7.3 | Authority of the Board of Managers | 24 |
| | 7.4 | Reliance by Third Parties | 25 |
| | 7.5 | Budget | 25 |
| 8. | | DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES AND DUTIES OF OFFICERS AND AGENTS | 25 |
| | 8.1 | Officers, Agents | 26 |
| 9. | | BOOKS, RECORDS, ACCOUNTING AND REPORTS | 26 |
| | 9.1 | Books and Records | 26 |
| | 9.2 | Fiscal Year; Financial Statements | 27 |
| | 9.3 | Filings | 27 |
| | 9.4 | Non-Disclosure | 27 |
| 10. | | TAX MATTERS PARTNER | 28 |
| | 10.1 | Tax Matters Partner; Taxpayer Representative | 28 |
| | 10.2 | Indemnity of Tax Matters Partner and Taxpayer Representative | 30 |
| | 10.3 | Tax Returns | 30 |
| 11. | | TRANSFER OF INTERESTS | 30 |
| | 11.1 | Transfer Restrictions | 30 |
| | 11.2 | Transfers to Permitted Transferees | 31 |
| | 11.3 | Transfers by Operation of Law | 31 |
| | 11.4 | Prohibition on Encumbrances | 32 |
| | 11.5 | Repurchase from Former Spouse | 32 |
| | 11.6 | Purchase Price | 33 |
| | 11.7 | Drag-Along Rights | 33 |
| | 11.8 | Repurchase Option | 36 |
| | 11.9 | Rights of First Refusal on Voluntary Transfers | 38 |
| | 11.10 | Co-Sale Rights | 40 |
| 12. | | PLAN; PARTICIPATION RIGHTS OF CERTAIN MEMBERS | 42 |
| | 12.1 | Plan | 42 |
| | 12.2 | Right to Participate in Certain Sales of Additional Securities | 42 |

LEGAL_US_W # 99102246.2

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 4

TABLE OF CONTENTS
(continued)

Page

13.  LOCK-UP ................................................................................................ 43

14.  INFORMATION RIGHTS .......................................................................... 44

    14.1  Annual Financial Statements ................................................. 44
    14.2  Quarterly Financial Statements ............................................. 44

15.  DISSOLUTION OF COMPANY .................................................................. 44

    15.1  Termination of Membership .................................................. 44
    15.2  Events of Dissolution ............................................................ 44
    15.3  Liquidation ........................................................................... 45
    15.4  No Action for Dissolution ..................................................... 45
    15.5  No Further Claim .................................................................. 45

16.  INDEMNIFICATION ................................................................................. 45

    16.1  Indemnification .................................................................... 45
    16.2  Exculpation .......................................................................... 47
    16.3  Persons Entitled to Indemnity .............................................. 47
    16.4  Procedure Agreements .......................................................... 47
    16.5  Duties of the Members ........................................................... 47
    16.6  Liability of the Members ....................................................... 48
    16.7  Fiduciary and Other Duties ................................................... 48
    16.8  Rights Not Exclusive ............................................................ 48

17.  REPRESENTATIONS AND COVENANTS BY THE MEMBERS ................. 48

    17.1  Investment Intent; Securities Regulation .............................. 49
    17.2  Organization and Binding Agreement .................................... 50
    17.3  Tax Position ......................................................................... 50
    17.4  Information ........................................................................... 50
    17.5  Licenses and Permits ............................................................ 51

18.  REPRESENTATIONS BY THE COMPANY ................................................ 51

    18.1  Duly Formed ........................................................................ 51
    18.2  Valid Issue ........................................................................... 51

19.  AMENDMENTS TO AGREEMENT ............................................................ 51

    19.1  Amendments ......................................................................... 51
    19.2  Corresponding Amendment of Certificate of Formation ........ 51
    19.3  Binding Effect ...................................................................... 51

20.  RIGHT TO CONVERT TO CORPORATE FORM ....................................... 51

    20.1  Right to Convert ................................................................... 51

-iii-

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 5

## TABLE OF CONTENTS
### (continued)

Page

| | | |
|---|---|---|
| 20.2 | Valuation | 53 |
| **21.** | **GENERAL** | **53** |
| 21.1 | Successors; Delaware Law; Etc | 53 |
| 21.2 | Notices, Etc | 53 |
| 21.3 | Further Assurances | 54 |
| 21.4 | Consent to Jurisdiction | 55 |
| 21.5 | Waiver of Jury Trial | 55 |
| 21.6 | Severability | 55 |
| 21.7 | Table of Contents, Headings | 56 |
| 21.8 | No Third Party Rights | 56 |
| 21.9 | Section 83 Safe Harbor | 56 |
| 21.10 | Registration Rights | 56 |

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 6

## ON POINT GLOBAL, LLC

## FIRST AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This First Amended and Restated Limited Liability Company Agreement of On Point Global, LLC, a Delaware limited liability company (the "Company"), is effective as of _____, 2019 (the "Effective Date"), by and among the Company and the Persons from time to time party hereto.  Terms used herein and not otherwise defined shall have the meanings set forth in Article 1.

### RECITALS

WHEREAS, the Company was formed in accordance with the Act on November 27, 2017;

WHEREAS, the Company entered into that certain Amended and Restated Limited Liability Company Agreement, effective as of April 24, 2018 (the "Initial A&R Agreement"); and

WHEREAS, the [parties thereto] desire to amend and restate the Initial A&R Agreement in its entirety and enter into this Agreement with the Company.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants, agreements and obligations contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby mutually covenant and agree as follows:

1. **DEFINITIONS**

For purposes of this Agreement (a) references to "Articles," "Exhibits," "Schedules" and "Sections" are to Articles, Exhibits, Schedules and Sections of this Agreement unless explicitly indicated otherwise, (b) references to statutes include all rules and regulations thereunder, and all amendments and successors thereto from time to time, (c) the word "including" shall be construed as "including without limitation", (d) all "Exhibits", recitals and "Schedules" of this Agreement are incorporated herein by reference, (e) unless the context otherwise requires, the words "hereof", "hereby" and "herein" and words of similar meaning when used in this Agreement refer to this Agreement in its entirety (including all Exhibits and Schedules hereto) and not to any particular Article, Exhibit, Schedule, Section or provision of this Agreement, (f) all references in this Agreement to any gender include references to all genders, and references to the singular include references to the plural and vice versa, and (g) unless otherwise described, any references to "as determined by the Members" or "prior written consent of the Members" or "prior approval of the Members" or any other similar term, shall mean Members holding a majority of the issued and outstanding voting Units of the Company (in each case subject to Section 3.8).

"Act" means the Delaware Limited Liability Company Act (6 Del. C. § 18-101, et seq.).

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year or other period, after giving effect to the following adjustments:

       (a)   Increasing such Capital Account by any amounts which such Member is obligated to restore pursuant to this Agreement (including any note obligations) or is deemed to be obligated to restore pursuant to the penultimate sentence of each of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

       (b)   Decreasing such Capital Account by the items described in Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

"Adjusted K-1 Election" means an election made by the Company in accordance with Code Section 6226, as amended by Section 1101 of the Bipartisan Budget Act of 2015.

"Affiliate" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, Controls, or is controlled by, or is under direct or indirect common control with such Person.

"Affiliate Transactions" means any and all transactions between the Company or its Subsidiaries and any of the Company's Affiliates and any material amendment or modification thereto.

"Agreement" means this First Amended and Restated Limited Liability Company Agreement of the Company, dated as of the date hereof, as amended, restated, supplemented or otherwise modified in writing from time to time in accordance with the terms hereof, and any Exhibits, Schedules, or Annexes attached hereto.

"Aggregator" means On Point Management Aggregator, LLC, a Delaware limited liability company.

"Aggregator Agreement" means that Limited Liability Company Agreement of Aggregator, dated as of the date hereof, as amended from time to time.

"Authority" means any governmental, regulatory or administrative body, agency, tribunal, commission, board, department, bureau, instrumentality, arbitrator, or authority, any court or judicial authority, any public, private or industry regulatory authority, whether international, national, federal, provincial, state, municipal, county, or local.

"Board of Managers" is defined in Section 7.1.

"Bronco" means Bronco Family Holdings, LP, a limited partnership formed under the laws of the Bahamas.

LEGAL_US_W # 99102246.2

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 8

"Budget" is defined in Section 7.5.

"Business Day" means any day that is not a Saturday, Sunday or any other day on which banks are required or authorized to be closed in New York, New York.

"Buying Members" is defined in Section 11.9(b).

"Buying Members' Notice" is defined in Section 11.9(b).

"Capital Account" is defined in Section 4.1.

"Capital Contribution" means with respect to any Member, the sum of (i) the amount of money plus (ii) the initial Fair Market Value of any other property (net of liabilities assumed by the Company or to which the property is subject) contributed to the Company with respect to the Interest held by such Member pursuant to this Agreement. The value of the Capital Contribution with respect to the Common Units and Preferred Units issued hereunder is as set forth on Schedule 3.1 attached hereto.

"Cardozo" means Cardozo Holdings, LLC, a Nevis limited liability company.

"Carrying Value" means with respect to any Company asset, the asset's adjusted basis for federal income tax purposes except as follows:

(a)     The initial Carrying Value of any asset contributed (or deemed contributed) to the Company shall be that asset's Fair Market Value (as determined by the Board of Managers) at the time of the contribution.

(b)     The Board of Managers may elect to revalue the Carrying Value of all Company property (whether tangible or intangible) for book purposes to reflect the Fair Market Value (as determined by the Board of Managers) of Company property immediately prior to the occurrence of an event set forth in Regulations Section 1.704-1(b)(2)(iv)(f) or at such other times as determined by the Board of Managers. In the event that Company property is revalued pursuant to this subsection, the Capital Accounts of the Members shall be adjusted in accordance with Regulations Section 1.704-1(b)(2)(iv)(f).

(c)     If the Board of Managers does not elect to previously revalue Company property distributed to Members pursuant to subsection (b) above, (i) the Carrying Value of that property shall be revalued for book purposes to reflect the Fair Market Value (as determined by the Board of Managers) of that property immediately prior to its distribution, and (ii) the Capital Accounts of all Members shall be adjusted in accordance with Regulations Section 1.704-1(b)(2)(iv)(e).

(d)     If the adjusted tax basis of Company assets is adjusted pursuant to Code Sections 732, 734 or 743, the Carrying Value of those Company assets shall be increased or decreased to the extent provided by Regulations Section 1.704-1(b)(2)(iv)(m).

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 9

(e)     The Carrying Value of a Company asset shall be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes in accordance with Regulations Section 1.704-1(b)(2)(iv)(g).

"Certificate" means the Certificate of Formation of the Company and any amendments thereto and restatements thereof filed on behalf of the Company with the Delaware Secretary of State pursuant to the Act.

"Class A Common Unit" is defined in Section Error! Reference source not found..

"Class A Unit Holder" means any Person holding an Interest in Class A Common Units.

"Class B Common Unit" means the Class B Common Units of the Company, which Class B Common Units shall be issued only to Aggregator in connection with Aggregator's issuance of Class B Aggregator Common Units.

"Class B Aggregator Common Unit" means the Class B Units (as defined in the Aggregator Agreement) of Aggregator issued to any Person pursuant to an Equity Agreement.

"Class B Unit Holder" means Aggregator.

"Co-Sale Selling Member" is defined in Section 11.10(a).

"Co-Sale Selling Member's Notice" is defined in Section 11.10(a).

"Co-Seller" is defined in Section 11.10(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Common Units" means the Class A Common Units and the Class B Common Units.

"Common Unit Holder" means any Person that holds any Common Units.

"Company" is defined in the Preamble of this Agreement.

"Company Notice" is defined in Section 11.9(a).

"Company Sale" shall mean any transaction with an independent third party or group of independent third parties whether by sale or other Transfer of Interests, merger, recapitalization, reorganization, combination, consolidation, or otherwise, pursuant to which one or more such independent third parties shall acquire Units possessing the voting power to elect a majority of the members of the Company's board of managers (or similar governing body) or control a majority of the issued and outstanding Units of the Company on a Fully Diluted Basis, or a sale or license of all or substantially all of the assets of the Company and its Subsidiaries (on a consolidated basis), in each case in a single transaction or series of related transactions to an independent third party.

"Company Securities" is defined in Section 12.2(a).

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 10

"Control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or agreement or otherwise.

"Contribution and Exchange Agreement" means that certain Contribution and Exchange Agreement, effective as of January 1, 2018, by and among the Company, OCP, Bronco, MM, Cardozo, the Companies (as defined therein), OCP/Bronco, and MM/Cardozo.

"Debt Transaction" is defined in Section 12.2(a).

"DG On Point" means DG On Point, LLC, a Delaware limited liability company.

"Dissolution Event" is defined in Section 15.2.

"Distribution" means cash or the Fair Market Value of other property (net of liabilities assumed by the Member or to which the property is subject) distributed to a Member in respect of the Member's Interest.

"Effective Date" is defined in the Preamble of this Agreement.

"Election Notice" is defined in Section 11.10(b).

"Equity Agreement" means, in relation to any indirect Unit Holder, any equity grant agreement entered into by such indirect Unit Holder in connection with the grant of Class B Aggregator Common Units pursuant to the Plan.

"Exempted Securities" means (a) securities issued as a result of any split, split-up, distribution, equity dividend, reclassification or reorganization or similar event with respect to the Units; (b) the issuance of any equity interests pursuant to the Plan; (c) Units or convertible securities issued upon the exercise, conversion or exchange of convertible securities issued pursuant to clause (a), (b), (d), (e), or (f) of this definition, in each case provided that such issuance is pursuant to the terms of such convertible securities; (d) Units, options, or convertible securities issued to banks, equipment lessors or other financial institutions, or to real property lessors, pursuant to a debt financing, equipment leasing or real property leasing transaction in each case approved by Bronco and OCP; (e) Units, options or convertible securities issued to suppliers or third party service providers in connection with the provision of goods or services in each case approved by Bronco and OCP; and (f) Units, options or convertible securities issued pursuant to the acquisition of another entity by the Company by merger, purchase of substantially all of the assets or other reorganization or pursuant to a joint venture agreement in each case approved by Bronco and OCP.

"Fair Market Value" means, with respect to any Units or property, as the case may be, an amount determined by the prior written approval of OCP and Bronco to be the fair market value of such Units or property, in each case in good faith using reasonable business judgment. For the sake of clarity, the Fair Market Value of a Class B Common Unit will not exceed the amount such Class B Common Unit would receive pursuant to Section 5.1(b) if the assets of the

-- 5 --

Company were sold for Fair Market Value and the net proceeds distributed pursuant to Section 5.1(b).

"Fiscal Year" means the fiscal year of the Company, which shall be the calendar year, or such other fiscal year as determined by the Board of Managers.

"Fully Diluted Basis" means, as of a particular time and without duplication, the aggregate number of Units outstanding at such time, determined by treating all outstanding options as having been exercised and by treating all convertible securities (or similar securities) as having been converted (whether or not then convertible or convertible thereafter); provided, that in no event shall any equity interests under the Plan be included in the determination of Fully Diluted Basis.

"Immediate Family Member" means, with respect to any Member who is an individual, each parent, Spouse, grandchild, brother, sister, or child (including those adopted) of such individual and each custodian or guardian of any property of one or more of such Persons in the capacity as such custodian or guardian.

"Indemnified Persons" is defined in Section 16.3.

"Initial Indebtedness Distribution Amount" means $7,506,134.37, plus any accrued and unpaid interest thereon.

"Initial Indebtedness Distribution Percentage" means with respect to (a) OCP/Bronco, 66.4% and (b) MM/Cardozo, 33.6%.

"Initial Members" means OCP, Bronco, MM, and Cardozo.

"Interest" means, with respect to a holder of Units, such holder's limited liability company interest in the Company which represents such holder's share of the Net Profit and Net Loss of the Company and such holder's right to receive distributions of the Company's assets in accordance with the provisions of this Agreement and the Act.

"Investment Threshold" means an investment of at least $10 million to be made by independent third parties in the Company. For the avoidance of doubt, any indirect investments into the Company through DG On Point shall qualify as investments by independent third parties for the purposes of this Agreement.

"IRS Notice" is defined in Section 21.9.

"Joinder Agreement" means a Joinder Agreement in substantially the form attached hereto as Exhibit A.

"Liabilities" or "liabilities" means all liabilities of the Company and its Subsidiaries which should be carried as liabilities on the consolidated balance sheet of the Company and its Subsidiaries in accordance with a method of accounting that is acceptable for the preparation of tax returns and/or the provision of financial information to the Company's creditors.

- 6 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 12

"Liquidation Event" means a Company Sale or a Dissolution Event.

"MM" means Mac Media, Ltd., a limited partnership formed under the laws of Belize.

"MM/Cardozo" means MM and Cardozo, LLC, a Delaware limited liability company.

"Member's Cumulative Tax Liability" is defined in Section 5.1(a).

"Members" means the Persons listed as members on Schedule 3.1 attached hereto and any other Person that both acquires an Interest in the Company and is admitted to the Company as a Member in accordance with the terms and conditions of this Agreement.

"Net Profit" and "Net Loss" are defined in Section 5.4(a).

"Non-Divorcing Members" is defined in Section 11.5(c).

"OCP" means OnPoint Capital Partners, a Delaware limited liability company.

"OCP/Bronco" means OCP and Bronco, LLC, a Delaware limited liability company.

"Offered Units" is defined in Section 11.9(a).

"Participating Members" is defined in Section 12.2(a).

"Participating Share" means, with respect to each Participating Member, a fraction, (i) the numerator of which is the total number of Common Units then held by such Participating Member and (ii) the denominator of which is the total number of Common Units then held by all Participating Members.

"Participation Threshold" means, with respect to each Class B Common Unit granted on or after the date hereof, the greater of (i) the aggregate amount that would be distributable with respect to all then outstanding Units under Section Error! Reference source not found. (immediately prior to the issuance of the Class B Common Unit(s) in question) assuming that an amount equal to the Fair Market Value of all such Units was distributed to the holders of Units in accordance with the liquidation provisions of Error! Reference source not found., and (ii) the amount determined by the Board of Managers to be the minimum amount necessary to cause such Class B Common Unit (or any corresponding Class B Aggregator Common Unit) to constitute a Profits Interest.

"Partnership Representative" has the meaning set forth in Code Section 6223, as amended by Section 1101 of the Bipartisan Budget Act of 2015.

"Permanent Disability" means a sickness, injury or other physical or mental condition suffered by a Person (who is a natural Person) such that such Person is no longer able to manage his or her own affairs for a period of six (6) consecutive months.

"Per Share Offering Price" is defined in Section 20.2.

"Permitted Transfer" is defined in Section 11.2.

- 7 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 13

"Permitted Transferee" is defined in Section 11.2.

"Person" means an individual, partnership, joint venture, association, corporation, trust, estate, limited liability company, limited liability partnership, unincorporated entity of any kind, governmental entity, or any other legal entity.

"Plan" means, an equity incentive plan provided by the Company pursuant to the On Point Global Aggregator, LLC 2018 Incentive Unit Plan, as the same may be amended and/or restated from time to time in accordance with the terms and conditions therein.

"Pre-Emptive Right Acceptance Notice" is defined in Section 12.2(a).

"Pre-Emptive Right Notice" is defined in Section 12.2(a).

"Pre-Offering Company Value" is defined in Section 20.2.

"Preferred Holder" means Ventures-On Point LLC.

"Preferred Units" means the units having the privileges, preference, duties, liabilities, obligations and rights specified with respect to "Preferred Units" in this Agreement

"Profits Interest" means an equity interest in the Company treated as a "profits interest" within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343, or any successor United States Internal Revenue Service or United States Treasury Department regulation or other pronouncement applicable at the date of issuance of such equity interest.

"Proposed Budget" is defined in Section 7.5.

"Public Offering" means any public offering and sale of the equity securities of the Company, any Subsidiary or any of their respective successors pursuant to an effective registration statement filed with the SEC under the Securities Act.

"Regulations" means the applicable provisions of the income tax regulations, including temporary regulations, promulgated under the Code.

"Regulatory Allocations" is defined in Section 5.5(f).

"Repurchase Notice" is defined in Section 11.8(a).

"Repurchase Period" is defined in Section 11.8(a).

"Secondary Indemnitor" is defined in Section 16.1(b).

"SEC" means the United States Securities and Exchange Commission or any other federal agency at such time administering the Securities Act.

"Securities Act" means the Securities Act of 1933, as amended, or any successor federal law then in force, together with all rules and regulations promulgated thereunder.

- 8 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 14

"Selling Member" is defined in Section 11.9(a).

"Selling Member's Notice" is defined in Section 11.9(a).

"Small Partnership Election" means an election made by the Company in accordance with Code Section 6221(b), as amended by Section 1101 of the Bipartisan Budget Act of 2015.

"Spouse" means a husband, wife, or domestic partner, as may be applicable.

"Subsidiary" means any Person with respect to which the Company and its other Subsidiaries collectively own, directly or indirectly, at least fifty percent (50%) of the equity interests of such Person or have the power, directly or indirectly, to control such Person or elect a majority of the members of the board of directors (or similar governing body). Unless the context expressly requires otherwise, any reference to the term "Subsidiary" in this Agreement shall mean the Subsidiary or Subsidiaries of the Company.

"Supermajority Approval" means the affirmative vote or written consent of the holders of at least seventy one percent (71%) of the issued and outstanding Class A Common Units (other than any equity interests issued or granted under the Plan).

"Tax Distribution" is defined in Section 5.1(a).

"Tax Distribution Amount" means, for any Fiscal Year, the excess, if any, of (a) the amount of taxable income, if any, allocated by the Company to such Member (including such Member's predecessor in interest) for such Fiscal Year, multiplied by (b) the lesser of thirty-five percent (35%) (which percentage may be amended or modified by the prior written consent of Bronco and OCP) or the maximum aggregate applicable federal and state tax rates applicable to the type(s) of income allocated to the Member (regardless of the Member's actual tax status), over (c) all distributions of cash made with respect to such Member during such Fiscal Year pursuant to Article 5.

"Tax Matters Member" is defined in Section 10.1(a).

"Transfer" means a sale, assignment, pledge, hypothecation, encumbrance, gift, bequest, abandonment, disposition or other transfer, whether effected by contract, operation of law or otherwise.

"Unit" or "Units" means an interest in the Net Profits, Net Losses and Distributions of the Company representing a fractional part of the aggregate interests in the Net Profits, Net Losses, and Distributions of the Company and shall include the Common Units and any other class or series of Units of the Company, including Preferred Units, issued from time to time; provided, however, that each holder of any class or series of Units that is a Member shall have the relative rights, powers, duties, and obligations specified with respect to such class or series of Units in this Agreement. The Company is authorized to, and intends to, issue fractional Units.

"Unit Certificate" is defined in Section 3.6.

"Unit Holder" means a Class A Unit Holder or a holder of equity interests under the Plan.

- 9 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 15

## 2. FORMATION AND PURPOSE

2.1 <u>Formation</u>. The Company was formed as a limited liability company in accordance with the Act by the filing of the Certificate with the Delaware Secretary of State on November 27, 2017. The rights and liabilities of the Members shall be determined pursuant to the Act and this Agreement. To the extent that the rights or obligations of any Member are different by reason of any provision of this Agreement than they would be in the absence of such provision, this Agreement shall, to the extent permitted by the Act, control.

2.2 <u>Name</u>. The name of the Company is "On Point Global, LLC". The business of the Company may be conducted under that name or, upon compliance with applicable laws, any other name that the Board of Managers deems appropriate. The Board of Managers shall file, or shall cause to be filed, any fictitious name certificates and similar filings, and any amendments thereto, that the Board of Managers consider appropriate.

2.3 <u>Registered Office/Agent</u>. The registered office and registered agent required to be maintained by the Company pursuant to the Act shall be the office and the agent so designated in the Certificate. The Company may, upon compliance with the applicable provisions of the Act, change its registered office or registered agent from time to time in the discretion of the Board of Managers.

2.4 <u>Term</u>. The term of the Company shall continue indefinitely unless sooner terminated as provided herein. The existence of the Company as a separate legal entity shall continue until the cancellation of the Certificate as provided in the Act.

2.5 <u>Purpose</u>. The Company is formed for the purpose of, and the nature of the business to be conducted by the Company is, acquiring, owning and disposing of, directly or indirectly, securities of its Subsidiaries and any of their respective successors, overseeing the operations of its Subsidiaries and engaging in any lawful act or activity for which limited liability companies may be formed under the Act in furtherance of the foregoing purposes, and engaging in any activities necessary, convenient or incidental thereto.

2.6 <u>Specific Powers</u>. Without limiting the generality of <u>Section 2.5</u> but subject to the other provisions of this Agreement, the Company shall have the power and authority to take any actions necessary, convenient or incidental to or for the furtherance of the purposes set forth in <u>Section 2.5</u>, including the power with respect to the Company (and/or its Subsidiaries):

(a) To conduct its business, carry on its operations and exercise the powers granted to a limited liability company by the Act in any country, state, territory, district or other jurisdiction, whether domestic or foreign;

(b) To acquire, whether by purchase, lease, contribution of property or otherwise, own, hold, operate, maintain, finance, improve, lease, sell, convey, mortgage, transfer, demolish or dispose of any real or personal property;

(c) To negotiate, enter into, renegotiate, extend, renew, terminate, modify, amend, waive, execute, perform and carry out and take any other action with respect to contracts or agreements of any kind, including any leases, licenses, guarantees and other contracts;

- 10 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 16

(d)     To purchase, take, receive, subscribe for or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, lend, pledge or otherwise dispose of, and otherwise use and deal in and with, shares or other interests in or obligations of domestic or foreign corporations, associations, general or limited partnerships, trusts, limited liability companies, individuals or other Persons, or direct or indirect obligations of the United States or any government, state, territory, governmental district or municipality or any instrumentality of any of them;

(e)     To lend money, to invest and reinvest its funds, and to accept real and personal property for the payment of funds so loaned or invested;

(f)     To borrow money and issue evidence of indebtedness, and to secure the same by a mortgage, pledge, security interest or other lien on the assets of the Company;

(g)     To pay, collect, compromise, litigate, arbitrate or otherwise adjust or settle any other claims or demands of or against the Company or to hold such proceeds against the payment of contingent liabilities;

(h)     To sue and be sued, defend and participate in administrative or other proceedings in its name;

(i)     To appoint employees, officers, agents, consultants and representatives of the Company, and define their duties and fix their compensation;

(j)     To indemnify any Person in accordance with the Act and this Agreement;

(k)     To cease its activities and cancel its Certificate;

(l)     To establish, maintain, manage, and close bank accounts for and on behalf of the Company and any of its Subsidiaries; and

(m)     To make, execute, acknowledge and file any documents or instruments necessary, convenient or incidental to the accomplishment of the purpose of the Company.

2.7     <u>Principal Office</u>.  The principal executive office of the Company shall be located in the State of Florida or at such place as the Board of Managers shall establish, and the Board of Managers may from time to time change the location of the principal executive office of the Company to any other place within or without the State of Florida.  The Board of Managers may establish and maintain such additional offices and places of business of the Company, either within or without the State of Florida, as it deems appropriate.

2.8     <u>Filings</u>.  Such Persons may be designated from time to time by the Board of Managers as authorized persons, within the meaning of the Act, to execute, deliver and file any amendments or restatements of the Certificate or any other certificates or instruments and any amendments or restatements thereof necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to conduct business.

3.     MEMBERSHIP, CAPITAL CONTRIBUTIONS AND UNITS

LEGAL_US_W # 99102246.2

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 17

3.1 <u>Members</u>. The Members shall be listed on <u>Schedule 3.1</u> attached hereto, as maintained by the Company and from time to time amended and supplemented in accordance with this Agreement. As of the date of this Agreement, each Member shall hold the number and class(es) of Units set forth opposite such Member's name on <u>Schedule 3.1</u> attached hereto. Schedule 3.1 attached hereto shall be amended from time to time by the Company so that it sets forth the then current list of Members and the number and class(es) of Units owned by such Member; <u>provided</u>, that, notwithstanding anything to the contrary contained herein, the Company shall not be required to disclose <u>Schedule 3.1</u> attached hereto to any holder of equity interests under the Plan, in his, her or its capacity as such.

3.2 <u>Member Interests and Units</u>. The Interests of the Members of the Company shall be divided into Units. There may be multiple separate classes of Units.

(a) <u>Class A Common Units</u>. Each "<u>Class A Common Unit</u>" shall represent a voting Interest in the Company, shall be designated as a Class A Common Unit of the Company, and shall be entitled to the Distributions and allocations of Net Profit and Net Loss as provided for in <u>Article 5</u>. Each Class A Common Unit shall be entitled to one (1) vote on all matters requiring the vote of the Unit Holders.

(b) <u>Class B Common Units</u>.

(i) <u>Grant</u>. The Company shall issue Class B Common Units to Aggregator (pursuant to <u>Section 3.2(b)(iii)</u>) in connection with Aggregator's issuance of Class B Aggregator Common Units to existing or new employees, managers, officers, directors, consultants or other service providers of the Company or of any of its Subsidiaries pursuant to Equity Agreements approved by the Board of Managers, which Equity Agreements shall contain such provisions as determined by the Board of Managers, which may include (i) the forfeiture of, or the right of the Company, Aggregator and/or of such other Persons as the Board of Managers shall designate, to repurchase or purchase from the holder of Class B Aggregator Common Units, all or any portion of such Class B Aggregator Common Units (and, in the case of a repurchase by the Company or a repurchase by Aggregator, simultaneously terminate and cancel any corresponding Class B Common Units) in the event such holder ceases to be an employee, officer, manager, director or consultant of, or to provide services to, the Company or its Subsidiaries, or upon such other conditions as determined by the Board of Managers and/or (ii) provisions regarding vesting of such Class B Aggregator Common Units, including upon the happening of certain events, upon the passage of a specified period of time, upon the fulfillment of certain conditions or upon the achievement by the Company and/or its Subsidiaries of certain performance goals. The purchase price of each Class B Aggregator Common Unit, if any, shall be as determined by the Board of Managers. Notwithstanding anything herein or in any Equity Agreement to the contrary, in connection with a Company Sale, Aggregator may terminate and cancel without any payment or other consideration with respect thereto any Class B Aggregator Common Unit (and the Company may simultaneously terminate and cancel without any payment or other consideration with respect thereto any Class B Common Unit) that, immediately prior to the consummation of such transaction(s), has a Fair Market Value equal to $0.00. For the avoidance of doubt, if any Class B Aggregator Common Unit is cancelled, the corresponding Class B Common Unit shall also automatically be cancelled.

- 12 -

PX23: Declaration of Lashanda Freeman
Attachment A: Page 18

(ii)    Participation Threshold.  As of the date of each grant of Class B Common Units, the Board of Managers shall establish a Participation Threshold with respect to each such Class B Common Unit granted on such date, and the participation threshold for each Class B Aggregator Common Unit granted on such date pursuant to an Equity Agreement and as set forth in the Equity Agreement shall be equal to the established Participation Threshold for the Class B Common Units.

(iii)    Automatic Issuance.  Upon the grant of any Class B Aggregator Common Units by Aggregator, the Company shall automatically issue a number of Class B Common Units to Aggregator in an equivalent amount, and on the same terms and conditions, as issued to an indirect holder of such Class B Common Units in the Equity Agreement effecting such grant.

(c)    Preferred Units.  The Company is hereby authorized to issue a class of Units designated as Preferred Units.  Each Preferred Unit shall be convertible, at the option of the holder thereof, at any time into one (1) Class A Common Unit.  The Preferred Units shall be entitled to the Distributions and allocations of Net Profit and Net Loss as provided for in Article 5.  Each Preferred Unit shall be entitled to vote on all matters requiring the vote of the Unit Holders.  Each Preferred Unit shall be entitled to one (1) vote for each Class A Common Unit into which such Preferred Unit could then be converted.

3.3    Additional Members and Units.  Subject to the terms and conditions of Section 12.2, the Company may issue Units and admit Persons as Members in exchange for such Capital Contributions (including commitments to make Capital Contributions) or such other consideration (including past or future services) and on such terms and conditions (including, in the case of Units issued to employees, consultants, or service providers such vesting and forfeiture provisions) as determined by the prior written consent of Bronco and OCP.  Promptly following the issuance of Units, the Company shall, pursuant to Section 3.1, cause the books and records of the Company and Schedule 3.1 attached hereto to reflect the number of Units issued and the Members holding such Units.  Upon the execution of this Agreement or a Joinder Agreement, together with any other documents or instruments required by the Company in connection therewith, and the making of the Capital Contribution (if any) specified to be made at such time, a Person shall be admitted to the Company as a Member of the Company.

3.4    Unit Splits and Dividends.  The Company shall not in any manner subdivide or increase the number of (by split, dividend or other similar manner), or combine in any manner, the outstanding Common Units unless a proportional and equitable adjustment is made to all Common Units.  In no event shall any such subdivision, increase or combination (by split, dividend or other similar manner) of the Common Units constitute a Distribution in respect of any Unit.

3.5    Capital Contributions.  Each Member's Capital Contribution, if any, whether in cash or in-kind, and the amount of each Member's Capital Contribution, if any, whether in cash or in-kind, and the number of Units issued to such Members shall be as set forth in Schedule 3.1 attached hereto (as amended or adjusted from time to time pursuant to Section 3.1 and Section 3.3).  Any in-kind Capital Contributions shall be affected by a written assignment or such other documents as the Company shall direct.  Any Member making an in-kind Capital Contribution

LEGAL_US_W # 99102246.2

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 19

agrees from time to time to do such further acts and execute such further documents as the Company may reasonably direct to perfect the Company's interest in such in-kind Capital Contribution. Notwithstanding anything else herein to the contrary, except as set forth in Schedule 3.1 attached hereto, no Member shall be required to make any additional Capital Contributions or future Capital Contributions.

3.6   Unit Certificates.   Each Member may be issued from the Company a certificate stating the number of Units held by such Member, in such form as shall, in conformity with applicable law and this Agreement, be prescribed from time to time by the Company (a "Unit Certificate"); provided, however, that the issuance, or non-issuance, of a Unit Certificate shall in no way affect the rights and/or obligations of a Member with respect to such Member's Units. Such certificate shall be signed by the President or the Vice President and by the Treasurer or an Assistant Treasurer or by the Secretary or an Assistant Secretary (in each case as instructed in writing by the Board of Managers). Any of or all the signatures on the certificate may be a facsimile. In case an officer, transfer agent or registrar who has signed or whose facsimile signature has been placed on such certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Company with the same effect as if such Person were such officer, transfer agent or registrar at the time of its issue. Each such certificate shall bear legends as follows:

"THE VOTING OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE, IF A VOTING INTEREST, AND THE SALE, ENCUMBRANCE OR OTHER DISPOSITION THEREOF, ARE SUBJECT TO THE PROVISIONS OF AN LIMITED LIABILITY COMPANY AGREEMENT TO WHICH THE ISSUER AND ITS MEMBERS ARE PARTY, A COPY OF WHICH MAY BE INSPECTED AT THE PRINCIPAL OFFICE OF THE ISSUER OR OBTAINED FROM THE ISSUER WITHOUT CHARGE."

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ISSUED IN A PRIVATE PLACEMENT, WITHOUT REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), AND MAY NOT BE SOLD, ASSIGNED, PLEDGED OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION UNDER THE ACT COVERING THE TRANSFER OR AN OPINION OF COUNSEL, REASONABLY SATISFACTORY TO THE ISSUER, THAT REGISTRATION UNDER THE ACT IS NOT REQUIRED."

In addition, any certificated Units shall bear such legends as may be required under any other applicable securities laws from time to time.

3.7   Loss of Certificates.   In the case of the alleged theft, loss, destruction or mutilation of a Unit Certificate, a replacement certificate may be issued in place thereof, upon such terms, including an indemnity by such Member indemnifying the Company against any claim on account thereof, as the Company may reasonably prescribe.

LEGAL_US_W # 99102246.2

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 20

3.8     Special Approval Rights.

(a)     So long as (x) OCP is Controlled by Robert Zangrillo or any of his Affiliates and OCP (including any of its Affiliates) holds (of record or beneficially) any Units and (y) Bronco (including any of its Affiliates) holds (of record or beneficially) any Units (provided, that until the Investment Threshold is achieved, if Bronco is no longer Controlled by Burton Katz for any reason, the rights of Bronco set forth in this Section 3.8(a) shall be exercised by MM/Cardozo), without the prior written consent of OCP and Bronco (as applicable), the Company shall not, and shall not permit any of its Subsidiaries to, do any of the following:

(i)     declare or pay any dividends or make any Distributions on any class or series of equity securities of the Company or any of its Subsidiaries now or hereafter outstanding;

(ii)     approve any Budget, any revisions thereto and any material derivation therefrom with respect to the Company or any of its Subsidiaries;

(iii)     purchase, redeem or otherwise acquire or retire any equity security of the Company or any of its Subsidiaries of any class or series now or hereafter outstanding, or otherwise return capital or make distributions of assets;

(iv)     conduct a Public Offering of the Company or any of its Subsidiaries;

(v)     other than in the ordinary course of business consistent with past practices, sell, transfer or license any assets of the Company or any of its Subsidiaries, or otherwise cause a Liquidation Event;

(vi)     make an assignment for the benefit of creditors, decide to voluntarily subject itself or any of its Subsidiaries to any proceedings under any bankruptcy or insolvency law, decide to avail the Company or any of its Subsidiaries of the benefit of any other legislation for the benefit of debtors, or take steps to wind up or terminate the Company's or any of its Subsidiaries' existence;

(vii)     adopt, or modify in any material respect, any significant accounting policy, or tax policy with respect to the Company or any of its Subsidiaries, including a tax allocation method for purposes of Section 704(c) of the Code, which differ from those set forth in this Agreement;

(viii)     alter or change the rights, powers, preferences, or privileges of any Units or any equity securities of any of the Company's Subsidiaries;

(ix)     authorize the issuance of any Interests or Company Securities or any equity securities of any of the Company's Subsidiaries;

(x)     amend or waive any provisions of this Agreement or the Certificate or any of the Company's or any of its Subsidiaries' organizational and governance documents;

- 15 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 21

(xi)     convert the Company or any of its Subsidiaries to corporate form, regardless of the form of the transaction used to accomplish the conversion or change the legal jurisdiction where the Company or any of its Subsidiaries operates;

(xii)    change the tax status of the Company or any of its Subsidiaries;

(xiii)   incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than the Initial Indebtedness, between $500,000 and $5,000,000 in the aggregate;

(xiv)    issue additional Interests or Company Securities or admit an additional Person as a Member of the Company;

(xv)     issue additional equity interests or admit an additional equity holder as an equity holder of any of the Company's Subsidiaries;

(xvi)    acquire or dispose any business or enterprise on behalf of the Company or any of its Subsidiaries or merge or consolidate the Company or any Subsidiary with another Person;

(xvii)   approve a Transfer of Interests of the Company or any of its Subsidiaries other than as expressly permitted hereunder;

(xviii)  encumber, hypothecate, pledge, create a lien, sell, purchase, lease, license and/or assign any of the Company's or any of its Subsidiaries' intellectual property, real property, and/or personal property;

(xix)    engage or select any bankers on behalf of the Company or any of its Subsidiaries;

(xx)     authorize money transfers or cash withdrawals at any time in excess of $250,000 on behalf of the Company and its Subsidiaries for any purpose other than documented payroll or pursuant to the limited liability company agreement (or similar governing document) of any Subsidiary;

(xxi)    make an offer of employment, hire or terminate any employee, or enter into or amend any employment, deferred compensation, severance, retirement or other similar agreement with (or change or modify the compensation or benefits for) any employee or declare any bonuses and/or advances with respect to any employee, in each case on behalf of the Company or any of its Subsidiaries, in each case solely with respect to the Company's Chief Executive Officer, President, and Chief Financial Officer;

(xxii)   amend or alter this Section 3.8(a); and/or

(xxiii)  enter into any agreement or arrangement to do any of the foregoing.

LEGAL_US_W # 99102246.2

(b)      Without Supermajority Approval, the Company shall not, and shall not permit any of its Subsidiaries to, engage in any transaction or enter into or amend (in any material respects) any agreement with an Initial Member or DG On Point or any Affiliate of an Initial Member or DG On Point or make any payment to an Initial Member or DG On Point or an Affiliate of an Initial Member or DG On Point, other than pursuant to Article 5, or amend or alter this Section 3.8(b) and/or enter into any agreement or arrangement to do the foregoing.

3.9      Member Indebtedness.  Until the Company or any of its Subsidiaries pays in full any unpaid principal and accrued and unpaid interest owing to any Member (including, for this purpose, MM/Cardozo and OCP/Bronco) that is a lender to the Company or any of its Subsidiaries, the Company shall not make any Distributions to the Members under Section 5.1(b) or Article 15.

3.10    Tax Treatment.  Aggregator shall require each Person who is receiving a grant of Class B Aggregator Common Units to make a timely election under Section 83(b) of the Code in connection with the issuance thereof, in a manner reasonably prescribed by Aggregator.  The Company and Aggregator (on behalf of each Person receiving  a grant of Class B Aggregator Common Units) hereby acknowledge and agree that the equity directly held by such Person in respect of such Class B Common Units (including any such corresponding Class B Aggregator Common Units), and the rights and privileges associated therewith, collectively are intended to constitute a Profits Interest.  The Company and Aggregator (on behalf of each Person who indirectly receives Class B Common Units (including any corresponding Class B Aggregator Common Units)) hereby agree (i) that all such Persons will be treated as partners of the entity in which they directly hold the corresponding equity for federal income tax purposes immediately upon issuance of such Class B Common Units (including any such corresponding Class B Aggregator Common Units) and (ii) for so long as Revenue Procedure 2001-43, 2001 2 C.B. 191, is effective, each recipient of a Profits Interest shall comply with the provisions of Revenue Procedure 2001 43, and neither the Company, Aggregator nor any such Person shall perform any act or take any position inconsistent with the application of Revenue Procedure 2001 43.

4.      CAPITAL ACCOUNTS

4.1      Capital Accounts.  A separate account (each a "Capital Account") shall be established and maintained for each Member which:

(a)      shall be increased by (i) such Member's Capital Contributions, (ii) such Member's share of the Net Profit (and other items of income and gain) of the Company under this Agreement, and (iii) the amount of any Company liabilities assumed by such Member or that are secured by any property distributed to such Member, and

(b)      shall be reduced by (i) the amount of cash and the Carrying Value of any other property distributed to such Member (net of liabilities secured by such property or that the Member assumes or takes the property subject to), (ii) such Member's share of the Net Loss (and other items of loss, expense or deduction) of the Company under this Agreement, and (iii) the amount of any liabilities of such Member assumed by the Company.

- 17 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 23

It is the intention of the Members that the Capital Accounts of the Company be maintained in accordance with Regulations Section 1.704-1(b)(2)(iv) and that this Agreement be interpreted consistently therewith.  In determining the amount of any liability for purposes of this Section 4.1, there shall be taken into account Code Section 752(c) and any applicable provisions of the Code and Regulations.

4.2     Additional Capital Account Provisions.   No Member shall have the right to demand a return of all or any part of such Member's Capital Contributions or Capital Account. Any return of the Capital Contributions or Capital Account of any Member shall be made solely from the assets of the Company and only in accordance with the terms of this Agreement.  No interest shall be paid to any Member with respect to such Member's Capital Contributions or Capital Account.  In the event that all or a portion of the Units of a Member are transferred in accordance with this Agreement, the transferee of such Units shall also succeed to all or the relevant portion of the Capital Account of the transferor in accordance with Regulations Section 1.704-1(b)(2)(iv)(l).   Units held by a Member may not be transferred independently of the Interest to which the Units relate.

4.3     Negative Capital Account.   No Member shall be required to pay to any other Member or the Company any deficit or negative balance which may exist from time to time in such Member's Capital Account (including upon and after dissolution of the Company).

5.      DISTRIBUTIONS AND ALLOCATIONS OF PROFIT AND LOSS

5.1     Distributions.   Subject to and in accordance with Section 3.8 and this Article 5, the Company (upon the written direction of OCP and Bronco) may make Distributions to the Members from time to time as follows:

(a)     *Tax Distributions*.   Subject to the provisions of Section 5.2, the Company shall use commercially reasonable efforts to distribute (subject to applicable law, available cash and cash flow, and any of the Company's loan agreements, documents, and instruments), to each Member on a quarterly basis on the 15th (or next succeeding Business Day) of each April, July October and January of each Fiscal Year commencing on January 1, 2018, an amount (the "Tax Distribution") in cash equal to the excess, if any, of (i) such Member's Cumulative Tax Liability (as defined below) over (ii) the amounts previously distributed to such Member pursuant to this Section 5.1(a), Section 5.1(b), or deemed distributed to such Member pursuant to Section 5.3. Such distributions shall be made in order to permit the Members to timely satisfy estimated tax or other tax payment requirements.  For purposes of computing a Member's Tax Distribution under this Section 5.1(a), salaries, bonuses, any other payments in the nature of compensation (including guaranteed payments for services), and any special basis adjustments under Section 743 of the Code shall not be taken into account, other than as an expense of the Company.  For purposes of this paragraph, a "Member's Cumulative Tax Liability" means, with respect to all fiscal periods beginning as of the date of this Agreement and ending on the last day of the most recent fiscal quarter, the product of (A) the cumulative excess of taxable income (including gross income or gain) over taxable losses and deductions (including depreciation and amortization deductions) of the Company allocated to such Member (and any prior owner of such Unit) with respect to such Unit pursuant to this Agreement multiplied by (B) the lesser of thirty-five percent (35%) or the maximum aggregate applicable federal and state tax rates applicable to the type(s)

- 18 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 24

of taxable income allocated to the Member. Notwithstanding the foregoing, as an alternative to the foregoing, upon the prior written approval of OCP and Bronco, the Company may elect to cause to be distributed to each Member before April 15 of each Fiscal Year, cash equal to the Tax Distribution Amount for the immediately preceding Fiscal Year. Each Tax Distribution pursuant to this Section Error! Reference source not found. shall be treated as an advance of, and shall offset, distributions distributable to such Member pursuant to this Agreement.

(b)     *Distributions.*

(i)     Except for Tax Distributions, (A) first, the Initial Indebtedness Distribution Amount shall be paid in full based upon the Initial Indebtedness Distribution Percentage, and then (B) second, all remaining Distributions shall, subject to Section 3.8, be made when and in the amounts determined by the prior written approval of OCP and Bronco, and subject to the following provisions of Section 5.1, to all holders of Common Units, pro rata based on their relative number of Units (treating such Common Units as a single class for this purpose).

(ii)     Participation Threshold Condition. Notwithstanding anything in this Section Error! Reference source not found, or otherwise in this Agreement to the contrary, no Class B Unit Holder shall be entitled to a Distribution of proceeds pursuant to this Agreement with respect to Class B Common Units issued on or after the date of this Agreement (other than Tax Distributions) unless and until the aggregate amount of Distributions to the Unit Holders made under, or in respect of Section 5.1 since the grant of such Class B Common Unit, is equal to the Participation Threshold for such Class B Common Unit. Any amounts that are not distributed to a Class B Unit Holder due to application of this Section Error! Reference source not found, shall instead be distributed to other Unitholders pursuant to Section Error! Reference source not found.(B).

(c)     *Distributions on a Liquidation Event.* Notwithstanding the foregoing, upon the occurrence of a Liquidation Event, the Company shall promptly pay, or make provision for the payment of all, of the expenses and liabilities of the Company, including the establishment of reserves as the Company (by action by the Board of Managers) shall determine to be required in order to provide for contingent liabilities and then distribute all remaining assets to the Members as follows: (i) *first*, to the Members holding Preferred Units pro rata in proportion to their holdings of Preferred Units, in an amount up to $1.25 per Preferred Unit, and (ii) *second*, in accordance with Section 5.1(b) (for this purpose treating the net proceeds from such Company Sale received directly by Members as having been distributed to the Members in accordance with the distribution provisions of Section 5.1(b)).

(d)     *Special Distribution Rules.* Upon any Company Sale, whether structured as a sale of equity, merger, consolidation, reorganization, recapitalization, redemption, asset sale or otherwise, the Company shall promptly make Distributions to the Members in accordance with Section 5.1(b).

5.2     No Violation. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make a Distribution to any Member on account of such

- 19 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 25

Member's Interest in the Company if such Distribution would violate Section 18-607 of the Act or other applicable law.

5.3     Withholdings.  All amounts withheld pursuant to the Code or any federal, state, local or foreign tax law with respect to any payment, distribution or allocation to a Member shall be treated as distributed to such Member.  The Company is authorized to withhold from Distributions to Members, or with respect to allocations to Members and in each case to pay over to the appropriate federal, state, local or foreign government any amounts required to be so withheld.  The Company shall allocate any such amounts to the Members in respect of whose Distribution or allocation the tax was withheld and shall treat such amounts as actually distributed to such Members.

5.4     Net Profit or Net Loss.

(a)     The "Net Profit" or "Net Loss" of the Company for each Fiscal Year or relevant part thereof shall mean an amount equal to the Company's taxable income or loss for that Fiscal Year or period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments (without duplication):

(i)     Income of the Company that is exempt from federal income tax shall be added to taxable income or loss.

(ii)     Expenditures of the Company described in Code Section 705(a)(2)(B) or treated as such expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), shall be subtracted from taxable income or loss.

(iii)     Gain or loss resulting from the disposition of a Company asset shall be determined by reference to the Carrying Value of the Company asset.

(iv)     Items of gain, loss, depreciation, amortization or depletion that would be computed for federal income tax purposes by reference to the tax basis of a Company asset shall be determined by reference to the Carrying Value of that asset in accordance with Regulations Section 1.704-1(b)(2)(iv)(g).

(v)     If the Carrying Value of any Company asset is adjusted in accordance with subparagraph (b), (c) or (d) of the definition of Carrying Value, the amount of that adjustment shall be taken into account as gain or loss from the disposition of that asset.

(vi)     Items that are specially allocated pursuant to Section 5.5 shall not be taken into account in computing Net Profit or Net Loss.

(b)     *Allocations of Income, Gain, Loss, Deduction and Credit.*  Except as provided in Section 5.5, Net Profit or Net Loss (and items thereof) of the Company for each Fiscal Year or other period shall be allocated to the Members in such a manner such that, as of the end of each Fiscal Year, the sum of (i) the Capital Account of a Member, (ii) such Member's share of "partnership minimum gain" (as defined and determined in accordance with Regulations

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 26

Sections 1.704-2(b)(2) and 1.704-2(d)), and (iii) such Member's share of "partner nonrecourse debt minimum gain (as defined and determined in accordance with Regulations Sections 1.704-2(i)(2) and 1.704-2(i)(3)), shall be equal, as nearly as possible, to the respective net amounts that would be distributed to such Member if the Company sold all of its properties for cash equal to their Carrying Values, satisfied all of its liabilities, and distributed the remaining proceeds in accordance with Section 5.1.

5.5    Regulatory Allocations. Despite any other provision of this Article 5:

(a)    This Agreement shall be deemed to contain (1) a "minimum gain chargeback" provision, within the meaning of Regulations Section 1.704-2(f); and (2) a "partner minimum gain chargeback" provision within the meaning of Regulations Section 1.704-2(i)(4), and there shall be allocations consistent with such provisions;

(b)    If any Member unexpectedly receives an adjustment, allocation or distribution of the type contemplated by Regulations Sections 1.704-1(b)(2)(ii)(d)(4), (5) or (6), items of income and gain shall be allocated to all such Members (to the extent of and in proportion to the amounts of their respective Adjusted Capital Account Deficits) in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit of such Member as quickly as possible. It is intended that this Section 5.5(b) qualify and be construed as a "qualified income offset" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(d);

(c)    No loss or deduction shall be allocated to any Member to the extent that such allocation would cause or increase an Adjusted Capital Account Deficit of such Member. Any such loss or deduction shall be reallocated away from such Member and to the other Members in accordance with this Agreement, but only to the extent that such reallocation would not cause or increase an Adjusted Capital Account Deficit with respect to such other Members. To the extent that allocations of loss or deduction have been made pursuant to this Section 5.5(c), future allocations of income and gain, notwithstanding anything to the contrary in this Agreement, shall be made first to restore such allocations of loss or deduction;

(d)    Nonrecourse deductions, within the meaning of Regulations Section 1.704-2(b)(1), shall be allocated to the Common Unit Holders in proportion to their ownership of such Common Units (treating for these purposes the Common Units as a single class);

(e)    Any item of Company loss or deduction that is attributable to a "partner nonrecourse debt" (within the meaning of Regulations Section 1.704-2(b)(4)) shall be allocated to the Members that bear the economic risk of loss for such debt (within the meaning of Regulations Section 1.752-2);

(f)    The allocations set forth in Section 5.5(a), Section 5.5(b), Section 5.5(c), Section 5.5(d), and Section 5.5(e) (the "Regulatory Allocations") are intended to comply with certain requirements of Sections 1.704-1(b) and 1.704-2 of the Treasury Regulations. The Regulatory Allocations may not be consistent with the manner in which the Members intend to allocate Net Profit, Net Loss and items thereof and make Distributions. Accordingly, notwithstanding anything to the contrary in this Agreement, income, gain, deduction, and loss shall be reallocated among the Members, in the manner determined by the prior written consent

LEGAL_US_W # 99102246.2

of OCP and Bronco based on the advice of the Company's tax advisors, so as to eliminate the effect of the Regulatory Allocations and thereby cause the respective Capital Accounts of the Members to be in the amounts (or as close thereto as possible) they would have been if Net Profit, Net Loss and items thereof had been allocated without reference to the Regulatory Allocations.

5.6     Tax Allocations.

(a)     Except as provided in Section 5.6(b), items of Company income, gain, loss, deduction and credit shall be allocated, for federal, state and local income tax purposes, among the Members in a manner that equitably reflects the manner in which its corresponding item of "book" income, gain, loss or deduction has been allocated under Section 5.4(b) and Section 5.5.

(b)     Items of taxable income, gain, loss and deduction with respect to property of the Company that has a Carrying Value different from its adjusted basis for federal income tax purposes will be shared among the Members so as to take account of such difference in accordance with the principles of Code Section 704(c) (including the remedial method) and the Regulations using any permitted method under Code Section 704(c) and the Regulations as determined by the Tax Matters Partner. In the event the Carrying Value of any Company property is adjusted pursuant to the definition of Carrying Value, subsequent allocations of income, gain, loss, and deduction with respect to such property shall take account of any variation between such property's adjusted basis for federal income tax purposes and such Carrying Value in the manner determined by the Tax Matters Partner, and consistent with Code Section 704(c) and the Regulations thereunder (including the remedial method).

(c)     The allocations required by this Section 5.6 are solely for purposes of federal, state and local income taxes and shall not affect the allocation of Net Profit or Net Loss as between Members or any Member's Capital Account.

6.     STATUS, RIGHTS AND POWERS OF MEMBERS; AND AGREEMENTS

6.1     Limited Liability. Notwithstanding anything else herein to the contrary, except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, expenses, obligations and liabilities of the Company, and no Member, Indemnified Person or member of the Board of Managers shall be obligated personally for any such debt, expense, obligation or liability of the Company or any Subsidiary, including by reason of being a Member, Indemnified Person or member of the Board of Managers. All Persons dealing with the Company shall have recourse solely to the assets of the Company for the payment of the debts, obligations or liabilities of the Company. Notwithstanding anything else herein to the contrary, in no event shall any Member be required to make up any deficit balance in such Member's Capital Account upon the liquidation of such Member's Interest or otherwise.

6.2     Return of Distributions of Capital. Notwithstanding anything else herein the contrary, except as otherwise expressly required by applicable law, a Member, in such capacity, shall have no liability for obligations or liabilities of the Company in excess of (a) the amount of

- 22 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 28

such Member's Capital Contributions, (b) such Member's share of undistributed profits of the Company and (c) to the extent required by law, the amount of any Distributions wrongfully distributed to such Member. Notwithstanding anything else herein the contrary, except as required by applicable law, no Member shall be obligated by this Agreement to return any Distribution to the Company or pay the amount of any Distribution for the account of the Company or to any creditor of the Company; provided, however, that pursuant to and in accordance with a non-appealable order from a court of competent jurisdiction which holds that, notwithstanding this Agreement, any Member is obligated to return or pay any part of any Distribution, such obligation shall bind such Member alone and not any other Member; and provided, further, that if any Member is required to return all or any portion of any Distribution under circumstances that are not unique to such Member but that would have been applicable to all Members if such Members had been named in the lawsuit against the Member in question (such as where a Distribution was made pro rata to all Members and rendered the Company insolvent, but only one Member was sued for the return of such Distribution), the Member that was required to return or repay the Distribution (or any portion thereof) shall be entitled to reimbursement from the other Members that were not required to return the Distributions made to them pro rata based on each such Member's share of the Distribution in question. The provisions of the immediately preceding sentence are solely for the benefit of the Members and shall not be construed as benefiting any third party. The amount of any Distribution returned to the Company by a Member or paid by a Member for the account of the Company or to a creditor of the Company shall be added to the account or accounts from which it was subtracted when it was distributed to such Member.

6.3  No Management or Control. Except as expressly provided in this Agreement, no Member, in its capacity as a Member, shall take part in or interfere in any manner with the management of the business and affairs of the Company or have any right or authority to act for or bind the Company notwithstanding Section 18-402 of the Act.

6.4  Specific Limitations. Except as expressly provided in this Agreement or any Equity Agreement between the Company and a Class B Unitholder, no Member shall have the right or power to: (a) withdraw or reduce such Member's Capital Contribution except as a result of the dissolution of the Company or as otherwise provided by law or in this Agreement, (b) make voluntary Capital Contributions or to contribute any property to the Company other than cash, (c) bring an action for partition against the Company or any Company assets, (d) cause the termination and dissolution of the Company, except as set forth in this Agreement, or (e) upon the Distribution of its Capital Contribution require that property other than cash be distributed in return for its Capital Contribution.

6.5  Meetings of Members. Meetings of the Members shall be held and conducted in accordance with the provisions set forth on Exhibit 6.5 attached hereto. The voting rights and special approval rights of the Members shall be governed by this Agreement (including the Exhibits attached hereto) and the Act.

6.6  Key Man (Other) Insurance. The Company shall procure and maintain key man life, disability, and/or other similar insurance on Burton Katz in the aggregate amount between $10,000,000 and $17,500,000 (with the Company as the beneficiary) and term life insurance in the aggregate amount between $5,000,000 and $10,000,000 on Bob Zangrillo (with the Company

LEGAL_US_W # 99102246.2

as the beneficiary), in each case on terms and conditions acceptable to the Members. Each of Burton Katz and Bob Zangrillo shall submit to such physical examinations and provide such information and complete such forms as may be reasonably necessary to obtain or renew any such insurance policies, from time-to-time.

7.    DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES AND DUTIES OF THE BOARD OF MANAGERS

7.1    Management of the Company by the Board of Managers. The business, property and affairs of the Company shall be managed exclusively by a board of managers (the "Board of Managers"), the members of which shall be "managers" within the meaning of Section 18-101(10) of the Act. Except for situations in which the approval of the Members is expressly required by the Certificate, the Act or this Agreement, the Board of Managers shall have full, complete and exclusive authority, power, and discretion to manage and control the business, property and affairs of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business, property and affairs. The Board of Managers shall have the authority to delegate any of its powers to one or more sub-committees of the Board of Managers as provided herein. Except as otherwise provided in this Agreement (including in Exhibit 7.1) or in the Act, in all matters in which a vote, approval or consent of the Board of Managers is required, a vote, consent or approval of a majority of the members of the Board of Managers shall be sufficient to authorize or approve such matters. Meetings of the Board of Managers shall be held and conducted in accordance with the provisions set forth on Exhibit 7.1 attached hereto.

7.2    Members of the Board of Managers. The Board of Managers shall have up to seven (7) members. Each of OCP and Bronco shall have the right to appoint two (2) members of the Board of Managers. The Preferred Holder shall have the right to appoint two (2) members of the Board of Managers. The remaining member of the Board of Managers will be an independent member appointed by the approval of OCP and Bronco As of the date hereof, the members of the Board of Managers shall be: Robert Zangrillo (designated by OCP), Burton Katz (designated by Bronco), Alex Soltani (designated by the Preferred Holder) and Phillip Sarofim (designated by the Preferred Holder). Remaining seats of the Board of Managers shall remain vacant until OCP and/or Bronco decide to appoint any new member(s) to the vacant seat(s). Each member of the Board of Managers shall hold office until a successor is appointed or until the member resigns or is removed. A member of the Board of Managers may be removed (a) for a member appointed by OCP, upon the written election of OCP, (b) for a member appointed by Bronco, upon the written election of Bronco, (c) for the member appointed by the Preferred Holder, upon the written election of the Preferred Holder, and (d) for the independent member, upon the written election each of OCP and Bronco. Upon the resignation or removal of a member of the Board of Managers appointed by OCP, Bronco or the Preferred Holder, as applicable, a replacement member of the Board of Managers shall be appointed by the party who initially appointed such member. Members of the Board of Managers need not be Members.

7.3    Authority of the Board of Managers. Subject to the provisions of this Agreement that require the consent or approval of one or more Members (including Section 3.8), the Board of Managers shall have the exclusive power and authority to manage the business and affairs of the Company (and/or its Subsidiaries) and to make all decisions with respect thereto. Except as

LEGAL_US_W # 99102246.2

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 30

otherwise expressly provided in this Agreement, the members of the Board of Managers or Persons designated by the Board of Managers, including officers and agents appointed by the Board of Managers, shall be the only Persons authorized to execute documents which shall be binding on the Company (and/or its Subsidiaries). To the fullest extent permitted by Delaware law, but subject to any specific provisions hereof granting special approval rights to certain Members (including Section 3.8), the Board of Managers shall have the power to perform any acts, statutory or otherwise, with respect to the Company (and/or its Subsidiaries) or this Agreement. The power and authority granted to the Board of Managers hereunder shall include all those necessary, convenient or incidental for the accomplishment of the purposes of the Company (and/or its Subsidiaries) and, subject to the provisions of this Agreement that require the consent or approval of one or more Members for the taking of certain actions (including Section 3.8), shall include the power to make all decisions with regard to the management, operations, assets, financing and capitalization of the Company (and/or its Subsidiaries), including the power and authority to undertake and make decisions concerning: (a) hiring and firing employees, attorneys, accountants, brokers, investment bankers and other advisors and consultants, (b) entering into leases for real or personal property, (c) opening or closing bank and other deposit accounts and operations thereunder, (d) purchasing, constructing, improving, developing and maintaining real property, (e) purchasing insurance, goods, supplies, equipment, materials and other personal property, (f) borrowing money, obtaining credit, issuing notes, debentures, securities, equity or other interests of or in the Company (and/or its Subsidiaries) and securing the obligations undertaken in connection therewith with mortgages on, pledges of and security interests in all or any portion of the real or personal property of the Company (and/or its Subsidiaries), (g) making investments in or the acquisition of securities of any Person, (h) giving guarantees and indemnities, (i) entering into contracts or agreements, whether in the ordinary course of business or otherwise, (j) mergers with or acquisitions of other Persons, (k) dissolution, (l) the sale or lease of all or any portion of the assets of the Company (and/or its Subsidiaries), (m) forming subsidiaries or joint ventures, (n) compromising, arbitrating, adjusting and litigating claims in favor of or against the Company (and/or its Subsidiaries), (o) issuing debt and equity securities of the Company (and/or its Subsidiaries) or incurring any debt, secured or unsecured, direct or contingent, (p) approving any Budget of the Company (and/or its Subsidiaries), any revisions thereto and any material derivation therefrom, (q) settling, or causing the settlement of any claims, suits, debts or demands against the Company (and/or its Subsidiaries) in excess of $50,000, individually or in the aggregate, (r) expanding the Company's business into any state or country outside of where the Company (and/or its Subsidiaries) currently conducts business on the date of this Agreement, and (s) all other acts or activities necessary, convenient or incidental for the accomplishment of the purposes of the Company (and/or its Subsidiaries) including any and all actions that the Company (and/or its Subsidiaries) may take as described in Section 2.6.

7.4    Reliance by Third Parties. Subject to the provisions of this Agreement that require the consent or approval of one or more Members for the taking of certain actions (including Section 3.8, and Section 3.9), any Person dealing with the Company or the Members may rely upon a certificate signed by the Board of Managers to do so as to: (a) the identity of the Members, if reasonably requested by such third Person, (b) the existence or non-existence of any fact or facts which constitute a condition precedent to acts by Members or are in any other manner germane to the affairs of the Company, (c) the Persons which are authorized to execute and deliver any instrument or document of or on behalf of the Company, (d) the authorization of any action by or on behalf of the Company by the Board of Managers, or any officer or agent

- 25 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 31

acting on behalf of the Company, or (e) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or the Members.

7.5    Budget.    The Board of Managers shall direct the officers of the Company to prepare a budget for each fiscal year of the Company (each such budget, unless and until approved in writing by OCP and Bronco pursuant to Section 3.8, a "Proposed Budget").  The Proposed Budget shall set forth, on a quarterly basis, all material items of expense and expected revenue.  A Proposed Budget for a fiscal year shall be presented to the Board of Managers not later than December 1st of the immediately preceding fiscal year for its approval (unless OCP and Bronco elects in writing for a Proposed Budget to be presented at another date).  Upon the prior written approval of OCP and Bronco in accordance with Section 3.8, the Proposed Budget shall be deemed the "Budget".  Unless and until a Proposed Budget is approved, the Company shall operate in accordance with the expense portion of the most recent Budget approved in writing by OCP and Bronco in accordance with Section 3.8, reasonably adjusted to reflect increases in expenses resulting from inflation, third party cost increases and the growth or development of the business.

## 8.    DESIGNATION, RIGHTS, AUTHORITIES, POWERS, RESPONSIBILITIES AND DUTIES OF OFFICERS AND AGENTS

8.1    Officers, Agents.    Subject to the provisions of this Agreement that require the consent or approval of one or more Members for the taking of certain actions (including Section 3.8), the Company's Board of Managers shall have the power to appoint officers and agents to act for the Company or any of its Subsidiaries with such titles, if any, as the Company's Board of Managers deems appropriate and to delegate to such officers or agents the powers as are granted by the Company's Board of Managers, including the power to execute documents on behalf of the Company or any of its Subsidiaries; provided, however, that no such delegation by the Company's Board of Managers shall cause the members of the Board of Managers to cease to be the "managers" of the Company within the meaning of the Act; provided, further, however, that Burton Katz shall not have the authority to replace himself as the Company's Chief Executive Officer, or appoint the Company's Chief Financial Officer or the Company's President, or select a banker for, or on behalf of the Company.  Subject to the provisions of this Agreement that require the consent or approval of one or more Members for the taking of certain actions (including Section 3.8), the officers so appointed may include individuals holding titles such as Chief Operating Officer, Executive Vice President, Vice President, Secretary, Assistant Secretary, Treasurer, Assistant Treasurer, or Controller.  Subject to the provisions of this Agreement that require the consent or approval of one or more Members for the taking of certain actions (including Section 3.8), unless the authority of the officer in question is limited in the document appointing such officer or is otherwise specified herein, any officer so appointed shall have the same authority to act for the Company as a corresponding officer of a Delaware corporation would have to act for a Delaware corporation in the absence of a specific delegation of authority and as more specifically set forth in Exhibit 8.1 attached hereto; provided, however, that unless such power is specifically delegated to the officer in question either for a specific transaction or generally, no such officer shall have the power to lease or acquire real property, to borrow money, to issue notes, debentures, securities, equity or other interests of or in the Company, to make investments in (other than the investment of surplus cash in the ordinary course of business) or to acquire securities of any Person, to give guarantees or indemnities, to

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 32

merge, liquidate or dissolve the Company or to sell or lease all or any substantial portion of the assets of the Company. On the date hereof, the following individuals shall be elected as the officers of the Company set forth opposite their respective names below to serve in such capacities until their respective successors shall have been duly elected and shall have qualified:

| | | |
|---|---|---|
| Chief Executive Officer | -- | Burton Katz; |
| Chief Financial Officer | -- | Bob Bellack; |
| Senior Vice President | -- | Charlie Eissa; and |
| Chief Administrative Officer | -- | Brent Levison. |

9.   BOOKS, RECORDS, ACCOUNTING AND REPORTS

   9.1   Books and Records. The Company shall maintain at its principal office or such other office as the Board of Managers shall determine all of the following:

      (a)   A current list of the full name and last known business or residential address of each Member;

      (b)   Information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each Member and which such Member has or may have agreed to contribute in the future, if any, and the date on which each Member became a Member of the Company;

      (c)   A copy of the Certificate and this Agreement, including any amendments to either thereof, together with executed copies of any powers of attorney pursuant to which the Certificate, this Agreement or any amendments have been executed;

      (d)   Copies of the Company's federal, state and local income tax or information returns and reports;

      (e)   The financial statements of the Company; and

      (f)   The Company's books and records.

Each of the Members shall have the right to examine all of the information described in Section 9.1(a) through Section 9.1(f) and such other information regarding the Company's affairs and financial condition as may reasonably be requested.

   9.2   Fiscal Year; Financial Statements. Unless otherwise determined by the Board of Managers or required by applicable law, the Fiscal Year of the Company shall end on December 31 of each year. The Board of Managers shall cause the Company's books and records to be audited annually by an independent public accounting, and promptly after completion of each such audit shall cause copies of the Company's audited financial statements to be distributed to all Class A Unit Holders and the Preferred Holder.

- 27 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 33

9.3   Filings. At the Company's sole expense, the Board of Managers shall cause the income tax returns for the Company to be prepared and timely filed with the appropriate authorities and to have prepared and to furnish to each Member such information with respect to the Company (including a Schedule K-1 setting forth such Member's distributive share of the Company's income, gain, loss, deduction and credit as determined for federal income tax purposes) as is necessary to enable such Member to prepare and timely file such Member's federal and state income tax returns. The Company shall use commercially reasonable efforts to make available to each Member such Member's Schedule K-1 on or prior to March 15th of each year. The Board of Managers, at the Company's sole expense, shall also cause to be prepared and timely filed, with appropriate federal and state regulatory and administrative authorities, all reports required to be filed by the Company with those entities under then current applicable laws, rules and regulations.

9.4   Non-Disclosure. Each Member, on behalf of itself and its Affiliates, agrees that, except upon the prior written approval of OCP and Bronco, all non-public information furnished to the Company or such Member pursuant to this Agreement will be kept confidential and will not be disclosed by the Company or such Member, or by any of the Company's or such Member's agents, representatives, employees or Affiliates, in any manner, in whole or in part, except that the Company and each Member shall be permitted to disclose such information (a) to the Company's or such Member's agents, representatives, employees and Affiliates who need to be familiar with such information in connection with the operations of the Company or its Subsidiaries or such Member's investment in the Company and who are informed of the confidential nature thereof, (b) to such Member's current and prospective partners and equity holders in connection with such Member's or such Member's Affiliates' normal fund raising, marketing, informational or reporting activities so long as they are informed of the confidential nature thereof and agree to keep such information confidential on the terms set forth herein, (c) to the extent requested by any government agency or self-regulatory body having jurisdiction over such Member, (d) to the extent required by applicable law (so long as such Member shall have, to the extent legally permissible, first provided the Company a reasonable opportunity to contest the necessity of disclosing such information) or the rules of any securities exchange, (e) to the extent necessary for the enforcement of any right of the Company or such Member arising under this Agreement, (f) to a potential Permitted Transferee who is informed of, and agrees to be bound by, the confidential nature thereof, and (g) if (and only to the extent) such information is known or becomes generally available to the public other than as a result of the unauthorized disclosure of such information by the Company or such Member, as applicable, or such Person's respective agents, representative, employees or Affiliates. Each Member will be responsible for any breaches or violations by its respective agents, representatives, employees and Affiliates of the obligations contained in this Section 9.4.

10.   TAX MATTERS PARTNER

10.1   Tax Matters Partner; Taxpayer Representative.

(a)   Unless and until another Member is designated as the tax matters partner by the Board of Managers, Bronco shall be the Tax Matters Partner of the Company as provided in the Regulations under Code Section 6231 and any analogous provisions of state law and in such capacity is referred to as the "Tax Matters Partner." The Tax Matters Partner, on behalf of

-- 28 --

PX23: Declaration of Lashanda Freeman
Attachment A: Page 34

the Company and its Members, shall be permitted to make any election or filing under the Code, the Regulations, or any other law or regulations that it in good faith believes is authorized, permitted or required under the terms of this Agreement.   If so instructed by the Board of Managers, the Tax Matters Partner shall make an election pursuant to Code Section 754 with respect to the Company in accordance with the procedures set forth in the applicable Regulations.

(b)     Effective for tax years of the Company beginning after December 31, 2017, the Tax Matters Partner shall be the Partnership Representative for purposes of the Code, except to the extent that the Tax Matters Partner resigns or does not qualify as a Partnership Representative for purposes of the Code, in which case the Board of Managers shall make an alternative designation of a Partnership Representative.

(c)     The Partnership Representative shall promptly notify the Board of Managers upon the receipt of a notice of final partnership adjustment and shall take such actions as directed by the Board of Managers in writing within thirty (30) days after the receipt of such notice, including whether to file a petition in court of competent jurisdiction, cause the Company to pay the amount of any such adjustment to the tax authorities, make a Small Partnership Election (to the extent permitted to be made under applicable law), or make an Adjusted K-1 Election.  By execution of this Agreement, the Members hereby consent to any Small Partnership Election (to the extent permitted to be made under applicable law) and any Adjusted K-1 Election if the Members elect to make either such election.

(d)     No later than fifteen (15) days after the Partnership Representative has knowledge of any audit or examination of the Company's affairs by tax authorities, the Partnership Representative shall notify the Board of Managers of the existence of such audit or examination.  Each Member shall have the right to have a tax advisor of its own choosing participate in, but not direct, the prosecution or defense of such audit or examination at such Member's sole expense. The Partnership Representative shall make reasonable efforts to facilitate such tax advisor's participation.

(e)     To the extent that the Partnership Representative does not make the Adjusted K-1 Election with respect to a material imputed underpayment amount (determined in the sole discretion of the Partnership Representative), the Partnership Representative shall use reasonable efforts (i) to make any modifications available under Code Section 6225(c), as amended by Section 1101 of the Bipartisan Budget Act of 2015, and (ii) if requested by a Member, to provide to such Member information that will allow such Member to file an amended U.S. federal income tax return, pursuant to the procedure set forth in Code Section 6225(c)(2), as amended by Section 1101 of the Bipartisan Budget Act of 2015, to the extent that the filing of such amended return and the payment of any U.S. federal income taxes due in relation to such amended return would reduce any taxes payable by the Company with respect to the imputed underpayment amount (after taking into account any modifications described in the preceding clause (i)).

(f)     The obligations of each Member or former Member under this Section 10.1 shall survive the transfer, redemption or termination by such Member of an interest in the Company, as well as the termination, dissolution, liquidation and winding up of the Company.

- 29 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 35

(g)    To the extent that a portion of the tax liabilities imposed under Code Sections 6221(a) and 6225, as amended by Section 1101 of the Bipartisan Budget Act of 2015, relates to a former Member, the Partnership Representative may require such former Member to indemnify the Company for such former Member's allocable portion of such tax liabilities. Each Member acknowledges that, notwithstanding the transfer, redemption or termination of all or any portion of its interest in the Company, it may remain liable for tax liabilities with respect to its allocable share of income and gain of the Company for the Company's taxable years (or portions thereof) prior to such transfer, redemption or termination.

(h)    Notwithstanding Section 19.1, the Members may propose, and the Members shall, by virtue of this Agreement, agree to, any amendment to the provisions of this Agreement required to appropriately reflect the proposal or promulgation of Treasury Regulations implementing Sections 6221 through 6241 of the Code, as amended by Section 1101 of the Bipartisan Budget Act of 2015, or any amendment thereof, or regulations, notices or other guidance issued thereunder.

(i)    In the event the Company pays any amount of federal income taxes, interest or penalties pursuant to the provisions of Sections 6221 through 6241 of the Code, as amended by Section 1101 of the Bipartisan Budget Act of 2015, such payment shall be treated as an expense of the Company or as a Distribution to one or more of Members, as the Board of Managers shall determine is appropriate and consistent with this Agreement.

10.2    Indemnity of Tax Matters Partner and Taxpayer Representative. The Company shall indemnify and reimburse the Tax Matters Partner and Taxpayer Representative for all actual and reasonable and documented expenses (including legal and accounting fees) incurred as Tax Matters Partner or Taxpayer Representative, as applicable, pursuant to this Article 10 in connection with any administrative or judicial proceeding with respect to the tax liability of the Members attributable to Interests in the Company.

10.3    Tax Returns. All tax returns of the Company shall be prepared by independent certified public accountants selected by the Tax Matters Partner.

11.    TRANSFER OF INTERESTS

11.1    Transfer Restrictions.

(a)    *Common Units.* Except as otherwise permitted by, and subject to, this Article 11, no Unit Holder may Transfer any Units or any right or interest therein (but excluding a direct or indirect Transfer of any equity interests or economic interests of an Initial Member), whether voluntarily or involuntarily, by operation of law, court order, foreclosure, marital property division or otherwise, without first obtaining written approval of Bronco and OCP, and then only in accordance with all applicable laws, including any federal and state securities laws, and this Agreement; provided, however, that no Unit Holder shall Transfer all or any portion of such Units or any right or interest therein (but excluding a direct or indirect Transfer of any equity interests or economic interests of an Initial Member) at any time if such Transfer would violate applicable laws, including federal or state securities laws, or this Agreement. Any such purported Transfer in violation of any provision of this Agreement and all actions by the

- 30 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 36

purported transferor and transferee in connection therewith shall be of no force or effect and the Company shall not be required to recognize such purported Transfer for any purpose, including for purposes of Distributions, dividends, and voting rights (if any).  If any Transfer of Units (but excluding a direct or indirect Transfer or any equity interests or economic interests of an Initial Member) is made or attempted contrary to the provisions of this Agreement, the Company and the Common Unit Holders shall have the right to purchase such Units from the owner thereof or the Unit Holder's transferee at a purchase price determined in accordance with Section 11.6.  In addition to any other legal or equitable remedies the Company and the non-breaching Members may have, the Company and the non-breaching Members may enforce this right by actions for specific performance, to the extent permitted by law.  The Company may also refuse to recognize any purported transferee (but excluding a direct or indirect Transfer of any equity interests or economic interests of an Initial Member) and may continue to treat the transferring Unit Holder as a Member for all purposes, including for purposes of Distributions, dividends, and voting rights (if any), until all applicable provisions of this Agreement have been complied with.  In the event that any Units to be purchased by the Company and/or the Common Units Holders are not already in the Company's or such the Common Units Holder's possession and the transferring Unit Holder fails to deliver such Units to the Company or the Common Units Holders, the Company may elect to (a) establish a segregated account in the amount of the purchase price, such account to be turned over to the selling Unit Holder upon delivery of such Units, and (b) immediately take such action as is appropriate to Transfer record title of such Units to the Company and/or the Common Units Holders and to treat the selling Unit Holder and such Units in all respects as if delivery of such Units had been made as required by this Agreement.  Each Unit Holder hereby irrevocably grants the Company a power of attorney which shall be coupled with an interest for the sole purpose of effectuating the provisions of the preceding sentence.  The remedies provided herein are cumulative and not exclusive of any other remedies provided herein or by applicable law.  Notwithstanding anything to the contrary contained herein, other than in connection with a Company Sale or as set forth in Section 11.2, (i) without written approval of Bronco and OCP, no Unit Holder may Transfer any Units (or any equity interests of such Unit Holder) to any competitor of the Company (or any of its Subsidiaries) or to any Affiliate of any competitor of the Company (or any of its Subsidiaries) and (ii) no holder of equity interests (including Class B Common Units and/or Class B Aggregator Common Units) issued under the Plan can Transfer any such equity interests without written approval of Bronco and OCP.

(b)      *Preferred Units*.  Except as otherwise permitted by, and subject to, this Article 11, no holder of Preferred Units may Transfer any Preferred Units or any right or interest therein, whether voluntarily or involuntarily, by operation of law, court order, foreclosure, marital property division or otherwise, without first obtaining written approval of the Board of Managers, and then only in accordance with all applicable laws, including any federal and state securities laws, and this Agreement; provided, however, that no holder of Preferred Units shall Transfer all or any portion of such Preferred Units or any right or interest therein at any time if such Transfer would violate applicable laws, including federal or state securities laws, or this Agreement.  Notwithstanding anything to the contrary contained herein, other than in connection with a Company Sale or as set forth in Section 11.2, without written approval of Bronco and OCP, no holder of Preferred Units may Transfer any Preferred Units (or any equity interests of such holder) to any competitor of the Company (or any of its Subsidiaries) or to any Affiliate of any competitor of the Company (or any of its Subsidiaries).  Any such purported Transfer in

- 31 -

violation of any provision of this Agreement and all actions by the purported transferor and transferee in connection therewith shall be of no force or effect and the Company shall not be required to recognize such purported Transfer for any purpose, including for purposes of Distributions, dividends, and voting rights (if any). The Company may also refuse to recognize any purported transferee (but excluding a direct or indirect Transfer of any equity interests or economic interests of an Initial Member) and may continue to treat the transferring holder of Preferred Units as a Member for all purposes, including for purposes of Distributions, dividends, and voting rights (if any), until all applicable provisions of this Agreement have been complied with.

11.2    <u>Transfers to Permitted Transferees</u>.  The restrictions on Transfer contained in <u>Section 11.1</u> shall not apply to Transfers (each a "<u>Permitted Transfer</u>") by (a) gift by a Member to a trust for the benefit of such Member or any Immediate Family Member of such Member, which trust is revocable solely by such Member; (b) a Member to his or her guardian or conservator, (c) a Member, in connection with estate planning purposes during his or her lifetime or in the event of his or her death, to his or her executor(s) or administrator(s) or to trustee(s) or Immediate Family Member under his or her will, or otherwise by will or the laws of descent and distribution, (d) a Member that is an entity, to holders of the equity securities of such Member (subject to <u>Section 11.1</u>), (e) a Member to any Affiliate of such Member, (f) OCP to any of its Affiliates or Affiliated funds or to their respective partners or members, or to any director, officer, or employee of, or consultant of advisor to, the Company, (g) by a Member to the Company pursuant to any repurchase rights exercised by the Company, including pursuant to <u>Section 11.8</u>, or the Plan, (h) a Member to another Member, (i) pursuant to a Public Offering and/or (j) an Initial Member solely of an economic interest in such Initial Member's Units (the transferee of any such Transfer in clause (a) through (j), a "<u>Permitted Transferee</u>"), provided, <u>however</u>, that in any such event the Units so transferred in the hands of any Permitted Transferee shall remain subject to this Agreement and each such Permitted Transferee that is not already a Member hereunder shall so acknowledge in writing, by executing a Joinder Agreement and such other documents as the Board of Managers may require and provided further that, in the case of a Transfer to a Permitted Transferee referred to in clause (a), (b), (c), or (j) for so long as such transferring Member remains alive and is not otherwise incompetent to vote such Interest, such transferring Member retains all voting rights associated with such Transferred Interest. <u>Schedule 3.1</u> attached hereto shall be amended to reflect the addition of any such additional party to this Agreement pursuant to <u>Section 3.1</u>.  No Permitted Transfer or Transfer of Units to a Permitted Transferee shall be effective if the purpose of such transfer shall have been to circumvent the provisions of this Agreement.

11.3    <u>Transfers by Operation of Law</u>.  In the event that a Unit Holder (a) files a voluntary petition under any bankruptcy or insolvency law or a petition for the appointment of a receiver or makes an assignment for the benefit of creditors, (b) is subjected involuntarily to such a petition or assignment or to an attachment or other legal or equitable interest with respect to the Unit Holder's Units and such involuntary petition or assignment or attachment is not discharged within sixty (60) days after its date of filing, or (c) is subject to a transfer of the Unit Holder's Units by operation of law (other than pursuant to <u>Section 11.2(a)</u>, <u>Section 11.2(b)</u>, or <u>Section 11.2(c)</u>, such Unit Holder shall promptly give written notice of such event to the Company. The Company (or its designee) or the other Common Unit Holders shall have the right to purchase all or any portion of such Unit Holder's Units at a purchase price determined in accordance with

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 38

Section 11.6 by giving written notice to such Unit Holder within thirty (30) days of its receipt of written notice of the applicable event under clause (a), (b), or (c) of this Section 11.3.

11.4    Prohibition on Encumbrances.    No Unit Holder may pledge, hypothecate or otherwise encumber such Unit Holder's Units in any way without written approval of Bronco and OCP.

11.5    Repurchase from Former Spouse.

(a)    Right of Member.    In the event of the dissolution of a Member's marriage, civil union, or domestic partnership, the Member shall have the right and option to purchase from his or her former Spouse all or any portion of his or her Units: (i) awarded to the former Spouse pursuant to a decree of dissolution of marriage, civil union, or domestic partnership, or any other order by any court of competent jurisdiction and/or by any property settlement agreement (whether or not incorporated by reference in any such decree) or (ii) gifted to the Spouse by the Member prior to the dissolution, at a purchase price determined in accordance with Section 11.6.  The Member shall exercise the Member's right, if at all, not later than thirty (30) days after the entry of any such decree or property settlement agreement by delivering to the Member's former Spouse a written notice of exercise, specifying the number of Units the Member elects to purchase.

(b)    Right of the Company.    In the event that the Member does not exercise the Member's right pursuant to Section 11.5(a) to purchase all of the Units awarded to his or her former Spouse, the Member shall deliver to the Company, not later than thirty (30) days after entry of such decree or property settlement agreement, a written notice of the number of Units that the Member has not purchased.  The Company shall then have the right to purchase directly from the Member's former Spouse, at a purchase price determined in accordance with Article 6, any Units not acquired by the Member.

(c)    Right of Non-Divorcing Members.    In the event that the Member does not exercise the Member's right pursuant to Section 11.5(a) and the Company does not exercise its right pursuant to Section 11.5(b), in each case, to purchase all of the Units awarded to such Member's former Spouse, the Member shall deliver to the other Members (other than holders of equity interests issued under the Plan) (the "Non-Divorcing Members"), not later than thirty (30) days after the expiration of the applicable period in Section 11.5(b), a written notice of the number of Units that the Member and the Company have not purchased.  Each of the Non-Divorcing Members shall then have the right to purchase directly from the Member's former Spouse, at a purchase price determined in accordance with Section 11.6, as applicable, a number of Units equal to the product of (i) the Units not acquired by the Member or the Company multiplied by (ii) a fraction, the numerator of which is the number of Units (other than holders of equity interests issued under the Plan) held by the Non-Divorcing Member, as applicable, and the denominator of which is the total number of Units held by the Persons electing to exercise its right pursuant to this Section 11.5(c).

(d)    Retention of Units by Spouse.  If any Spouse's Units are not purchased by such Member, the Company, or the Non-Divorcing Members, such Spouse's Units may be retained by the former Spouse, upon such Spouse's execution of a Joinder Agreement.  Unless

- 33 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 39

admitted as a substituted Member, such former Spouse shall have none of the powers of a Member hereunder (including voting rights) and shall have only such rights of a transferee under the Act as are consistent with this Agreement. Schedule 3.1 attached hereto shall be amended to reflect the addition of any such additional party to this Agreement pursuant to Section 3.1.

(c)   Consent of Spouse.   If a Member is married or party to a civil union or domestic partnership as of the date of this Agreement, the Member's Spouse shall execute a Consent of Spouse in the form of Exhibit B attached hereto. Such consent shall not be deemed to confer or convey to the Spouse any rights in the Units that do not otherwise exist by operation of law or the agreement of the parties. If a Member marries, remarries, or enters into a new civil union or domestic partnership, in each case, subsequent to the date hereof, the Member shall, not later than sixty (60) days thereafter, obtain his or her new Spouse's acknowledgement of and consent to the existence and binding effect of all restrictions contained in this Agreement by such Spouse's executing and delivering a Consent of Spouse in the form of Exhibit B attached hereto.

11.6   Purchase Price.   The final and determinative purchase price of each Unit purchased pursuant to Sections 11.3, and 11.5 shall be the Fair Market Value per Unit. For the avoidance of doubt, the determination of Fair Market Value shall be based on the amounts that would be distributable in respect of such Units under the terms of this Agreement, including any adjustments necessary to reflect the portion of any Tax Distributions that were previously made in respect of such Interests but not charged against other distributions in respect of such Interests. In the event any affected Unit Holder objects to the valuation determined pursuant to this Section 11.6 and the Company and such Unit Holder are unable to agree upon such valuation within ten (10) days of such objection, such Unit Holder shall have the right to retain (at such Unit Holder's expense) an independent third party valuation; provided, however, that in the event the Company objects to the valuation determined by such Unit Holder's third party appraiser, the Company's appraiser and such Unit Holder's appraiser shall appoint a third appraiser and such third appraiser shall determine a value of the Company, which shall be conclusive and binding. The fees and expenses of such third appraiser shall be borne by the party whose appraisal value was further from the value determined by the third appraiser. The value so determined shall be equitably adjusted to reflect any subsequent stock dividend, stock split, reverse split, recapitalization, or similar transaction of the Company.

11.7   Drag-Along Rights.

(a)   If a Company Sale has been approved by OCP and Bronco pursuant to Section 3.8 (and any other approvals required by law and under the terms and conditions of this Agreement) (each such Company Sale, an "Approved Sale"), each Member shall be obligated, as applicable, to (A) vote all of such Member's Units (whose ownership of any Units entitles such Member to voting rights) in favor of, and not object to, the Approved Sale, (B) transfer all of the Units which such Member then holds, of record or beneficially, in connection with such Approved Sale, (C) cooperate with Bronco and OCP and the purchaser in any such Approved Sale, (D) waive (to the extent permitted under applicable law) any dissenters' rights, appraisal rights or similar rights to which such Member may be entitled under applicable law, and (E) execute and deliver all agreements, documents, and instruments (including purchase agreements) reasonably necessary to effectuate such Approved Sale, so long as the indemnification provisions therein do not allocate liability to such Member that is disproportionate to the liability allocated

- 34 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 40

to the other Members as determined based on the percentage of total proceeds paid to the Members in connection with such Approved Sale.

(b)  Subject to Section 11.7(c), if the Approved Sale is structured:

(i)  as a sale of equity securities, each Unit Holder will agree to sell up to all of such Member's Units (on a pro rata basis, based on the aggregate number of Units which are to be transferred by Bronco and OCP) on the same terms as Bronco, OCP and the other Members participating in such Approved Sale, and each holder of Preferred Units that have not been converted pursuant to Section 3.2(c) will agree to sell up to all of such Member's Preferred Units (on a pro rata basis, based on the aggregate number of Units which are to be transferred by Bronco and OCP); or

(ii)  as a sale of assets, each Member will vote in favor of any subsequent Liquidation or other distribution of the proceeds therefrom, as approved by the Members in accordance with Section 3.8, so long as such subsequent liquidation or other distribution of the proceeds is in accordance with this Agreement.

(c)  If the Approved Sale is structured as a (i) sale of assets, upon the consummation of the Approved Sale, each Member will receive the same portion of the aggregate consideration available to be distributed to the Members (in their capacity as such) that such Members (in their capacity as Members) would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in this Agreement as in effect immediately before such Approved Sale in accordance with Section 5.1(c); or (ii) sale of equity securities, then each Member will be entitled to Distributions in accordance with Section 5.1(c). If any Member is given an option as to the form and amount of consideration to be received, each Member participating in such Approved Sale shall be given the same option.

(d)  Subject to the provisions of this Section 11.7(d) and Section 11.7(g), each Member participating in such Approved Sale will be obligated to join all other Members on a pro rata basis (determined in accordance with the portion of the aggregate proceeds received by all Members in connection with such Approved Sale) and on the same terms in any purchase price adjustments, indemnification, escrow arrangement, or similar financial or economic obligations that the sellers of Units are required to provide in connection with such Approved Sale.  Each Unit Holder (other than OCP) agrees to appoint Bronco (or any of its designees) as the "Sellers' Representative" (or similar term) in connection with an Approved Sale on standard and customary terms and conditions; provided, that if a Member (other than OCP) (whose ownership of any Units entitles such Member to voting rights) fails or refuses to vote or sell such Member's Units as required by, or votes such Member's Units in contravention of this Section 11.7, or refuses to execute documents as required hereby, such Member (other than OCP) hereby grants to Bronco or a designee approved by the prior written approval of OCP and Bronco an irrevocable proxy and such Member (other than OCP) hereby appoints Bronco as such Member's attorney in fact, to sell its Units and execute such documents in accordance with the terms of this Section 11.7.

LEGAL_US_W # 99102246.2

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 41

(e)     Subject to the provisions of this Section 11.7(e), each Member will bear such Member's pro rata share (determined in accordance with the portion of the aggregate proceeds received by all Members in connection with such Approved Sale) of the costs of any sale of such Units pursuant to an Approved Sale to the extent such costs are incurred for the benefit of all Unit Holders (including holders of equity interests issued under the Plan) and are not otherwise paid by the Company or the acquiring party; provided, that the liability of each such Member with respect to such costs shall be limited to the amount of aggregate consideration actually received by such Member in connection with such Approved Sale. Costs incurred by each Member on such Member's own behalf will not be considered costs of the Approved Sale; it being understood that the fees and disbursements of one (1) legal counsel chosen by the prior written approval of OCP and Bronco for the Company will be deemed to be for the benefit of all Members participating in such Approved Sale.

(f)     Subject to the provisions of this Section 11.7, at the closing of such Approved Sale, each Member shall deliver, against receipt of the consideration specified in the offer, the Unit Certificate(s) representing the Units, if any, which such Member holds of record or beneficially, with all endorsements necessary for Transfer. If the Units are certificated and any Member fails to deliver any Unit Certificate(s) representing such holder's Units, or fails to deliver in lieu thereof, a customary affidavit (with customary indemnification provisions) attesting to the loss or destruction of such Unit Certificate(s), such holder (i) will not be entitled to the consideration that such holder would otherwise receive in the Approved Sale until such holder cures such failure; provided, however, that, after curing such failure, such holder will be so entitled to such consideration without interest subject to all of the same terms, (ii) will be deemed, for all purposes, from and after the time at which such Unit Certificates were due for presentment, no longer to be a Member of the Company and will have no voting rights, (iii) will not be entitled to any dividends or other distributions declared after the Approved Sale with respect to the Company Securities held by such holder, (iv) will have no other rights or privileges granted to Members under this or any future agreement, and (v) in the event of liquidation of the Company, until such holder cures such failure, such holder will have no right to receive any of the consideration that such holder would have received if such holder had complied with this Section 11.7(f). Any payments due to such Member pursuant to this Section 11.7 shall be net of any reasonable costs and expenses incurred by the Company in connection with such holder's failure to deliver any certificate(s), if any, or a customary affidavit attesting to the loss or destruction of such certificate(s) pursuant to this Section 11.7(f).

(g)     For purposes of this Section 11.7, "the same terms" shall be deemed to mean (i) the making of all representations, warranties and covenants, (ii) the granting of all indemnifications on a pro rata basis and such indemnification shall be limited to such Member's applicable share (determined based on the respective proceeds payable to each Member in connection with such Approved Sale in accordance with the provisions of this Agreement) of a negotiated aggregate indemnification amount that applies equally to all Member but that in no event exceeds the amount of consideration allocated (and not necessarily paid) to such Member in connection with such Approved Sale, except with respect to claims related to fraud or intentional misrepresentation by such Member, unpaid taxes, or breach of a covenant by such Member, in each case, the liability for which need not be limited as to such Member, (iii) the liability for indemnification, if any, of such Member in the Approved Sale and for the inaccuracy of any representations and warranties made by the Company or all Members or any Member in

- 36 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 42

connection with such Approved Sale, is several and not joint with any other Person (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any Member of any of identical representations, warranties and covenants provided by all Members), (iv) each Member shall not be liable for the inaccuracy of any representation or warranty made by any other Person in connection with the Approved Sale, other than the Company (except to the extent that funds may be paid out of an escrow established to cover breach of representations, warranties and covenants of the Company as well as breach by any Member of any of identical representations, warranties and covenants provided by all Members), (v) the same type and form consideration, (vi) the same price per Unit or share being paid for each class or series of Company Securities being sold or transferred, unless otherwise agreed by the parties thereto, and (vii) similar agreements and arrangements (other than agreements not to compete or solicit employees or customers of the Company in connection with such Approved Sale, including Members who are executives or employees of the Company or its Subsidiaries being required to execute such non-compete and/or non-solicit restrictions), in each case reasonably agreed to in good faith by Bronco and OCP and not inconsistent with the other provisions of this <u>Section 11.7</u>, including participating on a pro rata basis in any escrow or holdback arrangements; <u>provided,</u> that nothing in this <u>Section 11.7</u> shall in any way restrict a Member from making additional representations, warranties and covenants, granting additional indemnifications, or accepting a lower per Unit purchase price than provided to other Members of the same class of Units so long as any such agreements do not negatively impact any such other Members.

11.8    <u>Repurchase Option.</u>

(a)    If a holder's (who holds of equity interests issued under the Plan, including Class B Aggregator Common Units) employment, engagement, or participation with the Company or any of its Subsidiaries or Affiliates is terminated (i) for Cause (as defined in such holder's employment agreement, or the Plan), (ii) due to such holder's resignation without Good Reason (as defined in such holder's employment agreement, or the Plan) or non-renewal, (iii) for Good Reason (as defined in such holder's employment agreement, or the Plan), (iv) without Cause, or (v) due to the death or disability of a holder of equity interests issued under the Plan, the Company shall have the right and option, but not the obligation, to cause Aggregator to purchase from such holder of equity interests issued under the Plan (including Class B Aggregator Common Units) and each Permitted Transferee, if any, for a period commencing on the termination date and ending on the earlier of (x) the one hundred and twentieth (120th) day following the termination date and (y) the date the Company causes Aggregator to provide such holder with written notice that it does not intend to exercise its repurchase rights hereunder (such period, the "<u>Repurchase Period</u>"), and such holder of equity interests issued under the Plan (including Class B Aggregator Common Units) and any of its Permitted Transferees shall be required to sell to Aggregator, and Aggregator shall sell to the Company, any or all of such vested equity interests issued under the Plan (including Class B Aggregator Common Units) then held by such holder and each Permitted Transferee, if any, at a price per Unit equal to (A) the lower of the original issue price or Fair Market Value measured as of the applicable termination date in the event of termination pursuant to clause (i) (for Cause) or (ii) (without Good Reason) of this <u>Section 11.8(a)</u> or (B) Fair Market Value measured as of the applicable termination date in the event of termination pursuant to clause (iii) (for Good Reason), (iv) (without Cause), or (v) (death or disability) of this <u>Section 11.8(a)</u>. Any unvested equity interests issued under the Plan

- 37 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 43

shall automatically be cancelled for no consideration upon a termination of such holder's employment for any reason, and such cancelled equity interests issued under the Plan shall be available to be reissued by the Company upon written approval of Bronco and OCP.

(b)     For purposes of this Section 11.8, and for the avoidance of doubt, the determination of Fair Market Value shall be based on the amounts that would be distributable in respect of such Interests under the terms of this Agreement, including any adjustments necessary to reflect the portion of any Tax Distributions that were previously made in respect of such Interests but not charged against other distributions in respect of such Interests.

(c)     If the Company desires to exercise its option to purchase any vested equity interests issued under the Plan pursuant to Section 11.8, the Company shall, not later than thirty (30) days prior to the end of the Repurchase Period, send or cause to be sent written notice to the holder thereof and each Permitted Transferee, if any, of its intention to purchase such vested equity interests issued under the Plan, specifying the number of vested equity interests issued under the Plan to be purchased by Aggregator (the "Repurchase Notice"). The closing of the purchase shall take place at the principal office of the Company or one of its Subsidiaries or Affiliates on a date specified by the Company no later than the thirtieth (30th) day after the giving of the Repurchase Notice.

(d)     If a holder of vested equity interests issued under the Plan has transferred all or a portion of such holder's vested equity interests issued under the Plan, the failure of any Permitted Transferee to perform its obligations hereunder shall not excuse or affect the obligations of any other Permitted Transferee, and the closing of the purchases from such other transferees by the Company shall not excuse, or constitute a waiver of its rights against, the defaulting transferee.

(e)     Except as otherwise provided in this Section 11.8(e), if at any time the Company elects to purchase any vested equity interests issued under the Plan pursuant to Section 11.8(a), the Company shall pay the purchase price for such vested equity interests issued under the Plan it purchases to Aggregator (to be used by Aggregator to repurchase the corresponding Class B Aggregator Common Units from such holder) (i) by the Company's delivery of a check or wire transfer of immediately available funds for the purchase price, if any, against delivery of the certificates or other instruments, if any, representing such vested equity interests issued under the Plan so purchased, duly endorsed or (ii) in the event such purchase of such vested equity interests issued under the Plan pursuant to Section 11.8(a) occurs prior to the earlier of (A) an initial Public Offering and (B) a Company Sale, the Company's delivery to Aggregator (to be used by Aggregator to repurchase the corresponding Class B Aggregator Common Units from such holder) of a subordinated unsecured promissory note (which shall be subordinated and subject in right of payment to the prior payment of any debt outstanding under any applicable financing agreements of the Company or any of its Subsidiaries or Affiliates and any modifications, renewals, extensions, replacements and refunding of all such indebtedness) of the Company bearing interest at the prime lending rate as reported in the *Wall Street Journal* on the repurchase date, which will be repayable upon the earliest to occur of (X) an initial Public Offering, (Y) a Company Sale, and (Z) the third (3rd) anniversary of the repurchase date.

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 44

(f)     Notwithstanding anything to the contrary contained herein, neither the Company nor Aggregator shall be obligated to purchase any vested equity interests issued under the Plan at any time pursuant to Section 11.8(a), regardless of whether it has delivered a Repurchase Notice, (i) to the extent that the purchase of such vested equity interests issued under the Plan or the payment to the Company or one of its Subsidiaries or Affiliates of a cash dividend or distribution to fund such purchase (together with any other purchases of vested equity interests issued under the Plan pursuant to Section 11.8(a) or pursuant to similar provisions in agreements with other holders of vested equity interests issued under the Plan of which the Company has at such time been given or has given notice and together with cash dividends and distributions to fund such other purchases) would result (A) in a violation of any law, statute, rule, regulation, policy, order, writ, injunction, decree or judgment promulgated or entered by any federal, state, local or foreign court or governmental authority applicable to the Company or any of its Subsidiaries or Affiliates or any of its or their property or (B) after giving effect thereto, in a default under any financing or credit document to which the Company or any of its Subsidiaries or Affiliates is a party, or (ii) if immediately prior to such purchase there exists a default under any financing or credit document to which the Company or any of its Subsidiaries or Affiliates is a party which prohibits such purchase, dividend or distribution. The Company shall, within fifteen (15) days of learning of any such fact, so notify the holders of such vested equity interests issued under the Plan and each Permitted Transferee, if any, that it is not obligated to purchase equity interests issued under the Plan.

(g)     The repurchase right under this Section 11.8 shall expire upon an initial Public Offering.

### 11.9   Rights of First Refusal on Voluntary Transfers.

(a)     Right of First Refusal of the Company.  Subject to Section 11.1, if at any time any Member (each, a "Selling Member") intends to Transfer any Units in a bona fide good faith Transfer (other than any Transfer pursuant to Sections 11.2, 11.5, 11.7, or 11.8), such Selling Member shall, prior to any such Transfer, give written notice (the "Selling Member's Notice") of such intention to the Company, the holders of Preferred Units and the Class A Common Unit Holders.  The Selling Member's Notice shall include the name of the proposed transferee, the proposed purchase price per Unit, the terms of payment of such purchase price, the closing arrangements for such Transfer, if available, and all other material matters, terms, and conditions relating to such sale and, to the extent available, shall be accompanied by a copy of a binding written agreement of the proposed transferee to purchase such Units from the Selling Member.  The Selling Member's Notice shall constitute a binding offer by the Selling Member to sell to the Company and the other Members pursuant to this Section 11.9 such number of Units then owned by the Selling Member as are proposed to be sold in the Selling Member's Notice (the "Offered Units") at the monetary price per Unit designated in the Selling Member's Notice, payable as provided in Section 11.9(c).  Not later than thirty (30) days after receipt of the Selling Member's Notice, the Company (or its designees) shall deliver written notice (the "Company Notice") to the Selling Member stating whether and to what extent the Company has accepted the offer stated in the Selling Member's Notice.  If the Company (or its designees) accepts the offer in the Selling Member's Notice, in whole or in part, the Company Notice shall fix a time, location, and date for the closing of such purchase, which date shall be not less than ten (10) nor more than sixty (60) days after delivery of the Company Notice.

- 39 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 45

(b)   <u>Right of First Refusal of the Other Members</u>.  If the Company (or its designees) fails to accept the offer stated in the Selling Member's Notice, or does not accept the offer for all of the Offered Units within the thirty (30) day period provided in <u>Section 11.9(a)</u>, then the Selling Member and the Company shall deliver the Selling Member's Notice to all of the holders of Preferred Units and Class A Common Unit Holders (in each case, the "<u>Buying Members</u>") and such Buying Members shall have the right to purchase their pro rata share of the remaining amount of Offered Units, and their pro rata share of any unsubscribed portion of such Offered Units, at the monetary price per Unit designated in the Selling Member's Notice, payable as provided in <u>Section 11.9(c)</u>.  For purposes of this <u>Section 11.9(b)</u>, each such Buying Member's pro rata share shall be the number of remaining Offered Units multiplied by a fraction, the numerator of which is the number of Units (other than holders of equity interests issued under the Plan) owned by such Buying Member on a Fully Diluted Basis (including any Units subject to lapsing repurchase restrictions) and the denominator of which is the number of Units (other than holders of equity interests issued under the Plan) owned by all of the holders of Preferred Units and Class A Unit Holders on a Fully Diluted Basis (other than holders of equity interests issued under the Plan), except the Selling Member (including any Units subject to lapsing repurchase restrictions).  Not later than thirty (30) days following the Buying Member's receipt of the Selling Member's Notice, each of the Buying Members shall deliver to the Selling Member and to the Company a written notice (the "<u>Buying Members' Notice</u>") stating how many Units such Buying Member intends to purchase up to its pro rata share, and stating the amount of unsubscribed Offered Units it would like to purchase (if any), in each case, on the terms stated in the Selling Member's Notice.  If one or more of the Buying Members accepts the offer of the Selling Member, the Company and such Buying Member shall fix a time, location, and date for the closing of such purchase, which date shall be not less than ten (10) nor more than sixty (60) days after proper delivery of the last Buying Members' Notice to the Company. If, as a result thereof, (i) oversubscriptions exceed the total number of remaining Offered Units available in respect of such oversubscription privilege, the oversubscribing Buying Members shall be reduced with respect to their oversubscriptions on a pro rata basis in accordance with their pro rata share as formulated herein or as they may otherwise agree among themselves or (ii) Offered Units remain available, then the Buying Members having timely delivered a Buying Member's Notice shall have an additional fifteen (15) days to determine whether to purchase any or all of such remaining Offered Units and if there is an oversubscription, the terms of clause (i) of this sentence shall apply *mutatis mutandis*.

(c)   <u>Closing</u>.  The place for the closing of any purchase and sale described in <u>Section 11.9(a)</u> or <u>Section 11.9(b)</u> shall be the principal office of the Company or at such other place as the parties shall agree.  At such closing, the Selling Member shall accept payment on the terms offered by the proposed transferee named in the Selling Member's Notice; <u>provided, however</u>, that the Company and the Buying Member shall not be required to pay any non-cash consideration.  If the consideration is non-cash consideration, then the Fair Market Value of the consideration shall be as determined in good faith by the prior written approval of OCP and Bronco, and the Company and/or such Buying Member may pay the cash value equivalent thereof, as determined in good faith by the prior written approval of OCP and Bronco.  At the closing, the Selling Member shall deliver to the Company and/or the Buying Members, as the case may be, in exchange for Units purchased and sold at the closing, certificates for the number of Units stated in the Selling Member's Notice, accompanied by duly executed instruments of

- 40 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 46

transfer or, in the event the Units are not certificated, an executed assignment of Units or similar document, which represents the number of Units stated in the Selling Member's Notice.

(d)     Transfers to Third Parties.  If the Company and the Buying Members fail to accept the offer stated in the Selling Member's Notice in full, then the Selling Member, subject to the Co-Sale Rights to participate in such sale pursuant to Section 11.10, shall be allowed to sell the remaining Offered Units to the designated transferee at a price and on terms no less favorable to the Selling Member than described in the Selling Member's Notice; provided, however, that such sale is consummated within ninety (90) days after the later of the expiration of the period in which the Company may provide the Company Notice and the expiration of the period in which the Buying Members may provide the Buying Member's Notice.  As a condition precedent to the effectiveness of a Transfer pursuant to this Section 11.9(d), the proposed transferee(s) shall agree in writing prior to such Transfer to become a party to this Agreement by executing and delivering a Joinder Agreement.  Schedule 3.1 attached hereto shall be amended to reflect the addition of any such additional party to this Agreement pursuant to Section 3.1.

11.10  Co-Sale Rights.

(a)     Subject to Section 11.1 and Section 11.9, in the event that any Unit Holder (the "Co-Sale Selling Member") elects to Transfer any Units (other than any Transfer pursuant to Sections 11.2, 11.5, 11.7, or 11.8), each other Unit Holder (other than holders of equity interests issued under the Plan, in their respective capacity as such) (a "Co-Seller") shall have the right to Transfer to the proposed transferee, as a condition to such sale by such Co-Sale Selling Member, at the same price per Unit and on the same terms and conditions (including form of consideration) as involved in such proposed Transfer to the proposed transferee by such Co-Sale Selling Member, an amount of Units (other than holders of equity interests issued under the Plan) equal to the product of (x) the number of Units (other than holders of equity interests issued under the Plan) held by such Co-Seller multiplied by (y) a fraction, (A) the numerator of which is equal to the number of Units (other than holders of equity interests issued under the Plan) proposed to be Transferred by such Co-Sale Selling Member and (B) the denominator of which is equal to the number of Units (other than holders of equity interests issued under the Plan) held by such Co-Sale Selling Member; provided, however, that in the event the number of Units proposed to be Transferred by the Co-Sale Selling Member and each Co-Seller is in excess of the number of Units the proposed transferee initially agreed to purchase, and the proposed transferee does not agree to purchase such excess Units, then the number of Units to be Transferred by the Co-Sale Selling Member and the Co-Sellers to the proposed transferee shall be reduced on a pro rata basis such that the Co-Sale Selling Member and each Co-Seller Transfers a number of Units determined by multiplying (i) the number of Units which the transferee has agreed to purchase by (ii) a fraction, the numerator of which shall be the number of Units (other than holders of equity interests issued under the Plan) owned by such Co-Sale Selling Member or Co-Seller, as the case may be, and the denominator of which shall be the number of Units (other than holders of equity interests issued under the Plan) owned by such Co-Sale Selling Member and all participating Co-Sellers on a Fully Diluted Basis (other than holders of equity interests issued under the Plan).  Prior to any such Transfer, the Co-Sale Selling Member shall give written notice (the "Co-Sale Selling Member's Notice") of such intention to the other Members.  The Co-Sale Selling Member's Notice shall include the name of the proposed transferee, the

– 41 –

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 47

proposed purchase price per Unit, the terms of payment of such purchase price, the closing arrangements for such Transfer, if available, and all other material matters relating to such Transfer and shall be accompanied by a copy of a binding written agreement of the proposed transferee to purchase such Units from the Seller Member.

(b)     Any Co-Seller may elect to participate in the contemplated Transfer on the same terms by delivering a written notice (an "Election Notice") to the Co-Sale Selling Member within fifteen (15) days after receipt of the Co-Sale Selling Member's Notice pursuant to Section 11.10(a), and each such Co-Seller may elect to Transfer in the contemplated transaction up to such Co-Seller's pro rata share as set forth in Section 11.10(a). If any Member fails to timely deliver an Election Notice to the Co-Sale Selling Member, such Member shall be deemed to have waived any right to participate in the Transfer. In the event that the number of Units proposed to be Transferred by the Co-Sale Selling Member and each Co-Seller is less than the number of Units the proposed transferee initially agreed to purchase, each Co-Seller having properly exercised its right pursuant to this Section 11.10(b) shall have fifteen (15) days to elect to Transfer an additional number of Units and in the event that following such election the aggregate number of Units to be Transferred to the proposed transferee exceeds the number of Units the proposed transferee initially agreed to purchase the terms of the proviso in the first sentence of Section 11.10(a) shall apply *mutatis mutandis* Solely for the sake of clarity, if any Member elects to participate in the contemplated Transfer by delivering an Election Notice, assuming the Co-Sale Selling Member has properly complied with the terms of Section 11.9, such Co-Seller shall not be required with respect to such Units being Transferred pursuant to this Section 11.10 to comply with the terms of the Right of First Refusal set forth in Section 11.9 or to provide the other Member's with the Co-Sale Right pursuant to this Section 11.10.

(c)     Each participating Co-Seller shall deliver to the Co-Sale Selling Member for transfer to the proposed transferee one or more certificates, duly endorsed or accompanied by duly executed stock powers, or, in the event the Units are not certificated, an executed assignment of Units or similar document, in each case, which represent the number of Units such party is permitted to sell pursuant to this Section 11.10. The certificates which each Co-Seller delivers to the Co-Sale Selling Member shall be Transferred by the Co-Sale Selling Member to the proposed transferee in consummation of the Transfer of the Units pursuant to the terms and conditions specified in the Co-Sale Selling Member's Notice and the Company, on behalf of the Co-Sale Selling Member, shall receive the proceeds therefrom and promptly thereafter remit to the Co-Sale Selling Member and each participating Co-Seller that portion of the sale proceeds to which each of them is entitled by reason of its participation in such Transfer.

(d)     At all times prior to consummation of a Transfer or entry by a Co-Seller into a binding agreement with the proposed transferee with respect to a Transfer, such Co-Seller shall be free to withdraw its participation in such Transfer. The Co-Sale Selling Member shall have no liability to any other Member if any Transfer proposed to be made pursuant to this Section 11.10 is not consummated.

(e)     The purchase agreement for the sale of Units by any Co-Seller shall not contain indemnification provisions that (i) allocate liability to a Co-Seller that is disproportionate to the liability allocated to the other Members thereto as determined based on the percentage of total proceeds paid to the Members in connection with such sale, or (ii) provide for any

PX23: Declaration of Lashanda Freeman
Attachment A: Page 48

indemnity or payment obligation by any Co-Seller in excess of the proceeds received by such Co-Seller with respect to his, her or its Units, other than in the event of fraud or willful misconduct or breaches by such Co-Seller of such Co-Seller's covenants and/or fundamental representations and warranties (which representations and warranties the parties agree shall be limited to title, authority, ownership, organization, no brokers, no transaction costs, and compliance with securities laws).

(f)    For the avoidance of doubt, holders of Preferred Units shall be permitted to participate in a proposed Transfer of Units pursuant to this Section 11.10 only to the extent that such Preferred Units have been converted into Class A Common Units pursuant to Section 3.2(c).

## 12.    PLAN; PARTICIPATION RIGHTS OF CERTAIN MEMBERS

12.1    Plan.  The Board of Managers may establish equity incentives for incentivizing employees and other Persons who provide services to, or on behalf of, the Company, including the terms and conditions of the Plan and similar arrangements.

12.2    Right to Participate in Certain Sales of Additional Securities.

(a)    The Company agrees that neither it nor any Subsidiary will sell or issue or agree to sell or issue (i) any Units or other equity securities of the Company or any Subsidiary (including in connection with any equity financing of the Company in which either OCP or Bronco are offered an opportunity to participate in such equity financing), (ii) securities convertible into or exercisable or exchangeable for Units or other equity securities of the Company or any Subsidiary, or (iii) options, warrants, convertible debt or rights carrying any rights to purchase Units or other equity securities of the Company or any Subsidiary (collectively, the "Company Securities"), unless the Company (A) submits a written notice to all Class A Common Unit Holders and holders of Preferred Units (in each case, a "Participating Member" and collectively, the "Participating Members") identifying the terms of the proposed sale (including price, number or aggregate principal amount of securities and all other material terms), and (B) offers to each Participating Member the opportunity to purchase its Participating Share (or any portion thereof) of the Company Securities (subject to increase for over-allotment if any Participating Member does not fully exercise his, her, or its respective right) on terms and conditions, including price, no less favorable than those on which the Company proposes to sell such Company Securities to the Participating Members or to a third party or parties (a "Pre-Emptive Right Notice").  The Company's offer pursuant to this Section 12.2 with respect to such Units shall remain open and irrevocable for a period of thirty (30) days following receipt by the Participating Members of the Pre-Emptive Right Notice; provided; that each Participating Member shall be entitled to waive its pre-emptive rights set forth in this Section 12.2.

(b)    Acceptance.  Each Participating Member shall have the right to purchase its Participating Share (or any portion thereof) of the Company Securities determined on a Fully Diluted Basis (other than holders of equity interests issued under the Plan) by giving written notice of such intent to participate (the "Pre-Emptive Right Acceptance Notice") to the Company within fifteen (15) days after receipt by the Participating Members of the Pre-Emptive Right Notice.  Each Pre-Emptive Right Acceptance Notice shall indicate the maximum number of

- 43 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 49

Company Securities subject thereto which such Participating Member wishes to purchase, and stating the amount of unsubscribed Company Securities such Participating Member would like to purchase (if any), in each case, on the terms and conditions stated in the Pre-Emptive Right Notice. If, as a result thereof, oversubscriptions exceed the total number of Company Securities available in respect of such oversubscription privilege, the oversubscribing equity holders shall be reduced with respect to their oversubscriptions on a pro rata and Fully Diluted Basis (other than holders of equity interests issued under the Plan) in accordance with their Participating Share as formulated herein or as they may otherwise agree among themselves.

(c)   <u>Sale to Third Party</u>.   Any Company Securities so offered that are not purchased by the Participating Members pursuant to the offer set forth in <u>Section 12.2</u> may be sold by the Company, but only on terms and conditions not more favorable to the third party purchaser than those set forth in the Pre-emptive Right Notice, at any time after five (5) days but within ninety (90) days following the termination of the above-referenced thirty (30)-day period, but may not be sold to any other Person or on terms and conditions, including price, that are more favorable to the third party purchaser than those set forth in such offer or after such ninety (90)-day period without again complying with this <u>Section 12.2</u>.

(d)   <u>Exceptions to Pre-Emptive Rights</u>.   Notwithstanding the foregoing, the right to purchase Company Securities granted under this <u>Section 12.2</u> shall not be applicable with respect to Exempted Securities.

(e)   <u>Interim Issuances</u>.   Notwithstanding anything to the contrary in the foregoing, the Company or a Subsidiary may proceed with the issuance of the Company Securities prior to offering such Company Securities to the Participating Members; <u>provided, however</u>, that the Company delivers the Pre-Emptive Right Notice to the Participating Members in connection with or promptly after such issuance and thereafter complies with valid elections in accordance with the Pre-Emptive Right Acceptance Notices by the Company issuing the requisite number of Company Securities on the terms and conditions set forth in the Pre-Emptive Right Notice (giving effect to the interim issuances pursuant to this <u>Section 12.2(e)</u>).

(f)   <u>Debt Transactions</u>.   In the event any Member proposes to make or participate as a lender in making a loan to or purchasing debt securities from the Company or any Subsidiary (each such transaction, a "<u>Debt Transaction</u>"), each other Member (other than holders of equity interests issued under the Plan) shall have the right, but not the obligation, to participate in such Debt Transaction on the same terms and conditions as such Member, and such Debt Transaction shall be subject to the provisions of this <u>Section 12.2</u> as if such loan or debt security was a Company Security.

13.   LOCK-UP.   In the event of an initial Public Offering, without the prior written consent of the underwriters managing any such initial Public Offering, for a period beginning seven (7) days immediately preceding and ending on the one hundred eightieth (180th) day following the effective date of the registration statement used in connection with such initial Public Offering, no Member may (a) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer, directly or indirectly, any equity securities of the Company or any securities convertible into or exercisable or exchangeable for such equity securities or (b) enter into any

LEGAL_US_W # 99102246.2

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 50

swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any equity securities of the Company, whether any such transaction described in clause (a) or (b) above is to be settled by delivery of such equity securities or such other securities, in cash or otherwise. The foregoing provisions of this Article 13 shall not apply (i) to transactions relating to shares of any equity securities of the Company or other securities acquired in open market transactions after the completion of such initial Public Offering, (ii) during the period preceding the execution of the underwriting agreement in connection with an underwritten offering, transfers to a charitable organization, (iii) to the sale of any shares to an underwriter pursuant to an underwriting agreement, or (iv) if all officers, directors and holders of greater than two percent (2%) of the Company's issued and outstanding Units determined on a Fully Diluted Basis on the date thereof do not enter into similar agreements. In the event that either (x) during the last seventeen (17) days of the 180-day period referred to above, the Company issues an earnings release or a press release announcing a significant event or (y) prior to the expiration of such 180-day period, the Company announces that it will release earnings results or issue a press release announcing a significant event during the 17-day period beginning on the last day of such 180-day period, the restrictions described above shall continue to apply until the expiration of the 17-day period beginning on the date of the earnings release or the significant event press release. The underwriters in connection with the initial Public Offering are intended third-party beneficiaries of this Article 13 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Each Member further agrees to execute such agreements as may be reasonably requested by the underwriters in the initial Public Offering that are consistent with this Article 13 or that are necessary to give further effect thereto.

14.     INFORMATION RIGHTS.  For as long as (a) any holder of Class A Common Units (together with its Affiliates) owns, beneficially or of record (or possesses the right to acquire upon the conversion of any Units of the Company) ten percent (10%) or more of the Company's issued and outstanding Class A Common Units determined on a Fully Diluted Basis and (b) MM, Bronco, OCP, or Cardozo (or any of their respective Affiliates) is a Member, the Company shall furnish the following information to such Members at the times indicated:

    14.1    Annual Financial Statements.  As soon as practicable after the end of each Fiscal Year of the Company, and in any event within one hundred thirty five (135) days thereafter, a consolidated balance sheet of the Company and its Subsidiaries as at the end of such Fiscal Year, and consolidated statements of income and cash flows of the Company and its Subsidiaries for such year, prepared in accordance with a method of accounting that is acceptable for the preparation of tax returns and/or the provision of financial information to the Company's creditors.

    14.2    Quarterly Financial Statements.  As soon as practicable after the end of the first, second and third quarterly accounting periods in each Fiscal Year of the Company, and in any event within forty-five (45) days thereafter, a consolidated balance sheet of the Company and its Subsidiaries as at the end of such quarterly period, and consolidated statements of income and cash flows of the Company and its Subsidiaries for such period and for the current Fiscal Year to date, prepared in accordance with a method of accounting that is acceptable for the preparation of tax returns and/or the provision of financial information to the Company's creditors.

LEGAL_US_W # 99102246.2

## 15.  DISSOLUTION OF COMPANY

15.1    <u>Termination of Membership</u>.  No Member shall resign or withdraw from the Company except that, subject to the restrictions set forth in <u>Article 11</u>, any Member may Transfer its Interest in the Company to a transferee and a transferee may become a Member in place of the Member assigning such Interest.

15.2    <u>Events of Dissolution</u>.  Subject to Section 3.8, the Company shall be dissolved upon the happening of any of the following events (each, a "<u>Dissolution Event</u>"): (a) the entry of a decree of judicial dissolution under Section 18-802 of the Act, (b) the written determination of Bronco and OCP, (c) the disposition, in one or a series of transactions, of all or substantially all of (i) the assets of the Company and its Subsidiaries, or (ii) the equity of the Company and its Subsidiaries, in each case, taken as a whole, (d) an event which makes it unlawful for the Company to carry on its business pursuant to a non-appealable order from a court of competent jurisdiction; or (e) the occurrence of any other event that requires dissolution of the Company under the Act.

15.3    <u>Liquidation</u>.  Upon dissolution of the Company for any reason, the Company shall promptly commence to wind up its affairs.  A reasonable period of time shall be allowed for the orderly termination of the Company's business, payment and discharge of all debts and liabilities of the Company to creditors in the order of priority as provided by law and consistent with this Agreement, and of the costs and expenses of liquidation, establishment of such reserves as deemed reasonably necessary or advisable, or as required by the Act, and distribution or liquidation of the remaining assets in compliance with Section 5.1. A full accounting of the assets and liabilities of the Company shall be taken and a statement thereof shall be furnished to each Member promptly after the distribution of all of the assets of the Company.   Such accounting and statements shall be prepared under the direction of the Board of Managers.

15.4    <u>No Action for Dissolution</u>.  The Members acknowledge that irreparable damage would be done to the goodwill and reputation of the Company if any Member should bring an action in court to dissolve the Company under circumstances where dissolution is not required by <u>Section 15.2</u>.  This Agreement has been drawn carefully to provide fair treatment of all parties and equitable payment in liquidation of the Interests of all Members.  Accordingly, except where the Members have failed to liquidate the Company as required by <u>Section 15.3</u> and except as specifically provided in Section 18-802(a) of the Act, each Member hereby waives and renounces its right to initiate legal action to seek dissolution or to seek the appointment of a receiver or trustee to liquidate the Company.

15.5    <u>No Further Claim</u>.  Upon dissolution, each Member shall have recourse solely to the assets of the Company for the return of such Member's capital, and if the Company's property remaining after payment or discharge of the debts and liabilities of the Company, including debts and liabilities owed to one or more of the Members, is insufficient to return the aggregate Capital Contributions of each Member, such Member shall have no recourse against the Company, or any other Member.

## 16.  INDEMNIFICATION

LEGAL_US_W # 99102246.2

16.1    Indemnification.

(a)    To the fullest extent permitted by applicable law, the Company shall indemnify, defend, and hold harmless the each Member, including the Tax Matters Partner in such Member's capacity as such, each such Person's Affiliates and its and their officers (including the Company's officers), directors (including each Person serving on the Company's Board of Managers), partners, members, shareholders, equity holders, employees, accountants, counsel, agents and representatives, and the employees, officers, accountants, counsel, agents and representatives of the Company (all indemnified persons being referred to as "Indemnified Persons" for purposes of this Agreement), from any liability, loss or damage incurred by the Indemnified Person by reason of any act performed or omitted to be performed by the Indemnified Person in connection with the business of the Company and from liabilities or obligations of the Company imposed on such Person by virtue of such Person's position with the Company, including reasonable attorneys' fees and costs and any amounts expended in the settlement of any such claims of liability, loss or damage; provided, however, that if the liability, loss, damage or claim arises out of any action or inaction of an Indemnified Person, indemnification under this Section 16.1 shall be available to the Indemnified Person only if (i) either (A) the Indemnified Person, at the time of such action or inaction, determined in good faith that its, his or her course of conduct was in, or not opposed to, the best interests of the Company or (B) in the case of inaction by the Indemnified Person, the Indemnified Person did not intend its, his or her inaction to be harmful or opposed to the best interests of the Company and (ii) the action or inaction did not constitute fraud, willful misconduct, gross negligence, or criminal conduct by the Indemnified Person; provided, further, however, that indemnification under this Section 16.1 shall be recoverable only from the assets of the Company and not from any assets of the Members.  The Company shall pay or reimburse reasonable and documented attorneys' fees of an Indemnified Person as incurred; provided, that such Indemnified Person executes an undertaking, with appropriate security if requested by the Members, to repay the amount so paid or reimbursed in the event that a final non-appealable order by a court of competent jurisdiction that such Indemnified Person is not entitled to indemnification under this Article 16.  The Company may pay for insurance covering liability of the Indemnified Persons for negligence in operation of the Company's affairs.

(b)    In the event that any Indemnified Person has rights to indemnification, advancement of expenses and/or insurance provided by OCP or any other direct or indirect Unit Holder of the Company or any Affiliate thereof (any of the foregoing being a "Secondary Indemnitor"), other than insurance provided by a Secondary Indemnitor under a liability insurance policy issued to the Company or its officers or directors, then as between the Company and the Secondary Indemnitor the following shall apply: the Company (i) will be the indemnitor of first resort (i.e., their obligations to such Indemnified Person shall be primary and any obligation of the Secondary Indemnitor to advance expenses or to provide indemnification for any obligations incurred by such Indemnified Person shall be secondary); (ii) shall advance the full amount of expenses incurred by such Indemnified Person and be liable for the full amount of all expenses and any obligations to the extent legally permitted and as required by the terms of this Agreement, without regard to any rights such Indemnified Person may have against the Secondary Indemnitor; and (iii) irrevocably waive, relinquish and release the Secondary Indemnitor from any and all claims they may have against the Secondary Indemnitor for contribution, subrogation or any other recovery of any kind in respect of their indemnification of

- 47 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 53

any obligations and advancement of expenses to such Indemnified Person. No advancement or payment by the Secondary Indemnitor on behalf of an Indemnified Person with respect to any obligations for which the Indemnified Person has sought indemnification from the Company will affect the foregoing and the Secondary Indemnitor will, to the extent of such advancement or payment, have a right of contribution from the Company and/or a right of subrogation to all rights of recovery of such Indemnified Person against the Company. Each Secondary Indemnitor is an express third party beneficiary of this Section 16.1(b).

(c)     This right to indemnification shall (i) not be exclusive of or affect any other rights that any Indemnified Person may have, (ii) inure to the benefit of the heirs, executors, and administrators of an Indemnified Person, and (iii) continue in effect regardless of whether an Indemnified Person continues to serve as an officer or Member of the Company. No amendment or repeal of this Article 16 shall have any effect on a Person's rights under this Section 16 with respect to any action or omission occurring prior to such amendment or repeal.

16.2    Exculpation. No Indemnified Person shall be liable, in damages or otherwise, to the Company or to any Member for any loss that arises out of any act performed or omitted to be performed by it, him or her pursuant to the authority granted by this Agreement if (a) either (i) the Indemnified Person, at the time of such action or inaction, determined in good faith that such Indemnified Person's course of conduct was in, or not opposed to, the best interests of the Company, or (ii) in the case of inaction by the Indemnified Person, the Indemnified Person did not intend such Indemnified Person's inaction to be harmful or opposed to the best interests of the Company and (b) the conduct of the Indemnified Person did not constitute fraud, willful misconduct, gross negligence, or criminal conduct by such Indemnified Person.

16.3    Persons Entitled to Indemnity. Any Person who is within the definition of "Indemnified Person" at the time of any action or inaction in connection with the business of the Company shall be entitled to the benefits of this Article 16 as an "Indemnified Person" with respect thereto, regardless of whether such Person continues to be within the definition of "Indemnified Person" at the time of such Indemnified Person's claim for indemnification or exculpation hereunder.

16.4    Procedure Agreements. The Company may enter into an agreement with any of its officers, members of its Board of Managers, employees, consultants, counsel, agents, and representatives setting forth procedures consistent with applicable law for implementing the indemnities provided in this Article 16.

16.5    Duties of the Members. Notwithstanding anything in this Agreement or at law or in equity to the contrary, no Member in its capacity as a Member shall have any duty (including fiduciary duty applicable to such Person in its capacity as a Member), or any liability for breach of duty (including fiduciary duty applicable to such Person in its capacity as a Member), to the Company, any Unitholder, or any other Person (including any creditor of the Company) and no implied duties, covenants or obligations shall be read into this Agreement against any such Member. For the avoidance of doubt, this Section 16.5 shall not restrict or eliminate the fiduciary duties of the Board of Managers and its members in their capacity as members of the Board of Managers. Notwithstanding anything to the contrary herein, (a) in no event shall any of the provisions in this Agreement prevent, impair or prohibit OCP or any of its Affiliates from

- 48 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 54

making any investment, including investing in any Person that is competitive with the Company (or any of its Affiliates or direct or indirect Subsidiaries), (b) none of OCP or any of its Affiliates, as an equity holder, officer, director (or similar positon), consultant, of the Company or any of its Subsidiaries, shall have any obligation to offer first to the Company or any of its Subsidiaries or any of their respective equity holders or Affiliates any business opportunity or venture of any kind, nature or description that OCP or any of its Affiliates may wish to pursue from time to time, independently or with others, and (c) neither the Company, any of its Subsidiaries nor any equity holders nor any of their respective Affiliates shall have any rights or obligations by virtue of this Agreement or the transactions contemplated hereby, in or to any independent venture of OCP any of its Affiliates, or the income or profits or losses or distributions derived therefrom, and such ventures shall not be deemed wrongful or improper even if competitive with the business of the Company or any of its Subsidiaries; provided, that, in the event OCP or any of its Affiliates makes an investment in an entity that is directly competitive to the Company's business (in each case as determined by Supermajority Approval) and such investment has not been offered to the Company, each Initial Member shall have the right, but not the obligation, to make an investment in such transaction to acquire a portion of the equity interests held or be acquired by OCP or any of its Affiliates, in each case on a pro rata basis (determined in proportion to the number of Units (other than equity interests issued under the Plan) owned by such Initial Member and its Affiliates to the number of Units (other than equity interests issued under the Plan) owned by all Initial Member and their respective Affiliates).

16.6    Liability of the Members.   None of the Members shall be liable for any debts, liabilities, contracts or obligations of the Company.  Except as otherwise required by the Act or this Agreement (or any other agreement between any such Member and the Company or any of its Subsidiaries), none of the Members shall be required to lend or contribute any funds to the Company.  The Company, out of its assets and not out of the assets of any Member, shall indemnify each Member and its officers, directors, equity holders, partners, members, managers, trustees, employees and agents for any liability reasonably incurred in connection with the defense or disposition of any actual or threatened claim, action, suit or proceeding made by any party, other than the Company or another Member, against such Member solely in its capacity as a Member, except liabilities that are the result of such Member's fraud, willful misconduct, gross negligence or criminal conduct.

16.7    Fiduciary and Other Duties.

(a)    An Indemnified Person acting under this Agreement shall not be liable to the Company or to any other Indemnified Person for its, his or her good faith reliance on the provisions of this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties (including fiduciary duties) and liabilities of an Indemnified Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Indemnified Person.

(b)    Notwithstanding any other provision of this Agreement or as otherwise required by applicable law, whenever in this Agreement an Indemnified Person is permitted or required to make a decision (i) in its, his or her discretion or under a grant of similar authority, the Indemnified Person shall be entitled to consider only such interests and factors as such

LEGAL_US_W # 99102246.2

Indemnified Person desires, including its, his or her own interests, and shall, to the fullest extent permitted by applicable law, have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person, or (ii) in its, his or her good faith or under another express standard, the Indemnified Person shall act under such express standard and shall not be subject to any other or different standards.

16.8   Rights Not Exclusive.  The rights accruing to any Indemnified Person under this Article 16 shall not exclude any other right to which such Indemnified Person may be lawfully entitled.

## 17.   REPRESENTATIONS AND COVENANTS BY THE MEMBERS

Each Member, severally as to itself and not jointly, hereby represents and warrants to, and agrees with, the other Members and the Company as follows:

17.1   Investment Intent; Securities Regulation.

(a)   Such Member acquired or is acquiring such Member's Interest with the intent of holding the same for investment for such Member's own account and without the intent or a view of participating directly or indirectly in any distribution of such Interests within the meaning of the Securities Act or any applicable state securities laws.

(b)   Such Member acknowledges and agrees that such Member's Interest was or is being issued and sold in reliance on the exemption from registration under the Securities Act and exemptions contained in applicable state securities laws, and that such Member's Interest cannot and will not be sold or transferred except in a transaction that is exempt under the Securities Act and applicable state securities laws or pursuant to an effective registration statement under the Securities Act and applicable state securities laws.

(c)   Such Member (i) is knowledgeable and experienced in financial and business matters, (ii) is capable of evaluating the merits and risks of an investment in the Units, (iii) is able to bear the economic risk of loss of such Member's investment in such Member's Interest, and (iv) is an "accredited investor" as defined in Regulation D promulgated by the SEC under the Securities Act.

(d)   Such Member understands that except as provided in this Agreement such Member has no contractual right for the registration under the Securities Act of such Member's Interest for public sale and that, unless such Member's Interest is registered or an exemption from registration is available, such Member's Interests may be required to be held indefinitely.

(e)   Such Member acknowledges and agrees that no representations or warranties have been made to such Member by the Company, or any of its officers, employees, agents, sub-agents, Affiliates or subsidiaries, or any other Member, in each case, other than any representations of the Company contained herein, and in purchasing its Interests such Member is not relying upon any representations other than those contained herein. Such Member further acknowledges that the Company has not made any representations to such Member regarding the Company's business prospects or the Company's ability to generate revenues in the future.

- 50 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 56

(f)     Such Member understands and acknowledges that his, her or its purchase of the Interests is a speculative investment that involves a high degree of risk and the potential loss of his, her or its entire investment, and, in particular, acknowledges that the Company is and will be engaged in a highly competitive business.

(g)     Such Member's overall commitment to investments that are not readily marketable is not disproportionate to such Member's net worth, and an investment in the Interests will not cause such overall commitment to become excessive.

(h)     Such Member is unaware of, is in no way relying on, and did not become aware of the offering of the Interests through or as a result of, any form of general solicitation or general advertising including any article, notice, advertisement or other communication published in any newspaper, magazine or similar media or broadcast over television or radio, or electronic mail over the internet, in connection with the offering and sale of the Interests and is not subscribing for the Interests and did not become aware of the offering of the Interests through or as a result of any seminar or meeting to which such Member was invited by, or any solicitation of a subscription by, a person not previously known to such Member in connection with investments in securities generally.

(i)     Such Member has taken no action, which would give rise to any claim by any person for brokerage commissions, finders' fees, or the like relating to this Agreement or the transactions contemplated hereby.

(j)     Such Member has discussed with, and relied upon the advice of, such Member's counsel with regard to the meaning and legal consequences of such Member's representations and warranties in this Agreement and the considerations involved in making an investment in the Company, and such Member understands that the Company is relying on the information set forth in this Agreement.

17.2    Organization and Binding Agreement.   Such Member (a) if an entity, is duly formed, validly existing and in good standing under the laws of its jurisdiction of organization and has all requisite power and authority to enter into, deliver, and perform this Agreement, and (b) if an individual, has all legal capacity and authority to enter into, deliver, and perform this Agreement.   This Agreement has been duly authorized by all necessary action and does not contravene any provision of the Member's certificate of formation, partnership agreement, operating agreement or similar organizational or governance documents or any law, regulation, rule, decree, order, judgment or contractual restriction binding on such Member or any of its assets.   All consents, approvals, authorizations, permits of, filings with and notifications to, any Person necessary for the due execution, delivery and performance of this Agreement by such Member have been obtained or made and all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with, any Person is required in connection with the execution, delivery or performance of this Agreement by such Member.   This Agreement constitutes a legal, valid and binding obligation of such Member enforceable against such Member in accordance with its terms, subject to (i) the effects of bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium or other similar laws affecting creditors' rights generally, and (ii) general equitable principles (whether considered in a proceeding in equity or at law).

- 51 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 57

17.3   Tax Position. Unless otherwise required by applicable law, no Member will take a position on such Member's federal income tax return, in any claim for refund or in any administrative or legal proceedings that is inconsistent with this Agreement or with any information return filed by the Company. If any Member believes that such a position is required by applicable law, such Member will promptly notify the Company and the other Members in writing, citing such applicable law or any interpretation thereof.

17.4   Information. Such Member (or Member's advisors and counsel, if any) has received all documents, books and records pertaining to an investment in the Company requested by such Member (or such Member's advisors and counsel, if any). Such Member (or such Member's advisors and counsel, if any) has had a reasonable opportunity to ask questions of and receive answers concerning the Company, and all such questions have been answered to such Member's (or such Member's advisor's and counsel's, if any) satisfaction, and acknowledges that other Members may have received additional and/or different disclosure materials relating to the Company and there is no guarantee that each Member has received the same information.

17.5   Licenses and Permits. Such Member will use commercially reasonable efforts to cooperate in providing such information, in signing such documents and in taking any other action as may reasonably be requested by the Company in connection with obtaining any foreign, federal, state or local license or permit needed to operate its business or the business of any entity in which the Company invests.

18.   REPRESENTATIONS BY THE COMPANY

In order to induce the Members to enter into this Agreement, the Company hereby represents and warrants to each Member as follows:

18.1   Duly Formed. The Company is a validly existing limited liability company under the Act, with all necessary power and authority under the Act to issue the Interests to be issued to the Members hereunder.

18.2   Valid Issue. When the Interests are issued to the Members as contemplated by this Agreement and the Capital Contributions required to be made by the Members are made, if any, the Interests issued to the Members will be duly and validly issued (except as expressly provided in this Agreement) and no liability for any additional Capital Contributions or for any obligations of the Company will attach thereto.

19.   AMENDMENTS TO AGREEMENT

19.1   Amendments. Subject to Section 3.8, this Agreement may be modified or amended only with the prior written consent of Bronco and OCP; provided, however, that any amendment or modification of this Agreement that materially and adversely affects the rights or obligations of any Common Unit Holder or any holder of Preferred Units, as applicable, set forth in this Agreement in a manner disproportionately different from any and all other Common Unit Holder or holder of Preferred Units, as applicable,  shall require the written consent of such affected Common Unit Holder or holder of Preferred Units, as applicable; provided, further, that the Company may issue additional Units without the consent of the Class B Unit Holders or the holders of Preferred Units; provided, further, that Section 3.9 may not be amended without the

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 58

unanimous consent of the Initial Members; provided, further, that any provision requiring Supermajority Approval or unanimous approval of the Initial Members, may only be amended or modified upon obtaining Supermajority Approval or the unanimous approval of the Initial Members, as applicable. All amendments to this Agreement will be sent to each Member promptly after the effectiveness thereof.

19.2  Corresponding Amendment of Certificate of Formation. The Company shall cause to be prepared and filed any amendment to the Certificate that may be required to be filed under the Act as a consequence of any amendment to this Agreement.

19.3  Binding Effect. Any modification or amendment to this Agreement pursuant to and in accordance with this Article 19 and any applicable law shall be binding on all Members.

## 20.   RIGHT TO CONVERT TO CORPORATE FORM.

20.1  Right to Convert.

(a)   If the Company, pursuant to the decision of the Board of Managers, undertakes an initial Public Offering, then the Members shall cooperate with each other to effectuate such initial Public Offering, which may involve converting the Company from a Delaware limited liability company to, or exchanging Company securities for securities of, a corporation organized under the laws of Delaware or another jurisdiction (the "Successor"), whether by merger, a tax-free contribution under Section 351 of the Code or by such other form of transaction as may be available under applicable law, and the Members hereby agree to cooperate in all reasonable respects to effectuate the initial Public Offering, which may require the conversion of their Units into or exchange of their Units for units of common stock or other securities in the Company or another successor entity in accordance with this Article 20. Upon such an election, the Board of Managers shall, at the expense of the Company, as soon as practicable thereafter execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered, all instruments and documents that may be reasonably requested by the Company to best effectuate the conversion of the Company to a corporation while continuing in full force and effect, to the extent consistent with such conversion, the terms, provisions, and conditions of this Agreement, including all rights, protections and benefits afforded to parties to this Agreement, and including those provisions (i) restricting the issuance of additional Interests, (ii) restricting the assignment of Interests, (iii) granting rights to repurchase or sell Interests or rights to participate in certain transactions, and (iv) relating to confidentiality, indemnification and limitation of the Company's activities. In the event that, at the time of such election, any Units or any equity interests in Subsidiaries of the Company are then held by an entity taxed under Subchapter C of the Code as a corporation, all Members shall work together in good faith to accomplish the conversion in the most tax-advantageous manner reasonably available, including effecting such tax-free mergers, contributions to capital and other transactions as are reasonable and will enable the holders of equity interests in such corporations to receive, and hold, in exchange therefor, equity interests in the entity effecting the initial Public Offering in tax-free transactions. It is the intent of the Members that the conversion of the Company into corporate form and the conversion or reorganization of any of the Company's operating divisions, whether currently existing or existing in the future, into corporate form, however accomplished, are part

- 53 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 59

of the Member's investment decision with respect to the Units or other limited liability company Interests of the Members.

(b)     Without limiting the generality of the foregoing or any other provision of this Agreement, it is understood and agreed that the following structures for any such reorganization and subsequent initial Public Offering shall be utilized by the Company and approved by the Members and each Member if so requested by Bronco and OCP:  A public offering by the Company which is immediately preceded by the contribution to the Company, in exchange for shares of common stock of the Company (the allocation of which among the Members shall be in accordance with Section 20.1(a)), of (i) all Units of the Company and (ii) all options, warrants or similar rights to acquire equity interests in the Company; provided, however, that if such a transaction would not qualify as an exchange of property for stock described in Code Section 351, in which all Unit Holders that are contributed to the Company are eligible to be treated as direct or indirect transferors under Code Section 351, then the initial Public Offering shall be effected under the following terms and in the following order:  (A) the Successor is formed; (B) in exchange for shares of the common stock of the Successor (the allocation of which among the Members shall be in accordance with Section 20.1(a)), the following property is contributed to the Successor:  (1) all Units of the Company and (2) all outstanding capital stock and all outstanding indebtedness of the Company; and (C) the Successor issues shares of common stock in the initial Public Offering

20.2    Valuation.  Immediately prior to the conversion to a corporation, the aggregate value of the Units immediately prior to the initial Public Offering (the "Pre-Offering Company Value") shall be based on the per share price at which common stock will be sold in the initial Public Offering (the "Per Share Offering Price") net of any underwriting discounts, fees and expenses.  Upon such conversion to a corporation, each Unit will be converted into a number of shares of common stock determined by dividing (A) the amount that would be distributed in respect of such Unit if all assets of the Company were sold for cash in an aggregate amount equal to the Pre-Offering Company Value and the proceeds were distributed in accordance with Section 5.1 by (B) the Per Share Offering Price.

21.    GENERAL.

21.1    Successors; Delaware Law; Etc.  This Agreement: (a) shall be binding upon the executors, administrators, estates, heirs and legal successors of the Members, (b) shall be governed by and construed in accordance with the Act as to matters within the scope thereof, and as to all other matters shall be governed by and construed in accordance with the internal laws of the State of Delaware, without regard to conflict of law principles that would result in the application of any law other than the law of the State of Delaware, (c) may be executed in more than one counterpart(including by facsimile or other electronic transmission), all of which together shall constitute one agreement, and (d) contains the entire contract among the Members as to the subject matter hereof.  The waiver of any of the provisions, terms or conditions contained in this Agreement shall not be considered as a waiver of any of the other provisions, terms or conditions hereof.

21.2    Notices, Etc.  All notices and other communications required or permitted hereunder shall be in writing and shall be deemed effectively given (a) on the fifth (5th) Business

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 60

Day after being sent by certified mail, return receipt requested, postage prepaid, (b) when received, if delivered by hand, (c) the following Business Day after having been timely sent by reputable overnight courier service for priority, next-day delivery, (d) upon confirmation of receipt by the recipient after having been sent by electronic mail (but on the next Business Day after confirmation of receipt if such receipt is after business hours at the time and place of receipt), or (e) on the date such notice is rejected or refused. All such notices in order to be effective shall be in writing and shall be (x) if to any Member, at the address of such Member set forth in the records of the Company (including Schedule 3.1 attached hereto) or at such other address as such Member shall have furnished to the Company in writing as the address to which notices are to be sent hereunder and (y) if to the Company to it at:

> On Point Global, LLC
> 350 NE 60th Street
> Miami, Florida  33137
> Attention:  Burton Katz

> With a copy to:

> OnPoint Capital Partners
> 1521 Alton Road #352
> Miami Beach, Florida  33139
> Attention:  Robert Zangrillo

> On Point Global, LLC
> 350 NE 60th Street
> Miami, Florida  33137
> Attention:  Brent Levison

21.3    Further Assurances. From time to time after the date of this Agreement, upon the good faith determination and reasonable request of the Company, each Member shall perform, or cause to be performed, all such additional acts, and shall execute and deliver, or cause to be executed and delivered, all such additional instruments and documents, as may be reasonably required to effectuate the purposes of this Agreement. Each Member (other than OCP), including each new and substituted Member, by the execution of this Agreement or by agreeing in writing to be bound by this Agreement, irrevocably constitutes and appoints Bronco or any Person designated by OCP and Bronco in writing to act on such Member's behalf solely for purposes of this Section 21.3 as such Member's true and lawful attorney-in-fact with full power and authority in such Member's name and stead to execute, deliver, swear to, file and record at the appropriate public offices such documents as may be necessary or appropriate to carry out this Agreement, including:

(a)    all certificates and other instruments (specifically including counterparts of this Agreement), and any amendment thereof, that Bronco deems appropriate to qualify or to continue the Company as a limited liability company in any jurisdiction in which the Company may conduct business or in which such qualification or continuation is, in the opinion of Bronco, necessary to protect the limited liability of the Members, in each case in accordance with the terms of this Agreement;

- 55 -

LEGAL_US_W # 99102246.2

(b)    subject to Section 19.1, all amendments to this Agreement adopted in accordance with the terms hereof and all instruments that Bronco deems appropriate to reflect a change or modification of the Company in accordance with the terms of this Agreement; and

(c)    all conveyances and other instruments that Bronco deems appropriate to reflect the dissolution of the Company in accordance with the terms of this Agreement.

The appointment by any Person designated by Bronco to act on its behalf for purposes of this Section 21.3 as such Member's attorney-in-fact shall be deemed to be a power coupled with an interest, in recognition of the fact that each of the Members (other than OCP) under this Agreement will be relying upon the power of Bronco to act as contemplated by this Agreement in any filing and other action by him, her or it on behalf of the Company, and shall survive the bankruptcy, dissolution, death, adjudication of incompetence or insanity of any Member giving such power and the transfer or assignment of all or any part of such Member's Interests; provided, however, that in the event of a Transfer by a Member of all of its Interest, the power of attorney given by the transferor shall survive such assignment only until such time as the transferee shall have been admitted to the Company as a substituted Member and all required documents and instruments shall have been duly executed, filed, and recorded to effect such substitution.

21.4    Consent to Jurisdiction.    Each of the parties agrees that all actions, suits or proceedings arising out of or based upon this Agreement or the subject matter hereof shall be brought and maintained exclusively in the state courts located in Miami, Florida. Each of the parties hereto by execution hereof (a) hereby irrevocably submits to the jurisdiction of the state courts located in Miami, Florida as set forth above in the immediately preceding sentence for the purpose of any action, suit or proceeding arising out of or based upon this Agreement or the subject matter hereof and (b) hereby irrevocably waives to the extent not prohibited by applicable law, and agrees not to assert, by way of motion, as a defense or otherwise, in any such action, suit or proceeding, any claim that he, she or it is not subject personally to the jurisdiction of the above-named courts, that he or it is immune from extraterritorial injunctive relief or other injunctive relief, that his or its property is exempt or immune from attachment or execution, that any such action, suit or proceeding may not be brought or maintained in one of the above-named courts should be dismissed on the grounds of forum non conveniens; should be transferred to any courts other than one of the above-named courts, should be stayed by virtue of the pendency of any other action, suit or proceeding in any courts other than one of the above-named courts, or that this Agreement or the subject matter hereof may not be enforced in or by any of the above-named courts. Each of the parties hereto hereby irrevocably consents to service of process in any such suit, action or proceeding in any manner permitted by the laws of the State of Florida, and irrevocably agrees that service of process by registered or certified mail, return receipt requested, at the address specified in or pursuant to Section 21.2 is reasonably calculated to give actual notice and irrevocably waives and agrees not to assert by way of motion, as a defense or otherwise, in any such action, suit or proceeding any claim that service of process made in accordance with this Section 21.4 does not constitute good and sufficient service of process. The provisions of this Section 21.4 shall not restrict the ability of any party to enforce in any court any judgment obtained in the state courts located in Miami, Florida and as described in this Section 21.4.

LEGAL_US_W # 99102246.2

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 62

21.5   Waiver of Jury Trial.   To the extent not prohibited by applicable law which cannot be waived, the Company and each Member hereby irrevocably waives, and covenants that such Person will not assert (whether as plaintiff, defendant or otherwise) any right to trial by jury in any forum in respect of any issue, claim, demand, action or cause of action arising out of or based upon this Agreement or the subject matter hereof, whether now existing or hereafter arising and whether sounding in tort or contract or otherwise.

21.6   Severability.   If any provision of this Agreement is determined by a non-appealable order from a court of competent jurisdiction to be invalid or unenforceable, that determination shall not affect the other provisions hereof, each of which shall be construed and enforced as if the invalid or unenforceable portion were not contained herein.  Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision shall be deemed to be effective, operative, made, entered into or taken in the manner and to the full extent permitted by law.

21.7   Table of Contents, Headings.   The table of contents and headings used in this Agreement are used for administrative convenience only and do not constitute substantive matter to be considered in construing this Agreement.

21.8   No Third Party Rights.   Except as otherwise explicitly set forth herein, the provisions of this Agreement are for the benefit of the Company and the Members and no other Person, including creditors of the Company, shall have any right or claim against the Company or any Member by reason of this Agreement or any provision hereof or be entitled to enforce any provision of this Agreement.

21.9   Section 83 Safe Harbor.   Each Member authorizes and directs the Company to elect to have the "Safe Harbor" described in the proposed Revenue Procedure set forth in Internal Revenue Service Notice 2005-43 (the "IRS Notice"), including any similar safe harbor in any finalized Revenue Procedure, Revenue Ruling or Regulation, apply to any interest in the Company issued or transferred to a service provider by the Company on or after the effective date of such final pronouncement in connection with services provided to the Company.  For purposes of making such Safe Harbor election, the Tax Matters Partner is hereby designated as the "partner who has responsibility for Federal income tax reporting" by the Company and, accordingly, execution of such Safe Harbor election by the Tax Matters Partner constitutes execution of a "Safe Harbor Election" in accordance with the IRS Notice or any similar provision of any final pronouncement.  The Company and each Member hereby agree to comply with all requirements of any such Safe Harbor, including any requirement that such Member prepare and file all Federal income tax returns reporting the income tax effects of each Interest issued by the Company in connection with services in a manner consistent with the requirements of the IRS Notice or other final pronouncement.  Each Member's obligations to comply with the requirements of this Section 21.9 shall survive such Member's ceasing to be a Member of the Company and the termination, dissolution, liquidation and winding up of the Company.

21.10   Registration Rights.   In the event that the Company files a registration statement on behalf of OCP or otherwise for a registered offering of securities of the Company for OCP's account or otherwise, the Members (other than holders of equity interests issued under the Plan) will be granted customary piggyback registration rights with respect to such registered offering

- 57 -

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 63

and any subsequent registered offering for 123's account for which the Company files a registration statement.

[Remainder of page intentionally left blank.]

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 64

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement (or caused this Agreement to be executed on its behalf by its officer or representative thereunto duly authorized) as of the date first above written.

**ON POINT GLOBAL, LLC**

By: _____

Name: BURTON KATZ

Title: CEO

LEGAL_US_W # 99102246.2

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement (or caused this Agreement to be executed on its behalf by its officer or representative thereunto duly authorized) as of the date first above written.

**MAC MEDIA, LTD.**

By: _____

Name: _RAMIRO BALUGA_

Title: _MANAGER_

LEGAL_US_W # 99102246.2

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement (or caused this Agreement to be executed on its behalf by its officer or representative thereunto duly authorized) as of the date first above written.

**ON POINT MANAGEMENT AGGREGATOR, LLC**

By: _____

Name: _BURTON KATZ_____

Title: _CEO_____

LEGAL_US_W # 99102246.2

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement (or caused this Agreement to be executed on its behalf by its officer or representative thereunto duly authorized) as of the date first above written.

VENTURE-ON POINT LLC

By: _____

Name: _____

Title: _____

LEGAL_US_W # 99102246.2

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement (or caused this Agreement to be executed on its behalf by its officer or representative thereunto duly authorized) as of the date first above written.

BRONCO FAMILY HOLDINGS, L.P.

By: _____
Name: Juan Lucich
Title: Director

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 69

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement (or caused this Agreement to be executed on its behalf by its officer or representative thereunto duly authorized) as of the date first above written.

**CARDOZO HOLDINGS, LLC**

By: _____

Name: Ivan Lucsi _____

Title: MANAGER _____

LEGAL_US_W # 99102246.2

IN WITNESS WHEREOF, each of the undersigned has duly executed this Agreement (or caused this Agreement to be executed on its behalf by its officer or representative thereunto duly authorized) as of the date first above written.

**ONPOINT CAPITAL PARTNERS**

By: Dragon Global Management, LLC, its Manager

By: _____

Name: Robert Zangrillo

Title: Manager

LEGAL_US_W # 99102246.2

IN WITNESS WHEREOF, each of the undersigned, has duly executed this Agreement (or caused this Agreement to be executed on its behalf by its officer or representative thereunto duly authorized) as of the date first above written.

DG ON POINT, LLC

By: _____

Name: _____Robert Zangrillo_____

Title: _____Manager_____

Schedule 3

## MEMBERS OF THE COMPANY INTD: Ledger to be updated

| Certificate Number, if any | Name of Holder | Number of Units Issued | Capital Contribution | Valuation | Date of Issuance |
|---|---|---|---|---|---|
| Common Units | | | | | |
| | OnPoint Capital Partners c/o Dragon Global Management, LLC 1521 Alton Road #352 Miami Beach, Florida 33139 Attention: Robert Zangrillo | 35,000,000 | Equity interest as described in the Contribution and Exchange Agreement, executed in connection herewith and other goodwill and knowledge capital related thereto. | 1.25 Per Class A Common Unit | Effective as of January 1, 2018 |
| | Bronco Family Holdings, LP No. 4 Pineapple Grove, Old Port Bay, West Bay Street, Nassau Bahamas Attention: Burton Katz or Bronco Family Holdings, LP 350 N.E. 60th Street Miami, Florida 33137 Attention: Burton Katz | 35,000,000 | Equity interest as described in the Contribution and Exchange Agreement, executed in connection herewith and other goodwill and knowledge capital related thereto. | 1.25 Per Class A Common Unit | Effective as of January 1, 2018 |
| | Mac Media, LTD. No 5 Cork Street Belize City Belize Attention: Elisha Rothman or Mac Media, LTD. | 20,000,000 | Equity interest as described in the Contribution and Exchange Agreement, executed in connection herewith and other goodwill and knowledge capital | 1.25 Per Class A Common Unit | Effective as of January 1, 2018 |

LEGAL_US_W # 99102276.2

| Certificate Number, if any | Name of Holder | Number of Units Issued | Capital Contribution | Valuation | Date of Issuance |
|---|---|---|---|---|---|
| | 350 N.E. 60th Street Miami, Florida 33137 Attention: Elisha Rofhman | | related thereto. | | |
| | Cardozo Holdings, LLC 733, Himkins Water Front Jewels Charlestown, Nevis West Indies Attention: Brent Levison<br><br>or<br><br>Cardozo Holdings, LLC 350 N.E. 60th Street Miami, Florida 33137 Attention: Brent Levison | 10,000,000 | Equity interest as described in the Contribution and Exchange Agreement, executed in connection herewith and other goodwill and knowledge capital related thereto. | 1.25 Per Class A Common Unit | Effective as of January 1, 2018 |
| | DG On Point, LLC c/o Dragon Global Management, LLC 1521 Alton Road #352 Miami Beach, Florida 33139 Attention: Robert Zangrillo | Up to 20,000,000 | Up to $25,000,000 | 1.25 Per Class A Common Unit | Multiple Dates |
| | On Point Management Aggregator, LLC | 6,700,000 | 0 | Profit Participation | Multiple Dates |
| | Preferred Units | | | | |
| | Ventures-On Point LLC<br><br>[Address] | 4,000,000 | $5,000,000 | 1.25 Per Preferred Unit | [ ] |

LEGAL_US_W # 991022x6.2

Exhibit 6.5

## MEETINGS OF MEMBERS, ETC.

1.    <u>Special Meetings</u>.  A special meeting of the Members may be called at any time by the Chief Executive Officer or the President or OCP and Bronco.  Any such call shall state in writing to each Common Unit Holder the place, date, hour and purposes of the meeting.  A special meeting of the Members shall be called by the Secretary, or in the case of the death, absence, incapacity or refusal of the Secretary, by an Assistant Secretary or some other officer of the Company, upon application of the Members.  Any such application shall state in writing to each Common Unit Holder the place, date, hour, and purposes of the meeting.

2.    <u>Place of Meeting</u>.  All meetings of the Members for any purpose shall be held at such place within or without the State of Delaware as may be determined from time to time by the Chief Executive Officer or the President or OCP and Bronco.  Any adjourned session of any meeting of the Members shall be held at the place designated in the vote of adjournment.

3.    <u>Notice of Meetings</u>.  Except as otherwise provided by applicable law, a written notice of each meeting of the Members stating the place, date, hour and purposes of the meeting shall be given not less than ten nor more than sixty (60) days before such meeting, to each Member entitled to vote thereat, and to each Member who, by law or by this Agreement, is entitled to notice, by leaving such notice with such Member or at such Member's residence or usual place of business, or by depositing it in the United States mail, postage prepaid, and addressed to such Member at such Member's address as it appears in the records of the Company.  Such notice shall be given by the Secretary, or by an officer or person designated by the Members, or in the case of a special meeting by the officer calling the meeting.  As to any adjourned session of any meeting of the Members, notice of the adjourned meeting need not be given if the time and place thereof are announced at the meeting at which the adjournment was taken, except that if the adjournment is for more than thirty (30) days or if after the adjournment a new record date is set for the adjourned session, notice of any such adjourned session of the meeting shall be given in the manner heretofore described.  No notice of any meeting of the Members or any adjourned session thereof need be given to a Member if a written waiver of notice, executed before or after the meeting or such adjourned session by such Member, is filed with the records of the meeting or if such Member attends such meeting without objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any meeting of the Members or any adjourned session thereof need be specified in any written waiver of notice.

4.    <u>Quorum of Members</u>.  At any meeting of the Members a quorum as to any matter shall consist of a majority of the votes entitled to be cast on the matter, except where a larger quorum is required by law or by this Agreement; <u>provided</u>, <u>however</u>, that Bronco and OCP are in attendance at each such meeting.  Any meeting may be adjourned from time to time by a majority of the votes properly cast upon the question.

5.    <u>Action by Vote</u>.  Each Member (whose ownership of any Units entitles such Member to voting rights) shall be entitled to one vote for each Class A Common Unit (determined on an as-converted basis with respect to the Preferred Units) held by such Member

LEGAL_US_W # 99102246.2

on all matters on which Members are entitled to vote at a meeting of Members or otherwise
when a quorum is present at any meeting (provided, that Bronco and OCP are in attendance at
each such meeting), a plurality of the votes properly cast for election to any office shall elect to
such office and a majority of the votes properly cast upon any question other than an election to
an office shall decide the question, except when a larger vote is required by law or by this
Agreement. No ballot shall be required for any election unless requested by a Member (whose
ownership of any Units entitles such Member to voting rights) present or represented at the
meeting and entitled to vote in the election. For the avoidance of doubt, no Class B Unit Holder
has any voting rights with respect to its Class B Common Units on any matter.

      6.    <u>Action without Meetings.</u>

      (a)    Subject to the terms and conditions set forth in the Agreement, any action
required or permitted to be taken by Members (whose ownership of any Units entitles such
Member to voting rights) for or in connection with any action of the Company may be taken
without a meeting, without prior notice and without a vote, if a consent or consents in writing,
setting forth the action so taken, shall be signed by the holders of outstanding Class A Common
Units (whose ownership of any Units entitles such holder to voting rights) having not less than
the minimum number of votes that would be necessary to authorize or take such action at a
meeting at which all Units entitled to vote thereon were present and voted (unless such other
number is required by applicable law) and shall be delivered to the Company by delivery to its
registered office in Delaware by hand or certified or registered mail, return receipt requested, to
its principal place of business or to an officer or agent of the Company having custody of the
book in which proceedings of meetings of Members are recorded. Each such written consent
shall bear the date of signature of each Member who signs the consent. No written consent shall
be effective to take the action referred to therein unless written consents signed by a number of
Members sufficient to take such action are delivered to the Company in the manner specified in
this paragraph within sixty (60) days of the earliest dated consent so delivered.

      (b)    If action is taken by consent of Members and in accordance with the
foregoing, there shall be filed with the records of the meetings of Members the writing or
writings comprising such consent.

      (c)    If action is taken by less than unanimous consent of Members (and which
action is permitted by applicable law), prompt notice of the taking of such action without a
meeting shall be given to those Members who have not consented in writing and a certificate
signed and attested to by the Secretary that such notice was given to all such Members shall be
filed with the records of the meetings of Members.

      7.    <u>Proxy Representation.</u> Every Member (whose ownership of any Units entitles
such Member to voting rights) may authorize another person or persons to act for such Member
by proxy in any or all matters in which a Member is entitled to participate, whether by waiving
notice of any meeting, objecting to or voting or participating at a meeting, or expressing consent
or dissent without a meeting. Every proxy must be signed by the Member or by such Member's
attorney-in-fact. No proxy shall be voted or acted upon after three years from its date unless
such proxy provides for a longer period. A duly executed proxy shall be irrevocable if it states
that it is irrevocable and, if, and only as long as, it is coupled with an interest sufficient in law to

support an irrevocable power. A proxy may be made irrevocable where the interest with which it is coupled is an interest in the Interest of such Member. The authorization of a proxy may but need not be limited to specified action; provided, however, that if a proxy limits its authorization to a meeting or meetings of Members, unless otherwise specifically provided such proxy shall entitle the holder thereof (whose ownership of any Units entitles such holder to voting rights) to vote at any adjourned session but shall not be valid after the final adjournment thereof.

8.     Participation in Meetings by Conference Telephone. Members may participate in meetings by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law. Such participation shall constitute presence in person at such meeting.

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 77

Exhibit 7.1

## MEETINGS OF BOARD OF MANAGERS

1.  _Time and Place of Meetings_.  The Board of Managers shall hold meetings from time to time during the Fiscal Year as the Board of Managers deems appropriate.  Board of Managers meetings may be called by not less than four (4) votes of members of the Board of Managers on not less than forty-eight (48) hours prior written notice.  Board of Managers meetings may be held at such date, time and place as the Board of Managers may deem appropriate from time to time.

2.  _Quorum_.  At all meetings of the Board of Managers, the presence in person, by telephone or by proxy, which proxy must be revocable at any time, of a majority of the members of the Board of Managers shall constitute a quorum for the transaction of business by the Board of Managers.  Unless otherwise specified in this Agreement, the vote of a majority of the Managers present at a meeting of the Board of Managers at which a quorum is present shall represent the action of the Board of Managers on a particular matter being considered by the Board of Managers; _provided, however,_ that until such time as OCP or Bronco, as applicable, appoints a new member to the vacant seat it has the right to fill then the member of the Board of Managers designated by OCP or Bronco, as applicable, shall have two votes with respect to any action taken by the Board of Managers.  For the avoidance of doubt, if a particular action requires the vote, consent or approval of greater than a majority of the members of the Board of Managers then a quorum with respect to such action shall not be achieved unless the required number of members of the Board of Managers (or equivalent number of votes) are present in person, by telephone or by proxy.  Each member of the Board of Managers shall be obligated to make reasonable efforts to attend meetings of the Board of Managers called in accordance with the procedures set forth herein.

3.  _Participation in Meetings by Conference Telephone_.  Members of the Board of Managers may participate in meetings by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other or by any other means permitted by law.  Such participation shall constitute presence in person at such meeting.

4.  _Action Without Meetings_.  Any action required or permitted to be taken by the Board of Managers for or in connection with any action of the Company may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by all members of the Board of Managers.  All such consents shall be filed with the secretary, if any, of the Company and shall be maintained in the Company records.

5.  _Observation Rights_.  The Board of Managers may permit Members owning greater than five percent (5%) of the issued and outstanding Units (calculated on a Fully Diluted Basis) to observe, or to designate one individual on such Member's behalf to observe, meetings of the Board of Managers without having any voting rights with respect to any matter brought before the Board of Managers.  At any such meeting where any such Member is in attendance, the Board of Managers may meet in executive session and such Member shall not have the right

to attend or participate in any such executive session. In addition, the Board of Managers shall have the right to exclude such Member or other Person from the meeting, or any portion thereof, (i) if the Board of Managers believes upon advice from counsel that such exclusion is necessary to preserve the attorney-client privilege, (ii) to protect highly confidential proprietary information, (iii) if the Board of Managers believes that Member or other Person would have a conflict of interest with respect to the subject matter of such material or meeting or (iv) for other similar reasons. A majority of the then-existing members of the Board of Managers may grant similar observation rights to Persons who are not Members or do not meet the ownership threshold described above.

Exhibit 8.1

## OFFICERS

1. <u>Election</u>. Subject to the terms of the Agreement, the officers may be elected by the Members. At any time or from time to time the Members may delegate to any officer their power to elect or appoint any other officer or any agents. .

2. <u>Tenure</u>. Each officer shall hold office until his or her respective successor is chosen and qualified unless a shorter period shall have been specified by the terms of his or her election or appointment, or in each case until he or she sooner dies, resigns, is removed or becomes disqualified. Each agent shall retain his or her authority at the pleasure of the Members, or the officer by whom he or she was appointed or by the officer who then holds agent appointive power.

3. <u>Chief Executive Officer, President and Vice President</u>. The Chief Executive Officer and Bronco shall preside, or designate the individual who shall preside, at all meetings of Members. Unless the Members otherwise specify by the prior written approval of OCP and Bronco, the Chief Executive Officer shall be the chief executive officer and shall have direct charge of all business operations of the Company and, subject to the control of the Members, shall have general charge and supervision of the business of the Company. Unless the Members otherwise specify by the prior written approval of OCP and Bronco, the President shall be the president and shall have direct charge of all business operations of the Company and, subject to the control of the Members, shall have general charge and supervision of the business of the Company. Any Vice Presidents shall have duties as shall be designated from time to time by the Members, the Chief Executive Officer or the President.

4. <u>Treasurer and Assistant Treasurers</u>. Unless the Members otherwise specify by the prior written approval of OCP and Bronco, the Treasurer shall be the chief financial officer of the Company and shall be in charge of its funds and valuable papers, and shall have such other duties and powers as may be designated from time to time by the Members or the President. If no Controller is elected, the Treasurer shall, unless the Members otherwise specify by the prior written approval of OCP and Bronco, also have the duties and powers of the Controller. Any Assistant Treasurers shall have such duties and powers as shall be designated from time to time by the Members, the Chief Executive Officer, the President or the Treasurer.

5. <u>Controller and Assistant Controllers</u>. If a Controller is elected, the Controller shall, unless the Members otherwise specify by the prior written approval of OCP and Bronco, be the chief accounting officer of the Company and be in charge of its books of account and accounting records, and of its accounting procedures. The Controller shall have such other duties and powers as may be designated from time to time by the Members, the President or the Treasurer. Any Assistant Controller shall have such duties and powers as shall be designated from time to time by the Members, the Chief Executive Officer, the President, the Treasurer or the Controller.

6. <u>Secretary and Assistant Secretaries</u>. The Secretary shall record all proceedings of the Members in a book or series of books to be kept therefor and shall file therein all actions by

LEGAL_US_W # 99102246.2

written consent of the Members. In the absence of the Secretary from any meeting, an Assistant Secretary, or if no Assistant Secretary is present, a temporary secretary chosen at the meeting, shall record the proceedings thereof. The Secretary shall keep or cause to be kept records, which shall contain the names and record addresses of all Members. The Secretary shall have such other duties and powers as may from time to time be designated by the Members or the President. Any Assistant Secretaries shall have such duties and powers as shall be designated from time to time by the Members, the Chief Executive Officer, the President or the Secretary.

7. <u>Vacancies</u>. If the office of any officer becomes vacant, any person or body empowered to elect or appoint that officer may choose a successor. Each such successor shall hold office for the unexpired term, and until his or her successor is chosen and qualified or in each case until he or she sooner dies, resigns, is removed or becomes disqualified.

8. <u>Resignation and Removal</u>. Subject to the terms of the Agreement, including <u>Section 3.8</u> thereof, the Members may at any time remove any officer either with or without cause. The Members may at any time terminate or modify the authority of any agent. Any officer may resign at any time by delivering his or her resignation in writing to Bronco, the President or the Secretary or to a meeting of the Members. Such resignation shall be effective upon receipt unless specified to be effective at some other time, and without in either case the necessity of its being accepted unless the resignation shall so state.

9. <u>Compensation</u>. Subject to <u>Section 3.8</u>, the Chief Executive Officer may make an offer of employment, hire or terminate any employee, or enter into or amend any employment, deferred compensation, severance, retirement or other similar agreement with (or change or modify the compensation or benefits for) any employee or declare any bonuses and/or advances with respect to any employee, in each case on behalf of the Company or any of its Subsidiaries, so long as such arrangements are in compliance with the Company's most recent Budget and in each case are on commercially reasonable terms.

LEGAL_US_W # 99102246.2

EXHIBIT A

## FORM OF JOINDER AGREEMENT

This Joinder Agreement, dated as of [_____, 20__], is delivered in connection with the receipt of [INSERT NUMBER OF UNITS] [INSERT TYPE OF UNIT] Units of On Point Global, LLC, a Delaware limited liability company (the "Company"). By execution of this Joinder Agreement, upon acknowledgement of same by the Company, the undersigned hereby becomes a party to that certain First Amended and Restated Limited Liability Company Agreement of the Company, effective as of [_____], 2019 (as amended, restated and/or modified from time to time, the "Agreement") and shall have the rights of and shall observe all the obligations applicable to a "[_____] Unit Holder" under the Agreement.

_____

[NAME]

Acknowledged:

ON POINT GLOBAL, LLC

_____

Name:
Title:

LEGAL_US_W # 99102246.2

EXHIBIT D

## CONSENT OF SPOUSE

I, _____, Spouse of _____, acknowledge that I have read the First Amended and Restated Limited Liability Company Agreement of On Point Global, LLC, effective as of [_____], 2019 (as amended, restated and/or modified from time to time, the "Agreement"), and that I know the contents of the Agreement. I am aware that the Agreement contains provisions regarding the voting and transfer of Units (as defined in the Agreement) of the Company that my Spouse may own, including any interest I might have therein.

I hereby agree that my interest, if any, in any shares of Units of the Company subject to the Agreement shall be irrevocably bound by the Agreement and further understand and agree that any community property interest I may have in such Units of the Company shall be similarly bound by the Agreement.

I am aware that the legal, financial and related matters contained in the Agreement are complex and that I am free to seek independent professional guidance or counsel (at my sole cost and expense) with respect to this Consent. I have either sought such guidance or counsel or determined after reviewing the Agreement carefully that I will waive such right.

Dated:

_____

[Name of Spouse, if any]

LEGAL_US_W # 99102246.2

LEGAL_US_W # 99102246.2



UNITED STATES OF AMERICA
### FEDERAL TRADE COMMISSION
WASHINGTON, D.C. 20580

Division of Enforcement
Bureau of Consumer Protection

### _FTC v. OnPoint Global, et. al_

# DOCUMENTS OBTAINED FROM DEFENDANTS' BUSINESS PREMISES

### 350 NE 60th Street, Miami, Florida 33137

**DATE:  December** ___|6___ **2019**

**FTC STAFF INITIALS:** ___SRW___

## LOCATION OF ORIGINAL DOCUMENTS:

Office 22, Carmen Pena desk,
3rd stack of papers against wall (to right)

## CUSTODIAN (if known):

Carmen Pena

## ADDITIONAL DESCRIPTION:

manila folder of LiveXLive / Dragon / OP documents

# MANI BROTHERS

*November*

## MANI BROTHERS RENT PAYMENT OPTIONS

All payments for monthly Base Rent and related charges are due and payable to Mani Brothers **on or before the first (1ˢᵗ) day of each month**, pursuant to Article 3 of Tenant's Lease. Tenant is required to pay the monthly Base Rent without receiving any notice, invoice or demand for payment from Mani Brothers. The amount of the Base Rent will remain as a fixed amount each month, but will increase once every twelve (12) months by a percentage amount, as specified in Tenant's lease. Our accounting department will provide you with an invoice each month for the Base Rent, including any related charges due. However, if Tenant does not receive an invoice, Tenant is still responsible for the timely remittance of the Base Rent for the Premises.

Mani Brothers does understand that there can be extenuating circumstances, on occasion, where the Rent payment is not made on or before the first (1ˢᵗ) day of the month. Accordingly, we have allowed Tenant a grace period that is specifically referenced in Article 25 of Tenant's lease. **Please Note:** Rent payments are marked as "paid" to Tenant's account as of the date Mani Brothers actually <u>receives</u> the payment and not the date Tenant processes the payment. Therefore, any Rent payments <u>received</u> by Mani Brothers, one or more days after the grace period, will automatically incur an irreversible late charge, calculated as a percentage of the total amount due, as set forth in Article 25 of your Lease. Late fees applied to Tenant's account will be due and payable to Mani Brothers as Additional Rent.

| Payment Options | Instructions |
|---|---|
| **U.S. Mail** | All checks should be sent to: 9200 Sunset Boulevard, Suite 555, West Hollywood, CA 90069, Attention: Isabel. |
| **Hand-Delivery** | Deliver checks to 9200 Sunset, Suite 555 and give directly to Isabel. Landlord will not be responsible for any checks left at either the Suite 555 reception desk, security desk in your Building or at the 9200 Sunset security desk. Isabel is in the office from 8:30 a.m. to 2:30 p.m. |
| **Automatic Payments** | Tenant is responsible to follow up with its bank to confirm payment was <u>received</u> into Landlord's bank account. Landlord is not responsible for the failure of the Tenant bank to process the payment. If late fees are incurred, Tenant's recourse is to file a claim with Tenant's bank for reimbursement of any late fees applied to Tenant's account. |
| **Wire Transfer** | Contact Isabel at isabel@manibrothers.com for Landlord's wire instructions. Tenant is responsible to follow up with its bank to confirm payment was <u>received</u> into Landlord's bank account. Landlord is not responsible for wire transfers not received into our bank account. |
| **Credit Card** | All credit card payments will include a 3% service charge. Contact Isabel at isabel@manibrothers.com and she will forward a credit card authorization form for completion by Tenant. |

Please take note of U.S.Mail and bank holidays, to be sure your payment is <u>received</u> no later than the last day of the grace period, regardless of the date of the holiday.

**Mani Brothers 9200 Sunset (DE) LLC**
9200 W. Sunset Blvd., Suite 555
West Hollywood, CA 90069

# Invoice

**MANI BROTHERS**

**Dragon Global Management, LLC**
9200 Sunset Boulevard
Suite 1201
West Hollywood, CA 90069

**Date:** 11/01/2019
**Invoice No :** 62456

**Reference:** t0000338 Dragon Global Management, LLC

**Property:** Mani Brothers 9200 Sunset (DE), LLC (m
**Space(s):** 00-1201

| Description | Unit | Detailed Notes | From Date | To Date | Amount |
|---|---|---|---|---|---|
| Validation Booklet | | Validation Purchases (09/2019) | 11/01/2019 | 11/30/2019 | 750.00 |

*Bob Zarquillo* (handwritten signature)

| | | | | | |
|---|---|---|---|---|---|
| Make Check Payable to: **Mani Brothers 9200 Sunset (DE) LLC** | | | | **Total Invoice** | **750.00** |

## MANI BROTHERS REAL ESTATE GROUP

Thursday, October 17, 2019

9200 W. Sunset Blvd., Suite 555, West Hollywood, CA 90069 • Phone: (310) 777-5000 • Fax: (310) 777-5010 • E-Mail: mail@manibrothers.com

Validation Purchases this month  for     Dragon Glob     at   Mani Brothers 9200 Sunset, LL

Charge

At     3:05:34 PM                              on                    9/4/2019

                        Purchaser             Robert Zangrillo

Quantity    0100                of Validation Type 15 Min Off                          $250.00

   Unit Cost              $2.50

At     2:27:27 PM                              on                    9/17/2019

                        Purchaser             Robert Zangrillo

Quantity    0100                of Validation Type 15 Min Off                          $250.00

   Unit Cost              $2.50

At     2:36:29 PM                              on                    9/26/2019

                        Purchaser             Robert Zangrillo

Quantity    0100                of Validation Type 15 Min Off                          $250.00

   Unit Cost              $2.50


There are    3            Transactions for a total of       $750.00

**Invoice**

**MANI BROTHERS**

**Mani Brothers 9200 Sunset (DE) LLC**
9200 W. Sunset Blvd., Suite 555
West Hollywood, CA 90069

**Dragon Global Management, LLC**
9200 Sunset Boulevard
Suite 1201
West Hollywood, CA 90069

**Date:** 11/01/2019
**Invoice No :** 62523

**Reference:** t0000338 Dragon Global Management, LLC

**Property:** Mani Brothers 9200 Sunset (DE), LLC (m
**Space(s):** 00-1201

| Description | Unit | Detailed Notes | From Date | To Date | Amount |
|---|---|---|---|---|---|
| Base Rent | 00-1201 | Base Rent (11/2019) | 11/01/2019 | 11/30/2019 | 39,988.22 |
| Late Fee | 00-1201 | Rental Late Fees (10/2019) | 11/01/2019 | 11/30/2019 | 2,083.16 |

Make Check Payable to:
**Mani Brothers 9200 Sunset (DE) LLC**

**Total Invoice**          **42,071.38**

## MANI BROTHERS REAL ESTATE GROUP

Thursday, October 17, 2019

PX23: Declaration of Lasharida Freeman
Attachment A: Page 89

**INVOICE**

**INVOICE NUMBER:** 0016081-IN

**INVOICE DATE:** 11/01/19

**INVOICE DUE:** 11/1/2019

# MANI BROTHERS
REAL ESTATE INVESTMENT

Dragon Global Management
9200 Sunset Boulevard

Suite #1201

West Hollywood     CA   90069

**TENANT ID:** 00-DRAGON

| SALES CD | DESCRIPTION | QUANTITY | PRICE | AMOUNT |
|---|---|---|---|---|
| TYPE A | P-2 & P-3 -Tandem-Unreserved | 5.00 | 215.00 | 1,075.00 |
| TYPE E | P-1 - Single - Reserved | 1.00 | 395.00 | 395.00 |

**INVOICE TOTAL:**     **1,470.00**

PLEASE MAKE ALL CHECKS PAYABLE TO:
MANI BROTHERS 9200 SUNSET (DE), LLC

## MANI BROTHERS REAL ESTATE INVESTMENT

◆ 9200 W. Sunset Blvd., Ste #555, West Hollywood, CA 90069 ◆ Phone: (310) 777-5000 ◆ Fax: (310) 777-5010 ◆ Email: mail@manibrothers.com

REPORT NAME:

**NAME OF CARDHOLDER**

10/16/2019
8:30:54AM

Cardholders for Company :   Dragon Global

**Alastra, Tommy**
Name # 237        Company -Dragon Global                                    Trace Card -Yes
                                                                            Visitor - No
         Card # - 10756                    Pin - 0
         Imprint # - 10756                 NumUses - 9,999      | Access Level(s) | | Loc - Linking Level(s) |
         StartDate - 4/24/2018             StopDate - 12/31/9999 | 9200 Elevators | | 12 - FLOOR 12 & 5 |
         Guard Tour - No                   Override APB - No
         Status - Yes
                                                                            End of Data for Name #237

**Bebel, Michael**
Name # 238        Company -Dragon Global                                    Trace Card -Yes
                                                                            Visitor - No
         Card # - 12088                    Pin - 0
         Imprint # - 12088                 NumUses - 9,999      | Access Level(s) | | Loc - Linking Level(s) |
         StartDate - 9/6/2017              StopDate - 12/31/9999 | 9200 Elevators | | 12 - FLOOR 12 & 5 |
         Guard Tour - No                   Override APB - No
         Status - Yes
                                                                            End of Data for Name #238

**Bellack, Bob**
Name # 239        Company -Dragon Global                                    Trace Card -Yes
                                                                            Visitor - No
         Card # - 13478                    Pin - 0
         Imprint # - 13478                 NumUses - 9,999      | Access Level(s) | | Loc - Linking Level(s) |
         StartDate - 8/1/2018              StopDate - 12/31/9999 | 9200 Elevators | | 12 - FLOOR 12 & 5 |
         Guard Tour - No                   Override APB - No
         Status - Yes
                                                                            End of Data for Name #239

**Blount, Sukari**
Name # 240        Company -Dragon Global                                    Trace Card -Yes
                                                                            Visitor - No
         Card # - 9960                     Pin - 0
         Imprint # - 9960 - $215.00        NumUses - 9,999      | Access Level(s) | | Loc - Linking Level(s) |
         StartDate - 5/7/2019              StopDate - 12/31/9999 | BLD/PARK/ELEV | | 12 - FLOOR 12 & 5 |
         Guard Tour - No                   Override APB - No
         Status - Yes
                                                                            End of Data for Name #240

**Brough, Alex**
Name # 241        Company -Dragon Global                                    Trace Card -Yes
                                                                            Visitor - No
         Card # - 8181                     Pin - 0
         Imprint # - 8181                  NumUses - 9,999      | Access Level(s) | | Loc - Linking Level(s) |
         StartDate - 6/6/2019              StopDate - 12/31/9999 | 9200 Elevators | | 12 - FLOOR 12 & 5 |
         Guard Tour - No                   Override APB - No
         Status - Yes
                                                                            End of Data for Name #241

**Corson, Taylor**
Name # 242        Company -Dragon Global                                    Trace Card -Yes
                                                                            Visitor - No
         Card # - 13480                    Pin - 0
         Imprint # - 13480 - $215.00       NumUses - 9,999      | Access Level(s) | | Loc - Linking Level(s) |
         StartDate - 6/6/2013              StopDate - 12/31/9999 | BLD/PARK/ELEV | | 12 - FLOOR 12 & 5 |
         Guard Tour - No                   Override APB - No
         Status - Yes
                                                                            End of Data for Name #242

**Ellin, Alec**
Name # 243        Company -Dragon Global                                    Trace Card -Yes
                                                                            Visitor - No
         Card # - 12091                    Pin - 0
         Imprint # - 12091                 NumUses - 9,999      | Access Level(s) | | Loc - Linking Level(s) |
         StartDate - 8/29/2017             StopDate - 12/31/9999 | 9200 Elevators | | 12 - FLOOR 12 & 5 |
         Guard Tour - No                   Override APB - No
         Status - Yes
                                                                            End of Data for Name #243

Page 55 of  385

**REPORT NAME:**

**NAME OF CARDHOLDER**

10/16/2019
8:30:54AM

---

**Ellin, Robert**
Name # 244    Company -Dragon Global        Trace Card -Yes    Visitor - No

| | |
|---|---|
| Card # - 12338 | Pin - 0 |
| Imprint # - 12338 | NumUses - 9,999 |
| StartDate - 8/29/2017 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #244*

---

**Fields, Kelsey**
Name # 245    Company -Dragon Global        Trace Card -Yes    Visitor - No

| | |
|---|---|
| Card # - 12340 | Pin - 0 |
| Imprint # - 12340 - $215.00 | NumUses - 9,999 |
| StartDate - 9/10/2019 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
BLD/PARK/ELEV

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #245*

---

**Gold, Jerry**
Name # 246    Company -Dragon Global        Trace Card -Yes    Visitor - No

| | |
|---|---|
| Card # - 12343 | Pin - 0 |
| Imprint # - 12343 - $215.00 | NumUses - 9,999 |
| StartDate - 8/29/2017 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
BLD/PARK/ELEV

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #246*

---

**Gruta, Chory**
Name # 247    Company -Dragon Global        Trace Card -Yes    Visitor - No

| | |
|---|---|
| Card # - 14754 | Pin - 0 |
| Imprint # - 14754 | NumUses - 9,999 |
| StartDate - 10/7/2019 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #247*

---

**Hoversten, Schuyler**
Name # 248    Company -Dragon Global        Trace Card -Yes    Visitor - No

| | |
|---|---|
| Card # - 12363 | Pin - 0 |
| Imprint # - 12363 | NumUses - 9,999 |
| StartDate - 8/29/2017 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #248*

---

**Islam, Aurnik**
Name # 249    Company -Dragon Global        Trace Card -Yes    Visitor - No

| | |
|---|---|
| Card # - 11715 | Pin - 0 |
| Imprint # - 11715 | NumUses - 9,999 |
| StartDate - 8/29/2017 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #249*

---

**Jacobson, Andrew**
Name # 250    Company -Dragon Global        Trace Card -Yes    Visitor - No

| | |
|---|---|
| Card # - 1331 | Pin - 0 |
| Imprint # - 1331 | NumUses - 9,999 |
| StartDate - 5/3/2018 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #250*

---

**Katz, Burton**
Name # 251    Company -Dragon Global        Trace Card -Yes    Visitor - No

| | |
|---|---|
| Card # - 11962 | Pin - 0 |
| Imprint # - 11962 | NumUses - 9,999 |
| StartDate - 3/4/2016 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #251*

---

Page 56 of 385

REPORT NAME:

10/16/2019
8:30:54AM

**NAME OF CARDHOLDER**

---

**Le, Anthony**
*Name # 252*    *Company* -Dragon Global

*Trace Card* -Yes
*Visitor* - No

| | |
|---|---|
| Card # - 12348 | Pin - 0 |
| Imprint # - 12348 | NumUses - 9,999 |
| StartDate - 8/29/2017 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #252*

---

**Lefkowitz, Jim**
*Name # 253*    *Company* -Dragon Global

*Trace Card* -Yes
*Visitor* - No

| | |
|---|---|
| Card # - 12081 | Pin - 0 |
| Imprint # - 12081 | NumUses - 9,999 |
| StartDate - 8/29/2017 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #253*

---

**Levison, Brent**
*Name # 254*    *Company* -Dragon Global

*Trace Card* -Yes
*Visitor* - No

| | |
|---|---|
| Card # - 13479 | Pin - 0 |
| Imprint # - 13479 | NumUses - 9,999 |
| StartDate - 8/1/2018 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #254*

---

**Loftus, Dede**
*Name # 255*    *Company* -Dragon Global

*Trace Card* -Yes
*Visitor* - No

| | |
|---|---|
| Card # - 1836 | Pin - 0 |
| Imprint # - 1836 | NumUses - 9,999 |
| StartDate - 10/1/2013 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #255*

---

**Muhammad, Tenia**
*Name # 256*    *Company* -Dragon Global

*Trace Card* -Yes
*Visitor* - No

| | |
|---|---|
| Card # - 12339 | Pin - 0 |
| Imprint # - 12339 - $215.00 | NumUses - 9,999 |
| StartDate - 8/29/2017 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
BLD/PARK/ELEV

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #256*

---

**Oseguero, Benny**
*Name # 257*    *Company* -Dragon Global

*Trace Card* -Yes
*Visitor* - No

| | |
|---|---|
| Card # - 10270 | Pin - 0 |
| Imprint # - 10270 | NumUses - 9,999 |
| StartDate - 6/21/2019 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #257*

---

**Phillips, Randy**
*Name # 258*    *Company* -Dragon Global

*Trace Card* -Yes
*Visitor* - No

| | |
|---|---|
| Card # - 14667 | Pin - 0 |
| Imprint # - 14667 | NumUses - 9,999 |
| StartDate - 9/10/2019 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #258*

---

**Ro, Tad**
*Name # 259*    *Company* -Dragon Global

*Trace Card* -Yes
*Visitor* - No

| | |
|---|---|
| Card # - 8987 | Pin - 0 |
| Imprint # - 8987 | NumUses - 9,999 |
| StartDate - 9/28/2018 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

Access Level(s)
9200 Elevators

Loc - Linking Level(s)
12 - FLOOR 12 & 5

*End of Data for Name #259*

---

Page 57 of 385

**10/16/2019**
**8:30:54AM**

## NAME OF CARDHOLDER

---

**Sangvhi, Sajan**
Name # 260      Company -Dragon Global

Trace Card -Yes
Visitor - No

| | |
|---|---|
| Card # - 11907 | Pin - 0 |
| Imprint # - 11907 | NumUses - 9,999 |
| StartDate - 8/29/2017 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

| Access Level(s) | Loc - Linking Level(s) |
|---|---|
| 9200 Elevators | 12 - FLOOR 12 & 5 |

*End of Data for Name #260*

---

**Schaer, Doug**
Name # 261      Company -Dragon Global

Trace Card -Yes
Visitor - No

| | |
|---|---|
| Card # - 12344 | Pin - 0 |
| Imprint # - 12344 | NumUses - 9,999 |
| StartDate - 8/29/2017 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

| Access Level(s) | Loc - Linking Level(s) |
|---|---|
| 9200 Elevators | 12 - FLOOR 12 & 5 |

*End of Data for Name #261*

---

**Sive, Bradly**
Name # 262      Company -Dragon Global

Trace Card -Yes
Visitor - No

| | |
|---|---|
| Card # - 8728 | Pin - 0 |
| Imprint # - 8728 | NumUses - 9,999 |
| StartDate - 5/16/2018 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

| Access Level(s) | Loc - Linking Level(s) |
|---|---|
| 9200 Elevators | 12 - FLOOR 12 & 5 |
| 9220 Elevators | 13 - FLOOR 2 |

*End of Data for Name #262*

---

**Wasson, Charlie**
Name # 263      Company -Dragon Global

Trace Card -Yes
Visitor - No

| | |
|---|---|
| Card # - 8667 | Pin - 0 |
| Imprint # - 8667 | NumUses - 9,999 |
| StartDate - 8/29/2017 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

| Access Level(s) | Loc - Linking Level(s) |
|---|---|
| 9200 Elevators | 12 - FLOOR 12 & 5 |

*End of Data for Name #263*

---

**Zangrillo, Robert**
Name # 264      Company -Dragon Global

Trace Card -Yes
Visitor - No

| | |
|---|---|
| Card # - 8611 | Pin - 0 |
| Imprint # - 8611 - addt | NumUses - 9,999 |
| StartDate - 10/7/2014 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - Yes |
| Status - Yes | |

| Access Level(s) | Loc - Linking Level(s) |
|---|---|
| BLD/PARK/ELEV | 12 - FLOOR 12 & 5 |

| | |
|---|---|
| Card # - 10935 | Pin - 0 |
| Imprint # - 10935 | NumUses - 9,999 |
| StartDate - 6/7/2012 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

| Access Level(s) | Loc - Linking Level(s) |
|---|---|
| 9200 Elevators | 12 - FLOOR 12 & 5 |

| | |
|---|---|
| Card # - 11299 | Pin - 0 |
| Imprint # - 11299 - addt | NumUses - 9,999 |
| StartDate - 6/7/2012 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

| Access Level(s) | Loc - Linking Level(s) |
|---|---|
| BLD/PARK/ELEV | 12 - FLOOR 12 & 5 |

| | |
|---|---|
| Card # - 11750 | Pin - 0 |
| Imprint # - 11750 | NumUses - 9,999 |
| StartDate - 5/9/2019 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - No |
| Status - Yes | |

| Access Level(s) | Loc - Linking Level(s) |
|---|---|
| 9200 Elevators | 12 - FLOOR 12 & 5 |

| | |
|---|---|
| Card # - 25049 | Pin - 0 |
| Imprint # - 25049 - $395.00 | NumUses - 9,999 |
| StartDate - 10/7/2014 | StopDate - 12/31/9999 |
| Guard Tour - No | Override APB - Yes |
| Status - Yes | |

| Access Level(s) | Loc - Linking Level(s) |
|---|---|
| Parking Only | |

*End of Data for Name #264*

---

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 94

REPORT NAME:

## NAME OF CARDHOLDER

---

**Zemetra, Mike**
Name # 265      Company -Dragon Global                           Trace Card -Yes
                                                                 Visitor - No

| | | | |
|---|---|---|---|
| Card # - 12124 | Pin - 0 | | |
| Imprint # - 12124 | NumUses - 9,999 | Access Level(s) | Loc - Linking Level(s) |
| StartDate - 4/3/2018 | StopDate - 12/31/9999 | 9200 Elevators | 12 - FLOOR 12 & 5 |
| Guard Tour - No | Override APB - No | | |
| Status - Yes | | | |

*End of Data for Name #265*

**Dragon Global Subtotal = 29**

---

**Page 59 of 385**



**Arlene Abreu Mahon**
SVP Finance & Accounting
Phone: 305-510-2430 (cell)
Email: amahon@onpointglobal.com

Please make note of my new company email address.

[Quoted text hidden]

---

**Taylor Corson** <tcorson@onpointglobal.com>                    Tue, May 14, 2019 at 12:55 AM
To: Arlene Mahon <amahon@onpointglobal.com>
Cc: Carmen Pena <cpena@onpointglobal.com>, Neal Sainani <nsainani@onpointglobal.com>

Hi Arlene,

Please see below from LiveXLives accounting team;

All,
Payment of $49,220.94 made up of the following:

*Billed        Diff*

| | | |
|---|---|---|
| March (revised) | 32,636.46 | *32,636.46* |
| April | 31,953.96 | *32,343.96* |
| Less deposit | (37,693.00) | *Due from Dragon Global* |
| | 26,897.42 | |
| May (no parking) | 22,323.52 | *28,831.02* |
| Total | 49,220.94 | |

*390.00 parking terminated*

*6,507.50 (Parking)*
*<4,085.00)(credit in June inv.*
*2,422.50 Bal*

[Quoted text hidden]

---

**Arlene Mahon** <amahon@onpointglobal.com> *WT  <1,812.50)07/11/19* Tue, May 14, 2019 at 10:07 AM
To: Carmen Pena <cpena@onpointglobal.com>             *610.00*
Cc: Alicia Nuche <anuche@onpointglobal.com>

Please see if this reconciles and record any reconciling entries in April.  The deposit, I will confirm with
Dede but it should be added to the Due from Dragon account as they likely have the deposit.

Thanks,



**Arlene Abreu Mahon**
SVP Finance & Accounting
Phone: 305-510-2430 (cell)
Email: amahon@onpointglobal.com

Please make note of my new company email address.

[Quoted text hidden]

*Caitlin Rober  215*
*Jerry Gold  215*
*Jorge Lopez  215*
*Tesia Muhammad  215*
*Alex Wu  8215*
*1075.00*
*Not credited*



**Carmen Pena <cpena@onpointglobal.com>**

## March and April 2019 Rent

**LiveXLive Accounting** <accounting@livexlive.com>          Wed, Apr 24, 2019 at 3:10 PM
To: Carmen Pena <cpena@onpointglobal.com>
Cc: Tenia Muhammad <tenia@livexlive.com>

Hi Carmen,

We will revise our invoice for March.

For April, we terminated parking for Andrew Jacobson and Jorge Lopez. We will remit the revised amount for 4,777.50.

| | |
|---|---|
| Billed | 5,167.50 |
| Changes | - 390.00 |
| New Amt: | 4,777.50 |

Thank you,
Sukari

LiveXLive Media, Inc.
269 S. Beverly Drive, Suite 1450
Beverly Hills, CA 90212
(310) 601-4770
accounting@livexlive.com

[Quoted text hidden]
*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please advise the sender immediately and delete this message. Any disclosure, copying, distribution or action taken or omitted to be taken by an unintended recipient in reliance on this message is strictly prohibited and may be unlawful.*

**Arlene Mahon** <amahon@onpointglobal.com>                    Tue, May 14, 2019 at 10:09 AM
To: Taylor Corson <tcorson@onpointglobal.com>
Cc: Carmen Pena <cpena@onpointglobal.com>, Neal Sainani <nsainani@onpointglobal.com>

Thank you, Taylor.  Do you and Neal agree with these payment terms, as they are not paying parking this month?  I am not yet sure why March is "revised" but Carmen will reconcile today and advise if she is able to come up to their number and what they exactly paid.

As far as the deposit, I will talk to Dede about transferring it from Dragon to On Point, but are there any repairs or damages to the property that would need to be made and applied to their deposit?

Thank you,

 **Arlene Abreu Mahon**
SVP Finance & Accounting
**Phone:** 305-510-2430 (cell)
**Email:** amahon@onpointglobal.com

Please make note of my new company email address.

[Quoted text hidden]

---

**Taylor Corson** <tcorson@onpointglobal.com>                    Tue, May 14, 2019 at 2:37 PM
To: Arlene Mahon <amahon@onpointglobal.com>
Cc: Carmen Pena <cpena@onpointglobal.com>, Neal Sainani <nsainani@onpointglobal.com>

Hi Arlene,

I will let Neal touch on the payment terms but in regards to property damages, there are a few repairs that Burt wanted me to have done. I've attached the invoices that Burt approved -
[Quoted text hidden]

**3 attachments**



**Office Repairs .png**
89K

📄 **Taylor Corson Revised Quoted $1,105.pdf**
56K

📄 **Flooring .pdf**
137K

                                    Carmen Pena <cpena@onpointglobal.com>

---

## LiveX Rent March-May
9 messages

**Carmen Pena** <cpena@onpointglobal.com>                    Fri, May 3, 2019 at 6:15 PM
To: Arlene Mahon <amahon@onpointglobal.com>

Arlene,

Please find attached invoices for LiveX Rent for March, April and May.

Thanks
Carmen

--



**Carmen E. Pena**
Controller
**Phone:** 305-546-0393
**Email:** cpena@onpointglobal.com

**3 attachments**

📄 **CA Rent - Apr2019.pdf**
3643K

📄 **CA Rent - Mar2019.pdf**
3571K

📄 **CA Rent - May Invoice.pdf**
4021K

---

**Arlene Mahon** <amahon@onpointglobal.com>                    Fri, May 10, 2019 at 5:43 PM
To: Taylor Corson <tcorson@onpointglobal.com>
Cc: Neal Sainani <nsainani@onpointglobal.com>, Carmen Pena <cpena@onpointglobal.com>

Hi Taylor,

We received $49,220.94 today and the three invoices for March, April and May equal $93,811.44  There is no way I have been able to tie out what they paid us so one of us will need to ask them what they are paying and why?  Let us know if you all are going to ask or if you prefer we inquire.

Thanks,



**Arlene Abreu Mahon**
SVP Finance & Accounting
**Phone:** 305-510-2430 (cell)
**Email:** amahon@onpointglobal.com

Please make note of my new company email address.

On Fri, May 10, 2019 at 3:53 PM Taylor Corson <tcorson@onpointglobal.com> wrote:
> Hi all,
>
> I have been informed from Robin and Tenia that the payment has been made but they have not clarified as to which invoices -
>
> Arlene, let me know if I need to follow up with them again if you're missing anything on your end.
>
> On Fri, May 3, 2019 at 5:35 PM Neal Sainani <nsainani@onpointglobal.com> wrote:
>> Thank Arlene. Adding Taylor.
>>
>> Taylor- pls follow up with Tenia and Robin on Monday. Thx
>>
>> ---------- Forwarded message ---------
>> From: **Arlene Mahon** <amahon@onpointglobal.com>
>> Date: Fri, May 3, 2019 at 3:55 PM
>> Subject: Fwd: LiveX Rent March-May
>> To: Neal Sainani <nsainani@onpointglobal.com>
>>
>>
>> HI Neal,
>>
>> Attached are the invoices prepared for the rent and March and April have already been sent to Tania.
>>
>> Please let us know if we can expect collection in May so I can add it to the treasury.
>>
>> Thank you,



**Arlene Abreu Mahon**
SVP Finance & Accounting
**Phone:** 305-510-2430 (cell)
**Email:** amahon@onpointglobal.com

Please make note of my new company email address.
[Quoted text hidden]
[Quoted text hidden]
--



**Neal Sainani**
Chief Product Officer
310.562.8970
nsainani@onpointglobal.com
onpointglobal.com



**Ms. Taylor Corson**
Executive Assistant & Office Manager
**Phone:** (206) 948-9736
**Email:** tcorson@onpointglobal.com
**Website:** onpointglobal.com

---

**Taylor Corson** <tcorson@onpointglobal.com>                    Fri, May 10, 2019 at 6:50 PM
To: Arlene Mahon <amahon@onpointglobal.com>
Cc: Neal Sainani <nsainani@onpointglobal.com>, Carmen Pena <cpena@onpointglobal.com>

Hi Arlene,

Thank you for this information. I sent them both an email earlier today asking what exact they paid so if I dont hear from them by Monday morning, I will let you know so you can reach out. If you dont hear from them I can offer a gentle nudge to the ladies when I see them in person -



**Ms. Taylor Corson**
Executive Assistant & Office Manager
**Phone:** (206) 948-9736
**Email:** tcorson@onpointglobal.com
**Website:** onpointglobal.com

[Quoted text hidden]

---

**Taylor Corson** <tcorson@onpointglobal.com>                    Mon, May 13, 2019 at 5:07 PM
To: Arlene Mahon <amahon@onpointglobal.com>
Cc: Neal Sainani <nsainani@onpointglobal.com>, Carmen Pena <cpena@onpointglobal.com>

Hi Arlene,

I reached out to Robin and Tenia again this morning to see what invoice they paid last week but I have yet to hear back -



**Ms. Taylor Corson**
Executive Assistant & Office Manager
**Phone:** (206) 948-9736
**Email:** tcorson@onpointglobal.com
**Website:** onpointglobal.com

[Quoted text hidden]

---

**Arlene Mahon** <amahon@onpointglobal.com>                    Mon, May 13, 2019 at 8:06 PM
To: Taylor Corson <tcorson@onpointglobal.com>
Cc: Neal Sainani <nsainani@onpointglobal.com>, Carmen Pena <cpena@onpointglobal.com>

Thank you, Taylor. Please let us know how to proceed as we do not know what to apply this to and they are missing the other half due.

# INVOICE

On Point Global LLC

INVOICE NO.   53119

DATE   5/31/2019

TO

LiveXLive

TERMS

Due on receipt

| DESCRIPTION | QUANTITY | TOTAL |
|---|---|---|
| May Rent @ 57.5% | | $22,323.52 |
| May Parking | | $6,507.50 |
| | | |
| | | |
| | | |
| | | |
| TOTAL DUE | | $28,831.02 |

# INVOICE

On Point Global LLC

INVOICE NO.   43019
DATE   4/24/2019

TO
    LiveXLive

TERMS
    Due on receipt

| DESCRIPTION | QUANTITY | TOTAL |
|---|---|---|
| April Rent @ 70% | | $27,176.46 |
| April Parking | | $5,167.50 |
| | | |
| | | |
| | | |
| | | |
| | TOTAL DUE | $32,343.96 |

# INVOICE

On Point Global LLC

INVOICE NO.   33019

DATE   3/31/2019

TO
    LiveXLive

TERMS
    Due on receipt

| DESCRIPTION | QUANTITY | TOTAL |
|---|---|---|
| March Rent @ 70% | | $27,176.46 |
| March Parking | | $5,460.00 |
| | | |
| | | |
| | | |
| | | |
| | TOTAL DUE | **$32,636.46** |

| Date | Amount | Description |
|------|--------|-------------|
| 1/10/2019 | 32,051.46 | WT FED#00567 1ST CENTURY BANK /ORG=LIVEXLIVE MEDIA INC SRF# 3362274075 TRN#19011014 2040 RFB# |
| 1/4/2019 | 33,408.73 | WT FED#00579 1ST CENTURY BANK /ORG=LIVEXLIVE MEDIA INC SRF# 3418322451 TRN#19010413 0130 RFB# |
| 1/22/2019 | 31,793.96 | WT FED#00875 1ST CENTURY BANK /ORG=LIVEXLIVE MEDIA INC SRF# 2508418534 TRN#19012217 5099 RFB# |

97,254.15

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 105

# Dragon Global Management, LLC

Invoice Number:     LL0119

Date:               Jan 3, 2018

Customer:           LiveXLive

**Description of Services: January and February Rent and Parking**
**Total Amount Due: <u>$65,926.92</u>**

**Total Rent and Parking Due:  $ 65,926.92**
- Jan 2019 Rent at 70%  $27,176.46
- Feb 2019 Rent at 70%  $27,176.46
- Jan 2019 Parking      $5,787
- Feb 2019 Parking est  $5,787

For questions please contact:      Dede Loftus (650) 533-3213

**Wire Instructions:**
On Point Global, LLC
Wells Fargo Bank, 420 Montgomery, San Francisco, CA 94104
ABA:121000248
Acct: ███7164

Dragon Global Management, LLC

# Dragon Global Management, LLC

Invoice Number:     LL1201

Date:               Dec 6, 2018

Customer:           LiveXLive

**Description of Services: December Charges and Outstanding Utilities**
**Total Amount Due: <u>$49,344.83</u>**

**Total Rent and Parking Due:  $34,710.63**
- Dec – Total Amount 75% of rent      $29,117.63  *pd*
- Parking Dec                          $5,265.50   *pd*
- Partial Parking & Misc Dec -         $327.50     *pd*

**Outstanding Amounts Due: $14,634.20**
- Balance due for Utilities for 2017 thru Aug 2018 -    $11,786.30 ✓
- Balance due for Utilities for Aug 2018 – Dec 2018-    $4,149.80 ✓
- Credit for parking overpayment –Nov 2018             ($1,301.90)  *two*

For questions please contact:      Dede Loftus (650) 533-3213        $33,408.73 *pd*.

**Wire Instructions:**
On Point Global, LLC
Wells Fargo Bank, 420 Montgomery, San Francisco, CA 94104
ABA:121000248
Acct: ████7164

Dragon Global Management, LLC

PX23:  Declaration of Lashanda Freeman
Attachment A: Page 107

| Date funded | Invoice | Company | Description | Amount |
|---|---|---|---|---|
| 1/4/2018 | 57079 | On Point | 2019 January Rent | 38,823.51 |
| | 15524 | On Point | Parking January | 6,660.00 |
| | 57027 | Live | Parking Nov-Dec | 292.50 |
| | 57027 | | Carpet cleaning | 425.00 |
| | | | | 46,201.01 |

## JP Morgan Chase Bank, N.A.
## INCOMING ACH TRANSFER

| | |
|---|---|
| **BANK ROUTING TRANSIT #:** | 021000021 |
| **BANK:** | JP Morgan Chase Bank, N.A.<br>2029 Century Park East 39th Floor<br>Los Angeles, CA 90067 |
| **BENEFICIARY:** | MANI BROTHERS 9200 SUNSET (DE), LLC<br>9200 SUNSET BOULEVARD, SUITE #555<br>WEST HOLLYWOOD, CA 90069 |
| **ACCOUNT #:** | ████2839 |

## JP Morgan Chase Bank, N.A.
## INCOMING WIRE TRANSFER

| | |
|---|---|
| **BANK ROUTING TRANSIT #:** | 021000021 |
| **BANK:** | JP Morgan Chase Bank, N.A.<br>2029 Century Park East 39th Floor<br>Los Angeles, CA 90067 |
| **BENEFICIARY:** | MANI BROTHERS 9200 SUNSET (DE), LLC<br>9200 SUNSET BOULEVARD, SUITE #555<br>WEST HOLLYWOOD, CA 90069 |
| **ACCOUNT #:** | █████2839 |

# MANI BROTHERS

## MANI BROTHERS RENT PAYMENT OPTIONS

All payments for monthly Base Rent and related charges are due and payable to Mani Brothers **on or before the first (1st) day of each month**, pursuant to Article 3 of Tenant's Lease. Tenant is required to pay the monthly Base Rent without receiving any notice, invoice or demand for payment from Mani Brothers. The amount of the Base Rent will remain as a fixed amount each month, but will increase once every twelve (12) months by a percentage amount, as specified in Tenant's lease. Our accounting department will provide you with an invoice each month for the Base Rent, including any related charges due. However, if Tenant does not receive an invoice, Tenant is still responsible for the timely remittance of the Base Rent for the Premises.

Mani Brothers does understand that there can be extenuating circumstances, on occasion, where the Rent payment is not made on or before the first (1st) day of the month. Accordingly, we have allowed Tenant a grace period that is specifically referenced in Article 25 of Tenant's lease. **Please Note:** Rent payments are marked as "paid" to Tenant's account as of the date Mani Brothers actually receives the payment and not the date Tenant processes the payment. Therefore, any Rent payments received by Mani Brothers, one or more days after the grace period, will automatically incur an irreversible late charge, calculated as a percentage of the total amount due, as set forth in Article 25 of your Lease. Late fees applied to Tenant's account will be due and payable to Mani Brothers as Additional Rent.

| Payment Options | Instructions |
|---|---|
| **U.S. Mail** | All checks should be sent to: 9200 Sunset Boulevard, Suite 555, West Hollywood, CA 90069, Attention: Isabel. |
| **Hand-Delivery** | Deliver checks to 9200 Sunset, Suite 555 and give directly to Isabel. Landlord will not be responsible for any checks left at either the Suite 555 reception desk, security desk in your Building or at the 9200 Sunset security desk. Isabel is in the office from 8:30 a.m. to 2:30 p.m. |
| **Automatic Payments** | Tenant is responsible to follow up with its bank to confirm payment was received into Landlord's bank account. Landlord is not responsible for the failure of the Tenant bank to process the payment. If late fees are incurred, Tenant's recourse will be to file a claim with Tenant's bank for reimbursement of any late fees applied to Tenant's account. |
| **Wire Transfer** | Contact Isabel at isabel@manibrothers.com for Landlord's wire instructions. Tenant is responsible to follow up with its bank to confirm payment was received into Landlord's bank account. Landlord is not responsible for wire transfers not received into our bank account. |
| **Credit Card** | All credit card payments will include a 3% service charge. Contact Isabel at isabel@manibrothers.com and she will forward a credit card authorization form for completion by Tenant. |

**Please take note of U.S.Mail and bank holidays, to be sure your payment is received no later than the last day of the grace period, regardless of the date of the holiday.**

Attachment B









Attachment C

| First Name | Last Name | Email Address |
|---|---|---|
| Thomas | Abercrombie | tabercrombie@onpointglobal.com |
| UY | AdSense | uy-adsense@onpointglobal.com |
| OnPoint Global | Affiliates | affiliates@onpointglobal.com |
| Ignacio | Alpuin | ialpuin@onpointglobal.com |
| Pablo | Amato | pamato@onpointglobal.com |
| India | Amos | iamos@onpointglobal.com |
| api-account1 | api | api-account1@onpointglobal.com |
| Development | Applications | devapps@onpointglobal.com |
| aws-admin | aws-admin-onpointglobal | aws-admin@onpointglobal.com |
| Sara | Ayala | sayala@onpointglobal.com |
| Kimberly | Babcock | t_kbabcock@onpointglobal.com |
| Hello | Baby | hellobaby@onpointglobal.com |
| Ramiro | Baluga | rbaluga@onpointglobal.com |
| Alejandro | Barrios | abarrios@onpointglobal.com |
| Fola | Baruwa | fbaruwa@onpointglobal.com |
| Gerardo | Bautista | gbautista@onpointglobal.com |
| Louis-Pierre | Beaumont | lbeaumont@onpointglobal.com |
| Taryn | Bell | tbell@onpointglobal.com |
| Bob | Bellack | bbellack@onpointglobal.com |
| Bianca | Benedi | bbenedi@onpointglobal.com |
| Michael | Bierbaumer | mbierbaumer@onpointglobal.com |
| Megan | Black | mblack@onpointglobal.com |
| Robert | Blaske | rblaske@onpointglobal.com |
| Alina | Blum | ablum@onpointglobal.com |
| Juan | Borges | jborges@onpointglobal.com |
| Tomasz | Boron | tboron@onpointglobal.com |
| Kimberly | Boza | kboza@onpointglobal.com |
| Martina | Bretous | mbretous@onpointglobal.com |
| Gelsey | Brizo | gbrizo@onpointglobal.com |
| Legal | Calendar | legal@onpointglobal.com |
| Conference | Call | conferencecall@onpointglobal.com |
| OnPoint | Candidates | candidates@onpointglobal.com |
| Jorge | Cardone | jcardone@onpointglobal.com |
| Ignacio | Carrera | icarrera@onpointglobal.com |
| Sara | Catanzano | scatanzano@onpointglobal.com |
| Vicente | Cersosimo | vcersosimo@onpointglobal.com |
| Anibal | Ciffoni | aciffoni@onpointglobal.com |
| Andy | Clavijo | aclavijo@onpointglobal.com |
| UY | Comunicaciones | comunicaciones@onpointglobal.com |
| Taylor | Corson | tcorson@onpointglobal.com |
| Edgar | Cruz | ecruz@onpointglobal.com |
| Carlos | Cunarro | ccunarro@onpointglobal.com |
| Martin | Da Rosa | mdarosa@onpointglobal.com |
| Florencia | Da Silva Backup | fdasilva@onpointglobal.com |
| Ariel | Dayan | adayan@onpointglobal.com |
| Cathy | Defini | cdefini@onpointglobal.com |

| First Name | Last Name | Email Address |
|---|---|---|
| Caitlin | Diamante | cdiamante@onpointglobal.com |
| Karel | Diaz | kdiaz@onpointglobal.com |
| Pablo | Diaz | pdiaz@onpointglobal.com |
| Aline | Domingues | adomingues@onpointglobal.com |
| Tehilla | Drori | tdrori@onpointglobal.com |
| Sasha | Drujinina | sdrujinina@onpointglobal.com |
| Sarah | Dunn | sdunn@onpointglobal.com |
| Calyn | Ehid | cehid@onpointglobal.com |
| Patrick | Eisenmann | peisenmann@onpointglobal.com |
| Charlie | Eissa | ceissa@onpointglobal.com |
| Tech | Email | tech@onpointglobal.com |
| Tim | Erdies | terdies@onpointglobal.com |
| Kimberly | Fernandes | kfernandes@onpointglobal.com |
| Whitney | Ford | wford@onpointglobal.com |
| Nicole | Franco | nfranco@onpointglobal.com |
| Luana | Gabriella | lgabriella@onpointglobal.com |
| Ines | Gaitan | igaitan@onpointglobal.com |
| Mario | Garcia | magarcia@onpointglobal.com |
| Carlos | Garcia | cgarcia@onpointglobal.com |
| Marcos | Garcia | mgarcia@onpointglobal.com |
| Valeria | Gauna | vgauna@onpointglobal.com |
| Kahlil | Gersbach | kgersbach@onpointglobal.com |
| MarÃa Eugenia | GimÃ©nez | mgimenez@onpointglobal.com |
| OnPoint | Global | skype@onpointglobal.com |
| Alana | Gomez | agomez@onpointglobal.com |
| Edwin | Gonzalez | egonzalez@onpointglobal.com |
| Wieslaw | Gorski | wgorski@onpointglobal.com |
| Richard | Granda | rgranda@onpointglobal.com |
| Angela | Grant | agrant@onpointglobal.com |
| Josh | Greenberg | jgreenberg@onpointglobal.com |
| Anthony | Guzzo | aguzzo@onpointglobal.com |
| All | Hands | allhands@onpointglobal.com |
| Eric | Hargett | ehargett@onpointglobal.com |
| Alexandra | Hargrove | t_ahargrove@onpointglobal.com |
| Jasmine | Harris | jharris@onpointglobal.com |
| Sheridan | Hathaway | shathaway@onpointglobal.com |
| Aaron | Hendrick | ahendrick@onpointglobal.com |
| Joe | Higgins | jhiggins@onpointglobal.com |
| Jason | Hiroshima | jhiroshima@onpointglobal.com |
| Steven | Hussey | shussey@onpointglobal.com |
| Zachary | Jacobs | zjacobs@onpointglobal.com |
| Sarai | Jaimes | sjaimes@onpointglobal.com |
| Christopher | Jalil | cjalil@onpointglobal.com |
| Valerie | Janda | vjanda@onpointglobal.com |
| Sara | Jaramillo | sjaramillo@onpointglobal.com |
| jobsuy | jobsuy | jobsuy@onpointglobal.com |

| First Name | Last Name | Email Address |
|---|---|---|
| Kelsey | Kaitazoff | kkaitazoff@onpointglobal.com |
| Burton | Katz | bkatz@onpointglobal.com |
| Lucia | Kroner | lkroner@onpointglobal.com |
| Manoj | Kumar | mkumar@onpointglobal.com |
| LA Conference Room | LA Conference Room | laconferenceroom@onpointglobal.com |
| Rafael | Lachowski | rlachowski@onpointglobal.com |
| Aldo | Lanzas | alanzas@onpointglobal.com |
| GerÃ³nimo | Larrique | glarrique@onpointglobal.com |
| Itziar | Lasarte | ilasarte@onpointglobal.com |
| Brent | Lenhard | blenhard@onpointglobal.com |
| Brent | Levison | blevison@onpointglobal.com |
| Mariana | Licio | mlicio@onpointglobal.com |
| Valentina | Lopez | vlopez@onpointglobal.com |
| Victoria | Lorido | vlorido@onpointglobal.com |
| Leesa | Love | llove@onpointglobal.com |
| Juan Ignacio | Lussich | jlussich@onpointglobal.com |
| Lev | Lvovsky | llvovsky@onpointglobal.com |
| Adam | Mallat | amallat@onpointglobal.com |
| Sunil | Manoharan | smanoharan@onpointglobal.com |
| Florencia | MartÃn | fmartin@onpointglobal.com |
| Leyanis | Martinez | lmartinez@onpointglobal.com |
| Conor | McFadden | cmcfadden@onpointglobal.com |
| Patrick | McGowan | pmcgowan@onpointglobal.com |
| Britt | McKay | bmckay@onpointglobal.com |
| Social | Media | socialmedia@onpointglobal.com |
| Matthew | Meyer | mmeyer@onpointglobal.com |
| OnPoint | MIA Communications | miacommunications@onpointglobal.com |
| Christian | Miguez | cmiguez@onpointglobal.com |
| Alin | Mihai | t_amihai@onpointglobal.com |
| Natanel | Miller | nmiller@onpointglobal.com |
| Edwin | Miranda | emiranda@onpointglobal.com |
| Logan | Mitchell | lmitchell@onpointglobal.com |
| Lilian | Mitrev | lmitrev@onpointglobal.com |
| modem | modem | modem@onpointglobal.com |
| Kyle | Moir | kmoir@onpointglobal.com |
| Manuela | Moncayo | mmoncayo@onpointglobal.com |
| Roxana | Moron | rmoron@onpointglobal.com |
| Felicia | Muniz | fmuniz@onpointglobal.com |
| Bonita | Navarro | bnavarro@onpointglobal.com |
| Candice | Nestel | cnestel@onpointglobal.com |
| Revenue | Notifications | revenue-notifications@onpointglobal.com |
| Alicia | Nuche | anuche@onpointglobal.com |
| Vickie | Oglesby | voglesby@onpointglobal.com |
| Charles | Ohana | cohana@onpointglobal.com |
| onelogin-connector | onelogin | onelogin-connector@onpointglobal.com |
| Reporting | OnPoint | reporting@onpointglobal.com |

| First Name | Last Name | Email Address |
|------------|-----------|---------------|
| Podcast | OnPoint | podcast@onpointglobal.com |
| Copyright | OnPoint | copyright@onpointglobal.com |
| Data | OnPoint | data@onpointglobal.com |
| Events | OnPoint | events@onpointglobal.com |
| Global Communication | OnPoint | globalcommunication@onpointglobal.com |
| Interview | OnPoint | interview@onpointglobal.com |
| Push | OnPoint | push@onpointglobal.com |
| Hello | OnPoint | hello@onpointglobal.com |
| Admin | Onpointglobal.com | admin@onpointglobal.com |
| Git | Onpointglobal.com | git@onpointglobal.com |
| Careers | Onpointglobal.com | careers@onpointglobal.com |
| Molly | O'Shea | moshea@onpointglobal.com |
| Alex | Ovalle | aovalle@onpointglobal.com |
| Rebeca | PÃ©rez | rperez@onpointglobal.com |
| Andres | Pache | apache@onpointglobal.com |
| Jeanne | Pascua | jpascua@onpointglobal.com |
| digital-ocean-admin | Passports | digital-ocean-admin@onpointglobal.com |
| Adriana | Patino | apatino@onpointglobal.com |
| Jeremy | Paulino | jpaulino@onpointglobal.com |
| Carmen | Pena | cpena@onpointglobal.com |
| Lena | Perez | lperez@onpointglobal.com |
| Nadia | Peshev | npeshev@onpointglobal.com |
| Kyle | Pierce | kpierce@onpointglobal.com |
| OnPoint | Polls | polls@onpointglobal.com |
| Melanie | Preiner | mpreiner@onpointglobal.com |
| Accounting | Printer | accountingprinter@onpointglobal.com |
| General | Printer | printer@onpointglobal.com |
| OnPoint | Processing | processing@onpointglobal.com |
| MarÃa Noel | Puentes | mpuentes@onpointglobal.com |
| recover-Raza | recover-malik | rmalik@onpointglobal.com |
| domains | registar | domains@onpointglobal.com |
| Francisco | Regusci | fregusci@onpointglobal.com |
| Analytic | Reporting | analyticreporting@onpointglobal.com |
| Human | Resources | humanresources@onpointglobal.com |
| Pablo | Revetria | prevetria@onpointglobal.com |
| Vanessa | Revetria | vrevetria@onpointglobal.com |
| Erika | Rincon | erincon@onpointglobal.com |
| Kirsten | Rincon | krincon@onpointglobal.com |
| Adam | Rioux | arioux@onpointglobal.com |
| Carla | Rivas | crivas@onpointglobal.com |
| Mark | Roah | mroah@onpointglobal.com |
| Mauricio | Rodriguez | mrodriguez@onpointglobal.com |
| Mina | Rofeh | mrofeh@onpointglobal.com |
| Conference | Room | conferenceroom@onpointglobal.com |
| Julieta | Rothberg | jrothberg@onpointglobal.com |
| Elisha | Rothman | erothman@onpointglobal.com |

| First Name | Last Name | Email Address |
|---|---|---|
| Jonathan | Rykman | jrykman@onpointglobal.com |
| Neal | Sainani | nsainani@onpointglobal.com |
| Victor | Sales | vsales@onpointglobal.com |
| Leonardo | Sales | lsales@onpointglobal.com |
| Andrea | Salmon | asalmon@onpointglobal.com |
| Janos | Sario | jsario@onpointglobal.com |
| Gregg | Schapiro | gschapiro@onpointglobal.com |
| Renzo | Scivoli | rscivoli@onpointglobal.com |
| Leeza | Segal | t_lsegal@onpointglobal.com |
| Jonas | Senker | jsenker@onpointglobal.com |
| Sol | Serron | sserron@onpointglobal.com |
| Chris | Sherman | csherman@onpointglobal.com |
| Bernardo | Simoes | bsimoes@onpointglobal.com |
| Ravi | Singh | rsingh@onpointglobal.com |
| SebastiÃ¡n | Sosa | ssosa@onpointglobal.com |
| Michael | Spitaleri | mspitaleri@onpointglobal.com |
| Jessica | Suarez | jsuarez@onpointglobal.com |
| Steve | Suslow | suslow@onpointglobal.com |
| Yohann | Taieb | ytaieb@onpointglobal.com |
| Cindy | Talavera | ctalavera@onpointglobal.com |
| Design | Team | design@onpointglobal.com |
| Accounting | Team | accounting@onpointglobal.com |
| Test | Test | testuser10@onpointglobal.com |
| testuser2 | test | testuser2@onpointglobal.com |
| testuser9 | test | testuser9@onpointglobal.com |
| testuser1 | test | testuser1@onpointglobal.com |
| Aditya | Thakur | athakur@onpointglobal.com |
| Maxim | Tishchenko | mtishchenko@onpointglobal.com |
| Edwin | Toro | etoro@onpointglobal.com |
| John | Torrents | jtorrents@onpointglobal.com |
| Kristen | Torres | ktorres@onpointglobal.com |
| OnPoint | US Communications | uscommunications@onpointglobal.com |
| Liza | Vallejos | lvallejos@onpointglobal.com |
| Mike | Van Aken | mvanaken@onpointglobal.com |
| MartÃn | Vera | mvera@onpointglobal.com |
| Pamela | Viales | pviales@onpointglobal.com |
| victest | victests | victest@onpointglobal.com |
| Zena | Whelan | zwhelan@onpointglobal.com |
| Ivan | Wolfsohn | iwolfsohn@onpointglobal.com |
| Agustin | Young | ayoung@onpointglobal.com |
| Alexa | Zangrillo | alzangrillo@onpointglobal.com |
| Amber | Zangrillo | azangrillo@onpointglobal.com |
| Bob | Zangrillo | bzangrillo@onpointglobal.com |
| Jeffrey | Zern | jzern@onpointglobal.com |
| Paola | Zuluaga | pzuluaga@onpointglobal.com |