IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-25046-Civ-Scola

FEDERAL TRADE COMMISSION,

        Plaintiff,

v.

ON POINT GLOBAL LLC and others,

        Defendants.

_____/

## RECEIVER'S SECOND STATUS REPORT

Melanie E. Damian, the court-appointed Receiver (the "Receiver") in the above-captioned enforcement action, submits her second status report concerning the status of the Receivership, established pursuant to the Court's Temporary Restraining Order ("TRO") [ECF No. 17], which the Court extended in its Order Granting Motion for Preliminary Injunction ("Preliminary Injunction") [ECF No. 126].  This interim report sets forth her activities and efforts to fulfill her duties under the TRO and Preliminary Injunction pursuant to which she was appointed for the period from January 10, 2020 through March 31, 2020 (the "Reporting Period").

## **TABLE OF CONTENTS**

I.  INTRODUCTION ..................................................................................................3

II.  PROCEDURAL BACKGROUND AND THE APPOINTMENT AND DUTIES
OF RECEIVER ....................................................................................................4

    A.  Appointment of Receiver, Initial Status Report, and
Preliminary Injunction .......................................................................... 4

    B.  Receiver's Duty to File Periodic Status Report ............................... 6

III.  STATUS AND ACTIVITIES OF THE RECEIVERSHIP
(JANUARY 10, 2020 THROUGH MARCH 31, 2020) ...........................................6

    A.  Updated Accounting of Receivership Assets .................................6

    B.  Additional Asset Recovery and Liability Management .................... 7
       i.  Accounts Receivable ............................................................ 7
       ii. Insurance Claims ................................................................. 8
       iii. Domain Assets .................................................................... 8
       iv. SunTrust Loan ..................................................................... 9
       v. Avenue I Media ................................................................. 10
       vi. Defendants' Offices ......................................................... 10

    C.  Ongoing Management and Administration of the Entity Defendant ........... 11
       i. Receiver's Modified Website Templates ....................... 11
       ii. Customer Refunds, Chargebacks and Complaints ....... 14
       iii. Further Consumer Protection and Compliance Measures ......... 15

    D.   Entities Added to Receivership ................................................... 15

IV. RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP ................ 17

V. CASH ON HAND AND EXPENSES OF RECEIVERSHIP ESTATE .................... 18

VI. ASSISTANCE FROM RECEIVER'S FORENSIC ACCOUNTANTS .................... 19

VII. CONCLUSION ............................................................................................20

## I.     INTRODUCTION

Since her appointment, the Receiver, with the assistance of her legal counsel and other professionals, took control of all Receivership Entities and operations related to the On Point Global business and has worked diligently with counsel for the Federal Trade Commission (the "FTC") and counsel for Defendants, to provide all parties access to any information requested and through the judicial process sought to preserve the assets by continuing those operations that could be operated (as modified) in nondeceptive manner.  Further, the Receiver identified and marshalled all known assets and records of the Defendants not previously identified and secured, including without limitation, funds held in bank accounts, merchant processor reserve funds, bank records, and open and overdue invoices with advertising affiliates and third-parties.  As reflected in the Receiver's Initial Status Report [ECF No. 108], the Receiver, with the assistance of her forensic accountants, identified, located, marshaled, and maximized Receivership Estate assets as authorized by the TRO and Preliminary Injunction including, but not limited to, revenue generated from partnerships with advertising affiliates, revenue generated by Avenue I Media ("Avenue I"), and liquidating certain Estate assets including valuable but unused domains owned by certain Defendants.  Further, the Receiver has succeeded in significantly reducing the Defendants' monthly operational costs by eliminating business segments that violated the TRO and Preliminary Injunction and trimming non-essential employees, restructuring or eliminating unnecessary lease agreements at various locations, and restructuring or working out debts with financial institutions. The Receiver continues to work with her counsel and the Defendants to collect on all outstanding accounts receivable so as to maximize the value of the Estate.

The Receiver, with assistance from outside compliance counsel, the Defendants and counsel for all parties, has spent significant time drafting and modifying new proposed templates

for implementation on the Defendants' freemium and pay-for-services websites so these websites may operate in compliance with FTC regulations, to protect consumers, and to maximize the value of the going concern and the Estate.  Since filing her Initial Status Report, and even after filing her Motion to Approve Modified Templates for Entity Defendants' Websites Pursuant to Court Order Dated January 14, 2020 and Authorization to Make Payments to Assist in Operating Going Concern [ECF No. 169] (the "Motion to Approve the Modified Templates"), the Receiver with assistance from outside compliance counsel has continued her efforts to implement additional policies and procedures to better inform and protect consumers to ensure that all of the Defendants' business lines are compliant with FTC regulations and provide value to consumers.

The Receiver has performed and will continue to perform her duties and obligations as set forth by the TRO and Preliminary Injunction, with the assistance of her counsel and other professionals, throughout the duration of the Receivership in furtherance of this Court's Orders.

## II.   PROCEDURAL BACKGROUND AND THE APPOINTMENT AND DUTIES OF RECEIVER

### A.  *Appointment of Receiver, Initial Status Report, and Preliminary Injunction*

The TRO entered on December 13, 2019, among other things, directed the Receiver to submit her conclusions and recommendations as to the nature of the Defendants' business and, among many other things, whether any portion of the business could continue to operate lawfully and profitably on or before the hearing on the FTC's motion for Preliminary Injunction, which was set to take place on January 10, 2020.  *See* ECF No. 17.

On January 9, 2020, the Receiver filed her Initial Status Report, which described the Receiver's initial efforts to carry out her duties and obligations as set forth in the TRO as well as her recommendations regarding the Defendants' business, continued operation and modification thereof, and the status of the Receivership Estate.  *See* ECF No. 108.  The Receiver's Initial Report

detailed the considerable time and effort made by the Receiver and her professionals in unpacking the complex and intertwined web of businesses and finances of the Defendants in order to fully satisfy her duties under the TRO.  The Initial Status Report reflected the Receiver's conclusions that, while a large segment of the business was required to be taken immediately off-line, certain of the Defendants' business could (if modified) continue to operate legally and profitably.  The Receiver opined that the Defendants' Avenue I business, which was not the subject of any FTC allegations, could continue legally and profitably.  The Receiver also proposed that the Defendants' freemium data business and certain "pay-for-service" sector business potentially could continue operating legally and profitably if modified and approved by the Court.  *See* ECF No. 108.[1]  The Receiver, therefore, recommended that she be permitted to draft modified templates for the freemium and "pay-for-services" websites that would make them nondeceptive and profitable, vet them with the FTC and the Defendants, and present them to the Court for approval. *See* ECF No. 108.

On January 14, 2020, following the evidentiary hearing on the FTC's motion for preliminary injunction, the Court entered the Preliminary Injunction, which, among other things, extended the Receivership and required the Receiver to submit her second interim status report by April 20, 2020.[2]  *See* ECF No. 126.

---

[1] The Receiver reasoned that collecting data in exchange for free information and providing services at an up charge with value add is not itself prohibited by law if done nondeceptively.  And so, an attempt to do so nondeceptively was pursued because based on the Receiver's investigation the going concern value could be substantial.  As such, keeping those aspects of the going concern operating would serve to preserve and substantially enhance the value of the Receivership Estate, and thereby fulfill certain obligations of the Receiver under the Court's Orders.  As set forth *infra*, the going concern performance to date supports that position.

[2] On April 17, 2020, the Court granted the Receiver's motion to extend the deadline to file her second interim status report through and including April 24, 2020.  *See* ECF No. 201.

### B.  Receiver's Duty to File Periodic Status Reports

The Receiver continues to fulfill her duties and obligations under the TRO and Preliminary Injunction.  Pursuant to Paragraph 13 of the Preliminary Injunction, the Receiver is required to "File a summary report with the Court of the receivership…every three months…and include the following information: 1. A summary of the Receiver's operations since the previous report; 2. The known value of Assets and sum of liabilities of the Receivership Entities; 3. A schedule of the Receiver's receipts and disbursements; 4. The steps the Receiver intends to take in the future to protect receivership Assets, recover receivership Assets from third parties, and adjust receivership liabilities; 5. The Receiver's recommendation for a continuation or discontinuation of the Receivership, or for changes to the Receivership, and the reasons for the recommendations; and 6. Any other matters which the Receiver believes should be brought to the Court's attention."  ECF No. 126.

### III.    STATUS AND ACTIVITIES OF THE RECEIVERSHIP (JANUARY 10, 2020 THROUGH MARCH 31, 2020)

The Receiver provides herein a detailed description of her efforts and accomplishments with respect to her duties under the Court's Orders during the current Reporting Period.

### A.  Updated Accounting of Receivership Assets

As of March 31, 2020, the Receiver held a total of $2,239,880.76 in her fiduciary accounts for the Receivership Estate at City National Bank in Miami, Florida, earning interest at 1.25% (APR), and in reserve accounts at merchant processors under the exclusive control of the Receiver. *See* Receivership Receipts and Disbursements attached hereto as **Exhibit A.**  In addition to this cash on hand, the entity Defendants own the following assets:

- $9,042,154.96 in uncollected amounts owed to On Point Global, LLC ("On Point") from advertising affiliates and other outstanding Receivables.

- $563.854.61 in liquid Assets held in reserve accounts at Merchant Processors not yet turned over to the Estate.[3]

- Domain Names valued at approximately $30 million.

- Remaining business operations and intellectual property, including the Avenue I – Exchange Business and domains (value unknown)

- Office furnishings and equipment including computers and other electronics currently in 5 offices.

- Dragon Global Management LLC's assets:  a 2010 Ferrari, a 2016 Range Rover, and various artwork disclosed in financial disclosures (the total value of these assets was disclosed to be approximately $1.2 million)[4]

**B.  *Additional Asset Recovery and Liability Management***

Pursuant to the authority granted to the Receiver by the TRO and Preliminary Injunction, as set forth below, the Receiver continues to identify and marshal assets for the benefit of the Estate, including potential third-party claims.  *See* ECF No. 126, Sec. XII.

> ***i.***  *Accounts Receivable*

With the assistance of the remaining employees at the Defendants' offices, the Receiver continues to identify and collect on all outstanding accounts receivable.  As of March 31, 2020,

---

[3] Figures reflecting outstanding invoice amounts derived from On Point Global A/R Aging Summary, attached hereto as **Exhibit B**.

[4] Subsequent to providing its financial disclosures to the Receiver, Dragon Global Management LLC informed the Receiver that the Range Rover is subject to a five-year retail installment sale contract entered into as of November 2019 and proposed to take responsibility for making all payments due under that contract and that the vehicle not be deemed an asset of the Estate.  The Receiver will agree to such arrangement, subject to Court approval.  Further, Dragon Global Management LLC informed the Receiver that it had erroneously listed the artwork as its assets when in fact it was owned by Defendant Robert Zangrillo or a third-party entity.  Dragon Global Management LLC is working on providing to the Receiver documentation and other evidence to support its position.

the Defendants have identified $9,042,154.96 in outstanding amounts owed from various sources. The Receiver, the Receiver's counsel and other professionals, and Defendants' employees continue to pursue these outstanding amounts for the benefit of the Estate.  The Defendants have identified $5,492,991.52 in amounts owed by various advertising affiliates with which the Defendants have had business dealings, $2,985,308.83 in amounts owed to Avenue I's data business, and $563.854.61 in amounts remaining in reserve in certain entity Defendants' reserve accounts at merchant processors.  *See* Exhibit B.[5]  The Receiver and her counsel will continue to work with the Defendants' employees to collect these outstanding amounts, seeking court intervention when necessary, for the benefit of the Receivership Estate.

ii.     *Insurance Claims*

During the Reporting Period, the Receiver identified several insurance policies held by the Defendants that may potentially offer coverage and insurance benefits for the Estate.  Specifically, the Receiver has identified Errors & Omissions policies as well as Directors and Officers Liability policies held by certain Defendants.  The Receiver has retained outside coverage counsel and is in the process of submitting claims under these policies for the benefit of the Estate.

iii.    *Domain Assets*

As detailed in the Receiver's Initial Status Report, on March 6, 2018, On Point Domains LLC purchased 502 domain names from CCH Domain Holdings, LLLP ("CCH") for $15,000,000, pursuant to an Asset Purchase Agreement.  Under the Agreement, On Point Domains LLC received a two-year option, followed by a five-year right of first refusal, to purchase an additional 80 domain

---

[5] The amounts identified include amounts currently due combined with amounts that are 30, 60, 90, and 90+ days overdue.

names.  At the time of the Initial Status Report, records indicated that, of the $15,000,000 purchase price, $13,752,456,51 remained outstanding under the Asset Purchase Agreement pursuant to a Promissory Note issued to CCH, with compound interest accruing on the obligation at an annual rate of 3% until maturity (December 1, 2032).  With the assistance of GoDaddy.com, the Receiver identified a purchaser for one of the domains that was transferred to the Defendants as part of the CCH agreement.  The prospective buyer made a significant six-figure offer for the purchase of one of the Defendants' more valuable domains that was not being used and, once the sale is completed, the Receiver will use the sale proceeds to reduce the Defendants' obligation under the Asset Purchase Agreement with CCH.  The Receiver seeks to preserve these domain assets and has negotiated a repayment plan for the amounts owed pursuant to that agreement whereby the Receiver is making monthly installment payments from the revenues generated from the Defendants' current operations to satisfy the remaining amount due to CCH.  The domain portfolio acquired from CCH greatly increases the value of the Defendants' assets; as such, the Receiver will fulfill the Defendants' obligations under the Asset Purchase Agreement to effectuate the full transfer of the domain portfolio to the Estate.

### iv.   SunTrust Loan

The Receiver learned that in December 2018 the Defendants entered into a loan agreement with SunTrust Bank that enabled the Defendants to borrow up to $7.5 million collateralized by a $7.2 million certificate of deposit held by the Defendants.  The repayment schedule for this loan requires the Defendants to repay principal and significant interest payments each month.  To reduce the burden of this monthly cost, the Receiver authorized the surrender of the certificate of deposit in full satisfaction of the SunTrust Bank loan, enabling the Defendants' to avoid at least

$64,000 in interest and charges as well as relieve the Defendants from having to make any further payment of interest, late fees, and principal.

v.   *Avenue I Media*

The Receiver reported in her Initial Status Report that on July 5, 2019, On Point acquired Avenue I which operates in Redondo Beach, California, in a transaction wherein Defendant Direct Market, LLC purchased all of the membership interests of Adam Rioux, LLC, d/b/a Avenue I Media, a California limited liability company, pursuant to a Membership Interest Purchase Agreement dated July 5, 2019, in exchange for the purchase price of $13,250,000.  Direct Market, LLC agreed to pay the remaining $4,000,000, plus interest, prior to July 5, 2020.

As explained *supra*, the Avenue I business was not the subject of the FTC's complaint and the Receiver has opined that it can be operated lawfully and profitably.  During the Reporting Period, the Avenue I business continued to generate significant revenue for the Estate which has greatly contributed to the Receiver's ability to satisfy monthly operational costs and to continue to operate the Defendants' business.

Pursuant to the Avenue I acquisition agreement, the Defendants were required to make additional significant payments.  As a cost-saving measure, to preserve this significant asset and to make these payments more manageable, the Receiver negotiated a restructured payment plan that permits the Receiver to retain the asset and make the payments from the monthly operating revenue without dissipating any Estate assets.

vi.   *Defendants' Offices*

The Receiver restructured or terminated a number of lease agreements entered into by the Defendants significantly reducing unnecessary monthly costs.  The Receiver terminated lease

agreements for properties in Miami, Florida (warehouse space and apartment space), Boca Raton, Florida, and Redondo Beach, California. As a further cost-saving measure, the Receiver recently vacated the Defendants' main office space located in Miami, Florida and will be surrendering the property to the landlord on April 30, 2020. The Receiver located more efficiently sized and less costly office space in Miami, Florida from which the Defendants' business can continue to operate under her guidance and supervision, if the Court permits her to do so. If not, the Receiver may terminate this lease obligation under its terms.

In her Initial Status Report, the Receiver reported that her California counsel had identified and entered a second California property located at 9200 Sunset Drive on the day of the simultaneous execution of the TRO. This property was leased from a Dragon Global entity to an On Point entity and then sublet to an unrelated entity and was used occasionally by Defendant Robert Zangrillo. During the initial reporting period, the Receiver permitted the subtenant to remain in possession unaltered. Since then, however, the Receiver has turned over this lease obligation to a Dragon Global entity.

### C. Ongoing Management and Administration of the Entity Defendant

#### i. Receiver's Modified Website Templates

As required by the TRO, the Receiver, with assistance from outside compliance counsel, analyzed the Defendants' business practices to determine whether certain segments of the business could be operated legally and profitably. *See* ECF No. 17. In her Initial Status Report, the Receiver determined that Avenue I was being operated legally and profitably. The Receiver further opined that Defendants' "freemium" and "pay-for-services" websites could be deceptive to consumers. However, the Receiver also reasoned that the information provided via the freemium websites free of charge to consumers, as well as the certain services provided to consumers via the pay-for-

services websites could be beneficial to consumers if provided in a legal and nondeceptive way.[6] *See* ECF No. 108.  The Receiver further analyzed the financial model of the freemium websites with her forensic accountants and opined that it was possible that modified websites could potentially be operated legally and profitably and, given the size of the operation and the potential value of the going concern, the Receiver proposed modifications and evaluation. *See id*.  A similar analysis was made for the pay-for-services websites, and the Receiver determined that, with modification, those websites could be operated nondeceptively, otherwise legally and profitably. *See id*.  Based on this determination and the Receiver's corresponding charge to "perform all acts necessary or advisable to preserve the value of those assets", the Receiver believed it was her obligation to attempt to operate the remaining going concern if it could be done legally and profitably.[7]

Based on the foregoing findings, the Receiver recommended that she be granted the opportunity to work with outside compliance counsel to propose modified templates.   The Receiver further recommended that these proposed modified templates be vetted by the FTC and the Defendants and then presented to the Court for approval while providing the parties an opportunity to brief any objections they may have.  *See id*.

---

[6] Based on current repeat customer data for the Defendants' freemium websites as of the filing of this Report, the Receiver's initial conclusions appear to be accurate.  In March 2020, 63% of all users who registered on the Defendants' freemium websites were repeat registered visitors.  In April 2020 (to date), that figure increased to 65%.  The data reflects that more users are returning to the Defendants' freemium websites, suggesting that the websites provide useful information for consumers.

[7] The Receiver's financial analysis has borne out.  Since making the changes to the websites and with ongoing revisions to tighten compliance and monitor and respond to customer issues, the websites' March and April net revenue is more than $6 million per month with EBIDTA for April projected to exceed $900,000.  As such, the Defendants' financial model is viable and the going concern has substantial value if this Court finds the websites comply with applicable law.

On March 13, 2020, after extensive work with compliance counsel, the FTC, and the Defendants in drafting and editing the proposed modified website templates to address all concerns raised by the parties, the Receiver filed her Motion to Approve the Modified Templates which attached the proposed modified website templates. *See* ECF No. 169. The Receiver also attached to her Motion a comprehensive report drafted by one of the Receiver's compliance counsel, Akerman LLP, that detailed the proposed modifications and the Defendants' methods for protecting the privacy of users and the data collected and further outlined the method by which the new templates better protect consumers and complied with all applicable regulations. *See* ECF No. 169-10. As set forth in the Motion and Reply in support, the revisions to the freemium websites (1) make clear that the websites were not run by the government, (2) do not "determine" eligibility for any government service; (3) do not require the user to answer survey questions or receive advertisements in order to receive the free guide; and (4) move the placement of this information so that it is prominently displayed, easy to understand, and unavoidable. Since filing the Motion to Approve Modified Templates, the Receiver's compliance counsel has continued to review every website and free guide and edit the websites to ensure they are not overstating the contents of the free guides provided. As of the filing of this Report, that project is nearly complete.

With respect to the e-commerce websites, which provide concierge assistance to users for a fee, they were revised to meet the following goals: (1) clearly identify for the user the steps involved in each process; (2) identify any fees charged by On Point at the beginning of the process, and explain when those fees are in addition to other fees charged by separate entities; (3) make clear that On Point is not part of or affiliated with any government entity; and (4) explain to the user that if the user does not wish to pay On Point's third-party fee, the user may complete the service on the official government website.

The Receiver's proposed modified templates were also updated to be compliant with the Telephone Consumer Protection Act ("TCPA") and applicable data protection and privacy policies and practices. A complete evaluation of the modified templates and the other compliance measures taken by the Receiver and the Defendants under her supervision is attached as Exhibit J to the Receiver's Motion to Approve the Modified Templates. *See* ECF No. 169-10.[8]

In response to the Receiver's Motion to Approve the Modified Templates, the FTC and the Individual Defendants filed their respective objections to the proposed modifications. *See* ECF Nos. 175, 176, and 177. On April 6, 2020, the Receiver filed her Reply in Support of Her Motion to Approve Modified Templates which addressed and responded to the objections raised by the FTC and the Individual Defendants. *See* ECF No. 188. The Court has permitted an additional filing by the FTC due on April 27, 2020. As a result, the Receiver's Motion to Approve Modified Templates remains pending.[9]

### ii.     *Customer Refunds, Chargebacks and Complaints*

In addition, since that Motion was filed, the Receiver has continued to monitor the call center, charge backs and refunds. During the Receivership, any customer who contacts the Defendants' call center to request a refund will receive a full refund, without exception. Still, the

---

[8] In addition to the modifications of the freemium and pay-for-services websites, the Receiver with the assistance of compliance counsel has required On Point to adopt a robust "Do Not Call" policy which is in progress. The purpose of this policy is to ensure that: (1) users who no longer wish to receive email messages, text or push notifications from the Defendants have readily identifiable options to opt out from receiving such communications; and (2) the Defendants comply with any opt out requests made by users.

[9] There are a number of additional measures the Receiver will continue and supplement if the Court approves the proposed website templates to add value for consumers during the current crises, including providing call center and content support regarding government programs and services without charging consumers.

Receiver continues to monitor any complaints, charge backs and number of refund requests to determine if any of the websites are causing customer confusion or could be considered deceptive.[10]  The Receiver will continue to monitor this data and will take off-line any offending website.

### iii.     Further Consumer Protection and Compliance Measures

Recently, the FTC approached the Receiver with concerns related to a third-party affiliate marketer of the Defendants wherein the ad from at least one marketer contained copy of particular concern to the FTC.  In response to the FTC's concern, the Receiver took affirmative action to ensure that new standards were implemented with respect to ads run by third-party affiliate marketers.  In particular, the Receiver is working with compliance counsel to implement these new standards that require ad copy satisfy at least one of the following: (1) the ad copy is provided by compliance counsel as acceptable content, or (2) compliance counsel approves the ad copy proposed by the affiliate marketer.  Any copy that does not meet these criteria will not be allowed. The Receiver and the Defendants under her supervision instituted a technological solution that permits the Receiver and the Defendants to monitor all ad copy of third-party affiliate marketers so that any third-party affiliate marketer that does not comply with these new standards will be terminated.  This policy should be fully operational by May 1, 2020.

### D.  Entities Added to Receivership

In her Initial Status Report, the Receiver identified several additional corporate entities used for billing and several others that have bank accounts related to the entity Defendants'

---

[10] The Receiver is concerned about one of the services websites and will continue to monitor it. At present, no traffic is being directed to it.

business and as potentially being involved with and related to the Defendants' business activities. *See* ECF No. 108.  The Receiver requested that the Court enter an Order appointing Ms. Damian as Receiver for these additional corporate entities.  *See id.*  At the conclusion of the Preliminary Injunction hearing, the Court granted the Receiver's request and directed the Receiver to file a motion identifying the entities proposed to be added to the Estate.  *See* ECF No. 126.  On April 1, 2020, the Receiver filed her Unopposed Motion to Add Entities to the Receivership.  *See* ECF No. 181.  On April 1, 2020, the Court granted the Receiver's motion, adding to the Receivership the following entities:

1. 9283-5503 QUEBEC, INC.
2. Adam Rioux, LLC
3. Adam Rioux, LLC d/b/a Avenue I Media
4. Anycase, S.A.
5. Because it Works, LLC
6. Claro Market, LLC
7. Dejaj Media
8. DG On Point, LLC
9. DG On Point II, LLC
10. DMV Web Management, Inc.
11. Financial Guide, LLC
12. Foodstamp Help, LLC
13. Government Assistance, LLC
14. Health Benefits, LLC
15. Housing Advice, LLC
16. Housing Benefits, LLC
17. Island Media, LLC
18. Jaco Beach, LLC
19. JourneyMan Media, LLC
20. Lady Boss Media, LLC
21. Medicare Assistance, LLC
22. My Senior Information, LLC
23. Nextsteplocal, LLC D/B/A Next Step Local
24. Nextstepsocial, LLC D/B/A Next Step Social
25. OCP
26. Ocotillo Media, Inc.
27. On Point Processing, LLC
28. Online Financial Assistance, LLC

     29. On Point Safety Services, LLC
     30. OP 2019, LLC
     31. Pacific Avenue Media, LLC
     32. PACMARC, S.A.
     33. PBJ Media, LLC
     34. Pelron, S.A.
     35. Raftaar Media Pvt. Ltd
     36. SEC8 Information, LLC
     37. SEC8 Portal, LLC
     38. Section 8 Portal, LLC
     39. Tag Media, LLC
     40. Unemployment Guidance, LLC
     41. Veteran Assistance, LLC
     42. Wellness Guide, LLC
     43. Yeah, S.A.
     44. Your Passport Now, LLC
     45. Yula Capital LLC

*See* ECF No. 182.

As the Receiver continues to fulfill her duties and obligations under the TRO and Preliminary Injunction, she will further identify any additional entities that may need to be added to the Receivership.

## IV.    RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP

The Receiver recommends that the Receivership continue as set forth in her Initial Status Report and in her Motion to Approve Modified Templates.  The Receiver and her professionals have spent considerable time with compliance counsel modifying the freemium and services websites and the business model to operate legally and profitably.   The Receiver acknowledges that the compliance work continues and that continued monitoring of the websites and consumer response is necessary.   Since filing her Motion to Approve Modified Templates, the Receiver with compliance counsel's assistance has (1) trained internal On Point employees regarding ad-content to ensure it is not misleading; (2) monitored call center calls and training; (3) has reviewed guides

to ensure that the information in the free guides is accurately represented and ensured periodic updates; (4) updated free content to provide value add to consumers including COVID-19; (5) modified the "contact us" dropdown to provide a vehicle for customers to specifically complain about the website to enable the Receiver to monitor the consumer complaints to determine if consumers are being misled by the website; and (6) monitored chargeback rates and refunds to determine consumer dissatisfaction.  In addition, the Receiver has responded specifically to issues raised by the FTC regarding a specific complaint about an affiliate marketer and generally as to controls in place to monitor emails as set forth above.  If this Court permits the websites to continue, the Receiver will hire a full-time employee whose sole duties would be to monitor ad-copy of On Point and the affiliate marketers under the supervision of compliance counsel.   The Receiver will also implement ongoing compliance mechanisms and continue monitoring the use of consumer personal data.   The Receiver is open to other specific suggestions to ensure compliance with the law if this Court determines the websites "fall short" as the FTC asserts.   The Receiver is also willing to engage an expert to perform a consumer perception study as recommended by the FTC, if the Court deems it a necessary and appropriate use of Receivership assets to move forward.[11]

**V.      CASH ON HAND AND EXPENSES OF RECEIVERSHIP ESTATE**

As stated above, as of March 31, 2020, the Receivership Estate had cash on hand in the amount of $2,239,880.76, which the Receiver is holding in the Estate's fiduciary accounts at City

---

[11] On the afternoon of this filing, counsel for the FTC notified the Receiver for the first time of complaints regarding a car registration website and potentially a food stamp website, which the FTC intends to bring to the Court's attention in its filing on Monday, April 27, 2020.  The Receiver had not received these complaints directly and will investigate and take appropriate action.  The Receiver will provide a response with proposed remedial action if the Court permits.

National Bank and in certain Defendants reserve accounts at merchant processors, under the Receiver's exclusive control.  *See* Exhibit A.

During the Reporting Period, On Point's remaining business has generated substantial revenues, and from those revenues the Receiver has paid the expenses and debts required to preserve the Estate assets.  Such expenses included payroll, rent, utilities for office locations, publishing and data expense, Google Adsense, e-commerce expense, domain hosting, maintenance fees, debt for investments in Avenue I and the domain purchase, and fees for bank account services and maintenance.  *See* Exhibit A.

The fees and expenses incurred by the Receiver and her professionals during the Reporting Period are also expenses of the Estate.  Pursuant to the TRO and Preliminary Injunction, the Receiver will file an application seeking approval and payment of those fees and expenses from the funds the Receiver has marshalled and deposited into her fiduciary account in connection with fulfilling her duties under the Court's Orders.

## VI.    ASSISTANCE FROM RECEIVER'S FORENSIC ACCOUNTANT

As discussed in her Initial Status Report, the Receiver engaged Kapila Mukamal LLP (the "forensic accountants") as her forensic accountants, financial and tax consultants and computer forensic professionals.  Since the filing of that Report, the forensic accountants have continued to assist the Receiver in evaluating and monitoring the Receivership Entities' ongoing business operations and have provided litigation support services.  Specifically, the forensic accountants have assisted in reviewing and evaluating the Receivership Entities' cash projections and business plans, monitoring and reconciling the daily cash and credit card activity, reviewing all payment requests to ensure they are within budget and supported by appropriate documentation, participating in periodic meetings with the Receivership Entities' accounting and finance team to

evaluate cash flow, periodic business plans and operations, assisting the accounting and finance team with reconciling cash, providing ongoing information technology services in connection with preserving and maintaining the Receivership Entities' websites, providing information to Receiver's counsel as needed to ensure all entities and assets, including bank accounts, are appropriately included in the Receivership, and assisting the Receiver's counsel with ongoing litigation matters.   The Receiver continues to utilize the valuable services of her forensic accountants for as long as she deems their assistance necessary to fulfill her duties and obligations under the TRO and Preliminary Injunction.

### VII.   CONCLUSION

The Receiver will continue to work with her team of professionals to locate, marshal and preserve all known and potential assets of the Estate.  Further, as authorized by the TRO and the Preliminary Injunction, the Receiver will continue to investigate and as appropriate pursue existing and potential claims against third parties on behalf of the Estate.  The Receiver will also continue to investigate and gather information regarding all Defendants' assets through subpoenas, depositions, and other inquiries to financial institutions, and other entities and persons with any connection to the Defendants to discover potential claims against third parties and other sources of recovery.  The Receiver will continue to perform all other duties as mandated by the TRO and Preliminary Injunction and will continue updating the Court on a regular basis as to the status of the Receivership.

Respectfully submitted this 24th day of April 2020.

Respectfully submitted,

/s/Kenneth Dante Murena
Kenneth Dante Murena, Esq.

Florida Bar No. 147486
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: kmurena@dvllp.com
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on April 24, 2020 on all counsel or parties who have appeared in the above-styled action.

/s/Kenneth Dante Murena
Kenneth Dante Murena,
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*