**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 19-CV-25046-Scola**

FEDERAL TRADE COMMISSION,
    Plaintiff,

v.

ON POINT GLOBAL LLC, *et al.*,
    Defendants.

**PLAINTIFF FTC'S SURREPLY[1] TO RECEIVER'S MOTION TO APPROVE MODIFIED WEBSITE TEMPLATES AND MAKE PAYMENTS TO DEFENDANTS**

    The Receiver's reply (ECF No. 188) does not address the majority of the FTC's concerns about the proposed websites. The Receiver proposes to make only two minor changes in response to the FTC's many objections, argues without evidence that the FTC is wrong about whether other features of the sites are likely to mislead consumers, and is silent on the remainder of the FTC's concerns. For these reasons, the FTC continues to oppose the Receiver's request to operate the redesigned websites and submits that the sites should instead be shut down.

    **I.    The Proposed Sites Promise Value They Do Not Deliver**

    The fundamental problem with the Receiver's sites remains unchanged since the FTC filed its Objections (ECF No. 175): the sites promise to help consumers, but offer little to no value in return for their money or data. The Receiver contends that the websites "could assist consumers by providing information about government services through the free guides and articles and could assist consumers in navigating government services more easily through the pay-for sites." Reply Br. at 3. The Receiver cites no evidence that consumers obtain the promised value from the sites or interpret them as the Receiver expects. The Receiver instead references unspecified "business metrics, [the business'] interaction with consumers, research and anecdotal evidence" to support the "fundamental assumption" that the sites offer value by explaining and providing government services better than the government does. *Id*. at 3.

---

[1] The FTC files this Surreply pursuant to the Court's Order of April 16, 2020 (ECF No. 196).

An examination of the Receiver's sites demonstrates that they do not. In several instances, Receiver's pay-for-services sites provide incorrect or incomplete information that consumers would not encounter on the government's official sites. For example, the Receiver's passport site explains that passport services are currently limited, noting that that "USCIS [Is] Temporarily Closing Offices to the Public" and redirecting consumers to the USCIS websites. *See* USA Passports Online, *available at* usa-po.com/order/form/new-passport (pop-up message). However, the USCIS provides citizenship and immigration services and does not process passports applications at all. Consumers are thus redirected to the incorrect website, preventing them from learning that the State Department presently offers only expedited passport services to consumers facing life or death emergencies in the next 72 hours. *See* Dept. of State, Get My Passport Fast, *available at* https://travel.state.gov/content/travel/en/passports/get-fast.html. The Receiver's driver's license site similarly fails to mention that certain states have closed all DMV offices and automatically renewed all driver's licenses due to the Covid-19 pandemic, leading consumers to pay for services the government has already provided for free. *Compare, e.g.*, State of California Department of Motor Vehicles, *available at* https://www.dmv.ca.gov/portal/dmv, with Driver's License Renewal, *available at* https://driverslicenserenewal.org/form/step1/renew-drivers-license-1/california.html. Consumers who encounter the Receiver's websites thus sometimes receive incorrect information about the services they are seeking, rather than the assistance the sites promise.

Further, the information the freemium sites provide consists of, at best, generic, unhelpful platitudes, even though the websites promise valuable assistance on specific subjects. Some of the services described in the "guides" are distributed and managed by individual state governments according to their own distinct processes (*e.g.*, public housing or voter registration), but the guides provide only high-level information with repeated instructions that consumers should contact their state government for specific guidance.[2] *See* Receiver's Reply Exh. A (ECF No. 186-2) (Section 8 guide); Your Guide to Understand Voter's Registration, *available at* https://political.com/wp-content/uploads/sites/84/2020/03/Political_Your-Guide-to-Understand-Voters-Registration.pdf (voter registration guide). Other freemium sites, as described in the FTC's Objections, promise help with specific problems or ailments, then deliver a grab bag of

---

[2] The Receiver provided only the Section 8 guide and the "healthy living" guide to the Court for review. Receiver's Mot. Exhs. B (169-2), D (169-4).

unrelated information with only a passing mention of the issue the website promised to address. FTC's Objections at 4. The Receiver discusses just one of the freemium sites, as described in section II below, proposes changes that do not resolve these problems, and is silent on the rest.

## II. The Receiver's Suggested Changes Are Insufficient.

The Receiver's reply proposes changes to address only two of the FTC's many objections. First, the Receiver admits that the driver's license site – which charges consumers $26.98 to transfer information consumers provide to a DMV form – does not adequately disclose REAL ID limitations. Reply Br. at 8. But the Receiver does not specify how this will be rectified, instead proposing vaguely to "update these websites to add that information." *Id*. at 8. Further, the Receiver fails to address the numerous other renewal-by-mail limitations the site also fails to disclose. *See* FTC's Objections at 3-4 (noting, for example, that California does not allow renewal by mail if the applicant's last two renewals were mailed).

Second, the Receiver acknowledges the FTC's objections that the "freemium" sites promise but do not deliver helpful guides. Reply Br. at 8; *see FTC v. Trudeau*, 579 F.3d 754, 767 (7th Cir. 2009) (advertisements must not misrepresent contents of publication). The proposed fixes for this problem are a promise to deliver the "long-form" version of the Section 8 guide to consumers seeking housing help,[3] and tweaks to the specific statements the FTC identified on the Section 8 template website. *Id*. The site still promises a "Section 8 Application Requirements Guide." My Section 8 Housing,[4] *available at* https://my-section-8-housing.org/apply. It delivers a PDF with generic, repetitive information about the Section 8 program, frequently referring readers to local public housing authorities for more information, as the guide is not state-specific. Receiver's Reply Exh. A at 10-21. The "guide" is padded with sections on, for example, "6 Ways to Pay off [sic] All Your Debt," "Tax Credits You May

---

[3] The Receiver does not state whether other sites have similar "long-form" guides, or submit to the Court any such guide for review.

[4] Another of the sites the Receiver submitted, section8assistance.org, displays an entirely different template with different text surrounding the data-collection boxes. This site, though, still promises "Get Your Section 8 Application Requirements Guide." *See* Section 8 Assistance, *available at* https://section8assistance.org. It is unclear why there are now two templates for Section 8-related sites or which template(s) the Receiver intends to use going forward, if the Court permits the sites to operate.

Qualify For," and "How to Decorate a Kid's Room on a Budget."[5] *Id.* at 5. This document still does not fulfill promises of an "Application Requirements Guide." Further, the Receiver does not address any other "freemium" sites, despite the FTC pointing out other examples of deceptive representations about the contents of the guides and noting that these issues were common to the guide-providing sites. FTC's Objections at 4. Indeed, Maryland's Department of Human Services recently reported its investigation of one such site – FoodStampsAssistance.org – to the FTC, noting that it appears to be capitalizing on the Covid-19 crisis to harvest consumers' personal information. FTC Surreply Exh. A (report of MD Dept. of Human Servs.).

### III. The Receiver Did Not Sufficiently Address the FTC's Other Objections.

The Receiver's reply was silent regarding a number of objections, and the FTC continues to have those concerns. Specifically, the Receiver never addresses the FTC's objections to the address-change and car-registration websites. *See* FTC's Objections at 7-9. Both types of sites charge consumers significant markups to transfer information to government websites. The FTC objected that these sites falsely suggest that they provide more, better, or faster services than the government, and fail to disclose material terms, including cost and refund policies. *Id.*; *see* Deception Policy Statement, 103 F.T.C. at 176; *FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 246 (2d Cir. 2014) (omission of material terms likely affected consumers' purchasing decisions). Most fundamentally, the sites charge exorbitant surcharges without providing any additional value; no consumers who realized they were paying extra for nothing would knowingly do so. For example, it defies belief that a consumer would knowingly pay a private site $44.50 to change his address when the United States Postal Service website will do so for $1.05, or that a consumer would knowingly pay a private site $64.45 to renew a car registration when the state site will do so for $23.46.[6] Receiver's Mot. Exh. I at 2-3 (address change site charges $44.50); How to Change Your Address with the Postal Service, *available at* https://www.usa.gov/moving (changing address online with USPS costs $1.05); FTC Surreply Exh. B at 8, 10 (wisconsincarregistration.org first placed hold for $189.99, then ultimately charged $64.45, for

---

[5] The guide offers such "tips" as "Grow your own spice garden," "Limit your shopping sprees," "Set goals," "Purchase fake plants," and "Hang art on a clothesline." Receiver's Reply Exh. A at 65-66, 74.

[6] Similarly, it is unlikely consumers would knowingly pay for a form from the Receiver's driver's license site, which adds steps to the renewal process, instead of simply filling out the form directly through the state government's site.

4

service that cost $23.46 through the state). Indeed, consumers have complained to the FTC, the BBB, and state law enforcement, including after the FTC filed its Objections, that they believed the Receiver's sites were government sites charging only government fees, and were surprised and angry to learn of the large surcharges. FTC Surreply Exh. B (Wisconsin DMV fraud investigation); Exh. C (complaints received by FTC from various sources).

The Receiver's reply makes a number of arguments in response to other FTC objections, which boil down to the Receiver's assertion that the proposed sites are clear enough about what they do to avoid misleading consumers. These arguments do not withstand scrutiny.

First, the Receiver argues that misleading URLs alone are not enough to shut down a website, responding to the FTC's objections to sites like "registermyvote.org" (which does not register users to vote) and "driverslicenserenewal.org" (which does not renew driver's licenses). Reply Br. at 5-6. The Receiver cites *TrafficSchool.com v. eDriver, Inc.*, 633 F. Supp. 2d 1063, C.D. Cal. 2008). *Id*. at 5. In fact, in that case, "The Court [found] that these domain names, like DMV.ORG, are confusing in that a consumer, upon seeing the domain names, might think that they are associated with actual state agencies that regulate motor vehicles." *TrafficSchool.com*, 633 F. Supp. 2d at 1084. To address DMV.org's conduct, the Court ordered an intercept page to inform consumers they had not reached the DMV's website and redirect consumers to actual state sites. *Id*. at 1086-87. Many of the Receiver's sites, in contrast, include no such intercept page and do not redirect consumers to the actual government sites, making the comparison to the cited Lanham Act case inapt. *E.g*., Driver's License Renewal, *available at* driverslicenserenewal.org (no intercept page); USA Passports Online, *available at* usa-po.com (same); Register My Vote, *available at* registermyvote.org (same); Tricare Assistance, *available at* tricareassistance.org (same). Further, the few sites that do have a splash page employ confusing language stating that services may be processed by official sites, but that the Receiver's sites offer those services "as an alternative to the official governmental" sites. *E.g*., Texas Car Registration, Receiver Mot. Exh. F (ECF No. 169-6) at 1; Postal Address Change Services, Receiver Mot. Exh. I (ECF No. 169-9) at 1. None of the Receiver's splash pages match the clarity of the revisions ordered by the *TrafficSchool.com* court. *See TrafficSchool.com v. eDriver, Inc*., 653 F.3d 820, 829 (9th Cir. 2011) (splash page read, "YOU ARE ABOUT TO ENTER A ***PRIVATELY OWNED*** WEBSITE THAT IS ***NOT*** OWNED OR OPERATED BY ANY STATE GOVERNMENT AGENCY.") (emphasis in original).

5

Second, the Receiver contends that the passport site "dramatically speed[s] up the processing of passports." Reply Br. at 7. The Receiver states, citing no evidence, that the passport site has historically obtained expedited services "regardless of a life and death emergency" and has been able to perform the promised services. *Id.* at 7. This contention is misleading at best. As the FTC noted, the State Department has warned applicants that they will not receive their passport faster from courier services than they would by applying in person at a passport agency. Dept. of State, Courier and Expeditor Companies, *available at* https://travel.state.gov/content/travel/en/passports/get-fast/courier-and-expeditorcompanies.html. Moreover, the State Department's faster expedited service requires either life-or-death emergency or urgent international travel plans. Dept. of State, Get My Passport Fast, *available at* https://travel.state.gov/content/travel/en/passports/get-fast.html. The Receiver's site buries this limitation on its "FAQ" page, which states at the bottom that all new passport orders (as opposed to renewals), including those for lost or stolen passports, must include a departure date. *See* USA Passports Online, Frequently Asked Questions, *available at* https://usa-po.com/faq ("As a Government Authorized expediting service, the government needs to verify that all of the requests we submit on a customer's behalf are urgent.").[7]

The Receiver's Reply claimed the passport site could still "provide a passport within 2 weeks plus shipping time" during the pandemic, even though the State Department cannot, and the site itself offers passports in 7-10 business days. Reply Br. at 7 n.6; USA Passports Online, *available at* https://usa-po.com/order/form/passport-renewal. This is false; the State Department, whether through courier agencies or otherwise, is currently offering limited services only to individuals with life-or-death emergencies. FTC Surreply Exh. E (State Department notice to courier companies stating that "[r]egistered courier companies will not be permitted to submit passport applications to a passport agency after March 19, 2020" and the "agencies will continue to serve customers with a life or death emergency").

Third, the Receiver believes the sites sufficiently disclose that they will sell the sensitive data they gather to third parties, who will spam consumers with questionable marketing pitches. Reply Br. at 8-16. The Receiver points to the statements, "We ask survey questions to connect you with offers. Our survey is optional and not required to get your free guide," and "Many of

---

[7] The Receiver did not respond to numerous other objections about the passport site. *E.g.*, FTC's Objections at 8 (noting the site fails to clearly disclose government fees).

our users allow us to share some of their information with our marketing partners so they can send them offers of their interest [sic]." *Id*. at 9, 11. The Receiver explains that these statements are "meant to" convey that the Receiver will sell the data consumers provide to marketers, who will use it to send emails and text messages with sales pitches. *Id*. But statements that the survey will "connect you with offers" and that "[m]any … users allow us to share some of their data" are a far cry from "We will sell the information you provide to our marketing partners, who might re-sell it or use it to send you offers." *See* FTC's Objections Att. A (ECF No. 175-1) at 2 (FTC's proposed design and text for Section 8 website); *FTC v. Direct Marketing Concepts, Inc.*, 624 F.3d 1, 12 n.9 (1st Cir. 2010) (confusing language in advertisement "leaves an overall impression of nonsense, not clarity"). The Receiver never explains why this crucial information cannot be stated directly, plainly, and unequivocally; if the reason is that such honesty would not be profitable, that is sufficient to conclude that the sites cannot be run both lawfully (*i.e.*, non-deceptively) and profitably. *See* Preliminary Injunction (ECF No. 126) at 14 (Receiver to investigate whether sites can be modified to operate "lawfully and profitably"). Further, the Receiver states that the companies are now employing a "tool" to give "visibility" into data purchasers' use of consumers' information, in answer to the FTC's objection that data buyers could use that information for any ends, even reselling it. Reply Br. at 14-15. But the Receiver does not specify what this "tool" is or how it works, making it impossible to determine whether it is capable of preventing data buyers from misusing consumers' sensitive information.

Fourth, the Receiver claims that the freemium sites give consumers "several opportunities to learn the survey questions are not required to receive the free guide." Reply Br. at 16. As the FTC pointed out in its objections, the freemium sites first ask consumers for their names, zip codes, and email addresses, which are required to receive the guide, then seamlessly continue with increasingly obtrusive questions about their health, income, personal identifiers, and more. FTC's Objections at 5. The Receiver points to the phrase "Your Guide is On Its Way!" on the second page of questions, above the phrase "Please Answer The Questions Below," as the notification to consumers that everything they provide after that point gives them no benefit and will only serve up their data to marketers. Reply Br. at 19. As the FTC explained, this marker is insufficient to notify consumers that they *have already received* the "guide" via email and that answering further questions will not benefit them. FTC's Objections at 5; *FTC v. World Patent Mktg., Inc.*, Case No. 17-CV-20848, 2017 WL 3508639, at *13 (S.D. Fla. Aug. 16, 2017) (citing

...

*FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)) (disclosures must be sufficient to change the net impression of the advertisement). The FTC proposed an alternative means of notifying consumers – through an unavoidable screen containing no questions – that consumers had already received all the contemplated benefits and would gain nothing by proceeding further. *See* FTC's Objections Att. A at 2. Instead, the Receiver's sites string consumers along with the false promise of helpful information in exchange for their data.

### IV. The Receiver's Sites Are Deceiving and Preying on Vulnerable Consumers.

As the FTC noted in its objections, a facial review of the Receiver's sites show that they are likely to mislead consumers, and evidence that consumers were actually deceived was likely to follow. FTC's Objections at 9-10; *Cyberspace.com LLC*, 453 F.3d at 1201 (proof of actual deception, while not required, is highly probative to show advertisement is likely to mislead consumers). Indeed, since the FTC filed its Objections, it has received and uncovered additional evidence of actual deception, and evidence that the Receiver's sites are targeting vulnerable populations in the midst of a pandemic and economic crisis.[8]

Since the FTC filed its brief, additional consumers have complained that they did not realize they were paying a surcharge to a private company for a government service on the Receiver's identified websites. *E.g.*, FTC Surreply Exh. C at 7-10 (March 28, 2020, complaint that consumer mistook "texascarregistration.org" for a Texas state website, but it turned out to be "a private company that charges twice the price"). Further, the FTC has identified several similar websites the Receiver did not include in her Court submission, which nevertheless are operating and generating similar complaints.[9] *E.g.*, *id*. at 4-7 (complaint that consumer mistook "coloradocarregistration.com" for the state site); *id*. at 10-13 (complaint that consumer mistakenly used "wisconsincarregistration.org" instead of the Wisconsin state site); *see also* Receiver's Mot. Exh. E (ECF No. 169-5) (coloradocarregistration.com and

---

[8] Neither the Receiver's initial brief nor the reply includes data on consumer complaints, chargebacks, or refunds requests, making it impossible to assess the full scale of consumer harm from the continued operation of these sites. Complaints that have reached the FTC, however, demonstrate that harm is ongoing, as described above. Nor has the Receiver identified any thresholds under those metrics that would lead her to conclude the sites must be taken down, or any mechanism for reporting those metrics to the FTC or the Court. Essentially, the Receiver proposes an unsupervised experiment in deception, with consumers as the guinea pigs.

[9] Similarly, the Receiver's list of operating sites includes sites for which the Receiver did not submit a template to the Court. Receiver's Mot. Exh. E (*e.g.*, registermyvote.org; carreg.org).

wisconsincarregistration.org are not listed). Indeed, the Wisconsin DMV recently notified the FTC that one such site – "wiconsincarregistration.org" – generated several complaints, prompting the agency to investigate the Receiver's site. FTC Surreply Exh. B; *see also id*., Exh. A (Maryland state investigation of freemium site offering food stamps assistance).

Further, the Receiver is driving traffic to the sites, particularly freemium sites, through affiliate marketing that targets vulnerable consumers with dubious promises. In April alone, one FTC attorney has received multiple unsolicited emails offering to help people who are having trouble buying food during the Covid-19 pandemic and directing traffic to the Receiver's site foodstampsassistance.com. FTC Surreply Exh. D ¶¶2-4, Atts. A, B, C. The FTC notified the Receiver on April 14 of the first such email, and the Receiver stated on that day that the affiliate was using unapproved advertising copy and had been terminated. Then, on April 19 and again on April 23, the FTC attorney received additional spam emails nearly identical to the first.[10] *Id*., Exh. D ¶¶3-4, Atts. B, C. At minimum, these events demonstrate the dangers of relying on affiliate marketers, whose representations are apparently difficult for the Receiver to control, to target vulnerable consumers at a difficult time. Similarly, the Receiver continues to purchase search-linked ads that are likely to ensnare consumers seeking government sites; for instance, a news reporter found a sponsored listing for the site "unemploymentclaims.org," with ad copy promising help to determine if the user is eligible for benefits, after searching "unemployment benefits" on Google.[11] Wodinsky, Shoshana, *Gizmodo*, "On Google Search, Scammy Unemployment Ads Are Targeting Some of the Most Vulnerable People," Mar. 24, 2020, *available at* https://gizmodo.com/on-google-search-scammy-unemployment-ads-are-targeting-1842426823. Such traffic-generating practices help create false and misleading net impressions that harm consumers.[12]

---

[10] The FTC also apprised the Receiver of the additional emails. The Receiver reported that the specific affiliate has been terminated and efforts to monitor and control affiliate marketing are under way.

[11] The reporter notes she was unable to reach On Point for comment. "Scammy Unemployment Ads," https://gizmodo.com/on-google-search-scammy-unemployment-ads-are-targeting-1842426823. The FTC has also noted the Receiver's sites lack transparency, as they do not tell consumers that they are in receivership, identify the Receiver, or give direct contact information. FTC's Objections at 10-11.

[12] Google recently announced that, as of May 26, 2020, it will no longer allow "ads for documents and/or services that can be obtained directly from a government or a delegated

## V. The Receiver Provides Insufficient Justification to Pay Receivership Assets To Defendants

The Receiver justifies paying the Defendants – who the FTC alleged ran the fraudulent scheme – to help her run the new websites with the assertion that the business is complex and Defendants' assistance goes "beyond the cooperation that is customary in these cases." Reply Br. at 25. But the Receiver also notes the estate has retained 164 of the Defendants' employees and agrees that the Preliminary Injunction requires the Defendants to cooperate with the Receiver as necessary. *Id*. at 24-25. If the Receivership is unable to conduct its proposed operations without input from three individuals who masterminded the original deceptive scheme,[13] it should not conduct those operations at all. Further, this Court has already denied Defendants' numerous efforts to siphon assets that should be safeguarded for injured consumers; the Court should likewise deny these payments, which accomplish the same end. *See* Preliminary Injunction (ECF No. 126) at 5-6 (maintaining asset freeze over Defendants' objections); Order Denying Mot. to Stay Asset Freeze Pending Appeals (ECF No. 174); Order on Robert Zangrillo's Mot. for Limited Relief from Asset Freeze (ECF No. 191).

## VI. Conclusion

The Receiver has worked for months to determine whether it is possible to design non-deceptive versions of On Point Global's websites that are nevertheless profitable. These good-faith efforts have demonstrated that such a balance is not possible. The proposed websites may be profitable, but those profits come at the expense of deceived consumers. The FTC therefore respectfully requests that the Court order the shutdown of the proposed websites, and permit continued operation only of the remaining unchallenged business lines – On Point's ownership of unused domains and its recently acquired pay-for-click business unit.

---

provider," calling into question the viability of several of the Receivership's current lines of business. Google, "New Government Services Policy (May 2020)," *available at* https://support.google.com/adspolicy/answer/9736337?hl=en&ref_topic=29265.

[13] Indeed, those same Defendants have repeatedly claimed they had no knowledge of, participation in, or control of the OPG operation, a position inconsistent with the Receiver's view that they have "intimate knowledge of the overall complex business models, operations, department roles, client relationships/agreements, etc. and specific details of same" and are thus so indispensable that the operation cannot run without them on the payroll. Reply Br. at 25; *see also* Defs.' Mem. in Opp. to Pl.'s Mot. for a Prelim. Inj. (ECF No. 78) at 40-41; Defs.' Mot. to Dismiss the Compl. (ECF No. 156) at 11-14.

Dated: April 27, 2020	Respectfully submitted,

*/s/ Sarah Waldrop*
Sarah Waldrop, Special Bar No. A5502583
(202) 326-3444; swaldrop@ftc.gov
Sana Chaudhry, Special Bar No. A5502350
(202) 326-2679; schaudhry@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave NW, CC 9528
Washington, DC 20580
Facsimile: (202) 326-3197


Attorneys for Plaintiff
FEDERAL TRADE COMMISSION

## CERTIFICATE OF SERVICE

I hereby certify that, on April 27, 2020, a true and correct copy of the foregoing was served on all counsel of record via CM/ECF.

**Counsel for Defendants Burton Katz, Brent Levison, Elisha Rothman, and Christopher Sherman:**

Robert W. Thielhelm, Jr. (rthielhelm@bakerlaw.com)
Jonathan B. New (jnew@bakerlaw.com)
Jimmy Fokas (jfokas@bakerlaw.com)
Patrick T. Campbell (pcampbell@bakerlaw.com)
Jeffrey D. Martino (jmartino@bakerlaw.com)
Lauren P. Lyster (llyster@bakerlaw.com)
Denis Durkin (ddurkin@bakerlaw.com)
Baker Hostetler
45 Rockefeller Plaza
New York, NY 10111


**Counsel for Defendant Arlene Mahon:**

Justin B. Kaplan (jkaplan@difalcofernandez.com)
DiFalco, Fernandez & Kaplan
777 Brickell Ave, Suite 630
Miami, FL 33131

Xavier A. Franco (xfranco@mcper.com)
McArdle, Perez & Franco, PL
255 Alhambra Circle, Suite 925
Coral Gables, FL 3313


**Counsel for Defendants Robert Zangrillo and Dragon Global Management LLC:**

Matthew Schwartz (mlschwartz@bsfllp.com)
John Zach (jzach@bsfllp.com)
Sara Winik (swinik@bsfllp.com)
Marshall Dore Louis (mlouis@bsfllp.com)
Boies Schiller Flexner LLP
55 Hudson Yards, 20th Floor
New York, NY 10001

**Counsel for Defendant Elisha Rothman:**

Solomon B. Genet (sgenet@melandrussin.com)
Joshua W. Dobin (jdobin@melandrussin.com)
Meland Russin & Budwick, P.A.
3200 Southeast Financial Center
200 South Biscayne Boulevard
Miami, Florida 33131


**Counsel for Receiver Melanie E. Damian and Corporate Defendants:**

Kenneth D. Murena (kmurena@dvllp.com)
Damian & Valori, LLP
1000 Brickell Avenue, Suite 1020
Miami, FL 33131


                                          */s/ Sarah Waldrop*
                                            Sarah Waldrop