IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-25046-Civ-Scola

FEDERAL TRADE COMMISSION,

      Plaintiff,

v.

ON POINT GLOBAL LLC and others,

      Defendants.
_____/

## RECEIVER'S FIFTH STATUS REPORT

Melanie E. Damian, the court-appointed Receiver (the "Receiver") in the above-captioned enforcement action ("FTC Enforcement Action"), submits her fifth status report concerning the status of the Receivership, established pursuant to the Court's Temporary Restraining Order ("TRO") [ECF No. 17], which the Court extended in its Order Granting Motion for Preliminary Injunction ("Preliminary Injunction") [ECF No. 126]. This interim report sets forth the Receiver's activities and efforts to fulfill her duties under the TRO and Preliminary Injunction, pursuant to which she was appointed for the period, from October 1, 2020 through December 31, 2020 (the "Reporting Period").[1]

---

[1] The Preliminary Injunction required the Receiver to submit her fifth interim status report by January 20, 2021. On January 20, 2021, the Court granted the Receiver's motion to extend the deadline to file her fifth interim status report to January 27, 2020. *See* ECF No. 341.

# **TABLE OF CONTENTS**

I. INTRODUCTION ...................................................................................................................3

II. PROCEDURAL BACKGROUND AND THE APPOINTMENT AND DUTIES
   OF RECEIVER .....................................................................................................................4

    A. The TRO, Appointment of Receiver, and Preliminary Injunction        4

    B. Receiver's Periodic Status Reports ................................................................5

    C. Release of Dragon Global LLC from Receivership .........................................6

    D. FTC Enforcement Action and Defense of Entity Defendants .........................7

III. STATUS AND ACTIVITIES OF THE RECEIVERSHIP
   (OCTOBER 1, 2020 THROUGH DECEMBER 31, 2020) ..................................................7

    A. Updated Accounting of Receivership Assets ...................................................7

    B. Additional Asset Recovery and Liability Management .................................9
       i. Claims Against Insurance Policies and On Point's Directors
          and Officers and Motion to Approve Settlement .......................................9
       ii. Agreement to Purchase Domain Names ....................................................10
       iii. Reduction of Expenses, Stay of Debt Collection by Third Parties,
          and Monitoring Ancillary Litigation .........................................................11
       iv. Avenue I Media ........................................................................................12

    C. Ongoing Management and Administration of the Entity Defendants ............12
       i. Modified Website Templates .......................................................................12
       ii. Customer Complaints, Refunds, and Chargebacks .....................................13
       iii. Further Consumer Protection and Compliance Measures
          and Affiliates' Potential Violations of Consumer Protection Measures ....14

IV. RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP ..................15

V. CASH ON HAND AND EXPENSES OF RECEIVERSHIP ESTATE ......................15

VI. ASSISTANCE FROM RECEIVER'S FORENSIC ACCOUNTANTS .....................16

VII. CONCLUSION ...............................................................................................................17

**I.      INTRODUCTION**

Since her appointment, the Receiver, with the assistance of her legal counsel and other professionals, took control of all Receivership Entities and operations related to the On Point Global, LLC ("On Point") business and has worked diligently with counsel for the Federal Trade Commission (the "FTC") and counsel for Defendants to provide all parties access to any information and documentation requested and, through the judicial process, has sought to preserve the assets by continuing those operations that could be operated in a nondeceptive manner by updating various website templates as permitted by Court Order and implementing consumer protection measures with the assistance of outside compliance counsel while continuing to oversee and evaluate said measures. The Receiver also terminated a large portion of the Defendants' business that violated the Court's TRO and Preliminary Injunction. As reflected in the Receiver's prior status reports [ECF Nos. 108, 210, 271, and 307], the Receiver, with the assistance of her forensic accountants, identified, located, marshaled, and maximized Receivership Estate assets as authorized by the Preliminary Injunction including, but not limited to, revenue generated from partnerships with advertising affiliates, merchant reserve funds, revenue generated by Avenue I Media ("Avenue I"), and liquidating certain Estate assets. Further, the Receiver continued to reduce the Defendants' liabilities and monthly operational costs by discharging third-party debt, eliminating costs tied to contracts for unnecessary services, and other related measures. And, the Receiver continued to work with her counsel and the Defendants to collect on all outstanding accounts receivables to maximize the value of the Estate.

The Receiver, with assistance from outside compliance counsel, the Defendants, and counsel for all parties, has implemented the Court-approved modified website templates [*see* ECF No. 234] and has continued to monitor consumer interaction with and response to same in order to

identify any potential issues and make further modifications necessary to address those issues. Further, the Receiver implemented and continued to monitor the impact of additional consumer protection measures including, among others, consumer refund policies, customer service contact options, and strict marketing affiliate guidelines and ongoing monitoring to provide consumers with satisfactory experiences and address any and all complaints and concerns in an effort to ensure compliance with all applicable FTC regulations and to maintain and preserve the value of the going concern.

The Receiver has performed and will continue to perform her duties and obligations as set forth in the Preliminary Injunction, with the assistance of her counsel and other professionals, throughout the duration of the Receivership in furtherance of this Court's Orders.

## II.     PROCEDURAL BACKGROUND AND THE APPOINTMENT AND DUTIES OF RECEIVER

### A. *The TRO, Appointment of Receiver, and Preliminary Injunction*

On December 13, 2019, the Court entered the TRO, which, among other things, set forth the duties and powers of the Receiver. Pursuant to Paragraph 13 of the Preliminary Injunction, the Receiver is required to

> "[f]ile a summary report with the Court of the receivership…every three months…and include the following information: 1. A summary of the Receiver's operations since the previous report; 2. The known value of Assets and sum of liabilities of the Receivership Entities; 3. A schedule of the Receiver's receipts and disbursements; 4. The steps the Receiver intends to take in the future to protect receivership Assets, recover receivership Assets from third parties, and adjust receivership liabilities; 5. The Receiver's recommendation for a continuation or discontinuation of the Receivership, or for changes to the Receivership, and the reasons for the recommendations; and 6. Any other matters which the Receiver believes should be brought to the Court's attention."

ECF No. 126.

On January 14, 2020, following the evidentiary hearing on the FTC's motion for preliminary injunction, the Court entered the Preliminary Injunction, which, among other things, extended the relief granted in the TRO and the Receivership.  *See* ECF No. 126.

### B.  *Receiver's Periodic Status Reports*

On January 9, 2020, the Receiver filed her Initial Status Report, which described the Receiver's initial efforts to carry out her duties and obligations as set forth in the TRO as well as her recommendations regarding the Defendants' business, continued operation and modification thereof, and the status of the Receivership Estate.  *See* ECF No. 108.  The Receiver's Initial Report detailed the considerable time and effort made by the Receiver and her professionals in unpacking the complex and intertwined web of businesses and finances of the Defendants in order to fully satisfy her duties under the TRO.  The Initial Status Report reflected the Receiver's conclusions that certain of the Defendants' business could (if modified) continue to operate legally and profitably.  The Receiver proposed that the Defendants' freemium data business and certain "pay-for-service" business potentially could continue operating legally and profitably if modified and approved by the Court.  *See* ECF No. 108.  The Receiver, therefore, recommended that she be permitted to engage compliance counsel to draft modified templates for the freemium and "pay-for-services" websites that would make them nondeceptive and profitable, vet them with the FTC and the Defendants, and present them to the Court for approval.  *See* ECF No. 108.

On April 24, 2020, the Receiver filed her Second Status Report, which, among other things, described the Receiver's continued efforts to carry out her duties and obligations as set forth in the TRO and the Preliminary Injunction as well as her efforts to bring Defendants' business in compliance with FTC regulations by implementing proposed modified website templates and several other consumer protection policies as well as technology monitoring solutions.  *See* ECF No. 210.  The Receiver's Second Status Report detailed the efforts of the Receiver and her

professionals in updating the Defendants' internal and consumer-facing policies to provide for greater consumer protection, transparency, and focus on customer satisfaction in order to fully satisfy her duties under the Preliminary Injunction.  The Receiver, therefore, proposed that, if the Court granted the Receiver's Motion to Approve the Proposed Modified Website Templates, the Receiver would continue to monitor and utilize the services of a third-party compliance counsel to assist in monitoring the newly modified websites while further analyzing and implementing updated consumer protection measures.  *See* ECF No. 210.

On July 27, 2020 and October 20, 2020 respectively, the Receiver filed her Third and Fourth Status Reports, which, among other things, described the Receiver's continued efforts to carry out her duties and obligations as set forth in the TRO and the Preliminary Injunction as well as her efforts to continue to operate and monitor the Defendants' business in compliance with FTC regulations through implementation of updated and robust consumer protection policies.  *See* ECF Nos. 271, 307.  The Receiver's Third and Fourth Status Reports detailed the efforts of the Receiver and her professionals in continuing to update the Defendants' internal and consumer-facing policies and monitoring the effects of same, and the Receiver's efforts to implement and monitor the performance of the Court-approved modified website templates, update and improve the content throughout all of the freemium websites, and to identify and marshal assets while reducing liabilities.  *See id*.

### C.  *Release of Dragon Global LLC from Receivership*

On October 14, 2020, the Receiver and Defendant Dragon Global LLC filed an unopposed joint motion to release Defendant Dragon Global LLC from the receivership and to substitute counsel for that Defendant.  *See* ECF No. 302.  On October 16, 2021, the Court granted the unopposed joint motion and ordered that Dragon Global LLC to be released from receivership, that the Receiver's counsel is withdrawn as counsel of record for Dragon Global LLC, and that

counsel for Defendants Robert Zangrillo and Dragon Global Management, LLC is substituted in as counsel for Dragon Global LLC. *See* ECF No. 304. However, the Court's Order made clear that Dragon Global LLC is still a Defendant in the FTC Enforcement Action. *See id*.

### D. *FTC Enforcement Action and Defense of Entity Defendants*

During the Reporting Period, the Receiver's counsel continued to act as counsel of record for the Entity Defendants and exchanged written discovery with counsel for all parties and further provided documents in response to requests for production and informal requests for documents from the FTC. The Receiver's counsel further appeared for and attended discovery hearings regarding the parties' competing motions concerning written discovery requests. *See* ECF Nos. 300, 313. The Receiver and her counsel also participated in the Court-ordered settlement conference that occurred on November 17, 2020. *See* ECF No. 313. The Magistrate Judge presiding over the settlement conference ordered that the settlement conference will continue on a future date if the parties were able to agree as to non-monetary relief. *See id*. The Receiver believes these efforts are ongoing.

### III. STATUS AND ACTIVITIES OF THE RECEIVERSHIP (OCTOBER 1, 2020 THROUGH DECEMBER 31, 2020)

The Receiver provides herein a detailed description of status of the operations and assets of the Receivership Estate and the Entity Defendants and her efforts and accomplishments with respect to her duties under the Court's Orders during the current Reporting Period.

### A. *Updated Accounting of Receivership Assets*

As of December 31, 2020, the Receiver held a total of $11,193,145 cash in the various accounts managed by the Receiver. *See* Fourth Quarter Receivership Receipts and Disbursements

attached hereto as **Exhibit A.**[2]  The Receiver also attaches hereto as **Exhibit B** the Profits & Losses Statement[3] for the period from January 1, 2020 through December 31, 2020.  During the fourth quarter as reflected by the Profits & Losses Statement and Balance Sheet, attached hereto as **Exhibit D**, the Entity Defendants have continued to improve their financial position and have continued to increase the value of the going concern.  In addition to this cash on hand, the Entity Defendants own the following assets:

- $15,546,415 in uncollected amounts owed to On Point from advertising affiliates and other outstanding receivables.[4]

- $952,035 in liquid assets held in reserve accounts at merchant processors not yet transferred to the Estate.

- Domain names appraised in 2019 valued at approximately $30 million (less the debt associated with the purchase thereof).

- Remaining business operations and intellectual property, including the Avenue I exchange business and domain names (exact value unknown).[5]

- Office furnishings and equipment including computers and other electronics currently in 6 offices (exact value unknown).

---

[2] The Receipts and Disbursements are in a summary form because individual entries would be voluminous and reveal personal data.  The Receiver can make any specific detail information available to the Court *in camera* upon request for same.

[3] Exhibit B, the Profits & Losses Statement, reflects revenue figures compiled on an accrual basis rather than a cash basis.

[4] This total comprises the outstanding invoice amounts derived from updated On Point Global A/R Aging Summary, attached hereto as **Exhibit C**.

[5] An unaudited Balance Sheet as of December 31, 2020 of the combined going concern is attached hereto as **Exhibit D**.

- Dragon Global Management LLC's assets: a 2010 Ferrari and various artwork disclosed in financial disclosures (the total value of these assets was disclosed to be approximately $1.2 million).[6]

### B. Additional Asset Recovery and Liability Management

Pursuant to the authority granted to the Receiver by the Preliminary Injunction, as set forth below, the Receiver continues to identify and marshal assets for the benefit of the Estate, including potential third-party claims. *See* ECF No. 126, Sec. XII.

> i. *Claims Against Insurance Policies and On Point's Directors and Officers and Motion to Approve Settlement*

As previously reported, the Receiver with the assistance of her counsel made demand on the Entity Defendants' Errors and Omissions insurance policy with Columbia Casualty Company for payment of attorneys' fees and costs incurred in connection with defending against the FTC's claims in the Enforcement Action, as have the Individual Defendants. The Receiver negotiated a settlement with the carrier of this policy. On November 24, 2020, the Receiver filed an agreed

---

[6] As previously reported, subsequent to providing its financial disclosures to the Receiver, Dragon Global Management LLC informed the Receiver that it owned a Range Rover subject to a five-year retail installment sale contract entered into as of November 2019 and proposed to take responsibility for making all payments due under that contract and that the vehicle not be deemed an asset of the Estate. On September 25, 2020, the parties filed a joint stipulated motion to modify the preliminary injunction and to, among other things, release Dragon Global Management LLC from the receivership. *See* ECF No. 296. As part of the joint stipulated motion, the Receiver agreed that the Range Rover, which was subject to a 5-year installment purchase agreement, would not be part of the Estate, subject to Court's approval. *See id*. On September 28, 2020, this Court granted the joint stipulated motion releasing Dragon Global Management, LLC from the receivership and, among other things, ruling that the Range Rover is not an asset of the Estate and that it would be the responsibility of Dragon Global Management LLC. *See* ECF No. 297. Further, Dragon Global Management LLC informed the Receiver that it had erroneously listed the artwork as its assets when it purportedly was owned by Defendant Robert Zangrillo and a third-party entity. The Receiver and Dragon Global Management LLC did not reach an agreement regarding the ownership of the artwork but did agree that it shall be kept in a secure location and will remain frozen pursuant to the terms of the Preliminary Injunction and further that the Receiver shall be named as the sole insured under the existing insurance policy, which Dragon Global Management LLC shall pay for and maintain. *See* ECF No. 297.

motion to approve allocation of policy proceeds among the various counsel for the Defendants. *See* ECF No. 315. The motion set forth a detailed allocation of the policy proceeds that would exhaust the limits of coverage under the applicable policy. *See id*. On December 14, 2020, the Court entered an order granting the Receiver's motion and authorized payment of the policy proceeds to the various counsel for the Defendants. *See id*.

Additionally, the Receiver with the assistance of her counsel made demand on the Entity Defendants' Director and Officer insurance policies based on the Estate's claims against certain directors and officers of On Point, on which the Receiver has previously reported, and a pre-suit mediation has been scheduled to take place in February or March 2021.

The Receiver will continue to work with her counsel to identify claims the Entity Defendants and/or the Estate may have and will pursue any valuable claims she may discover, and will seek swift resolution of such claims that will maximize the recovery by, and minimize the expense to, the Estate.

> ii. *Agreement to Purchase Domain Names*

As detailed in the Receiver's prior Status Reports, the Receiver continues to make monthly payments in satisfaction of the modified payment plan negotiated to complete the Asset Purchase Agreement that was entered into with CCH Domain Holdings, LLLP ("CCH") for the purchase of 502 domain names that have significant value.[7] The Receiver has deemed these payments necessary as the domain portfolio acquired from CCH greatly increases the value of the Entity Defendants' assets. The modified payment plan in place during the Reporting Period was set to expire on December 31, 2020 so the Receiver and her counsel negotiated a further modification to

---

[7] As of December 31, 2020, pursuant to the negotiated repayment schedule, $13,258,214 remained outstanding inclusive of interest.

the payment plan extending the monthly payments into the current calendar year. As such, the Receiver will ensure that the Entity Defendants fulfill their obligations under the Asset Purchase Agreement as amended by agreement to effectuate the full transfer of the domain portfolio to the Entity Defendants and the Estate.

         *iii.*    *Reduction of Expenses, Stay of Debt Collection by Third Parties, and Monitoring Ancillary Litigation*

During the current Reporting Period, the Receiver learned of a number of unnecessary and costly services that third parties were purportedly providing to the Entity Defendants and/or for which payment was allegedly past due and being sought. Such services included, among others, online analytics services, website traffic generation services[8], and premises security services at one of On Point's former office locations. The Receiver terminated such service contracts, which reduced the monthly and overall expenses of the Entity Defendants. In the event the Receiver identifies any other unnecessary service contracts with third parties, the Receiver will take all necessary measures to eliminate such expenses of the Entity Defendants and preserve their assets and operations by, among other things, cancelling any such contracts.

Moreover, during the current Reporting Period, it was brought to the Receiver's attention that the Miami-Dade Tax Collector's office was attempting to collect allegedly delinquent tangible personal property tax from On Point. The Receiver discovered that the alleged delinquent tangible

---

[8] A third party that claims to have provided these services to On Point in the past had previously sent correspondence to On Point to collect their purported debt that exceeds $500,000. However, the Receiver's counsel sent correspondence on more than one occasion to this third party advising that the alleged services provided were fraudulent and not entirely payable pursuant to the terms of On Point's agreement with said third party. Further, the Receiver's counsel advised that they are enjoined from taking action that would interfere with the District Court's jurisdiction over the receivership entities. Despite the Receiver's efforts, this third party continues to send collection correspondence to On Point. The Receiver, pursuant to her powers and authority under the TRO and Preliminary Injunction, will continue to seek a resolution to this issue.

personal property tax was the result of the Property Appraiser's Office misunderstanding of On Point's business organization thus resulting in an incorrect tax assessment of On Point and Issue Based Media, LLC ("IBM") based on an incorrect calculation of the alleged delinquent tangible personal property tax owed. The Receiver worked with the Property Appraiser's Office to resolve this issue.

In addition to the foregoing, pursuant to the Preliminary Injunction, all ancillary actions involving the Entity Defendants were stayed to preserve the assets of the Estate and prevent third parties from interfering with the Court's exclusive jurisdiction over such assets and the Entity Defendants. During the Reporting Period, the Receiver continued to monitor those actions and file status reports as required by the courts in which they are pending.

### iv. *Avenue I Media*

In her prior Status Reports, the Receiver reported that the Avenue I business was not the subject of the FTC's complaint and opined that it can be operated lawfully and profitably. During the current Reporting Period, the Avenue I business continued to generate significant revenue for the Estate which has greatly contributed to the Receiver's ability to satisfy monthly operational costs and to continue to operate the Entity Defendants' business. As such, because Avenue I remains a crucial and key component of the going concern, the Receiver made all required payments to finalize the acquisition of Avenue I pursuant to the negotiated restructured payment plan as previously outlined in her prior Status Report.

### C. *Ongoing Management and Administration of the Entity Defendants*

### i. *Modified Website Templates*

During the current Reporting Period, the Receiver together with employees and compliance counsel have continued to update the Guides provided to consumers and facilitate consumer ability to opt-out of e-mails or have access to data collected. The Receiver has monitored consumer

responses to the modified websites and observed that consumer interaction therewith has been generally favorable. The Receiver and her professionals will continue to closely monitor consumer responses to the modified websites and make any changes that are necessary to address issues raised by consumers and to otherwise improve the websites and enhance the interface with consumers.

### ii. Customer Complaints, Refunds, and Chargebacks

The Receiver and her professionals have continued to monitor the customer call center, charge backs, and refunds as well as any potential link between same and the updated freemium and pay-for-services websites. Further, the Receiver has continued to oversee and enforce the policy to provide a refund to any customer who contacts the Entity Defendants' call center to request a refund. Additionally, the Receiver and her professionals have monitored and responded to individual customer complaints, including those lodged with private and public organizations such as the Better Business Bureau and consumer protection departments of local and state governments. The Receiver will continue to respond to customers directly once refunds are requested to ensure their complete satisfaction. As previously reported, the Receiver elected to receive all consumer complaints directly and implemented an updated policy to monitor, index, and thoroughly respond to consumer complaints made with both private and public agencies. And the Receiver has been providing this information directly to the FTC upon request. This will ensure that the Receiver has full knowledge of all consumer complaints and complete control over the responses thereto to ensure that they are addressed and resolved appropriately and expeditiously. In the event the Receiver determines that any content or website is confusing or deceptive to consumers, she will revise or remove such content or shut down the website.

     *iii.* *Further Consumer Protection and Compliance Measures and Affiliates' Potential Violations of Consumer Protection Measures*

  The Receiver, with the assistance of outside compliance counsel, continues to monitor, update, and bolster the Entity Defendants' consumer protection measures including, but not limited to, those related to third-party ad affiliates and the Entity Defendants' internal Do Not Call policies as well as TCPA and CCPA compliance, including telephone response and training of call center employees. The Receiver and her professionals continue to monitor On Point's marketing affiliates to ensure their compliance with On Point's various consumer protection and compliance practices including without limitation a prohibition on text message marketing without the express consent of the consumer. The Receiver has received email correspondence from individuals who allege that they received spam text messages from a marketing affiliate of On Point in violation of TCPA regulations. The Receiver has thoroughly investigated each complaint by identifying the affiliate responsible for sending the message, ensuring that the consumer expressly consented to receiving marketing messages via text message, and responding to each consumer with details and findings of the investigation. The Receiver has also discovered that several complaints were fraudulent as individuals have manipulated data to make it appear that they received text message ads and are attempting to extort a quick cash settlement. The Receiver's professionals and compliance counsel have proved invaluable in investigating and responding to these complaints, and the Receiver with the assistance of her professionals and compliance counsel will continue to review, investigate, and respond to each complaint of which she is made aware. The Receiver will also continue to monitor the activity of On Point's marketing affiliates to ensure compliance with all consumer protection regulations and internal compliance measures and will not hesitate to terminate relationships with marketing affiliates that violate these policies.

### IV.    RECOMMENDATION FOR CONTINUATION OF RECEIVERSHIP

The Receiver recommends that the Receivership continue as the Receiver continues to operate and preserve the significant value of the Entity Defendants' going concern and assets, monitor the various Court-approved modified websites, implement and track the performance of additional consumer protection measures and policies, review and respond to any consumer complaints related to their experiences with any of the Defendants' websites, identify and marshal additional assets of the Estate, and investigate and pursue claims of the Entity Defendants and the Estate to maximize their value.  The Receiver acknowledges that continued compliance work, closely monitoring the websites and modifying them as necessary, ensuring the effectiveness of consumer protection measures, and expeditiously responding to consumers and resolving their issues are all necessary to ensure that the Entity Defendants' business operates lawfully.  And, the Receiver will consider any specific suggestions by this Court, the FTC, and the Defendants to achieve this.

### V.    CASH ON HAND AND EXPENSES OF RECEIVERSHIP ESTATE

As stated above, as of December 31, 2020, the Receivership Estate had cash on hand in the amount of $11,193,145.  *See* Exhibit A.

During the Reporting Period, On Point's remaining business generated substantial revenues, and from those revenues the Receiver has paid the expenses and debts required to operate the business and preserve the Estate's assets.  Such expenses included payroll, rent, utilities for office locations, publishing and data expense, Google Adsense, e-commerce expense, domain hosting, maintenance fees, debt for investments in Avenue I and the domain purchase, and fees for bank account services and maintenance.  *See* Exhibit A.

The fees and expenses incurred by the Receiver and her professionals during the Reporting Period are also expenses of the Estate. Pursuant to the TRO and Preliminary Injunction, the Receiver will file an application seeking approval and payment of those fees and expenses from the funds the Receiver has marshalled and deposited into her fiduciary account in connection with fulfilling her duties under the Court's Orders.

## VI.     ASSISTANCE FROM RECEIVER'S FORENSIC ACCOUNTANT

As discussed in her prior Status Reports, the Receiver engaged Kapila Mukamal LLP (the "forensic accountants") as her forensic accountants, financial and tax consultants and computer forensic professionals. Since the filing of the previous Status Report, the forensic accountants have assisted the Receiver by continuing to assist the Receiver in evaluating and monitoring the Receivership Entities ongoing business operations and have further provided litigation support services. The Receiver's forensic accountants have assisted with the review and evaluation of the Receivership Entities' cash projections and business plans; review of all payment requests for accounts payable, payroll and other costs to ensure they are appropriate legitimate business expenses and are within the budget of the going concern; participated in weekly meetings with the Receivership Entities' accounting and finance team to evaluate cash flow, periodic business plans, projections and operations; investigated and monitored the activity in the Receivership Entities' domestic and foreign bank and credit card accounts; and analyzed the historical profit and loss activity of the Receivership Entities by business segment for the period prior to the Receivership and quantified certain types of expenses and information as requested by the Receiver.

The Receiver will continue to utilize the valuable services of her forensic accountants for as long as she deems their assistance necessary to fulfill her duties and obligations under the TRO and Preliminary Injunction.

## VII.    CONCLUSION

The Receiver will continue to work with her team of professionals to locate, marshal and preserve all known and potential assets of the Estate. Further, as authorized by the TRO and the Preliminary Injunction, the Receiver will continue to investigate and as appropriate pursue existing and potential claims against third parties on behalf of the Estate. The Receiver will continue to perform all other duties as mandated by the TRO and Preliminary Injunction and will continue updating the Court on a quarterly basis as to the status of the Receivership.

Respectfully submitted this 27th day of January 2021.

Respectfully submitted,

/s/Kenneth Dante Murena
Kenneth Dante Murena, Esq.
Florida Bar No. 147486
DAMIAN & VALORI LLP
1000 Brickell Avenue, Suite 1020
Miami, Florida 33131
Telephone: (305) 371-3960
Facsimile: (305) 371-3965
Email: kmurena@dvllp.com
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on January 27, 2021 on all counsel or parties who have appeared in the above-styled action.

/s/Kenneth Dante Murena
Kenneth Dante Murena,
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*