**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 19-Civ-25046-SCOLA**

FEDERAL TRADE COMMISSION,

      Plaintiff,

      v.

ON POINT GLOBAL, LLC, *et al.*,

      Defendants.

**PLAINTIFF FEDERAL TRADE COMMISSION'S MOTION FOR**
**SUMMARY JUDGMENT**

## Table of Contents

I.    THE EVIDENCE COMPELS ENTRY OF SUMMARY JUDGMENT. ............................... 1

    A.    THE GUIDE SALES SITES MISREPRESENTED THEIR SERVICES. ............. 1

    B.    THE FREEMIUM SITES MISREPRESENTED THEIR SERVICES ................. 3

    C.    THE CORPORATE DEFENDANTS .................................................................... 5

    D.    THE INDIVIDUAL DEFENDANTS ................................................................ 6

II.   ARGUMENT .......................................................................................................... 12

    A.    LEGAL STANDARD ........................................................................................ 12

    B.    THE FTC'S EVIDENCE IS ADMISSIBLE. ..................................................... 12

    C.    THE FTC IS ENTITLED TO SUMMARY JUDGMENT AGAINST
           DEFENDANTS ON ALL COUNTS. .................................................................. 14

         1.    Procedural History ................................................................................ 14

         2.    The Defendants Violated the FTC Act Through Their Deceptive
              Marketing of Online Guides. ............................................................... 15

         3.    The Defendants Operated as a Common Enterprise. ............................... 18

         4.    The Six Individual Defendants Are Individually Liable for the
              Corporate Defendants' Violations of the FTC Act. .................................. 19

    D.    THE PROPOSED BANS AND FENCING-IN RELIEF ARE NECESSARY
           TO REMEDY DEFENDANTS' PAST VIOLATIONS AND TO PREVENT
           FUTURE VIOLATIONS. ................................................................................... 21

         1.    Defendants' Pattern of Conduct Was Egregious and Recurrent. .............. 22

         2.    The Violations Took Place with Knowledge. ........................................... 24

         3.    Absent Strengthened Injunctive Relief, Defendants Have Ample
              Opportunity to Continue Their Conduct. .................................................... 25

III.  CONCLUSION ...................................................................................................... 25

For years, Defendants operated websites that pretended to offer government services, like renewing driver's licenses or checking consumers' eligibility for public benefits, to entice consumers to pay money and disclose their personal data. However, Defendants did not deliver what they promised; instead, consumers received only a PDF "guide" containing general information about government services. Defendants then sent consumers who disclosed their personal information an avalanche of spam text messages and emails, and sold their data to other scammers. The facts establishing Defendants' liability are not, and cannot be, genuinely disputed. The FTC accordingly moves for summary judgment against all Defendants on both counts in its Complaint, and seeks appropriate injunctive relief to ensure Defendants' deceptive conduct ceases.

## I.   THE EVIDENCE COMPELS ENTRY OF SUMMARY JUDGMENT.

The FTC's evidence in this case includes investigator declarations, screenshots of websites, defendants' own sworn statements, court and deposition testimony, corporate agreements, consumer complaints and declarations, banking records, and numerous other business records. The uncontroverted and overwhelming evidence shows Corporate Defendants engaged in a pattern of conduct that violated the FTC Act for years precisely as the Commission alleged in the Complaint, and that the six Individual Defendants participated in and controlled the deceptive practices. Accordingly, the facts of the case and the applicable law compel entry of summary judgment against Defendants.

### A.   THE GUIDE SALES SITES MISREPRESENTED THEIR SERVICES.

Defendants' guide-sales websites claimed to perform state transactions – *e.g.*, renewing a driver's license, registering a car, or getting a fishing license – but instead gave consumers only a PDF of general information about the service they sought. SUF ¶¶16-18, 22-23.[1]

The deception began when consumers looking to obtain a license or registration typed search terms or a URL into a browser. SUF ¶1. Defendants purchased advertising on search engines so their sites would appear as "sponsored links" above the "organic," or unpaid, search results when consumers used certain search terms. Defendants paid for their links to appear when consumers entered search terms that were simply the URLs of actual state agencies ending in ".gov," like "dmv.pa.gov" and "www.njmvc.gov." SUF ¶2. Others were terms consumers

---

[1] "SUF" citations refer to the Plaintiff FTC's contemporaneously filed Statement of Undisputed Material Facts.

trying to find an official state site would likely use, like "nc dmv, "florida dmv," and "penndot registration renewal."  SUF ¶3.

Defendants' "sponsored links" displayed their "portal sites."  These sites' URLs all contained a state name, a variant of "driver" or "drivers license," and ended in ".org" – for example, "californiadrivers.org" and "floridadriverslicenses.org."  SUF ¶4.  The portal sites' landing pages displayed the outline of the state border and a menu of links referencing state services, like "New license" or "Renew."  SUF ¶5.  Defendants operated portal sites for 34 states as of April 2019.  SUF ¶¶6-7.

Defendants also drew traffic to their sites through their "flagship" domain, "DMV.com." SUF ¶8.  Its home-page banner stated, "The DMV Made Easier" and featured links to "Renew your License," "Renew Car Registration," and more.  DMV.com's Facebook page included posts stating, "you can renew you driver [sic] licenses online here!! Skip the lines doing it from you [sic] home" and linking to "dmv.com/drivers-license-renewal," and using the hashtag "#SkipTheLine" while linking to DMV.com.  SUF ¶¶9-10.

The links on the portal sites and DMV.com led to one of Defendants' billing sites, like "license-driver.com" or "registrationtags.com."  SUF ¶¶11-12; *see also id.* ¶¶14-15.  These sites used headlines like "Renew Drivers License In Your State."  SUF ¶¶13, 16-17.  They also included small-print "disclaimers" that the sites were not affiliated with the government, and blocks of text that, buried in the middle, vaguely noted consumers "can" purchase a guide.  SUF ¶¶19, 18.  These "disclaimers" never mentioned that Defendants' sites, in fact, would not perform the requested transaction.  SUF ¶20.  Indeed, Defendants admitted their "disclaimers" did not work, telling a payment processor they "still encounter confusion from consumers," and further noting consumers did not read the disclaimers, and instructing call center operators how to respond to consumers who were "under the impression we processed or will process" the requested state service.  SUF ¶¶41-42, 40; *see also id.* ¶21.  An expert study of one of Defendants' driver's license sites confirmed consumers are very unlikely to see or understand Defendants' purported "disclaimers."  SUF ¶44; *see also id.* ¶43.

Unsurprisingly, many consumers complained when they realized Defendants did not deliver what they promised.  *See, e.g.*, SUF ¶¶36-37.  Some of these complaints occurred on online review sites.  SUF ¶38.  Defendants tried to cover up these negative reviews by writing their own positive reviews, falsely posing as objective third parties.  SUF ¶¶38-40.

2

Many unhappy consumers also sought chargebacks from their credit card companies to recoup the money Defendants stole from them.  SUF ¶¶27-29; *see also id.* ¶26.  Credit card processors set thresholds for chargeback totals and ratios to monitor for potential fraud; Defendants constantly breached those thresholds.  SUF ¶28.  To evade detection by merchant processors (*see* SUF ¶31), Defendants employed several schemes:  (1) "load balancing," or shifting transactions between multiple accounts to keep ratios low, SUF ¶26; (2) splitting the transaction into multiple charges, the smaller of which is rarely disputed, SUF ¶¶32-33; (3) adding "clean volume," or charges consumers are unlikely to dispute, by soliciting small donations to Mothers Against Drunk Driving, SUF ¶34; and (4) spreading their processing over hundreds of merchant accounts held by eighteen companies created specifically for that purpose, SUF ¶¶26, 84-85.  Despite these tactics, processors still frequently flagged and shut down Defendants' merchant accounts for high chargebacks and suspected load balancing.  SUF ¶¶29-30, 35.

Indeed, Defendants' other service providers also flagged their sites as problematic and occasionally suspended services, which Defendants worked hard to avoid due to the resulting drop in revenues.  SUF ¶¶24-25, 79.  Specifically, both Google and Bing suspended traffic to Defendants' sites at different points, citing policy violations and referring Defendants to their policies on misleading content.  SUF ¶24.  Defendants' number of active portal sites thus fluctuated, as some might be "suspended" or "shut down" at any given point.  SUF ¶¶4, 6-7.

Approximately two thirds of Defendants' revenues came from the guide-sales sites.[2] SUF ¶45.  Net of refunds and chargebacks, Defendants' guide-sales sites took $85,470,480.60 from consumers from 2017 until the FTC sued them in 2019.  SUF ¶46.

**B.      THE FREEMIUM SITES MISREPRESENTED THEIR SERVICES**

Defendants also operated dozens of websites that promised to verify consumers' eligibility for public benefits, such as Section 8 housing, food stamps, Medicaid, or unemployment benefits.  SUF ¶47.  These websites were part of the defendants' "freemium" business, and used domain names associated with the government benefit, like "section-8-housing.org."  SUF ¶¶47-48.  As with their guide-sales sites, Defendants paid search engines to

---

[2] Some of Defendants' "e-commerce," or online sales, revenues came from the sale of other types of services, which hovered around 15% of ecommerce sales until the last few months before the FTC filed suit.  SUF ¶45.  The remainder of their revenues came from the "freemium" business, described below.  *Id.*

have their freemium sites appear at the top of search results when consumers searched terms like "Section 8." SUF ¶¶49-50. The text that appeared on the results page with these sponsored links in many instances offered eligibility determinations with no qualifications. For example, On Point frequently used a Google advertisement stating, "Check Your Eligibility for Section 8 Housing." That advertisement resulted in over 2.1 million clicks and 796,000 conversions. SUF ¶¶51-52.

Defendants' sites contained headlines like "Find Out If You Are Eligible for [Public Benefit]" or "Find out if you Qualify." SUF ¶53. They continued through a series of screens asking consumers to enter personal data, including demographic information, medical and health conditions, employment status, household income, health insurance, and credit card debt – the type of information a consumer would expect to provide to actually check eligibility or apply for public benefits. SUF ¶¶54, 57. Each data-gathering screen (or the "PATH") contained a bold headline above the form: for example, "Confirm Your Date of Birth and Gender to Verify Eligibility," "Confirm Your Eligibility," or "Confirm your information to get your Eligibility Guide." SUF ¶58; *see also id*. ¶60. Some of the screens asked yes-or-no questions about consumers' situations and opened links to third-party advertisers' sites depending on what the consumer clicked. SUF ¶59.

After collecting consumers' data, the sites did not "confirm," "verify," or "check" consumers' eligibility for public benefits. SUF ¶61. Instead, like Defendants' sales sites, at most they provided a PDF "guide" containing general information about the selected public benefit. SUF ¶62. The freemium sites contained "disclaimers" similar to those on the guide-sales sites disclaiming government affiliation (SUF ¶55), which were equally ineffective (SUF ¶56); even On Point's content writers recognized the potential for their sites to "mislead the reader into thinking that he or she can apply through us or get benefits through us." SUF ¶65, *see also id.* ¶¶66, 69-70.

Immediately after consumers left one of Defendants' public benefits sites, Defendants and their marketing partners began sending them unsolicited text messages and emails. SUF ¶63. These included offers for psychic counseling, job-search assistance, government grants, and more. *Id.* Consumers reported receiving spam texts and emails after providing information on Defendants' websites, and complained to Defendants about such practices. SUF ¶64.

Defendants made money from the freemium sites from advertisers whose pages opened if consumers clicked certain answers, from the texts and emails they sent, and by selling the data consumers entered to third parties.  SUF ¶67.  The Receiver reported that Defendants made $17,297,754.87 from the freemium sites from January 1, 2019 to December 16, 2019.  SUF ¶68.

## C.     THE CORPORATE DEFENDANTS

Defendants ran their business as a single operation.  SUF ¶¶71-72.  The Corporate Defendants fall into two groups:  the "Dragon Global" entities and the "On Point Global" (or "On Point") entities.[3]  *See generally* SUF ¶¶72-82, 84-102, 113-116, 120 (On Point), 83, 103-112, 117-119, 121-135 (Dragon Global).  According to the Receiver, "[t]he vast majority of the entity Defendants are related, interwoven and inter-dependent corporate entities that operate under the banner of On Point Global LLC."  SUF ¶72.  These On Point entities served different purposes within On Point Global, *see* SUF ¶¶73-82, 84, 87, 91-92, 99-102, but had no true, independent existence.  They had a single roster of employees, SUF ¶¶113, 85, 143-146 (Katz, 163-165 (Zangrillo), 207-209 (Levison), 227-229 (Mahon), 248-250 (Rothman), 265-267 (Sherman); unified operations, including payroll, human resources, and accounting, *id.* ¶¶113-114; and operated together from one headquarters building in Miami and several satellite offices, *id.* ¶¶115-116, 120.  They held many bank accounts and commingled their funds; the billing companies collected the revenues and sent them to centralized operating and holding accounts.  SUF ¶127; *see also id.* ¶¶73-82 (operating companies), 91-98 (holding companies), 153, 188, 222, 241, 255, 275 (bank account signatories).  The Individual Defendants were officers and owners of the umbrella company, On Point Global LLC, and were the owners of the predecessor entities that became On Point Global LLC's subsidiaries.  SUF ¶¶143-146 (Katz), 162-165 (Zangrillo), 207-209 (Levison), 227-229 (Mahon), 248-250 (Rothman), 265-267 (Sherman); *see also id.* ¶¶136, 139, 93-97.  Most importantly, all the On Point entities worked together on their consumer-facing sites, which used the same wording and branding – and unified advertising accounts – to deceive consumers into paying for their guides and providing personal information.  *See generally* SUF ¶¶1-70, 72, 84, 88-90.

The Dragon Global entities were a crucial part of the On Point common enterprise.  SUF ¶83.  These entities – which, in reality, were simply Robert Zangrillo and a few assistants – were

---

[3] The Dragon Global entities are Dragon Global Management LLC, Dragon Global LLC, and Dragon Global Holdings LLC.  The On Point entities are all the other Corporate Defendants.

On Point Global's capital-raising division.  SUF ¶¶104-105, 162.  The same individuals controlled both groups of entities.  Zangrillo and Katz dreamed up On Point Global, jointly negotiating the purchase of its "flagship" web property, DMV.com, in 2014 and planning its business strategy and corporate structure.  SUF ¶¶166, 139-142; *see also id.* ¶¶168-176, 191.  Robert Zangrillo was the CEO and founder of Dragon Global and the chairman of On Point Global, SUF ¶¶162, 163, with "special approval rights" over On Point's activities, *id.* ¶139;  Burton Katz was the CEO and founder of On Point Global and a Managing Director of Dragon Global.  SUF ¶¶143, 144.  Katz and Zangrillo jointly hired Robert Bellack to be the CFO of On Point Global and Operating Partner of Dragon Global.  SUF ¶¶109-111, 168-170.  While hiring Bellack, Zangrillo wrote to him, "The goal is a long term partnership with both OnPoint and Dragon Global."  SUF ¶112.  Dragon Global and On Point Global shared the same roster of "advisors," whom Zangrillo recruited.  SUF ¶¶103, 177.  The two also shared employees (other than Bellack):  Dragon Global had two staffers, including chief of staff Megan Black; Black worked for both Dragon Global and On Point Global, and On Point paid half her salary and her benefits.  SUF ¶¶104-108, 132.

Dragon Global's "official" address was a UPS store that forwarded mail to Zangrillo's assistant's home, but it listed On Point Global's Miami headquarters on its LinkedIn page and letterhead.  SUF ¶¶118, 119.  Indeed, that headquarters was part of Dragon Global's real estate portfolio, SUF ¶117, as was the new property On Point Global planned to move into in 2020 – which was to include physical office space for Dragon Global's use – before the FTC filed suit, *id.* ¶¶125, 126.  Dragon Global and On Point Global shared occupancy of an office in Los Angeles, to which employees of both had keycard access, SUF ¶¶123, 124; On Point "subleased" the space from Dragon Global, *id*. ¶¶121-122.  Dragon and On Point shared assets, including a domain Dragon initially owned, then brought in On Point to manage, and ultimately transferred to On Point's domain portfolio.  SUF ¶¶128-130 (discussing "livinghealthy.com").  Dragon Global advertised On Point Global was its sole "early stage control investment," and Zangrillo and Katz worked together to update and harmonize both companies' corporate websites.  SUF ¶¶134, 135, 190.

### D.    THE INDIVIDUAL DEFENDANTS

**Burton Katz** is the architect and founder of Defendants' scheme.  SUF ¶¶143, 144-161.  Katz was On Point Global's CEO, a board member, and its largest shareholder (along with

Zangrillo).  SUF ¶¶143, 136-139.  Additionally, he was a managing director and "venture team" member of Dragon Global, SUF ¶144, and a partner, manager, and co-owner of numerous Corporate Defendants, SUF ¶¶145-146.  Katz developed the business plans for the deceptive e-commerce and freemium businesses, SUF ¶¶ 141, 149, touted these businesses to investors, SUF ¶¶ 171, 173-174, developed On Point's relationships with its advertising and merchant processing providers, SUF ¶¶ 157, 160-161, held board and company-wide meetings, SUF ¶¶152, 175, and exercised "special approval rights" over the business, SUF ¶¶139-140.  Katz hired, performed reviews for, and regularly met with On Point's executives SUF ¶¶168-169, 143, 148.  Further, Katz provided input on the design and content of the deceptive sites, SUF ¶149, discussed suspension of On Point's advertising accounts, SUF ¶¶160-161, and traveled to Latin America to oversee On Point's offshore operations, including the call center that took complaints from consumers, SUF ¶¶ 191, 216.  Katz also obtained at least one private mailbox rental and three merchant accounts for On Point, and he was a signatory on at least 27 corporate bank accounts.  SUF ¶¶153-155.  Indeed, the company noted, "Our success and future growth depend, to a significant degree, on the skills and continued services of our management team, including Burton Katz, our Chief Executive Officer."  SUF ¶152.

This case is not Katz's first encounter with this Court.  On October 16, 2014, this Court entered a stipulated permanent injunction against Katz in a mobile cramming case, requiring him to pay $704,244 to the FTC.  SUF ¶281 (citing *FTC v. Acquinity Interactive, LLC, et al.*, No. 0:14-cv-60166, ECF 132 (S.D. F1a.) ("2014 Order")).  That injunction prohibits Katz and anyone acting in active concert and participation with him from making misrepresentations to consumers, requires Katz to deliver a copy of the Order to specified individuals and entities, and subjects him to ongoing compliance monitoring and self-reporting when he creates or changes certain businesses.  SUF ¶281.  In October 2015, Katz submitted a one-year compliance report to the FTC that did not disclose his involvement in operating any business or website that sold or offered guides to consumers, even though he was already doing so through On Point's predecessor entities.  SUF ¶282.  To date, Katz has not submitted any self-reporting compliance notice to the FTC, despite personally establishing new businesses and entities since 2014.  SUF ¶¶137, 283.  Further, since 2014, Katz has delivered a copy of the Order to only one person: his wife.  SUF ¶283.

**Robert Zangrillo**, is the founder, chairman, and CEO of Dragon Global.  SUF ¶162.  He was Katz's partner in the deceptive operation since at least 2014, when he created DG DMV SUF ¶¶166-167.  Zangrillo created that company the day before he personally paid Katz's $704,244 judgment in the *Acquinity* lawsuit, which they booked as a loan from the brand-new DG DMV.  SUF ¶¶290, 291.  Since then, Zangrillo has invested millions in, and closely overseen, the financial performance of On Point's deceptive operation.  SUF ¶¶167, 178, 183-187.  In 2015, Zangrillo and Katz partnered to buy DMV.com.  SUF ¶¶166-167.  In 2018, Zangrillo and the other individual defendants combined the network of entities (including DG DMV) they owned and ran to create On Point Global.  SUF ¶¶71-72, 81-83, 137.  Zangrillo became On Point's chairman and held a share in the new company equal to Katz's.  SUF ¶¶136-138.  Though Zangrillo nominally resigned as On Point's chairman, executive, and officer in March 2019 when he was indicted in the "Varsity Blues" college bribery matter, his role did not change.  SUF ¶¶201-206.  Throughout his involvement in On Point Global, Zangrillo served as a member of its board, SUF ¶¶139, 204, personally recruited investors and advisors, SUF ¶¶177, 205, raised funding, *id.*, led executive and board meetings, SUF ¶¶175, 205, received detailed reports about the deceptive businesses, including its chargeback rates, SUF ¶¶186-187, and exercised "special approval rights" over the company to, for example, open bank accounts, obtain credit, acquire new website domains, lease office space, and hire officers, SUF ¶¶139-140.  Zangrillo drafted, edited, and distributed numerous documents to investors that described On Point's business, including detailed walk-throughs and screenshots of its guide-sales and freemium sites.  SUF ¶¶171, 173, 174.  He funded and helped carry out new domain acquisitions.  SUF ¶180.  Zangrillo's duties for On Point Global were as high-level as hiring its executives and as minor as directing the removal of a refrigerator from its offices and recruiting an intern.  SUF ¶¶168-169, 189, 193.

Zangrillo's influence also allowed him to use On Point as a personal piggy bank and endless source of favors, such as receiving tens of thousands in expense reimbursements for lavish trips, including a *per diem* fee of $750, SUF ¶131; hiring his brother's firm to recruit On Point's officers, SUF ¶168; having On Point pay for his assistant's benefits and half of her salary, SUF ¶¶106-108, 132-133, 199; placing himself on On Point's payroll for a time to obtain health insurance, SUF ¶132; having On Point take over the lease for an office space in California to "decrease costs," SUF ¶¶121, 133, 199; obtaining a salary and health benefits for two years for

his ex-girlfriend who does not appear to have performed *any* service for On Point, SUF ¶¶ 194-196; acquiring internships for his daughters and their friend, SUF ¶¶192-193; and securing multiple leases for office space from On Point at properties in which he personally held an ownership interest, SUF ¶199.  In fact, one of Zangrillo's co-defendants noted many of these events to question the pervasive "conflicts of interest" arising from Zangrillo's involvement in On Point.  SUF ¶¶197-200.  Zangrillo knew about Katz's "settlement" in 2014 and spoke with Katz and his lawyers about it in 2015; he also paid Katz's judgment under the 2014 Order.  SUF ¶¶288-291.

**Brent Levison** was Katz's right-hand man and his operating partner since 2012.  SUF ¶¶147, 207-226.  Levison was On Point Global's fourth-largest shareholder and its Chief Administrative Officer, Senior Vice President of Products, and general counsel.  SUF ¶¶136-138, 207.  Levison also owned and managed numerous Corporate Defendants.  SUF ¶¶85, 88-89, 94, 208-210.  Levison oversaw On Point's payment processing operation for the deceptive e-commerce sites and directly communicated with On Point's employees and merchant services providers about its accounts and chargeback rates.  SUF ¶¶214, 220.  Moreover, Levison obtained and personally guaranteed at least 18 merchant accounts for the deceptive sites and, in the three years prior to the FTC's lawsuit, reaped at least $257,720 in "productivity fees" for revenue processed through his billing companies.  SUF ¶¶225-226.

Levison also established, oversaw, and regularly visited On Point's Costa Rica-based call center, which received calls and complaints from customers of the deceptive sites.  SUF ¶¶216-218.  Additionally, Levison performed various other managerial tasks, such as negotiating and signing leases for office space, SUF ¶211; organizing and managing corporate entities, SUF ¶210, including to obtain advertising accounts, SUF ¶¶88-89; and hiring content writers, SUF ¶213.  Further, Levison obtained four mailbox rentals and registration services for 177 of On Point's domains, SUF ¶¶223-224, was a signatory on 30 corporate bank accounts, SUF ¶222, and used his credit card to purchase advertising for On Point's sites, SUF ¶90.  Like his co-defendants, Levison received detailed internal reports about On Point's revenues, chargebacks, data sales, and media buying.  SUF ¶¶217, 219-221.  Levison acted as counsel to the On Point entities and solicited advice from outside counsel on "on every aspect of [On Point's] websites," as well as its advertising and call center scripts, and was involved in testing the sites.  SUF

¶¶213, 215.  Moreover, Levison saw the 2014 Order when it was entered and was aware of it throughout his involvement in the deceptive businesses.  SUF ¶284.

**Elisha Rothman** was Katz's partner since 2014 and helped him run On Point's "freemium" business, including the public benefits sites.  SUF ¶¶147, 248, 251.  Rothman was On Point's third-largest shareholder, SUF ¶¶136-138, its Director of Data Processing, SUF ¶248, and owned and managed several Corporate Defendants, SUF ¶¶85, 88-89, 95, 249-250.  Rothman directed employees in several departments, including the accounting and freemium "channels" marketing teams, SUF ¶251, and discussed the wording of On Point's sites with co-defendants Katz and Sherman, SUF ¶¶263-264; *see also id.* ¶¶252-254.  Further, Rothman helped On Point grow by negotiating domain deals for new public benefits sites, SUF ¶262, soliciting investors, SUF ¶258, seeking to refinance On Point's debt, *id.*, and addressing the conflicts of interest his partner Zangrillo created for the business, SUF ¶¶197-200.  Rothman was a signatory on 19 bank accounts, sought new banking relationships for On Point, and internally discussed removing Zangrillo's name from the company's LLC agreement after his indictment due to concerns over banking relationships. SUF ¶¶255, 206.  Similar to his co-defendants, Rothman obtained four private mailbox rentals and used his credit cards to purchase advertising for the deceptive sites.  SUF ¶¶90, 256, 259.  Rothman also personally bought advertising for On Point's sites and created companies to obtaining new advertising accounts.  SUF ¶¶88-89, 259.  Rothman obtained and personally guaranteed at least 7 merchant accounts for the deceptive sites and, in the three years prior to the FTC's lawsuit, reaped at least $114,226 in "productivity fees" for revenue processed through his billing companies.  SUF ¶¶260-261.  Rothman also knew about Katz's settlement with the FTC around the time the 2014 Order was entered.  SUF ¶128.

**Christopher Sherman** has worked with Katz at On Point and its predecessor companies since at least 2012.  SUF ¶147.  Like Rothman, Sherman was a Director of Data processing, SUF ¶¶265-267, helped operate the deceptive freemium business, SUF ¶¶265, 268-274, and negotiated domain deals for new public benefits sites, SUF ¶262.  Sherman owned and managed several Corporate Defendants, SUF ¶¶85-86, 88, 96, 267.  Sherman was involved in modifying and testing the public benefits sites, drafting wording for its SMS marketing, discussing the "PATH" survey on these sites with Katz and Rothman, and (along with Rothman) directing employees to hide the PATH from Google during Google's review of On Point's sites.  SUF ¶¶60, 263-264, 268-269.  Sherman also supervised and directed employees on the freemium

team on various tasks, including editing the deceptive sites.  SUF ¶¶265, 268-269.  He received the company's online ad copy, including ads Google disapproved.  SUF ¶274.  Similar to his co-defendants, Sherman obtained registration services for 85 of On Point's domains, SUF ¶276, and at least three private mailbox rentals, SUF ¶277, for On Point's sites, received detailed internal metrics about the performance of On Point's sites, SUF ¶¶272-273, was a signatory on five corporate bank accounts, SUF ¶275, and purchased advertising for the deceptive sites, SUF ¶¶90, 271.  Sherman assisted with the deceptive state licensing sites by obtaining and personally guaranteeing at least eight merchant accounts for the deceptive sites.  SUF ¶¶278-279.  He earned at least $74,822.66 in "productivity fees" for revenue processed through his billing companies.  SUF ¶279.  In addition, Sherman was notified when payment processors and Google AdWords terminated or flagged his merchant and advertising accounts for violating their policies.  SUF ¶¶273, 280.  Sherman also personally received complaints from consumers who provided their information on the deceptive public benefits sites.  SUF ¶270.  Finally, Sherman was aware of Katz's 2014 Order around the time of its entry and had looked it up himself.  SUF ¶286.

**Arlene Mahon** is a certified public accountant who has been one of Katz's top lieutenants since at least 2011.  SUF ¶¶227-230.  Mahon was the CFO of Waltham and Senior Vice President of Finance and Accounting for On Point Global, and solely owned a billing company.  SUF ¶¶85-86, 227.[4]  Mahon oversaw the operation's accounting finance divisions and its human resources functions, and was a self-described "leader" and "executive" of the company.  SUF ¶¶230-231.  In fact, Mahon stated she was "directly involved" in the "initial start-up activities for each company," "[s]upervise[d] the daily activities of the finance / accounting departments for all subsidiaries," "[s]upervised the internal financial analysis, in order to meet shareholder's [sic] expectations" and "[c]oordinated with Senior Management to prepare annual budget."  SUF ¶¶232; *see also id*. ¶233 (Mahon wrote to Katz, "not only do I know where the bodies are buried, I helped bury a few").  Mahon directed employees handling payment processing, and like Levison, directly communicated with On Point's employees and merchant services providers about its accounts and chargebacks.  SUF ¶231, 236.  Mahon met with the content writers for On Point's sites, approved employment offers for junior content writers, and personally received calls from unhappy customers of On Point's e-commerce sites.

---

[4] Mahon was also On Point's CFO at its inception for a four-month period.  SUF ¶227.

SUF ¶¶234-235, 240.  Similar to her co-defendants, Mahon obtained registration services for 200 of On Point's domains, SUF ¶¶242-243, and a mailbox rental, SUF ¶¶244-245, for On Point's sites, received detailed internal metrics about the performance of On Point's sites, SUF ¶¶237-238, was a signatory on 87 corporate bank accounts, SUF ¶241, and purchased advertising for the deceptive sites, SUF ¶¶90, 239.  Mahon obtained and personally guaranteed merchant accounts for the billing sites, SUF ¶¶246-247, and earned at least $54,229.85 in "productivity fees" for revenue processed through her billing company, SUF ¶247.  Mahon knew about the 2014 Order around the time of its entry.  SUF ¶287.

## II.    ARGUMENT

### A.    LEGAL STANDARD

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment, the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  Although the evidence must be viewed in the light most favorable to the non-moving party, that party has a "duty to present affirmative evidence to defeat a properly supported motion for summary judgment."  *Tomasini v. Mt. Sinai Med. Ctr. of Fla., Inc.*, 315 F. Supp. 2d 1252, 1257 (S.D. Fla. 2004) (internal citation omitted).[5]

### B.    THE FTC'S EVIDENCE IS ADMISSIBLE.

Summary judgment is proper where the supporting evidence can be presented in admissible form.  Fed. R. Civ. P. 56(c)(2).  The evidence upon which the FTC relies is admissible, and thus, meets this standard.  All evidence the FTC presents is properly

---

[5] Defendants raised several defenses in their Answers to the Complaint (*see* ECF 220-225, 239-40) that are actually denials of the elements of the FTC's claims; as the evidence the FTC presents establishes each element of its claims, these "defenses" cannot defeat summary judgment. Katz, Levison, Rothman, and Sherman have also asserted an affirmative defense of estoppel, but they cannot establish the factual or legal basis for it.  *See Blue Cross & Blue Shield of Alabama v. Weitz,* 913 F.2d 1544, 1552 (11th Cir. 1990) (defendant asserting an affirmative defense must raise issues of material fact to survive summary judgment); *Cent. Transp., LLC v. Glob. Aeroleasing, LLC,* 2020 WL 2617891, at *5 (S.D. Fla. May 25, 2020); *see also United States v. McCorkle*, 321 F.3d 1292, 1297 (11th Cir. 2003) (estoppel).  Specifically, there was no affirmative and egregious misconduct by the FTC, so their claim must thus fail.

authenticated, clearing the low bar requiring merely a showing that the evidence "is what the proponent claims it is." Fed. R. Civ. P. 901(a). Much of the evidence the FTC presents is from third parties who provided services to Defendants; those third parties provided affidavits certifying that FTC's exhibits are true and correct copies of their records. *E.g.*, PX50 Atts. K, L, O (ECF 440-442 at 1-3, 4-6, 21); PX9 (ECF 440-11 at 4, 9, 16, 21, 26, 34, 40, 44, 47, 52, 56, 59, 65, 71). Much of the remainder of the evidence is Defendants' own records, including (1) their websites and (2) their internal documents and emails. FTC staff who gathered and copied those records, Internet Archive personnel who accessed preserved historical websites, and the Receiver provided affidavits that the exhibits are true and correct copies of the records found in Defendants' offices, on Defendants' email servers and cloud accounts, and on their websites. *E.g.*, PX25 (ECF 440-23); PX26 (ECF 440-24); PX72 (ECF 440-64 to 440-66); PX74 (ECF 440-67 to 440-68). Defendants themselves produced their own records in response to the FTC's discovery requests, and undersigned counsel provided affidavits affirming the exhibits are true and correct copies of those records. *E.g.*, PX50 (ECF 440-41 to 440-42); PX34 (ECF 440-27 to 440-29).

Further, the documents presented by the FTC are either subject to hearsay exceptions or are simply non-hearsay. The Commission offers many of the exhibits not to prove the truth of any matter asserted in them, but for notice of other purposes. Fed. R. Evid. 801(c)(2). For instance, the FTC offers Defendants' websites not to prove that their claims were true; quite the opposite – the FTC alleges these claims were false, and offers the sites only to show Defendants made the claims. Further, many of Defendants' internal communications are offered not for the truth of matters asserted therein, but for example, to prove the extent of the individuals' participation in, control over, and knowledge of the deceptive operation. Where the FTC offers documents to prove the truth of their contents, in most instances these are business records accompanied by a certification that meets the requirements of Fed. R. Evid. 902(11), rendering them admissible under Fed. R. Evid. 803(6)(d). Other business records, including regularly created internal reports found on Defendants' servers, are admissible because circumstantial evidence (*e.g.*, where and how they were stored, Defendants' reliance on them to operate their business) and testimony (*e.g.*, the FTC's forensic specialists' testimony that the documents were copied from Defendants' accounts) prove their trustworthiness. *E.g., U.S. v. Parker*, 749 F.2d 628, 633 (11th Cir. 1984); *In re Intern. Mgmt. Assocs., LLC*, 781 F.3d 1262, 1267-68 (11th Cir.

2015).  Many of the offered documents consist of Defendants' own statements, or those of their agents and co-conspirators (*i.e.*, the employees and officers who helped carry out their deceptive scheme).  Fed. R. Civ. P. 801(d)(2); *see also, e.g., City of Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 557-59 (11th Cir. 1998); *Horne v. Turner Const. Co.*, 136 Fed. App'x 289, 292 (11th Cir. 2005).

Finally, the FTC offers a number of affidavits and deposition excerpts containing direct testimony, which expressly meet the Federal Rules' requirements for summary judgment.  Fed. R. Civ. P. 56(c)(4).  Consumers who were deceived by Defendants' sites provide several of these affidavits.  PX14-17 (ECF 440-18).  These affidavits also support the admission of the hundreds of consumer complaints the FTC offers under Fed. R. Evid. 807.[6]  The consumer complaints are remarkably similar in describing their encounters with Defendants' websites and how those websites misled them.  Further, these complaints are also consistent with the sworn affidavits the FTC provided from some of the complaining consumers.  These circumstances – where hundreds of consumers are unlikely to have made up the same story, some under oath, about how Defendants' sites deceived them – provide the "circumstantial guarantees of trustworthiness" Fed. R. Evid. 807 requires.  *See also, e.g., U.S. v. Ismoila*, 100 F.3d 380, 393 (5th Cir. 1996) (hundreds of cardholder complaints about defendants' fraud, supported by sworn testimony of five cardholders, were admissible under residual hearsay exceptions).

## C.      THE FTC IS ENTITLED TO SUMMARY JUDGMENT AGAINST DEFENDANTS ON ALL COUNTS.

### 1.      Procedural History

In December 2020, the Court issued a temporary restraining order appointing a receiver and temporarily prohibiting certain deceptive marketing practices.  In January 2020, the Court held a preliminary injunction hearing, at which the receiver testified and submitted a written report.  The Court preliminarily ruled that the Defendants' guide-sales and public benefits

---

[6] Due to their volume, the FTC presents these complaints in summary form pursuant to Fed. R. Evid. 1006.  Several of the FTC's exhibits are or contain summaries of voluminous data pursuant to this rule.  The FTC has already produced all summarized material to the Defendants and will provide any or all of it to the Court should the Court so request.  Further, where the summarized data consist of business records (*e.g.*, sales databases, bank and wire records, and credit-card transaction records), the FTC files affidavits containing proper business records certifications in addition to the summaries.

websites were "patently misleading," noting "independent evidence is unnecessary in this case" to find the sites deceptive.  ECF 126 at 2.  The Court reasoned that the sites were:

> cleverly designed so that even though disclosures appeared on many or most of the pages, consumers['] attention would be drawn to links and language in larger, more colorful font that directed them to the service they were seeking (such as renewing a driver's license) and most consumers would likely ignore the disclosures written in relatively smaller and pale-colored font.  And, if a consumer did read the disclosures, they would learn they could purchase a guide and would also learn that the site is a privately-owned company selling guides that can be obtained for free elsewhere on governmental sites.  But most importantly, they were not clearly informed that they could **not** obtain the government service they were misled to believe was available to them.

ECF 126 at 2 (emphasis in original).

The Receiver's report noted that she "took offline 57 websites that were prohibited by the TRO because the sites deceptively charged consumers to obtain guides or "assistance" for government services."  Receiver's Report (ECF 108) at 5.  At the hearing, she testified that the freemium websites "need to be modified in order to be run legally and lawfully."  ECF 440-35 at 123:7-124:19.  After the Receiver proposed such modifications, the Court required additional changes, including, for instance, that the disclaimer "must be as large and as bold as the font . . . that reads "Get Your Section 8 Application Requirements Guide."  Order (ECF 234) at 2-5.

### 2.    The Defendants Violated the FTC Act Through Their Deceptive Marketing of Online Guides.

Defendants' deceptive conduct violates the FTC Act, which prohibits "deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).  Deception occurs when: (1) defendants make a representation or omission; (2) that is likely to mislead consumers acting reasonably; and (3) that representation or omission is material to consumers' decisions.  *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1266-67 (S.D. Fla. 2007).  Courts review the net impression of the marketing for deceptiveness; disclosures are ineffective if they do not change the marketing's overall impression.  *FTC v. World Patent Mktg., Inc*., Case No. 17-CV-20848, 2017 WL 3508639, at *13 (S.D. Fla. Aug. 16, 2017) (quoting *FTC v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006)).  "A representation is material if it is of a kind usually relied upon by a reasonably prudent person."  *Transnet Wireless Corp.*, 506 F. Supp. at 1266 (citing *FTC v. Jordan Ashley, Inc.,* No. 93-2257-CIV, 1994 WL 200775 (S.D. Fla. Apr. 5, 1994)).  The undisputed evidence

15

establishes all three elements for both Defendants' licensing and motor-vehicle sites, as well as their public benefits sites.

### a)    Count I:  Deceptive Guide-Sales Websites

As described above, Defendants' "guide-sales" sites represented they would provide state services – *e.g*., renewing a driver's license or providing a fishing license.  *See supra* Section I.A. Defendants purchased search-engine advertising to place their sites high in the results when consumers searched for ways to conduct these transactions, and those search results linked to Defendants' official-looking, often ".org" portal websites, leading consumers to trust the sites. Indeed, Defendants' paid search terms included official state DMV URLs ending in ".gov" (*e.g*., dmv.pa.gov), which primed consumers to believe they are dealing with a legitimate party who would actually perform the promised service even before reaching Defendants' sites.  The sites and their online advertising prominently claimed consumers could "Renew your License," "Renew Car Registration," and "Skip the Line" to conduct DMV transactions or get other state services online.  However, Defendants never provided the promised services, instead sending only a PDF of general, publicly available information.  Indeed, the very nature and cost of Defendants' "service" demonstrates their deception; consumers are unlikely to knowingly pay nearly $30 for information they can obtain for free from a public source.

The undisputed evidence not only shows Defendants' guide-sales sites were likely to mislead consumers, but that they overwhelmingly did so.  Hundreds of consumers complained to law enforcement and Better Business Bureaus that Defendants did not provide the services consumers expected.  Many more complained to their banks to seek chargebacks.  Defendants' high chargeback rates caused constant problems, which they addressed not by abandoning their deception but instead by trying to disguise the problem, establishing hundreds of merchant accounts in the name of more than a dozen entities, load balancing transactions across these accounts, and splitting their transactions into multiple charges to keep some "clean volume." Further, complaints on online review sites were such a constant problem Defendants wrote fake "reviews" of their own products, hoping to push the legitimate complaints lower in search results.  Defendants themselves knew their sites deceived consumers, telling a payment processor that they "still encounter confusion from consumers," noting consumers did not read their small-print and confusing "disclaimers."  In fact, complaints were so ubiquitous Defendants had to instruct call center operators how to respond to consumers who had paid Defendants money and

were "under the impression we processed or will process" the requested state service.  Some of Defendants' own employees were uncomfortable with their deception, writing in an internal survey that "[g]uides are sometimes confusing for the people and that causes problems," and that "some of the money [the company] earn[s] comes from a service that has, at least in the past, tried to misrepresent itself as something other than a how-to-guide."  SUF ¶151.

A claim is material if it "address[es] the central characteristics of the product or service offered."  *World Patent Mktg.,* 2017 WL 3508639, at *11.  Here, Defendants' misrepresentations concerned the essential nature of the services consumers sought – Defendants led consumers to believe they would receive their state licenses or registrations, but instead delivered only a PDF of general information.  Because such a claim is of a kind normally relied upon by a prudent person, Defendants' misrepresentations on their licensing and motor vehicle sites are material. *See Transnet Wireless Corp.*, 506 F. Supp. 2d at 1266.

### b)      Count II: Deceptive Public Benefits Sites

As described above, Defendants' public benefits websites claimed they would verify or confirm consumers' eligibility for public benefits.  *See supra* Section I.B.  Their sponsored links appeared high in search results for terms like "Section 8" and often used ".org" domain names to appear trustworthy to consumers.  The Defendants' search engine, ad copy often explicitly offered to check consumers' eligibility for benefits, with no mention of a "guide" whatsoever. The headlines on Defendants' sites proclaimed, for example, "Find Out If You Are Eligible for [Public Benefit]."  The sites solicited the types of information consumers commonly provide to obtain public benefits, like household income, medical conditions, and birth date.  Importantly, consumers who click through Defendants' form see a representation on nearly every screen that instructs consumer to provide information to, for example, "verify eligibility."  However, Defendants did not verify consumers' eligibility, and instead merely emailed consumers a PDF of general, publicly available information, then bombarded consumers with spam emails and texts.  To add insult to injury, they then sold consumers' personal information to shady operators.

Just like Defendants' sales sites, the "freemium" sites misled consumers to believe they were dealing with trusted entities that would use their information to check their eligibility to apply for benefits.  This misrepresentation concerned the "central characteristics" of Defendants' services, which in truth consisted only of emailing a PDF of general information, and was thus material.  *World Patent Mktg.,* 2017 WL 3508639, at *11.  Indeed, the relentless spam

17

consumers received instead of the services Defendants promised prompted many to complain, both to law enforcement and to the Defendants directly.

### 3. The Defendants Operated as a Common Enterprise.

Under the FTC Act, entity defendants are liable for the conduct of other entities "where the structure, organization, and pattern of a business venture reveal a common enterprise or maze of integrated business entities." *FTC v. Lanier Law, LLC*, 715 F. App'x 970, 979 (11th Cir. 2017). To determine if a common enterprise exists, courts consider whether the businesses "share office spaces and employees, commingle funds, coordinate advertising efforts, and operate under common control." *Id.* This list of factors is not rigidly applied, and the FTC need not prove a specific number of factors; instead, the court considers whether the entities "maintained an unholy alliance." *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1270 (S.D. Fla. 2019) (quoting *FTC v. Kennedy*, 574 F. Supp. 2d 714, 722 (S.D. Tex. 2008)). As another court in the 11th Circuit said, "in situations where corporations are so entwined that a judgment absolving one of them of liability would provide the other defendants with a clear mechanism for avoiding the terms of the order, courts have been willing to find the existence of a common enterprise." *FTC v. Nat'l Urological Grp.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008) (citing *Delaware Watch Co. v. FTC*, 332 F.2d 745, 746–47 (2d Cir. 1964)).

It is undisputed that the On Point entities meet all of the common enterprise factors. As described in Section I.C, they operated under the common control of the Individual Defendants; shared officers, employees, office space, and addresses; commingled their funds in central operating accounts; and created slates of identical websites to obtain consumers' money and information. *See Lanier Law*, 715 F. App'x at 979. Indeed, the Receiver noted that the On Point defendants were "related, interwoven and inter-dependent corporate entities that operate under the banner of On Point Global LLC."

Further, the undisputed evidence also shows the Dragon Global entities were in common enterprise with the On Point entities: Katz and Zangrillo shared control of On Point and were partners in Dragon Global, along with On Point CFO Bellack. In fact, one of Dragon's few employees also worked for On Point, and the companies split her salary; the companies shared office space in both Miami and Los Angeles, assets including web domains and their California subtenant's rent, and a roster of "advisors;" and they coordinated their branding and marketing, advertising On Point as Dragon Global's sole "early-stage control investment."

Each of the Corporate Defendants played a role in this unholy alliance, including obtaining merchant accounts, purchasing advertising, buying and managing domains, leasing office space, raising funds from investors, and designing the websites that lure in consumers. They worked together in an integrated scheme to deceive consumers. *Pointbreak Media*, 376 F. Supp. 3d at 1270. Thus, the Corporate Defendants are jointly and severally liable for the acts of the enterprise as a whole.

### 4. The Six Individual Defendants Are Individually Liable for the Corporate Defendants' Violations of the FTC Act.

The Individual Defendants are liable for injunctive relief for the Corporate Defendants' unlawful acts practices because they (1) participated directly in the acts or practices, or (2) had the authority to control them. *FTC v. Grant Connect, LLC*, 763 F.3d 1094, 1101-02 (9th Cir. 2014); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1204 (10th Cir. 2005); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170-71 (9th Cir. 1997); *FTC v. 1st Guar. Mortg. Corp.*, Case No. 09-CV-61840, 2011 WL 1233207, at *15 (S.D. Fla. Mar. 30, 2011). The FTC need only show *either* direct participation *or* authority to control to obtain injunctive relief. Here, the undisputed facts easily satisfy both prongs as to each Individual Defendant.

"An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation." *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1270; *Pointbreak Media*, 376 F. Supp. 3d at 1284; *FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016) (Scola, J.). That presumption is difficult to rebut. *Transnet Wireless Corp.*, 506 F. Supp. 2d at 1270 ("A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception."). The FTC may also prove authority to control by establishing "active involvement in business affairs and the making of corporate policy." *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014).

Here, there is no genuine dispute about Individual Defendants' authority to control. *See supra* Section I.D. Katz, Zangrillo, Rothman, and Levison were On Point Global's four largest shareholders. SUF ¶¶136-138. Katz and Zangrillo were its CEO and chairman, respectively, were members of its board, exercised special approval rights over its corporate affairs, and controlled its finances. SUF ¶¶143-144, 162-163, 166-174, 139-142. Zangrillo and Katz had the authority to hire executives and employees; could (and did) place anyone they wanted on the

payroll, even people who apparently did not work at the company, such as Zangrillo's girlfriend; and closely managed On Point's financial performance. *Id.*; SUF ¶¶194-196.  Levison, Rothman, Sherman, and Mahon admittedly had managerial responsibilities over various Corporate Defendants, including billing companies that charged consumers' credits cards. *See supra* Section I.D; SUF ¶¶207-280; *FTC v. Spectrum Res. Grp., Inc.* 107 F.3d 877 (Table), 1997 WL 103406, at *2-3 (9th Cir. Mar. 6, 1997) (holding individuals who each owned one half of the common enterprise jointly and severally liable for the revenues of the entire enterprise); *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 472-73 (S.D.N.Y. 2014) (individuals who served as officers of some entities within a common enterprise had authority to control the entire enterprise). Additionally, as described *supra* Section I.D, undisputed evidence proves that the six Individual Defendants actually controlled On Point.  For example, each individual directed On Point employees, made decisions and acted on behalf of On Point, and was a signatory on Corporate Defendants' bank accounts.

Moreover, even absent authority to control, individual defendants are liable if they directly participated in the unlawful conduct.  Direct participation requires only some degree of involvement, not day-to-day involvement in all of the corporate defendant's activities.  *See Pointbreak Media*, 376 F. Supp. 3d at 1271.  Here, each individual defendant actively managed and operated the common enterprise.  Among other things, as described above, they were all signatories on corporate bank accounts, organized and managed entities for the common enterprise, and entered contracts with mailbox and/or domain services providers.  Katz and Sherman provided input on the deceptive websites; Mahon, Levison, and Zangrillo facilitated payment processing for the sales sites; and Rothman personally purchased advertising.  Further, Zangrillo was involved in business activities ranging from the most minor, such as removing a refrigerator, to the most important, such as hiring a CFO, recruiting an advisory board, and negotiating leases for office space.  *See supra* Section I.D.  In addition, Katz, Levison, Rothman, Sherman, and Mahon directly participated in the operations' illegal practices by obtaining merchant accounts for the deceptive websites.  *See Pointbreak Media*, 376 F. Supp. 3d at 1271 (individual who obtains merchant accounts for deceptive marketing is personally liable). Further, all six individual defendants received detailed reports on various metrics of the business, including sales numbers and chargeback rates.

These facts unequivocally demonstrate individual defendants' authority to control and participation in Defendants' illegal conduct—either of which is sufficient to hold them individually liable for injunctive relief.

### D. THE PROPOSED BANS AND FENCING-IN RELIEF ARE NECESSARY TO REMEDY DEFENDANTS' PAST VIOLATIONS AND TO PREVENT FUTURE VIOLATIONS.

Section 13(b) of the FTC Act authorizes courts to issue permanent injunctions when a defendant violates any law enforced by the FTC and is likely to continue to violate such laws. *See, e.g.*, *FTC v. USA Fin., LLC*, 415 F. App'x 970, 975 (11th Cir. 2011). Specifically, Section 13(b) provides that the FTC may obtain permanent injunctions for violations of "any provision of law enforced by the FTC." 15 U.S.C. § 53(b); *see also AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1349 (2021) ("the Commission may use § 13(b) to obtain injunctive relief . . . when it seeks only injunctive relief" for violations of the FTC Act). Permanent injunctive relief "is appropriate when the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *Partners In Health Care Ass'n*, 189 F. Supp. 3d at 1369; *see also United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (to issue a permanent injunction, court must only determine that there is "some cognizable danger of a recurrent violation, something more than the mere possibility which serves to keep the case alive"). In issuing a permanent injunction, courts should consider:

> the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir.1982). Moreover, courts have discretion to include "fencing-in" provisions which "extend beyond the specific violations at issue in the case to prevent Defendants from engaging in similar deceptive practices in the future." *Id.* These provisions "must bear a reasonable relation to the unlawful practices found to exist." *Litton Indus., Inc. v. FTC*, 676 F.2d 364, 370 (9th Cir. 1982) (quotation omitted).

*Partners In Health Care Ass'n*, 189 F. Supp. 3d at 1369-70; *see also FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) (where defendants are caught violating the FTC Act, they "must expect some fencing in.") (quotation marks omitted). Further, where Defendants' violations were "predicated upon systematic wrongdoing, rather than isolated occurrences, a court should

be more willing to enjoin future conduct." *FTC v. Gill*, 71 F. Supp. 2d 1030, 1047 (C.D. Cal. 1999).

Because there is a cognizable danger that the Defendants will again violate the FTC Act, a permanent injunction is necessary to protect consumers.  The FTC accordingly seeks injunctive relief to remedy the Defendants' past violations of the FTC Act and a permanent injunction to protect the public in the future.  The Defendants' egregious and long-running misconduct in this case necessitates strong injunctive relief, including bans on (1) offering assistance with government services and (2) disclosure of sensitive information, as well as prohibitions against (3) the use of information without express verifiable authorization and (4) material misrepresentations.[7]  Such relief reasonably relates to the Defendants' conduct here.  They marketed and operated hundreds of websites promising a quick and easy government service, such as renewing a driver's license or an eligibility determination for public benefits. Defendants disclosed consumers' sensitive personal information to third parties, and did so without the consumers' knowing consent.  They deceived consumers into giving up their money and personal data.  Entering a permanent injunction addressing these problems would allow the Court to exercise its contempt powers if any defendant cheats another consumer.

### 1.    Defendants' Pattern of Conduct Was Egregious and Recurrent.

First, Defendants caused significant consumer harm over numerous years.  They reaped over $85 million in three years from the deceptive sale of paid guides, and over $17 million in one year from using or selling personal information harvested from consumers who visited the public-benefits sites.  SUF ¶¶46, 68.  Courts in this circuit have issued injunctions containing multiple bans, even with significantly less consumer harm.  *See, e.g.*, *Pointbreak Media,* 376 F. Supp. 3d at 1272-73 (~$3.3 million in consumer harm; telemarketing, search engine optimization, and remotely created payment order bans) (order available as Ex. 1); *Partners In Health Care*, 189 F. Supp. 3d at 1369-71 (~$8.7 million in consumer harm; bans on selling healthcare related products and telemarketing) (order available as Ex. 2); *FTC v. Life Mgmt.*

---

[7] The FTC seeks bans on government services and disclosure of consumers' sensitive information only against the corporate defendants and the four individuals (Katz, Zangrillo, Rothman, and Levison) named in the accompanying contempt action.  Proposed Order, attached; *see also Acquinity*, Case No. 0:14-cv-60166, ECF 135, 137.  As to Mahon and Sherman, the FTC seeks only provisions requiring express verifiable authorization for the use of consumers' data and prohibiting misrepresentations.  *Id.*

*Servs. of Orange Cty., LLC*, 350 F. Supp. 3d 1246, 1272-74, 1276 (M.D. Fla. 2018) (~$23.1 million in consumer harm; telemarketing and debt-relief product or service bans).

Importantly, this conduct took place in contempt of this Court's previous order against Katz, the CEO of On Point.[8]  2014 Order.  Each individual defendant was aware of this order, which prohibited the making of material misrepresentations.  SUF ¶¶282-291.  "Any history of prior violations" is directly relevant "in determining whether fencing-in relief is justified in light of a defendant's violation of the FTC Act."  *In re Sanctuary Belize Litigation*, 482 F. Supp. 3d 373, 467 (D. Md. 2020) (quoting *FTC v. Direct Mktg. Concepts, Inc.*, 648 F. Supp. 2d 202, 213 (D. Mass. 2009)).

Katz also agreed to various reporting obligations, including one obliging him to deliver a copy of the 2014 Order to "all principals, officers, directors, and LLC managers and members" for any business entity he "controls directly or indirectly," another requiring that he obtain a signed and dated acknowledgement from each person to whom he delivered the order, and others providing that he submit a compliance report to the FTC one year after the 2014 Order's entry, plus compliance notices when he creates an entity engaging in acts or practices subject to the Order.  2014 Order 7-10.  However, despite being the CEO of On Point Global, Katz admitted providing the Order to no one other than his wife, and did not accurately disclose his business activities in his compliance report or submit a compliance notice to the FTC after the creation of On Point Global.  SUF ¶283.  Such conduct strongly militates in favor of strong injunctive relief.  *See Carriba Air, Inc.*, 681 F.2d at 1322 (issuing an injunction is proper where the defendants "knowingly made material misrepresentations and at least recklessly made material omissions on documents submitted to the SEC.").

These violations were not isolated.  They were recurrent, taking place for years, and only ceased when this Court issued its temporary restraining order and preliminary injunction.  SUF ¶¶147, 230.  The extent of the harm cannot be overstated.  Through their pattern of deceptive conduct, Defendants cheated consumers out of over $85 million dollars in just three years, and

---

[8] The FTC has sought compensatory contempt remedies against Katz, Zangrillo, Rothman, and Levison, along with corporate defendants, in the *Acquinity* matter.  *See Acquinity*, Case No. 0:14-cv-60166, ECF 135, 137.  The FTC intends to seek a summary ruling in the contempt proceedings after the Court rules on the FTC's pending motion for an order to show cause against certain defendants.  *See id.*, ECF 137 at 4 n.3.

sold consumer information for $17 million more over the course of a single year.  *See* SUF ¶¶46, 68.

### 2.     The Violations Took Place with Knowledge.

Second, the violations took place with, at best, reckless indifference towards the acts and practices that constituted the wrongdoing.  As discussed *supra* Section I.C, On Point created a maze of dozens of companies for different functions – billing companies, holding companies, media buying companies, operating companies, as well as other miscellaneous functions.  *See generally* SUF ¶¶71-135.  As described above, the billing companies held hundreds of merchant accounts and engaged in load balancing techniques to hide their scheme from processor scrutiny. Yet, On Point still repeatedly breached payment processors thresholds, which led processors to suspend or close Defendants' merchant accounts.   Microsoft and Google also suspended On Point's advertising accounts at various points.  Moreover, On Point received numerous complaints about its acts and practices.

Further, as described *supra* Section I.D, the Individual Defendants – all owners or managers of On Point in supervisory roles – were all aware, should have been aware, or were recklessly indifferent to of at least some of the red flags flying at On Point.  All six Individual Defendants - Katz, Zangrillo, Rothman, Mahon, Sherman, and Levison – received correspondence and reports about high chargebacks.  SUF ¶¶158, 187, 221, 237, 253, 280. Levison, Rothman, Sherman, and Mahon all received sizable kickbacks in exchange for putting their names and personal guarantees on On Point's merchant applications, which allowed the fraud to operate by processing millions of dollars in charges.  SUF ¶¶86, 226, 247, 261, 279.  All six individuals were informed when On Point's advertising accounts were suspended, and Rothman personally stepped in to loan funds for On Point's continued marketing.  SUF ¶¶160-161, 186, 219, 239, 259, 273-274; *see also id*. ¶¶60, 90.  Indeed, Defendants' deception did not stop with consumers – when Zangrillo was indicted for bribery in a case that prompted widespread headlines, the defendants removed his name from On Point's operating documents at least in part to ensure his notoriety did not lead banks to drop their accounts, though Zangrillo continued his involvement behind the scenes.  SUF ¶¶201-206.

In spite of these red flags, as well as those discussed *supra* Section I.D, the Defendants operated the business until the issuance of the Court's temporary restraining order.  This degree of scienter compels strong injunctive relief.

24

### 3.     Absent Strengthened Injunctive Relief, Defendants Have Ample Opportunity to Continue Their Conduct.

Here, Defendants' own arguments demonstrate why an injunction simply prohibiting misrepresentations would be insufficient to protect consumers from their deceit.  Defendants were subject to just such a provision in the 2014 Order, which they violated for years.  Each defendant the FTC named in the accompanying contempt matter has argued that provision is unenforceable, *see Acquinity*, Case No. 0:14-cv-60166, ECF 158, 159, 162, 163.  While these arguments ignore the plain language of the Court's order and will fail, *id.*, ECF 168, they demonstrate that broader relief is necessary, both to deter future violations and to provide additional means to remedy such violations if Defendants commit them anyway.  *See Partners In Health Care*, 189 F. Supp. 3d at 1370 (in decision issued prior to banning defendant from multiple industries, the Court noted, "Of particular concern is Kieper's continued denial that he did anything wrong despite the fact that he received customer complaints about the violations as early as 2010 and that he did not take steps necessary to halt the misrepresentations in a four-year span.").

Furthermore, in the absence of injunctive relief, Defendants have ample ability to commit future violations.  Defendants operated on the internet, where websites can appear and disappear with the click of a button for the cost of a domain purchase and some advertising.  This ease of re-entry mitigates in favor of strong injunctive relief.  *See FTC v. Washington Data Res.*, 856 F.Supp.2d 1247, 1282 (M.D. Fla. 2012), *aff'd*, 704 F.3d 1323 (11th Cir. 2013) (considering the low "economic barriers to enter" a certain industry when enjoining the defendants from participating in that industry in the future).

## III.   CONCLUSION

For the foregoing reasons, the FTC respectfully requests that the Court grant the FTC summary judgment against the Corporate and Individual Defendants on both counts in the FTC's Complaint and enter the attached proposed permanent injunction.

Dated:  July 9, 2021                    Respectfully submitted,

*/s/ Sarah Waldrop*
Sarah Waldrop, Special Bar No. A5502583
(202) 326-3444; swaldrop@ftc.gov
Sana Chaudhry, Special Bar No. A5502350
(202) 326-2679; schaudhry@ftc.gov
Christopher Erickson, Special Bar No. A5502434
(202) 326-3671; cerickson@ftc.gov
Federal Trade Commission
600 Pennsylvania Ave. NW, CC 9528
Washington, DC 20580
Facsimile: (202) 326-3197
Attorneys for Plaintiff, Federal Trade Commission

## CERTIFICATE OF SERVICE

I hereby certify that, on July 9, 2021, a true and correct copy of the foregoing was served on all counsel of record via CM/ECF.

*/s/ Sarah Waldrop*
Sarah Waldrop