**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 19 Civ. 25046-Scola**

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.

ON POINT GLOBAL LLC, *et al.*,

    Defendants.

**ROBERT ZANGRILLO, DRAGON GLOBAL LLC, DRAGON GLOBAL MANAGEMENT LLC, ON POINT CAPITAL PARTNERS LLC, DRAGON GLOBAL HOLDINGS LLC, AND ARLENE MAHON'S JOINT REPLY IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................... 1

    I.      The FTC Misconstrues the Law and Evidence as to Mr. Zangrillo. ....................... 1

          A.      Direct Participation ................................................................................... 1

          B.      Authority to Control ................................................................................. 3

          C.      Knowledge ................................................................................................ 5

    II.     Dragon Global Did Not Operate as a Common Enterprise with OPG. .................. 6

    III.    The FTC is Not Entitled to Injunctive Relief Against the Dragon Defendants. ...... 8

    IV.    Arlene Mahon is Entitled to Summary Judgment on Individual Liability .............. 8

CONCLUSION ......................................................................................................................... 11

Defendants Robert Zangrillo, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC (collectively "Dragon Global," and together with Mr. Zangrillo the "Dragon Defendants"), and Arlene Mahon (together with the Dragon Defendants, the "Moving Defendants") respectfully submit this joint reply in support of their motions for summary judgment. (ECF Nos. 406 & 410).

## INTRODUCTION

The Court should grant summary judgment for the Moving Defendants. The FTC cannot demonstrate any genuine dispute of material fact as to Mr. Zangrillo and Ms. Mahon's roles at On Point Global ("OPG"), as it misconstrues the law of individual liability, exaggerates their roles in an unsupported way, and points to only irrelevant and out-of-context facts. As to Dragon Global, the FTC cannot dispute that Dragon Global is its own venture capital firm, not part of a maze of interrelated companies. Nor is the FTC entitled to injunctive relief as to the Dragon Defendants because it cannot show a reasonable likelihood of future violations of the FTC Act.

### I. **The FTC Misconstrues the Law and Evidence as to Mr. Zangrillo.**

As to Mr. Zangrillo, the FTC misconstrues case law and emphasizes evidence unrelated to the allegedly deceptive practices. But the undisputed evidence shows that Mr. Zangrillo had no knowledge, direct participation, or ability to control those practices. And in seeming recognition of its inability to create a factual issue as to knowledge, the FTC argues that it does not need to show that Mr. Zangrillo knew about the deceptive practices – an argument foreclosed by precedent.

#### A. Direct Participation

In contending that "[d]irect participation includes, among other things, working at and drawing a salary from the company, even if the individual is not involved in day-to-day operations," the FTC cites a single case that does not support its characterization of the law. (FTC Br. at 4) (citing *FTC v. Ivy Cap., Inc.*, 2013 WL 1224613, at *14 (D. Nev. Mar. 26, 2013)). *Ivy Capital* involved a thoroughly corrupt scheme, involving deceptive websites that channeled consumers to telemarketers who made further false representations to get them to buy the company's services, upsold those customers with a series of further false representations, and lied about the company's refund policy. *Id.* at *2–5. There, the court found a defendant individually liable where he founded the company, began as the single largest shareholder, regularly participated in "management meetings and was treated as a senior manager," "was either an officer or managing member" of several entities, was treated by the other defendants "as a business partner

1

with the same managerial authority and involvement as the other three partners," opened accounts and signed contracts on behalf of the company, and obtained "lead lists" for the telemarketing scheme. *Id.* at \*2–5, 15–16. Further, in his managerial capacity, the defendant was informed that the "enterprise generated leads through fraudulent sales of business development products[,] was included on dozens of emails discussing dishonest credit card charge back practices, [and his] partners made him aware of customer dissatisfaction with the services, as well as complaints from state attorneys general." *Id.* at \*16–17; *see also FTC v. Ivy Cap., Inc.*, 616 F. App'x 360, 361 (9th Cir. 2015) (same defendant also personally set up a call center for scheme). *Ivy Capital* does not support the FTC's reading of the law, and its facts bear no resemblance to Mr. Zangrillo's.[1]

The undisputed evidence shows that Mr. Zangrillo did not directly participate in the alleged scheme and that his role at OPG is distinguishable from the FTC's cited cases. He did not play a "necessary part" or "integral role" in the alleged scheme, as the FTC says. (FTC Br. at 6–7). Notably, in describing Mr. Zangrillo's alleged "role," the FTC strings together random pieces of evidence unrelated to the "scheme" as set forth in the Complaint. But the allegedly deceptive scheme in this case is specific – implied misrepresentations on e-commerce and freemium websites – and it is *not* OPG's operations as a whole, nor even its guides generally, which the Receiver continues to offer legally to consumers. (ECF No. 446 ("FTC SOF Resp.") ¶¶ 33–41). The FTC does not dispute that Mr. Zangrillo had *no involvement* in the alleged implied misrepresentations

---

[1] The FTC cites only one in-circuit case on the direct participation standard, *FTC v. Wilcox*, 926 F. Supp. 1091, 1094 (S.D. Fla. 1995), for the proposition that "reviewing sales and marketing reports" can give rise to individual liability. But in *Wilcox*, involving a direct mail scheme, the defendants personally "wrote or approved all the solicitations" and "personally signed some of these solicitations." Each of the FTC's other authorities also show that much more than "working at" a corporate defendant is required for direct participation. (FTC Br. at 4 nn.4–10 (citing *FTC v. Ross*, 897 F. Supp. 2d 369 (D. Md. 2012) (individual "personally approved, developed, wrote, altered, reviewed, and contributed" to ads); *FTC v. MacGregor*, 360 F. App'x 891, 894 (9th Cir. 2009) (individual wrote call center scripts and designed websites); *FTC v. Consumer Alliance, Inc.*, 2003 WL 22287364, at \*6 (N.D. Ill. Sept. 30, 2003) (individual "admits that his people sold the [deceptive products] and obtained credit card numbers from individuals," "received complaint letters, knew that not all complainants received their packages, [and] reviewed the telemarketing scripts when someone complained"); *FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000) (individual used her credit card to obtain merchant bank accounts and signed agreement to purchase database used to perpetuate scheme; defendant did so after another individual was rejected trying to open the same accounts); *FTC v. Pointbreak Media, LLC*, 376 F. Supp. 3d 1257, 1270–71 (S.D. Fla. 2019) (individuals "provided phone numbers for . . . Defendants to robocall and a merchant account for them to use" and "shared welcome emails and contracts with them")).

on the ecommerce and freemium websites or those websites at all. (*Id.* ¶¶ 63, 66, 69–71).

Further, the FTC's cited facts are either wrong or irrelevant. The FTC says that Mr. Zangrillo "actively participated in the scheme" by purchasing DMV.com, but does not dispute that at that time DMV.com "did not sell or provide guides or e-books to consumers" – the basis of the alleged scheme. (FTC Br. at 6; FTC SOF Resp. ¶ 23).[2] The FTC says that Mr. Zangrillo was involved in "purchasing additional domains," but OPG's domain acquisition and sale business is lawfully operating and is not implicated by the FTC's allegations. (ECF No. 458 ("Dragon SOF Reply") ¶¶ 125–27; FTC SOF Resp. ¶ 40). Finally, the FTC cites Mr. Zangrillo's introduction of OPG to investors, claiming that this establishes participation because OPG needed money to operate. (FTC Br. at 7). Under this absurd theory, any investor is liable for FTC Act violations alongside the company, no matter what their money was used for or whether they had operational involvement. The remaining evidence of participation the FTC cites is unrelated to the alleged scheme, mischaracterized, or both. (Dragon SOF Reply ¶¶ 115, 118, 124, 128–32, 134, 136).

At base, the FTC's attempts to resist summary judgment depend entirely on its argument that *any* involvement Mr. Zangrillo had in *any* of OPG's "business activities" establishes "direct participation" in an allegedly deceptive scheme, even though his conduct had nothing to do with that "scheme." (FTC Br. at 6–7). But the FTC's cited authorities do not support this argument and the FTC does not cite – let alone distinguish – *FTC v. Johnson*, which rejected nearly identical arguments. 156 F. Supp. 3d 1202, 1210 n.6 (D. Nev. 2015) (rejecting FTC's suggestion "that any work within iWorks qualifies as direct participation in the violations at issue" and rather evaluating only whether defendants "directly participated in the deceptive practices found in [prior order]")).

B. Authority to Control

The FTC's attempt to establish Mr. Zangrillo's authority to control the allegedly deceptive practices is similarly unsupported. It argues that Mr. Zangrillo's "status as chairman of a small, closely-held corporation gives rise to a presumption of ability to control." (FTC Br. at 7 (citing *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007))). But the FTC does not even attempt to explain how OPG – a company with multiple business lines and departments, 284 employees, five offices, a value of $322 million, and at least 18 outside investors (*see* ECF

---

[2] The FTC disputes that Mr. Zangrillo "did not have any operational involvement in" DG DMV, but only cites evidence that Dragon Global was involved in negotiating the *purchase* of DMV.com, not that Mr. Zangrillo was involved in operating that website. (FTC SOF Resp. ¶ 25).

Nos. 78-2 ¶¶ 5, 6; 108 at 20–27; 408-33 ¶ 48; 408-14 ¶ 29) – is a "small, closely-held corporation." And even if OPG was a "small, closely-held corporation," *Transnet* explicitly states that the presumption applies to corporate *officers*, not to a "chairman" or "shareholder" as the FTC implies. 506 F. Supp. 2d at 1270 ("An individual's status *as a corporate officer* gives rise to a presumption of ability to control a small, closely-held corporation. A heavy burden of exculpation rests on the *chief executive and primary shareholder* of a closely held corporation . . . ." (emphases added)). Mr. Zangrillo was *not* "a corporate officer" or the "chief executive and primary shareholder" of OPG.[3] (FTC SOF Resp. ¶ 43; Dragon SOF Reply ¶¶ 102, 166). The FTC is thus not entitled to a presumption of authority to control. In fact, in one of the FTC's own authorities, the court rejected the FTC's argument that simply being "an officer or director . . . sufficiently shows authority to control." *J.K. Publ'ns*, 99 F. Supp. 2d at 1206.[4]

Unable to point to any evidence of authority to control the deceptive practices at issue, the FTC again resorts to its conclusory (and demonstrably false) assertion that Mr. Zangrillo "had authority to control everything." (FTC Br. at 7; FTC SOF Resp. ¶¶ 65, 67). The FTC argues that Mr. Zangrillo "set the agenda for, and participated in, executive meetings, and designed the business' corporate structure and business plan," but the evidence it cites does not support this proposition. (FTC Br. at 7; Dragon SOF Reply ¶¶ 112, 124). The FTC says that the "CFO reported directly to" Mr. Zangrillo, but the CFO swore that he did not. (FTC Br. at 7–8; Dragon SOF Reply ¶ 116). The FTC says that Mr. Zangrillo "could fire [OPG's] top executives if he did not approve

---

[3] In each case cited by the FTC, the individual was an officer or executive – not just a shareholder or board member – with authority to control the allegedly deceptive operations. (*See, e.g.*, FTC Br. at 5 n.11 (citing *FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1367 (S.D. Fla. 2016) (individual was "president and sole officer," "controlled the day-to-day activities," and "had the authority to review and approve all marketing materials"). The FTC's other authority is also inapposite. *FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1207 (N.D. Ga. 2008) (defendants had authority to control all aspects of operations and did not dispute knowledge of misrepresentations); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1270 (S.D. Fla. 2007) (individual "signed as vice president of sales, regional director, and director of operations" and "held himself out as president or vice president"); *FTC v. Windward Mktg., Inc.*, 1997 WL 33642380, at *13 (N.D. Ga. Sept. 30, 1997) (defendant "specifically had the authority to control all of the precise actions which comprised the unfair practices").

[4] The FTC fails to address the cases rejecting an individual's title or status alone as supporting individual liability. (Dragon Opening Br. at 12 n.4). Nor does it address the cases demonstrating that it must show that Mr. Zangrillo had the authority to control the practices that are deceptive, not that he might have had control over unrelated functions. (*Id*. at 12).

of their actions and hire others who would act as he wished," but he undisputedly could not. (FTC Br. at 8; FTC SOF Resp. ¶ 55 (admitting that Mr. Zangrillo could not exercise special approval rights unilaterally); *see also* Dragon SOF Reply ¶¶ 103–04, 115 (special approval rights only pertained to hiring of CEO, CFO, and President, not all "top executives")). The FTC says Mr. Zangrillo "decided how it spent its money and what assets (i.e., web domains) it acquired for use in its schemes," but he could not. (FTC Br. at 8; Dragon SOF Reply ¶ 103 (special approval rights pertained only to selling assets "other than in the ordinary course of business" and making purchases in excess of $250,000)). The FTC's mischaracterizations of simple evidence do not create a genuine dispute as to Mr. Zangrillo's authority to control the allegedly deceptive scheme.

### C. Knowledge

The FTC's contention that Moving Defendants "cite an outdated standard for individual liability," and that the FTC need not prove knowledge to establish individual liability, is incorrect. (FTC Br. at 3). First, in arguing that it suddenly need not prove knowledge, the FTC cites not a single Eleventh Circuit case, because none exists. Instead, it cites out-of-circuit cases and one unreported case that suggest that the FTC need prove knowledge only if the FTC is seeking monetary relief. But this is not the law in the Eleventh Circuit, which binds this Court and which makes clear that "[i]ndividuals may be *liable for FTC Act violations* committed by a corporate entity" only if the FTC can establish that "the individual had some knowledge of the [deceptive] practices." *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014) (emphasis added). The FTC does not cite *any* Eleventh Circuit case distinguishing between monetary relief and injunctive relief in articulating the individual liability standard, or stating that the FTC Act imposes strict liability depending on what relief the FTC seeks. The FTC and this Court are thus bound by existing Eleventh Circuit precedent. And the FTC does not even address the precedent that the "authority to control" prong *itself* requires knowledge. (*See* Dragon Opening Br. at 13–14).[5]

The FTC therefore must prove knowledge, and the undisputed evidence shows that Mr.

---

[5] Further, this is not a case in which the FTC is seeking only injunctive relief. The FTC's Complaint seeks monetary relief. (ECF No. 1 at 46). It is true that the FTC cannot possibly prevail on that request in light of *AMG Capital Management, LLC v. FTC*, 141 S. Ct. 1341 (2021), but no court of which we are aware has analyzed the impact of *AMG* on the standard for individual liability. In fact, some have continued analyzing knowledge after *AMG* when only injunctive relief remained at issue. *See, e.g., FTC v. Hoyal & Assocs., Inc.*, 2021 WL 2399707, at *2 (9th Cir. June 11, 2021) (vacating monetary judgment and analyzing whether court erred in finding knowledge).

5

Zangrillo had no such knowledge. Having no evidence of knowledge, the FTC points to two investor presentations that included small, illegible screenshots of a single webpage.[6] (FTC SOF Resp. ¶ 68; Dragon SOF Reply ¶¶ 120–21). But Mr. Zangrillo never saw the websites at issue, as the FTC cannot otherwise controvert. (FTC SOF Resp. ¶ 68). And the FTC again relies on Mr. Zangrillo's role in introducing OPG to investors, implying that he must have known about the deceptive practices in order to describe OPG to potential investors. (FTC Br. at 9). But this inference is unsupported – the guides were "not described as On Point's core business or a major driver of OPG's value" to investors. (ECF No. 456-7 ¶ 6).[7]

The cases the FTC cites are all inapposite. The FTC again cites *J.K. Publications* for the proposition that being aware of "the nature of [OPG's] businesses" establishes knowledge of deceptive practices, but in that case the court found that the common enterprise did not have *any* legitimate operations. 99 F. Supp. 2d at 1203 (finding a "complete absence of the ordinary indicia of a legitimate business"). That is not the case here, where the FTC concedes that much of OPG's business is running lawfully (FTC SOF Resp. ¶¶ 38–41), and thus knowledge of the "nature" of OPG's business is not by itself evidence of knowledge of deceptive practices.[8]

## II. Dragon Global Did Not Operate as a Common Enterprise with OPG.

The FTC does not dispute that Dragon Global is an independent venture capital firm. (FTC SOF Resp. ¶¶ 2–7). But in responding to Dragon Global's evidence that its relationship with OPG was typical, the FTC argues that there is no exception for venture investors. (FTC Br. at 14–15). This misses the point, which is not that investors should be categorically excluded from FTC Act liability, but rather that the FTC has taken typical, arms-length transactions and twisted them into

---

[6] Mr. Zangrillo did not receive notifications about chargeback rates, problems with merchant accounts, or search engine account suspensions, as the FTC contends. (FTC Br. at 9; Dragon SOF Reply ¶¶ 139–41). Further, Mr. Zangrillo knew that OPG was a "high risk merchant" only because he understood that *any* e-commerce company was "high risk" to payment processors, not because he knew about any purported indicators of deceptive conduct. (Dragon SOF Reply ¶ 128).

[7] Even if it were, there is nothing deceptive about offering or selling guides. The thing that made OPG's websites allegedly deceptive is the *way* they were being sold.

[8] The FTC's other cases are also distinguishable because in those case the court found actual knowledge due to the individual's direct participation in the allegedly deceptive conduct, not due to a high-level understanding of the nature of the business. *See FTC v. Williams, Scott & Assocs., LLC*, 679 F. App'x 836, 839 (11th Cir. 2017) (individual "directly participated in the collectors' conduct"); *FTC v. Glob. Mktg. Grp., Inc.*, 594 F. Supp. 2d 1281, 1288 (M.D. Fla. 2008) (individual "reviewed, edited, and approved the telemarketers' sales scripts").

purported evidence of a "maze of integrated business entities." (*See* FTC Br. at 13). Doing business with, providing advice to, and investing in a company does not create a such a "maze."[9]

The FTC does not create a genuine dispute as to the *Lanier Law* factors. As to shared employees, the FTC points to the fact that OPG's CEO and CFO were listed as "venture team" members on Dragon Global's website, even though both have sworn that they were not employees of Dragon Global. (FTC Br. at 16; Dragon SOF Reply ¶ 98–100). The FTC also points to the fact that Mr. Zangrillo's assistant helped OPG with investor relations tasks and that OPG reimbursed Dragon Global for a portion of her salary, even though she was employed by only Dragon Global. (FTC Br. at 16; Dragon SOF Reply ¶¶ 147–48; *see also* Dragon SOF Reply ¶¶ 136, 157 (addressing intern and assistant who purportedly "performed tasks for Zangrillo")). Nor are "advisors" – who were not OPG employees and spent miniscule time advising OPG – evidence of shared employees. (Dragon SOF Reply ¶¶ 118, 144). The FTC does not even attempt to put forth evidence as to the role of the advisors, let alone create a disputed issue as to whether they were "shared employees."

As to shared office space, it is undisputed that Dragon Global subleased office space to OPG in L.A. (FTC SOF Resp. ¶ 76). To attempt to prove that Dragon Global and OPG shared the space, the FTC points only to the fact that Dragon Global still had access (which is obvious – it originally leased the space itself) and that in 2019 the Receiver stated that "a portion of the office appeared to be used by Mr. Zangrillo." (FTC. SOF Resp. ¶ 77). But later testimony by the Receiver and others confirms that OPG and Dragon Global did not share the L.A. space *or* OPG's Miami office, and the FTC does not offer contrary evidence. (Dragon SOF Reply ¶ 150–52, 155).

The FTC also provides no evidence that Dragon Global and OPG commingled assets and does not dispute that the transfers between them had a "documented and legitimate purpose," or that Dragon Global and OPG maintained separate accounts. (FTC Br. at 17; FTC SOF Resp. ¶¶ 89–92). The FTC says Dragon Global and OPG shared "web domains they acquired together,"

---

[9] The FTC also attempts to argue that Dragon Global's relationship with OPG was atypical. It says Mr. Zangrillo "received perks and benefits other investors did not," but does not point to evidence of what "other investors" did or not did receive. (FTC Br. at 14). The FTC cites Elisha Rothman's hearsay statement in a letter that OPG was not a "typical Private Equity Deal," which is inadmissible if offered for its truth, and in any case does not mean what the FTC wants it to. (*Id.*; Dragon SOF Reply ¶ 172). The FTC also says that Dragon Global and OPG had a "partnership," but does not cite *any* supporting evidence. (FTC Br. at 15). And the FTC has not attempted to rebut the Dragon Defendants' expert report, which addressed the facts the FTC says it did not. (*See, e.g.*, ECF No. 408-14 ¶¶ 44; 45). Nor did it designate any rebuttal expert witness.

apparently referring to a company in which Mr. Zangrillo invested whose assets OPG acquired. (FTC Br. at 18). But that transaction was not even between Dragon Global and OPG, let alone evidence of "commingled assets." (Dragon SOF Reply ¶¶ 160–61). The FTC also argues that Dragon Global and OPG shared "their California subtenant's rent" because OPG's subtenant sometimes paid OPG and sometimes paid Dragon Global (*id.* ¶ 153), but the rent was not "shared" and was paid to the landlord either way. (*See* ECF No. 408-3 ¶¶ 28–29).

Finally, the FTC argues that OPG and Dragon Global "coordinated their branding and marketing" because OPG was listed on Dragon Global's website as its sole "early-stage control investment." (FTC Br. at 18). This merely establishes that Dragon Global's website stated that it invested in OPG, which it did, and just as Dragon Global listed other portfolio companies on its website. (*See, e.g.*, ECF No. 440-1 at 190). What matters is that Dragon Global did not advertise itself as OPG, and OPG did not advertise itself as Dragon Global. The FTC has failed to create a genuine dispute as to Dragon Global's purported common enterprise liability.

### III. The FTC is Not Entitled to Injunctive Relief Against the Dragon Defendants.

Contrary to the FTC's arguments, not all violations of the FTC Act automatically warrant a sweeping injunction and the FTC must show "a reasonable likelihood of future violations of the FTC Act." *FTC v. Atlantex Assocs.*, 1987 WL 20384, at *13 (S.D. Fla. Nov. 25, 1987), *aff'd* 872 F.2d 966 (11th Cir. 1989). In a case the FTC cites (FTC Br. at 18), the Supreme Court held that a lower court did not err in refusing to award injunctive relief where there was no evidence that future violations would occur absent an injunction. *United States v. W. T. Grant Co.*, 345 U.S. 629, 635 (1953). The FTC's own authority thus demonstrates why permanent injunctive relief is inappropriate here: the FTC points to no evidence that the Dragon Defendants have ever violated the FTC Act or any other consumer protection law, that there is any threatened future violation, or that they were aware that OPG's conduct allegedly violated any law until the FTC filed suit. Thus, the Court can "decide that there [is] no significant threat of future violation and that there [is] no factual dispute about the existence of such a threat." *Id.* at 635.

### IV. Arlene Mahon is Entitled to Summary Judgment on Individual Liability.[10]

The FTC takes issue with Mahon's failure to point to "contemporaneous record(s)" to support her assertion that she did not have control over or actively participate in allegedly

---

[10] Mahon also joins in the legal arguments made by Mr. Zangrillo in Section I above. *See supra*, pp. 1–3 (direct participation), 3–5 (authority to control), 5–6 (knowledge).

8

deceptive acts. (FTC Br. at 8). First, the very lack of such records proves Mahon's lack of participation and control. Furthermore, it's the FTC's burden to furnish evidence of Mahon's participation, not the reverse. *See FTC v. Nationwide Connections, Inc.*, 2007 U.S. Dist. LEXIS 62891, *8 (S.D. Fla. August 27, 2007). The FTC downplays the fact that numerous other individual defendants testified that Mahon played no role in OPG business operations, the development of business strategies, or the design/development of the websites. (ECF No. 407 ("Mahon SUF" ¶ 4). By all accounts, Mahon was hired solely to oversee the company's accounting department. (*Id.*). While it was Mahon's job to keep track of OPG's revenue, she had no say over, and very little knowledge about, how that revenue was generated. (*Id.* at ¶¶ 4-8).

The FTC points to the fact that Mahon "created" Waltham and downplays the significance of the fact that it was not a profit center. (FTC Br. at 8). However, the evidence is clear that Waltham's sole purpose was to track the time that OPG employees dedicated to the different incubator companies in order to facilitate payroll. (Mahon SUF ¶11). No evidence exists that Mahon directed the employees, other than those in accounting, or was aware of any of their roles in furthering alleged consumer deception. (ECF No. 457 ("Mahon Reply SUF") ¶¶ 18-20, 25). Indeed, there is no evidence that Mahon was aware of or understood the details of OPG's various businesses, as it was not part of her job responsibilities. (*Id.* at ¶ 23). Mahon herself testified that she had not visited any of the dozens of websites the FTC inquired about. (Mahon SUF at ¶ 4).

The FTC greatly exaggerates Mahon's role, pointing to out-of-context facts in support of its position. For example, as part of their authority-to-control argument, the FTC states that Mahon oversaw various employees, "including members of the payment processing team." (FTC Br. at 8-9). However, the FTC omits that, at the time, those employees were not part of that team, and Mahon had no oversight over merchant processing. (Mahon Reply SUF at ¶¶ 18, 20, 25). The FTC also misleadingly states that Mahon communicated with the merchant processing team. (FTC Br. at 13). As Mahon pointed out during her deposition, she was aware of chargebacks only to the extent that she had to account for all "contra revenue," i.e., debits to company accounts. (Mahon Reply SUF at ¶ 25). There is absolutely no evidence to suggest that Mahon understood or had reason to know that OPG's chargeback ratios evidenced a deceptive business practice.

In further support of their control position, the FTC states that "Mahon was directly involved with all of the initial start-up activities," but the only record evidence of Mahon's involvement indicates that her activities were limited to the opening of bank accounts, which

9

would fall squarely within her limited job responsibilities. (FTC Br. at 11; Mahon Reply SUF at ¶ 23). The FTC points to Mahon's role as "VP of Finance and Accounting" and short stint as CFO as further proof of her control, but furnishes no proof, as none exists, that Mahon was listed as an officer of OPG in any of its corporate documents/filings or had any meaningful authority or discretion over company decisions. (Mahon Reply SUF at ¶¶ 18-26).

The FTC's direct participation arguments are equally unavailing. The FTC argues that Mahon's agreement to allow OPG to use her credit to open a merchant processing account proves her participation in the deceptive acts. (FTC Br. at 11). However, Mahon was just one of many employees who were asked to lend their credit without any reason to believe that they were unwittingly facilitating alleged consumer deception. (Mahon SUF at ¶ 10). That pales in comparison to the direct actions taken by the individual defendants in the authority cited by the FTC on this issue. (FTC Br. at 4 FN 8) (citing *Pointbreak*, 376 F. Supp. 3d at 1270-71; *J.K. Publ'ns*, 99 F. Supp. 2d at 1206). The FTC states that Mahon used a corporate credit card to pay for online advertising – which is to say, as the accountant, she paid approved company invoices with company funds. (FTC Br. at 11). The FTC cites no evidence that Mahon had any awareness or say in the advertisements. The FTC then misleadingly states that Mahon met with content writers to lead the Court to conclude that she collaborated on website content. (*Id*.). However, the evidence cited actually shows that these meetings were related to a department cost study and were not in any way related to website content. (Mahon Reply SUF at ¶ 45). The FTC claims that Mahon fielded calls from "unhappy customers." (*Id*.). However, the evidence cited actually shows that Mahon only accidentally received customer complaints for a matter of days, as they were accidentally forwarded to her phone by a different department. (*Id.* at ¶ 46). This is a far cry from the "avalanche of consumer complaints" received by the individual defendant in the authority cited by the FTC. (FTC Br. at 3, 5-6 (citing *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989)). In short, there is no evidence that Mahon participated in any deceptive acts.

Mahon neither owned any of OPG nor shared in its profits, as was the case with respect with the vast majority of the individual defendants held personally accountable in the caselaw cited by the FTC. Mahon was merely an employee whose employment was terminated prior to the filing of this case. (Mahon Reply SUF at ¶ 18). The FTC has not met its burden of establishing that Mahon's role at OPG prior to her termination was sufficient to justify the onerous, life-changing enjoinments and decades of affirmative obligations the FTC seeks to impose upon her.

# CONCLUSION

The Court should grant summary judgment in favor of the Moving Defendants.

Dated: July 12, 2021
       Miami, Florida

Respectfully,

/s/ Marshall Dore Louis
Marshall Dore Louis
Florida Bar No. 512680
BOIES SCHILLER FLEXNER LLP
100 S.E. Second Street, Suite 2800
Miami, FL 33131
TEL: (305) 539-8400
E-mail: mlouis@bsfllp.com

Matthew L. Schwartz (pro hac vice)
John T. Zach (pro hac vice)
Sabina Mariella (pro hac vice)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York
Telephone: (212) 446-2300
E-mail: mlschwartz@bsfllp.com

*Counsel for Defendants Robert Zangrillo, Dragon Global LLC, Dragon Global Management LLC, Dragon Global Holdings LLC, and On Point Capital Partners LLC*

**McARDLE, PEREZ & FRANCO, P.L.**

/s/ Xavier A. Franco
Xavier A. Franco, Esq.
Florida Bar Number: 0031823
Michael A. Mullavey, Esq.
Florida Bar Number: 0124191
255 Alhambra Circle, Suite 925
Coral Gables, Florida 33134
Tel:   305-442-2214/Fax:   305-442-2291
xfranco@mcper.com
mmullavey@mcper.com
docketclerk@mcper.com

**DIFALCO, FERNANDEZ & KAPLAN**

Justin B. Kaplan, Esq.

11

                                                777 Brickell Avenue, Suite 630
                                                Miami, FL 33131
                                                Tel: 305-569-9800
                                                Fax: 866-569-0666
                                                jkaplan@difalcofernandez.com
                                                *Co-Counsel for Arlene Mahon*