**ALL DEFS' RES TO PL'S STMT OF FACTS**

**DX 9**

19-cv-25046; FTC v OnPoint

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

FEDERAL TRADE COMMISSION,

    Plaintiff,

    v.

ON POINT GLOBAL LLC, *et al.*,

    Defendants.

Civil Action No. 19-25046-Civ-Scola

**SECOND EXPERT REBUTTAL REPORT SUBMITTED BY DR. JUSTIN R. ANDERSON IN RESPONSE TO THE EXPERT REPORT OF DR. MICHELLE L. MAZUREK** Submitted pursuant to 28. U.S.C. § 1746

1

**TABLE OF CONTENTS**

2

3   Introduction ................................................................................................. 1

4   My Qualifications......................................................................................... 2

5   Materials Reviewed and Compensation................................................... 3

6   Summary of My Opinions........................................................................... 4

7   Detailed Opinions Regarding the Mazurek Surveys................................ 7

8        I.    The Mazurek Surveys include respondent universes that are over-inclusive

9              and do not represent the relevant consumer populations. ...................................... 8

10       II.   The Mazurek Surveys failed to test the disputed websites in a manner that

11             represents marketplace conditions. ...................................................... 14

12       III.  The Mazurek Surveys failed to include controls, and cannot demonstrate that

13             the survey results were caused by the disputed websites, as opposed to other

14             factors that are not under dispute. ...................................................... 20

15       IV.   The Mazurek Surveys are leading and encourage respondents to evaluate the

16             websites differently than they might in a real marketplace situation................... 23

17       V.    The Mazurek Report provides tables that display results in a misleading

18             manner that inflates the survey measures...................................................... 26

19   Conclusions .................................................................................................. 28

20

21   Exhibit 1:    Dr. Justin R. Anderson CV and Testimony Experience

22

23

24

25

26

27

28

**Introduction**

1.       I have been retained by counsel for Defendants Burton Katz, Brent Levison, Elisha Rothman, and Christopher Sherman in the above litigation.  I previously provided a rebuttal report ("First Anderson Report")[1] that sets forth my opinions regarding surveys (the "Mazurek Surveys") conducted by Dr. Michelle Mazurek[2] on behalf of the Plaintiff, the Federal Trade Commission ("FTC").  This second rebuttal report includes many of the same criticisms of the Mazurek Surveys that I provided in the First Anderson Report, and adds additional information from the testimony that Dr. Mazurek provided during the preliminary injunction hearing held January 10 and 13, 2020.[3]

2.       It is my understanding that the FTC alleges that certain websites operated by On Point Global, LLC ("On Point"), at the time the Complaint was filed, misled consumers.  The Mazurek Report describes the Mazurek Surveys and preliminary studies Dr. Mazurek conducted.  Based on the Mazurek Surveys, Dr. Mazurek concludes that On Point's websites, in the form in which they were tested, are likely to mislead consumers.[4]  The FTC relies on Dr. Mazurek's opinion in its allegations in this matter.[5]

3.       The opinions expressed in this report are based on materials I reviewed, research I conducted, and my experience.  I reserve the right to supplement this report in light of the ongoing discovery in this matter.

---

[1] "Expert Rebuttal Report Submitted by Dr. Justin R. Anderson in Response to the Expert Report of Dr. Michelle L. Mazurek," dated January 6, 2020.

[2] The Mazurek Surveys are described in a report titled, "Expert Report of Dr. Michelle L. Mazurek" ("Mazurek Report"), dated December 2, 2019.  The Mazurek Report indicates that Dr. Mazurek also conducted preliminary studies.  However, it appears that Dr. Mazurek's opinions in this matter are based on the surveys, and not the preliminary studies.  As a result, my rebuttal reports address only the Mazurek Surveys, and not the preliminary studies, except where specifically noted.  It is my understanding that the FTC disclosed the Mazurek Report again on May 24, 2021, with no changes from the report originally disclosed in this matter.

[3] This second rebuttal report cites transcripts of Dr. Mazurek's testimony during the preliminary injunction hearing as "Transcript 161" for testimony recorded in Document 161 from January 10, 2020, or as "Transcript 162" for testimony recorded in Document 162 from January 13, 2020.

[4] Mazurek Report, ¶19.

[5] Plaintiff's *Ex Parte* Motion for a Temporary Restraining Order and Memorandum in Support Thereof, December 9, 2019, pp.7, 13.

**My Qualifications**

4.      I am a Senior Vice President with MMR Strategy Group ("MMR"), a marketing research and consulting firm founded in 1974.  During more than eight years at MMR, I have personally designed and conducted hundreds of surveys about a variety of topics, including false or deceptive advertising.  I have provided expert reports and/or testimony at deposition or trial in other matters indicated in my curriculum vitae, and have been qualified as a survey expert in federal court, including previously in this matter.  I have previously been retained as a survey expert by the Federal Trade Commission in a matter involving an allegation of consumer deception.

5.      I earned a Doctorate of Philosophy (PhD) in Business Administration with a concentration in Marketing from the University of Southern California.  My doctoral studies included training in survey research methods, statistics, marketing, and consumer psychology, among other topics.  I also earned a Master of Business Administration (MBA) with a concentration in Marketing from the University of Illinois at Urbana-Champaign, and a Bachelor of Science in Atmospheric Science from the University of Wisconsin – Madison.

6.      During my career in academia, I was a Marketing professor at the University of North Carolina Wilmington and at California State Polytechnic University, Pomona, and a Marketing instructor at the University of Southern California.  In those positions, I taught MBA and undergraduate courses in marketing research, consumer behavior, marketing strategy, and other topics.  The courses I taught in marketing research emphasized survey research methods.

7.      I have presented my research at conferences of the American Marketing Association and delivered other invited presentations at universities.  In May, 2019, I moderated a roundtable discussion regarding litigation surveys at the Annual Meeting of the International Trademark Association (INTA).  In September, 2016, I presented a webinar, titled "Litigation Surveys for Non-Traditional Marks," to a meeting of the U.S. Subcommittee of the Non-Traditional Marks Committee of the International Trademark Association (INTA).  In October, 2015, I was a panelist at a Continuing Legal Education seminar, titled "Using Surveys in Intellectual Property Matters," sponsored by the Bar Association of San Francisco.

8.      I serve on the editorial board of the *Journal of Brand Strategy*, and serve as a reviewer for the *Journal of Brand Strategy* and the *Journal of Brand Management*.  I have previously served as a reviewer for the journals *Marketing Science* and *Arts and the Market*.

9.      I am a member of the American Marketing Association, the Insights Association, the Association of National Advertisers, the Brand Activation Association, and the International Trademark Association.  I have also served as a member of the Non-Traditional Marks Committee of the International Trademark Association.

10.     I previously worked as a Research Director at Lieberman Research Worldwide marketing research agency, and as a Senior Research Analyst at BBDO Chicago advertising agency.  In both of those positions, I designed and conducted surveys for a variety of clients in diverse industries.  I have also served as a meteorological officer in the United States Air Force.

11.     Exhibit 1 provides my curriculum vitae, including all publications in the past ten years, as well as testimony I have provided during the past four years.


**Materials Reviewed and Compensation**

12.     For this report, I have reviewed the following materials:

     i.      Plaintiff's *Ex Parte* Motion for a Temporary Restraining Order and Memorandum in Support Thereof, dated December 9, 2019.

     ii.     Sealed Order Granting *Ex Parte* Temporary Restraining Order and Order to Show Cause, dated December 13, 2019.

     iii.    Expert Report of Dr. Michelle Mazurek ("Mazurek Report"), dated December 2, 2019, including Attachments 1 through 10.

     iv.     Additional materials regarding the Mazurek Surveys, including the survey programs,[6] data files, codebooks, coding files, and script for data analysis.

---

[6] I understand the survey was conducted on websites using the following URLs: https://www.surveygizmo.com/s3/5306935/User-Study-Market-Research-Prolific was the DMV Survey for respondents from Prolific, https://www.surveygizmo.com/s3/5280802/User-Study-Market-Research was the Section 8 Survey, and https://www.surveygizmo.com/s3/5299963/user-study was the DMV Survey for Cint respondents.

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

      v.    Websites tested in the Mazurek Surveys, including www.dmv.com[7] and section-8-housing.org.

      vi.    Screenshots of certain website pages from the following websites: finance-watcher.com/getting-your-guide, food-stamps.com, section-8-housing.org, section-8-apartments.org, and veteran-affairs.org. These screenshots were provided to me by counsel.

      vii.    Screenshots of certain website pages accessed through an Internet archive, including the following websites:

web.archive.org/web/20190318114646/http://foodstampsinformation.com and web.archive.org/web/20190210194111/https://fishinglicense.org/index.html. These screenshots were provided to me by counsel.

      viii.    Transcripts from the preliminary injunction hearing held January 10 ("Transcript 161") and 13 ("Transcript 162"), 2020.

13. In addition, I consulted published literature and cases relevant to the issues and theories in this matter, the most relevant of which are cited in this report. I also rely on my knowledge in fields such as surveys, consumer behavior, and marketing.

14. MMR billed $7,500 for this rebuttal report. After the production of this report, MMR bills my time in this matter at $600 per hour, except for testimony at deposition or trial, which is billed at $5,500 per day. These fees do not depend on the outcome of this matter.


**Summary of My Opinions**

15. Based on my review of the Mazurek Report, my review of other materials identified in this report, and my experience, I believe that the Mazurek Surveys are fatally flawed, and do not provide valid or reliable measures of whether certain websites operated by On Point mislead consumers.

---

[7] The Mazurek Report does not specify whether the DMV-related website tested was DMV.com or license-driver.com. It is my understanding that license-driver.com is not in operation as of this writing.

16.     The Mazurek Surveys suffer from significant flaws, including the following:

     i.    <u>The Mazurek Surveys include respondent universes that are over-inclusive and do not represent the relevant consumer populations</u>.  The DMV Survey and the Section 8 Survey[8] failed to qualify respondents as representing consumers who are likely to renew their driver's license online, or to inquire about Section 8 housing eligibility, respectively.  Some respondents included in the DMV Survey indicated that they do not have a driver's license.  Some respondents included in the Section 8 Survey reported an annual household income that would disqualify them from Section 8 housing benefits, and others indicated that they are not at all familiar with the Section 8 program.  Neither survey includes screening questions to ensure that the survey universe represents the relevant consumer population.  Dr. Mazurek acknowledged this at the preliminary injunction hearing.  She testified that the surveys "did not include any screening questions about whether respondents have an actual interest in obtaining motor vehicle services"[9] or "whether respondents are interested in obtaining information about section 8 or public housing eligibility."[10]

     ii.    <u>The Mazurek Surveys do not represent marketplace conditions</u>.  The surveys ask respondents to imagine they were someone else.  Therefore, the survey measures do not reflect respondents' beliefs about the On Point websites.  At best, the measures reflect what respondents think some other person would believe about the websites.  Dr. Mazurek acknowledged that she does not believe that consumers seeking "motor vehicle services online"[11] or "inquiring about section

---

[8] The Mazurek Surveys include two surveys.  One focused on a DMV-related website, which this rebuttal report refers to as the "DMV Survey."  The other focused on a website regarding Section 8 housing eligibility, which this rebuttal report refers to as the "Section 8 Survey."

[9] Transcript 162 (17:14-17).

[10] Transcript 162 (18:12-15).

[11] Transcript 162 (23:6-9).

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

8 eligibility online do so by role playing as a fictitious person."[12]  The surveys also ask respondents to evaluate the websites as if they were testing them for usability.  Therefore, the surveys do not provide valid measures of whether consumers understand information provided on the On Point websites.  The DMV Survey also showed the website as an image that was smaller than the website would appear in a typical marketplace situation, and some respondents indicated that they were not able to read information provided on the website.

iii.  The Mazurek Surveys do not include controls, and cannot demonstrate that the survey results were caused by the disputed websites, as opposed to other factors that are not under dispute.  Because they lack control stimuli or control questions, the surveys cannot determine how much, if any, of the reported results were caused by the disputed websites, and how much of the results were due to survey "noise."

iv.  The Mazurek Surveys are leading and encourage respondents to evaluate the websites differently than they might in a real marketplace situation.  As noted previously, the surveys instructed respondents to pretend they were a fictitious person named Terry Spencer.  As a result, the surveys do not reflect how consumers would interact with the websites in a real marketplace situation, but rather how respondents believe Terry Spencer would behave in the artificial context of the survey.  Dr. Mazurek acknowledged that she does not believe that consumers seeking "motor vehicle services online"[13] or "inquiring about section 8 eligibility online do so by role playing as a fictitious person."[14]  The surveys also provided instructions that implied that information entered into the website would remain confidential.  This may have encouraged respondents to indicate that they would enter Terry Spencer's credit card or personal information in the

---

[12] Transcript 162 (23:10-13).

[13] Transcript 162 (23:6-9).

[14] Transcript 162 (23:10-13).

1  survey, when they might not have entered their own information in a real

2  marketplace situation.  Additionally, the surveys instructed respondents that

3  Terry Spencer has come to the website for the purpose of renewing her driver's

4  license online or checking her eligibility to receive Section 8 housing benefits.

5  These instructions led respondents to believe that the websites provide these

6  services.

7       v.    <u>The Mazurek Report provides tables that display results in a misleading manner</u>

8  <u>that inflates the survey measures</u>.  Certain tables in the Mazurek Report provide

9  the results of survey questions calculated as percentages of respondents who

10  answered each question, instead of as percentages of respondents who viewed

11  each website.  This misleading method of calculation inflates the survey

12  measures and makes it seem as though the On Point websites misled a larger

13  percentage of respondents than proper survey calculations would indicate.

14  17.    As I have summarized above and will describe below in this rebuttal report, these are

15  fatal flaws in the design and execution of the Mazurek Surveys.  As a result of these flaws, it is

16  my opinion that the Mazurek Surveys do not provide valid or reliable measures of whether

17  certain websites operated by On Point at the time that the Complaint in this matter was filed

18  misled consumers.

19

20  **Detailed Opinions Regarding the Mazurek Surveys**

21  18.    It is my opinion that the Mazurek Surveys are fatally flawed.  The flaws bias the survey

22  results, and make the Mazurek Surveys and their findings unreliable.  I describe these flaws in

23  detail below.

24

25

26

27

28

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

**I.**     <u>**The Mazurek Surveys include respondent universes that are over-inclusive and do not represent the relevant consumer populations.**</u>

19.     One important element of survey design is ensuring that the universe of survey respondents represents the consumer population at issue. According to *McCarthy on Trademarks and Unfair Competition*, "Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant."[15]

20.     Although Dr. Mazurek was not familiar with *McCarthy on Trademarks and Unfair Competition* when she conducted her surveys,[16] she acknowledges this principle in her report, which reads, "It is critical to choose a sample that is appropriate to the research question intended to be answered."[17]

21.     For a survey measuring whether a website is misleading, the proper survey universe "should focus on those consumers to whom the ad is directed (i.e., the advertiser's potential customers)."[18]

22.     The Mazurek Surveys are intended to test whether certain websites mislead consumers. As Dr. Mazurek has defined it, the relevant consumer population for the DMV Survey is consumers who are seeking to renew their driver's license online. Similarly, as Dr. Mazurek

---

[15] McCarthy, J. Thomas. § 32:159 Relevant "universe" surveyed - Defining the universe. *McCarthy on Trademarks and Unfair Competition*, 4th ed., Thomson Reuters, 2014, p. 1.

[16] Transcript 162 (10:6-10). Dr. Mazurek also testified that, when she conducted her surveys, she had not heard of other authorities regarding litigation surveys, including the Reference Guide on Survey Research (Tr. 162 (10:13-19)) and Trademark and Deceptive Advertising Surveys: Law, Science, and Design (Tr. 162 (11:3-6)). She also testified that she did not "consult any reference materials regarding the design or execution of deceptive advertising surveys" (Tr. 162 (11:7-11)) and that she did not "consult any court decisions regarding deceptive advertising surveys." (Tr. 162 (11:12-14))

[17] Mazurek Report, p. 6, ¶27.

[18] Barber, William G. "The Universe." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2012, p. 36.

has defined it, the relevant consumer population for the Section 8 Survey is consumers who are inquiring about Section 8 housing eligibility.[19]

23.     The Mazurek Surveys fail to represent these relevant consumer populations.  Instead, the surveys include respondent universes that are over-inclusive[20] because they include a broader category of consumers than the relevant consumer populations.

24.     For the DMV Survey, Dr. Mazurek defines the consumer population as, "U.S. adults who may wish to obtain motor vehicle services (e.g., driver's license renewal, car registration) online…."[21]

25.     However, the DMV Survey fails to qualify survey respondents as representing this population.  Dr. Mazurek acknowledged this, testifying that the DMV "survey did not include any screening questions about whether respondents have an actual interest in obtaining motor vehicle services."[22]  In fact, the survey includes respondents who appear to be unqualified for the survey.

26.     Dr. Mazurek recruited respondents from the Cint consumer panel and from the Prolific crowdsourcing service.[23]  She asked these providers to provide respondents who met certain demographic criteria based on age, gender, education level, and ethnicity.[24]

27.     The DMV Survey failed to measure whether respondents may wish to obtain motor vehicle services online.  In fact, 8 (7.5%) of the 107 respondents who completed the DMV

---

[19] I am not providing the opinion that these are the correct definitions of the relevant consumer populations.  It is my understanding that the websites tested in the Mazurek Surveys provide information about how to renew a driver's license or how to check eligibility for Section 8 benefits.  My analysis in this section addresses whether the respondent universes in the Mazurek Surveys properly represent the consumer populations that Dr. Mazurek indicated are relevant to this matter.

[20] "A universe may be improperly over-inclusive by encompassing such a large group of persons that it includes those whose perceptions are not relevant, thus skewing the results by introducing irrelevant data."  McCarthy, J. Thomas.  § 32:159 Relevant "universe" surveyed - Defining the universe.  *McCarthy on Trademarks and Unfair Competition*, 4th ed., Thomson Reuters, 2014, p. 1.

[21] Mazurek Report, p. 6, ¶27.

[22] Transcript 162 (17:14-17).

[23] Mazurek Report, p. 19, ¶81.

[24] Mazurek Report, p. 19, ¶82.

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

Survey do not have a driver's license.[25]  It seems unlikely that a consumer who does not have a driver's license would wish to renew a driver's license or obtain car registration online.

28.     There is also no indication that the respondents who indicated that they do have a driver's license would wish to obtain motor vehicle services online.  The survey did not ask any questions to measure whether respondents wish to obtain motor vehicle services, and did not ask questions to measure whether respondents wish to obtain those services online.

29.     For the Section 8 Survey, Dr. Mazurek defines the consumer population as, "U.S. adults who may wish to obtain information about Section 8 eligibility and/or apply for Section 8 vouchers online."[26]

30.     However, the Section 8 Survey fails to qualify survey respondents as representing this population.  Dr. Mazurek acknowledged this, testifying that the Section 8 "survey did not ask any screening questions about whether respondents are interested in obtaining information about section 8 or public housing eligibility."[27]  In fact, the survey includes respondents who appear to be unqualified for the survey.

31.     Dr. Mazurek recruited respondents from the Cint consumer panel and from the Prolific crowdsourcing service.[28]  She asked these providers to provide respondents who met certain demographic criteria based on age, gender, education level, ethnicity, and annual household income.[29]

32.     The Section 8 Survey failed to measure whether respondents may wish to obtain information about Section 8 eligibility and/or apply for Section 8 vouchers online.  Dr. Mazurek reported that she asked Prolific to limit respondents to those with annual household incomes "below $60,000/year."[30]  Despite this request, 23 (21.1%) of the 109 respondents who

---

[25] Mazurek Report, p. 21, Table 1.

[26] Mazurek Report, p. 6, ¶27.

[27] Transcript 162 (18:12-15).

[28] Mazurek Report, p. 19, ¶81.

[29] Mazurek Report, p. 19, ¶82.

[30] Mazurek Report, p. 19, ¶82.  Although not clear in the Mazurek report, Dr. Mazurek testified that the $60,000 threshold applied only to the Prolific sample (Transcript 161 (189:12-16)).

completed the Section 8 Survey indicated that their annual household incomes are $75,000 or more.[31]  Another 18 respondents (16.5%) indicated that their annual household incomes are between $50,000 and $74,999.[32]  Therefore, at least 21.1% of respondents and possibly as many as 37.6% of respondents failed to meet the annual income threshold that Dr. Mazurek defined for the survey.[33]

33.     Even if the Section 8 Survey had included only respondents who met the income requirement that Dr. Mazurek specified, that would not mean that those respondents properly represent the relevant consumer population at issue in this matter.  Dr. Mazurek testified that even consumers who make less than $60,000 per year may "have no interest in government-subsidized housing."[34]

34.     Additionally, the Section 8 Survey included respondents who were unfamiliar with the Section 8 program, and therefore would be unlikely to inquire about their eligibility for Section 8 benefits at all, or online.  The survey asked respondents, "Prior to participating in this study today, how familiar were you with the Section 8 program?"[35]  The survey provided response options including, "Very familiar," "Moderately familiar," "Slightly familiar," and "Not at all familiar."  Of 116 respondents who answered this question, 49 (42.2%) indicated that they were "Not at all familiar" with the Section 8 program.

35.     There is also no indication that the respondents who indicated that their annual household income is below Dr. Mazurek's specified threshold, and were familiar with the Section 8 program, would wish to obtain information about Section 8 eligibility and/or apply for Section 8 vouchers online.  The survey did not ask any questions to measure whether respondents wish to obtain information about Section 8 eligibility and/or apply for Section 8

---

[31] Mazurek Report, p. 31, Table 7.

[32] Mazurek Report, p. 31, Table 7.

[33] It is my understanding that the income level for Section 8 housing eligibility varies by geography.  I am not providing an opinion that $60,000 is the correct income threshold for the Section 8 Survey.  That is the threshold that Dr. Mazurek indicates she intended for the survey (Mazurek Report, p. 19, ¶82).

[34] Transcript 162 (19:4-9).

[35] Question 407, reported in Column XP of the file labeled "section8-raw."  It is my understanding that this file contains all of the responses for the Section 8 Survey.

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

1   vouchers, and did not ask questions to measure whether respondents wish to obtain information

2   or apply for vouchers online.

3   36.    To ensure the survey asks questions of the right persons, "Each participant in a survey

4   should first be questioned to ensure that he or she qualifies to be a member of the defined

5   universe.  This is typically done using a screening questionnaire (or screener)."[36]

6   37.    In previous matters regarding whether certain marketing materials were misleading to

7   consumers, courts have accepted surveys that screen respondents by asking whether they have

8   purchased the product in question in a reasonable past time period, or whether they are likely to

9   do so in a reasonable future time period.  Such questions could be adapted to measure whether

10  respondents have sought, or are likely to seek, the information provided on the On Point

11  websites.  The Mazurek Surveys failed to ask any such screening questions.

12  38.    Survey respondents who do not represent the relevant consumer population may hold

13  beliefs or perceive certain information differently than consumers in the relevant population.

14  For example, survey respondents who do not have a driver's license may not understand the

15  process for renewing a driver's license online, and might think the DMV.com website provides

16  information or services that it does not claim to provide.  Similarly, survey respondents who are

17  not eligible for Section 8 benefits may not understand the eligibility requirements for Section 8

18  benefits, and might think the section-8-housing.org website provides information or services

19  that it does not claim to provide.

20  39.    In her testimony, Dr. Mazurek attempted to defend the over-inclusive universe of her

21  surveys.  She argued that the surveys' lack of relevant screening questions was necessary to

22  allow the survey to include a sufficient number of respondents and to be demographically

23  representative.[37]  That argument suffers for two reasons.

24

25

26  _____

27  [36] Barber, William G. "The Universe." *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, edited by Shari Seidman Diamond and Jerre B. Swann, ABA Publishing, 2012, p. 48.

28  [37] Transcript 161, (190:6-20).

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

40.      First, there seem to be plenty of potentially qualified respondents.  It is my understanding that there are approximately 230 million licensed drivers in the United States,[38] and it is reasonable that many of them would be interested in renewing their driver's license online.  It is also my understanding that more than 10 million people receive housing assistance from the United States government, and that millions more are eligible but do not receive benefits.[39]  It seems reasonable that many of those who are eligible for benefits would be interested in inquiring online about their eligibility for Section 8 housing benefits.  Based on my experience, when the relevant consumer population includes tens of millions or hundreds of millions of people, it is not difficult to recruit a sufficient number of qualified respondents to participate in a survey.

41.      Second, even if the consumer population were limited, I am not aware of any court relying on a survey with an over-inclusive respondent universe simply because the survey expert believed it would be too difficult to obtain a sufficient number of qualified respondents to complete the survey.

42.      The Mazurek Surveys failed to ask any screening questions to ensure that survey respondents represent the relevant consumer population.  The result is an over-inclusive universe that provides little or no information about whether the On Point websites are misleading to consumers in the relevant populations for each website.

---

[38] In 2019, there were more than 228 million licensed drivers in the U.S.  Wagner, I. "Number of Drivers Licensed in the U.S. 2019." *Statista*, Mar. 11, 2021, www.statista.com/statistics/191653/number-of-licensed-drivers-in-the-us-since-1988/.  Accessed June 21, 2021.

[39] "Federal Rental Assistance Fact Sheets." *Center on Budget and Policy Priorities*, June 1, 2021, www.cbpp.org/research/housing/federal-rental-assistance-fact-sheets#US.  Accessed June 21, 2021.

**II.**      **The Mazurek Surveys failed to test the disputed websites in a manner that represents marketplace conditions.**

43.      A survey measuring whether a website is misleading to consumers should test the disputed website in a manner that represents how consumers would encounter the website in a real marketplace situation.  As one legal scholar has written, "The Closer the Survey Context Comes to Marketplace Conditions, the Greater the Evidentiary Weight It Has."[40]

44.      As Dr. Mazurek reports, the degree to which a survey represents marketplace conditions is referred to as "External validity, also called ecological validity."[41]

45.      The DMV Survey is intended to test the marketplace condition of a consumer using a website to renew a driver's license or car registration online.  The Section 8 Survey is intended to test the marketplace condition of a consumer using a website to obtain information about Section 8 eligibility or apply for Section 8 vouchers online.  A litigation survey intended to measure these marketplace conditions would typically ask respondents what they believe the website communicates or implies.

46.      The Mazurek Surveys fail to reflect marketplace conditions because the surveys did not measure respondents' own beliefs about the disputed websites.

47.      Rather than measure respondents' own beliefs, the survey instructed respondents to imagine that they were someone else.  The survey then asked questions about what respondents thought while playing their fictitious role.

48.      In the Mazurek Surveys, respondents "were instructed to role-play as Terry Spencer, a fictional person from Florida."[42]  In the DMV Survey, respondents were provided information about Terry Spencer's gender, birth date, email address, phone number, and address.[43]  In the

---

[40] McCarthy, J. Thomas.  § 32:163 Survey methodology - Approximating market conditions. *McCarthy on Trademarks and Unfair Competition*, 4th ed., Thomson Reuters, 2014, p. 1.

[41] Mazurek Report, p. 7, ¶33.

[42] Mazurek Report, p. 12, ¶53.  The Mazurek Report provides this description in the section on the Preliminary Studies.  The report later indicates that the Mazurek Surveys used "the same Terry Spencer roleplaying tasks" (Mazurek Report, p. 16, ¶70).

[43] Mazurek Report, Attachment 3.

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

Section 8 Survey, respondents were provided a persona describing Terry Spencer in detail, including her marital status, number of children, employment status, annual income, a child's medical condition, debt, lack of insurance, college tuition, and interest in Section 8 benefits, in addition to her gender, birth date, email address, phone number, and address.[44]

49.     Respondents were instructed to "pretend that [they] are **Terry Spencer** of North Gulf Beach, Florida" while they interacted with the website.[45]

50.     Questions asked respondents to provide answers not as themselves, but in their role as Terry.  For example, the DMV Survey asked, "What would you like to do?  Please keep in mind that your goal, as Terry, is to renew your driver's license."[46]  For another example, the Section 8 Survey asked, "What would you (**as Terry**) like to click on?"[47]

51.     Dr. Mazurek testified that she included this role-playing task because, "it's important to give participants in a study some kind of task or goal."[48]

52.     Dr. Mazurek acknowledged that the role-playing task is not ecologically valid and does not represent realistic marketplace conditions.  She testified that she does not "believe that consumers seeking motor vehicle services online do so while role playing as someone else, such as a fictitious person,"[49] and that she does not "believe that consumers inquiring about section 8 eligibility online do so by role playing as a fictitious person." [50] I am not aware of any court accepting a survey into evidence that asked respondents to pretend they are someone else and answer questions while role-playing a fictitious person.  By doing so, the Mazurek Surveys do not measure what respondents think or how they would behave if they encountered the On Point website.  Therefore, the Mazurek Surveys do not reflect realistic marketplace conditions.

---

[44] Mazurek Report, Attachment 7, p. 1.

[45] Mazurek Report, Attachment 8, p. 5 and Attachment 9, pp. 5-6.

[46] Mazurek Report, Attachment 8, p. 7.

[47] Mazurek Report, Attachment 9, p. 21.

[48] Transcript 161 (192:20-21).

[49] Transcript 162 (23:6-9).

[50] Transcript 162 (23:10-13).

53.     Additionally, by instructing respondents to pretend to be someone else, the surveys reduced the attention and involvement that respondents devoted to the surveys.  As one respondent indicated, "I literally have no idea.  It wasn't my money, so I wasn't paying attention"[51]

54.     The Mazurek Surveys also fail to reflect marketplace conditions because the surveys instructed respondents to evaluate the websites for usability.

55.     Typically, it is recommended that a litigation survey should be conducted under blind conditions, meaning that the respondents are not aware of the purpose of the survey.[52]  Blind interviewing is thought to reduce demand effects[53] and other survey bias, making the survey more objective.

56.     The Mazurek Surveys violated this recommendation and informed respondents of the purpose of the surveys.  Rather than informing respondents of the true purpose of the surveys, the Mazurek Surveys employed what Dr. Mazurek refers to as "deception."[54]  The surveys instructed respondents that they would be asked "to evaluate the usability of the website."[55]

57.     Dr. Mazurek indicates that she engaged in this deception to preserve ecological validity.[56]  However, the deception actually served to reduce ecological validity.

---

[51] DMV Survey, Prolific Respondent 34, Question 101, "You just entered Terry's credit card information.  How much money did you spend?"

[52] Diamond, Shari Seidman.  "Reference Guide on Survey Research."  *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, pp. 410-411.  When a survey is administered by an interviewer, the survey should be conducted under "double-blind" conditions, meaning neither the respondent nor the interviewer is aware of the purpose of the survey.

[53] A demand effect is bias caused by respondents trying to provide socially acceptable answers or answers they believe would be helpful to the survey sponsor or researcher.  *See* Joseph F. Hair et al, *Marketing Research: In a Digital Information Environment*, McGraw-Hill Irwin, 2009, p. 284.  *See also* Mazurek Report, pp. 8-9, ¶37.

[54] Mazurek Report, p. 8, ¶34.

[55] Mazurek Report, p. 8, ¶34.

[56] Mazurek Report, p. 7, ¶33.

58.     In the marketplace conditions being tested, consumers would use the On Point websites to obtain information or services online.  However, in contrast to consumers' purposes of obtaining information or services, respondents in the Mazurek Surveys were instructed to evaluate the usability of the websites.

59.     Consumers seeking information or services under real marketplace conditions are not likely to be focused on evaluating a website's usability.  Rather, they are seeking to obtain the desired information or services.  Because the surveys instructed respondents to focus on usability, rather than the content of the websites, respondents may not have paid any attention, or not paid as much attention as they typically would in a real marketplace situation, to the information communicated about what the websites offered.  Therefore, the Mazurek Surveys do not reflect realistic marketplace conditions.

60.     The DMV Survey also failed to represent marketplace conditions because respondents were unable to read the website as they would under typical marketplace conditions.

61.     The survey displayed an image of the website on the left side of the survey screen.  This reduced the size of the image compared to what consumers would see when viewing the website in a full screen.  Figure 1 below provides a screenshot of the DMV Survey that shows how the website image was displayed to respondents.

**Figure 1:  Screenshot from the DMV Survey[57]**

62.     As Figure 1 shows, the website appears only on the left side of the screen, with instructions, questions, and answers shown on the right side of the screen.  Because the survey program includes blank space to the left and right sides of the image and questions, the size of the website image is actually less than half of the size it would appear when viewed on a full screen.

63.     The DMV Survey did not allow respondents to zoom or enlarge the image of the website being tested.

64.     Some respondents indicated that they were unable to see or read the information on the website clearly.  The following verbatim responses provide examples of this phenomenon:

---

[57] This screenshot was taken from https://www.surveygizmo.com/s3/5306935/User-Study-Market-Research-Prolific, accessed January 5, 2020.  I understand that this was website used for the DMV Survey for respondents from Prolific.  My understanding is that respondents from Cint viewed the DMV Survey in the same format.

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

i.    Respondent 69:[58] "easy to use, but small text" (Question 98)[59] and "see" (Question 99).[60]

ii.    Respondent 101: "To read the screen shots they were fuzzy and hard to read." (Question 99).

iii.    Respondent 104: "Text was too small to comfortably read" (Question 98).

iv.    Respondent 109: "read the fine print and figure out what it wanted me to do" (Question 99).

v.    Respondent 171: "read all the fine print" (Question 99).

vi.    Respondent 213: "Reading the site was difficult." (Question 99) and "I couldn't tell, because the print on the site was so small." (Question 100).[61]

vii.    Respondent 222: "hard to see the cost of renewal" (Question 100).

viii.    Respondent 229: "difficult to read. the print too small" (Question 99).

ix.    Respondent 232: "it was a bit hard to read, small words" (Question 98) and "to read" (Question 99).

x.    Respondent 233: "Figuring out what I wanted to do. It was hard to read" (Question 99).

xi.    Respondent 259: "reading the small pring" (Question 99).

xii.    Respondent 263: "read fine print wanting to accept" (Question 99) and "the fine print too small" (Question 100).

xiii.    Respondent 298: "text to small to read" (Question 99).

---

[58] These examples refer to respondents from the Cint panel. Some respondents from the Prolific crowdsourcing service also indicated that the website image was too small to see or read.

[59] Question 98 asked, "What was easy to do?"

[60] Question 99 asked, "What was hard to do?"

[61] Question 100 asked, "Was there anything that was confusing or hard to understand? Please describe it."

65.     Dr. Mazurek also agreed that the images tested in the survey are smaller and "more difficult for a user to read it than it would on the original website."[62]

66.     As a result of this flaw in the way the website was displayed, the survey failed to provide relevant information regarding the actual services provided by the website in a manner that represents how consumers would actually encounter that information under actual marketplace conditions.  If the survey had displayed the website realistically and legibly, respondents might have been able to read and understand what the websites actually offered.

III.     **The Mazurek Surveys failed to include controls, and cannot demonstrate that the survey results were caused by the disputed websites, as opposed to other factors that are not under dispute.**

67.     Survey responses may be affected by a number of factors.  One such factor may be the disputed elements, which in this matter are certain websites operated by On Point.  However, there are other reasons why respondents might provide answers indicating a misunderstanding that are not caused by the disputed websites.  The Mazurek Report provides a discussion of some of these survey biases, including social desirability bias,[63] satisficing,[64] and demand characteristics.[65]  Biases may also be caused by pre-existing attitudes, inattentiveness, response order bias,[66] acquiescence bias,[67] or other factors.

---

[62] Transcript 162 (53:5-10).

[63] Mazurek Report, p. 8, ¶35.

[64] Mazurek Report, p. 8, ¶36.

[65] Mazurek Report, pp. 8-9, ¶37.

[66] Response order bias can be caused by the order in which responses are displayed.  For example, some respondents might select the first or last response from a list simply because it was listed first or last.  *See* Pamela L. Alreck, and Robert B. Settle. *The Survey Research Handbook*, Irwin, 1995, p. 103.

[67] Acquiescence bias can be caused by the possible tendency of survey respondents to agree with survey questions presented in certain formats, such as "yes" and "no" response options.  *See*, Baumgartner, Hans, and Jan-Benedict E.M. Steenkamp. "Response Styles in Marketing Research: A Cross-National Investigation." *Journal of Marketing Research*, vol. 38, no. 2, May 2001, pp. 143–156.

68.     The use of a control can allow a survey to measure "general background noise."[68] Noise may manifest itself as a false positive measurement.  In other words, noise might cause a respondent to indicate a misunderstanding when none exists, or for a reason unrelated to the websites at issue.  A control can measure the effect of such influences, and allow a survey to isolate the effect associated with the disputed elements.

69.     Surveys that measure whether a website or other materials are misleading commonly use a control stimulus, or external control.  A control stimulus is typically similar to the test stimulus, but has been modified to remove or alter the disputed elements.  Typically, "…the expert should select a stimulus for the control group that shares as many characteristics with the experimental [test] stimulus as possible, with the key exception of the characteristic whose influence is being assessed."[69]

70.     A control stimulus is typically shown to a separate group of respondents who are not exposed to the test stimulus.  Respondents are typically randomly assigned to be exposed to either the test stimulus or the control stimulus.  By subtracting the noise measured by the control stimulus from the test measure, a survey researcher can calculate a "net" measure caused only by the disputed elements.

71.     For example, the name DMV.com on a website might cause some respondents to believe they can use the website to renew a driver's license.  Since the website name is not under dispute, a control version of the website would include the same DMV.com name, and would measure the same degree of noise.  This noise would then be subtracted from the test measure to calculate a net measure, which would reflect the actual amount, if any, that the On Point websites may mislead consumers.

---

[68] McCarthy, J. Thomas.  § 32:187 "The need for a survey control."  *McCarthy on Trademarks and Unfair Competition*, 4th ed., Thomson Reuters, 2014, p. 1.

[69] Diamond, Shari Seidman. "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, p. 399.

72.     Sometimes, instead of a control stimulus, a survey measuring whether certain materials are misleading may include a control question or questions.[70]  Control questions may take the form of asking respondents about messages that are known not to be communicated or implied by the disputed materials, and can be used to measure survey noise.

73.     The Mazurek Surveys did not include a control stimulus or control questions.  All respondents were shown one of the disputed websites operated by On Point.  No respondents were exposed to any control stimulus instead of the disputed websites.  Also, no respondents were asked control questions that could be used to measure noise in the questions used to measure whether the disputed websites mislead consumers.

74.     Dr. Mazurek testified that the surveys included a role-playing task,[71] instructions to read the questions carefully,[72] and open-ended questions,[73] and that these acted as controls.  However, these do not control for biases that Dr. Mazurek described in her report, including social desirability bias,[74] satisficing,[75] and demand characteristics.[76]  As recommended by authorities, a control stimulus or control questions can account for these types of biases, but the Mazurek Surveys did not include any such controls.

75.     As a result of this lack of any control stimuli or control questions, there is no way to determine how much, if any, of the surveys' measures of consumer misunderstanding was caused by the websites operated by On Point, or by survey noise unrelated to the On Point websites.  The Mazurek Surveys do not demonstrate that the surveys' results reflect anything other than survey noise.

---

[70] Diamond, Shari Seidman. "Reference Guide on Survey Research." *Reference Manual on Scientific Evidence*, 3rd ed., National Academies Press, 2011, p. 401.

[71] Transcript 161 (196:15-16).

[72] Transcript 161 (196:16-23).

[73] Transcript 161 (196:24 to 197:17).

[74] Mazurek Report, p. 8, ¶35.

[75] Mazurek Report, p. 8, ¶36.

[76] Mazurek Report, pp. 8-9, ¶37.

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

**IV.**     <u>The Mazurek Surveys are leading and encourage respondents to evaluate the websites differently than they might in a real marketplace situation.</u>

76.     One important requirement for a litigation survey is that the "questions asked were clear and not leading."[77]  If a survey asks leading questions, or questions that suggest correct or desired answers, then the survey is susceptible to demand effects[78] or other biases.

77.     Dr. Mazurek indicates that her surveys prevented such bias by deceiving respondents into believing their task was to evaluate the usability of the websites.  She writes that she employed "the usability study framing… so that participants would not believe that they needed to complete the renewal/eligibility check in order to achieve the study's objective."[79]

78.     However, the surveys instructed respondents to interact with the website while pretending they were Terry Spencer.[80]  The surveys also instructed respondents that Terry's goal was to renew her driver's license online[81] or to check her eligibility to receive Section 8 benefits.[82]

79.     The surveys then measured whether respondents would enter Terry Spencer's credit card or personal information into the websites.  If respondents indicated that they would do so, Dr. Mazurek considers this to indicate that respondents were misled by the website.  Dr. Mazurek's interpretation is false.

---

[77] McCarthy, J. Thomas.  § 32:181 Introducing a survey into evidence – Laying a foundation. *McCarthy on Trademarks and Unfair Competition*, 4th ed., Thomson Reuters, 2014, p. 1.

[78] A demand effect is bias caused by respondents trying to provide socially acceptable answers or answers they believe would be helpful to the survey sponsor or researcher.  *See* Joseph F. Hair et al, *Marketing Research: In a Digital Information Environment*, McGraw-Hill Irwin, 2009, p. 284.  *See also* Mazurek Report, pp. 8-9, ¶37.

[79] Mazurek Report, p. 9, ¶38.

[80] Mazurek Report, Attachment 8, p. 5 and Attachment 9, pp. 5-6.

[81] Mazurek Report, Attachment 8, p. 5.

[82] Mazurek Report, Attachment 9, p. 5.

80.     On the contrary, it seems logical that respondents who indicated that they would enter Terry Spencer's credit card or personal information into the websites were likely doing so to be able to evaluate the usability of the website, as they had been instructed.  Without doing so, they would have no way to evaluate the usability of the parts of the websites that collect that information.

81.     By instructing respondents to evaluate the usability of the websites, the survey was leading in such a way as to artificially encourage respondents to indicate that they would enter Terry Spencer's credit card or personal information, when they might not do so in a real marketplace situation.

82.     The surveys were also leading because of other instructions provided to respondents. Before being asked questions about the websites, the survey provided respondents with the following information:

> "Confidentiality:  Any potential loss of confidentiality will be minimized by storing data on password-protected servers.  If we write a report or article about this research project, your identity will be protected to the maximum extent possible."[83]

83.     It seems logical that this information led respondents to believe that any information they might enter into the On Point websites would be safeguarded according to the protections described in this instruction.  As a result, the surveys may have led respondents to be more willing to share credit card and other personal information than they would be likely to do in a real marketplace situation.

84.     Additionally, the surveys instructed respondents that Terry Spencer has come to the website for a certain purpose.  The DMV Survey instructed respondents that, "Terry's driver's license is about to expire, and it needs to be renewed soon.  **Terry would like to renew her driver's license online**.  Terry entered DMV.com into her web browser, which led to the website you are about to see."[84]

---

[83] Mazurek Report, Attachment 8, pp. 3-4, and Attachment 9, p. 4.

[84] Mazurek Report, Attachment 8, p. 5.

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

85.     Similarly, the Section 8 Survey instructed respondents that, "**Terry would like to check her eligibility to receive Section 8 benefits**."[85]  The survey also instructed respondents that, "Terry used Google to search for '**Section 8 housing apply**' and clicked on the first link, which led to the website on the next page."[86]

86.     As Dr. Mazurek acknowledged in her testimony,[87] these instructions may imply that Terry believes the websites provide the information and services that Terry is seeking to obtain. Therefore, when the surveys later asked respondents whether the websites provide the desired information or services, it is logical that respondents would indicate that they do – not because of information provided on the website, but rather because the survey has led respondents to believe that this is the case.

87.     Dr. Mazurek testified that her surveys provided these instructions because, "commonly when you want someone to evaluate usability, you would give them a task to do, and we wanted them to navigate through the site."[88]  This explanation is based on the flawed premise that the purpose of the surveys is "to evaluate usability."  However, despite the deception employed in the surveys, the true purpose of the surveys is to measure whether consumers are misled by the websites.  Dr. Mazurek's rationale for using leading instructions is not grounded in the true purpose of the surveys for measuring the allegations involved in this matter.

88.     As a result of the leading nature of the Mazurek Surveys, it seems likely that the survey measures reflect how respondents reacted to the artificial context of the survey environment, rather than how consumers would react when they encounter the On Point websites in a real marketplace situation.

---

[85] Mazurek Report, Attachment 9, p. 5.

[86] Mazurek Report, Attachment 9, p. 8.

[87] Transcript 162 (26:14-20).

[88] Transcript 161 (194:15-17).

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

**V.       The Mazurek Report provides tables that display results in a misleading manner that inflates the survey measures.**

89.     I understand that the issue under dispute in this matter is whether certain On Point websites mislead consumers who encounter them.  In that case, the results of a survey measuring whether the websites are misleading should be calculated among all survey respondents who viewed the websites and completed the survey.  This is the analysis method that courts typically rely on, and is recommended by authorities on litigation surveys that measure consumer perceptions of allegedly misleading advertising.[89]

90.     Instead of only calculating percentages among all respondents who viewed each website, the Mazurek Report also provides percentages calculated only among the subset of respondents who answered each question.  Because fewer and fewer respondents answered questions as they progressed through the survey, the percentages appear to become larger and larger when calculated among respondents who answered each question.  In reality, the percentages actually become smaller and smaller when calculated properly, among all respondents who viewed the website and completed the survey.

91.     For example, the Mazurek Report indicates that 41 respondents from the Cint panel "Paid" using Terry Spencer's credit card information.[90]  These 41 respondents were then asked what they believe was purchased, and 36 indicated they thought they purchased a license renewal.  The report presents these 36 respondents as 87.8% of the 41 respondents from the Cint panel who were asked the question.[91]

---

[89] Stewart, D. W.  "Deception, Materiality, and Survey Research: Some Lessons from Kraft."  *Journal of Public Policy & Marketing,* vol. 14, no. 1, Spring 1995, p. 23.

[90] Mazurek Report, p. 21, Table 2.

[91] Mazurek Report, p. 22, Table 3.

92.     This is an incorrect analysis of the survey responses that inflates the level of consumer misunderstanding measured by the survey.  More correctly, 36 of the 82 Cint respondents who were shown the DMV.com website thought that paying with Terry's credit card would renew her driver's license.  This represents only 43.9% of Cint respondents.  This figure was included at the end of paragraph 88 of the Mazurek Report, but not in the results displayed in Table 3.

93.     I am not providing an opinion that the true measure is 43.9% among Cint respondents. Due to the many flaws in the Mazurek Surveys, I do not believe that the survey data can be reanalyzed to provide reliable information.  Rather, I am pointing out that there is a difference between the 87.8% value that Dr. Mazurek reported in Table 3[92] and the 43.9% value that would result from a proper calculation of the results.

94.     The Mazurek Report focuses attention on the inflated survey measures calculated among subsets of respondents by placing those results in tables in the report.  By doing so, the Mazurek Report suggests that the On Point websites are significantly more misleading than the surveys would actually indicate, if the surveys were reliable.

95.     If the survey were not otherwise fatally flawed, the inflated results reported in certain tables of the Mazurek Report could be ignored, and the results that were properly calculated among all respondents who viewed each website could be considered.  However, because of the significant flaws in the Mazurek Surveys, even the properly-calculated results are unreliable for determining whether the On Point websites mislead consumers.

_____

[92] Mazurek Report, Table 3, p. 22.

Second Expert Rebuttal Report of Dr. Justin R. Anderson
Civil Action No. 19-25046-Civ-Scola

**Conclusions**

96.    As I have described in this rebuttal report, the Mazurek Surveys suffer from significant flaws, including the following:

      i.    The Mazurek Surveys include respondent universes that are over-inclusive and do not represent the relevant consumer populations.

     ii.    The Mazurek Surveys do not represent marketplace conditions.

   iii.    The Mazurek Surveys do not include controls, and cannot demonstrate that the survey results were caused by the disputed websites, as opposed to other factors that are not under dispute.

   iv.    The Mazurek Surveys are leading and encourage respondents to evaluate the websites differently than they might in a real marketplace situation.

    v.    The Mazurek Report provides tables that display results in a misleading manner that inflates the survey measures.

97.    These are fatal flaws in the design and execution of the Mazurek Surveys.  As a result of these flaws, it is my opinion that the Mazurek Surveys do not provide valid or reliable measures of whether certain websites operated by On Point mislead consumers.


I declare under penalty of perjury that the foregoing is true and correct to the best of my belief.


Executed in Encino, California, on June 23, 2021.


_____

Dr. Justin R. Anderson

**Exhibit 1:**
**Dr. Justin R. Anderson CV and Testimony Experience**

# MMR STRATEGY GROUP
*Creating growth through customer insight.™*

16501 Ventura Boulevard, Suite 601, Encino, CA 91436 • Phone (818) 464-2400 • www.mmrstrategy.com

# DR. JUSTIN R. ANDERSON, MBA, PHD

**Summary of Qualifications**

- Expertise in marketing and survey research.
- Experience in intellectual property matters.
- Doctorate, University of Southern California; MBA, University of Illinois; Bachelor of Science, University of Wisconsin.

---

**MMR Strategy Group**, Encino, CA
**SENIOR VICE PRESIDENT**                          2020 – Present
**VICE PRESIDENT**                                 2014 – 2019

MMR provides surveys, analysis, and consulting to measure the attitudes and behaviors of customers and prospective customers.  MMR has three primary practice areas:

1. <u>Marketing Research and Consulting</u>:  MMR provides marketing research and consulting to help clients improve products, and develop marketing and sales strategies.

2. <u>Litigation Surveys</u>:  MMR provides surveys and testimony for intellectual property matters.  MMR has been retained by firms including Jones Day, Proskauer Rose, and others.  MMR has also been retained by government agencies, including the Department of Justice and the Federal Trade Commission.

3. <u>Claim Substantiation</u>:  MMR provides research and consulting to help clients evaluate claims made in packaging, advertising, and other marketplace communications.

- As Senior Vice President, I design surveys, manage research projects, and provide consulting for clients.  I have conducted hundreds of surveys during my career.

- I have conducted surveys and provided rebuttals to surveys for intellectual property litigation and claim substantiation matters.

- I have published peer-reviewed articles in academic journals and conferences of the American Marketing Association.  I have presented invited lectures to other groups.  I write on topics relating to marketing and survey research.

---

**Education**

- Doctor of Philosophy (**PhD**) in Business Administration (concentration in Marketing), **University of Southern California**, 2007.  Awarded Doctoral Fellowship.

- Master of Business Administration (**MBA**) (concentration in Marketing), **University of Illinois**, 2001.  Graduated with Academic Excellence.

- Bachelor of Science (**BS**) in Atmospheric Science, **University of Wisconsin**, 1995.

MMR

## Prior Professional Experience

**Lieberman Research Worldwide**, Los Angeles, CA                    2012 – 2014
**RESEARCH DIRECTOR**

**MMR Strategy Group**, Encino, CA                    2011 – 2012
**RESEARCH DIRECTOR**

**California State Polytechnic University, Pomona**, Pomona, CA                    2010 – 2011
**VISITING PROFESSOR OF MARKETING**

**University of North Carolina Wilmington**, Wilmington, NC                    2007 – 2010
**ASSISTANT PROFESSOR OF MARKETING**

**University of Southern California**, Los Angeles, CA                    2005 – 2006
**INSTRUCTOR OF MARKETING**

**University of Southern California**, Los Angeles, CA                    2002 – 2004
**RESEARCH FELLOW**

**BBDO Chicago**, Chicago, IL                    2001 – 2002
**SENIOR RESEARCH ANALYST**

**United States Air Force**, Various Locations                    1996 – 1999
**METEOROLOGICAL OFFICER**

## Honors and Awards

- Named an Impact Professor, University of North Carolina Wilmington, 2008, 2009, 2010

- Winner, American Marketing Association Best Lecture Slide Competition, Brands and Branding category, 2008

- Winner, American Marketing Association Best Lecture Slide Competition, Society and Marketing category, 2008

- Excellence in Teaching Award, Marketing Department, Marshall School of Business, University of Southern California, 2005 – 2006

- Doctoral Fellowship, Marshall School of Business, University of Southern California, 2002 – 2007

- MBA Graduate with Academic Excellence (top 15% of class), 2001

- Inducted into Beta Gamma Sigma business honor society, 2001

**MMR**

### Appointments and Affiliations

- Member, Insights Association, 2017 – Present

- Editorial Board, *Journal of Brand Strategy,* 2014 – Present

- Member, International Trademark Association (INTA), 2014 – Present

- Member, Brand Activation Association (BAA), 2014 – Present

- Member, Association of National Advertisers (ANA), 2014 – Present

- Reviewer, *Journal of Brand Management,* 2011 – Present

- Reviewer, *Arts and the Market* (formerly *Arts Marketing*), 2011 – Present

- Member, American Marketing Association (AMA), 2002 – Present

- Member, Non-Traditional Marks Committee, International Trademark Association, 2016 – 2017

- Member, Marketing Research Association (MRA), 2014 – 2016

- Member, Faculty Teaching Committee, College of Business, California State Polytechnic University, Pomona, 2010 – 2011

- Faculty Advisor, Pi Sigma Epsilon professional sales fraternity, California State Polytechnic University, Pomona, 2010 – 2011

- Chair, Scholarship Committee, Cameron School of Business, University of North Carolina Wilmington, 2009 – 2010

- Faculty Advisor, Student Veterans Organization, University of North Carolina Wilmington, 2008 – 2010

- Member, Military Task Force, University of North Carolina Wilmington, 2008 – 2010

- Member, Scholarship Committee, Cameron School of Business, University of North Carolina Wilmington, 2008 – 2009

- Reviewer, Atlantic Marketing Association Conference, Consumer Behavior/Marketing Research track, 2008

- Reviewer, Society of Consumer Psychology Doctoral Dissertation Proposal Competition, 2008

- Member, Faculty Growth and Development Committee, Cameron School of Business, University of North Carolina Wilmington, 2007 – 2009

- Reviewer, *Marketing Science,* 2006 – 2007

**MMR**

## Publications and Public Speaking Engagements

- "Surveys for Trademark Litigation:  What Every Trademark Attorney Should Know About Conducting and Rebutting a Trademark Survey," moderation of a roundtable discussion, INTA Annual Meeting. May 21, 2019.

- "Litigation Surveys for Non-Traditional Marks," presentation to the U.S. Subcommittee of the INTA Non-Traditional Marks Committee, September 2016.

- "Using Surveys in Intellectual Property Matters," Continuing Legal Education (CLE) seminar presented to the Bar Association of San Francisco, October 2015.

- Anderson, Justin (2011), "Measuring the Financial Value of Brand Equity: The Perpetuity Perspective," *Journal of Business Administration Online*, 10 (1), 1-11.

- "Brand Equity: The Perpetuity Perspective," Presented to AMA Winter Educators' Conference, 2007.

- "Entertainment Expectations: How Affective Forecasting and Regret Cause Consumers to Prefer Familiar Mediocrity Over Superior Novelty," Presented to Houston Doctoral Symposium, 2006.

- "Entertainment Consumption: How Entertainment Goods Give the People What They Want," Presented to AMA Winter Educators' Conference, 2006.

## Blog Posts Written for www.MMRStrategy.com

### Marketing and Marketing Research
- "Is Your Brand Loyalty Immune to COVID-19?" (May, 2020)

- "Can You Measure a Longitudinal Variable in a Cross-Sectional Survey?" (July, 2015)

- "Three Questions to Ask Before Introducing a Brand Extension" (January, 2015)

- "Is Your Country Brand Name Expansionist or Isolationist?" (December, 2014)

- "Are In-Person Surveys Better Than Online Surveys?" (November, 2014)

### Advertising Claim Substantiation Surveys
- "Don't Play Games with 'Made in the USA' Advertising Claims" (October, 2018)

- "When Not To Conduct an Advertising Claim Substantiation Survey" (August, 2018)

### Litigation Surveys
- "When Do You Need a False Advertising Survey" (September, 2015)

- "Three Essential Elements of a Genericness Survey" (November, 2014)

MMR

**<u>Undergraduate and MBA Marketing Courses Taught</u>**

- Business Research Methods

- Buyer Behavior

- Consumer Behavior

- Marketing Intelligence and Communication

- Marketing Research

- Marketing Strategy

- Marketing the Movies

- Principles of Marketing


**<u>Selected Topics of Study in MBA and PhD Programs</u>**

- <u>Research Methods and Research Design</u>:  Doctoral research seminars focused on buyer decision making, consumer psychology, individual choice modeling, marketing management, marketing strategy modeling, and research design and measurement

- <u>Statistics</u>:  Doctoral-level courses in probability and statistics focused on comparing groups, hierarchical linear modeling, linear regression analysis, multivariate analysis techniques, and structural equation modeling

- <u>Marketing</u>:  Consumer Behavior, Customer Marketing, Global Marketing, Marketing Management, Marketing Research, Marketing Strategy, Pricing, Promotion Management

- <u>Management</u>:  Business Strategy, Corporate Strategy, International Business, Strategic Theory

- <u>Communications, Psychology and Sociology</u>:  Communications Theory, Organization Theory and Design, Organizational Behavior

- <u>Economics and Finance</u>:  Capital Market Environment. Financial Accounting, Game Theory, Macroeconomics, Managerial Accounting, Managing Cash Flows, Microeconomic Theory, Microeconomics

**MMR**

**Dr. Justin R. Anderson Litigation Expert Witness Experience**
**June 2021**

Cases in which Dr. Justin R. Anderson has testified as an expert, including written expert reports or testimony at deposition or trial, in the past four years.

**Elevate Federal Credit Union v. Elevations Credit Union**
United States District Court, District of Utah
Retained by Plaintiff

**Gaby's Bags, LLC v. Mercari, Inc.**
United States District Court, Northern District of California
Retained by Defendant

**Blackstone International, Ltd. v. Costco Wholesale Corporation**
United States District Court, Western District of Washington at Seattle
Retained by Defendant

**Country Life, LLC v. The Hain Celestial Group, Inc.**
United States District Court, Eastern District of New York
Retained by Defendant

**Federal Trade Commission v. On Point Global LLC et al.**
United States District Court, Southern District of Florida
Retained by Defendant

**Blackboard, Inc.  v. AudioEye, Inc.**
United States Patent and Trademark Office, Trademark Trial and Appeal Board
Retained by Applicant, AudioEye, Inc.

**Ian V. Jacobs v. Fareportal, Inc.**
United States District Court, District of Nebraska
Retained by Defendant

**Allergan USA, Inc. v. Imprimis Pharmaceuticals, Inc.**
United States District Court, Central District of California
Retained by Plaintiff

**Cross Trailers, Inc. v. Cross Trailer Manufacturing and Sales, LLC, et al.**
United States District Court, Western District of Texas
Retained by Defendant

**Jaguar Land Rover Limited v. Bombardier Recreational Products Inc.**
United States District Court, Eastern District of Michigan
Retained by Plaintiff

**Hain Blueprint, Inc. v. Blueprint Coffee, LLC**
United States District Court, Eastern District of Missouri
Retained by Defendant

**DRL Enterprises, Inc. v. North Atlantic Operating Company, Inc., North Atlantic Trading Company, Inc., and National Tobacco Company, L.P.**
United States District Court, Northern District of Illinois
Retained by Plaintiff