UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-cv-25046-Scola

FEDERAL TRADE COMMISSION,

        Plaintiff,

v.

ON POINT GLOBAL, LLC, *et al.*,

        Defendants.

**INDIVIDUAL DEFENDANTS'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Individual Defendants Burton Katz, Brent Levison, Elisha Rothman, Chris Sherman, and Robert Zangrillo (the "Individual Defendants") respectfully submit the below Proposed Findings of Fact and Conclusions of Law:[1]

**I. INDIVIDUAL LIABILITY**

1. To hold an individual defendant liable for a company's deceptive acts, the FTC must show (1) corporate liability under section 5 of the FTC Act; (2) that the individual defendant participated directly in the deceptive practices or acts or had authority to control them; and (3) that the individual had some knowledge of the deceptive practices. ECF No. 528 ("Summary Judgment Order") at 18; *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 469 (11th Cir. 1996). The FTC must establish that the individuals had or exercised authority with respect to the specific misrepresentations alleged. *See FTC v. Primary Grp., Inc.*, 713 F. App'x 805, 806–07 (11th Cir. 2017) (requiring that FTC show individual had authority to control alleged deceptive acts at issue); *FTC v. Johnson*, 156 F. Supp. 3d 1202, 1211 (D. Nev. 2015). Likewise, to show knowledge, the

---

[1] Consistent with this Court's stated preference, Individual Defendants submit these proposed findings of fact and conclusion of law jointly. Each Individual Defendant joins in paragraphs 1 and 76-79, in addition to those paragraphs listed under his name. Individual Defendants reserve the right to amend their Proposed Findings of Fact and Conclusions of Law following the presentation of evidence at trial.

FTC must prove that the individual had (1) "actual knowledge of the deceptive conduct," (2) "was recklessly indifferent to its deceptiveness," or (3) "had an awareness of a high probability of deceptiveness and intentionally avoided learning of the truth." Summary Judgment Order at 18-19 (quoting *FTC v. Primary Grp., Inc.*, 713 F. App'x 805, 807 (11th Cir. 2017)). An individual's title alone is not sufficient to establish individual liability. Summary Judgment Order at 18; *Johnson*, 156 F. Supp. 3d at 1210.

**A.     Elisha Rothman**

2.     During his employment with On Point Global, LLC and its affiliates and/or predecessors ("OPG"), Elisha Rothman held the title of "Director of Data Processing." He was not an executive of the company.

3.     Mr. Rothman did not supervise or manage the work of any employees of OPG and did not have the authority to supervise or manage the work of any employees of the company.

4.     Mr. Rothman did not control any department or team at OPG.

5.     As Director of Data Processing, Mr. Rothman had two distinct roles. First, Mr. Rothman reviewed the company's financial data and performed financial forecasting functions. This role required Mr. Rothman to aggregate information from across the company pertinent to the forecasting of future performance and apply that aggregated information to the financial performance fundamentals made available to him by the finance and accounting teams. Second, Mr. Rothman worked on a project to identify and purchase websites with substantial organic traffic that could be utilized by the company to provide new or existing products and services.

6.     Mr. Rothman could not purchase any websites on behalf of the company without approval, and he did not have any role in drafting, editing, revising, modifying, or reviewing the content placed on OPG websites, including the websites he helped obtain on behalf of the company.

7.     OPG's business operations were managed by several teams, including a content team that created and designed the company website content and a marketing team that created the substance of online advertisements. Mr. Rothman was not a member of either team and did not supervise, participate in, or direct their daily business or decision-making.

8.     Mr. Rothman was not a member of OPG's payment solutions/merchant processing team. The payment solutions/merchant processing team obtained and managed any and all merchant accounts for OPG websites, including merchant accounts in Mr. Rothman's name.

9. Mr. Rothman did not operate OPG's Freemium business and did not work on OPG's Freemium team.

10. Mr. Rothman did not participate directly in making representations to consumers on OPG websites.

11. Mr. Rothman did not participate directly in making representations to consumers through OPG advertising and marketing materials.

12. Mr. Rothman did not have authority to control representations made to consumers through OPG websites, marketing, or advertising.

13. Accordingly, Mr. Rothman cannot be held liable for the deceptive practices of OPG.

**B.    Christopher Sherman**

14. During his employment with OPG, Christopher Sherman held the title of Director of Data Processing at OPG.

15. Mr. Sherman did not supervise or manage any employees of OPG and did not have the authority to supervise or manage any employees of the company.

16. Mr. Sherman did not control any department or team at OPG.

17. As Director of Data Processing, Mr. Sherman had two roles. First, Mr. Sherman worked on a special project to identify and purchase websites with substantial organic traffic that could be utilized by the company to provide new or existing products and services. Second, Mr. Sherman worked on the Channels team to take data collected from Freemium websites and direct push notification campaigns to consumers who opted-in to receive such marketing.

18. Mr. Sherman did not modify or test public benefits websites and did not have the authority to do so if he had wanted to.

19. OPG's business operations were managed by several teams, including a content team that created and designed the company website content and a marketing team that created the substance of online advertisements. Mr. Sherman was not a member of either team and did not supervise, participate in, or direct their daily business or decision-making.

20. Mr. Sherman did not direct employees on the "PATH" team or "Freemium" teams to take any actions and did not have the authority to do so.

21. A domain registration account was registered in Mr. Sherman's name, but that account was used by other OPG personnel to purchase domain names for the benefit and use of OPG. Mr. Sherman did not use the account on behalf of OPG.

22.     OPG's media team utilized a Google Ads account in Mr. Sherman's name. However, Mr. Sherman did not manage or use that account on behalf of OPG.

23.     Mr. Sherman was not a member of OPG's payment solutions/merchant processing team. The payment solutions/merchant processing team obtained and managed any and all merchant accounts for OPG websites, including merchant accounts in Mr. Sherman's name.

24.     Mr. Sherman did not participate directly in making representations to consumers on OPG websites.

25.     Mr. Sherman did not participate directly in making representations to consumers through OPG advertising and marketing materials.

26.     Mr. Sherman did not have authority to control representations made to consumers through OPG websites, marketing, or advertising.

27.     Accordingly, Mr. Sherman cannot be held liable for the deceptive practices of OPG.

**C.      Robert Zangrillo**

28.     Robert Zangrillo is a private equity, venture capital, and real estate investor.

29.     Mr. Zangrillo identifies and manages investments for both his family office and on behalf of third-party investors, all under the "Dragon Global" brand.

30.     Dragon Global's business model, as an investment firm, is to identify potential investments, and then create special purpose vehicles to make investments in particular ventures.

31.     In October 2014, Dragon Global formed a special purpose vehicle called DG DMV, LLC for an investment opportunity with Burton Katz.

32.      The creation of DG DMV was spurred by Mr. Katz's idea to invest in the online automotive space, and specifically to purchase URLs like DMV.com with the vision of creating the LegalZoom.com of the automotive industry.

33.     On or around June 9, 2015, On Point Capital Partners LLC ("OPCP") invested $3,232,000 in DG DMV LLC.

34.     OPCP is owned approximately 97% by Dragon Global Holdings LLC, with third-party investors making up the other approximately 3%.

35.     Dragon Global Holdings LLC is the principal investment vehicle for Mr. Zangrillo's family office, and its members are Mr. Zangrillo personally (74%), a trust established for the sole benefit of Mr. Zangrillo's three daughters (25%), and DGM GP LP, which is owned by Mr. Zangrillo (1%).

36. Burton Katz separately invested $808,000 in DG DMV, meaning that OPCP owned 80% of the equity and Mr. Katz owned 20% of the equity.

37. Thereafter, DG DMV purchased DMV.com.

38. When DG DMV acquired DMV.com, DMV.com contained content and advertisements, but did not sell or provide guides or e-books to consumers.

39. Mr. Zangrillo did not have any operational involvement in DG DMV.

40. In January 2018, DG DMV, along with other entities, was rolled up into On Point Global LLC.

41. OPCP's $3,232,000 of equity in DG DMV, plus $1,022,323.46 of debt that DG DMV LLC owed to OPCP was contributed to On Point Global LLC.

42. OPCP ended up with a 35% equity interest in On Point Global LLC, as well as an outstanding loan balance.

43. OPCP's equity interest in On Point Global LLC was eventually diluted to approximately 27.74%.

44. Because Dragon Global Holdings owns 97% of OPCP, and Mr. Zangrillo owns 75% of Dragon Global Holdings, Mr. Zangrillo has an indirect ownership interest through OPCP of slightly more than 20% of the equity of On Point Global LLC.

45. OPCP is one of 11 minority investors in On Point Global LLC.

46. Mr. Zangrillo was never an executive, employee, or officer of OPG.

47. Between January 1, 2018 and March 3, 2019, Mr. Zangrillo served as the non-executive Chairman of OPG's Board of Managers. In conjunction with that role, Mr. Zangrillo signed a Consulting Agreement with OPG providing that he was "an independent contractor, to provide consulting services."

48. The agreement provided that Mr. Zangrillo "on a consulting (and not on a full-time) basis, shall serve as a consultant to the Company, and upon the establishment of the Company's Board of Managers (or similar governing body), the Consultant shall serve as Chairman of the Board."

49. In exchange for his consulting services, Mr. Zangrillo was entitled (1) "to participate in the Company's health insurance plan," (2) to be "directly pa[id] or reimburse[d] . . . for the Consultant's reasonable business expenses incurred in the course of the Consultant's engagement by the Company," and (3) to be indemnified by OPG.

50. In his role as Chairman and as an investor, Mr. Zangrillo was involved in OPG's finances and strategic goals at a high level. Mr. Zangrillo provided high-level input on strategic decision-making, offered advice based on his industry knowledge, and introduced OPG to other investors and advisors in his network. As a member of the Board of Managers, Mr. Zangrillo also signed certain Written Consents adopted by the Board of Managers.

51. Mr. Zangrillo's role on OPG's Board of Managers was in accordance with venture capital industry custom and practice.

52. As OPG attracted additional venture capital investments, representatives of other investors were also given seats on OPG's Board of Managers.

53. Under OPG's Operating Agreement, OPCP had contractual "Special Approval Rights" designed to protect its material equity interests by providing, in essence, a veto right over certain categories of actions by the company that could jeopardize the value of OPCP's investment.

54. The Special Approval Rights all relate to OPG's capital structure, governance, legal or tax status, capital expenditures, strategic direction, or liquidation/termination.

55. The Special Approval Rights do not relate to the operations of OPG.

56. The Special Approval Rights are customary features of an operating agreement of a venture-funded company.

57. The Special Approval Rights do not relate to decisions that would more traditionally be within the purview of executives or others involved in the day-to-day operations of a company.

58. Mr. Zangrillo was not involved in the day-to-day operations of OPG or any of the other remaining corporate defendants.

59. Mr. Zangrillo did not meet with OPG's executives on a regular basis.

60. Mr. Zangrillo was not responsible for OPG's Freemium business, or the use of consumer data in connection with that business.

61. Mr. Zangrillo was not responsible for OPG's e-commerce business, or the sale of guides in connection with that business.

62. Mr. Zangrillo did not directly participate in or have the authority to control the design of the websites that are the subject of the FTC's complaint.

63. Mr. Zangrillo did not directly participate in or have the authority to control the operation or maintenance of the websites that are the subject of the FTC's complaint.

64. Mr. Zangrillo did not directly participate in or have the authority to control the disclaimers on the websites that are the subject of the FTC's complaint.

65. Mr. Zangrillo did not directly participate in or have the authority to control any of the other content on the websites that are the subject of the FTC's complaint.

66. Mr. Zangrillo did not directly participate in or have the authority to control the advertising or marketing of any of the guides or the websites that are the subject of the FTC's Complaint.

67. Mr. Zangrillo did not directly participate in or have the authority to control the use of consumer data collected from the Freemium websites that are the subject of the FTC's Complaint.

68. Mr. Zangrillo did not ever visit or see the user flow of the websites that are the subject of the FTC's Complaint.

69. Mr. Zangrillo had no knowledge of the language utilized on the websites that are the subject of the FTC's Complaint.

70. Mr. Zangrillo had no knowledge of any consumer complaints about the websites that are the subject of the FTC's Complaint.

71. Before this action, Mr. Zangrillo has never been accused of engaging in deceptive practices that would violate the FTC Act or any other consumer protection law. Nor has Dragon Global or any other entity associated with Mr. Zangrillo been accused of such deceptive practices.

72. Mr. Zangrillo did not directly participate in the deceptive conduct at issue in this matter.

73. Mr. Zangrillo did not have the authority to control the deceptive conduct at issue in this matter.

74. Mr. Zangrillo did not have knowledge of the deceptive conduct at issue in this matter.

75. Accordingly, Mr. Zangrillo cannot be held liable for the deceptive practices of OPG.

## II. INJUNCTIVE RELIEF

76. A permanent injunction is appropriate where there is a "cognizable danger of recurrent violation," or some reasonable likelihood of future violations. *U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the

case alive." *Id*. In determining whether a permanent injunction is appropriate, the court should consider

> the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*FTC v. Partners In Health Care Ass'n, Inc.*, 189 F. Supp. 3d 1356, 1369-70 (S.D. Fla. 2016), (Scola, J.) (quotations and citation omitted); *see also* Summary Judgment Order at 25.

77. "Injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties," meaning, "[i]njunctive relief should be narrowly tailored to fit the specific legal violations adjudged." *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003); *see also* Summary Judgment Order at 26. Proposed injunctive relief must contain specificity, detail and definitions to be proper. *FTC v. Vylah Tec LLC*, No. 2:17-cv-228, ECF No. 339, 1-2 (M.D. Fla. Feb. 11, 2019); *see also* Summary Judgment Order at 25. Injunctions that contain "fencing in" provisions are not proper if they do not bear a reasonable likelihood to address illegal conduct. *Id*. In the context of FTC orders, this means that the prohibited acts bear a "reasonable relation" to the violative conduct. *Partners in Health Care*, 189 F. Supp. 3d at 1370; *see also* Summary Judgment Order at 26-27.

78. Injunctions that contain "fencing in" provisions are not proper if they do not bear a reasonable likelihood to address illegal conduct. *Id.*; *see also Grove Labs v. FTC*, 418 F.2d 489, 496 (5th Cir. 1969) (striking down provision that prohibited the sale of any "drug" even though the violation only related to certain type of drug); *see also Trans World Accts., Inc. v. FTC*, 594 F.2d 212, 216 (9th Cir. 1979) (striking down "fencing in" provision). Additionally, injunctions cannot be so broad as to prohibit general violations of the law. *See Minotti S.P.A. v. Belletti*, 2016 U.S. Dist. LEXIS 188300, *4 (S.D. Fla. June 29, 2016) (citing *Florida Ass'n of Rehab. Facilities*, 225 F.3d at 1223; *Am. Home Prod. Corp. v. FTC*, 402 F.2d 232, 237 (6th Cir. 1968) ("The effect of this provision of the Commission's order is to admonish petitioner not to violate the law again . . . [t]his is not within the contemplation of the [FTC] Act.")).

79. There exists no "cognizable danger of recurrent violation" for Mr. Rothman, Mr. Sherman, or Mr. Zangrillo. Accordingly, the FTC's request for permanent injunction as to Mr. Rothman, Mr. Sherman, and Mr. Zangrillo is denied.

Dated: October 11, 2021

Respectfully submitted,

/s/ *Robert W. Thielhelm*
ROBERT W. THIELHELM, JR., ESQ.
Florida Bar No. 889679
rthielhelm@bakerlaw.com
BAKER & HOSTETLER, LLP
200 S. Orange Ave., Suite 2300
Orlando, Florida 32801
Telephone: (407)649-4000
Facsimile: (407)841-0168

-and-

Linda Goldstein*
lgoldstein@bakerlaw.com
Jonathan B. New*
jnew@bakerlaw.com
45 Rockefeller Plaza
New York, NY 10111
Telephone: 212.589.4200

William Oxley*
woxley@bakerlaw.com
Meghan Kelly*
mkelly@bakerlaw.com
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025

Thomas Donaho*
tdonaho@bakerlaw.com
811 Main Street
Suite 1100
Houston, TX 77002

*ADMITTED PRO HAC VICE

**Attorneys for Burton Katz, Brent Levison, Elisha Rothman and Christopher Sherman**

/s/ *Marshall Dore Louis*
Marshall Dore Louis
Florida Bar No. 512680
BOIES SCHILLER FLEXNER LLP
100 S.E. Second Street, Suite 2800

Miami, FL 33131
TEL: (305) 539-8400
E-mail: mlouis@bsfllp.com

Matthew L. Schwartz (pro hac vice)
John T. Zach (pro hac vice)
Sabina Mariella (pro hac vice)
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York
Telephone: (212) 446-2300
E-mail: mlschwartz@bsfllp.com

*Attorneys for Robert Zangrillo*