United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Federal Trade Commission, | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 19-25046-Civ-Scola |
| On Point Global LLC and others, | ) |
| Defendants. | ) |

## Verdict and Order Following Non-Jury Trial

On December 9, 2019, the Federal Trade Commission sued sixty individual and corporate defendants, alleging violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). (ECF No. 1.) The FTC alleged that the Defendants operated various websites that deceptively caused consumers to believe that they could apply for, or otherwise complete transactions related to, government services or benefits, such as applying for a driver's license or receiving an eligibility determination for Section 8 housing. (*Id.*) In a related development, after obtaining a preliminary injunction in its favor in the *On Point* matter, the FTC moved for an order to show cause as to why Robert Katz and twelve corporate entities should not be held in contempt of an earlier order in *FTC v. Acquinity Interactive, LLC*, 14-cv-60166 (S.D. Fla.). (*Acquinity* ECF No. 135.)

Several parties filed motions for summary judgment in the *On Point* matter as well as motions for a summary contempt ruling in the *Acquinity* matter. On September 29, 2021, the Court held that the websites at issue constituted deceptive acts or practices in violation of Section 5(a), and the Court found Burton Katz, Brent Levison, and the Corporate Defendants liable.[1] (ECF No. 528.) The Court found that there remained genuine disputes of material facts as to the liability of Defendants Elisha Rothman, Christopher Sherman, and Robert Zangrillo. (*Id.*) In addition, the Court granted summary judgment in favor of the Dragon Global Defendants, finding that they were not liable for the deceptive acts and practices at issue. (*Id.*) In the *Acquinity* action, the Court granted in part the FTC's motion for summary contempt, finding all Contempt Defendants except Elisha Rothman in contempt of the *Acquinity* Order. (*Acquinity* ECF No. 225.) The Court found that there remained genuine disputes of material facts as to Elisha Rothman. (*Id.*) Last, the Court granted

---

[1] Undefined terms shall have the meaning set forth in the Court's summary judgment order. (ECF No. 528.)

the Dragon Global Defendants' motion for summary contempt ruling, holding that those entities could not be held in contempt. (*Id.*) The Court did not rule on the appropriate tally of contempt damages, reserving that question for after the parties had an opportunity to present evidence concerning the appropriate measure of damages. (*Id.*)

The Court then set the matters for a contemporaneous non-jury trial and show cause hearing on the following issues: the individual liability of Elisha Rothman, Christopher Sherman, and Robert Zangrillo for the deceptive acts and practices at issue, as well as the contempt liability of Elisha Rothman and the appropriate measure of contempt damages for any Defendants subject to the contempt liability. (*See* ECF No. 541.)

The Court held a 6-day non-jury trial and show-cause hearing by videoconference, beginning on November 3, 2021. Prior to the trial, the parties submitted a joint pretrial stipulation (ECF No. 527), as well as their proposed findings of fact and conclusions of law (ECF Nos. 534, 535; *Acquinity* ECF No. 231.) The Court has carefully reviewed these submissions.

At the conclusion of the FTC's presentation of evidence, the Court found the FTC had failed to establish Zangrillo's liability for the deceptive acts and practices and entered a judgment on partial findings pursuant to Fed. R. Civ. Pro. 52(c) in favor of Zangrillo. The Court also found that Rothman was unaware of the *Acquinity* order and entered a judgment on partial findings in his favor, thus absolving him of liability for contempt.

After considering the credible testimony and evidence, and the applicable law, the Court finds that the FTC did establish the liability of Rothman and Sherman for the deceptive acts and practices which subject them to the terms of the permanent injunction.

The Court also finds that the *starting point* for the appropriate measure of damages for contempt is $102,768,235.47, representing $85,470,480.60 in gross receipts minus refunds and chargebacks from three years of guide sales and $17,297,754.87 in gross receipts from one year of selling and monetizing data consumers provided on the freemium websites. However, the Court finds that there was significant and credible anecdotal evidence to indicate that many of the customers either suffered no harm or were wholly satisfied with their experiences with the Defendants. To impose over $100,000,000 in sanctions in this circumstance would be inequitable.

The Court will establish a claims process to allow any unsatisfied consumers to be fully compensated for their losses. Thus, Katz, Levison, and the On Point Contempt Defendants are therefore jointly and severally liable for an amount *not to exceed* $102,768,235.47 in compensatory contempt remedies. *See Leshin I*, 618 F.3d at 1236–37 (holding that parties who "join

together" to violate an order are jointly and severally liable for contempt remedy); (*Acquinity* ECF No. 225 at 11 n.5.). Any lesser/final amount will be determined after the claims process is concluded.

### 1. Summary of the Testimony

#### A. Lashanda Freeman

Freeman received a bachelor's degree and a master's degree in criminal justice. She has worked as an investigator for the FTC Consumer Protection Division since 2019.

She investigates possible violations of the FTC Act. She reviews and captures transactions online and makes undercover calls; she reviews corporate document filings as well as documents obtained by the FTC pursuant to civil investigative demands.

Freeman is familiar with this case. She was assigned this matter by her supervisor in February 2019. Burton Katz, in a compliance report, disclosed that he was associated with a couple of companies as well as the DMV.com website.

During her investigation in 2019, she captured websites online, conducted undercover calls, and reviewed documents obtained by the FTC. One of the websites she visited was OnPointGlobal.com. Freeman also visited direct-market.com. On the bottom of the website page are listed "The Team," which includes Chris Sherman and Elisha Rothman.

Freeman also visited and captured the website dragonglobal.com belonging to Dragon Global. On page two of the website are photos of Robert Zangrillo, Burton Katz, and Bob Bellack. Zangrillo's bio on the website indicates he is the founder, chairman, and CEO of Dragon Global. The website also contains a bio for Burton Katz which indicates that Katz partnered with Dragon Global to acquire and operate On Point.

Freeman visited the Defendants' websites and conducted undercover transactions on eight of the sites. She did not conduct transactions on all the sites. Freeman also used the Wayback Machine software to review between five and ten of the websites' histories.

There were three distinct functions: transaction websites, public benefits websites, and feeder websites. One of the public benefits websites was related to Section 8 public housing. Freeman created an undercover profile using a fictitious name with an email address and credit card to match. She then navigated through the Section-8-housing.org website found after writing "section 8 housing apply" in a Google search and clicking on

the link. Freeman did not use one of the On Point guides to navigate to the Section 8 housing website. The website she found through the Google search provides information for Virginia Section 8 housing. Freeman clicked on the "find out if you are eligible for the Section 8 program" box and completed the information requested, including her email and phone number of her undercover profile. The email Freeman created was only used for this website and for an Obamacare website.

After she completed the form on the Section 8 website, she received two text messages the day she navigated through the website and two more text messages the next day. She also received an email with the subject line "We found a check in your name." The body of the email indicates that they "found a check in her name and she might be missing out on some serious cash and it would be in her best interest to click the link below to collect." Freeman also received an email with the subject line, "CITIBANK Card Cleared ($1000) Congrats." The body of the email indicates that a total of $1000 had been loaded to a CITIBANK Card and prompted the user to click the link below to collect.

Freeman also visited an On Point guides website and asked her paralegal to download 38 of the guides listed on the website. Freeman downloaded a guide pertaining to VA benefits and one pertaining to Section 8 housing. The On Point guides website did not ask for personal information and did not involve a financial transaction. It did not fit into one of the three types of website categories.

Freeman investigated whether any of the Defendants had social media accounts. She searched Facebook, Twitter, and LinkedIn. She found a LinkedIn account of Elisha Rothman. He is listed as the Director of Data Processing at On Point and is listed as a principal of Direct-market.com. Freeman also found a LinkedIn profile for Chris Sherman, who is listed as Director of Data Processing at On Point. Freeman also found a LinkedIn account for Robert Zangrillo, which lists him as Chairman and CEO of Dragon Global. An Instagram account of Zangrillo includes a post of a photo of On Point's headquarters in Miami. Another capture from Zangrillo's Instagram account includes a photo of Zangrillo standing next to a helicopter with Burton Katz in the Aeropuerto de Carrasco in Uruguay.

In December 2019, Freeman went to the On Point headquarters with the Receiver as part of an "immediate access" provision of the Court's TRO. The building was a large, converted warehouse with large open work areas as well as individual offices. Freeman spent three days at the headquarters. Freeman supervised other FTC employees who gathered and copied documents and computers. Freeman also gathered documents.

In Rothman's office, in a filing cabinet, Freeman found various letters from Offices of Attorneys General and Better Business Bureaus from numerous states. Also found were letters from merchants terminating business due to excessive chargebacks.

Domains by Proxy submitted approximately 21,000 pages in response to an FTC request. Freeman prepared a summary of the Domains by Proxy records. Zangrillo's shopper ID for On Point was transferred to Levison in 2018.

Freeman took a screenshot of the californiadrivers.org and the floridadriverslicense.org websites in April 2010.

Freeman was recalled as a rebuttal witness by the FTC. During her rebuttal she added the following testimony.

Freeman conducted an investigation of the DMV.com website and took screenshots of the website on April 4, 2019. When Freeman was on the website, but not until after she had entered her financial information, a pop-up box with a disclaimer appeared.

On June 27, 2019, she conducted an investigation of a fishing license website. At no time did a pop-up box with a disclaimer appear even though she navigated through the entire path of the website.

Freeman attempted to obtain a refund from the fishing license website and called a call center. She did not receive a refund. She was told that she would receive a refund for everything except the processing fee of $3.99 or $4.99, but she never received the refund.

On March 8, 2019, Freeman navigated through two different DMV.com websites, and there was no pop-up disclaimer on either site.

### B. Melanie Damian

Damian is the court-appointed receiver in this case pursuant to an order of the Court dated December 13, 2019. Damian and her team took control of the Defendants on December 16, 2019. The companies had three types of businesses: Ecommerce; freemium sites; and Avenue I, which involved the purchase and sale of websites.

The guides related to many different topics from hunting and fishing to driver's license guides. There were also different guides for each state. The freemium sites offered guides for free.

While On Point was operating the websites, there were guides relating to Section 8 housing, reclaimed property, veteran's benefits, and automotives, among others.

The free sites made money through advertising. Some revenue came from sharing email or information about consumers with marketers. After an email

address would be acquired, there would be an email sent to the consumer targeting interests of the consumer. Text messages were also sent to the consumers.

In 2017 the percentage of sales from guides constituted 62% of the revenue of On Point; in 2018 they constituted 68% of the revenue; but, in 2019 the sales constituted only 41% of On Point's revenues. The freemium sites revenues constituted 31% of On Point's revenues in 2017, 20% in 2018, and 26% in 2019. From January 2019 through her appointment as Receiver, the path revenues were approximately $9.8 million. Through its channels subdivision the company obtained revenues through advertising. The channels revenue from January 2019 through the appointment of the Receiver totaled $8.2 million.

On April 19, 2019, Bob Bellack forwarded an email to Zangrillo which discussed the anticipated loss of $4 million in revenue due to Bing suspension.

The company had corporate credit cards in the names of some of the individuals who worked for the company. The cards were used to buy media, *i.e.*, search advertising. On Point used cards in the name of Chris Sherman and Elisha Rothman. Some employees, including Sherman and Rothman, used their personal credit cards to purchase media and were reimbursed by the company. Since the Receiver took over On Point, the companies do not use employees' credit and do not use multiple processing entities and do not pay productivity fees to the owners of processing entities.

Liza Vallejos was on the On Point payroll from October 14, 2015 to the present. She is currently in the finance department. Vallejos was part of the channel team as SMS Push manager. The SMS numbers were not shared with marketing partners but were only used in-house. Aldo Lanvas, Mauricio Rodriguez, Nadia Peshev also worked at On Point.

Zangrillo was only on the On Point payroll for one month in January 2019 along with another Dragon Global employee, Megan Black, so that they could be covered by health insurance. Emily Paulshock was on the On Point payroll for a couple of years and was paid approximately $77,000 over three years. Damian could not find any evidence that Paulshock performed any work for On Point.

On Point sought reimbursement of the salaries paid to Zangrillo, Black, and Paulshock from Dragon Global but were never reimbursed by Dragon Global.

In company records, employees are listed as "manager," "executive," or "all other." Sherman, Katz, Levison, and Rothman are listed as "executive." On another company document, Zangrillo is also listed as "executive."

Alicia Nuche worked with Rothman in the finance area. Rothman interfaced with the technology department.

On Point maintained 191 bank accounts. Sherman, Rothman, Zangrillo were listed as signatories on a least one of the accounts.

On Point also rented approximately 50 mailboxes for merchant processing accounts. Sherman obtained 37 channels mailboxes and a couple mailboxes for merchant processing. Rothman obtained two mailboxes for merchant processing accounts.

The website OnPointglobal.com is owned by On Point Global, LLC. Direct-market.com is owned by On Point but was previously owned by Direct-market.

On Point used a program called Slack for internal communications. In November 2017, there was a Slack conversation in which Katia Canete, an On Point employee, states that they want to avoid any further suspensions and Sherman and Rothman want a new protocol instituted.

The initial shareholders were Bronco (Katz), Cardozo (Levison), MAC Media (Rothman), and On Point Capital Partners (Zangrillo).

An agreement was entered that required approval of the companies controlled by Katz and Zangrillo for budget matters, for any sale or transfer of assets of On Point, and for the hiring or terminating of the CEO of On Point. Some matters of the company required a supermajority of the initial shareholders of 71%. Katz and Zangrillo each owned a 35% share of the company. Therefore, either's vote against any action would prevent that action from taking place. In 2019, additional investors were added, and the ownership share of Zangrillo through On Point Capital Partners was reduced to 27.75%. Zangrillo has other partners, so his personal share of ownership is approximately 19%.

Zangrillo was the chairman of On Point from January 2018 through March or April of 2019. In April 2019, Zangrillo and Katz entered into an amended agreement by which Zangrillo resigned as chairman and manager as of March 1, 2019.

Zangrillo had no role writing content for On Point, no role with requests for refunds, no role in consumer complaints, no role with consumer service issues, and no role in dealing with chargebacks.

On Point held corporate meetings and minutes of the meetings were created and maintained. The August 29, 2019 meeting minutes list Zangrillo, Katz, Bellack, Philip Sarofim and Alex Soltani as being in attendance. Sarofim and Soltani were nominated to the board during this meeting. Each are outside investors in On Point.

On an organizational chart, Sherman is listed as reporting to Rothman. Sherman is listed as director of data trading and path.

In 2018, On Point had operations in Uruguay and Brazil. Zangrillo was reimbursed for travel to South America. Zangrillo was also paid a per diem of $750 for travel on behalf of On Point. Sarofim and Soltani were never paid a per diem; not were they ever reimbursed for any expenses.

Sherman has worked as a consultant for the Receivership. He still works in channels coding for email messages, but he has no managerial responsibilities. Rothman is also performing high level financial and data analysis for the Receivership.

Damian is familiar with the claims process proposed by the Defendants. The consumers would be notified of the process, and the process would be as consumer friendly as possible. For some consumers, the amount the consumers previously paid is known to the company.

At the present time, the company has $30 million in liquid assets which could be available for the payment of claims. If there is a shortfall, the individual Defendants would be responsible.

Damian has previous experience as a claims' administrator and as a distribution agent. She feels comfortable in her ability to run the type of process proposed by the Defendants.

To be eligible for a claim, the consumer would have to make an affirmative indication that they were unsatisfied with their purchase. Even if someone received a voucher, they would still get their money back. All segments of the claims' process would be subject to Court approval.

For the freemium guides, the consumers do not pay any money but do provide data in exchange for a free guide. For some of the freemium guides, consumers provided solely their name and email address. In 2019 there were over 15 million freemium consumers and the freemium revenues during 2019 were approximately $17 million, which breaks down to $1.13 per guide.

Merchant processing fees for the websites were $13.9 million from 2017 through 2019. None of those monies were ever in the hands of the corporate Defendants.

Sometimes, consumers received coupons or vouchers in addition to the guides. When a customer activates a roadside assistance voucher, they can receive free towing or tire change. There were also vouchers for $5 off for gasoline purchases, and gift cards for restaurants and grocery stores. Approximately 360,000 consumers used the vouchers provided with the guides.

Between 2017 and 2019, On Point took measures to attempt to comply with the law. They retained three law firms for privacy notices, disclaimers, and

reviewing websites. The company also purchased software to monitor TCPA compliance. The cost of the software was $318,000 and the cost of the law firms was $254,000. The company also paid $344,000 for insurance. The company also paid government permitting expenses in the amount of $165,000.

The company recently sent out a survey by email to 2.4 million consumers who purchased guides from 2017 to 2019 with a single question asking if they were satisfied with their experience with the purchase. 10% of them opened the survey and to this date, 4767 consumers responded to the survey. 80.49% indicated they were satisfied and 19.51% indicated they were unsatisfied.

Rothman was director of data processing when the Receiver took over but was not a member of the content team, marketing team, payment solutions team, or the freemium team.

Sherman was channels manager when the Receiver took over but was not a member of the content team, marketing team, payment solutions team, or the freemium team.

On one of the organizational charts, many employees are listed as "executive," but neither Rothman nor Sherman are listed as "executive." Rothman is listed as "director," and Sherman is listed as "manager." On another organizational chart, Rothman is listed as Director of Assets Acquisition and Sherman is listed directly below Rothman as Director of Data.

AdSense is an automated program from Google that places ads on publishers' websites. Google pays the publisher depending on the number of clicks on the ads.

On Point paid out over $1 million on August 28, 2018 to Bronco, OCP, Cardozo, Mac Media and MMCardozo. Those payments are listed as "shareholder loan payout and investment in DG On Point" and include interest.

On February 4, 2019, $4.5 million was paid to the same investors as loan payout plus interest. On Point never paid distributions to any investor.

There have only been four members of the board of managers: Katz, Zangrillo, Soltani, and Serofim. No board meeting minutes have been found since the meeting in August 2019 when Soltani and Serofim came on board.

**C. Alicia Nuche**

Nuche has been with On Point Global for five years and has been the director of finance since October 2019. Previously, she was the director of accounting.

On January 19, 2019, she sent an email to Wells Fargo listing the ownership interests in On Point Global, LLC. The email listed 35% for Bronco

Holdings (Katz), 35% by OCP (Zangrillo), 20% Mac Media (Rothman), and 10% Cardozo (Levison).

In 2019, Wells Fargo closed the accounts of On Point. Rothman had a previous relationship with Optimum Bank and On Point opened its accounts at Optimum.

Merchant fees are charged by merchant banks for processing credit card transactions. Merchant fees were paid in conjunction with the purchase of guides. From 2017 to 2019, the amount of merchant fees paid by the On Point entities was $12.7 million.

Gateway fees are billed for verifying the credit card information prior to the transaction going through. On Point paid $1.2 million from 2017 to 2019 on gateway fees.

On Point incurred compliance costs relating to its websites from 2017 to 2019. On Point paid law firms and for Jonaya software, which is used to comply with the TCPA. The legal fees from 2017 to 2019 were $254,000. The Jonaya software cost $318,000 for its use from 2017 to 2019.

On Point had directors and officers insurance, cyber-security liability insurance, and errors and omissions insurance. The cost of the insurance from 2017 to 2019 was $344,000. Between 2017 and 2019, On Point incurred $165,000 for government licensing and permits.

From 2017 to 2019, Nuche worked with Rothman on financial forecasting and reconciliation. She did not work with him on other matters and is unaware of Rothman's involvement in other matters.

Rothman was a signatory because Arlene Mahon was the primary signer and they needed someone as a backup in case she were not available. Rothman had knowledge of the finances of the company and would be familiar with payments that needed to be paid.

Nuche never reported to Zangrillo for assignments and Zangrillo was not her boss.

Nuche reported the monthly close to shareholders and executives every month since 2016. She reported the monthly close to Zangrillo no more than four times. Zangrillo never attended any of the 36 monthly close meetings in person. He may have attended one or two times by telephone.

### D. Anne Miles

Miles has an undergraduate degree and graduate certificate. She is presently employed at the FTC. She began working there in 2005. She was in the FTC Bureau of Economics for six years and then became a data analyst in the Consumer Protection Bureau and has a been a senior data analyst for the past year.

Miles was assigned to this case in February 2021. Her responsibilities included summarizing transactions in a database. She later received more data sets of Google and Microsoft ads and key words. She prepared summaries of the data.

Miles received a database with individual transactions, and from that data she prepared transaction summaries. There were 50 columns and 9.9 million individual transactions.

Miles summarized the purchase date, the source, the amount, refund amount and transaction status. The source column contained the URLs and there were 104 different URLs. The date range was from December 29, 2016 through December 31, 2019.

Miles also summarized financial information from an Excel file with two worksheets provided to her. There were ten columns and over 13,000 rows. It was organized by months, year, processing company, domain, product and a few other columns, and it was broken down into revenue, refunds, chargebacks, and fulfillment costs. There were 140 URLs. She compared those with the 104 URLs in the other summary and there were 80 URLs which were found in both.

The total amount of revenues set forth in the summaries is $99.8 million. For the 80 URLs that were in both, the total amount was $93.8 million. The total amount of refunds was $12.8 million. For the 80 URLs in both, the total refunds were $9.6 million.

Miles also determined the total amount of chargebacks of $1.5 million.

The net amount (revenue minus refunds and minus chargebacks) was $85.5 million.

Miles also prepared summaries of revenue by four processing entities. GNR had $7.5 million, Pirate had $3.6 million, Orange Grove had $7.9 million, and Yamazaki had $7.9 million.

Miles also summarized advertising data from Google ad and keywords and Microsoft keywords. There were four files. She was asked to find the top ten ads and the top 20 keywords.

Approximately 14.2% of the revenue was returned by refund or chargebacks. Thus, 85% of the revenue was not subject to refund or chargeback.

**E. Elisha Rothman**

Rothman is 51, married, and has six children from age 3 to 15. He has a bachelor's degree in economics.

He worked for an options trading house for three years and traded options on the New York Mercantile for 15 years. Prior to moving to Florida, he

had never done advertising work, web design, online content, or merchant processing.

Rothman had gone to school with Katz, and after he moved to Florida they were reintroduced.

At the end of 2014, Rothman bought shares in some of Katz's companies. One was doing guide sales and one was the precursor to the data business. Rothman felt he could use his talent to forecast financial numbers for the companies and reconcile numbers. Rothman looked at the financial data numbers, convergent rates, profitability, revenues, and sales to make his forecasts.

Rothman is still working for On Point as a consultant.

Rothman owns Mac Media, which owns 14% of On Point. Rothman was the director of data processing from January 2018 through December 2019. Before that, he was a manager at direct-market.com.

Katz, Levison, and Sherman were owners of direct-market.com at the time On Point was formed.

Rothman was the manager of 18 entities named as Defendants in this case. Rothman was also the manager of Yula Capital, which was set up to receive AdSense from Google. Rothman wrote in his answer to interrogatories that he had supervisory responsibility over Brian Satz, Lisa Vallejos, and Mauricio Rodriguez. But, in court he testified that he wrote that answer because at one point he was asked to sign their performance reviews even though he had not supervised them.

Rothman allowed the company to use his credit card to purchase media. He was always reimbursed and he received miles which he could use for travel with his family.

Rothman met with and spoke with Zangrillo very infrequently. Zangrillo's role was raising money from investors. Zangrillo did an amazing job raising money.

Rothman sent an email in January 2018 to Gabriela Mendivil. With the email he sent media performance reports for DMV.com, Direct market and PBJ. In another email he wrote that the conversion rate for Texas benefits was really low and the cost per acquisition was $2.69.

From 2018 through 2019, Rothman had two responsibilities as the director of data processing: working on special projects with Sherman to identify websites to purchase, and, acting as liaison between the accounting/financing and the partners. Rothman also forecast revenue for On Point.

Rothman would sometimes receive daily summary reports. In one email he received which set forth refunds and chargebacks, there were 5.0%, 6.5%

and 6.6% refunds in three consecutive weeks and there were three months of chargebacks showing rates of 3.8%, 6.7% and 4.9% for April, May, and June.

According to a company document, Rothman spent 15% of his time during January 2019 on general administrative matters, 60% on investment banking, 10% on list management 3P, and 15% billing management-ecommerce. Sherman spent 50% on investment banking, 12.5% on channel marketing-affiliates, and 37.5% on channel marketing SMS.

Once On Point purchased websites, Rothman did not really focus on what happened with the websites. In his deposition, Rothman indicated that in order to better monetize the sites once a site was purchased, Sherman would work with the team to implement the path, and it would be transferred to the On Point group of sites. The hardest part of the job was finding sites to purchase. He had to find the sites, evaluate the sites, find the owner, and negotiate to purchase the sites. Only ten websites were purchased despite all his efforts. Any purchase needed to be approved by Bellack or Katz.

Rothman kept track of the revenue produced by the new websites but would not go on the websites to see why they were underproducing. He would notify Sherman and others if a site was underperforming, and they would take steps to increase monetization.

Sherman is the person who would have provided specific information about features on a website (size of logo, language, size of font, etc.) to Rothman and others at On Point.

Rothman received an email from Sherman which included as an attachment photos of the Florida Section 8 website and the path through all the pages. Rothman responded: that's really well done; that should help get them on the path.

On December 11, 2017, Rothman received an email from Danielle Ciolfi which talks about running Bing to Food-stamps.com which was suspended in Google some time ago. So, as of that date, Rothman was aware the site was suspended by Google.

Rothman testified that he believes that On Point's Bing and Google accounts were suspended because of the FTC's investigation.

On April 19, 2019, Rothman received an email from Penaloza indicating that due to the Bing suspension the company could lose $4 million, but due to better Google numbers the loss could be mitigated.

On September 11, 2019, Rothman received an email which included a forwarded email from Bing indicating the account was closed permanently for violation of Bing Ad policies and refers them to Bing's policy on misleading advertisements.

In August 2019, Rothman wrote to Giovanni of Optimum Bank informing him that On Point wanted to bring its processing accounts to that bank. Rothman later wrote to Moishe Gubin from Optimum Bank concerning refinancing of On Point's debts.

In July 2019, Zangrillo and Rothman exchanged emails concerning raising an additional $4 million in capital for On Point.

On Point's Wells Fargo accounts were closed because of Zangrillo's indictment in the Varsity Blues case.

On October 2, 2019, Rothman was in the process of opening new bank accounts, and he wanted to make sure that Zangrillo was removed from the operating agreement.

Rothman signed two merchant account applications on behalf of Orange Grove and five merchant account applications for Yamazaki. He did not visit any of the websites associated with those applications.

Rothman never participated in the payment processing operations of On Point.

Rothman never had a majority interest in any of the Defendant entities; was never an officer of the Defendant entities; did not direct the work of any employees of the Defendant entities.

Rothman went to the first meeting with Synthesis but was never asked to participate again because he was not a leader and worked mostly by himself.

Rothman was aware of the number of chargebacks and had a decent understanding of the pricing of the guides. Rothman is aware that On Point's merchant accounts were shut down between 3 and 10 times. Rothman received emails detailing the number of chargebacks that occurred in December 2017 and January 2018. One email relating to the high chargeback accounts in January 2018 lists driverslicenseadvisors.org as one of the websites with high chargebacks. He was warned in an email dated January 24, 2018 that chargeback rates were very high. The email lists the number of chargebacks on several sites and the rates of several were in excess of 1%. In the industry, Visa and MasterCard will put you in a program if you are in excess of 1% chargebacks for an extended period of time. Another email on January 31, 2018 that Rothman received listed a number of sites whose chargebacks were too high and warned they would breach on the accounts. Another email notified Rothman that the refund rates for guides was 15 to 19%. Rothman doubts that he ever clicked on the attachments to look at the actual date of the chargebacks. He worked on a macro level with the numbers and not on a granular level. He mostly shared his forecasts with Katz, who was the CEO. He generally did not share his forecasts with investors. He did send one email to

Moishe Gubin who was also a close friend of his. Gubin did not invest but he did make a short-term loan to On Point.

From 2017 through 2019, Rothman estimates he spent the majority of his time in forecasting. There was a finite time period during which he was more involved in obtaining new websites.

Rothman's authority to make decisions within the Defendant entities was extremely limited.

Rothman was aware of the *FTC v. Acquinity* lawsuit towards the end of 2014 or early 2015 after having a conversation with Katz about it. Rothman remembers the conversation very well. Katz said he had settled a case with the FTC, that Katz was a vendor, that the case centered around mobile billing, and that the case had nothing to do with the type of business that they were anticipating working together on. Rothman had a long-standing relationship with Katz, and he had no reason not to believe him. Katz assured Rothman that the FTC matter had nothing to do with the paid guide business and the data business they were embarking on. Rothman did not take any steps to investigate Katz and did not Google Katz.

Rothman first learned that Katz's previous dispute with the FTC resulted in an order enjoining Katz and others when this lawsuit started in December 2019. He never saw the order until his deposition.

### F. Christopher Sherman

Sherman first met Katz in 2011. Katz invested in a technology project Sherman created which eventually became Direct Market. After the roll up into On Point, Sherman became the director of data processing. Sherman did not own On Point. Sherman owns an equity interest in Bronco which owns an interest in On Point.

Sherman signed a Contribution and Exchange Agreement which gave him a 4% ownership interest in Bronco which, in turn, gave him an ownership interest in On Point.

Sherman owns 100% of 714 Media, which owns 17% of Direct Market. He has also owned interests in Leatherback Media, Macau Media, GNR Media, and Pirate Media. He was also a manager of those entities and other media entities.

Since appointment of the Receiver, Sherman has continued to work as a contractor for On Point doing the same work he did previously. Sherman reported to Charlie Eissa and no one reported to Sherman. Ramiro Baluga ran the freemium team.

Sherman is not involved in designing ads that appear on Google or Bing and is not involved in the purchase of ads. Sherman is not involved in what

appears on the landing page of a website. The channels team has no involvement in writing the questions that consumers are asked to answer. Once the consumer goes through the flow of the paths, they receive a guide. Sherman is not involved in the preparation of the guides. Sherman is not involved in the coding or technical maintenance of the freemium websites.

Sherman flagged a website for a path flow demonstration and took screen shots of the path of one of the Section 8 housing websites. He sent the screen shots by email to Rothman and Baluga. The screen shots include notes with additional information by Sherman.

On January 2, 2018, Sherman sent Katz an email asking him to review a path report which was attached. In the attachment, there were details concerning the path for food-stamps.org and tennesseefoodstamps.org.

On January 8, 2018, Sherman wrote an email to Katz responding to certain of his questions.

On March 28, 2018, Sherman sent as an attachment to an email to Katz a sample domain relating to food stamps. The attachment also includes several notes of Sherman, but he had input from other workers to assist in the attachment.

Sherman was part of many email exchanges with Katz and others concerning the paths of many different websites. In several emails there are discussions of the language of landing pages of websites and on January 24, 2018, he received an email discussing three matters. As to one of the matters, the email suggested changing a disclosure statement to a non-bold font or even removing it. But Sherman explained that he had nothing to do with the matter about which the disclaimer was discussed and he would not have paid attention to that part of the email. In another email from Liza Vallejo in May 2019, Sherman was asked to add a disclaimer that the website was not a government website as part of a compliance review.

Sherman denies ever directing anyone to remove a path from an On Point website or a Direct Market website before submitting the website to Google.

On Point used Sherman's credit cards to purchase media and other company expenses.

At least one of On Point's AdSense accounts with Google was suspended, but Sherman indicated he does not know why it was suspended. It is common for AdSense accounts to be suspended in the industry for reasons other than fraud.

The Adwords account of Direct Market was taken over by other employees of On Point. Even though the same email address was used, and even though Sherman kept that email on his phone, he rarely checked the emails and other employees of On Point had access to the email address. Even

if Sherman read the email from Google indicating that the AdWords account was terminated, the explanation was that the link was not taking the consumer to the correct destination, not due to any fraud.

Sherman signed or authorized the signing of five merchant applications for GNR Media and three merchant applications for Pirate Media. Sherman was the 100% owner of those companies.

On at least one occasion, Sherman was notified at his home address that a merchant account had been terminated due to excessive chargebacks.

Sherman has heard about Katz's order in the FTC matter. Katz had mentioned it to Sherman and Sherman had received an email mentioning it. He then looked up the order on the internet. Sherman does not recall when he looked up the order. Sherman never discussed Katz's FTC matter and never discussed the order with Rothman.

Sherman has never: worked on the payment processing team, acquired payment processing, worked at the call center, media center, or content team, worked in the e-commerce division, designed websites, worked on a path, had an operational role, or been an officer or supervisor at On Point.

### G. Robert Zangrillo

Zangrillo graduated from University of Vermont and then obtained an MBA from Stanford. He recently completed the executive program on artificial intelligence in business strategy at MIT.

Zangrillo had extensive experience in complex software businesses and wealth management and venture capital businesses prior to his involvement in this case.

Zangrillo runs Dragon Global, and Dragon Global Management, LLC (DGM) is the management entity for all the entities within the Dragon Global family. He is the CEO and Chairman of DGM.

DGM formed a company—On Point Capital Partners, LLC. Originally, DGM was the sole member of On Point.  On October 22, 2014, On Point Capital Partners created DGDMV, LLC. Zangrillo signed an operating agreement as the manager of On Point. DGDMV was set up to invest in the online auto space and was set up to purchase a URL and a publishing asset.

In order to purchase DMV.com in June 2015, Dragon Global needed to pay $3.3 million from Zangrillo's personal accounts and trust account and then through On Point to DGDMV, LLC.

Zangrillo knew of Katz from his former company New Motion, and other entrepreneurs whom Zangrillo knew spoke highly of Katz. Zangrillo had just moved to Miami and was interested in starting a business here.

In February 2015, Katz sent Zangrillo an email saying he was going to call Megan Black, Zangrillo's executive assistant, to get on Zangrillo's calendar the next week. With the email, Katz sent an attachment with a business plan for DMV.com. There was no mention of guides in the business plan.

After DMV.com was purchased, Katz became CEO and ran the day-to-day operations and also took a 20% ownership stake in DGDMV. Zangrillo may have looked at the website once before he bought it but did not look at the website thereafter.

In an email on December 17, 2017, Zangrillo suggests giving Katz more authority and eliminating the supermajority requirements in certain ways.

On Point Global was formed in 2018. An operating agreement was signed by Katz, Zangrillo, Levison, and Rothman through their companies. That agreement provided certain protections for the investors. On the same day as the operating agreement, Zangrillo signed a separate consulting agreement which provided that Zangrillo was a consultant and Chairman of the Board. As of April 2018, Zangrillo and Katz were the only members of the Board of Managers of On Point Global.

Katz and Zangrillo signed a document approving the acquisition of Livinghealthy.com and Healthstation.com.

In June 2018 Neal Sanani was hired by On Point Global and his hiring was approved by Katz and Zangrillo.

Another agreement approved by Katz and Zangrillo from January 2019 gave certain employees the authority to be signatories on the company bank accounts.

In January 2018, Levison and Zangrillo exchanged emails concerning the acquisition and transfer of OnPointguides.com to the benefit of On Point Global.

On Point Global obtained other domains over time. On September 10, 2018, a written consent of the board of managers approved Austin.com and freefuninaustin.com for $1.2 million. Zangrillo does not believe the purchases ever came to fruition. Zangrillo believes he is the one who killed these purchases.

In October 2017, Katz sent Zangrillo and others an email concerning the purchase of a portfolio of 750 domain names for $15 million to be paid at 20% down ($3 million) and 3% interest over time. Zangrillo believes he approved the purchase. Under his agreement, Zangrillo and Katz needed to agree on the expenditure of $500,000 or more.

In October 2018, Zangrillo wrote an email to Alex Soltani of Sky View Capital suggesting that On Point Global should look into purchasing DMV.org. but this transaction never occurred.

Zangrillo introduced Soltani to Katz and Soltani later made an investment of $17 million.

Zangrillo made a recommendation to Katz to hire True Search for executive hiring decisions but Katz did not follow his recommendation.

In February 2018, Zangrillo wanted On Point Global to hire Bob Bellack as CFO and COO. Bellack had an impeccable record in publishing and e-commerce. In March 2018, Bellack and Zangrillo exchanged emails with details of his proposed compensation and responsibilities.

In May 2019, Bellack sent Zangrillo and others an email detailing the state of the entities including forecasts for 2019.

Zangrillo received numerous emails detailing operations of On Point throughout the relevant years. Most of the detailed information about the operations were contained in attachments to those emails. Zangrillo continuously claimed that he did not read and/or pay attention to the information in these emails since he was only interested in "high level" decisions and didn't pay attention to the details and left the day-to-day operations to others. He claims he has never visited any of On Point's websites (except the corporate website) or read any of the guides.

Zangrillo testified he had no role in the: design of the websites, contents of the websites, appearance of the websites, consumer complaints, refunds or chargebacks. He also claims he never discussed those matters or supervised anyone involved in those matters. Zangrillo had no role in marketing, text message marketing, or search engine marketing.

Zangrillo claims he had no reason to believe there were too many refunds or chargebacks or customer complaints. Zangrillo did not know that search engines had suspended On Point's accounts.

On Point had agreed to reimburse Dragon Global for 50% of Zangrillo's executive assistant's salary for a certain period of time based upon the amount of work for On Point it was anticipated she would be performing.

On the Dragon.com website, the company touts taking a controlling interest in the companies in which they invest.

In his answers to interrogatories, he indicated that he was scheduled to visit On Point offices during 40 days between January 2018 and December 2019.

Zangrillo received an email in January 2019 with an attachment concerning January Overview which includes references to chargebacks and reduced Google rates. There is a breakdown between e-commerce and advertising. There is a column breaking down percentages of chargebacks and refunds: "Total chargeback fees were 3.8% of revenue." Although another witness testified that chargebacks exceeding 1% of transactions were

worrisome, this was 3.8% of revenue, not transactions. Further, Zangrillo testified that he was not aware of that statistic even though it was included in the attachment and that no one brought to his attention that there were an inordinate number of chargebacks.

On April 19, 2019, Zangrillo received an email from Bellack which forwarded an email from Gabriel Penaloza. The Penaloza email indicated that $4 million in revenue would be lost due to the company being suspended from Bing. Zangrillo testified that the loss of that revenue was less than 5% of their plan which anticipated $100 million in revenue during 2019.

On May 12, 2019, Bellack sent an email to Zangrillo which mentioned the "Bing recovery." Zangrillo testified that Bing was a small search engine. Zangrillo denies discussing the Bing recovery with Bellack.

Zangrillo testified that he could not recall any accounts with Google AdSense being suspended.

When meeting with potential investors, Zangrillo would provide them with disclosures which had been prepared by his legal team. As part of the disclosures, investors are told that Zangrillo made decisions impacting the company that may be in conflict with the best interest of the company. As part of a draft investor deck, which included Zangrillo's and Megan Black's edits, screen shots of DMV.com, a registration page, and a purchase page were included in the slides, and Zangrillo crossed them out so they would not be included. There were other slides which included screenshots of how the website would look. But the text in the screenshots of the web pages is so small that it is illegible.

On Point received approximately $25 million from other outside investors. Zangrillo's total investment was approximately $5 million. Zangrillo received 5% from On Point for obtaining the investments, but this was more a reimbursement for legal fees and taxes than a fee he had earned.

In April 2019, an amendment to the consulting agreement was entered into under which Zangrillo stepped down as Chairman of the Board and as an officer and executive of the company and would no longer have any day-to-day management responsibility. Zangrillo testified that he did not pay close attention to the wording of the document because he was going through a traumatic time in his life. He was indicted in the Varsity Blues case and decided to step down from a number of companies and was more focused on that case and his daughter and not on matters related to the company.

On August 29, 2019, Zangrillo attended a board of director's meeting at which Sarofim and Soltani became board members.

Zangrillo introduced Rob Sena to Levison and others in the company in the hope that the company would use his services, but the company did not go

along with his suggestion and did not use Sena's company. Zangrillo also suggested an accounting firm, data security expert, and public relation firm to the company but his suggestions were rejected by the company.

### H. Burton Katz

Katz has an undergraduate degree from Yeshiva University and an MBA from University of Southern California.

Between 1998 and 2014, he worked for Price Waterhouse for three years, then joined an Italian startup which was a mobile content company. The company was eventually sold to a Japanese telecommunications company. He then worked for another startup which eventually went public.

Katz came up with the concept for On Point after having a bad experience while trying to transfer his vehicle registration from California to Florida. He realized there was a dearth of information to help people obtain vehicle registrations and decided to set up a business to help people learn how to access government services like unclaimed assets and Section 8 housing.

Katz met Rothman at Yeshiva University in 1990. Rothman graduated prior to Katz and they lost touch with each other. At the end of 2014 or beginning of 2015, another friend re-introduced Katz to Rothman. Rothman became an investor with Katz but was never a majority investor. Rothman was originally a passive investor and provided financial forecasting, reconciliation, and general support of financial matters.

Rothman received information from databases or technology platforms and from other employees. Rothman did not supervise other employees. Rothman worked on a special project to identify other websites which would be suitable for acquisition. Sherman worked with Rothman on the project. Sherman was responsible for determining the traffic status of the websites, and Rothman worked on the financial aspects of the websites. Neither Rothman nor Sherman had authority to purchase websites. Either Bellack or Katz needed to approve of a purchase. Five to ten websites were purchased but were never made a part of the freemium sites or the guide sites.

Neither Rothman nor Sherman had the authority to hire or fire, supervise other employees, change the content of any of the websites, or shutdown a website.

DG DMV was rolled up into On Point. Katz originally established On Point in 2014 as two companies under one umbrella. The first company distributed free "how to" guides (freemium business) which acquired high value signal data with permission to market relevant services. The second company sold paid "DIY" guides. Rothman and Levison were soon brought in as operating partners.

Katz was the CEO of On Point Global, LLC when it started operating in 2018 and remained CEO until the FTC filed this lawsuit. Katz and Zangrillo were the only people who initially sat on the Board of Managers. Zangrillo was the Chairman of the Board of Managers but was not an employee or officer or executive.

Zangrillo's role was to find investors and to help attract executive talent for certain roles. Zangrillo knew people who could offer strategic business advice. Zangrillo put together an advisory board to provide general or specific advice to Katz. Zangrillo helped bring on board Bellack as CFO and Neal Sainani as chief product officer. Zangrillo was not responsible for maintaining websites. Zangrillo sometimes made suggestions to Katz, but Katz did not always follow his advice. Zangrillo needed to agree on the hiring of a CFO or President of the company and any expenditure of $500,000 or more needed to be approved by the Board of Managers. Zangrillo was only scheduled to attend board meetings one time per month.

Katz from time to time received and responded to questions from investors and answered questions honestly.

On June 25, 2018, Katz sent an email to Zangrillo, Megan Black, and Bellack with an attachment that included possible answers to questions from investors. It was Katz's intent to give this information to Bellack to respond to questions so Katz would not have to do so.

On July 5, 2018, Zangrillo sent an email to Flaxman, a possible investor, which included a number of answers to the operations of On Point. The email had an attachment with a number of domains and other offerings of On Point. The attachment stated that Zangrillo joined in January 2018 and he was the Executive Chairman. Other emails to potential investors also listed Zangrillo as Executive Chairman.

On January 8, 2018, Katz sent an email to Zangrillo, Levison, and Rothman in which he lists priorities to be addressed for the upcoming year. Some of the items listed are "domain strategy and budget," "technology re-engineering (wadiya global & transition/rebuild console/enterprise warehouse)," "mid management," "rebuild/relaunch services onto wadiya platform," "rebuild and optimize freemium web properties," "search engine optimization strategic plan," "templatize our front ends," and "core daily operations."

In 2016, Katz invested in one of Sherman's companies. Katz's brother Jonathan Katz was Sherman's business partner. In 2018, Sherman was primarily responsible for the day-to-day operations of Direct Market. Sherman was responsible for the channels functions of the business.

Katz was a defendant in the *FTC v. Acquinity* case, which he settled by agreeing to entry of a permanent injunction. That order required him to submit a compliance report to the FTC one year later. Katz did submit a compliance report to the FTC under oath in October 2015. Katz did not identify any of the entities in this case (Cambridge Media, Direct Market, Falcon Media). He did list Bronco Holdings Family, LLC which owned interests in those companies and in another part of the report indicated Bronco owned a passive, minority interest in other companies as a seed/angel investor. The freemium business and guide business were not identified in the report.

On April 2, 2021, the FTC sent Katz a demand letter to which Katz responded on April 16, 2021.

Katz discussed his settlement with the FTC with Zangrillo in approximately June 2015 but did not discuss the order from that case. Katz's attorney and Zangrillo's attorney spoke about the FTC matter to make sure Katz would be able to be the manager for DG DMV.

Katz is generally familiar with the threshold of Visa and MasterCard related to chargebacks. Visa's threshold was 1% and MasterCard's threshold was 1.5%. Katz is unaware of any website having its Visa or MasterCard account terminated due to excessive chargebacks.

### I.  Ramiro Baluga

Baluga started working for On Point's predecessors in 2016 until On Point was created in 2018.

Baluga was responsible for purchasing media. Neither Rothman nor Sherman were involved in purchasing media.

After On Point came online, Baluga helped with content design as well as the e-commerce business. Baluga headed a team responsible for content and user experience on e-commerce websites. Neither Rothman nor Sherman worked on e-commerce, and neither bought ads.

Baluga was responsible for creating new websites and improving the existing websites. Neither Rothman nor Sherman was involved in that work.

Katia Canete was the project manager of the freemium team. There were certain protocols that Google representatives recommended be implemented to make sure that the ads purchased complied with Google's rules. Baluga was included in a Slack channel discussion group with Canete relating to the Google ads. Rothman and Sherman were not part of the discussion group.

On the freemium websites, the consumer can obtain a guide without going all the way through the website. There are incidents of consumers who returned to the same website after earlier ordering a guide.

When a consumer signs up on a freemium website and gives their email address, they will begin receiving emails. The consumers have the ability to unsubscribe to the emails. About 5-6% of the consumers have unsubscribed.

### J.  Juan Ignacio Lussich

Lussich is currently vice president of e-commerce with On Point and has worked with them since 2015. Lussich was responsible for the data analytics for e-commerce, and On Point had verticals for fishing, automobile services, car registrations or driver's licenses.

Lussich is familiar with the voucher system users received after purchasing a guide. Lussich believes that all the vouchers were valued at $25. The vouchers were for roadside assistance, gasoline, groceries, restaurants, and other goods or services of value.

Between 2017 and 2019, approximately 360,000 customers accessed the vouchers. The revenue to On Point for those customers was at least $8.2 million based on a price of $22 per guide.

On some of the e-commerce websites a box would pop up which notified the consumer that this was not a government website and that by clicking "continue" you acknowledge the site is privately owned and is not affiliated with any government agency. Approximately 1.8 million consumers saw the pop-up and from 2017 to 2019 those consumers purchased $32.5 million in guides.

In May 2019, a similar disclosure pop-up was added to the fishing website. From May 2019 through December 2019, there were 105,000 visitors to the site, and they paid a total of $2.5 million.

Some of the other On Point websites did not have a disclosure pop up.

### K.  Karla Jinesta

Jinesta is currently the operations manager of the call center for On Point and has been working for On Point since 2015. Prior to 2015, she worked for four different call centers in Costa Rica for 8 years. The prior companies were collections, cable and telephone, internet services, and a shoe company.

Jinesta is familiar with the operation of the call center of On Point from 2017 to 2019 relating to road guides. Customers called because they did not know how to download the guides or wanted more information on how to use the $25 vouchers or wanted a refund. Jinesta recalls many of the customers were satisfied with their purchases. The level of customer satisfaction with the customers at On Point was similar to the level of satisfaction of customers she dealt with at the other four call centers.

In 2018 around 2.2 million customers purchased road guides and in 2019 it was around 1.8 million. In 2018, 641,000 customers who purchased road guides called into the call center and in 2019 there were 560,000 customers who called in. Approximately 29% of customers who purchased road guides called the call center. Approximately 25% of those who called the call center were calling for a reason other than a refund. Other customers requested a refund by email.

In 2018, the lowest priced guide was $22.98 and in 2019 the lowest priced guide was $23.98.

The total revenue of the persons who called the call center for reasons other than a refund in 2018 and 2019 was $6.9 million.

### L. Katia Canete

Canete worked for On Point from January 2017 until mid-February 2019. She was a project manager at the beginning and left as a product manager.

Canete created a Slack channel to communicate with her team when sites were being launched and to keep track of what was going on with the websites. Canete worked on freemium websites. Sherman worked on the channels team. Canete reported to Rothman and Sherman and Danielle Ciolfi.

Canete wrote in the Slack channel that Rothman and Sherman wanted no sites to be submitted to Google until every task was completed to avoid further suspension from Google ads. Sherman told her to hold off uploading a site to Google until Monday.

Canete was fired from On Point by Baluga because she was not performing her duties adequately.

### 2. Findings of Fact

### A. Background

### 1. The Acquinity Permanent Injunction

In 2014, the FTC brought a lawsuit against Burton Katz and his associates alleging that they had engaged in the deceptive and unfair practice of cramming charges on consumers' mobile phone bills. *FTC v. Acquinity Interactive, LLC*, Case No. 14-cv-6011-Scola (S.D. Fla.), (*Acquinity* ECF No. 88). The FTC alleged that Katz's operation ran websites that offered free merchandise in exchange for consumers' phone numbers and enrolled consumers who provided their information in unwanted premium text messaging services that charged them monthly. (*Id.* ¶¶ 45–47.) To resolve the

matter, Katz stipulated to a final judgment and order for permanent injunction. (*Acquinity* ECF No. 132) ("2014 Order" or "*Acquinity* Order").

Among other things, the 2014 Order prohibits Katz and persons in "active concert or participation" with him, "whether acting directly or indirectly, . . . from making, or assisting others in making, expressly or by implication, any false or misleading material representation including representations concerning the cost, performance, efficacy, nature, characteristics, benefits, or safety of any product or service, or concerning any consumer's obligation to pay for charges for any product or service." (2014 Order at 3 (Section II).) The 2014 Order also required Katz to pay $704,244 to the FTC by October 23, 2014. (2014 Order at 3.) Acquinity Interactive LLC was Katz's co-defendant in the 2014 lawsuit. (*Acquinity* ECF No. 88.)

### 2. *The On Point Lawsuit*

Despite the permanent injunction, Katz continued to operate deceptive businesses that he failed to disclose to the FTC in violation of the 2014 Order's compliance monitoring provisions. After learning about Katz's additional deceptive scheme, on December 9, 2019 the FTC filed its complaint against Katz, five of his associates, and fifty-four corporate entities. (ECF No. 1.) The Complaint alleges that defendants were operating scam websites that falsely promised to provide government services to consumers in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). The Complaint further alleges that defendants are jointly and severally liable because the entity defendants acted as a common enterprise and the individual defendants participated in, controlled, and knew of the deceptive practices. (*Id.* at ¶¶ 61–77, 80–107.)

After a two-day evidentiary hearing, the Court issued a preliminary injunction that, among other things, appointed a receiver and froze the Defendants' assets. (ECF No. 126.)

Upon conclusion of discovery, the FTC moved for summary judgment against all Defendants on both of its Complaint counts. (ECF No. 454.) Robert Zangrillo and the Dragon Global Defendants also moved for summary judgment. (ECF No. 410.)

### 3. *Summary Judgment Rulings*

On September 29, 2021, the Court partially granted the FTC's motion for summary judgment as to individual defendants Katz, Levison, and the Corporate Defendants. (ECF No. 528.) The Court denied the FTC's motion for summary judgment as to individual defendants Robert Zangrillo, Elisha

Rothman, and Christopher Sherman.[2]

The Court found that On Point's paid-guides websites and freemium websites violated Section 5(a) of the FTC Act. (ECF No. 528 at 14–18.) The Court also found that the Corporate Defendants "operated under a 'common enterprise' and are thus liable for the deceptive practices" at issue. (ECF No. 528 at 18.) The Court further found Katz and Levison individually liable as each had the authority to control the deceptive practices and had some knowledge of such practices. (ECF No. 528 at 19–20.)

### 4. The Acquinity Contempt Proceedings

On February 12, 2020, the FTC initiated contempt proceedings in the *Acquinity* case against Katz and twelve corporate entities for violating the 2014 Order. (*Acquinity* ECF No. 135.) The FTC argued that Katz should be held in contempt because the same misrepresentations described in the *On Point* action also violated the 2014 Order's injunction against misrepresentations and that the twelve entities should be held in contempt because they had "actual notice" of the 2014 Order and violated it "in active concert or participation" with Katz. (*Id.*) On February 14, 2020, the Court ordered Katz and the twelve entities to show cause why they should not be held in contempt and consolidated the show cause hearing with trial in the *On Point* matter. (*Acquinity* ECF No. 136.)

On April 30, 2021, the FTC moved for contempt against three of Katz's individual co-defendants in the *On Point* matter: Brent Levison, Elisha Rothman, and Robert Zangrillo. (*Acquinity* ECF No. 137.) The Court subsequently ordered Levison and Rothman, but not Zangrillo, to show cause why they should not be held in contempt. (*Acquinity* ECF No. 136.)

The FTC thereafter moved for summary ruling against all remaining contempt defendants in the *Acquinity* matter. (*Acquinity* ECF No. 181.) The Dragon Global Contempt Defendants also moved for summary contempt ruling. (*Acquinity* ECF No. 184.)

On September 29, 2021, the Court partially granted the FTC's motion for summary contempt rulings as to Katz and Levison and all On Point Contempt Defendants. (*Acquinity* ECF No. 225.) The Court denied the FTC's motion for summary judgment as to Rothman and the Dragon Global Contempt Defendants. (*Id.*) The Court held that the 2014 Order is valid and lawful and

---

[2] The Court did not rule as to Defendant Arlene Mahon, as on September 20, 2021, the FTC and defendant Arlene Mahon moved to stay the proceedings against Mahon in light of the parties' negotiation of a settlement agreement. (ECF No. 508.) The Court granted the parties' request (ECF No. 513) and subsequently entered a stipulated order for permanent injunction against Mahon on October 18, 2021 (ECF No. 540).

not impermissibly vague and ambiguous. (*Acquinity* ECF No. 225).

The Court found that On Point's sites made false and misleading material representations to consumers. (*Acquinity* ECF No. 225 at 4.) The Court also held that Katz violated the 2014 Order as he had the requisite control or power to prevent the making of the false or misleading material representations at issue. (*Id.* at 4–5.) The Court also found that Levison and the On Point Contempt Defendants had actual notice of the 2014 Order and acted in active concert or participation with Katz to carry out the deceptive scheme. (*Id.* at 5–6, 9.) The Court further found that Katz, Levison, and the On Point Contempt Defendants were not excused from complying with the 2014 Order due to "inability to comply." (*Id.* at 9–10.) Last, the Court also granted the Defendants' motion for summary contempt ruling as to the Dragon Global Contempt Defendants. (*Acquinity* ECF No. 225.)

### B. Defendants

The On Point and Corporate Defendants operated the deceptive paid guides and freemium business as a common enterprise. (ECF No. 528 at 18.) Between 2012 to 2014, Burton Katz brought in Brent Levison, Elisha Rothman, and Christopher Sherman as partners and built OPG's paid guides and freemium business lines.

Prior to 2018, On Point Global LLC's predecessor entities operated as an "incubator" consisting of different business lines. In particular, Direct Market LLC operated the freemium and data business, including the public benefits sites, and DG DMV LLC acquired and owned the domain DMV.com.

Katz, Zangrillo, Rothman, and Levison formed On Point Global LLC in 2018 through a "roll up" of the "incubator" entities, which became On Point Global LLC's subsidiaries. On Point Global LLC managed corporate development and business relationships, including by recruiting employees, holding bank accounts, creating branding, and running a corporate website and email server.

Through their holding companies, Katz, Zangrillo, Rothman, and Levison were OPG's founders and four largest shareholders.

When On Point Global LLC was created in 2018, Zangrillo and Katz each held a 35% share, Rothman held 20%, and Levison held 10%. Following outside investment, Zangrillo and Katz each held a 28.4% share, Rothman held 16.2%, and Levison held 8.1%.

### 1. *Robert Zangrillo*

The Court, having already entered a preliminary injunction against

Zangrillo, and having received the slip opinion from the 11th Circuit Court of Appeals which affirmed the Court's finding that Zangrillo likely had "some knowledge" of On Point's deceptive activities, listened to Zangrillo's testimony with a great deal of skepticism—particularly his claim that he was not aware of the content of the websites and was generally unaware of the problems with chargeback, refunds, and suspension of ad accounts and bank accounts. But, ultimately the Court found these assertions credible.

The Court accepts Zangrillo's assertion that he was not involved in the day-to-day operations of the company and was not aware of the deceptive nature of the websites. Although he did have a certain amount of control of the company, he was not privy to the operations on a granular level. Although he did receive many emails which included detailed information of company operations in attachments, the Court accepts his testimony that he did not read those attachments.

Zangrillo was never an executive, employee, or officer of OPG. Zangrillo had no role in the: design of the websites, contents of the websites, appearance of the websites, consumer complaints, refunds or chargebacks. He never discussed those matters or supervised anyone involved in those matters. Zangrillo had no role in marketing, text message marketing, or search engine marketing.

Zangrillo had no reason to believe there were too many refunds or chargebacks or customer complaints. Zangrillo did not know that search engines had suspended On Point's accounts.

Not one witness testified about any conversations they had with Zangrillo that would have put Zangrillo on notice that the websites were involved in deceptive practices.

At the time the Court granted the FTC's request for a preliminary injunction against Zangrillo, the Court relied mostly on circumstantial evidence of Zangrillo's ownership interest, ability to control certain aspects of the company, and the unlikelihood he would not have known of the deception, Indeed, the 11th Circuit similarly noted, "Zangrillo likely knew that On Point made over eighty million dollars in two years selling 'guides' on government services, and it almost beggars belief that he would be completely unaware of how On Point's websites were raising that quantity of money."

But the Court did not have the benefit of Zangrillo's testimony at that time. His testimony has now provided the Court with credible, direct evidence of his state of mind which the FTC has failed to refute.

### 2. Elisha Rothman

The Court finds that the evidence and testimony establish that Rothman knew about and directly participated in the deceptive practices. He had the ability to control the company as the third largest shareholder with voting rights and authority to direct employees in the company's freemium operations and guide sales.

Rothman was the manager of 18 entities named as a defendant in this case. Rothman created and owned multiple companies to obtain merchant accounts and ad buying accounts, and he used his personal credit card to pay for ads to help the company continue operating during their frequent advertising account suspensions. Rothman received kickbacks for lending his name and credit to many of the company's merchant accounts. He was paid more than $110,000 in "productivity fees." About 15 percent of the company's guide sales revenues over the past three years were processed through his merchant accounts.

Rothman was a shareholder and had the trust of Katz such that he was a signatory on company bank accounts. And, when Wells Fargo terminated its banking relationship with On Point, it was Rothman who sought out and obtained a new banking relationship with Optimum.

Rothman had full knowledge of the misleading nature of the representations On Point Global sites. Rothman knew about On Point's repeated breaches of processing thresholds and resulting chargebacks.

Rothman testified that he knew chargeback ratios above 1 percent would be cause for concern. Yet, Rothman was repeatedly notified that chargebacks exceeded this threshold and were very high, incredibly high, and breaching the thresholds. As just one example, in one email he received which set forth refunds and chargeback for three consecutive months, there were chargeback rates of 3.8%, 6.7%, and 4.9%. These notifications also included notifications that Rothman's own merchant companies, including Yamazaki Media, had breached thresholds for the payment processers chargeback ratios.

Rothman also admitted that he knew about several specific instances in which payment processers shut down On Point's merchant accounts and that he knew about repeated advertising account suspensions. He testified in particular that he knew about one very disastrous Bing suspension, and the evidence showed that Rothman knew that suspension came after several internal Microsoft investigations and was due to ads policies violations—in particular Bing's misleading content policies. But, instead of trying to stop the deceptive practices, he simply opened new ad buying companies under the umbrella Yula

Capital. And Rothman personally stepped in to lend the company money to buy ads when their ad buying accounts were suspended.

Rothman and Sherman also ensured that On Point Global staff carried out a process for finalizing new freemium sites that included removing the information-gathering features from the sites before submitting them for Google's approval and then replacing those features once the sites were approved and had gone live.

Rothman also received and reviewed screen shots of the freemium site flow that Sherman put together. These screen shots included the freemium site's central misrepresentation. And, Rothman praised Sherman's reconstruction of the freemium sites as well done. Rothman also sent Katz a detailed description of the freemium site's layout and wording.

The evidence establishes Rothman had actual knowledge of On Point's representations that the company provided and the problems its deception caused. Even if he did not have actual knowledge (which he did), his admitted knowledge of repeated red flags from ad suspensions to merchant account breaches is sufficient to hold that he was recklessly indifferent to or intentionally avoided knowledge of On Point's deception.

### 3. Christopher Sherman

Sherman was involved from the very beginning as one of the creators of Direct Market, LLC, the subsidiary that originated and operated the freemium business line. Sherman primarily operated Direct Market on a day-to-day basis at the time On Point Global was formed in 2018.

Sherman and Rothman were managers of Direct Market and its ad buying subsidiaries, and Sherman exchanged his interest in that business for a stake in On Point Global, LLC when the new company was formed. Sherman was responsible for day-to-day operation of the freemium business for On Point.

Sherman owned and created multiple entities that On Point used to obtain merchant accounts and advertising accounts. On Point used those companies in the names of partners and top employees to obtain accounts that could not all be connected back to On Point Global. That way, when advertising and merchant accounts were inevitably shut down, the remainder could continue taking consumers' money undisturbed. He received notification at his home address that a merchant account had been terminated due to excessive chargebacks.

Sherman was a leader on the freemium side of the business. He was responsible for channels marketing that monetized the deceptively gathered

data. He directed other employees to make changes and edits to On Point's websites and provided the wording of text messages.

Sherman's emails showed that the sites he worked on made revenues from the paths and included one of the freemium sites on which the FTC's investigator conducted an undercover transaction (Foodstamps.com).

Katz referred to Sherman and Rothman as his "partners" and even scolded them and held them responsible for failing to properly supervise the workers who carried out the freemium sites operations.

Sherman directly participated in and had knowledge of On Point Global's deceptive activities. Sherman founded the freemium business before On Point Global was formed. He worked directly on the deceptive websites and directed employees to make edits to their coding, wording, and design.

Sherman also gave On Point the use of his credit to buy search engine advertising and open merchant accounts. On Point processed more than $11 million in revenues from guide sales through Sherman's accounts. That amounted to 11 percent of the company's total guide sales reserves from 2017 to 2019.

Sherman also received more than $60,000 in "productivity fees" in exchange for lending his name to the merchant accounts. He also obtained multiple bank accounts and rented mailboxes that the company used for both merchant and advertising account applications.

### 3. Conclusions of Law

The Court has subject matter jurisdiction over the FTC Act claims in this matter pursuant to 28 U.S.C. §§ 1391(b)(2), (c)(1), (c)(2), (c)(3), and (d), and 15 U.S.C. § 53(b).

The Court previously ruled, in granting partial summary judgment, that On Point's guide-sales and freemium websites are deceptive pursuant to Sections 5(a) and 13(b) of the FTC Act, that the On Point and Corporate Defendants are jointly liable for that conduct as a common enterprise, and that Defendants Katz and Levison are individually liable for injunctive relief. (ECF No. 528 at 12–21.) Moreover, in the *Acquinity* show-cause action, the Court previously ruled in a summary contempt proceeding that all Contempt Defendants except Elisha Rothman were in contempt of the *Acquinity* Order. (*Acquinity* ECF No. 225.)

Therefore, the remaining questions under Section 13(b) in the *On Point* action are whether Defendants Robert Zangrillo, Elisha Rothman, and Christopher Sherman are individually liable for injunctive relief. The remaining questions in the *Acquinity* show-cause hearing are whether Elisha Rothman can be held in contempt of the *Acquinity* Order and what is the appropriate

calculation of contempt damages.

### A. Individual Liability

To hold an individual liable for the deceptive practices of a company, the FTC must show that the individual (1) "participated directly in the deceptive practices" or had "authority to control" such practices and (2) had "some knowledge" of the deceptive practices. *See FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014); *see also FTC v. On Point Cap. Partners LLC*, No. 20-10790, 2021 WL 5115204, at *12 (11th Cir. Nov. 4, 2021). The FTC must prove these elements by a preponderance of the evidence. *See, e.g., FTC v. Direct Benefits Grp., LLC*, No. 6:11-cv-1186, 2013 WL 3771322, at *1 (M.D. Fla. July 18, 2013).

"Authority to control" may be shown by "active involvement in business affairs and the making of corporate policy." *See IAB Mktg.*, 746 F.3d at 1233. An individual's title alone is not sufficient to establish individual liability. *See FTC v. Johnson*, 156 F. Supp. 3d 1202, 1210 (D. Nev. 2015). But an individual's role in a company, considered in light of their conduct, is evidence of authority to control. *See FTC v. USA Fin.*, LLC, 415 F. App'x 970, 975 (11th Cir. 2011) ("In their capacity as manager and vice president, and as demonstrated by their conduct, [individual defendants] had the 'authority to control' the corporate entities' acts."); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1207 (N.D. Ga. 2008) ("In this case, Wheat, Holda, and Smith were all corporate officers, owners, and/or independent contractors or employees of NUG, NICWL, and Hi–Tech. In these roles, these individuals clearly had the ability to control the corporate defendants."). Significant involvement "in the hiring of senior management" may evince authority to control. *See FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1205 (10th Cir. 2005).

"Direct participation" means an individual "played an integral role in the commitment of unfair [or deceptive] practices by the corporate defendants." *See FTC v. J.K. Publ'ns, Inc.*, 99 F. Supp. 2d 1176, 1206 (C.D. Cal. 2000). Evidence of a defendant obtaining merchant accounts and signing agreements to purchase a credit card database in furtherance of an unauthorized billing scheme, *see id.; FTC v. Pointbreak Media*, 376 F. Supp. 3d 1257, 1271 (S.D. Fla. 2019), or funding "the dissemination of [the misleading] ads, whether through [the defendant's] own personal account or other accounts such as those of [the common enterprise]," *see FTC v. Ross*, 897 F. Supp. 2d 369, 384 (D. Md. 2012), may go towards a finding of direct participation. Where a defendant carries out an integral role in facilitating the deception, "day-to-day involvement [in the corporate defendants'] activities is unnecessary to establish

direct participation." *See Pointbreak Media*, 376 F. Supp. 3d at 1271; *FTC v. Ivy Capital, Inc.*, No. 2:11-CV-283 JCM GWF, 2013 WL 1224613, at *14 (D. Nev. Mar. 26, 2013) (citing *J.K. Publ'ns.,* 99 F. Supp. 2d at 1206), *aff'd in relevant part by* 616 Fed. App'x 360, 360–61 (9th Cir. 2015).

Knowledge may be established by showing that the individual had (1) "actual knowledge of the deceptive conduct," (2) "was recklessly indifferent to its deceptiveness," or (3) "had an awareness of a high probability of deceptiveness and intentionally avoided learning of the truth." *FTC v. Primary Grp., Inc.*, 713 F. App'x 805, 807 (11th Cir. 2017). A defendant's "participation in corporate affairs is probative of knowledge." *See FTC v. Wilcox*, 926 F. Supp. 1091, 1104 (S.D. Fla. Sept. 29, 1995) (Ferguson, J.).

### 1. Robert Zangrillo

As detailed in the Court's findings of fact, Zangrillo did not directly participate in the deceptive conduct at issue in this matter. Zangrillo did not have the authority to control the deceptive conduct at issue in this matter. Zangrillo did not have knowledge of the deceptive conduct at issue in this matter. Zangrillo's credible testimony as to his actual knowledge and state of mind was unrebutted by any direct evidence or testimony. Accordingly, Zangrillo cannot be held liable for the deceptive practices of OPG.

### 2. Elisha Rothman

As is more fully set forth in the Findings of Fact, Rothman possessed and exerted control over On Point's activities, demonstrated by his participation in business affairs and setting of corporate policy. He was the third-largest owner and one of On Point's founders, along with Katz, Zangrillo, and Levison. *See Transnet Wireless Corp.*, 506 F. Supp. 2d at 1270. Rothman joined forces with Katz years before On Point Global LLC was created and was one of Katz's partners in the "incubator" that preceded it.

Rothman participated directly in On Point's deceptive activities. Rothman and Sherman both operated On Point's existing "freemium" websites. Rothman, Sherman, and Katz worked together to edit the wording and design of the deceptive freemium sites, including the path that solicited consumers' information on those sites.

Rothman created "billing companies" to obtain merchant accounts to process sales on the deceptive guide-sales websites, and he received $114,226 in kickbacks in exchange. In total, at least 15% of On Point's guide-sale revenues flowed through Rothman's merchant accounts. Rothman also created the companies that purchased On Point's search-engine advertising.

Rothman also had knowledge of his company's deceptive practices. Rothman and Sherman worked together to edit and analyze the path that gathered consumer data on the freemium sites. Rothman knew when search engines suspended the company's sites, and when the company accordingly had trouble buying search advertising, he permitted his personal credit card to be used to buy ads to work around those suspensions. Indeed, when Google suspended On Point freemium sites, Rothman and Sherman ordered their employees to remove the data-gathering path from those sites while they were under review, then restore the path once Google reinstated the sites. Rothman's and Sherman's action in submitting one version of the website to Google for approval, then using a different version once they were past the gatekeeper, demonstrates that their sites "contained terms that defendants knew were improper." *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 989 (N.D. Cal. 2010) (emphasis in original) (holding that when a telemarketing company deviated from a payment-processor-approved script, it demonstrated knowledge of improper terms in the scripts).

Rothman not only knew about but helped prepare analyses of and reports about the merchant accounts' high chargeback rates, and he testified that he was aware of the company's business model and pricing because he forecast its revenues. Rothman's claim that he does not "remember" seeing the websites that generated these problems—and the majority of the company's revenues—is not credible.

Rothman also re-established a banking relationship with Optimum Bank when Wells Fargo terminated its relationship with On Point and lent his credit to On Point to purchase media which helped prevent any misleading advertisements from being tied back to On Point.

Rothman participated directly in On Point's deceptive activity, had authority to control that activity, and had at least some knowledge of the deceptive activity. Thus, he is individually liable for injunctive relief pursuant to Section 13(b) of the FTC Act.

### 3. Christopher Sherman

Sherman also exercised control over On Point's deceptive operations, both before and after On Point Global LLC's formation. Sherman managed the day-to-day operations of Direct Market LLC, which originated and operated On Point's freemium business. He also owned several of Direct Market's subsidiaries, whose purpose was to purchase search advertising. Upon the creation of On Point Global LLC, Sherman's contribution of the entities he owned earned him a share in the new entity. He, along with Rothman, supervised the employees who operated the freemium sites, and in particular,

the "channel" marketing sent to consumers from those sites.

Sherman also directly participated in On Point's deceptive conduct. Most directly, he, Rothman, and Katz worked together to edit and analyze the performance of the freemium websites. Sherman made, and ordered employees to implement, wording and design edits for the freemium sites, including their "disclaimers," checkboxes, and language including, for instance, "Confirm that you will qualify for coverage" on a Medicare-related freemium site.

Sherman created companies to purchase search-engine advertising, and in some instances, he purchased those advertisements with his personal credit card. Sherman provided other essential services, including obtaining merchant accounts, bank accounts, rented mailboxes, and registration for On Point's domains. Sherman obtained the merchant accounts by creating "billing companies" and signing merchant account applications that contained personal guarantees of the accounts and listed the deceptive websites for which the account would process sales. Sherman received kickbacks for the revenues obtained through his merchant accounts. In all, at least 11% of On Point's guide-sales revenues flowed through Sherman's merchant accounts.

Sherman received notifications when On Point's advertising accounts and merchant accounts were suspended or terminated, including merchant account termination letters sent to his home.

When Google suspended On Point's advertising for freemium sites, Sherman and Rothman directed employees to remove the path from the sites while they were under review, then to reinstate it once the sites were restored, demonstrating they knew their path was problematic. *See Inc21.com Corp.*, 745 F. Supp. 2d at 989. Sherman even directly reviewed and received complaints from consumers upset about the avalanche of text messages and emails they received after visiting the freemium websites. Further, Sherman knew about Katz's prior troubles with the FTC. *See Sanctuary Belize Litig.*, 482 F. Supp. 3d at 453.

Because Sherman participated directly in On Point Global's deceptive activity, had authority to control that activity, and had at least some knowledge of the deceptive activity, he is individually liable for injunctive relief pursuant to Section 13(b) of the FTC Act.

### B. Scope of Injunctive Relief

When determining the scope of a permanent injunction, courts look to the following factors, among others: (1) the egregiousness of the defendant's actions, (2) the isolated or recurrent nature of the infraction, (3) the degree of scienter involved, and (4) the likelihood that the defendants' occupation will present opportunities for future violations. *See FTC v. Partners in Health Care*

*Ass'n*, 189 F. Supp. 3d 1356, 1369–70 (S.D. Fla. 2016) (Scola, J.). A permanent injunction is appropriate where there is a "cognizable danger of recurrent violation" or some reasonable likelihood of future violations. *See U.S. v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953). "The necessary determination is that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive." *Id.*

"Injunctive relief should be limited in scope to the extent necessary to protect the interests of the parties," meaning, "[i]njunctive relief should be narrowly tailored to fit the specific legal violations adjudged." *Keener v. Convergys Corp.*, 342 F.3d 1264, 1269 (11th Cir. 2003); (*see also* ECF No. 528 at 26.) Proposed injunctive relief must contain specificity, detail, and definitions to be proper. *See FTC v. Vylah Tec LLC*, No. 2:17-cv-228, ECF No. 339, 1–2 (M.D. Fla. Feb. 11, 2019); (*see also* ECF No. 528 at 25.) Injunctions that contain "fencing in" provisions are not proper if they do not bear a reasonable likelihood to address illegal conduct. *Id.*; *see also Grove Labs v. FTC*, 418 F.2d 489, 496 (5th Cir. 1969) (striking down provision that prohibited the sale of any "drug" even though the violation only related to certain type of drug); *see also Trans World Accts., Inc. v. FTC*, 594 F.2d 212, 216 (9th Cir. 1979) (striking down "fencing in" provision). In the context of FTC orders, this means that the prohibited acts bear a "reasonable relation" to the violative conduct. *See Partners in Health Care*, 189 F. Supp. 3d at 1370; (*see also* ECF No. 528 at 26–27.) Additionally, injunctions cannot be so broad as to prohibit general violations of the law. *See LabMD, Inc. v. FTC*, 894 F.3d 1221, 1235 (11th Cir. 2018).

The Court has already held that the violations here were egregious in scope and duration. As the Court previously ruled, the Defendants sought to evade limits on their websites' deceptiveness, demonstrating that they did not act in good faith in operating their websites. (ECF No. 528 at 25–26.)

As discussed above, Rothman and Sherman had the requisite knowledge to be held liable. A higher degree of scienter is not required for permanently enjoining such deceptive conduct. (ECF No. 528 at 26.)

The Court has already ruled that there is a high likelihood of future violations absent a permanent injunction for defendants in the online advertising business, and that the low barriers to entering the online advertising and sales business weigh strongly in favor of a permanent injunction. *See Wash. Data Res.*, 856 F. Supp. 2d at 1282; (ECF No. 528 at 26.) This factor applies equally to Rothman and Sherman.

Further, Rothman and Sherman were all aware of Katz's previous troubles with the FTC, whether they knew an order resulted from that incident or not. Rothman and Sherman both spoke with Katz about the 2014 FTC

matter around the time it was entered and Sherman looked up the order and read it himself. Rothman and Sherman all worked closely with Katz's former colleagues from his codefendant Acquinity Interactive, and Katz testified that generally everyone in his office, and indeed his industry, knew about the 2014 FTC matter. Stronger relief is therefore necessary because Rothman and Sherman worked with Katz while paying little to no heed to his troubles with the FTC. Thus, there exists a cognizable danger of recurrent violation for Rothman and Sherman.

The Court has already examined the relationship between the FTC's proposed injunctive relief and fashioned a permanent injunction whose scope is reasonably related to the violations found. (ECF No. 528 at 26–27.) The Court will therefore enter the same injunctive relief against Rothman and Sherman as it entered against Katz, Levison, and the Corporate Defendants.

### C. Contempt of the 2014 Order

The Court has jurisdiction over the contempt claims in this matter pursuant to its inherent power to enforce its 2014 Order. (*See* 2014 Order at 13) (stating that the Court retains jurisdiction "for purposes of construction, modification, and enforcement of this Order").

The Court previously ruled in granting partial summary contempt that: its 2014 Order was valid, lawful, and unambiguous; On Point's websites made material misrepresentations in violation of that Order; Burton Katz, Brent Levison, and the On Point Contempt Defendants are liable in contempt for those violations and were not excused from compliance due to an inability to comply; and gross receipts of the paid-guide sites are the correct baseline for relief as to those sites, with the potential for appropriate offsets if the Defendants prove them. (*Acquinity* ECF No. 225 at 3–6, 9–11.)

The remaining questions in contempt are thus (1) whether Defendant Elisha Rothman is liable for contempt; (2) the appropriate baseline for relief as to the freemium sites; and (3) the amount of monetary relief required as a compensatory contempt remedy, following any permitted offsets that the Defendants establish.

### 1. Elisha Rothman Contempt

To establish contempt, the movant must show by clear and convincing evidence that:

> (1) the violated order was valid and lawful;

> (2) the order was clear and unambiguous; and

> (3) the violator had the ability to comply with the order.

*Peery v. City of Miami*, 977 F.3d 1061, 1076–77 (11th Cir. 2020) (cleaned up). Moreover, a nonparty to an order is liable for contempt of that injunction if it is shown by clear and convincing evidence that the nonparty had "actual notice" of the order and was in "active concert or participation" with a party to violate it. *See* Fed. R. Civ. P. 65(d)(2).

To establish actual notice, all that is required in a contempt action is "knowledge of the mere existence of the injunction; not its precise terms." *FTC v. Neiswonger*, 494 F. Supp. 2d 1067, 1079 (E.D. Mo. 2007); *see also Gen. Motors Corp. v. Gibson Chem. & Oil Corp.*, 627 F. Supp. 678, 681–82 (E.D.N.Y. 1986) ("It is clear, however, that the knowledge required of a party in contempt is knowledge of the existence of the order . . . not knowledge of the particulars of that order.").

To establish "active concert and participation" under Rule 65(d)(2)(C), nonparties who "aid and abet the party bound by the injunction in carrying out prohibited acts" may be bound by the injunction. *ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1352 (11th Cir. 2017). The nonparty aids and abets the party in violating an injunction if he or she "played an essential role" in knowingly assisting the party to the injunction to carry out the prohibited acts. *See Goya Foods, Inc. v. Wallack Mgmt. Co.*, 290 F.3d 63, 76 (1st Cir. 2002); *see also FTC v. Leshin* ("*Leshin I*"), 618 F.3d 1221, 1236 (11th Cir. 2010). To establish contempt against individual defendants, "the FTC must have met its burden of providing clear and convincing evidence that [each one] had the management control or power to prevent the contempt in the first place." *FTC v. Kuykendall*, 371 F.3d 745, 761 (10th Cir. 2004). This requires clear and convincing evidence that each "knowingly and actively refused to comply with the injunction; that [each] personally participated in the infringing activities, or that [each] knowingly directed, authorized, approved or ratified the" conduct infringing the injunction's provisions "or was otherwise a moving force in [the] decision to commit the infringing acts." *ADT LLC v. Sec. Networks, LLC*, No. 12-81120-CIV, 2017 WL 2113410, at *3 (S.D. Fla. Mar. 16, 2017) (Hurley, J.). The court must "construe any ambiguities in favor of the party charged with contempt." *Id.*; *see also Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019).

"The civil contempt power of the United States courts is limited to 'the least possible power adequate to the end proposed.'" *Mercer v. Mitchell*, 908 F.2d 763, 765 (11th Cir. 1990) (quoting *Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 231 (1821)). "Every civil contempt proceeding is brought to enforce a court order that requires the defendant to act in some defined manner." *Id.* at 768.

### (a) Actual Notice

Rothman did not have "actual notice" of the Acquinity Order or its terms. Following his settlement with the FTC in this case, Burton Katz informed Rothman—a then-prospective investor in the predecessor companies and OPG—that he had settled a dispute with the FTC. Katz did not inform Rothman that the Court had entered a Stipulated Final Judgment or other order that enjoined him, or those acting in concert with him, from engaging in any conduct. Katz did not provide Rothman a copy of the *Acquinity* Order, reference the *Acquinity* Order to Rothman, or otherwise make Rothman aware that the Court had entered an order of any kind in connection with Katz's dispute with the FTC relating to Acquinity Interactive. Rothman did not learn of the existence of the *Acquinity* Order from any other party or source. Rothman did not have notice of the Acquinity Order's existence until the FTC brought suit against him and other defendants in December of 2019.

Rothman did not have actual notice of the *Acquinity* Order, or the existence of any injunction contained therein, and therefore he cannot be held in contempt of the *Acquinity* Order.

### 2. Compensatory Sanctions

Sanctions in a civil contempt case may serve to either "(1) coerce the contemnor to comply with a court order, or (2) compensate a party for losses suffered[.]" *McGregor*, 206 F.3d at 1385 n.5; *FTC v. Leshin* ("*Leshin II*"), 719 F.3d 1227, 1231 (11th Cir. 2013). Compensatory sanctions are "only limited by the requirement that they be compensatory." *Leshin II*, 719 F.3d at 1231 (quoting *Howard Johnson Co.*, 892 F.2d at 1521). The Court must ensure that any remedy is civil, not criminal. *In re E.I. DuPont De Nemours & Co.-Benlate Litig.*, 99 F.3d 363, 368 (11th Cir. 1996). And "only '[t]he least possible power adequate to the end proposed' should be used in contempt cases." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) (quoting *United States v. Wilson*, 421 U.S. 309, 319 (1975) (emphasis added).

Consumer loss is a "common measure for civil sanctions in contempt proceedings[.]" *FTC v. Trudeau*, 579 F.3d 754, 771–72 (7th Cir. 2009). Courts will often look to gross receipts as a baseline for determining consumer loss. See *McGregor*, 206 F.3d at 1388–89; *see also FTC v. Figgie Intern., Inc.*, 994 F.2d 595, 606 (9th Cir. 1993) ("The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each [product] that is not useful to them."); *FTC v. Kuykendall*, 371 F.3d 745, 766 (10th Cir. 2004) (holding that "using the defendant's gross receipts is a proper baseline in calculating the amount of sanctions necessary to

compensate injured consumers").

But as the Tenth Circuit held in *Kuykendall*, a baseline is just a starting point for determining consumer loss. *See Kuykendall*, 371 F.3d at 766. Indeed, once an appropriate baseline is proved by the complainant, the liable Contempt Defendants must have the opportunity to present evidence regarding what, if any, amounts should "offset" the sanctions. *See id*. Those offsets could be shown by, among other things: (a) demonstrating that certain costs or expenses must be deducted; or (b) demonstrating that some consumers were "wholly satisfied with their purchases." *Kuykendall*, 371 F.3d at 766.

Where a defendants' misrepresentation preceded and indeed prompted the transaction at issue, only offsets showing that consumers were either never misled or have already been made whole are appropriate because "the 'seller's misrepresentations tainted the customer's purchasing decisions[.]'" *FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 245 (2d Cir. 2014) (quoting *McGregor*, 206 F.3d at 1388). To obtain offsets, defendants thus must show that some portion of their gross receipts do not represent consumer harm, either because specific consumers' purchasing decisions were not tainted by the misrepresentation or because specific consumers have already been compensated.

The Defendants' websites caused two types of consumer loss: the guide-sales sites tricked consumers into giving up their money, and the freemium sites tricked consumers into giving up their personal information. The guide-sales websites took money directly from consumers. Those sites received $99,829,391.97 in consumer payments from 2017 through 2019, which is the proper compensatory baseline of "gross receipts." *See McGregor*, 206 F.3d at 1388-89.

The amounts returned to consumers who paid money to the Defendants' guide-sale sites from 2017 through 2019, in the form of refunds was $12,877,182.15, and the amount returned in the form of chargebacks was $1,481,729.22. Deducting these amounts from defendants' gross receipts from those sites during the same time period results in $85,470,480.60. *See id*.; *see Kuykendall*, 371 F.3d at 766-67 (holding that an offset of refunds is appropriate).

The Defendants' freemium websites took consumers' data, not their money, under false pretenses. The Defendants made money from that data by using it in ways consumers had not knowingly authorized, including by selling it to third parties. The consumers victimized by the freemium site lost the ability to exclusively control and use their personal information, which the Defendants obtained by misrepresenting how that information would be used. The Defendants' actions in selling access to and use of that information thus

established on the open market the value of consumers' loss. In the year prior to commencement of this action, the Defendants took in $17,297,754.87 from the monetization of consumer data obtained on their freemium websites. $17,297,754.87 is therefore the proper baseline to measure consumer loss caused by the freemium websites. Once Defendants sold and monetized consumers' data without their consent, there was no way to "return" control of the already-sold and already-exploited data to consumers, meaning no offsets for "returns" or "refunds" are possible for Defendants' freemium sites.

Defendants have presented anecdotal evidence that some consumers were "wholly satisfied" with their transactions on both the guide-sales and freemium websites. *See Kuykendall*, 371 F.3d at 766–67. But, evidence that some consumers who submitted information on the freemium websites later returned to those and other freemium sites does not necessarily demonstrate consumer satisfaction, let alone complete satisfaction of any particular consumer. Instead, the Defendants routinely sent consumers who provided information on a freemium site a barrage of text messages and emails linking back to that same site and Defendants' other sites. These messages perpetuated the very deception that tricked consumers in the first place—that the linked site offered assistance with applications for public benefits, including eligibility decisions. Any consumer who clicked on any such message—whether because the defendants had again deceived that consumer, due to simple confusion about who was behind the messages, or for any other reason—is included in the Defendants' "return visitor" figures. Such statistics therefore do not demonstrate that any particular consumer was "wholly satisfied" with his or her transaction on a freemium website and cannot form the basis of any offset.

Further, where the FTC has shown that defendants made widespread contumacious material misrepresentations and consumers purchased defendants' products, the FTC is entitled to a presumption that each purchasing consumer relied on those misrepresentations. *See McGregor*, 206 F.3d at 1388; *Kuykendall*, 371 F.3d at 765–66; *BlueHippo*, 762 F.3d at 244–45. The burden then shifts to the Defendants to disprove this presumption of reliance on a consumer-by-consumer basis. See id. Specifically, the Defendants are only permitted to demonstrate "that individual transactions were atypical and resulted in a lower-than-expected gain to the wrongdoer." *See FTC v. Bronson Partners, LLC*, 654 F.3d 359, 369 (2d Cir. 2011) (emphasis original). In other words, for each consumer for which an offset is claimed, the Defendants must show that the consumer's injury was less than the full amount that he or she paid or the full value of the information he or she provided. *See id.* (rejecting application of 25.25 percent offset to account for 25.25 percent

chargeback rate because the chargebacks pertained to all products sold by company, not just the two products at issue).

The FTC has shown that the Defendants' misrepresentations were widespread, as they occurred on publicly accessible websites and targeted consumers across the United States. The FTC has further shown that the misrepresentations—which led consumers to believe they would receive government services, when in fact they received only a PDF "guide"—were material. (*See* ECF No. 528 at 13); *FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999) ("Express claims or deliberately-made implied claims used to induce the purchase of a particular product or service are presumed to be material."). Finally, the FTC has shown that consumers actually paid money on the Defendants' guide-sales sites and provided their personal information on the Defendants' freemium websites. The FTC is therefore entitled to a presumption that each consumer who paid money or provided personal information on defendants' sites did so in reliance on defendants' misrepresentations.

The Defendants have offered some credible, anecdotal evidence to rebut this presumption—*i.e.*, that any particular consumer did not act in reliance on the Defendants' misrepresentations. But, at this time, the Court is unable to accurately quantify the true number of satisfied consumers.

The FTC argues that the Defendants' total gross receipts minus amounts already refunded is thus the correct amount of compensatory remedies**.** But, the Court believes that imposing such a sanction does not recognize the not insignificant number of satisfied customers and would result in an inequitable result.

The Court agrees with the FTC that the Defendants may not offset the costs of operating their websites from the compensatory relief baseline for two reasons. First, the operational costs that the Defendants incurred are irrelevant to the value of consumers' loss, meaning the figure resulting from such an offset would not provide "a fair equivalent" for the loss the Defendants caused. *See McGregor*, 206 F.3d at 1388. Second, the Defendants are not entitled to "deduct costs associated with committing their illegal acts" from the restitutionary baseline. *Cf. FTC v. Wash. Data Res., Inc.*, 704 F.3d 1323, 1327 (11th Cir. 2013) (rejecting defendants' argument to deduct business expenses in awarding monetary relief under Section 13(b) of the FTC Act) (quoting *Bronson Partners*, 654 F.3d at 375). The Defendants therefore may not deduct their operational costs from the baselines established above.

The Defendants claim that the evidence in the trial established that "the vast majority of the customers who purchased guides did not complain, request a refund, or initiate a chargeback in connection with any of their guide

purchases. As such, it is reasonable to conclude that a vast majority of customers were 'wholly satisfied with their purchases.' Accordingly, the gross receipts from those customers should not be included in any contempt sanction and thus should be deducted from the baseline sanction of all gross receipts for the Defendants' paid-guide business." The Court does not agree. Failing to complain is not the equivalent to satisfaction. Moreover, the Defendants' claims of good faith are belied by the many red flags they ignored and indeed sought to evade or conceal, from high chargeback rates, to repeated suspensions of their advertising accounts, to the writing of false "reviews" to drown out online consumer complaints about their websites. (*See* ECF No. 528 at 26.)

As an alternative to the FTC's demanded remedy, the Corporate Defendants propose that this Court adopt its recommendation that the appropriate contempt sanction based on the amount of consumer losses from the Defendants' paid-guide business and freemium sites should be determined by a claims process. That process, which would be subject to this Court's ultimate approval, and administered by the Receiver, would allow actual consumer harm to be determined and a distribution plan to be established through which consumers could be wholly compensated. *See, e.g., FTC v. Figgie Int'l*, 994 F.2d 595 (9th Cir. 1993) (establishing claims procedure as relief for violation of Section 19(b) and disapproving portion of order that allowed FTC to use unclaimed remainder of claims fund at FTC's discretion).

This claims process and distribution plan would involve the Receiver's establishing a fund consisting of an amount determined necessary to provide full monetary recovery to be made available to customers who made purchases through the Defendants' paid guide websites. For those consumers who used the freemium websites, the FTC's recommended sanction would result in each of the consumers receiving $1.13. Under a claims process, those consumers who were not wholly satisfied with their experience on the websites could receive a significantly greater award similar to those consumers who paid for the guides. Any funds beyond those necessary to pay all consumer claims would be returned to the Defendants.

The Court finds that such a claims process and distribution plan will ensure that the compensatory purposes of a civil contempt sanction are met and align with this Court's exercise of its equitable discretion. Therefore, the Court orders the Receiver, within thirty days after the entry of this Order, to submit to this Court for approval a proposed claims process and distribution plan consistent with the foregoing proposal.

Katz, Levison, and the On Point Contempt Defendants are therefore jointly and severally liable for an amount not to exceed $102,768,235.47 in

compensatory contempt remedies. *See Leshin I*, 618 F.3d at 1236–37 (holding that parties who "join together" to violate an order are jointly and severally liable for contempt remedy); (*Acquinity* ECF No. 225 at 11 n.5.). Any lesser/final amount will be determined after the claims process is concluded.

**Done and ordered**, in chambers, at Miami, Florida, on November 15, 2021.

Robert N. Scola, Jr.
United States District Judge