**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 05, 2022

Clerk - Southern District of Florida
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number:  20-10790-GG
Case Style: Federal Trade Commission v. Burton Katz, et al
District Court Docket No: 1:19-cv-25046-RNS

A copy of this letter, and the judgment form if noted above, but not a copy of the court's
decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision
was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion
was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to:  Lois Tunstall
Phone #:  (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-10790

_____

FEDERAL TRADE COMMISSION,

Plaintiff-Appellee,

*versus*

ON POINT CAPITAL PARTNERS LLC,
a limited liability company,
DRAGON GLOBAL LLC,
a limited liability company,
DRAGONGLOBAL MANAGEMENT LLC,
a limited liability company,
DRAGON GLOBAL HOLDINGS LLC,
a limited liability company,
ROBERT ZANGRILLO,
individually and as an Officer of DG DMV LLC,
Dragon Global LLC, Dragon Global Management
LLC, Dragon Global Holdings LLC, On Point

Capital Partners LLC, and On Point Global LLC,
d.b.a. On Point, et al.,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-25046-RNS

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued
on this date in this appeal is entered as the judgment of this Court.

Entered: November 4, 2021

For the Court: DAVID J. SMITH, Clerk of Court

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-10790

_____

FEDERAL TRADE COMMISSION,

Plaintiff-Appellee,

*versus*

ON POINT CAPITAL PARTNERS LLC,
a limited liability company,
DRAGON GLOBAL LLC,
a limited liability company,
DRAGONGLOBAL MANAGEMENT LLC,
a limited liability company,
DRAGON GLOBAL HOLDINGS LLC,
a limited liability company,
ROBERT ZANGRILLO,
individually and as an Officer of DG DMV LLC,
Dragon Global LLC, Dragon Global Management

2                    Opinion of the Court                    20-10790

LLC, Dragon Global Holdings LLC, On Point
Capital Partners LLC, and On Point Global LLC,
d.b.a. On Point, et al.,

                                        Defendants-Appellants.

————————————————

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-25046-RNS

————————————————

Before JORDAN, JILL PRYOR, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

On December 9, 2019, the Federal Trade Commission
("FTC") brought suit under 15 U.S.C. § 53(b) of the Federal Trade
Commission Act ("FTCA") against Burton Katz, Robert Zangrillo,
Brent Levison, Arlene Mahon, Elisha Rothman, Christopher Sher-
man, and fifty-four corporate entities[1] under their control, alleging

---

[1] The corporate defendants are On Point Global LLC, On Point
Employment LLC, On Point Guides LLC formerly known as ("f/k/a") Rogue
Media Services LLC, DG DMV LLC, On Point Domains LLC, Final Draft Me-
dia LLC, Waltham Technologies LLC, Cambridge Media Series LLC f/k/a
License America Media Series LLC, Issue Based Media LLC, Bella Vista Media
Ltd. also doing business as ("d/b/a") BV Media, Carganet S.A. also d/b/a G8

20-10790            Opinion of the Court                    3

that they had engaged in "unfair or deceptive" business practices in
violation of 15 U.S.C. § 45(a) under the collective name of "On
Point." That same day, the FTC filed a motion for a temporary re-
straining order against the On Point parties to freeze their assets,
place the On Point entities into a receivership, and enjoin all On
Point parties from materially misrepresenting their services or
from releasing consumer information obtained through On Point.
Operating under then binding Eleventh Circuit precedent[2] inter-
preting § 53(b), the District Court granted the motion for a tempo-
rary restraining order in full on December 13. On January 14, 2020,
following a two-day evidentiary hearing, the Court granted a pre-
liminary injunction against On Point, extending the asset freeze,
receivership, and injunction for the duration of the lawsuit. On

_____

Labs, Dragon Global LLC, Dragon Global Management LLC, Dragon Global
Holdings LLC, Direct Market LLC, Bluebird Media LLC, Borat Media LLC,
Bring Back the Magic Media LLC, Chametz Media LLC, Chelsea Media LLC,
Coinstar Media LLC, Domain Development Studios LLC, Domain Dividends
Media LLC, Eagle Media LLC, Falcon Media LLC, GNR Media LLC, Island
Media LLC, Leatherback Media Group LLC, Macau Media LLC, CEG Media

LLC f/k/a Matzoh Media LLC, MBL Media Ltd. Inc., Orange and Blue Media
LLC, Orange Grove Media LLC, Panther Media LLC, Pirate Media LLC, Pivot
Media Group LLC, PJ Groove Media LLC, Sandman Media Group LLC,
Shadow Media LLC, Skylar Media LLC, Slayer Billing LLC, Spartacus Media
LLC, Very Busy Media LLC, Wasabi Media LLC, Yamazaki Media LLC,
Bronco Family Holdings LP a/k/a Bronco Holdings Family LP, BAL Family
LP, Cardozo Holdings LLC, 714 Media Ltd., Mac Media Ltd., On Point Capital
Partners LLC, License America Management LLC, License America Holdings
LLC, and Blackbird Media LLC.

    [2] *See FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984).

4                    Opinion of the Court                    20-10790

Point now challenges this preliminary injunction on appeal under 28 U.S.C. § 1292(a).

We affirm the parts of the preliminary injunction enjoining the appellants from misrepresenting their services and releasing consumer information[3] for the reasons set forth below. However, while this appeal was pending, the Supreme Court held in *AMG Capital Management* that 15 U.S.C. § 53(b) does not permit an award of "equitable monetary relief such as restitution or disgorgement," leaving the asset freeze and receivership aspects of the preliminary injunction unsupported by law. *AMG Cap. Mgmt., LLC v. FTC*, 141 S. Ct. 1341, 1344 (2021). As a result of this ruling, all On Point appellants except for Dragon Global LLC ("DG"), Dragon Global Holdings LLC ("DGH"), Dragon Global Management LLC ("DGM"), On Point Capital Partners LLC ("OPCP") (collectively "Dragon Global"), and Zangrillo voluntarily dismissed their appeal and instead sought relief from the District Court. Accordingly, we vacate the parts of the preliminary injunction subjecting the remaining appellants to the asset freeze and receivership[4] to the extent the District Court has not already provided relief.

I.

---

[3] Parts I and II of the preliminary injunction.

[4] Parts III through XIX of the preliminary injunction.

We have broken the factual background of this case into three subparts: Subpart A discusses On Point's allegedly deceptive activities, Subpart B discusses Zangrillo and Dragon Global's relationship with On Point, and Subpart C discusses the procedural history of the case.

### A.

Through its various corporate entities, On Point owns and operates over two hundred websites aimed at providing the public with information about government benefits and services. On Point has four primary lines of business: 1) a "freemium" service that provides free guides about public benefit and services programs in exchange for customer information, 2) a domain ownership business that buys and sells valuable domain names, 3) a "pay for clicks" business that generates revenue by enticing visitors to click on advertisements, and 4) an e-commerce business that sells guides and services for obtaining government benefits and services like driver's license renewal, passport assistance, and Section 8 housing.

The typical On Point website in the e-commerce line focused on providing information about a benefit or license in a particular state. For example, On Point operated a website known as "floridadriverslicenses.org," which featured an image of the state's border and claimed to be "Your source for [state] driver's information." On Point also operated "DMV.com," which claimed in Facebook advertisements that "[y]ou can renew you [sic] driver licenses online here!! Skip the lines doing it from you [sic] home."

Both DMV.com and state-specific websites like floridadriv-erslicenses.org would redirect consumers to a landing site, also owned by On Point, where On Point would attempt to induce vis-itors to buy paid guides or give up personal information with bold headlines like "Renew Drivers License In Your State."

Consumers who continued further on the landing page would then be prompted to enter credit card information and to "SELECT A SERVICE," with options including "Renew Driver's License," "Replace Driver's License," and "Reinstate Suspended Li-cense;" depending on the option chosen, On Point would then ask for further information such as birth date. However, once the con-sumer completed the transaction, they received a guide to obtain-ing the service based entirely on publicly available information; the selected service was not actually provided through the site or the transaction. Consumers would initially be charged a small amount (usually $3.99 or $4.99), but several days later would be charged a larger amount for the same purchase (usually $19.99 or $21.99). On Point followed this general website and payment model for other state benefits and services such as hunting and fishing licenses.

On Point also operated forty-five websites in its "freemium" line aimed at inducing consumers to provide personal information to determine their eligibility for programs such as housing assis-tance, Medicaid, and unemployment benefits. For example, "sec-tion-8-housing.org" invited consumers to "Find Out If You Are El-igible for the Section 8 Program" and solicited consumer names, email addresses, zip codes, phone numbers, birth dates, gender,

employment status, health insurance coverage status, medical di-
agnoses, disability status, and debt level. Only once consumers pro-
vided all this information would they be informed that the site did
not actually determine eligibility. Instead, consumers simply re-
ceived a PDF document containing general advice for estimating
eligibility, regardless of the information provided. This consumer
information would then be sold to third parties; soon thereafter,
consumers would receive spam emails and text messages offering
services such as psychic counseling or claiming that the consumer
had won prizes in sweepstakes or was eligible for government
grants. Between January 2018 and November 2019, On Point raised
over eighty million dollars through its e-commerce line and seven-
teen million through selling consumer information.

On Point did provide some disclaimers. For example, On
Point sites disclosed at the top of each page in small, gray letters
that they were not affiliated with any government agencies or of-
fice and would describe their site in paragraphs under their bold
headlines as providing "guide[s] and resources." On Point also pro-
vided a "notice" in a pop-up window that consumers had to click
"I understand and accept" on to proceed with their purchase. One
such notice informed consumers that:

> Driving a motor vehicle without a valid driver's li-
> cense, car registration or car title may be illegal, as is
> driving with expired credentials. Motor vehicle ser-
> vices and applications must be processed by an official
> DMV location/website. The assistance and services
> on this site simplify the process by providing

personalized guides, documents, and live support for
a fee. This site store [sic] cookies, by clicking 'I
UNDERSTAND AND ACCEPT' you acknowledge
the statements above and that this site is privately
owned and is not affiliated with nor endorsed by an
official agency. To aid in this task, our detailed web-
site has compiled and lists the most important infor-
mation surrounding your motor vehicle services, so
you can ensure the process is handled in a compliant
and timely manner.

However, On Point never provided a disclosure or notice that ex-
plicitly informed customers that the desired government benefit or
service could not be obtained on its websites. Nor were consumers
entering personal information told that information would be sold
to third parties; they were simply provided with a statement that
their use of the site constituted "express written consent for [site]
and our Marketing Partners to contact" the consumer.

As a result of these practices, hundreds of consumers sub-
mitted complaints to the FTC, other law-enforcement organiza-
tions, and the Better Business Bureau, claiming that On Point had
misrepresented their services as providing actual government ben-
efits, not just guides. Furthermore, a consumer survey[5] commis-
sioned by the FTC found that most visitors to an On Point websites

---

[5] The survey was conducted by Dr. Michelle Mazurek of the Univer-
sity of Maryland, a computer-science professor who specializes in empirical
studies of human-computer interaction.

believed On Point could actually provide government benefits or services, not just guides.

On Point also took steps to prevent paying customers from receiving refunds and to hide the number of credit-card charge-backs On Point was receiving from credit-card processors. Despite having a money-back guarantee, customers who requested a refund directly from On Point rarely received one. For example, when an undercover FTC agent purchased an On Point guide and then requested a refund, On Point offered only to refund the later $19.99 charge, not the initial $4.99 charge (characterized as a "processing fee"); On Point never actually refunded either.

In contrast, customers who instead chose to dispute their purchase directly with credit-card processors such as Visa often succeeded. For On Point, this was a serious problem; businesses that exceeded set limits for chargeback rates were subject to account monitoring, suspension, and termination, and On Point consistently exceeded these limits – over the course of three years, On Point triggered Visa's threshold sixty-four times. Indeed, several credit-card processors did terminate On Point accounts. To limit these consequences, On Point created various companies selling identical products on similar websites to reduce the number of credit-card chargebacks originating from any particular site, a practice known as "load balancing." On Point's practice of dividing charges into two installments, an initial "processing fee" and a larger, substantial fee later, also served to disguise the number of chargebacks; when customers disputed one of the charges, On

Point would have a fifty percent chargeback-to-successful sales ra-
tio, not a hundred percent ratio.

*B.*

Robert Zangrillo, the last remaining individual appellant, is
a private equity, venture capital, and real estate investor who con-
ducts business under the Dragon Global name through the four re-
maining corporate appellants. Of these, DGM is Zangrillo's man-
agement entity with four full-time employees that handles the day-
to-day operations of Dragon Global's investments, DGH is the pri-
mary investment vehicle for the Zangrillo family,[6] OPCP is the spe-
cial-purpose vehicle used by DGH to invest in the On Point enter-
prise, and DG is a largely defunct entity with no assets. OPCP
owned an approximately twenty-eight percent interest in On Point
Global, LLC, a holding company. OPCP was one of the two mem-
bers with the largest ownership interests in the holding company,
the other member being controlled by Katz.

Dragon Global's leadership, known collectively as the "Ven-
ture Team," consisted of Zangrillo, Katz, and another investor
named Bob Bellack. The Venture Team also formed the core lead-
ership of On Point: Zangrillo served as a consultant and the Chair-
man of On Point's Board of Managers ("the Board") until March

---

[6] DGH has three members: Zangrillo, who owns a seventy-four per-
cent stake, a trust for the benefit of Zangrillo's daughters that owns a twenty-
five percent stake, and a general partner entity owned by Zangrillo that has a
one percent stake.

2019, when he was indicted in an unrelated college-entrance brib-ery scheme,[7] Katz served as On Point's CEO and as a board mem-ber, and Bellack served as On Point's CFO. While Dragon Global had investments in both major companies such as Facebook, Twit-ter, and Uber, and minority "seed" investments in newly formed companies, at the time On Point was Dragon Global's only "early-stage control" investment. Dragon Global's website described early-stage control investments as "seek[ing] to take controlling, majority ownership stakes" in the company in order to "fully lev-erage the broad experience of [Dragon Global's] Operating Part-ners," the Venture Team.

Zangrillo and Katz also had "Special Approval Rights" over On Point. These rights provided that On Point and its subsidiaries could not perform a variety of actions, including, but not limited to, dispersing company assets outside the normal course of busi-ness; approving a budget; engaging bankers; or hiring or terminat-ing On Point's President, CEO, or CFO without prior written ap-proval from both Zangrillo and Katz. The Special Approval Rights essentially gave both Zangrillo and Katz a veto over major com-pany decisions, above and beyond the control they already exer-cised by sitting on the Board.

Zangrillo and one of Dragon Global's four full-time employ-ees, Megan Black, also performed extensive services for On Point.

---

[7] *See United States v. Sidoo*, 471 F. Supp. 3d 369 (D. Mass. 2020) (sum-marizing the indictment).

12                    Opinion of the Court                    20-10790

Zangrillo entered into a consulting agreement with On Point to last from January 1, 2018, until December 31, 2019. Pursuant to this agreement, Zangrillo assisted On Point with raising capital, collecting fees, coordinating and attending investor meetings, reviewing slides about On Point for investor meetings, and updating investors as to the status of their investments. Black assisted Zangrillo in these endeavors and was put on On Point's payroll from February 2018 to July 2018. Additionally, both Zangrillo and Black were put on On Point's payroll and company health insurance during the month of January 2019. However, Black claims she was never an employee of On Point.

       The FTC contends that Dragon Global and On Point shared office space in Miami and Los Angeles; Dragon Global disputes both claims. For the Miami address, the FTC claims Zangrillo shared a corner office with Katz and Bellack, which Zangrillo and Dragon Global deny. In support, the FTC notes that Zangrillo owns the building through one of his real estate companies, has the building listed as Dragon Global's address on LinkedIn, and that the only other addresses Dragon Global ever listed are a UPS store and a Dragon Global employee's house. In contrast, Dragon Global points to a declaration by Black where she states that "to [her] knowledge, Dragon Global has never ran [sic] business at that address, and has never received mail at that address." Most significantly, both the FTC and Zangrillo point to two separate sets of seating charts admitted as evidence at the preliminary injunction hearing: one, prepared by an FTC investigator when the FTC

20-10790               Opinion of the Court                    13

searched the Miami office in December 2019, lists only Katz and
Bellack as sharing the corner office, while the other, taken during
the December search from an employee's desk, lists Katz, Bellack,
and Zangrillo as occupying the corner office.

        In Los Angeles, Dragon Global subleased part of its office to
On Point, storing On Point records and giving On Point employees
access to the office. However, Zangrillo still used the office and
continued to have Dragon Global's name on the door, although
On Point requested that its name be added. Additionally, On Point
often paid rent to the building owner on behalf of Dragon Global,
and other companies also subleasing parts of the Los Angeles office
from Dragon Global sometimes paid their rent to On Point, noting
the rent was for Dragon Global.

                                  *C.*

        This case began with the FTC filing a complaint under 15
U.S.C. § 53(b) on December 9, 2019, against the individuals and en-
tities involved in the On Point enterprise. On December 13, the
District Court granted a temporary restraining order against the
On Point parties, freezing their assets, placing the corporate de-
fendants into a receivership, and enjoining all defendants from mis-
representing their services or releasing consumer information ob-
tained from On Point's activities. A month later, the Court held a
two-day evidentiary hearing on January 10 and 13, 2020; in total,
the Court spent over fifteen hours examining the evidence. At the
close of the January 13 hearing, the Court made an oral finding that
the corporate entities were in a common enterprise and that the

14                    Opinion of the Court                    20-10790

individual defendants had "sufficient control and knowledge to
make them responsible." On January 14, the Court granted a pre-
liminary injunction with substantially the same terms as the tem-
porary restraining order against On Point and Dragon Global, from
which On Point and Dragon Global filed separate appeals.

    Concurrently with its actions in this case, the FTC also reo-
pened proceedings against Katz in a 2014 case, *FTC v. Acquinity
Interactive* ("*Acquinity*"). In *Acquinity*, the FTC alleged that Katz
used spam text messages to lure consumers into disclosing personal
information and making purchases with offers of free merchandise
such as $1000 gift cards or Apple iPads. The FTC and Katz agreed
to the issuance of a consent decree in *Acquinity* whereby Katz was
permanently enjoined from making materially misleading repre-
sentations about the "cost, performance, efficacy, nature, charac-
teristics, benefits, or safety of any product or service." Additionally,
the consent decree specified that the permanent injunction applied
to any person "in active concert or participation" with Katz who
received "actual notice" of the injunction.

    On February 12, 2020, the FTC moved the District Court in
*Acquinity* for an order to show cause why Katz should not be held
in contempt for violating the *Acquinity* permanent injunction
through his activities with On Point. The FTC also alleged that var-
ious corporate entities in this case, including DG, DGM, and DGH,
had actual notice of the *Acquinity* permanent injunction and had
acted in concert with Katz to violate the injunction. *See* Fed. R.
Civ. P. 65(d)(2). Therefore, the FTC asked the Court to require

those entities to show cause for why they should not be held in contempt as well. On February 14, the Court ordered both Katz and the named entities to show cause for why they should not be held in contempt.

On September 18, 2020, the District Court released DGM from the receivership in this case based on the recommendation of the receiver. On October 15, the Court also released DG from the receivership in this case based on the recommendation of the receiver. This left only two Dragon Global entities, DGH and OPCP, in the *On Point* receivership.

On April 22, 2021, the Supreme Court held in *AMG Capital Management* that 15 U.S.C. § 53(b) does not permit an award of equitable monetary relief such as restitution or disgorgement, setting off a chain reaction of motions in both the *On Point* and *Acquinity* cases. *See AMG Cap. Mgmt.*, 141 S. Ct. at 1347–48. On April 23, the individual On Point defendants, Katz, Zangrillo, Brent Levison, Arlene Mahon, Elisha Rothman, and Christopher Sherman, moved to lift the asset freeze as to themselves. In response, on April 30 the FTC moved in *Acquinity* for an order to show cause why Zangrillo, Levison, and Rothman should not be held in contempt for violating the *Acquinity* injunction against Katz. The FTC also sought in *Acquinity* a preliminary injunction to impose an asset freeze against Zangrillo, Katz, Levison, Rothman, and the various

16                    Opinion of the Court                    20-10790

named corporate entities to preserve funds for money damages in a future contempt hearing.[8]

On July 19, 2021, we granted Katz, Sherman, and the On Point corporate entities' voluntary motion to terminate their appeal of the District Court's January 14, 2020, preliminary injunction in *On Point*. This left only Zangrillo, DG, DGM, DGH, and OPCP as parties to this appeal.

On August 13, 2021, the District Court ruled on both the *Acquinity* and *On Point* motions. In *Acquinity*, the Court granted the requested preliminary injunction and imposed an asset freeze on Katz, Levison, Rothman, and the named corporate entities, including DG, DGM, and DGH. The *Acquinity* asset freeze contains the same terms and covers the same property as the *On Point* asset freeze; indeed, the Court amended the *Acquinity* asset freeze on August 18 to ensure the two asset freezes were identical. However, the Court found that Zangrillo lacked actual notice of the *Acquinity* injunction and so excluded him from the *Acquinity* asset freeze. *See* Fed. R. Civ. P. 65(d)(2). In *On Point*, the Court released all defendants from the asset freeze except those whom the Court listed as subject to the asset freeze in *Acquinity*, holding that the *Acquinity* asset freeze made the issue moot as to them. Notably, the Court

---

[8] Essentially, the FTC used its show cause motion under the 2014 *Acquinity* permanent injunction as the platform for moving the District Court to issue a new preliminary injunction in *Acquinity* against parties who were never defendants in the original *Acquinity* case.

20-10790                Opinion of the Court                17

lists DG, DGM, and DGH as subject to the *Acquinity* asset freeze
in the *Acquinity* preliminary injunction, but only lists DGH as sub-
ject to the *Acquinity* asset freeze in the *On Point* order. This leaves
some doubt as to whether DG and DGM are still subject to the *On
Point* asset freeze, although they are clearly subject to the *Acquin-
ity* asset freeze. The Court did not create a receivership in *Acquin-
ity* nor affect the receivership in *On Point* with these orders.

On September 29, 2021, the District Court acted again in
both *Acquinity* and *On Point*. In *Acquinity*, the Court granted sum-
mary judgment in favor of Dragon Global on the show cause for
contempt motion, finding that Dragon Global both lacked actual
notice of the 2014 *Acquinity* permanent injunction against Katz and
that Dragon Global did not act in "active concert or participation"
with Katz. In *On Point*, the Court also granted summary judgment
in favor of Dragon Global, finding that Dragon Global was not in a
common enterprise with On Point and thus not responsible for On
Point's activities. However, the Court found that there were "gen-
uine disputes of material facts" regarding whether Zangrillo could
be held responsible for On Point's activities and so denied his mo-
tion for summary judgment. Yet despite these orders and to the
best of this Court's knowledge based on our review of the *Acquin-
ity* and *On Point* dockets, the District Court has not yet entered an
order vacating or amending the preliminary injunctions in either
*Acquinity* or *On Point* as a result of its September 29 orders. There-
fore, the preliminary injunctions in both cases appear to remain as
they were following the August 13 orders.

18                    Opinion of the Court                    20-10790

To summarize, this leaves DGH subject to the asset freezes in *Acquinity* and *On Point* and to the *On Point* receivership, DG and DGM subject to the asset freeze in *Acquinity* and possibly also in *On Point* but not to the *On Point* receivership, OPCP subject to the *On Point* receivership but neither of the asset freezes, and Zangrillo subject to neither asset freeze. Furthermore, all five remaining appellants are still enjoined by the *On Point* preliminary injunction from materially misrepresenting On Point's services or releasing customer information obtained from the On Point enterprise to third parties.

## II.

A preliminary injunction is an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376 (2008). We review a district court's grant of a preliminary injunction for abuse of discretion. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019); *see also Carillon Imps., Ltd. v. Frank Pesce Int'l Grp., Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997) ("The review of a district court's decision to grant or deny a preliminary injunction is extremely narrow in scope"). We review the preliminary injunction's underlying legal conclusions *de novo* and its findings of fact for clear error. *Democratic Exec. Comm.*, 915 F.3d at 1317.

As mootness is a jurisdictional issue, we may review questions of mootness *sua sponte*. *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1331–32 (11th Cir. 2005). "We review the question

of mootness *de novo.*" *Id.* at 1331 (quoting *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328 (11th Cir. 2004)).

### III.

Prior to *AMG Capital Management*, Eleventh Circuit precedent interpreted 15 U.S.C. § 53(b) as not limiting the traditional equitable powers of the district courts, including the power to grant monetary relief. *See FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984). Therefore, district courts could implement preventative measures, such as asset freezes, in preliminary injunctions to preserve resources "needed to make permanent relief possible," i.e., to satisfy a future monetary judgment. *Id.* However, in *AMG Capital Management* the Supreme Court held that § 53(b) does not allow district courts to grant "equitable monetary relief such as restitution or disgorgement," thereby abrogating *U.S. Oil & Gas. See AMG Cap. Mgmt.*, 141 S. Ct. at 1344. As monetary relief is no longer available under § 53(b), there is no need to preserve resources for a future judgment. Consequently, the imposition of an asset freeze or receivership premised solely on § 53(b) is inappropriate and we vacate the portions of the District Court's preliminary injunction imposing these restrictions on Dragon Global to the extent the Court has not already provided relief.

We note that this decision directly applies only to Zangrillo and Dragon Global, as all other appellants have chosen to voluntarily dismiss their appeal. Furthermore, nothing in this opinion should be construed as commenting on or having a legal effect on the separate asset freeze in *Acquinity*, as that case is not properly

before us on appeal. Since we reach this result based on the holding in *AMG Capital Management*, we need not address any of Dragon Global's other arguments for relief from the asset freeze and receivership.

We recognize that the separate asset freeze imposed on DG, DGM, and DGH in the related *Acquinity* matter may limit the short-term practical effect of this decision. However, despite the District Court and FTC's assertions to the contrary, the imposition of a separate asset freeze on the same parties in a related case, even an asset freeze with identical terms covering the same property, does not moot the question of whether the asset freeze and receivership is lawful in this case. An issue only becomes moot when "the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172, 133 S. Ct. 1017, 1023 (2013) (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S. Ct. 721, 726 (2013)). Any "concrete interest, however small, in the outcome of the litigation" is sufficient to prevent a case from becoming moot. *Id.* (quoting *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 307–08, 132 S. Ct. 2277, 2287 (2012)). Lifting the unlawful asset freeze and receivership in this case is a necessary condition for Dragon Global to regain the use and control of its property, even if it is not sufficient in and of itself. Furthermore, until the asset freeze and receiverships are terminated by court order, they continue to remain in force. Therefore, Dragon Global continues to have a legally cognizable interest in lifting the *On Point* asset freeze and receivership and this aspect of the appeal is not moot.

With the asset freeze and receivership dealt with by *AMG Capital Management*, the only remaining question is whether the District Court abused its discretion by enjoining Zangrillo and Dragon Global from misrepresenting their services or releasing customer information. Prospective injunctive relief is still allowed under § 53(b). *See AMG Cap. Mgmt.*, 141 S. Ct. at 1347–48. Zangrillo and Dragon Global challenge (1) the Court's finding that the FTC will likely succeed on the merits and that the balance of equities favors a preliminary injunction, (2) the sufficiency of the findings of fact issued by the Court, (3) the Court's finding that Dragon Global participated in a common enterprise with On Point,[9] and (4) the Court's finding that Zangrillo was individually

---

[9] We recognize that the District Court granted summary judgment in favor of Dragon Global on September 29, 2021, on the question of whether Dragon Global was in a common enterprise with On Point. However, in this appeal from the preliminary injunction order, we are reviewing only whether the FTC made a "proper showing" at the time of the order to support the District Court's grant of the preliminary injunction. *See* 15 U.S.C. § 53(b). As more evidence is introduced and arguments are held over the course of the litigation, the District Court may, of course, change its mind and come to a different conclusion than the one it reached at the preliminary injunction hearing. Nevertheless, until the preliminary injunction is vacated by court order, this appeal remains live. In this opinion, we answer only the question of whether the District Court could have found that Dragon Global was in a common enterprise with On Point based on the evidence introduced at the preliminary injunction hearing held in January 2020. Nothing in this opinion should be construed as preventing the District Court from terminating or modifying that preliminary injunction at a later date.

22                    Opinion of the Court                    20-10790

responsible for the actions taken by On Point. We address each argument in turn.

*A.*

Under the FTCA, a district court may grant a preliminary injunction in an enforcement action by the FTC "[u]pon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest." 15 U.S.C. § 53(b). To succeed on the merits under 15 U.S.C. § 45(a), the FTC must show that "(1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material." *FTC v. Tashman*, 318 F.3d 1273, 1277 (11th Cir. 2003).

The District Court had ample evidence to conclude that the FTC has shown all three elements. The Court found that On Point had "misrepresented on [its] websites that [it] would provide government services (*e.g.*, a driver's license, car registration, or eligibility determination for public benefits) to consumers who paid money and/or provided personal information." This finding was based on the Court's determination that:

> The websites were cleverly designed so that even though disclosures appeared on many or most of the pages, consumer attention would be drawn to links and language in larger, more colorful font that directed them to the service they were seeking (such as renewing a driver's license) and most consumers

would likely ignore the disclosures written in rela-
tively smaller and pale-colored font. And, if a con-
sumer did read the disclosures, they would learn they
could purchase a guide and would also learn that the
site is a privately-owned company selling guides that
can be obtained for free elsewhere on governmental
sites. But, most importantly, they were not clearly in-
formed that they could not obtain the government
service they were misled to believe was available to
them.

Having reviewed the record, we cannot say that this determination
is clear error. On Point's websites could easily be perceived by un-
wary visitors as promising government services or benefits, with
options such as "Renew Driver's License," "Replace Driver's Li-
cense," and "Reinstate Suspended License" on an official-sounding
website like "DMV.com" lending itself to that impression. Indeed,
On Point's advertisements occasionally outright promised con-
sumers they could obtain services at home, telling consumers to
"skip the lines doing it from you [sic] home." The eligibility web-
sites face similar problems, telling consumers to "find out" if
they're eligible for government benefits and then soliciting a great
deal of personal information necessary for determining eligibility,
only to offer generic advice once the information is provided. Nor
were the disclosures sufficient to disabuse consumers of this im-
pression, being either too small or too vague to dispel the misrep-
resentations otherwise created by the websites.

The District Court also had sufficient evidence to find that the websites were not just likely to mislead consumers, but actively doing so, with hundreds of consumer complaints, a history of regular chargebacks, and a consumer survey to rely on. Furthermore, On Point's misrepresentations were clearly material, either inducing consumers to purchase guides in the belief they were obtaining benefits or to surrender sensitive personal information to obtain an eligibility determination. As such, the Court could properly find that the FTC was likely to ultimately succeed on the merits.

Having determined that On Point's activities were materially misleading the public, the District Court was within its discretion to conclude that a preliminary injunction was necessary. To begin with, "judgments . . . about the viability of a plaintiff's claims and the balancing of equities and the public interest . . . are the district court's to make." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005) (quoting *Cumulus Media v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002)). We will not lightly disturb this balancing of the equities, particularly when supported by factual findings drawn from two full days of evidentiary hearings. Zangrillo and Dragon Global's main objection, that the hardships imposed by the asset freeze and receivership outweighed the potential public benefit of a preliminary injunction, is moot now that we have lifted the asset freeze and receivership. Therefore, the Court did not abuse its discretion by imposing a preliminary injunction as the FTC will likely succeed on the merits and the public

interest weighs in favor of halting the materially misleading prac-
tices.

*B.*

Rule 52(a) of the Federal Rules of Civil Procedure requires
that district courts make "findings of fact and conclusions of law"
when issuing an injunction. *Snook v. Tr. Co. of Ga. Bank of Savan-*
*nah*, 859 F.2d 865, 872 (11th Cir. 1988). Findings of fact must be
sufficient to allow the reviewing court "an opportunity to engage
in meaningful appellate review." *Danley v. Allen*, 480 F.3d 1090,
1091 (11th Cir. 2007). Oral findings are allowed so long as they are
made "on the record after the close of evidence." *See* Fed. R. Civ.
P. 52(a).

The District Court did not include its findings on common
enterprise and individual responsibility in its written order. Instead,
the Court issued oral findings at the close of the evidentiary hear-
ing, stating:

> After considering the written submissions of the par-
> ties, the testimony, and all the evidence that was pre-
> sented, I find that the FTC has met its burden as to
> both the entities and the individual defendants. I find
> that there has been a showing that there was a com-
> mon enterprise based upon shared control[], shared
> offices, shared payroll, commingled funds, [and] that
> the individuals, the government has shown that each
> of them had sufficient control and knowledge to
> make them responsible.

Zangrillo and Dragon Global contend that this statement was not a sufficiently detailed factual finding under Rule 52(a) and that therefore the Court abused its discretion by including Zangrillo and Dragon Global in the preliminary injunction.

We disagree. District court findings need not be extensive. A "judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts." *Stock Equip. Co. v. Tenn. Valley Auth.*, 906 F.2d 583, 592 (11th Cir. 1990) (quoting Fed. R. Civ. P. 52, Advisory Committee Note (1946)). So long as there is "sufficient record evidence to support the findings, [district courts] need not 'state the evidence or any of the reasoning upon the evidence.'" *Id.* (quoting *Petterson Lighterage & Towing Corp. v. N.Y. Cent. R.R.*, 126 F.2d 992, 996 (2d Cir. 1942)). The District Court identified the precise factors which led to its determination that the corporate defendants were in a common enterprise with each other and that the individual defendants were individually responsible under the FTCA. Furthermore, the Court did not merely list all the potential factors, but excluded those for which it found insufficient evidence, such as coordinating advertising or direct participation. *See infra* Parts III.C and III.D. The Court also based its findings upon "the written submissions of the parties, the testimony, and all the evidence that was presented," which, in the context of the statement, refers to the evidence presented during the two days of evidentiary hearings. Together, these statements enable meaningful appellate review under Rule 52(a); we know what

factors led the Court to making its determination and what evidence it considered when doing so. Accordingly, we proceed with our review of the Court's findings.

## C.

We have previously recognized that corporate entities can be responsible under the FTCA for each other's actions through the common enterprise doctrine. *FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017). However, we have never officially endorsed a test for determining whether a common enterprise exists under the FTCA. Both the FTC and Dragon Global rely on the test we used in an unpublished case, *FTC v. Lanier Law, LLC*, 715 F. App'x 970, 979–80 (11th Cir. 2017). *Lanier Law* found that a corporate entity can be responsible for the actions of other corporations in a business venture when "the structure, organization, and pattern of a business venture reveal a common enterprise or a maze of integrated business entities." *Id.* (quoting *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1271 (M.D. Fla. 2012)). *Lanier Law* then lists several factors for determining whether a common enterprise exists, such as whether the businesses operated under common control, shared office space and employees, commingled funds, and coordinated advertising. *Lanier Law*, 715 F. App'x at 980. This test has been officially adopted by the Sixth Circuit and is already employed by district courts within our circuit. *See FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 636–37 (6th Cir. 2014); *see e.g., FTC v. Simple Health Plans LLC*, 379 F. Supp. 3d 1346, 1363 (S.D. Fla. 2019), *aff'd* 801 F. App'x. 685 (11th Cir. 2020); *FTC*

*v. Roca Labs, Inc.*, 345 F. Supp. 3d 1375, 1399 (M.D. Fla. 2018); *FTC v. NPB Advert., Inc.*, 218 F. Supp. 3d 1352, 1362 (M.D. Fla. 2016); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1182 (N.D. Ga. 2008), *aff'd* 356 F. App'x 358 (11th Cir. 2009). We now adopt this test as well.

Of course, when the FTC brings an enforcement action under § 53(b), it is not authorized to recover equitable monetary relief. *AMG Cap. Mgmt.*, 141 S. Ct. at 1344. The FTC may recover civil monetary relief under a common enterprise theory only if the FTC first pursues administrative proceedings, obtains a cease-and-desist order, and then brings the civil action. *See id.* at 1346 (citing 15 U.S.C. §§ 45(l), 57(b)). However, a common enterprise theory may still be used to disregard corporateness when granting injunctive relief. *See E.M.A. Nationwide Inc.*, 767 F.3d at 619, 636–37 (affirming both restitution and a permanent injunction against multiple corporate defendants based on a common enterprise theory). Therefore, we will continue with our analysis about whether Dragon Global was in a common enterprise with On Point for the purpose of injunctive relief under § 53(b).

The District Court did not commit clear error by finding that Dragon Global was part of a common enterprise with On Point based on common control, shared office space and employees, and commingled funds. Under common control, Dragon Global and On Point's leadership heavily overlapped. Dragon Global's three "Venture Team" partners, Katz, Zangrillo, and Bellack, each occupied important positions within On Point,

respectively CEO, Chairman of the Board, and CFO. Additionally, Katz and Zangrillo together controlled a majority stake in On Point, sat on the Board, and exercised "Special Approval Rights" over On Point. While other investors certainly participated in On Point, Dragon Global's Venture Team was clearly in control. Indeed, this behavior aligns with Dragon Global's "early-stage control" investment model, whereby Dragon Global would take "controlling, majority ownership stakes" to "fully leverage the broad experience" of the Venture Team. Dragon Global claims that this behavior is simply common practice for investors. Perhaps this is true – but it does not make Dragon Global's control over On Point any less real.

Dragon Global contends that it did not share office space with On Point in either Miami or Los Angeles, and there is certainly a factual dispute on the matter. In Miami, the FTC points towards the office being listed as both On Point's and Dragon Global's address on LinkedIn and a seating chart showing that Zangrillo, Katz, and Bellack shared a corner office, while Dragon Global responds with an affidavit from a Dragon Global employee stating the company never operated out of Miami and its own seating chart showing only Katz and Bellack shared the corner office. Likewise, in Los Angeles, On Point and Dragon Global did share an office and paid and accepted rent interchangeably, but Dragon Global emphasizes that this was all pursuant to an "arms-length" sublease agreement. Luckily, we do no need to decide whether On Point and Dragon Global actually shared office space. That is the job of the finder of

30                    Opinion of the Court                    20-10790

fact. We need only decide whether there was sufficient evidence in the record to support the District Court's finding that On Point and Dragon Global did share office space. Determining which seating chart to believe, assessing the credibility of an affidavit by a Dragon Global employee, and exploring the precise relationship between On Point and Dragon Global in the Los Angeles office is the province of the trial court, and we find that there is sufficient evidence to support the Court's determination that On Point and Dragon Global did share office space.

Dragon Global claims that it did not share employees with On Point because Black and Zangrillo were not "official" employees of On Point, despite working with On Point for several months and being placed on On Point's payroll and health insurance. If this was the test for shared employees in the common enterprise context, companies could avoid this factor merely through labeling. Furthermore, if Black and Zangrillo were not employees, then that is simply evidence of commingling funds instead. In either case, the two other Venture Team members, Katz and Bellack, were certainly employees of On Point as the CEO and CFO respectively. Likewise, On Point and Dragon Global did commingle funds by interchangeably paying and accepting rent for the Los Angeles office. Therefore, we affirm the District Court's determination that On Point and Dragon Global were in a common enterprise based on common control, shared office space and employees, and commingled funds.

*D.*

For an individual to be responsible under the FTCA for the wrongdoings of a corporation, the FTC must show that the individual had "some knowledge of the practices" and that the individual either "participated directly in the practice or acts or had the authority to control them." *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (internal quotation marks omitted). As with corporate responsibility under a common enterprise theory, individual responsibility under 15 U.S.C. § 53(b) no longer includes equitable monetary relief; however, individuals may still be enjoined under § 53(b) for the actions of corporations should the FTC establish knowledge and either participation or the authority to control. *See FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014) (affirming the application of a preliminary injunction including both injunctive and monetary relief to individual defendants).

The District Court found that Zangrillo had "sufficient control and knowledge to make [Zangrillo] responsible" for the actions of On Point. As Chairman of the Board and a "consultant" who regularly gave presentations to potential investors, Zangrillo was certainly aware of On Point's lines of business and the revenue each line generated. Zangrillo claims that he was only involved in high-level decision making and had no knowledge of or control over the contents of On Point's websites. In fact, the slides Zangrillo prepared for his presentations listed each of On Point's services and how they fit into On Point's business model. These slides described DMV.com as On Point's "FLAGSHIP" website and named various

32                    Opinion of the Court                    20-10790

state drivers' licenses websites that On Point operated. The slides also included screenshots from some of On Point's websites.

Zangrillo also likely knew that On Point made over eighty million dollars in two years selling "guides" on government services, and it almost beggars belief that he would be completely unaware of how On Point's websites were raising that quantity of money. Even assuming Zangrillo never once visited an On Point website, his presentation slides show that Zangrillo knew On Point was capturing a great deal of personal information (which On Point sold for over seventeen million dollars) despite supposedly offering only guides drawn from publicly available information. Zangrillo would also need to have been completely unaware of the persistent problems On Point faced with credit-card processors and charge-backs, problems which resulted in the termination of several On Point accounts and the creation of various On Point companies to minimize the problem through load-balancing. Taken together, this information is sufficient for the District Court to find that Zangrillo likely had "some knowledge" of On Point's deceptive activities.

Zangrillo also had the authority to control On Point's activities. He was the Chairman of the Board, a major investor, one of On Point's primary fundraisers, and had special approval rights over many of On Point's activities. Zangrillo's contention that he was neither an officer of the company nor managed its day-to-day affairs is irrelevant; the true question is whether he had the "authority to control" On Point's activities or, in other words, whether

Zangrillo could have ended the deceptive practices. *Gem Merch. Corp.*, 87 F.3d at 470. Besides only Katz, Zangrillo had the most authority of anyone in On Point, and should he have chosen to exercise that authority, he likely "could have nipped the offending [activities] in the bud." *FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 13 (1st Cir. 2010). Therefore, we affirm the District Court's finding that Zangrillo was individually responsible for the actions of On Point.

## IV.

For the reasons set forth above, we **AFFIRM** the parts of the preliminary injunction enjoining Zangrillo and Dragon Global from engaging in deceptive practices or releasing consumer information, **VACATE** the asset freeze and receivership as to Dragon Global to the extent the District Court has not already provided relief, and **REMAND** this case for further proceedings consistent with this opinion.[10]

**AFFIRMED IN PART, VACATED IN PART.**

---

[10] We deny as MOOT the pending Motion for Leave to Adopt Portions of Reply Brief.

[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-10790

ERRATA SHEET

_____

FEDERAL TRADE COMMISSION,

Plaintiff-Appellee,

*versus*

ON POINT CAPITAL PARTNERS LLC,
a limited liability company,
DRAGON GLOBAL LLC,
a limited liability company,
DRAGONGLOBAL MANAGEMENT LLC,
a limited liability company,
DRAGON GLOBAL HOLDINGS LLC,
a limited liability company,
ROBERT ZANGRILLO,
individually and as an Officer of DG DMV LLC,

2                    Opinion of the Court                    20-10790

Dragon Global LLC, Dragon Global Management
LLC, Dragon Global Holdings LLC, On Point
Capital Partners LLC, and On Point Global LLC,
d.b.a. On Point, et al.,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:19-cv-25046-RNS

_____

The opinion has been changed as follows:

On page 19, a closing parenthesis (")") was added after "(11th
Cir. 2004)" to "*Id.* at 1331 (quoting *Coral Springs St. Sys., Inc. v.
City of Sunrise*, 371 F.3d 1320, 1328 (11th Cir. 2004))."