UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 19-Civ-25046-SCOLA

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.

ON POINT GLOBAL, LLC, *et al.*,

    Defendants.

Case No. 14-CV-60166-SCOLA

FEDERAL TRADE COMMISSION,

    Plaintiff,

v.

ACQUINITY INTERACTIVE, LLC, *et al.*,

    Defendants.

**FTC'S EXPEDITED[1] MOTION TO RECONSIDER ORDERS REQUIRING CLAIMS PROCESS**

    The Defendants operated websites that falsely claimed to offer DMV-related services and eligibility determinations for government benefits. Order on Cross Mots. for Sum. J. (ECF No.

---

[1] The FTC seeks expedited review by July 17, 2022, because the claims process discussed herein is subject to a Court-ordered deadline to complete the claims process by that date. *See* ECF Nos. 605-3 (proposing 90 days after notice deadline for claims bar date), 615 (extending notice deadline to April 18 and extending all other dates accordingly).

1

528). After trial, the Court ordered that victims be compensated through an opt-in claims process, in which victims were to receive emails notifying them of their eligibility for relief and providing a means to file a claim. Order Granting Receiver's Mot. to Approve (A) Noticing and Claims Administration Process and (B) Plan of Distribution ("Claims Process Order") (ECF No. 607). The Court implemented this plan, rather than sending checks to the victims, in an effort to distinguish between victims who were satisfied with what they received and those who were dissatisfied. Verdict and Order (ECF No. 579) at 44-45.

Those emails have now been sent. Data from the claims agent who sent the emails, reports from the two largest email providers, and reports from victims who were slated to receive the emails have now identified two major problems. First, very few of the emails have reached victims' inboxes at all: about a third of the initial notice emails were not delivered, and the "vast majority" of the "delivered" remainder were diverted into spam folders, never reaching victims' inboxes. Waldrop Decl. (Exh. A) Att. 1 p. 1 (delivery rate of 64.98% from initial notice campaign), Att. 2 (averaging two notices in initial campaign, 30% of records categorized as "soft bounce," "hard bounce," or "null" delivery status), Att. 4 (Gmail spam delivery information), Att. 5 (Yahoo spam delivery information). Second, the text of the notice emails proved confusing to the few victims who received them, prompting an unusually high number to flag the emails as spam or as illegitimate. Christ Decl. (Exh. D) ¶14.

These problems have prevented the claims process from accomplishing the Court's goal. The Court instituted the opt-in claims procedure to identify dissatisfied victims. Verdict and Order (ECF No. 579) at 44. To do so, the Court required the Receiver to email all eligible victims and ask them to file a claim if they were dissatisfied.[2] Claims Process Order (ECF No. 607). Victims who did not respond would be presumed satisfied and would receive no redress. Instead, the vast majority of the victims have not received the notices asking them to state their dissatisfaction, and thus have no opportunity to claim their redress. Moreover, the small percentage who did receive notices could not understand them or connect them to the transaction at issue, and thus cannot state whether they were satisfied with an unidentified transaction. The notice campaign thus has not succeeded and cannot succeed in quantifying victims'

---

[2] The FTC objected to this procedure, because it was not consistent with controlling law and likely to severely undercount Defendants' victims. ECF No. 565.

dissatisfaction or identifying satisfied or dissatisfied victims, necessitating changes to ensure the Court's goals are met and Eleventh Circuit law is obeyed.

## Legal Standard

"Interlocutory orders may be reconsidered by the court at any time prior to the entry of a final judgment." *Villeda Aldana v. Fresh Del Monte Produce, Inc.*, No. 01-3399-CIV, 2007 WL 3054986, at *2 (S.D. Fla. Oct. 16, 2007) (citing *Region 8 Forest Service Timber Purchasers Council v. Alcock*, 993 F.3d 800, 806 (11th Cir. 1993). Any order "adjudicating the rights and liabilities of fewer than all the parties" is interlocutory. *Supreme Fuels Trading FZE v. Sargeant*, 689 F.3d 1244, 1246 (11th Cir. 2012); Fed. R. Civ. P. 54(b). Here, the Court's orders initiating a claims process expressly leave open Defendants' total repayment obligations, requires further briefing, and contemplates entry of a final order following conclusion of a claims process. Verdict and Order (ECF No. 579) at 45 (amount to be paid "will be determined after the claims process is concluded"); Claims Process Order (ECF No. 607). The orders requiring a claims process are by their terms not final, and the Court may thus reconsider them at any time, on its own authority and its ongoing authority to oversee the receivership. *See Region 8*, 993 F.3d at 806 (authority to reconsider interim orders); *SEC v. Elliott*, 953 F.2d 1560, 1577 (authority to supervise receivership). The new evidence discussed herein provides good cause to reconsider those orders.

## New Evidence Regarding Insufficiency of Notice

The notice emails sent to each eligible victim failed in two ways: first, by failing to reach the majority of the victims through two kinds of delivery failures, and second, by failing to communicate clearly what transaction victims should identify as satisfying or unsatisfying.

1. **Undelivered Messages**

First, the claims agent's data shows a large proportion of the notice emails never reached victims' email services at all, with extremely high "bounce" (or undelivered) rates. The initial emails were not delivered to thirty percent of the victims, or 3,654,785 people. Waldrop Decl. (Exh. A) Att. 2 (see "soft bounce," "null," and "hard bounce" numbers in first column). Almost 12%, or 1,413,314, of the victims' email addresses could not receive emails at all, meaning delivery to those email addresses permanently failed and those victims cannot receive any future attempted emails. *Id.* (see "hard bounce" numbers in first column). A large percentage of the

victims have thus received no notice and had no opportunity to file their claims and receive the redress they are owed.[3]

Noting the issue with "bounced" emails, the Receiver has begun sending text messages to certain of the "bounced" victims containing the statement, "Legal Notice of a Claims Process: To learn more about the Federal Trade Commission v. On Point Global, LLC claims process, visit [link to FTC site]." Waldrop Decl. (Exh. A) Att. 3 p. 1.  Text messages will not resolve the email delivery failure for several reasons.

First, almost a million victims who received no notice email did not provide a telephone number when Defendants took their money and data, and thus the Receiver cannot send these victims any texts.[4]  Waldrop Decl. (Exh. A) Att. 2 (chart displaying number of total records and "phone number available" records in each delivery status category; difference between total and phone-available in bounce and null categories is 968,252 ).

Second, delivery rates for the text campaign indicate about 15% of the texts were "hard bounces," meaning no messages can successfully be delivered to those phone numbers.  Waldrop Decl. (Exh. A) Att. 3 p. 2.  This is not surprising, given that the parties have no way to know if the phone numbers victims originally provided are cell phones or land lines, or have gone out of service since the victims provided them. [5]

Third, the data the parties are already receiving from victims who have received the texts show they mistrust and disregard an unsolicited text referencing a "claims process" and a set of

---

[3] The claims agent removed the email addresses to which delivery permanently failed before attempting further rounds of emails.  See Waldrop Decl. (Exh. A) Att. 1 p. 8 ("Due to the fact that the recipient domains are reporting that these addresses are 100% not deliverable by any sender, we suggest removing these from the second round of notification to improve our delivery speed and quality.").  Doing so changed the denominator for calculating bounce and delivery rates, including in the third round of attempted email delivery described below.  Id. Att. 3 p. 2 (showing changes in bounce and delivery rates between initial emails and later attempts).  "Improvements" created by simply removing the email addresses for victims to whom delivery failed, however, are illusory, and do nothing to provide notice to the victims whose email addresses were cut from further campaigns.

[4] During telephonic conferral on May 10, the Receiver indicated a potential openness to sending mail notices to victims whose emails bounced and who did not provide phone numbers, but has not yet determined whether and to what extent she would agree to do so.

[5] Mailing addresses may at least be updated using public records databases through "skip tracing;" no similar method exists to update an individual's cell phone number or email.  Christ Decl. (Exh. D) ¶17.

unfamiliar names, and asking them to click an unknown link.[6]  *See* Christ Decl. (Exh. D) ¶15; Waldrop Decl. (Exh. A) Att. 3 p. 2 (initial text data), Att. 7 (complaints regarding texts).  About one in five text recipients have already unsubscribed or opted out (a process like that of flagging an email as spam), and the FTC has begun to receive complaints from victims reporting the messages as spam and potential fraud.  Waldrop Decl. (Exh. A) Att. 3 p. 2 (text opt-out rate is 21% among paid-guide victims and 13% among freemium victims), Att. 7 p.1 ("I am not sure if this is fraudulent or legit.  I have not clicked on any links").  Moreover, complaints from victims show that, in addition to the wording the Receiver proposed to include, many of the texts contain the line "You've agreed to receive messages from Stretto on behalf of On Point."  Waldrop Decl. (Exh. A) Att. 7 pp. 1, 5, 7, 9.  This is confusing and concerning to victims, who have no reason to know the names Stretto or On Point.  *Id*. p. 9 ("I got a text saying I opted into text but I never did. … I replied STOP.  Im concerned someone could be using my information.").  It is not surprising the texts are not having their intended effect; text messaging spam is increasing rapidly, as the rising number of complaints about such spam to the FTC each year attests.  *Id*.  Further, the victims receiving the texts are the same people Defendants sent "a barrage of text messages" linking to Defendants' own deceptive websites.  Verdict and Order (ECF No. 579) at 42.  Defendants' victims are thus even more likely than the public at large to be wary of unsolicited texts asking them to click a link for no stated reason.

    Finally, the limitations of text message tracking will prevent the parties from ever knowing if the victims who theoretically "received" the texts ever read them.  Unlike emails, with capability to provide "open" and "click" rates, the claims agent stated to the FTC that texts cannot track whether recipients, for example, click the links they contain or delete the texts unread.  The failure of the attempted email delivery was at least ascertainable through tracking metrics; the likely failure of text message noticing will not be, leaving potentially hundreds of thousands of victims with no way to claim the redress they are due.

---

[6] The Receiver agreed to include a link to the FTC's .gov pages hosting links to the claims page, rather than the generic .com site created to host the claims page.  The FTC and Receiver hoped the use of a .gov link may partially mitigate consumers' appropriate suspicions of unsolicited texts, but as discussed herein, text unsubscribe rates and complaints indicate this has not made a significant difference.

## 2. Messages Diverted to Spam Folders

Further data and information from the FTC investigator's undercover email addresses also demonstrate that even "delivered" emails were diverted to hidden spam folders, both in the initial notice campaign and during the ongoing attempt at re-delivery. First, the email campaign data revealed exceptionally low "open" rates, or the rate at which recipients verifiably opened the emails. The claims agent observed[7] that only 2.52% of victims who were counted as having "received" the initial notice emails verifiably opened them. Waldrop Decl. (Exh. A) Att. 1 p.1; *see also id*. Att. 2 (average open rate following averaging of initial notice emails was 2.71%). This open rate is 13 times lower than open rates from comparable FTC email campaigns, including claims process notice campaigns, and 8 to 12 times lower than email-marketing industry open rates. Christ Decl. (Exh. D) ¶¶7-13. Second, the FTC's investigator has three email accounts that are on the Receiver's distribution list, because she conducted undercover transactions with those emails during the FTC's investigation. Freeman Decl. (Exh. C) ¶¶4-5. The investigator observed that none of these addresses (all Gmail addresses) received the notice emails in their inboxes. *Id*. ¶¶6, 11, 13. She checked the addresses' spam folders, which in Gmail accounts requires consumers to navigate to a hidden menu, and found that all six of the notice emails to the undercover accounts were diverted as spam.[8] *Id*. ¶¶7-10, 12, 14. The FTC therefore contacted Gmail and Yahoo,[9] which provide services to a combined 80.5% of the eligible victims. Miles Decl. (Exh. B) ¶¶3-4 (@gmail.com, @yahoo.com, @aol.com, and @verizon.net emails constitute 80.5% of the eligible list); Waldrop Decl. (Exh. A) Att. 5 (Yahoo services @yahoo.com, @aol.com, and @verizon.net email addresses). Gmail confirmed that the "vast majority" of the notice emails to their customers were diverted as spam, and Yahoo

---

[7] Measurement of email open rates is imperfect, because the tracking technology may be blocked by firewalls. *See* Waldrop Decl. (Exh. A) Att. 1 p. 1. The FTC therefore compares the confirmed open rate to industry benchmarks and comparable FTC email campaigns rather than drawing conclusions from the notice campaign's 2.52% confirmed open rate standing alone.

[8] A victim the FTC reached by phone confirmed her notice emails also went to her Gmail account's spam folder, and she thus did not see them until the FTC called to ask her about the emails and asked her to look in her spam folder. Dembe Decl. (Exh. E) ¶2.

[9] Yahoo's representative informed the FTC that Yahoo services both @yahoo.com and @aol.com email addresses.

confirmed the same happened to 65.45% of the emails to their customers.[10]  Waldrop Decl. (Exh. A) Att 4, Att. 5.  Delivery thus failed not only to the third of victims whose initial notice emails went undelivered, but also to the vast majority of the remainder, whose notices were diverted as spam rather than landing in their inboxes.

The Receiver has begun sending additional emails to victims, other than those whose emails were undeliverable as discussed above, in an attempt to address the spam-blocking problem.  Waldrop Decl. (Exh. A) Att. 2, Att. 3 p. 2.  Unfortunately, initial results show this new campaign is meeting the same obstacles as the first.  The Receiver and claims agent expressed hope that a second email campaign will succeed where the first failed because the emails will be sent more slowly this time, and because the claims agent followed up with the two email providers the FTC identified to ask them not to block the new notice emails.[11]  Despite these efforts, open rates and click rates are presently even lower than in the first campaign, indicating inbox delivery has not improved.  Waldrop Decl. (Exh. A) Att. 3 p. 2 (of 1,408,681 new emails "delivered," open rate is 0.6% and click rate is 0.02%).  Most notably, the FTC's investigator found that two of her three undercover accounts were sent the new emails during the second campaign – and they were diverted to the hidden spam folder, just like the notice emails from the first campaign.  Freeman Decl. (Exh. C) ¶¶15-19, Atts. D-E.  These indicators show that the re-delivery campaign is no more successful than the first email campaign, still leaving the vast majority of victims with no notice of the claims process.  Further, even if a new round of emails could achieve perfect or even majority delivery – an impossibility, given the extensive, ongoing delivery problems and very large number of victims to be noticed – the text of the email would still cause the confusion described below.

---

[10] The FTC provided the information it received from Gmail and Yahoo to the Receiver and claims agent, who referred to it when formulating their plan to re-attempt email delivery.

[11] Both email providers the FTC contacted stated the content of the email was a significant factor in activating automated spam filters; indeed, Yahoo noted that "mail like this typically seems fraudulent."  Waldrop Decl. (Exh. A) Att. 4, Att. 5.  In an effort to mitigate spam issues, the Receiver contacted two email providers and changed a few lines of the text and subject line, by adding the word "reminder" in several places and changing the line "You May Have a Claim for Payment of Money From a Lawsuit" to "You May Have a Claim From the Lawsuit."  Waldrop Decl. (Exh. A) Att. 3 p. 1.  Unfortunately, as discussed above, these changes proved insufficient to significantly improve inbox delivery.

### 3. Consumer Confusion Regarding Claims Notices

The email metrics, reports from email providers, and reports from victims demonstrate a second problem with the notices: even when the emails reached victims' inboxes, they did not successfully communicate what transaction they referenced. As courts and the FTC have often observed, it is not uncommon for the recipients' actual perceptions of a message to differ from the message the sender intended to convey. FTC Policy Statement on Deception (appended to *Matter of Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)) (advertiser is liable for all reasonable interpretations of an advertisement); *FTC v. Freecom Comm'cns., Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005) (deception analysis turns on effect the claim had on consumers who heard it; representation may be deceptive regardless of the maker's intent). Here, evidence of victims' understanding of the notice emails, which could not exist before those emails were sent, illustrate how efforts to communicate a desired message can fall short.

Victims who actually opened the emails – like the email providers' spam algorithms – identified the notice emails as illegitimate at an unusually high rate and clicked on the links at an unusually low rate. This demonstrates a misunderstanding of why they were sent and who sent them. Among the small subset of victims who opened the first round of notices, at least 1.17% manually identified them as spam upon reading them. Waldrop Decl. (Exh. A) Att. 2; Christ Decl. (Exh. D) ¶14. This is approximately double the rate at which recipients in comparable FTC email campaigns report emails as spam. Christ Decl. (Exh. D) ¶14. Further, the first notice emails' click rate was far lower than the click rate for comparable FTC email campaigns, and the second campaign's rate, while preliminary, is lower still. *Id.* ¶¶7-14 (initial campaign rate comparisons); Waldrop Decl. (Exh. A) Att. 1 p. 1 (initial campaign open rate was 2.52% and click rate was 0.07%), Att. 2 (average of initial campaign open rate was 2.71% and open rate was 0.07%), Att. 3 p. 2 (new email campaign open rate is click rate is 0.59% and click rate is 0.02%). The high rates at which victims misidentified the notice emails as fraudulent, and low rates at which they opened the emails and clicked the links, indicate problems with even the delivered emails. Christ Decl. (Exh. D) ¶14. Indeed, some victims actually reported the notice emails to the FTC's database of spam as a potential scam. *Id.*; Waldrop Decl. (Exh. A) Att. 6.

Examination of reports from victims identifies some of the ways in which the notices confused them. First, victims did not recognize the name "On Point Global." Dembe Decl. (Exh. E) ¶4 ("The name 'On Point Global' does not mean anything to me."); Waldrop Decl.

8

(Exh. A) Att. 6 p. 3 ("I HAVE NO RECOLLECTION OF THIS COMPANY AT ALL."), p. 12 ("I have no recollection of ever being on any network or website run by On Point Global, LLC"). It makes sense that victims do not know this name, because it was not used on the consumer-facing websites that duped victims into paying money and providing personal data. *See, e.g.*, PX1C1, 1C2, 1J, 1N, 1Q, 1U, 1W (ECF Nos. 584-1, -2, -6, -7, -8, -9, -10) (Defendants' websites and marketing materials did not use the name "On Point Global").

Second, victims did not connect the notice's description of a claims process from a lawsuit to their stymied efforts to, *e.g.*, renew drivers' licenses or find out if they were eligible for public benefits on Defendants' sites. Waldrop Decl. (Exh. A) Att. 6 pp. 3, 12; Dembe Decl. (Exh. E) ¶4 ("Even if the claims process emails had arrived in my inbox instead of my spam folder, I do not think I would have realized what they were about or opened them.").

Third, the content of the emails led victims to believe the emails were "phishing" for personal data, much as Defendants did in their original scheme. Dembe Decl. (Exh. E) ¶3 ("I have been trained to recognize phishing emails at work, and the emails about the claims process raised several red flags for me."); Waldrop Decl. (Exh. A) Att. 6 p. 1 ("Very slick phising [sic] email invoking the FTC."), p. 3 (victim who received email was suspicious and "searched the FTC website for a phishing address"), p. 11 ("Uncertain if this is a legitimate communication or not."). Indeed, one victim was so mistrustful of the notice email that she did not feel safe filing a claim, even though she was dissatisfied that she "got scammed" on Defendants' sites, because she did not want to risk further compromising her information. Dembe Decl. (Exh. E) ¶5. These reports indicate even victims who received and read the notice email did not understand what it is about; such victims have not received sufficient notice any more than those who never received an email at all.

### The Claims Process Has Not Satisfied Contempt Remedies Law

The Court ordered the claims process specifically to identify and quantify which victims were dissatisfied with Defendants' failure to deliver what they promised. Verdict and Order (ECF No. 579) at 44. That process is premised on assumptions that victims will receive the notice, understand which transaction it is asking them about, and choose whether to file a claim based on whether they were satisfied or dissatisfied with that transaction. Here, however, the notice is not reaching victims, is unsuccessful in identifying the relevant transaction, and is leading victims and email providers to believe it is part of a phishing scheme. Under these

circumstances, the claims process cannot even remotely approximate the amount of harm Defendants' scam caused, let alone provide a "fair equivalent," and it thus cannot provide an appropriate contempt remedy. *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000) ("There can be no equity in a compensatory award except as it provides a fair equivalent for some loss.") (cleaned up); *see also McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 193 (1949) ("And the grant or withholding of remedial relief is not wholly discretionary with the judge … The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief.").

Indeed, as the Court found, Defendants' scam caused up to $102,768,235.47 in consumer harm to millions of victims, and Defendants could provide only unidentified "anecdotal" evidence that some consumers were satisfied, which was insufficient to allow the Court to quantify satisfaction. Verdict and Order (ECF No. 579) at 2, 42-44. By contrast, the claims process as of May 12, when the claims agent last provided updated information, stands to compensate a maximum of 22,623 victims to the tune of $412,786 – less than half a percent of the total number of victims or amount of harm.[12] Waldrop Decl. (Exh. A) Att. 3 p. 1. Any equity-based concern about providing a $25 windfall to a handful of satisfied customers pales in comparison to denying compensation to millions of dissatisfied victims because they did not respond to an email they never received, could not understand, or did not trust.

### Proposed Remedies for Delivery Failures and Consumer Confusion

To address these significant problems, the FTC first outlines two proposed changes to the claims process that would at least partially address the issues above, and then proposes an alternative that would fully address the problems and bring the contempt remedy into compliance with Eleventh Circuit law.[13]

---

[12] Notably, comparable FTC-run email-notice claims processes resulted in claims rates of 9.95%, many times higher than this claims process' rates, further underscoring the delivery issues and confusion among victims who received the notices. Christ Decl. (Exh. D) ¶8.

[13] The FTC attaches alternate proposed orders, one for each of the alternative remedies it outlines here.

To partially address the problems that arose in delivery, the notices could be delivered by mail.[14] Mail delivery does not risk any spam filtering issues, thus resolving the single largest hurdle to delivery. Additionally, any mail delivery problems are easily flagged, because the Postal Service returns undeliverable mail. Returned mail can thus be remedied through the common practice of "skip tracing" to identify updated addresses. Christ Decl. (Exh. D) ¶17. Mailed notices could make use of FTC letterhead, at least partially addressing victims' suspicions of the generic "noreply@onpointclaimform.com" sender address used for the email notices. The FTC's research and experience consistently demonstrate much higher engagement with mailed notices than with emailed notices. *Id*. ¶16.

Second, the FTC proposes that any further notices and claim forms be revised to clarify the issues observed in reports from email providers and confused victims. Exhs. F, G (proposed revised notice and claim forms).[15] Specifically, the FTC proposes the attached notice text to better inform victims why they are receiving the notice and trigger their memories of the relevant transaction, rather than relying on company and agency names with which they are unfamiliar.[16] Recipients could file a claim either by returning the proposed mail claim form, or by visiting a claims website, entering their email address as claimant ID, clicking a checkbox to denote if they were unsatisfied with their transaction, and choosing a payment method.

These two proposed changes cannot fully resolve the inherent legal and factual problems an opt-in claims process presents in this case. Such a process still improperly transfers the

---

[14] If the Court orders that a claims process should continue with changes in delivery methods or text, the FTC proposes the deadlines in the Court's Claims Process Order (ECF No. 607) be reset to ensure victims have the full 90-day period after receiving notice to file claims.

[15] Per the Receiver's request during conferral, the FTC provided the text of the proposed revised notice and claim form to the Receiver on Friday, May 13, 2022. On Monday, May 16, the Receiver noted she will provide her position on the proposed text when responding to the FTC's motion.

[16] The FTC drafted the proposed revised notice and claim materials to fit an "opt-in" campaign, where victims would report dissatisfaction with the transaction to claim their redress; the revised materials could readily be edited to fit an "opt-out" campaign, where victims would report satisfaction with the transaction to remove themselves from the redress list. For all the reasons stated in the FTC's original objection to an opt-in claims process, *see* ECF No. 600, an opt-out claims process remains both more equitable and legally appropriate method than an opt-in process. Neither an opt-in nor opt-out process, however, can succeed without properly delivered notices that successfully communicate the premise of the claims process, necessitating changes to the notice forms and process regardless.

burden of demonstrating satisfaction from the wrongdoers in this case to their victims. *See* Verdict and Order (ECF No. 579) at 42 (once FTC establishes presumption of reliance, "[t]he burden then shifts to the Defendants to disprove this reliance on a consumer-by-consumer basis. … Specifically, the Defendants are only permitted to demonstrate 'that individual transactions were atypical and resulted in a lower-than-expected gain to the wrongdoer.'"), 43 (holding the FTC established the presumption). Moreover, given the struggles with notice delivery and comprehension, a claims process will continue to dramatically undercount dissatisfied victims.

To fully address these issues, then, the Commission proposes an alternative approach consistent with the applicable legal framework and utilizing the known "anecdotal" evidence of satisfaction the Court cited in its Verdict and Order. The problems with the claims process here illustrate why the Eleventh Circuit and multiple other circuits apply the presumption of consumer reliance and burden-shifting framework this Court cited in its post-trial decision. Verdict and Order (ECF No. 579) at 42-44. As circuit courts have observed, scams that victimize large numbers of consumers (here, approximately twelve million, or more than 3% of the U.S. population) make it impossible to establish with precision whether each affected individual was duped by and dissatisfied with the scam. *See FTC v. Kuykendall*, 371 F.3d 745, 765 (10th Cir. 2004) ("To the extent the large number of consumers affected by the defendants' deceptive trade practices creates a risk of uncertainty, the defendants must bear that risk."). Quantifying relief in such large-scale scams therefore involves inherent uncertainty. Courts must then decide whether to place the burden of that uncertainty on the victims, by requiring them to demonstrate one-by-one that they were dissatisfied, or on the wrongdoers, by making them demonstrate one-by-one which of their victims were satisfied. *Id*.

All circuits that have addressed this question have clearly placed the weight of that uncertainty on the wrongdoer and not their victims, as long as the FTC (as it did here) proves the fraud was widespread and makes a reasonable approximation of the resulting harm. *See McGregor*, 206 F.3d at 1388 (applying presumption that each purchasing consumer relied on the misrepresentations); *Kuykendall*, 371 F.3d at 765 (applying presumption and permitting offsets only with consumer-by-consumer proof of satisfaction); *FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 244-45 (2d Cir. 2014) (same); *see also Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946) ("The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created."); *FTC v.*

12

*Febre*, 128 F.3d 530, 535 (7th Cir. 1997) (under FTC Act, "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created the uncertainty.") (internal citation omitted); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, (8th Cir. 1991) (under FTC Act, finding agency need not prove subjective reliance by each consumer because that would be "virtually impossible" and "inconsistent with the statutory purpose"); Verdict and Order (ECF No. 579) at 41 (finding the FTC established the presumption and shifting burden to Defendants to prove consumer satisfaction on individual basis).

      The noticing efforts in this case have provided the clearest possible illustration of the uncertainty Defendants themselves created by victimizing a vast number of consumers, and thus of the reasons behind the required presumptions and burden-shifting. As this Court noted in post-trial ruling, a court entering contempt remedies is sitting in equity. Verdict and Order (ECF No. 579) at 43 (declining to apply presumptions due to concerns it would "result in an inequitable result."). Given the claims process' overwhelming failure to reach the victims, failure to apply this law here will deny the vast majority of Defendants' dissatisfied victims any redress. *See* Waldrop Decl. (Exh. A) Att. 3 p. 1 (payment of all claims made to date would compensate 22,623 victims out of 12 million, and return $412,786 of approximately $102 million lost). Denying redress to 97% of Defendants' victims to avoid a speculative possibility of a windfall to the remaining 3% would be massively inequitable and thus not a proper remedy for contempt. *See* n. 17 *infra*, (Defendants' anecdotal evidence that Court credited counted a maximum of 304,086 satisfied consumers out of 12 million); *McGregor*, 206 F.3d at 1388 ("no equity in a compensatory award" unless it provides "fair equivalent" for loss); *McComb*, 336 U.S. at 193.

      Instead, to fully resolve all of these issues, the FTC proposes the Court order a monetary contempt remedy in the full amount the FTC proved, minus consumers identified in evidence presented at trial as "satisfied." *See* Verdict and Order (ECF No. 579) at 41-42 (establishing baseline for relief amount). To address the Court's concerns about windfalls to satisfied consumers, the Court could identify the "anecdotal" evidence of consumer satisfaction referred to in the post-trial verdict and subtract any consumers identified in that evidence, and the amounts they paid, from the baseline.[17] This would resolve both the legal issues raised in the

---

[17] Based on the Court's explicit rejection of several of the "satisfaction" arguments Defendants offered, it appears the Court's reference to "anecdotal" evidence of satisfaction may refer to two

FTC's original objection to the claims process, and the factual and equitable problems the conduct of that process has made plain.

## Local Rule 7.1(a) Statement

Following extensive conferral with FTC counsel by telephone and email, the Receiver stated her position on the relief the FTC seeks as follows: "The Receiver and the independent claims agent (Stretto) conferred extensively with the FTC by telephone and email regarding the delivery and results of the notice emails throughout April and May 2022, and on the FTC's potential motion several times by telephone and email during the week of May 9. The Receiver analyzed the data from the initial rounds of e-mail and after consulting with the FTC and notifying all parties, began additional notice by e-mail and SMS to consumers to improve deliverability of the Court approved notices to the maximum extent possible under the circumstances. The Receiver states that the data is improving and she does not believe it is necessary to replace the claims process with direct redress payments. The Receiver states she does not agree with the provision of mailed notice, except as to consumers whose emails could not be delivered and who could not be reached by SMS notice. For that subset of consumers who could not be reached based on digital information they provided, and for which the Receiver has a physical address, she proposes to send a post card with a QR code that links to the appropriate claim form. The Receiver will seek approval of that form postcard notice forthwith. Regarding the FTC's proposed revised mail notices, the Receiver is willing to consider some of the proposed alternative language in her forthcoming additional rounds of e-mail notice and will

---

categories: (1) consumers who responded to Defendants' emailed "survey" asking their victims if they were satisfied; and (2) consumers who called Defendants' telephone numbers for reasons other than requesting refunds. Verdict and Order (ECF No. 579) at 9, 25. While the FTC maintains that neither constitutes reliable evidence of consumer satisfaction, if these are the pieces of evidence the Court found credible, both should permit ready identification of the consumers they cover. First, Defendants should have records of which consumers responded to the "survey," as they were able to present its results, and the Court can order those who stated they were satisfied excluded from relief. These include approximately 3,836 consumers who stated they were satisfied. *Id*. at 9 (80.49% of the 4767 "survey" respondents stated they were satisfied). Second, Defendants also should have records of the calls to their customer service center, as they were able to present testimony about these calls, permitting exclusion of any who called for reasons the Court finds evidenced satisfaction. These include approximately 300,250 paid-guide victims, representing $6.9 million in revenue. *Id*. at 25 (approximately 25% of the approximately 1,201,000 paid-guide victims who called the call center did so for reasons other than requesting a refund).

propose same in response to the FTC's Motion, however, having just received the proposed language and having not yet received the FTC's Motion, she needs additional time to do so."

Counsel for the FTC conferred with counsel for the individual defendants who will be jointly and severally liable for any monetary relief (Burton Katz and Brent Levison) via email on May 12, 2022. Counsel stated their clients oppose the FTC's motion.

Counsel for the FTC conferred with counsel for the corporate defendants by telephone on Friday, May 13, 2022. Counsel stated their clients oppose the FTC's motion.

Dated: May 16, 2022              Respectfully submitted,

                                 */s/ Sarah Waldrop*
                                 Sarah Waldrop, Special Bar No. A5502583
                                 (202) 326-3444; swaldrop@ftc.gov
                                 Sana Chaudhry, Special Bar No. A5502350
                                 (202) 326-2679; schaudhry@ftc.gov
                                 Christopher Erickson, Special Bar No. A5502434
                                 (202) 326-3671; cerickson@ftc.gov
                                 Federal Trade Commission
                                 600 Pennsylvania Ave. NW, CC 9528
                                 Washington, DC 20580
                                 Facsimile: (202) 326-3197
                                 Attorneys for Plaintiff, Federal Trade Commission

## CERTIFICATE OF SERVICE

I hereby certify that on May 16, 2022, I served a true and correct copy of the foregoing and all related documents via this Court's CM/ECF filing system on all counsel of record.

                                 */s/ Sarah Waldrop*
                                 Sarah Waldrop