IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-25046-Civ-Scola

FEDERAL TRADE COMMISSION,

        Plaintiff,

v.

ON POINT GLOBAL LLC and others,

        Defendants.
_____/

## RECEIVER'S FINAL STATUS REPORT

Melanie E. Damian, the court-appointed Receiver (the "Receiver") in the above-captioned enforcement action ("FTC Enforcement Action"), submits her final status report concerning the status of the Receivership for the period from October 1, 2022 through December 1, 2022, the date of partial discharge of the Receiver (the "Reporting Period").

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................................3

II. PROCEDURAL BACKGROUND AND APPOINTMENT, DUTIES
    AND DISCHARGE OF RECEIVER ....................................................................................4

    A. The TRO, Appointment of Receiver, and Preliminary Injunction      4

    B. Receiver's Periodic Status Reports ....................................................................5

    C. Verdict and Order Following Non-Jury Trial, Permanent Injunction,
       and Claims Process .............................................................................................5

III. STATUS AND ACTIVITIES OF THE RECEIVERSHIP
     (OCTOBER 1, 2022 THROUGH DECEMBER 1, 2022) ..........................................7

    A. Updated Accounting of Receivership Assets................................................. 7

    B. Asset Recovery and Preservation Efforts ....................................................... 8
       i.  Claims Against Former Counsel ............................................................. 8
       ii. Agreement to Purchase Domain Names.................................................. 8

    C. Court-Approved Claims Process....................................................................  9

    D. Ongoing Management and Administration of On Point and
       Its Operations .................................................................................................13
       i.  Modified Website Templates and Compliance with Amended
           Permanent Injunction ............................................................................13
       ii. Further Consumer Protection and Compliance Measures
           of On Point and its Affiliates ................................................................13
       iii.Customer Communications, Refunds, and Complaints..............................14
       iv.Wind-Down of E-Commerce Business .....................................................14

IV. CASH ON HAND AND EXPENSES OF RECEIVERSHIP ESTATE.....................14

V. ASSISTANCE FROM RECEIVER'S FORENSIC ACCOUNTANT .......................15

I.   **INTRODUCTION**

During the Reporting Period, the Receiver, with the assistance of her legal counsel and other professionals, continued to exercise control of all Receivership entities and their assets and business operations and has worked diligently with counsel for the Federal Trade Commission (the "FTC") and counsel for Defendants to fulfill her duties under the Amended Permanent Injunction until the Order Granting Receiver's Motion for Partial Discharge [ECF No. 656] ("Discharge Order").  Pursuant to the Discharge Order, this will be the Receiver's final Status Report.  After the Receiver has sent out all distributions to consumers with allowed claims and returned any remaining funds to On Point Global, LLC ("On Point"), the Receiver will file one final report summarizing the outcome of the claims and distribution process (and potentially the resolution of the one outstanding Receivership lawsuit).

During the Reporting Period, the Receiver continued to work with counsel for the FTC and counsel for the Defendants as well as On Point employees to ensure that the Corporate Entities[1] remain in compliance with the terms of the Amended Permanent Injunction that the Court entered on November 16, 2021 [ECF No. 582].  The Receiver also submitted a compliance report to the FTC as required by the Amended Permanent Injunction outlining all of On Point's websites and their respective business purposes and the steps taken to comply with the Court's orders approving the Receiver's modifications to the websites.  In addition to ensuring that On Point remained in compliance with the Amended Permanent Injunction, the Receiver focused on having On Point comply with all applicable FTC and other regulations while maintaining and preserving the value of the going concern.  To that end, during the Reporting Period, the Receiver and her compliance

---

[1] The entities included in the term "Corporate Defendants" are identified on pages 2-3 of the Amended Permanent Injunction.  *See* ECF No. 582.

counsel formulated extensive procedures and protocols to ensure On Point's continued compliance with all applicable laws and regulations and the Amended Permanent Injunction and carried out compliance training sessions with On Point employees. In addition, in an abundance of caution for the going concern, the Receiver together with On Point's stakeholders wound down all the company's e-commerce business.

Further, during the Reporting Period, the Receiver continued to work to implement and monitor the progress of the Court-approved claims and distribution process with her claims and distribution agent, Stretto, and counsel for the FTC. In particular, the Receiver, through Stretto, sent out postcard notices to On Point's customers for whom she had or could locate a physical address, who had not yet filed claims or opted out of the claims process. The Receiver worked with Stretto to assist potential claimants in submitting online claims and set up a technical support call center and email response service to address claimant inquiries and technical problems. Finally, the Receiver and Stretto implemented procedures for collecting, reviewing, and making determinations on verified and unverified claims and continued making distributions to verified claimants pursuant to this Court's previous Orders.

## II. PROCEDURAL BACKGROUND AND APPOINTMENT, DUTIES AND DISCHARGE OF RECEIVER

### A. The TRO, Appointment of Receiver, and Preliminary Injunction

On December 13, 2019, the Court entered the Temporary Restraining Order ("TRO") appointing the Receiver and setting forth her duties and powers in this case. *See* ECF No. 17.

On January 14, 2020, following the evidentiary hearing on the FTC's motion for preliminary injunction, the Court entered the Preliminary Injunction, which, among other things, extended the relief granted in the TRO and the Receivership. *See* ECF No. 126.

### B. Receiver's Periodic Status Reports

On January 9, 2020, the Receiver filed her Initial Status Report, which described in detail the Receiver's initial efforts to carry out her duties and obligations as set forth in the TRO as well as her recommendations regarding the Defendants' business, continued operation and modification thereof, and the status of the Receivership Estate.  *See* ECF No. 108.

The Receiver has filed quarterly status reports[2] detailing, among other things, the Receiver's continued efforts to carry out her duties and obligations as set forth in the TRO and the Preliminary Injunction as well as her efforts to continue to operate the Defendants' business in compliance with FTC regulations and this Court's Orders through implementation of updated and robust consumer protection policies and claims process.  *See* ECF Nos. 108, 210, 271, 307, 343, 371, 476, 543, 601, 616, 632, 638.  As explained above, although this will be the Receiver's final quarterly status report, she will file one additional report upon completion of distributions to all consumers with allowed claims, advising the Court of the conclusion of the claims and distribution process.

### C. Verdict and Order Following Non-Jury Trial, Permanent Injunction, and Claims Process

As previously reported, on November 15, 2021, following the conclusion of the six-day non-jury trial, the Court entered its *Verdict and Order Following Non-Jury Trial* ("Verdict and Order"), finding among other things that the Corporate Contempt Defendants[3] are jointly and

---

[2] The Receiver's first through twelfth status reports were filed on January 9, 2020, April 24, 2020, July 27, 2020, October 20, 2020, January 27, 2021, April 27, 2021, July 29, 2021, October 20, 2021, January 20, 2022, April 20, 2022, July 20, 2022, and October 20, 2022, respectively.

[3] The Corporate Contempt Defendants include the following Entity Defendants: On Point Global LLC; On Point Employment LLC; On Point Guides LLC f/k/a Rogue Media Services LLC; DG DMV LLC; Waltham Technologies LLC; Cambridge Media Series LLC f/k/a License America Media Series LLC; Issue Based Media LLC; Dragon Global LLC; Dragon Global Management

severally liable for an amount not to exceed $102,768,235.47 in compensatory contempt remedies. *See* ECF No. 579. The Verdict and Order directed the Receiver to formulate and submit to the Court for approval a claims process and distribution plan for purposes of determining the customers who were dissatisfied with the guides provided by, and/or their interactions with, On Point and making distributions to the dissatisfied customers. *See* ECF No. 579.

On that same date, the Court also entered the Amended Permanent Injunction which, among other things, imposed certain restrictions on On Point's business. The Receiver, with the assistance of her compliance counsel and On Point employees, worked to implement the provisions of the Amended Permanent Injunction and continued to closely monitor the operations of On Point to ensure its compliance therewith and with applicable laws and regulations. *See* ECF No. 582. Robust compliance review was continued as well as mechanisms and trainings to assist the company to maintain such compliance when the company is transitioned out of Receivership, as described in further detail in Section III.E. below.

On December 16, 2021, the Receiver filed her Claims Process Motion [ECF No. 596]. On February 10, 2022, the Court entered its Order granting the Receiver's Claims Process Motion (the "Claims Process Order"), authorizing the Receiver to institute the Court-approved claims process using third-party noticing, claims and distribution agent service, Stretto, to assist the Receiver to compile and finalize the lists of customers to which notice of the claims process would be provided, to send out the notices to customers, to prepare the online claims portals and proof of claim forms through which customers will submit claims, and to distribute amounts to customers based on the extent to which they were harmed. *See* ECF Nos. 596, 607.

---

LLC; Dragon Global Holdings LLC; Direct Market LLC; Bronco Family Holdings LP a/k/a Bronco Holdings Family LP; and each of their subsidiaries, affiliates, successors, and assigns (collectively, the "Corporate Contempt Defendants").

6

During this Reporting Period, the Receiver carried out the claims process and began making distributions to claimants holding allowed claims as described in Section III.D. below.

### III. STATUS AND ACTIVITIES OF THE RECEIVERSHIP (OCTOBER 1, 2022 THROUGH DECEMBER 1, 2022)

The Receiver provides herein a detailed description of the status of the operations and assets of the Receivership Estate during the current Reporting Period.

#### A. *Updated Accounting of Receivership Assets*

The Receiver attaches the Q4 Cash Receipts and Disbursements reflecting the cash operations of the Receivership entities from October 1, 2022 through the Discharge Order.[4] *See* **Exhibit "A"**. The Receiver attaches the Q4 Consolidated Income Statement for October 1, 2022 through December 1, 2022 and the Balance Sheet for the time period ending on December 1, 2022 as **Exhibit "B"**.[5]

As of the Discharge Order, the Estate held $21,014,294.38 in the reserve account and $10,545,225.48 in the operating account. The Receiver will, pursuant to the Discharge Order, reserve funds to make all distributions and return the remaining funds to the entities, which are now operated and controlled by their owners.

---

[4] The Receipts and Disbursements are in a summary form because individual entries would be voluminous and reveal, *inter alia,* personnel data. The Receiver can make more detailed information available to the Court *in camera* upon request for same.

[5] The Q4 Consolidated Income Statement reflects revenue figures compiled on an accrual basis rather than a cash basis. The Balance Sheet reflects the company's accrued expenses. The Receiver disagrees with accruals and does not attest to the accuracy of such item or its effect on the Balance Sheet.

### B. Asset Recovery and Preservation Efforts

####  i. Claims Against Former Counsel

As long as the limited Receivership continues, the Receiver will continue to work with her counsel to pursue certain claims against On Point's former counsel as authorized in the Discharge Order. During the prior reporting period, the Receiver engaged in pre-suit mediation with one of On Point's former counsel to attempt to resolve the Estate's claims before pursuing time-consuming and costly litigation. However, the parties could not come to an agreement. As such, on August 16, 2022, the Receiver filed her Complaint against On Point's former counsel. During the Reporting Period, the Receiver reviewed additional documents regarding former counsel's representation of On Point and made significant revisions to the Complaint, and on November 14, 2022, the Receiver filed her Amended Complaint against former counsel as of the date of the Discharge Order, the Receiver's counsel have agreed to pursue those claims on a contingency fee.

#### ii. Agreement to Purchase Domain Names

As detailed in the Receiver's prior Status Reports, the Receiver negotiated a modified payment plan to complete the Asset Purchase Agreement that On Point had entered into with CCH Domain Holdings, LLLP ("CCH") for the purchase of 502 domain names that have substantial value.[6] *See* ECF No. 371. This domain portfolio significantly increases the value of On Point. During the Reporting Period, the Receiver directed On Point to make the required payments to CCH pursuant to the modified payment plan and ensured that On Point continued to fulfill its obligations under the Asset Purchase Agreement as amended to effectuate the full transfer of the domain portfolio to On Point.

---

[6] As of the Discharge Order, pursuant to the negotiated repayment schedule, $11,447,448 remained due and owing to CCH inclusive of interest.

### C. Court-Approved Claims Process

The Receiver's prior status reports describe her efforts to work with her counsel, her Court-approved noticing and claims agent (Stretto), On Point employees, and the FTC's counsel, IT professionals, and redress team to implement the claims process. In particular, those reports detailed the Receiver's extensive efforts to provide adequate notice to potential claimants by way of email and, upon learning that some emails were being delivered to claimants' spam folders, the Receiver worked with the FTC's counsel to design and implement a physical noticing methodology for consumers who were not receiving the email notices. Further, the Receiver's prior status report explained that, with the assistance of Stretto, the Receiver prepared a mailing list for postcards being sent to all consumers who had provided On Point with a physical mailing address and who had not either already submitted a claim or opted out of the noticing process. The Receiver also conducted a skip tracing by phone number for all consumers with undeliverable addresses who had also provided a phone number to On Point. Those undeliverable addresses were updated to the extent a new or complete address was located using skip tracing. The skip-traced addresses were then verified using the USPS and NCOA databases and updated again, as necessary. Postcards were then mailed to those skip-traced addresses deemed deliverable by the USPS. Finally, postcards were mailed to all claimants with a complete mailing address whether deemed deliverable or not in an attempt to deliver notice to as many claimants as possible. To better accommodate consumers receiving the postcards, the Receiver set up a call center for consumers with inquiries concerning the claims process, claims submissions, or claims status, or requiring other technical support. The phone number was posted on the FTC's website and on the claims portal. To provide adequate time for these postcards to be delivered and for claims to

submit online claim forms, the Receiver sought and was granted an extension of the claims bar date to September 7, 2022. *See* ECF Nos. 634, 635.

During the Reporting Period, the FTC requested that the Receiver conduct a skip tracing and attempt to locate the remaining 2.8 million consumers who had not received a postcard because those consumers did not provide a mailing address or a phone number to On Point (or because skip tracing their phone number did not produce a mailing address) but for whom On Point obtained an e-mail address. The Receiver again agreed and began conducting a skip tracing search by email for all consumers who had only provided an email address to On Point and/or for whom the Receiver has not yet been able to locate a deliverable address. To accommodate this process, the Receiver moved for and was granted a final further extension of the claims bar date through and including October 18, 2022. *See* ECF Nos. 363, 637.

In total, the Receiver mailed 11,435,116 postcards to consumers and completed four rounds of email noticing, with more than 98% of the emails sent having a "delivered" status, and one round of SMS text message noticing.

After completing the noticing process, the Receiver conducted a review of all verified claims, removing any duplicate claims and consolidating multiple claim submissions from claimants that carried out multiple transactions with Defendants. The Receiver then deemed all of the resulting verified claims as allowed claims and began making distributions to claimants holding an allowed claim. As of the end of the Reporting Period, the Receiver had sent an initial round of payments totaling $1,351,985.79 to 68,999 claimants.

On October 28, 2022, the Receiver filed her Claims Report detailing the number and amount of claims received and outlining her claims review and determination process and the resulting number and amount of allowed and disallowed claims. After the filing of that Claims

Report, the FTC audited the Receiver's review process. During several rounds of audits wherein Stretto provided all available claimant data to the FTC, the FTC corrected certain claimant submissions and/or located additional claimant information provided in the payment method selection within the claim forms. After updating and/or correcting the personal information for those certain claimants, they were matched with customers or users in On Point's records. The Receiver then agreed to allow all such claims except those that Stretto was able to establish were duplicate claims filed by claimants who were not entitled to multiple allowed claims. By November 19, 2022, the Receiver sent out all emails notifying claimants of disallowed claims and informing them of the reconsideration process. The Receiver received 1,246 requests for reconsideration and determined that most disallowed claims should remain disallowed because those claimants failed to provide any additional information to support their claims. After the Reporting Period, the FTC continued to audit all reconsidered yet disallowed claims and all claims identified as duplicates by Stretto. The Receiver awaits the FTC's final audit review. The Receiver will continue to work with the FTC and consider approving any additional claims deemed proper by the FTC's analysThus, the reconsideration results displayed below may change following the completion of the FTC's audit of reconsidered claims.

As of the conclusion of the Reporting Period, the Receiver has processed and made her final determinations on all claims submitted as follows:

**Results of Reconsideration**

|  | Paid-Guide | | Freemium | | Total | |
|---|---|---|---|---|---|---|
| Allowed Claims | 47 | $875.14 | 228 | $3,270.00 | 275 | $4,145.14 |
| Disallowed Claims | 436 | | 535 | | 971 | $0.00 |
| **Total Reconsiderations** | **483** | **$875.14** | **763** | **$3,270.00** | **1,246** | **$4,145.14** |

11

**Claim Determinations**

|  | Paid-Guide | | Freemium | | Total | |
|---|---|---|---|---|---|---|
| **Allowed Claims** | | | | | | |
| Verified Claims | 105,189 | $2,051,031.94 | 257,697 | $3,357,700.00 | 362,892 | $5,408,839.90 |
| Unverified Claims | 42,992 | $768,179.98 | 184,210 | $2,559,915.00 | 227,202 | $3,328,094.98 |
| **Allowed Claims Total** | **148,181** | **$2,819,211.92** | **441,907** | **$5,917,615.00** | **590,094** | **$8,736,934.88** |
| | | | | | | |
| **Disallowed Claims** | | | | | | |
| Unverified Claims | 175,268 | $406 Billion* | 340,765 | $4,725,080.00 | 516,033 | $406 Billion* |
| **Disallowed Claims Total** | **175,268** | **$406 Billion*** | **340,765** | **$4,725,080.00** | **516,033** | **$406 Billion*** |
| | | | | | | |
| Timely-Filed Claims | 323,449 | | 782,672 | | 1,106,127 | |
| | | | | | | |
| Late-Filed Claims | 96 | $1,800.21 | 33 | $385.00 | 129 | $2,185.21 |
| Allowed Late-Filed Claims | 96 | $1,800.21 | 33 | $385.00 | 129 | $2,185.21 |
| | | | | | | |
| **Allowed Claims Total** | 148,277 | $2,821,012.13 | 441,940 | $5,918,000.00 | 590,223 | $8,739,120.09 |
| **Total Claims** | 323,545 | | 782,705 | | 1,106,256 | |

### D. Ongoing Management and Administration of On Point and its Operations

      *i.     Modified Website Templates and Compliance with Amended Permanent Injunction*

During the Reporting Period, the Receiver together with her compliance counsel and On Point employees continued to monitor and update the free guides provided to consumers and to facilitate consumers' opting out of receiving e-mails or granting access to data collected. Further, the Receiver worked with compliance counsel and On Point employees to modify and monitor the previously instituted changes to On Point's business and websites made to comply with the Court's Amended Permanent Injunction, including adoption of the templates providing "Express Verifiable Authorization" with regard to consent and use of consumer data. The Receiver, with the assistance of her compliance counsel and On Point employees, continued to monitor the effects of these modifications to ensure that On Point and its websites continue to comply with the Amended Permanent Injunction until the entry of the Discharge Order. As of the filing of this Report, all compliance monitoring duties have now been turned over to the shareholders and management of On Point.

      *ii.    Further Consumer Protection and Compliance Measures of On Point and its Affiliates*

During the Reporting Period, the Receiver, with the assistance of her compliance counsel, continued to monitor and update On Point's consumer protection measures including, but not limited to, those related to third-party advertising affiliates and On Point's internal Do Not Call policies as well as TCPA and CCPA compliance, including telephone response and training of call center employees. Further, the Receiver's compliance counsel prepared a comprehensive compliance handbook and Freemium guidance memorandum to assist On Point to comply with all applicable laws and regulations and the Amended Permanent Injunction on a going forward basis.

### iii. *Customer Communications, Refunds, and Complaints*

During the Reporting Period, the Receiver and her professionals continued to monitor the customer call center, chargebacks and refunds, as well as any potential link between them and the updated freemium websites. The Receiver reviewed such data with compliance counsel no less than on a weekly basis. Also, the Receiver and her professionals monitored and responded to individual customer complaints including those based on alleged TCPA violations.

### iv. *Wind-Down of E-Commerce Business*

As explained above, together with the On Point stakeholders, the Receiver has completely terminated the e-commerce business. And following the entry of the Discharge Order, control of On Point was transitioned back to the shareholders and management.

## IV. CASH ON HAND AND EXPENSES OF RECEIVERSHIP ESTATE

As stated above, as of the Discharge Order, the Receivership Estate had cash-on-hand in the amount of $31,559,519.86 including the operating account and the reserve account for the claims process and distribution plan.

During the Reporting Period, On Point's remaining business generated substantial revenues, and from those revenues the Receiver has paid the expenses and debts required to operate the business and preserve the Estate's assets. Such expenses included payroll, rent, utilities for office locations, publishing and data expense, Google Adsense, e-commerce expense, domain hosting, maintenance fees, debt for investments in Avenue I and the domain purchase, and fees for bank account services and maintenance. *See* Exhibit A.

The fees and expenses incurred by the Receiver and her professionals during the Reporting Period are also expenses of the Estate. Pursuant to the TRO and Preliminary Injunction, the

Receiver will file an application seeking approval and payment of those fees and expenses from the funds the Receiver is retaining in the reserve account.

## V.     ASSISTANCE FROM RECEIVER'S FORENSIC ACCOUNTANT

As discussed in her prior Status Reports, the Receiver engaged Kapila Mukamal LLP (the "forensic accountants") as her forensic accountants, financial and tax consultants, and computer forensic professionals. During the Reporting Period, the forensic accountants continued to assist the Receiver in evaluating and monitoring On Point's ongoing business operations. Specifically, until the Discharge Order, the Receiver's forensic accountants reviewed and evaluated the Receivership Entities' cash projections and business plans, reviewed all payment requests for accounts payable, payroll and other costs to ensure they were legitimately incurred and within budget of the going concern, reviewed and evaluated audited financials, and participated in weekly meetings (along with the Receiver) with On Point's accounting and finance team to evaluate cash flow, periodic business plans, projections and operations. The forensic accountants also assisted the Receiver with the turnover of all financial reporting obligations to On Point's former management upon entry of the Discharge Order.

The Receiver and her counsel appreciate the opportunity to assist the Court in this matter. The Receiver is available to provide any additional transition information to the Court or the FTC and will continue to fulfill the limited duties remaining in this Court's limited Discharge Order.

Respectfully submitted this 20th day of January 2023.

                                        Respectfully submitted,

                                        /s/Kenneth Dante Murena
                                        Kenneth Dante Murena, Esq.
                                        Florida Bar No. 147486
                                        DAMIAN & VALORI LLP
                                        1000 Brickell Avenue, Suite 1020
                                        Miami, Florida 33131
                                        Telephone: (305) 371-3960

Facsimile: (305) 371-3965
Email: kmurena@dvllp.com
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic transmission via this Court's CM/ECF filing system on January 20, 2023 on all counsel or parties who have appeared in the above-styled action.

/s/Kenneth Dante Murena
Kenneth Dante Murena,
*Counsel for Melanie E. Damian,*
*Court-Appointed Receiver*